UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 11-35884-RAM |
| TOWN CENTER AT DORAL, L.L.C., *et al.*, | Chapter 11 |
| Debtors._____/ | (Jointly Administered) |

**LANDMARK AT DORAL COMMUNITY DEVELOPMENT DISTRICT RESPONSE AND OBJECTION TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363 AND 364 AND BANKRUPTCY RULES 2002, 4001, 6004 AND 6006: (I) APPROVING (A) PLAN TERM SHEET AND (B) REIMBURSEMENT OF EXPENSES; AND (II) AUTHORIZING POSTPETITION FINANCING**

**LANDMARK AT DORAL COMMUNITY DEVELOPMENT DISTRICT** (the "**District**"), through undersigned counsel, files this response and objection (the "**Objection**") to the *Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 363 and 364 and Bankruptcy Rules 2002, 4001, 6004 and 6006: (I) Approving (A) Plan Term Sheet and (B) Reimbursement of Expenses; and (II) Authorizing Postpetition Financing* [ECF No. 45] (the "**Motion**"), and respectfully states as follows:

**Introduction**

1.      An over-arching issue in this case is why the Debtors are specifically crafting a chapter 11 plan to convey to the Terra Entities[1] the Debtors' equity and (presumably) the benefit of chapter 11's cram down provisions for a so-called capital contribution likely in an amount no more than $5 million but in any event for no more than $20 million, when the Debtors' real estate alone has a tax-assessed value of approximately $36 million and the Debtors have no

---

[1]  Capitalized terms used but not defined in this Objection have the meaning ascribed to them in the Motion.

1

operations, only one "employee," and an uncertain number and amount of non-deficiency, non-insider general unsecured claims. Another issue, albeit premature, is whether such a chapter 11 plan can be confirmed. The issue in this Motion is whether the Terra Entities through a manufactured emergency should be able to lock in this deal, pay professional fees with a super-priority claim (including its own professional fees and a "management fee" to the Debtors' sole employee and insider, Issac Kodsi), and ultimately gain control over these bankruptcy cases through the DIP Loan and Term Sheet.

2. The Debtors have failed to demonstrate that the DIP Loan is appropriate under Section 364(c). The DIP Loan is not necessary to preserve the assets of the estate because it is the District, not the Debtors, that is carrying the burden of preserving the Property and preventing its waste. Not a single dollar from the DIP Loan is budgeted to go to the Property; to the contrary, the DIP Loan burdens (and, therefore, erodes the value of) the Property for the existing creditors. Substantially all of the proceeds of the DIP Loan are to fund Terra Landmark's professionals and certain preferred estate professionals. Terra Landmark's guaranty of fees and expenses for certain preferred estate professionals also negates the Debtors' showing that credit is not available on less restrictive terms.

3. Indeed, "a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990); *see also In re Mid-State Raceway, Inc.*, 323 B.R. 40, 59. (Bankr. N.D.N.Y. 2005) (noting that "bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender"). Stated differently, postpetition financing is not consistent with the requirements of section 364 of the Bankruptcy

Code where it would "skew the conduct of the bankruptcy case" and "destroy the adversary process." *Ames Dep't Stores*, 115 B.R. at 38. Here, the proposed DIP Loan benefits only the Terra Entities at the expense of the District as this chart of the Debtors' existing creditors[2] as of the Petition Date highlights:

| Creditor | Amount | |
|---|---|---|
| District | | $71,500,000 |
| AMT Venture | | $103,870,058 |
| Insider Unsecured Claims | Unknown | $17,536,201 |
| Non-insider Unsecured Creditors | Unknown | |

    4.    The Debtors have also failed to demonstrate that approval of the Term Sheet is appropriate. The combined effect of the Term Sheet, particularly the window-shop, indemnification and milestone provisions, is to unduly restrict the plan process and competitive bidding. That the Debtors seek approval of these provisions, at least in part, on the basis of a manufactured emergency is doubly offensive. The Motion asks the Court to approve the proposed Term Sheet under the guise of the Debtors' business judgment to evade the requirement to provide sufficient disclosure. *See* Motion at 13-14. However, it is clear from the Motion that the Debtors' "business" is the confirmation of a plan that serves only Terra Landmark's agenda.[3] Although this Motion is disguised as a post-petition financing motion, it is really an impermissible effort to transfer control of the Debtors and the reorganization process to Terra Landmark, at the expense of the District. Moreover, the Motion is nothing more than an ultimatum to the Court: "approve this Term Sheet, or these Debtors will not survive." As a

---

[2]    The amounts set forth in this chart taken from the Debtors' schedules and statements of financial affairs. These amounts are used here for illustrative purposes, and is not an admission or concession as to allowability of these claims or any other matter. The chart omits 2011 *ad valorem* taxes, which are due in an unknown amount, and certain other alleged liens against certain of the Debtors in the approximate aggregate amount of $1,456,860.

[3]    The Term Sheet also refers to a "Plan Funder." According to the Term Sheet, however, the Plan Funder has not yet been created, and so this Objection will simply refer to Terra Landmark, which should be understood to include the Plan Funder as applicable.

matter of policy, the Bankruptcy Court should not condone such strong-arm tactics. Accordingly, the Motion should be denied.

## Objection

**A.     There is no emergency, and the Debtors cannot carry their burden to show immediate and irreparable harm. Accordingly, the Court should not enter the Interim DIP Order.**

5.     The Court should reject the Debtors' and Terra Landmark's transparent attempt to manufacture an emergency. These bankruptcy cases have been pending since September 19, 2011. According to the Debtors' numerous representations in their filings with the Court and at the first hearing in this case, the Debtors have been in discussions with Terra Landmark for two months, since before September 19th. In the ensuing two months the Debtors and Terra Landmark have come up with no more than what may be charitably described as a "plan to have a plan." The only disclosure provided therein is that Terra Landmark will finance professionals—its own professionals, the estates' professionals, and the estates' insider—in exchange for a super-priority claim under Section 364(c) and commit to contribute between $5 million and $20 million to a chapter 11 plan acceptable to Terra Landmark in its sole and absolute discretion. Other than these broad outlines, no other details or documents, such as the Definitive Documents that the Debtors request the Court approve sight unseen, have been supplied. It strains credulity that this same relief could not have been sought a month ago on a non-emergency basis.

6.     Moreover, the Debtors' manufactured emergency does not meet the standards for immediate and irreparable harm. The Court may conduct a hearing and grant relief on a request for debtor-in-possession financing on less than 14 days notice only upon a showing of immediate and irreparable harm. *See* Fed. R. Bankr. P. 4001(c)(2). To show an immediate and irreparable

harm, it is a debtor's burden to show "that no lesser means will prevent the harm that will ensue if the credit is not obtained." Colliers on Bankruptcy ¶ 4001.07[3] (15th ed. rev. 2011).  The Debtors have not carried, and cannot carry, their burden here.  Here, the Debtors assert that "immediate and irreparable harm [will] occur if the Debtors do not have immediate access to a new postpetition financing facility and the use of cash collateral to fund critical expenses in order to preserve and protect the property of the estates." See Motion, at p. 1.  However, this emergent assertion is disingenuous, as the only use for the proceeds of the DIP Loan during the purported "emergency" period is to pay professional fees to Terra Landmark's counsel, to the estates' professionals (including certain professional such as the appraiser that have not yet been approved by the Court), and to the estates' insider.  All of these amounts—except for small amounts for the United States Trustee's fees and for Creditors' Committee's counsel—have been guaranteed by Terra Investments, an affiliate of Terra Landmark.  *See* Motion, Ex. B., at 2.  There is no real prospect that these professionals will not be paid for their services.

7. Finally, to the extent this tailored emergency is purportedly driven by the single-asset real estate deadlines in Section 362(d)(3), that is a red herring.  The District's motion for relief from stay [ECF No. 35] is already pending and set for preliminary hearing.  As set forth in that motion, the stay should be terminated under Section 362(d)(1) and (d)(2).  Even if the Court finds that it is not appropriate to terminate the stay, the Court may grant partial relief from stay.  The Court may allow the District to obtain a foreclosure judgment and set a sale, subject to the Debtors seeking to enjoin that sale for cause.  *See*, *e.g.*, *In re 8118 Harding*, Case No. 10-14963 [ECF No. 53] (denying motion to dismiss, but allowing secured creditor to set its foreclosure sale in state court outside SARE deadline and reserving jurisdiction to enjoin the sale for cause).  Or, the Court may allow the District to obtain a foreclosure judgment but not to set a sale date

5

without first obtaining further relief from the Court.  *See*, *e.g.*, *In re Piazza Navona, LLC*, Case No. 10-14978-RAM, Order Granting Secured Creditor's Motion for Stay Relief [ECF No. 55]. Either form of relief, terminating the stay or granting partial relief from stay, will obviate the 90-day deadline in Section 362(d)(3).

8. Because the Debtors have manufactured this "emergency" and because they cannot carry their burden to show immediate and irreparable harm, the Court should not enter the Interim DIP Order.

> **B. The Debtors have failed to carry their burden under Section 364(c) of the Bankruptcy Code to show that the Court may authorize a super-priority claim that benefits none of the other creditors.**

9. Debtor-in-possession financing cannot be approved under Section 364(c) of the Bankruptcy Code unless each of the elements in the following three-part test are met:

(i) The debtor is unable to obtain unsecured credit under § 364(b), *i.e.*, by allowing a lender only an administrative claim;

(ii) The credit transaction is necessary to preserve the assets of the estate; and

(iii) The terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Crouse*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (denying request to authorize debtor-in-possession financing under Section 364(c)).  Here, the Debtors have failed to show that they even attempted to obtain unsecured credit under section 364(b).  Having failed to show any attempt to obtain unsecured credit (other than the successful attempt to obtain unsecured credit from Terra Investments), the Debtors have failed to show that they are unable to obtain unsecured credit under Section 364(b).  As a result, the Debtors have failed to show that the DIP Loan is necessary to preserve assets of the estate.

(i) <u>The Debtors have not shown that they were unable to obtain unsecured credit</u>.

10. The Debtors cannot carry their burden to show that they were unable to obtain unsecured credit because they have already obtained such credit. Terra Investments has already extended fee and expense guaranties to counsel for the Debtors, the Debtors' insider, the Debtors' appraiser, and other estate professionals. In the context of these cases, these fee and expense guaranties are more than credit support: they are tantamount to a promise to pay the "guaranteed" fees and expenses. Moreover, in the context of these cases, the likelihood is that the only significant administrative expense other than the professional fees Terra Investments has already guaranteed are those of counsel for the Creditors' Committee. The practical effect of the request for a super-priority claim is to place a stranglehold on counsel for the Committee by subordinating the Committee to all the other estates' professionals and Terra Landmark's professionals except to the extent of the small carve out proposed for Committee counsel.

(ii) <u>The DIP Loan is not necessary to preserve the assets of the estates</u>.

11. The DIP Loan is not necessary to preserve the assets of the estates for at least three reasons.

12. First, the DIP Loan is not necessary to preserve the assets of the estates because not a single dollar of the DIP Loan proceeds is proposed to be paid to preserve the Property or prevent waste. The estates' sole asset is the Property. The Debtors collectively define and describe the Property as consisting solely of 16 individual tracts of raw land with the single exception of an unfinished 4-level parking garage. The Debtors' Budget shows that not a single dollar of the DIP Loan is proposed for the benefit of the Property. Not a single dollar is proposed to be spent on security, on mowing the lawn, or otherwise to preserve the Property and

7

prevent waste. The District is paying to preserve the Property and prevent waste, and yet the Debtors are not even making adequate protection payments.

13. Second, the DIP Loan is not necessary to preserve the estates' assets because the Debtors have no real operations to fund, no employees and no going-concern value to be preserved. The only "operations" of the Debtors are the activities of their professionals for the benefit of the Terra Entities. That the operations of the Debtors' professionals are for the benefit of Terra Landmark and that no "necessity" exists here are both evidenced by the fact that Terra Landmark has already guaranteed payment of the all the Debtors' professionals and the Debtors' insider.

14. Indeed, as the Budget shows, nearly all the proceeds of the DIP Loan are proposed to pay estate professionals or Terra Landmark's professionals. The Budget does not, however, show that six of the eight professionals who will receive payment from the proceeds of the DIP Loan have guarantees of payment from Terra Landmark, as they were doing Terra Landmark's bidding. *Compare* Motion, Ex. B, at 2 *with* Motion, Ex. C. Stated differently, of the $134,275 in projected disbursements during the period of this tailored emergency, $126,950—or 94.5%—is for payment to professionals who are working for Terra Landmark and who are guaranteed payment by Terra Landmark. Only $325 for the United States Trustee and $7,000 for counsel for the Creditors' Committee does not have Terra Landmark's guarantee. Excluding the $7,325, the DIP Loan simply elevates the fees of Terra Landmark's professionals to a super-priority claim.

15. Third, the DIP Loan does not preserve the estates' assets, but rather diminishes them. If the Final DIP Order is entered, the general unsecured creditors will be subordinated to up to an additional $750,000 in exchange for no more than a lock-up of the Debtors and an

8

agreement to agree by Terra Investments. Based on what the Debtors have provided to date, the Debtors assertion that this process will result in a meaningful distribution to general unsecured creditors who are not deficiency creditors or insiders is no more than speculation.

      **C.      The DIP Loan and Term Sheet give away control of these Chapter 11 cases to Terra Landmark and, therefore, constitute an impermissible *sub rosa* plan**

16.      The Motion, in seeking approval of the terms of the DIP Loan and Term Sheet simultaneously, is attempting to bind the estates, and the Court, to the terms of an impermissible *sub rosa* plan. "The debtor and the Bankruptcy Court should not be able to short circuit the requirement of Chapter 11 for confirmation of a reorganization plan by establishing the terms of a plan *sub rosa* in connection with the sale of assets" *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983). Although *sub rosa* plans are typically discussed in the context of a 363 sale, many courts have addressed the impact of certain post-petition financing transactions on achieving the effect of a *sub rosa* plan. *See*, *e.g.*, *In re Belk Properties, LLC*, 421 B.R. 221 (Bankr. N.D. Miss. 2009) (denying the DIP motion and finding that the motion "is a clever way for the lender to gain control of the debtor's assets without going through the process of a §363(b) sale."); *In re Den-Mark Construction*, 406 B.R. 683 (E.D.N.C. 2009); *cf. In re Tenney Village*, 104 B.R. 562 (Bankr. D. N.H. 1989) (denying the post-petition financing motion and holding that it "would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specifically crafted for the benefit of the [DIP lender] and the Debtor's principals who guaranteed its debt.").

17.      Here, the Motion makes it abundantly clear what this Chapter 11 case is really about: an unrelated third-party, Terra Landmark, with no standing otherwise in these proceedings, seeking to game the bankruptcy system in order to inexpensively purchase the assets of the Debtors, on an expedited basis and at the expense of the secured creditors, without

9

subjecting the assets to a market test, while foreclosing the District from exercising its state court remedies and prohibiting the Debtors from exploring other options. If the Court approves the Motion, as requested, it will allow Terra Landmark to achieve *de facto* control of the Debtors and the reorganization process. *See Belk Properties*, 421 B.R. at 225; *Tenney Village*, 104 B.R. at 567-70.

18. The Milestones set forth in paragraph 17.e. of the Motion are particularly instructive on this point. First, the Milestones indicate that it is Terra Landmark, not the Debtors, who control the reorganization process. All Milestones were demanded by Terra Landmark, and upon the failure of the Debtors to meet any of the Milestones, Terra Landmark, at its **sole discretion**, may terminate any post-petition financing and support for any plan.

19. In addition, the Milestones create an unnecessary, burdensome and inequitable emergent process that solely benefits Terra Landmark, not the estates. First, the sense of urgency is manufactured. If the Debtors do not meet a Milestone, Terra Landmark will not fund the DIP Loan. However, upon inspection of the Budget, attached as Exhibit C to the Motion, it is clear that the DIP Loan is exclusively for the benefit of insiders and Terra Landmark's professionals, save only the $325 allocated to the United States Trustee and $7,000 allocated to Creditors' Committee counsel (which could have been obtained merely by asking the District). Thus, if Terra Landmark decides to cease paying insiders and professionals, the creditors of the estate will not be any worse off – and the professionals will be able to look to the guarantee of Terra Investments. Second, by creating a false sense of urgency, Terra Landmark achieves two goals: (1) Terra Landmark obtains the Debtors' exclusivity to propose a plan of reorganization; and (2) Terra Landmark obtains an expedient process that reduces administrative fees, or more appropriately, the bankruptcy premium it is paying for the assets of the Debtors at the expense of

the creditors. As evidence of this intention, the Debtors are required to propose a plan of reorganization, in form and content acceptable to Terra Landmark, in Terra Landmark's **sole discretion**, on or before the ninetieth day from the Petition Date. In so doing, Terra Landmark ensures that its plan will enjoy exclusivity, and not be subject to competing plans of reorganization from the District or any other party in interest. This attempt to "short-circuit" the bankruptcy process is impermissible. *Braniff*, 700 F.2d at 941.

20.     Furthermore, the Milestones require the Debtors to file a motion to value the Property on an expedited basis. Upon further exploration, this Milestone, in particular, demonstrates the perverse nature of the proposed process. The Plan Sponsor intends to propose a plan of reorganization that values the property pursuant to a judicial determination rather than a market test – as the latter would subject the Property to the District's credit bid. That judicial valuation, in conjunction with the manufactured exclusivity discussed *supra*, elucidates Terra Landmark's goal of utilizing the bankruptcy process for its own benefit, and at the sole expense of the District. Tellingly, the DIP Loan does not contemplate paying adequate protection to the District or the necessary costs of preserving the District's collateral, only insiders and the professional fees of the Debtors and Terra Landmark.

21.     The Milestones, in conjunction with the Window-Shop Clause (defined and discussed below), **impede** the Debtors' ability to explore meaningful alternatives to exit from bankruptcy. In particular, the Milestones are onerous and the Window-Shop Clause prevents the Debtors from maximizing the value of the estates through a potential sale of the Debtors' assets. An example of the stranglehold that Terra Landmark posits over the reorganization process is found in the Indemnification clause, which is objectionable on a number of grounds. First, it is overly broad because it seeks to have the estates indemnify Terra Landmark for all costs and

expenses following (not merely caused by) "the failure of [Debtors] to perform or observe fully any covenant, obligation, agreement, or provision to be performed or observed by [Debtors] pursuant to this Term Sheet or any other agreements executed as part of this Term Sheet…" *See* Motion, Ex. B., at 5-6.  In addition to being overly broad, this language chills whatever competitive bidding may be derived from this process, as it serves as a *de facto* overbid/break-up fee without stating or limiting the amount of the overbid/fee.  Any offer that the Debtors may receive from a third-party will have to include an amorphous indemnity to Terra Landmark.  Not knowing what that number will be creates uncertainty that is devastating to a competitive environment.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir. 1999) (requiring the requesting party to show that the break-up fee actually benefited the estate and was necessary to preserve the value of its assets); *In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010).  The Indemnification clause also strains whatever is left of the Debtors' fiduciary duty to these estates.

      22.      The Motion also seeks to impermissibly bind the Debtors, its creditors and the Court to its terms.  For instance, the Term Sheet sets a Capital Contribution of $5,000,000.00 to $20,000,000.00.  In setting the amount of the Capital Contribution, the Debtors lose all leverage to negotiate for a Capital Contribution outside that range.  Even more troublesome, the Debtors have effectively lost all leverage to negotiate within that range.  There is no indication of what will dictate the Plan Sponsor's discretion within that range.  Moreover, the imposition of a cap is seemingly premature, as the Property has not been valued.

      23.      As mentioned *supra*, the DIP Loan is for the benefit of Terra Landmark's professionals and insiders only, except for the negligible $7,325.  This is a patently impermissible use of post-petition financing.  *Tenney Village*, 104 B.R. at 568 ("Under the guise

of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the [DIP Lender], seize control of the reins of reorganization, and steal a march on other creditors in numerous ways."). Worse, it is not even clear at this point that the professionals will be entitled to compensation as an administrative expense, if a competing plan is proposed and eventually confirmed.

24.     Terra Landmark also seeks to circumvent the requirements of the Bankruptcy Code through the Expense Reimbursement provision in the Term Sheet. It proposes to pay its professional fees from estate assets, the DIP Loan, without court approval and notice to creditors. Under these circumstances, where the Debtor is locked-up and the DIP Loan is solely for the benefit of professionals, this arrangement constitutes an impermissible dissipation of estate assets, *see Braniff Airways*, 700 F.2d at 939, and arguably violates due process and section 503 of the Bankruptcy Code. This is perhaps the best example of the *sub rosa* nature of the process for which the Debtors and Plan Sponsor seek this Court's approval.

25.     In sum, since the Motion constitutes an improper *sub rosa* plan, the relief requested in the Motion must be denied.

> **D.     The Window-Shop Clause should not be approved because it does not meet the standards ordinarily applied to such provisions and because in this case it is an abrogation of the Debtors' fiduciary duties.**

26.     The Debtors have agreed to a so-called "limited 'lock-up' arrangement" whereby the Debtors may not solicit higher and better transactions. Although it appears that the Debtors may consider higher and better transactions that fall into their lap, they must notify Terra Landmark (the "**Window-Shop Clause**"). As shown below, this Window-Shop Clause should not be approved for at least two reasons.

27.     First, the Window-Shop Clause does not pass muster under the standards for approving such provisions in related contexts.  Window-shop clauses are subject to heightened scrutiny, and should not be approved where they are designed to deter marketing and competitive bidding for an asset.  *See In re Bidermann Industries U.S.A., Inc.*, 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997) (rejecting window-shop provision designed "to cut off other possible sales").  Usually, window-shop clauses are approved only where necessary to bring in prospective buyers, such as where due diligence costs are extremely high and the debtor can demonstrate that no party would undertake due diligence or where prior attempts to obtain a plan sponsor have failed.  *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 889 (Bankr. S.D.N.Y. 1990) (approving window-shop provision after four unsuccessful attempts to attract a plan sponsor and after exclusivity had been terminated).   Here, the Property is nearly all vacant land, and is located approximately one-half mile south of The Reserve at Doral, a projected recently completed by Terra Investments. Motion at 7.  According to the Debtors, the Terra Entities approached the Debtors without solicitation.  Under these circumstances, it is unlikely in the extreme that the due diligence expense for the Terra Entities is high or that for any other reason the Window-Shop Clause was necessary (or even rationally related) to bringing the Terra Entities to the table.  Rather, these circumstances suggest that the Window-Shop Clause is proposed solely to prevent competitive bidding.

28.     Second, the Window-Shop Clause is an abrogation of the Debtors' fiduciary duties.  Typically, a window-shop clause is given for a specific deal.  Here, however, the Debtors are giving the Window-Shop Clause in exchange for a plan to have a plan, not a specific deal, and locks the  so-called Capital Contribution into the range of $5 million to $20 million.  The problem with this material concession by the Debtors is that once Terra Landmark has the

14

benefit of the Window-Shop Clause, it has little or no incentive to make a Capital Contribution in excess of $5 million, as there will be no competitive bidding.  Although the Debtors have purported to include a "fiduciary out" in the Window-Shop Clause, this purported out is no more than window-dressing.  *See Bidermann Industries U.S.A., Inc.*, 203 B.R. at 552 (describing a purported "fiduciary out" in a window-shop clause, which, *inter alia*, prohibited the debtors from soliciting competitive bids, as mere "window-dressing").  The simple fact is that under the facts of this case, where there is no need for the Window-Shop Clause, any limitation on the Debtors' ability to solicit competitive bids is an abrogation of the Debtors' fiduciary duties.  The Debtors, by agreeing to the Window-Shop Clause, have agreed to give up significant leverage in what should have been arm's-length, back-and-forth negotiations with Terra Landmark concerning whether the ultimate Capital Contribution will be near the low end or the high end of the $5 million to $20 million spectrum.[4]

E. **The DIP Loan and Term Sheet contain a number of other objectionable provisions that should not be approved.**

29. In addition to the fatal flaws described above, the DIP Loan and Term Sheet should not be approved unless the following matters are clarified or excised, as appropriate, in any Interim and Final Order:

- The Interim and Final DIP Orders should contain a provision that no priming lien is being granted, notwithstanding the references in the Motion to Section 364(d).

- Any legal fees and expenses paid to Terra Landmark should be subject to bankruptcy court approval in accordance with the procedures for estate professionals and under the applicable legal standards.

---

[4] In light of the Window-Shop Clause, the District reserves its right to seek to terminate exclusivity so as to enable competitive marketing of the opportunity to file a chapter 11 plan or to otherwise obtain the estates' assets.

- Line items in the Budget for estate professionals that have not yet been retained should be excluded until those professional are retained pursuant to an appropriate motion and bankruptcy court approval.

- The "Management Fee" for Issac Kodsi, the Debtors' insider, in the amount of $10,000 per month is patently objectionable in a case with no operations whatsoever. Moreover, the guaranty of Mr. Kodsi's "Management Fee" by Terra Investments implicates Mr. Kodsi's duty of loyalty to the Debtors and the estates' creditors, and should be subject to further proceedings before the bankruptcy court.

## Conclusion

30. "The conduct of bankruptcy proceedings not only should be right but must seem right." *Bidermann Industries. U.S.A., Inc.*, 203 B.R. at 549 (quoting *Knapp v. Seligson ( In re Ira Haupt & Co.)*, 361 F.2d 164, 168 (2d Cir.1966) (Friendly, J.)). The conduct of these bankruptcy cases to date does not seem right. Through the DIP Loan, the Debtors have substantially arranged to pay for Terra Landmark's fees and expenses, the estates' professionals' fees and expenses, and the Debtors' insider's fees. The Debtors have not, however, provided a single dollar for securing or maintaining the Property or preventing its waste, or for paying adequate protection to the District which is acting to preserve the Property. Terra Landmark's ultimatum to the Court, the Term Sheet, impermissibly turns over control of the plan process and substantially restricts the Debtors' marketing efforts for little more than payment of $10,000 per month to the Debtor's insider and a plan to have a plan. In so doing, the Debtors' ability to negotiate Terra Landmark up to the high end of the $5 million to $20 million range is hamstrung.

31. The Debtors are patently running these bankruptcy cases for the benefit of the Terra Entities and their insider. Although the ultimate course of these cases—for example,

whether they should be dismissed for lack of good faith—has yet to be determined, the Court should not countenance turning over control of these cases to the Terra Entities for little more than a plan to have a plan. The Debtors' attempt to wrap themselves in the flag of the unsecured creditors is unavailing here. The Debtors have failed to show any more than speculation that this process will result in a meaningful distribution to general unsecured creditors who are not holders of deficiency claims (who are not insolvent, who hold junior liens and who may otherwise bid at a foreclosure sale) or an insider.

WHEREFORE, the District respectfully requests entry of an Order sustaining this Objection and denying the Motion.

Dated: November 21, 2011                                    Respectfully submitted,

**Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.**
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3553
Facsimile: (305) 789-3395

By:     /s/ Patricia A. Redmond
        Patricial A. Redmond
        predmond@stearnsweaver.com
        Florida Bar No. 303739

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2011, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either via transmission of Notices of Electronic Filing generated by CM/ECF, which is incorporated here by reference, or by first class U.S. mail for those counsel or parties identified on the Service List below, who are not authorized to receive electronically Notices of Electronic Filing.

By:     /s/ Patricia A. Redmond
        Patricia A. Redmond

## SERVICE LIST

**11-35884-RAM Notice will be electronically mailed to:**

C Craig Eller on behalf of Creditor AmT CADC Venture, LLC
celler@broadandcassel.com

Jordi Guso on behalf of Creditor Terra World Investments, LLC
jguso@bergersingerman.com, fsellers@bergersingerman.com;efile@bergersingerman.com

Phillip M. Hudson III on behalf of Interested Party FLORIDA PRIME HOLDINGS, LLC
pmhudson@arnstein.com,
rkcummings@arnstein.com;jtunis@arnstein.com;hbabcock@arnstein.com;hpiloto@arnstein.com;akang@arnstein.com;befernandez@arnstein.com

John B. Hutton III on behalf of Creditor U.S. Bank National Association as Trustee
huttonj@gtlaw.com, thompsonc@gtlaw.com;mialitdock@gtlaw.com;miaecfbky@gtlaw.com

Mindy A. Mora on behalf of Debtor Landmark Club at Doral, LLC
mmora@bilzin.com,
laparicio@bilzin.com;cvarela@bilzin.com;eservice@bilzin.com;lflores@bilzin.com;abeck@bilzin.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Patricia A Redmond on behalf of Interested Party Landmark at Doral Community Development District
predmond@stearnsweaver.com,
jrivera@stearnsweaver.com;rross@stearnsweaver.com;mmesones-mori@stearnsweaver.com;dillworthcdp@ecf.epiqsystems.com

Melinda S Thornton on behalf of Creditor Miami-Dade County Tax Collector
cao.bkc@miamidade.gov

**Notice will provided conventionally by first class mail, postage prepaid to:**

Town Center at Doral, L.L.C. , Debtor
c/o Steven Amster, Esq., Kodsi Law Firm, P.A.
701 W. Cypress Creek Road, Suite 303
Ft. Lauderdale, FL 33309

Daniel Y. Gielchinsky
1450 Brickell Ave #2300
Miami, FL 33131