1                  UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF FLORIDA

2

3                  Judge Robert A. Mark

IN RE:

4

TOWN CENTER AT DORAL,       CASE NO: 11-35884-BKC-RAM

5  L.L.C.,
          Debtor.

6  _____/

7

8   APPLICATION TO EMPLOY GLENN D. MOSES, ESQ. AS COUNSEL FOR
    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FILED BY
             CREDITOR COMMITTEE. (34)

9   MOTION FOR RELIEF FROM STAY FILED BY INTERESTED PARTY
    LANDMARK AT DORAL COMMUNITY DEVELOPMENT DISTRICT. (35)

10  MOTION TO OBTAIN CREDIT PURSUANT TO SECTIONS 105(A) AND
    364(C), IN ADDITION TO MOTION TO APPROVE PLAN TERM SHEET

11  AND REIMBURSEMENT OF EXPENSES FILED BY DEBTOR TOWN CENTER
             AT DORAL, L.L.C. (45)

12   MOTION TO ESTABLISH PROCEDURES NUNC PRO TUNC TO THE
    PETITION DATE TO PERMIT MONTHLY PAYMENT OF INTERIM FEE

13  APPLICATIONS OF CHAPTER 11 PROFESSIONALS FILED BY TOWN
          CENTER AT DORAL, L.L.C. (49)

14

15               NOVEMBER 22, 2011

16

17     The above-entitled cause came on for hearing before

18  the HONORABLE ROBERT A. MARK, one of the Judges in the

19  UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN

20  DISTRICT OF FLORIDA AT LARGE, at 51 SW 1st Avenue, Miami,

21  Dade County, Florida, commencing at or about 2:30 p.m. on

22  Tuesday, November 22nd, 2011, and the following proceedings

23  were had:

24

25               Reported by:  Amy L. Moorefield, RPR

1                    APPEARANCES:
2

        BILZIN SUMBERG BAENA PRICE & AXELROD, LLP, by
3               MINDY A. MORA, ATTORNEY-AT-LAW
             TARA V. TREVORROW, ATTORNEY-AT-LAW
4            on behalf of the Town Center at Doral
                       and its affiliates
5
6                 STEARNS WEAVER MILLER WEISSLER
                  ALHADEFF & SITTERSON, P.A., by
7                 PATRICIA A. REDMOND, ESQUIRE
                    ERIC J. SILVER, ESQUIRE
8             on behalf of the Landmark at Doral
                Community Development District
9
10               GREENBERG TRAURIG, LLP, by
                JOHN B. HUTTON, III, ESQUIRE
11                JOHN R. DODD, ESQUIRE
          on behalf of U.S. Bank as Indenture Trustee
12
13                 BROAD AND CASSEL, by
                 C. CRAIG ELLER, ESQUIRE
14          on behalf of AmT CADC Joint Venture, LLC
15
16                 ARNSTEIN & LEIR, LLP, by
                 PHILLIP HUDSON, III, ESQUIRE
             on behalf of Florida Prime Holdings, LLC
17
18              COUNTY ATTORNEY'S OFFICE, by
         MELINDA S. THORNTON, ASSISTANT COUNTY ATTORNEY
19        on behalf of the Miami-Dade County Tax Collector
20
21                 BERGER SINGERMAN, P.A., by
                   JORDI GUSO, ESQUIRE
             DEBI EVANS GALLER, ATTORNEY-AT-LAW
22                    on behalf of
                   Terra Landmark, LLC
23
24          OFFICE OF THE UNITED STATES TRUSTEE, by
             STEVEN D. SCHNEIDERMAN, TRIAL ATTORNEY
25             on behalf of the United States Trustee

1          GENOVESE, JOBLOVE & BATTISTA, P.A., by
              GLENN D. MOSES, ESQUIRE,
2          Proposed Counsel to the Committee

3

                    ALSO PRESENT:
4

5                  ISAAC KODSI,
            Vice President of the Debtor
6

7              MICHAEL SIMINOVITCH

8

                   BRIAN PEARL,
9      Terra Landmark's authorized representative

10

                        _ _ _
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Okay.  Have a seat, thanks.

2          I have some bigger matters coming up that were

3    set at 3:00 that I reset for 3:30, but we're not going to

4    be able to go for hours here on this case, but -- so with

5    all the people here, I guess, you'll each have about maybe

6    seconds, but let's see.  Let's get appearances.

7          MS. MORA:  Judge, good afternoon.

8          Mindy Mora and Tara Trevorrow on behalf of

9    Town Center at Doral and its affiliates, the Landmark

10   entities.  With me in the courtroom is the vice president

11   of the debtor, Isaac Kodsi, who's sitting in the second row

12   at the end.

13         MS. REDMOND:  Good afternoon, Your Honor.

14         Patricia Redmond, Stearns Weaver Miller, on

15   behalf of the Landmark at Doral Community Development

16   District.  And, Your Honor, in the courtroom with me is my

17   colleague, Eric Silver, and also in the courtroom is

18   Mr. Michael Siminovitch, who is employed by the office of

19   the district manager.

20         THE COURT:  Okay.

21         MR. ELLER:  Good afternoon, Your Honor.

22         Craig Eller of Broad and Cassel on behalf of

23   AmT CADC Joint Venture.

24         MS. THORNTON:  Good afternoon, Your Honor.

25         Mindy Thornton from the County Attorney's Office

1   on behalf of the Miami-Dade County Tax Collector.

2              MR. MOSES:  Good afternoon, Your Honor.

3              Glenn Moses, Genovese Joblove & Battista.  We are

4   the proposed counsel to the committee.

5              MR. HUTTON:  Good afternoon, Your Honor.

6              John Hutton from Greenberg Traurig on behalf of

7   U.S. Bank as indenture trustee.  With me in the courtroom

8   is my colleague, John Dodd.

9              THE COURT:  It's the indenture trustee for the

10  bonds issued by the district?

11             MR. HUTTON:  Correct.

12             THE COURT:  It's all part of the same senior

13  debt?

14             MR. HUTTON:  Correct.

15             THE COURT:  Okay.

16             MR. HUDSON:  Good afternoon, Your Honor.

17             THE COURT:  And AmT is the second lien holder?

18             MR. ELLER:  Correct, Your Honor, mortgage lender.

19             THE COURT:  Okay.

20             MR. HUDSON:  Phillip Hudson, Arnstein & Lehr, on

21  behalf of Florida Prime Holdings, LLC.  We own 100 percent

22  of the bonds, Judge.

23             THE COURT:  Oh, okay.

24             MR. GUSO:  Good afternoon, Your Honor.

25             Jordi Guso and Debi Galler from Berger Singerman

1  on behalf of Terra Landmark, LLC, and we're joined in the

2  courtroom this afternoon also by Mr. Brian Pearl, who is

3  Terra Landmark's authorized representative.

4          MR. SCHNEIDERMAN:  Steven Schneiderman for the

5  U.S. Trustee.

6          THE COURT:  Okay.  Well, I think we just ate up

7  the 150 -- all right.  So what order do you want to proceed

8  in?

9          MS. MORA:  Judge, I think it makes sense for the

10 Court to first consider the debtor's motion to approve the

11 plan support agreement and term sheet.  Obviously, if --

12 depending on how the Court rules on that, I think it will

13 bear on proceeding with the motion for stay relief.  That's

14 ECF 45.

15         THE COURT:  All right.  So why is this an

16 emergency -- well ---

17         MS. REDMOND:  Your Honor, I -- I think actually

18 the opposite.  I think that Your Honor should start with

19 the stay relief motion, because if Your Honor grants that,

20 it will resolve the rest of the issues.

21         THE COURT:  Okay.  Well, we'll -- let's just get

22 into it.  I don't have time to think about which order.  So

23 why was this filed as an emergency, or did -- was it not

24 filed as an emergency and we just set it?

25         MS. MORA:  Judge, it was filed as an emergency

1   motion, although, when I spoke with the calendar clerk

2   about setting it, we didn't ask for it to be set on two

3   days notice as is common for emergency motions.  We asked

4   for it just to be set out this week.  There are some

5   administrative expenses that need to be funded, and that's

6   why we did ask for some expedient consideration of the

7   motion.

8           THE COURT:  Like what?

9           MS. MORA:  Well, U.S. Trustee fees that were

10  incurred for the third quarter that need to be funded.

11  We've gotten some --

12          THE COURT:  What's that, $300?

13          MS. MORA:  Well, it's $325 per debtor.  In

14  addition, we have funds as well have been incurred by the

15  debtor in terms of accounting services for preparation of

16  the first monthly operating report that runs through the

17  end of October.

18          THE COURT:  Is there a retained professional?

19          MS. MORA:  There is an internal accountant,

20  Your Honor.  It's not a retained professional.  It's not a

21  CPA.  It's the former full-time CFO that we brought back on

22  an hourly basis to work inhouse for the debtor and to

23  prepare these documents in order to limit the cost.  And so

24  there are ongoing expenses that the debtor has incurred,

25  and that's why we asked for it to be considered this week,

1   Your Honor.  Obviously, the 14 days would run out through

2   next Friday, the 2nd.

3        In addition, it was a requirement, under our plan

4   support agreement and term sheet with Terra, that we seek

5   approval of this on an interim basis, to get before the

6   Court.

7        The $150,000 that we're seeking approval of is

8   outlined in the budget.  That's the last page of the motion

9   that was filed, Judge.  It is, in total, scheduled out --

10  there's actually an error in terms of the U.S. Trustee

11  fees, because it only limits the cost for one debtor.

12  That's on Page 81 of 81, outlining what those expenses are.

13       Obviously, some of the expenses as well are

14  dependent upon whether the Court approves the motion that

15  the debtors filed seeking approval of monthly interim

16  compensation payments to counsel.

17       Judge, the reason why this financing is being --

18  approval for this financing is being sought is that the

19  debtors filed this case with no cash in their bank

20  accounts.  Until about three years ago, while they were

21  under the leadership and direction of Elie Berdugo, the

22  debtors were operating to develop their properties.  But

23  with Mr. Berdugo's untimely death, the debtors lost their

24  ability to secure the money that they needed to continue

25  operating their business and the support of their

1   creditors.  That led to the foreclosure actions that were

2   filed against the debtor's property, and if those had

3   proceeded, they would have wiped out any possibility of a

4   recovery by any creditor other than the district.

5        THE COURT:  What happened to all the money?  How

6   much was spent acquiring the property itself?

7        MS. MORA:  Judge, I would defer to Mr. Kodsi to

8   address that question with you.  I know that the funds that

9   were used were used for both acquisition of the property

10   and for infrastructure at the property.  There was

11   extensive sewer lines run, roads created.  There was

12   construction of a parking garage that was done at the

13   property, and I know that the funds were utilized for that

14   purpose.  I can't itemize for the Court right now the ---

15        THE COURT:  Mr. Kodsi, how much was -- what was

16   the acquisition cost?

17        MR. KODSI:  I believe the land was around

18   $100 million, the original acquisition.

19        THE COURT:  Okay.  And do you mind if he just

20   proffers what happened to the other 74 million?

21        MS. MORA:  I have no problem with that, Judge.

22        MR. KODSI:  The other money would have went into

23   infrastructure for the property and all the design and site

24   plans and engineering.  This project was fully permitted

25   right before Mr. Berdugo passed away.

1            THE COURT:  Okay.

2            MS. MORA:  Judge, as the foreclosure was

3    proceeding, the debtor realized that it was likely going to

4    lose the property through a foreclosure.  It recognized

5    that it still had a fiduciary duty to other creditors in

6    the estate besides the district, and it sought out whether

7    or not there were other parties who might be interested in

8    stepping into the shoes of a party to lend moneys to the

9    debtor to fund this reorganization case.

10           It engaged in discussions with AmT, but,

11   unfortunately, AmT was unwilling -- although it supported

12   initially prepetition the concept of filing a Chapter 11,

13   it was unwilling to step up to the plate with any funding.

14           Terra World Investments controls property that is

15   adjacent to the debtor's property, and discussions were

16   commenced before the filing of this bankruptcy case in

17   which Terra agreed that it was willing to step up to the

18   plate and fund the expenses of a Chapter 11 case, and to

19   put in equity that would result in the debtor being able to

20   put forth a plan that not only provides a distribution to

21   unsecured creditors in this case, but will involve the

22   assumption of the obligations due to the district.

23           THE COURT:  So what's the plan going to look

24   like?  We don't know that yet; right?

25           MS. MORA:  We're very close on working on it,

1    Judge.  We certainly have the contours of the plan worked

2    out.  We have Excel spreadsheets that we're working on with

3    Terra, and what the plan is going to look like is,

4    basically, repayment of the district's obligations over a

5    term of years.  There's a remaining term, I believe, of

6    approximately 24 to 25 years left on the term of the

7    special assessments, and those obligations are going to be

8    termed out over that period of time, obviously,

9    accelerating the repayment of those obligations as

10   construction continues and the project starts being built

11   out.  In addition ---

12           THE COURT:  Stripping down their lien or no?

13           MS. MORA:  There's no intention, Judge, to strip

14   down their lien.  The concept would be, frankly, we would

15   expect that the district is going to want to make an

16   1111(b) election and to have the full amount of their

17   obligations paid over time.  And so ---

18           THE COURT:  That ---

19           MS. MORA:  Right now, the property ---

20           THE COURT:  I'm not with you.  If you're

21   proposing to pay them in full with interest, why would they

22   make an 1111(b) election?

23           MS. MORA:  No, Judge.  What I think the debtor is

24   going to propose is to value the property.  As a result of

25   that, there would be some obligation.  First of all, AmT,

1    clearly, as mortgagee, is going to step into the unsecured

2    class, and so that would mean our unsecured creditors would

3    be owed approximately $120 million.

4        What we're anticipating is that the district's

5    obligations are going to be paid out in full under our

6    plan, and it will be paid out over the 20 -- remaining

7    24 years the special assessments are due.  There is an

8    interest ---

9        THE COURT:  With interest?  No?

10       MS. MORA:  I believe there's an interest

11   component attached to -- not all the obligations, Judge, we

12   believe are presently due and owing because of the nature

13   of the way these special assessments get set.  Essentially,

14   what we'd be doing is resetting those special assessments

15   to be paid out in their original term.

16       THE COURT:  All right.  I'm still not clear as to

17   whether you're trying to strip down and then assuming

18   they're going to make an election, and so you're just going

19   to pay them the 71 million over time with no interest

20   and ---

21       MS. MORA:  It's actually about $77 million now,

22   Judge, that's going to be due over the period.

23       But, Judge, I'm happy to ask Terra's counsel to

24   come up and explain it, or Mr. Pearl, who is a principal of

25   Terra and working closely on the Excel spreadsheet that

1    demonstrates the projections, to come up and speak to the

2    issue.

3          But, essentially, what's going to happen though

4    is those obligations will be paid under our plan,

5    essentially, in full, the 77 million, plus there will be

6    distributions made to the holders of unsecured debt under

7    the plan.

8          THE COURT:  So then why are we -- why are we

9    valuing?

10         MS. MORA:  Well, we're valuing, Judge, because

11   AmT has a subordinate lien behind the district on the

12   property, and I need to be able to demonstrate that the

13   value of the property is insufficient to cover the AmT debt

14   as well, and so they will have to move it to ---

15         THE COURT:  Mr. Eller, you don't concede that?

16         MR. ELLER:  Not at this time, Your Honor.  We

17   don't have sufficient information in the form of an

18   appraisal to -- a recent appraisal to determine what that

19   value might be.

20         THE COURT:  So where's the 36 number come from?

21   That's ---

22         MS. MORA:  That's the Miami-Dade County property

23   appraiser's market valuation of the property from the

24   county's website.  It includes the value ---

25         THE COURT:  So the valuation deadlines that

1    Terra's insisting on are just to strip off the AmT debt,

2    not to strip down the first lien?

3            MS. MORA:  Correct, Judge.  It's a motion --

4    Judge, when we started ---

5            THE COURT:  Okay.  So you're going to restructure

6    the first, you want to strip off the second, and then

7    you're hoping -- you're going to propose some distributions

8    to the unsecured creditors.  Is that going to be along the

9    way or years down the road, or what?

10           MS. MORA:  No, it'll be -- it'll be shortly after

11   the effective date, Judge, not years down the road.  I

12   mean, unsecured creditors are in a different category than

13   the district, who was anticipating on these special

14   assessments being paid over many, many years.

15           THE COURT:  Okay.

16           MS. MORA:  So the unsecured creditors are

17   supposed to be getting a distribution shortly after the

18   effective date.

19           THE COURT:  Okay.  And besides AmT, how much

20   unsecured debt is there?

21           MS. MORA:  Another $17-1/2 million, Judge.

22           THE COURT:  17?

23           MS. MORA:  $17-1/2 million, correct.  So, in the

24   aggregate, besides the district, there's $120 million in

25   debt, which, if the district is allowed to proceed with

1   their foreclosure action, will get wiped out and not

2   receive any recovery at all.

3          THE COURT:  So you're hoping to get to a plan

4   where you're going to offer something to the unsecureds and

5   have an unsecured class voting yes?

6          MS. MORA:  That's correct, Judge.

7          THE COURT:  And then you think your plan is going

8   to be subject to cramdown on the district.

9          MS. MORA:  Well, we're hoping that ultimately the

10  district is going to support the plan, Judge.  I know that

11  Ms. Redmond is here today filing a motion for stay relief,

12  but I think if the district is really fulfilling its

13  fiduciary obligation, which is to see the development of

14  this property and the collection of special assessments,

15  that it will ultimately see that this is a viable plan and

16  commensurate with its fiduciary duty, because it involves

17  the development of the property that the district was

18  formed for the specific purpose of trying to insure.

19         THE COURT:  And why is the number so uncertain?

20  Five to 20 million, that's a big -- you know, I've heard

21  people say five or ten cents, but not five or 20 million.

22         MR. GUSO:  That's the capital contribution,

23  Your Honor.  It is no less than five and no more than 20,

24  depending on where the model shakes out, and there are ---

25         THE COURT:  What does that mean, the model?

1          MR. GUSO:  The model for the reorganized

2    enterprise, Your Honor, whether the product mix, the

3    proposed sellout, the absorption rate, et cetera, how much

4    cash it would require, as by way of a capital contribution,

5    for the reorganized debtor to funds its operation through

6    that sellout.

7          THE COURT:  And is it determined yet how much of

8    the money that's infused would go to unsecured creditors?

9          MR. GUSO:  No, Your Honor.  Those are discussions

10   that have commenced, but will be ongoing as we advance down

11   this process.

12         And, Your Honor, if I may clarify one statement

13   that Ms. Mora made.  We are looking at -- our client is

14   looking at a number of different alternatives with respect

15   to this property, which impacts the cash flow and the

16   projected payout.

17         One alternative, in all candor with the Court,

18   that we are evaluating, is a breakdown of the CDD debt to

19   the present value of the property, but that would result in

20   the bond holders receiving the full amount of their debt,

21   admittedly no interest on the $77 million, but an imputed

22   interest based on the value of the property, which would

23   get them to a $77 million recovery.  So there would be no

24   loss to the bond holders.  That's one of the models that

25   we're exploring.

1          THE COURT:  So a financial model based on the

2    equivalent of an 1111(b) election?

3          MR. GUSO:  Presuming that -- essentially,

4    imputing a -- an imputed 1111(b) exemption on the part of

5    the bond holder, Your Honor.  Or I should say the CDDs

6    because the bond holders don't have debt against the

7    debtor.  The bond holders have recourse against the CDDs,

8    and then by statute it is the CDDs who have liens against

9    the property.

10          THE COURT:  Okay.  So the money people say

11    they're already thinking of a stripdown?

12          MS. MORA:  The money people are thinking of a

13    stripdown.  I'm hearing that as well, Judge, and ---

14          THE COURT:  So you need a valuation for that

15    purpose as well?

16          MR. GUSO:  Yes, sir.

17          THE COURT:  Okay.

18          MS. MORA:  Judge, what's critical is that the

19    party who is objecting to this financing is the secured

20    creditor on the case.  This loan is coming in on an

21    unsecured basis.  It is not affecting the lien of the CDD.

22    The money is coming in with -- under 364(c), as a

23    superpriority administrative expense only, and so ---

24          THE COURT:  So where would money come from, other

25    than the capital that's going to be infused to pay the

1    superpriority?

2            MS. MORA:  Well, Judge, there is no money

3    presently.  The debtors are going to be filing this joint

4    plan with Terra.  If the plan is approved, they're -- the

5    equity will be paid to them in partial consideration for

6    this claim.  If for any reason the debtors can't get this

7    plan approved and there's an alternative transaction ---

8            THE COURT:  Wait, say that again.

9            MS. MORA:  If the debtors ---

10           THE COURT:  The equity will be -- they will get

11   100 percent of the equity in the reorganized debtor in

12   exchange for somewhere between five and 20 million; right?

13           MS. MORA:  And the satisfaction of this DIP loan.

14           THE COURT:  Okay.  But why -- so if the plan is

15   confirmed, they're just paying themselves back?

16           MS. MORA:  That's correct, they're just paying

17   themselves back.

18           THE COURT:  Okay.  And if the plan is not

19   confirmed is really the issue, and that's why I asked, not

20   accusingly, what happened to the other 74, which, I guess,

21   is actually 91 million, because if there's avoidance

22   actions, then -- I mean, it's all ifs, but if there are

23   avoidance actions, then they're going to have a

24   superpriority claim against those recoveries to fund the

25   legal fees in their failed plan.

1        MS. MORA:  Presumably, they would, Judge, but, at

2   this point, the debtor is not aware of any avoidance

3   actions that could be pursued.  I mean, this company,

4   essentially, was simply operating up until Mr. Berdugo's

5   death in the ordinary course of business as a real estate

6   developer.  We're not aware, certainly in the last three

7   years, of any payments being made by the debtor to any

8   party, other than obligations that had to be paid, such as

9   deposits by parties who were going to buy a residence.

10  Their moneys were refunded to them in full.  But there is

11  not any other avoidance actions that the debtor's aware of

12  at this point.

13        THE COURT:  You've looked into the, if my numbers

14  are right, 91 million that was paid besides the property

15  acquisition?

16        MS. MORA:  No, Judge, we have not done a full

17  forensic examination of that.  The debtor simply hasn't had

18  the cash available to do that.

19        THE COURT:  All right.  So what's your response,

20  just jumping into this, to the creditor's argument that

21  Terra should just fund its own plan negotiations and

22  expense.  If it goes, it goes, it can -- it can reduce

23  their five or 20 million by the amount that otherwise would

24  have gone in to fund some of the professional fees --

25        MS. MORA:  Well, I mean, Judge ---

1          THE COURT:  -- and go forward with the plan.  Why

2     do we need to bless all the term sheet things when we don't

3     even have a plan?  Why not just file it when you can file

4     it, and then on stay relief consider perhaps a parallel

5     track?

6               The foreclosure was at what stage, Ms. Redmond?

7          MS. REDMOND:  Your Honor, the foreclosure's

8     pending.  There was a motion for summary judgment that was

9     filed, and, right before the hearing on that motion, the

10    bankruptcy was filed two days before.

11         MS. MORA:  Judge, the ---

12         THE COURT:  So you probably would get to

13    confirmation before necessarily you would even get a

14    summary judgment hearing, huh?  I don't know how fast the

15    state court sets big summary judgments, probably not too

16    fast; right?

17         MS. REDMOND:  Your Honor, they're a little bit

18    faster now than they had been in the last two years.

19         THE COURT:  Okay.

20         MS. MORA:  Judge, the debtor does need money in

21    order to proceed through the Chapter 11 case.  I mean,

22    there are fees for committee counsel that are provided for

23    under this.  There are U.S. Trustee fees.  I mean, there

24    are amounts that the debtor needs to obtain in order to

25    proceed ---

1        THE COURT:  What do we need a committee for,

2   frankly?

3        MS. MORA:  Well, there are -- I mean, Judge, it's

4   not uncommon in a Chapter 11 case -- it's not uncommon in a

5   Chapter 11 case for the debtor to have some counterbalance

6   to the weight of the secured creditor in the case.

7        THE COURT:  No, but we've got a big unsecured

8   creditor, Mr. Eller; right?

9        MR. ELLER:  Correct.

10       THE COURT:  What's your view on all this so far?

11       MR. ELLER:  Your Honor, at this point in time,

12  we're sort of adopting a wait and see attitude, because one

13  of these parties or the other is probably going to need to

14  vote our claim, or otherwise our assistance, in proposing

15  whatever they're looking for.  We've not made any type of

16  alignment with anyone, but at this point in time, if the

17  bankruptcy is -- does not succeed in some form or fashion,

18  stay relief is granted, we don't have a bankruptcy, we're

19  simply foreclosed out like the other parties, and we see

20  nothing.

21       So we see the bankruptcy, in some fashion,

22  regardless of who may be proposing a plan, as our only hope

23  to some recovery in this case.  So we would like to see it

24  continue in some fashion, and if the financing is necessary

25  in order for that to occur, you know, we're skept ically in

1   support of that.

2          MS. MORA:  Judge, I just want to emphasize again,

3   the only party who's filed an objection to this is the one

4   party who's not affected by the financing.  Because if the

5   plan is successful, then the obligations due to the

6   district are going to be assumed and paid by the

7   reorganized debtor.  If the plan isn't successful and the

8   creditor is able to get stay relief at a later date, then

9   they will foreclose, and Terra, frankly, will be out their

10  money.  They're not going to be a source of recovery for

11  Terra to get paid.

12         THE COURT:  Well, that's assuming there's no

13  avoidance action.

14         MS. MORA:  That's assuming there's no avoidance

15  actions, Judge, that's correct.  But even if there are

16  avoidance actions, Judge, there's got to be some source to

17  fund those avoidance actions, and so, to the extent that

18  there are funds in the estate as a result of this DIP loan,

19  there's a potential for those funds to be available at the

20  end of the day to maybe fund that investigation.

21         But there could also be, Judge, an alternative

22  transaction that comes along that gets promoted by, for

23  example, the creditors' committee in this case, who we're

24  looking to as the party who any third parties who wish to

25  propose an alternative arrangement can speak with, and seek

1  whether or not the plan provided by the debtor and Terra is

2  one that should proceed, and so there are other

3  opportunities for -- for example, Terra to get paid, but

4  none of those impact the district, the only party who's

5  objecting to the stay relief here.

6          I mean, the creditors' committee fees are

7  provided for under this financing.  U.S. Trustee fees are

8  provided for under this financing.  The accountant that is

9  preparing the monthly operating reports, which is a

10 debtor's obligation, is provided for under this financing.

11         THE COURT:  Why should they pay their own fees as

12 a superpriority, though?

13         MS. MORA:  Judge, that was a point of

14 negotiation.  I mean, certainly it is not uncommon, in

15 connection with a DIP financing facility, for the debtor to

16 be responsible for the lender's fees and costs.  That

17 happens all the time in every DIP financing that comes

18 before you.

19         THE COURT:  But this is a little different.  This

20 is a financing mostly for professional fees.

21         MS. MORA:  But, Judge, it's still ---

22         THE COURT:  We don't even know what portion of it

23 is going to be for Terra, right, if they're just going to

24 submit bills and debit the DIP account?

25         MS. MORA:  Judge, no, I believe that the budget

1   contemplates a cap on that.  If the Court would turn to the

2   budget that's attached, there is, in the aggregate, no more

3   than $100,000 of the six -- of the 750 that is allocated

4   for Berger Singerman's fees.

5          But in the interim, Judge, I mean, all we're

6   seeking at this point, this week, is just approval of

7   funding on an interim basis, no more than 150,000, just to

8   cover the costs that have been incurred since the petition

9   date in respect to these various categories.

10          I mean, the debtor has gone out and had to obtain

11  the services of financial consultants through counsel, as

12  well as an appraisal through counsel, and those are

13  expenses that need to be funded as well in order to proceed

14  with this case and deal with the issues that need to be

15  dealt with in order to get a plan confirmed in the case,

16  which, again, is for the benefit of all the creditors and

17  not just for the district.

18          Judge, there are other arguments that the

19  district has made as well.  They've complained that there

20  may be conditions amounting to waste on the property, but

21  the property is fully fenced and locked.  We're not aware

22  of any conditions on the property that would constitute

23  waste.

24          In addition, the district complains that this

25  motion seeks to transfer control of the debtors to Terra.

1    Judge, that's not true.  The debtors recognize that they

2    have a fiduciary duty to all the creditors in this case,

3    which is why they filed these cases in the first instance.

4    Without the bankruptcy case, only the district would have a

5    recovery here, but instead the plan that we're going to

6    file, we believe, is going to enable the unsecured

7    creditors to obtain a recovery in these cases.

8         The district also criticizes the limited lockup

9    provision that's in the term sheet, but the term sheet

10   clearly recognizes that the lockup is subject to the

11   fiduciary duties of the debtors as debtors-in-possession.

12        In fact, we've spoken with the creditors'

13   committee about those provisions, and we've made it clear

14   that any inquiries that are made of us will be turned over

15   to the committee to pursue, and, to the extent that there's

16   any reasonable due diligence requirements made of the

17   debtor, we will provide that information to the committee

18   so it can provide it to third parties.

19        Judge, we're on a very short time frame here.  By

20   December 19th, as single-asset real estate debtors, we've

21   got an obligation to get a plan on file, so there's a lot

22   of work that the professionals are doing in these cases,

23   together with management and with Terra, to try to get a

24   plan on file in very short order.  We believe that that's

25   the fiduciary duty that the debtors have an obligation to

1  fulfill, because, frankly, if the district gets its way,

2  then it's going to proceed to foreclose its lien and wipe

3  out any chance of recovery by the other creditors here.

4          Judge, from a big picture perspective, as I said

5  before, this financing really has no effect at all on the

6  liens asserted by the district.  If the district -- if the

7  debtors are unable to confirm a plan, then this Court is

8  either going to grant stay relief or dismiss these cases,

9  in which case Terra will be simply out its unsecured

10  advances and the district will foreclose its liens against

11  the property.

12          So the question occurred to us, why is the

13  district opposing this financing so strenuously?  And the

14  answer, of course, is because the district knows the

15  debtors need the financial support to remain in Chapter 11

16  and to propose a reorganization plan, and so long as

17  they're in Chapter 11, they're going to be stayed from

18  proceeding with the foreclosure of the property and being

19  the sole creditor to retain a recovery in these cases.

20          What's curious though is why the district is so

21  vigorously opposing the debtor's efforts to get a plan

22  confirm ed.  After all, this district was formed for the

23  specific purpose of promoting the development of the

24  property, and that's what the debtors' plans are going to

25  do.  It's going to enable the debtors to develop the

1    property and pay the special assessments to the district.

2           The only reason that comes to mind as to why the

3    district is taking the position it is is because it's

4    acting for the bond holders in pursuing its agenda, rather

5    than fulfilling the district's own fiduciary duty regarding

6    development of the property.

7           The district suggests that the term sheet gives

8    away control of these cases to Terra Landmark and

9    constitutes an impermissible sub rosa plan, but nothing

10   could be further from the truth.  The debtors remain

11   subject to their fiduciary responsibilities to all

12   creditors and intend to be responsive to any information

13   request made by the committee in connection with any

14   alternative transaction.

15          Moreover, Judge, the plans remain subject to

16   negotiations with creditors, voting by creditors, and

17   ultimately approval by this Court.  No one is attempting to

18   take away any of these protections of the debtor's estate

19   through the approval of the term sheet.  All we're seeking

20   to do, Judge, is to proceed with a borrowing of the loan on

21   an interim basis and to be subject to the milestones and

22   limited lockup at this time.

23          We'll come back to the Court for final approval

24   of the financing before we proceed to borrow any further

25   funds, and we simply request that we are able to obtain a

1    date from the Court for final approval of this in

2    accordance with the milestones that are set forth in the

3    term sheet.

4              THE COURT:  All right.  Before I hear from

5    Ms. Redmond, the -- Mr. Hudson, where are you?  Oh, there

6    you are.  You're at the same table, so maybe you're in the

7    same boat, but -- what, you're supporting stay relief and

8    opposing the financing?

9              MR. HUDSON:  Correct, Your Honor.

10             THE COURT:  Okay.  And why?  Ms. Mora thinks this

11   is a better deal for the bond holders to go with a plan.

12             MS. MORA:  Judge, I didn't say the bond holders.

13   I said the district.

14             THE COURT:  Ah.

15             MS. MORA:  The bond holders are not creditors of

16   the debtor.  It's only the district that's the creditor of

17   the debtor.

18             THE COURT:  All right.  Then explain how this

19   works, the bonds.

20             MS. MORA:  The bond holders are an obligation of

21   the district, Judge.  We are not the district.

22             THE COURT:  But it's a special district, right?

23   I mean, it's not --

24             MS. MORA:  It's a special district.

25             THE COURT:  -- a general obligation.

1          MS. MORA:  No.  It's a special district, it's a

2    community development district, and it's the district that

3    is the creditor of the debtors.

4          THE COURT:  The bond holders only get paid from

5    whatever the district realizes, either from foreclosure or

6    your plan; right?

7          MS. MORA:  That's correct, but they -- but the

8    bond holders are only creditors of the district.  They're

9    not creditors in this estate.

10          THE COURT:  Okay.

11          MR. HUDSON:  Well, we obviously disagree with

12    that, Judge.  While, technically, there may be levels, at

13    the end of the day, the district and the trustee of the

14    indenture hold the collateral.  If they were to foreclose,

15    it's held in trust by them for our benefit, so it is the

16    bond holders who have the ultimate stake here.  So we

17    disagree with that.

18          THE COURT:  But from a business matter, your

19    clients have analyzed this and would rather just have a

20    foreclosure and a sale than consider a plan?  Because we

21    don't really know what the plan is yet.

22          MR. HUDSON:  We don't, Judge, but what we've seen

23    so far, and as you've seen already, there's even confusion

24    on their side of the table about whether they're going to

25    lien strip or not.  We don't think they're entitled to lien

1    strip, but we suspected that that's probably ---

2            THE COURT:  Because of value or because of the

3    nature of the debt?

4            MR. HUDSON:  The nature of the debt, Judge.

5    There are several different reasons, but we -- Judge, at

6    the end of the day, we're the first priority, nobody

7    objects to that, lien creditor.  We would like to take the

8    collateral back.  They've sat on this for two years.  This

9    foreclosure's been pending for two years.  We've actually

10   been taking care of the property.  Ms. Redmond will get to

11   that in her presentation, if you like.  We have, I believe,

12   about $450,000 that we've spent so far, as bond holders, on

13   this property in the last couple of years.  There's

14   $12 million in accrued interest in the last couple of

15   years.

16           THE COURT:  The bond holders have put in new

17   money?

18           MR. HUDSON:  Yes, sir.  That's the only person

19   that has a stake in the game at this point, Your Honor.  We

20   have to put in -- we have to -- anything that needs to be

21   done to keep the property safe and secure, insured, we've

22   done all of that in the last two years.  So, at the end of

23   the day, Judge, we'd like to test the market.  That's what

24   secured creditors do with their collateral at the end of

25   the day.

1       In essence, what we see here is a truncated

2   option.  They're giving this plan sponsor an option and, in

3   our view, pushing everybody else out.  We, as a secured

4   creditor, want to see this go to market and get the highest

5   and best number for the benefit of the secured creditor.

6       With all due respect to Mr. Eller, I don't think

7   Mr. Eller and his client think there's any value for them.

8   If there's no value for them, there's certainly no value

9   for a committee.  Your question was the right one, I think,

10  why do we even have a committee, because with a

11  $170 million hole and a property the tax assessor says is

12  worth $36 million, where are we going?

13      Now, we understand why they're trying to do what

14  they're trying to do, but at the end of the day it makes no

15  sense.  It serves no policy to be in Chapter 11.

16  Chapter 11s are generally about unsecured creditors.

17  They're not going to see a nickel in this case, Judge.  I

18  haven't heard anybody say -- other than, yeah, maybe

19  they'll get some money, Judge, but how?  I don't know how

20  they'll ever get any money.  So we ---

21      THE COURT:  Well, they're going to propose a plan

22  that will --

23      MR. HUDSON:  That strips ---

24      THE COURT:  -- generate cash flow to cram down

25  the secureds and pay something to the unsecureds.

1          But tell me why legally they couldn't cram down

2     here.

3          MR. HUDSON:  Well, there's -- let me explain a

4     couple of other things.

5          THE COURT:  Do a stripdown and potentially a

6     cramdown.

7          MR. HUDSON:  Let me explain a couple of other

8     things, Your Honor, toward that point.  Number one, there

9     are what we have -- what we call A & B bonds here.  A bonds

10    are long-term bonds that start with a 30-year maturity, and

11    they're paid by -- once the property is sold to an end

12    user, that semiannual assessment or annual assessment

13    occurs on the tax bill.  That's an A bond.  That's about

14    $31 million in this case.  So there's a 20 -- roughly,

15    25 years left on the A bonds.

16         Then there are B bonds.  B bonds typically mature

17    either at a short maturity date, typically five years out

18    from the bonds.  That would be 2015 at this point.  That's

19    a $41 million obligation.  And B bonds are also payable

20    upon the sale of a particular piece of property.  So, if

21    the property has been fully developed and sold to an end

22    user, when that property is sold, the proceeds of that

23    sale, a portion of that goes to fully amortize -- fully

24    satisfy that B bond.

25         In this case, since they haven't been selling

1   properties and we have big parcels of land, as opposed to

2   small little parcels of land, the B bonds will mature on

3   their own, $41 million, plus the accrued interest, plus,

4   plus, plus, in 2015.  So that's going to create

5   complications, Your Honor, in not only cramdown and lien

6   stripping, but we also believe these are taxes under the

7   appropriate statutes, and if they're taxes, they're

8   entitled to, in our view, under the Code, a priority

9   unsecured claim.  So even if there are unsecured creditors

10  because these are tax obligations, they would be entitled

11  to a -- even if they did strip us down, we would be

12  entitled to a priority claim above just about everybody

13  else, except for the superpriority that we're talking

14  about.

15          THE COURT:  If there's a foreclosure and the

16  property's -- the property would be in the name of the bond

17  trustee, and then ---

18          MR. HUDSON:  For the benefit of ---

19          THE COURT:  Okay.  And then it's resold --

20          MR. HUDSON:  Correct.  And the proceeds ---

21          THE COURT:  -- then what happens to the proceeds

22  in terms of A and B?

23          MR. HUDSON:  It would be called a redemption,

24  either a full or partial redemption under the bonds,

25  depending on how much money were there.

```
 1        THE COURT:  But would a buyer -- any buyer be

 2   subject to assessments going forward?

 3        MR. HUDSON:  If -- that's an interesting

 4   question, Judge.  It depends on how the foreclosure is

 5   structured relative to A and B bonds.  If they're all -- we

 6   have accelerated all of the bond debt, so the 71 million

 7   plus is the A and B bond.  If those were foreclosed, there

 8   would be no lien going forward.  My understanding is there

 9   would be no lien going forward.  However, the proceeds

10   would be utilized at that point to affect a partial, if

11   there wasn't enough money, redemption under the bonds.

12        THE COURT:  But do the B bonds come ahead even

13   though they're B?

14        MR. HUDSON:  I don't know the answer to that,

15   Judge.  That's a question we're looking into.

16        THE COURT:  But were you arguing -- because I'm

17   just trying to get the sense of whether you believe the

18   contours of the plan that have been described would be

19   unconfirmable for some reason because of the nature of

20   these bonds, and I'm not sure if you're saying it would be

21   or would not.

22        MR. HUDSON:  I don't -- I personally can't

23   envision, and my clients can't envision, Your Honor, the

24   economics of this.  For instance, we've recently done this

25   in Tampa as well in a case that's similar where
```

1    Judge Delano entered complete relief from the stay in a

2    similar context.  Because we don't understand how you take

3    a piece of property that they believe they can strip our

4    lien, which means they believe the value is less than

5    $77 million, restructure this case, and put money into the

6    unsecureds, unless somebody's just going to come in and put

7    money in for the unsecureds, and we don't see that at this

8    point, Judge.

9           And if they're going to strip us down, our view

10   is we'd rather go to the market than get this one

11   particular entity a lockup and come in and do all of these

12   valuation hearings and pay us some number that ultimately

13   you decide, as opposed to going to the market and allowing

14   the market -- test the market, Judge, because developers

15   are out there buying now.  That's a good thing for all of

16   us.  But at the end of the day, that's the best way to get

17   the most value here, not to lock something up in the first

18   week of the case and say, you're the only one that's going

19   to have a chance to bid on this.  We just don't see

20   economically ---

21          THE COURT:  It's not a bid.  They're not doing a

22   sale, and they're not doing a sale under a plan.

23          MR. HUDSON:  They're selling the equity, Judge.

24          We're here today -- and this is exactly the

25   problem that we have, Judge -- we're here today trying to

1    envision what sort of plan they can file.  We don't see any

2    sort of plan that they can file that makes economic sense

3    in a Chapter 11 context, because no plan gets unsecured

4    creditors any money that we see under -- you've got the

5    absolute priority rule issues.  We've got my tax issue, if

6    I'm right on the tax issue, Judge.  We have a priority

7    claim against any unsecured proceeds that come into this

8    that would prime the general unsecured class.

9              I don't see an out, Judge.  Our clients don't see

10   an out.  So instead of wasting another two years or another

11   six months ---

12             THE COURT:  Is there case law -- it sounds

13   creative, but is there case law that obligations to a

14   special assessment district by a debtor are taxes?

15             MR. HUDSON:  I don't know in a bankruptcy

16   context, Judge, no.

17             THE COURT:  Have you looked at this issue?

18             MS. MORA:  Judge, the statute says that they have

19   the same priority as taxes.  We don't believe that they are

20   taxes, however.

21             MR. HUDSON:  Well, Judge ---

22             THE COURT:  What statute?

23             MS. MORA:  They're obligations.  I'm sorry?

24             THE COURT:  What statute?

25             MR. HUDSON:  170.10.

Page 37

1          MS. MORA:  Florida Statute.

2          MR. HUDSON:  Florida Statute 170.10.

3          MS. MORA:  Judge, I think Mr. Hudson is sort of

4     mixing apples and oranges.  I mean, the bond holders and

5     the indenture trustee are not the parties who are

6     foreclosing here.  The foreclosure was filed by the

7     district.  The district is the one who takes title to the

8     property.  It's subject to claims owed to the indenture

9     trustee, but it's not the indenture trustee or the bond

10    holders who are going to be taking title to this property,

11    and, again ---

12         THE COURT:  Is that right, Mr. Hutton?  Who -- do

13    you -- who gets title?  Mr. Hudson, I thought, was saying

14    you would.

15         MR. HUDSON:  They take title for the benefit of

16    us, Judge, under the indenture.

17         THE COURT:  They being the ---

18         MR. HUTTON:  Your Honor ---

19         THE COURT:  I'm not sure this is material, but

20    I'm just curious, I guess ---

21         MR. HUDSON:  It probably isn't, Judge, but --

22         THE COURT:  If there's a ---

23         MR. HUDSON:  -- the trustee would take -- under

24    the indenture, the trustee would take title, and, at the

25    end of the day, that is -- the indenture is very specific

1  on this point, hold that property in trust for the benefit

2  of the bond holders because the bond holders have put up

3  all the money, Judge.

4        THE COURT:  Yeah, I mean, ultimately it's --

5  you're the party in interest, I guess, but not necessarily

6  for voting purposes or plan purposes.  Who's the plaintiff

7  in the foreclosure?

8        MS. MORA:  It's the CDD, Judge.  It's

9  Ms. Redmond's client.  It's not the indenture trustee, and

10  it's not the bond holders.

11        THE COURT:  Okay.  Mr. Hutton?

12        MR. HUTTON:  Your Honor, I just wanted to clarify

13  the nature of the relationship because there were some

14  representations made that I don't think are correct.  The

15  reason that the CDD was created in the first instance, and

16  it's done by -- through legal action and action of the

17  commission, is solely for purposes of issuing taxes and

18  bonds.  So what happens is the CDD gets created, and this

19  was done back in 2005.  The CDD issues the bonds, borrows

20  the money from the bond holders and lends that money to the

21  debtor/developer.  In exchange for that, the district gets

22  the tax assessment liens against the property -- against

23  the property that's benefited by the funding, which are

24  pledged and assigned to the indenture trustee for the

25  benefit of bond holders.  It's an integrated transaction.

1    The funds collected by the CDD, with regard to

2  the assessment liens, can only be used to pay down the debt

3  on the bonds, and the structure of the payments matches the

4  debt obligations on the bonds.  So the funds, in other

5  words, are earmarked.  The way the structure works, they

6  pay twice a year, in April and November, and the payments

7  that are due on the assessment liens, which haven't been

8  paid for years, mirrors the obligations that the CDD has to

9  the indenture trustee for the benefit of the bond holders.

10    So to pretend that these are separate unrelated

11  transactions is not ---

12    THE COURT:  I don't think anybody's suggesting

13  they're unrelated.  It's just a matter of maybe who -- who

14  has the standing and who forecloses and who takes title.

15    Ultimately, though, does the bond trustee wind up

16  taking title to the property and then liquidating it for

17  the purpose -- for the benefit of the bond holders?

18    MR. HUTTON:  The way I've seen these deals

19  structured in the past is they'll create a special purpose

20  entity for purposes of taking title to the property.

21    THE COURT:  Have you looked at whether there's

22  any legal -- other than the normal Chapter 11 stuff -- but

23  any legal prohibition on restructuring the debt, given the

24  nature of the secured debt here that is being owed to a

25  district in connection with a bond financing rather than a

1    typical lender?

2           MR. HUTTON:  I'm not fully prepared to address

3    that today, Your Honor.  I can tell you I'm not -- based

4    upon our experience with CDD cases, I'm not aware of cases

5    where bond debt of this sort has been stripped down.  I'm

6    not saying it hasn't happened.  In the cases I've been

7    involved, I've not seen bond debt assessments get stripped

8    down.

9           MR. HUDSON:  Judge, I will address that if you

10   like.  I can add a little bit.

11          THE COURT:  All right.  Briefly.  And then ---

12          MR. HUDSON:  Briefly.  Under the cramdown

13   provisions of 1129, if it is a tax, and we believe it is a

14   tax because it's an obligation of a municipality that

15   appears on a tax bill used to build infrastructure, that's

16   what municipalities do, and it's an obligation that

17   encumbers everybody within the confines of a district.

18   That's what taxes do.

19          So we believe it's a tax.  And there's provision

20   in 1129 that prevents filing a plan to improperly strip or

21   negatively impact taxes.  So we do believe that, from an

22   1129 cramdown point of view, they're also going to have a

23   problem with confirmation.

24          THE COURT:  Okay.  But, Mr. Guso, and, Ms. Mora,

25   you think you're going to --

Page 41

1          MR. GUSO:  We disagree.

2          THE COURT:  -- come up on that issue?

3          MR. GUSO:  Well, Your Honor, these -- it seems to

4    me that Mr. Hutton -- excuse me -- Hudson's position and

5    Ms. Redmond's position are irreconcilable.

6          On the one hand, the CDD is before you asserting

7    that it is entitled to relief from stay on the basis that

8    it is a secured creditor.  If I heard Mr. Hudson correctly,

9    he asserts that certain of the claims of the CDD are

10   entitled to priority under 5078(a) of the Bankruptcy Code,

11   which deals expressly with allowed unsecured claims of

12   governmental units.  Those positions are inapposite.

13         THE COURT:  Well, not necessarily if you strip

14   them down, right, if there's an unsecured piece?

15         MR. GUSO:  If there's an unsecured piece -- if

16   there's an unsecured piece, by definition, Your Honor, it

17   would fall to the unsecured class, not to a priority class,

18   is our position.

19         THE COURT:  Why can't it be an unsecured tax

20   claim?

21         MR. GUSO:  Because these are non-recourse -- I

22   would argue, Your Honor, these are non-recourse claims that

23   are made recourse solely by the application of Section 1111

24   of the Bankruptcy Code.  The debtor does not have personal

25   liability on these bonds.  It is an in rem remedy against

Page 42

1   the property.

2              THE COURT:  Okay.

3              MR. GUSO:  And, Your Honor, I'm not aware of any

4   case that would prohibit the restructuring of the CDD

5   bonds.

6              And, Your Honor, if I may just address some of

7   the terms of our term sheet, we tried to play it straight

8   down the middle with our proposal.  Our proposal does not

9   require the debtor to grant our client any collateral for

10  this loan.  There's obviously no priming.  Your Honor, we

11  believe that the interest rate is market for an unsecured

12  loan of this type.  There's no breakup or topping fee that

13  would be payable to our client if someone comes in and

14  offers a higher or better transaction.  The limited lockup

15  provisions that are subject of the objection are in my view

16  usual and customary.  They have a fiduciary out.  There's

17  also an independent fiduciary in this case in the form of

18  the committee, that I can tell Your Honor has been active.

19             Moreover, Your Honor, to Ms. Mora's point, in my

20  experience as well, it is customary for a debtor and an

21  estate to fund the reasonable costs and expenses of a

22  lender, and here those costs and expenses --

23             THE COURT:  But you're not --

24             MR. GUSO:  -- are budgeted.

25             THE COURT:  -- you're not really -- well, you're

1    a lender in part, but the expenses are not the expenses of

2    doing the DIP loan documents, although they are long for

3    the amounts at issue.  But the expenses are the deal

4    negotiations and analysis and plan expenses; right?

5            MR. GUSO:  Correct, Judge.  We do have ---

6            THE COURT:  And you think that's -- that's

7    typical, that --

8            MR. GUSO:  Yes.

9            THE COURT:  -- you loan money that's going to be

10   used to finance the ---

11           MR. GUSO:  It's the cost of the transaction,

12   Your Honor, and so, in our view, if someone comes forward

13   and proposes an alternative transaction that the Court

14   determines is higher or better, our client should at least

15   be reimbursed for advancing a transaction which set the

16   table for an alternative transaction.

17           THE COURT:  So -- well, now you're talking more

18   like a breakup ---

19           MR. GUSO:  A breakup fee is usually just a

20   percentage of the deal in a sale, Judge, and there's no

21   such provision here.

22           THE COURT:  So, in effect, you're saying that the

23   covering your expenses is -- it's only going to have

24   meaning if somebody else comes in as a plan proponent.

25           MR. GUSO:  That's our view, Judge.  That's our

1    view, and we have not -- the superpriority claim is not

2    linked in any way, Your Honor, to any perceived value in

3    avoidance actions.  We haven't done that analysis at all,

4    and taking Ms. Mora's statements at face value, Judge, we

5    don't believe there's any here.

6            Judge, could the Court also inquire -- Your Honor

7    asked of the indenture trustee's counsel and of the bond

8    holders' counsel, what happens when a foreclosure's

9    completed, and I understood Mr. Hutton to say that often

10   the indenture trustee creates a special purpose entity for

11   purposes of taking title to the collateral, but I'm unclear

12   as to what happens next.

13           Does the trustee then distribute that property to

14   the bond holders?  Because, if so, it seems to me that

15   that's an end around of the process we're trying to advance

16   with the bond holders, trying to take title to the property

17   outside of the jurisdiction of this Court.  We're competing

18   for the same asset.  Is that ---

19           THE COURT:  I'm not sure I follow that.

20           MR. GUSO:  Sure.

21           THE COURT:  I mean, I'm understanding that -- and

22   they never -- I'll ask, because maybe it wasn't specified,

23   but my understanding was that the bond trustee would take

24   title and liquidate the asset, and then the moneys would go

25   to the A holders and B holders in some unknown fashion.

Page 45

1        MR. GUSO:  The A holders and the B holders are
2   one, as I understand it.
3        THE COURT:  Right.  So I guess it doesn't matter.
4        MR. GUSO:  They bought at a discount.  I think
5   Mr. Hudson will tell you that.  And I didn't hear the last
6   part, which is that they will liquidate -- they, the
7   indenture trustee will liquidate the asset and then
8   distribute cash.
9        MR. HUDSON:  As I recall, Judge, standing here,
10  the bond -- the indenture does not say who liquidated --
11  liquidates it.  It does have a waterfall in it and says
12  what's paid first, but the indentures do say that the
13  property has taken title -- the district takes title,
14  because technically that's the way it was set up in the
15  beginning, for the benefit of.  So once the foreclosure has
16  commenced, at the end of the day, if the foreclosure
17  finishes, that's what the law says.  That's what the
18  Legislature says.
19       THE COURT:  I guess, Mr. Guso's question, and I'm
20  not -- I understand in part where he's going, that -- is
21  that the bond -- whether the bond trustee would just convey
22  title to you or your client instead of selling.
23       MR. HUDSON:  I don't believe -- I believe the
24  indenture is silent on that, so the answer is it could
25  happen -- that could -- that is a possibility, but not

Page 46

1  necessarily a legal requirement.

2         THE COURT:  All right.  Then, I guess, I still

3  don't really understand though, Mr. Guso, what you think is

4  an end around.  If they're --

5         MR. GUSO:  Judge, if ---

6         THE COURT:  -- if they're the money in the deal,

7  in effect, and they -- they wind up getting the property,

8  why is that different than a normal lender just getting

9  title if they are successful in foreclosing?

10         MR. GUSO:  If they're getting money, Your Honor,

11 we believe our plan will address the money.  That is, our

12 plan will propose a restructuring of the debt, and they

13 will get the benefit of that bargain.

14         If what they're telling Your Honor is that the

15 bond holders are giving the indenture trustee direction,

16 who in turn is giving the CDD direction, in order to

17 foreclose to end up with title to the property, that's a

18 straight foreclosure, and what they're trying to do is

19 exercise rights against collateral which they don't have

20 through the person of the CDD.  And the way this works,

21 Your Honor, is that the debtor has privity with the CDDs

22 because they hold the liens, and the debtor has the right

23 under the Bankruptcy Code to restructure that debt.

24         THE COURT:  Okay.  Well, that -- let's get --

25 let's back away from the plan issues themselves and some

1    potential complications by virtue of the nature of this

2    senior debt.

3              Ms. Redmond, what's your -- you having listened

4    patiently to the other parties in the court ---

5              MS. REDMOND:  Well, Your Honor ---

6              THE COURT:  Well, at least looking patient.  I

7    don't know.

8              MS. REDMOND:  Your Honor, may I hand up a

9    schematic of the property so you can see what it looks

10    like?

11              THE COURT:  Okay.

12              MS. REDMOND:  Thank you.

13              Your Honor, on behalf of the district we

14    filed ---

15              THE COURT:  What direction are we looking?

16              MS. REDMOND:  Your Honor, you are looking -- if

17    you look at the little piece on the side, that is the

18    partially constructed parking garage.  The rest of it, the

19    big square in the middle ---

20              THE COURT:  Why don't we -- beam us up, Scotty.

21              You know how to use this thing?

22              MS. REDMOND:  I  don't.  I did not go to

23    Mr. Silver's brown bag, which he reminds me of all the

24    time.

25              THE COURT:  He can do it then.

Page 48

1          THE COURT:  Well, we're not on yet.

2          MS. AFTIMOS:  We're not on?

3          THE COURT:  It's not working?

4          MS. AFTIMOS:  No.

5          MR. SILVER:  I believe that the court reporter

6    has the power to beam that up.

7          THE COURT:  All right.  I guess, no time for fun

8    and games.

9          The main road here along the side of the

10   property, what direction is that running, north/south?

11         MS. REDMOND:  Your Honor --

12         MR. SILVER:  Yes.

13         MS. REDMOND:  -- yes.

14         MS. MORA:  It's 107th Avenue, Judge, going south.

15   In other words, Judge ---

16         THE COURT:  The border between -- this long --

17   the longest red line?

18         MS. REDMOND:  It's north/south.  It's

19   107th Avenue, Your Honor.

20         THE COURT:  Okay.  And so the property is to the

21   west of 107th Avenue?  I'm just trying to get my bearings.

22         MS. REDMOND:  East, Your Honor.

23         MS. MORA:  East.

24         THE COURT:  East.  So we're looking south?

25         MS. MORA:  Correct, Your Honor.

Page 49

1          THE COURT:  Okay.

2          MS. REDMOND:  Your Honor, the large structure, in

3     the top of the smaller rectangle on the piece that goes

4     across 107th Avenue, is the partially constructed parking

5     garage.  The rest is the property that doesn't have any

6     vertical construction on it.  That's been the subject of

7     the infrastructure construction over the past couple of

8     years.

9          THE COURT:  Okay.  And what are the streets here,

10    north and south?

11         MS. REDMOND:  Your Honor, it's 107th and 50 --

12    58th ---

13         MS. MORA:  Judge, on the bottom here of the flag,

14    I think of this like a flag, this is 50 -- Northwest

15    58th Street, and then it's 74th on the top and 102nd Avenue

16    here on the right-hand side, and 107th.

17         THE COURT:  Of course, you're holding --

18         MS. MORA:  It upside down.

19         THE COURT:  -- the thing upside down.

20         MS. MORA:  I am, because, Judge -- I mean, this

21    is north and this is south.  Whenever you look at a map,

22    that's south.

23         THE COURT:  I know.  But I had finally gotten my

24    bearings from the north.  All right.  So the southern

25    boundary is what?

Page 50

```
 1           MS. MORA:  Northwest 58th Street.
 2           THE COURT:  And then north is 70 ---
 3           MS. MORA:  74th Street.
 4           THE COURT:  Okay.
 5           MS. MORA:  And on the eastside ---
 6           MS. REDMOND:  Northwest 102nd.
 7           MS. MORA:  Right, 102nd Avenue.  And that's
 8   107th Avenue.
 9           THE COURT:  And where's -- is that -- where's,
10   like, the Doral Country Club?  That's down by 36th Street?
11           MS. MORA:  That's correct, Judge.
12           MS. REDMOND:  Yes, Your Honor.
13           THE COURT:  And that far west, is that what we
14   see sort of near the top, or the bottom, Ms. Mora?
15           MS. MORA:  Correct, Judge.
16           MS. REDMOND:  Yes, Your Honor.
17           THE COURT:  Okay.  All right.  So what about it?
18           MS. REDMOND:  So, Your Honor, I just wanted you
19   to see the property so that you'd be a little bit familiar
20   with what we're talking about today.  And the district
21   moved for relief from stay because, since May of 2009, the
22   district hasn't received a semiannual interest payment.
23   It's not received a principal paydown on the A bonds, and
24   it has been advancing costs to preserve and protect the
25   property.  It has been advancing moneys to insure the
```

1  property.

2          In fact, since December of 2008, the district has

3  advanced over $730,000 to protect the property.  Those

4  moneys have just gone into cleaning the property, making

5  sure that the property isn't overgrown, making sure that

6  the infrastructure that's been put in place is protected

7  and isn't diminished and the value isn't lost.

8          THE COURT:  What about post-petition so far in

9  ongoing expenses?  Is the district continuing to fund or

10 have they funded anything post-petition?

11         MS. REDMOND:  Yes, Your Honor.  There's an

12 expense for $45,000 to clean the property to protect the

13 infrastructure.  The property was getting overgrown, and

14 that overgrowth could have damaged the infrastructure, and

15 because of that there's a $45,000 charge.

16         THE COURT:  That's been spent post-petition?

17         MS. REDMOND:  Yes, Your Honor.

18         Your Honor, in addition to that, what's happened

19 during the last three years, is we estimate the costs of

20 preserving the property are approximately 450,000 out of

21 the 700,000 I referenced to the Court.  If that's so,

22 then usually the cost of preserving the property, if you

23 figure for three years 450,000, is about 150,000 per year.

24 I have certain costs that ---

25         THE COURT:  So are you -- I know I'm rushing you

1   a little bit -- but are you saying this in the context of

2   requesting in the alternative, or perhaps as part of the

3   financing, if it's approved, some adequate protection

4   payments?

5          MS. REDMOND:  Well, Your Honor, one of the

6   reasons that we moved for relief from stay is lack of

7   adequate protection, and the fact that -- and it was

8   somewhat stunning to us that when a financing was proposed,

9   none of the ongoing costs to preserve the collateral, which

10  is the issue in this case, was even included, and, in fact,

11  the only thing that was included was attorney's fees in

12  that.

13         Your Honor, we have things -- like, we provided

14  the fencing around the property, that Ms. Mora told you is

15  there, and a no trespassing sign.  We've replaced cast iron

16  basin gates and manholes in order to preserve the property.

17         Again, we had insurance.  We've paid insurance in

18  the amount of $210,000 since the time -- since the end of

19  2008.  We've done monthly mitigation and management

20  services and mitigation and monitoring environmental permit

21  modification, and other things to preserve the collateral.

22         Your Honor, so I think, and to be very, very

23  accurate, the district has budgeted $70,000 a year for

24  preservation of the property for 2012 going forward.

25  Although, the numbers look like, historically, that they're

1    closer to 150,000 a year.  But we know that we did have

2    that expense for 45,000.  That's been incurred since the

3    filing of the petition.

4            Your Honor, so, you know, we raise the issue of

5    lack of adequate protection, and, in fact, the financing

6    seeks to prime any 507(b) claim that the lender would have

7    with respect to a loss of adequate protection in this

8    particular proceeding, and the financing, of course,

9    doesn't deal with any of the preservation of the assets of

10    the estate.

11            Your Honor, the other basis that we sought relief

12    from stay, which we think is clear, we take the debtor's

13    own documents and their own petition that says the

14    property's worth 36 million and there's no dispute that the

15    CDD debt is 71 million.  So there is no equity in this

16    property.  We do believe that the debtor will seek some

17    sort of a strip down in connection with confirmation, and

18    we believe that that plan probably isn't confirmable.

19            THE COURT:  Why?

20            MS. REDMOND:  And I say probably, Your Honor,

21    because the first of the trilogy of cases that dealt with

22    indubitable equivalents, and that's the Pacific Lumber case

23    out of the Fifth Circuit ---

24            THE COURT:  We're not talking about a sale as

25    part of a plan though.

1          MS. REDMOND:  Well, Your Honor, that's what the

2    Fifth Circuit determined.  What the Fifth Circuit

3    determined, which we believe is favorable, we don't think

4    indubitable equivalence ruling is one that's right.  We

5    agree with Judge Ambro in the Philadelphia Newspapers case

6    in the Seventh Circuit and River Road Hotel Partners.

7    However, what the Court did say in overruling and reversing

8    the Bankruptcy Court -- it said, "In this case, the

9    Bankruptcy Court held --- "

10          THE COURT:  Go a little slower.  Go ahead.

11          MS. REDMOND:  "In this case, the Bankruptcy Court

12   held that clause two, governing sales free and clear, is

13   inapplicable because the reorganization plan constitutes a

14   transfer rather than a sale of assets.  We agree with the

15   note holders that this ruling was wrong.  MRC, which -- a

16   competitor of Palco (phonetic) joined with Palco's creditor

17   to offer cash and convert debt into equity in return for

18   taking over both Palco and Scopak (phonetic).  Palco and

19   Scopak were the subsidiaries, and they took over the equity

20   of those entities.  New entities wholly owned by them

21   received title to the assets in exchange for this purchase.

22   That transaction is complex, does not -- that it is complex

23   does not fundamentally alter that it involved a sale of the

24   note holder's collateral."

25          So, Your Honor, we believe that the transfer, in

Page 55

1  the context of a plan, still implicates a sale, and we

2  would rely on the Fifth Circuit decision in arguing that.

3            THE COURT:  What transfer?  They're going to --

4            MS. REDMOND:  A transfer to ---

5            THE COURT:  They're going to get the stock of the

6  reorganized debtor.

7            MS. REDMOND:  A transfer to Terra of the

8  interest -- 100 percent interest in the entity, which the

9  Fifth Circuit says in an exactly similar circumstance

10  constitutes a sale, which would give rise, we believe, to a

11  right to credit bid, and that issue would come up at

12  confirmation, and we think that is a very significant

13  impediment to confirmation of this plan.

14            THE COURT:  But you wouldn't be credit bidding

15  the asset.  You'd be credit bidding the equity.

16            MS. REDMOND:  Well -- but we would be credit --

17  if Your Honor finds, in accordance with the Fifth Circuit,

18  that the transfer, even though the transfer was of the

19  interest of the debtor to another entity, that it

20  constitutes a sale, then it would give rise to the right of

21  the CDD, the district, to credit bid under that

22  circumstance.

23            THE COURT:  Okay.  I can't digest --

24            MS. REDMOND:  But, Your Honor ---

25            THE COURT:  -- the comment on that piece of

1  specific --

2          MS. REDMOND:  Your Honor ---

3          THE COURT:  I know I didn't agree with the

4  depriving the right to credit bid and a straight sale of

5  the asset under a plan based on indubitable equivalent,

6  but ---

7          MS. REDMOND:  So, Your Honor, those are the

8  reasons that we sought relief from stay.  Our foreclosure,

9  as Your Honor commented, is unlikely to even get to

10  judgment by the time that Ms. Mora has to do something

11  particularly pursuant to the terms that she's agreed to and

12  locked up to in the term sheet.

13          Your Honor, that's -- we think that relief from

14  stay is appropriate, that the CDD should be able to go

15  forward.  We haven't received a payment.  There's no

16  provision for a payment.  There's no provision for

17  preserving the property.

18          In fact, I'll address in a minute the term sheet

19  and why we object to it and why we think that it doesn't --

20  that the debtor doesn't meet their burden to be able to

21  show to the Court that they're entitled to this financing.

22          But for relief from stay purposes, going forward

23  with our case, at this point, would at least allow us to

24  advance our position so that if the case is not

25  confirmable, as we believe it isn't, Ms. Mora believes it

1    is -- but going forward would lead us to less prejudice --

2    we would not be prejudiced in having to wait until that day

3    when we determine yes or no in order to be able to assert

4    our rights.

5            THE COURT:  So if there was some sort of parallel

6    track order which allowed the debtor to go forward with

7    its -- the prosecution of a -- or the presentation of a

8    plan, then what's your -- then what's your view on the

9    funding and, I guess, in part, Ms. Mora's comment that

10   you're not affected whether or not you get stay relief,

11   you're not impacted by the superpriority loan?

12           Because it's -- as Mr. Guso explained it, I

13   think, from a business standpoint, it's only going to

14   really have meaning if there's some other plan proponent

15   that comes in.

16           MS. REDMOND:  Well, Your Honor, let me address a

17   couple things in the term sheet because -- and, you know,

18   to answer Your Honor's question about an emergency, we

19   didn't see what the emergency was with respect to this

20   particular financing.  The only thing that's attached to

21   the motion for financing is not the definitive documents,

22   which are certainly much more complex and detailed than the

23   term sheet, but a term sheet -- and, for example, Ms. Mora

24   stands here today and tells the Court that this involves

25   only a superpriority administrative expense, but in item

1    one in the summary of the DIP financing, it says,

2    authorizing the debtors to obtain secured post-petition

3    financing.

4            THE COURT:  Well, they clarified that, I think.

5            MS. REDMOND:  Your Honor, in addition, the debtor

6    must show the Court that -- in order to get financing on

7    any priority basis, that they're unable to obtain financing

8    on a less -- on a more restrictive basis.

9            Here, on Page 2, the term sheet says,

10   notwithstanding the foregoing cap on the DIP financing,

11   nothing in this term sheet shall modify, limit or abrogate

12   the separate fee and expense guarantees extended by

13   Terra World Investments, LLC to the debtor's professionals,

14   consultants and independent contractors, including without

15   limitation Bilzin Sumberg, Isaac Kodsi, Frank De Marco

16   (phonetic), Fishkin & Associates and Rocker and Rosen

17   (phonetic), Inc.

18           Your Honor, that is everybody.  The entire

19   financing is designed to pay those people, plus only two

20   others.  The only two who aren't guaranteed coming into

21   this hearing today by Terra in connection with this case

22   are the unsecured creditors' committee, who are budgeted at

23   $7,000 a month, and the United States Trustee fee for the

24   first month budgeted at $325.

25           Your Honor, so the debtor has a guarantee.  The

1   debtor knows they're going to be paid.  The case is being

2   advanced by Terra and being paid for by Terra, but what

3   Terra wants to do is upgrade its protection for paying for

4   things that it ought to be paying for itself, for things

5   that it has guaranteed in order to get this case before

6   this Court and take that and upgrade it to a superpriority

7   administrative expense.

8            THE COURT:  But how is it going to be paid -- how

9   are you going to be impacted by that?

10           MS. REDMOND:  Your Honor ---

11           THE COURT:  The way it's been described, and I

12  don't know the answer, and Ms. Mora said there hasn't been

13  a forensic analysis, but if there's no money that's going

14  to come in other than Terra's own money, in which case it's

15  kind of a moot point, I think, or somebody else that's

16  going to fund a plan, in which case Mr. Guso was arguing

17  that in lieu of a -- kind of a breakup fee that you might

18  get in a sale deal, they're just getting their expenses

19  covered for having gotten the plan process started.

20           MS. REDMOND:  Your Honor, I think we are impacted

21  a couple ways.  You heard two different stories today.  You

22  heard Ms. Mora say, no, there's going to be no lien

23  stripping with respect to the CDD debt, and then Mr. Guso

24  got up and said, well, you know, we may lien strip with

25  respect to the CDD debt.  If that is a circumstance, then,

1   of course, under 1111(b), we have an unsecured claim that's

2   created in Chapter 11, and, therefore, we're impacted

3   severely by that.

4        In addition, the financing, again, as I said to

5   the Court earlier, seeks to prime any 507(b) claim that the

6   district may have with respect to the cost of preserving

7   the property, which is again -- dovetails into our motion

8   for relief from stay and why we're entitled to relief from

9   stay.  So we're impacted in that way as well.

10        THE COURT:  Well, that's not an additional

11   clause.  364(c) does prime 507(b); right?

12        MS. REDMOND:  Well, Your Honor, in the term sheet

13   it says it does.  You know, the superpriority that's

14   provided for in 364(c) can be a superpriority to the extent

15   that it's agreed to.

16        THE COURT:  Right.  But as a matter of law, if

17   it's approved under 364(c) it primes, and that's what

18   you're saying it would ---

19        MS. REDMOND:  It primes all administrative

20   expenses, and 507(b) is a superpriority administrative

21   expense, but not at that level.  So it would be that a

22   364(c) administrative expense would come before a 507(b),

23   which would come before administrative expenses.

24        And, Your Honor, the -- a couple of the other

25   things that are troubling with the term sheet is there's an

1    indemnification provision that the debtor agrees to in

2    Paragraph 11 on Page 5, and the debtors jointly and

3    severally agree to indemnify the plan funder, its officers,

4    directors, agents, employees, contractors, representatives

5    and attorneys, and their heirs, personal representatives,

6    successors and assigns of each from and against the full

7    amount of any and all losses as hereinafter defined whether

8    or not the indemnified persons or any of them suffer such

9    losses ---

10          THE COURT:  You're going too fast, but I'm

11    reading it.  So the ---

12          MS. REDMOND:  Your Honor, one of the problems

13    with this at this stage is that we don't know what all this

14    means.  One of the losses or defaults which could occur

15    under the term sheet is a breach of representations of

16    warranties, and all the term sheet tells us today is that

17    the definitive documentation will contain the ordinary and

18    usual representations and warranties.

19          So there could be a representation of warranty

20    that the debtor breaches and creates an obligation under

21    the indemnification that, again, rises to the level of a

22    superpriority administrative expense, again pushing

23    everybody in the estate down lower, and resulting in a loss

24    of adequate protection in that respect.

25          THE COURT:  Okay.  Without commenting on whether

Page 62

1    the Court would approve the term sheet, it does contemplate

2    a final order by a week from Friday; right?  So you're ---

3             MS. MORA:  That's correct, Judge.

4             THE COURT:  So you would be asking for a hearing

5    on the 2nd?

6             MS. MORA:  That's correct, Judge.

7             THE COURT:  So is there any problem just carrying

8    all this to the 2nd?  Is there some emergency between now

9    and December 2nd?

10            MS. MORA:  Judge, as long as Mr. Schneiderman is

11   not going to yank our chain because ---

12            THE COURT:  I wouldn't give him a hearing on a

13   motion before then, so ---

14            MS. MORA:  Yeah, we've got U.S. Trustee fees that

15   are due, but other than that, Judge, we can postpone it

16   until the 2nd.

17            THE COURT:  Okay.

18            MR. SCHNEIDERMAN:  No objection.

19            THE COURT:  Well, with everybody here, I did want

20   to get a fuller view, but -- all right.

21            So now I'll comment on the various things.  I

22   think where this case should go is to give the debtor a

23   chance, through Terra, to come up with a plan.  I haven't

24   heard anything definitive that would suggest that this is a

25   hopeless plan legally.

1          If Mr. Eller's on board, he's going to control

2     the unsecured class.  You won't have an impaired -- you

3     won't have the issue of whether you'll have at least one

4     impaired class voting yes.  New money is getting an equity,

5     so I don't think you have an absolute value issue.  I mean,

6     I don't think you're going to have -- so you won't have a

7     classification issue.  Whether you can cram down and strip

8     down the secured debt, I haven't heard anything definitive

9     on that, so I would give it a chance to go forward.

10          I'm also inclined, though, to grant stay relief

11     and let them go forward with the foreclosure so it proceeds

12     on parallel tracks.  The funding -- I don't see much risk,

13     and I see the need and benefit to funding administrative

14     expenses, which even though they may be largely

15     professional fees, to take a shot at confirmation.  In all

16     likelihood, if Terra doesn't confirm the plan, they're

17     going to be out the money, superpriority or otherwise.

18          I'm not prepared to comment specifically on all

19     of the term sheet provisions, but, frankly, I'm not sure

20     why they're necessary as part of this deal.  If Terra wants

21     to go forward with the deal, then we've got some aggressive

22     deadlines.  I don't see a problem with the Court basically

23     meeting those deadlines.  I'm going to give you a hearing

24     on the 2nd, so you'll have that.  You know, file your

25     motion to value, if you file your plan.  I mean, if

1    everything is done -- if you're agreeing to do it, it's

2    going to get heard when they want you to have it heard, but

3    this notion of approving a lengthy term sheet in advance

4    seems troublesome.  So let's carry it to December 2nd at

5    10:00.

6              You got a problem?

7              MS. REDMOND:  Just with December 2nd, Your Honor.

8    I'm in La Quinta for the ABI Winter Leadership Conference,

9    and I also think Ms. Mora has the Florida Bar Conference.

10             MS. MORA:  That's the 1st.

11             MS. REDMOND:  Okay.

12             MR. HUTTON:  I'm also doing a leadership

13   conference on that date, Your Honor.

14             MS. REDMOND:  Your Honor, back on Monday morning?

15             THE COURT:  That's what, the 5th?  All right.

16   Well, assuming that the deal isn't going to implode --

17             MS. MORA:  It won't, Judge.

18             THE COURT:  -- carrying it to the 5th.

19             MS. MORA:  We've asked Terra, and they'll consent

20   to the 5th -- to a hearing on the 5th.

21             THE COURT:  All right.  So let's just carry it to

22   12/5 at 10:00.

23             What else was on the -- oh, the creditor

24   committee motion.

25             MR. MOSES:  Yes, Your Honor, and notwithstanding

1    the comments that were made, I think we are a relevant

2    party here in the case.  The U.S. Trustee did appoint a

3    committee, and, obviously, right now is not the time and

4    the place for it, but I'm not sure, to the extent that

5    Mr. Eller's client is completely unsecured, whether that

6    vote is going to carry the debt.  The debtor did assert

7    claims against AmT, and they did schedule a $5 million

8    counterclaim against them, but, obviously, that's not the

9    time or the place.

10           THE COURT:  Well, I don't think the committee's

11   going to carry the unsecured class, but perhaps there's

12   going to be a basis to separately classify.  I don't know.

13           But the other thing that was mentioned was that

14   the committee is going to take some role in soliciting or

15   considering other proposals, notwithstanding the proposed

16   lockup.

17           MR. MOSES:  Yes.  And -- well, in the terms of

18   the lockup, there is -- the debtor is prohibited from

19   soliciting or initiating contact with third party

20   committees, and to the extent that any parties are

21   interested and have contacted the debtor, they will forward

22   that over to the committee, and then, obviously, the

23   committee is not prohibited from shopping or taking any

24   independent actions.

25           THE COURT:  All right.  So is there any objection

1    to the application?  All right.  You're in.

2            MR. MOSES:  Thank you, Judge.

3            THE COURT:  For free so far.  But, as I said, I'm

4    inclined to allow financing to pay the professionals

5    necessary to give the plan a shot.  Whether that includes

6    Terra paying itself is an open issue.  The term sheet's an

7    open issue, and then the parallel tracks is something that

8    I would consider given the nature of the case and the debt

9    here.

10           MS. MORA:  Judge, one thing I just want to

11   clarify.  Ms. Redmond made a point about the documents and

12   concerns about the representations that the debtor's

13   making.  The only documents that are contemplated in

14   connection with this financing is the term sheet and a very

15   simple promissory note.  I'll provide a copy of that to

16   Ms. Redmond to review.  There are no representations that

17   the debtor is making in any of those documents.

18           THE COURT:  Okay.

19           MS. REDMOND:  And, Your Honor, that's fine.  The

20   term sheet did refer to it being subject to definitive loan

21   documentation, and if it -- there isn't, then I'll look at

22   the term sheet.

23           THE COURT:  All right.  Let's carry the monthly

24   payment fee issue.  I'm not sure we're going to need it

25   given the short fuse, or if it is going to be appropriate,

1   it should be considered as part of the financing.

2          The track this is on, though -- I'm not inclined

3   to have a whole list of schedules of when you file fee apps

4   and all that stuff, but maybe.  But let's carry that to the

5   5th as well and deal with that in connection with the

6   financing that would be used to pay the fees.

7          MS. MORA:  Judge, do you want us to just prepare

8   an order that carries everything over to the 5th?

9          THE COURT:  Well, we certainly need an order just

10  granting the appointment of a committee.  As far as the

11  other matters, I guess, we probably should have an order

12  because -- I guess, this would be a preliminary hearing on

13  the stay relief, and we'll call it a final hearing on the

14  5th, and then just an order resetting the financing and

15  term sheet motion.

16         But, Mr. Guso, maybe spend a couple minutes now

17  just to give me some idea why we need to have the Court

18  bless all of these dates and obligations.

19         MR. GUSO:  The dates, Your Honor, are -- were

20  tied to the deadline by which the debtor has to file a plan

21  because it's a -- it filed as a single-asset real estate

22  case, and so, Your Honor, we wanted to work a timeline off

23  of that date, which is why you have dates proposed for

24  approval in the term sheet so that we knew we could -- if

25  we financed, we had the protections accorded us under the

1 order, a deadline by which the motion for valuation had to

2 be filed ---

3          THE COURT:  But do we need -- why don't we do

4 this because I've already delayed the previously scheduled

5 motion by an hour.  Why don't you just think about and

6 consider a simpler order that would set deadlines on the

7 debtor, and perhaps pursuing the limited lockout -- I'm not

8 close minded for that -- without a specific order approving

9 a very detailed term sheet.

10          MR. GUSO:  We could work that out, Judge.

11          THE COURT:  That's the part that makes me

12 uncomfortable.  I don't have a problem with an order that

13 compels the debtor to file a plan by a certain date and

14 seek, subject to Court availability, a hearing by a certain

15 date.  But to have an order approving, essentially, a term

16 sheet that is in conjunction with an as yet unfiled plan is

17 a little more problematic.

18          MR. GUSO:  I understand, Your Honor.

19          THE COURT:  Okay.

20          MR. GUSO:  We'll work through that.

21          THE COURT:  All right.  And then the -- from the

22 debtor's standpoint, I don't know what the cost is of

23 defending summary judgment if you have a defense or

24 whether -- what the prejudice would be in a parallel track

25 situation.  And it would be considered, I guess,

Page 69

1    alternatively, as suggested in the response to the

2    financing -- it could be parallel track through sale with

3    the right to enjoin the sale if you get to a certain point.

4    Typically, in my parallel tracks, it's a disclosure hearing

5    in which you can demonstrate a prima facie case for

6    confirmation, or in this instance, given the fact that

7    we're not yet at judgment or scheduling a sale, it could be

8    just perhaps stay relief through judgment.  You can talk

9    about that.

10            But I think this is a case where confirmation may

11   be possible, but it's still -- you still have the one big

12   secured creditor out there that may be the only player in

13   the money, based on the values, that may have a solid

14   argument to at least get stay relief through judgment,

15   so ---

16            MR. GUSO:  Yes, sir.

17            (Thereupon, the hearing was concluded.)

18                        — — —

19

20

21

22

23

24

25

Page 70

1                          CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY  OF  DADE:

5

6              I, Amy L. Moorefield, Shorthand Reporter

7    and Notary Public in and for the State of Florida at Large,

8    do hereby certify that the foregoing proceedings were taken

9    before me at the date and place as stated in the caption

10   hereto on Page 1;  that the foregoing computer-aided

11   transcription is a true record of the excerpt of my

12   stenographic notes taken at said proceedings.

13              WITNESS my hand this 1st day of December,

14   2011.

15

16

17        _____
                   Amy L. Moorefield, RPR
18             Court Reporter and Notary Public
            in and for the State of Florida at Large
19          My Commission Expires:  August 30, 2014

20

21

22

23

24

25