# SUMMARY APPRAISAL REPORT

## PART 1 OF 2

# SUMMARY APPRAISAL REPORT

*Prepared for*

**Ms. Mindy A. Mora, P.A.**
**Bilzin Sumberg Baena Price & Axelrod, LLP**

*Property Appraised*

**117 acres of Vacant Land**
**Northeast of NW 58th Street and NW 107th Avenue**
**Doral, FL 33178**

*Date of Valuation*

**December 11, 2011**

*Prepared by*

**Waronker & Rosen, Inc.**
**5730 S.W. 74th Street, Suite 200**
**South Miami, Florida, 33143**

**LEE H. WARONKER, MAI, SRA**

**CARLOS A. DIEZ**

**File # 6891**

# Waronker & Rosen, Inc.
### Real Estate Appraisers and Consultants

Miami-Dade County Office
5730 S.W. 74th Street, Suite 200
South Miami, Florida 33143

Broward / Palm Beach County Office
10242 N.W. 47th Street, Suites 40/41
Sunrise, Florida 33351

**Lee H. Waronker, MAI, SRA**     Phone: (305) 665-8890 / Fax: (305) 665-5188          **Josh L. Rosen, MAI**
lee@waronkerandrosen.com                www.waronkerandrosen.com              josh@waronkerandrosen.com

December 20, 2011

Mindy A. Mora, P.A.
Bilzin Sumberg Baena Price & Axelrod, LLP
1450 Brickell Avenue, 23rd Floor
Miami, FL 333131

*Re:*     117 acres of Vacant Land
Northeast of NW 58th Street and NW 107th Avenue
Doral, FL 33178
WRI File No. 6891

Dear Ms. Mora:

We have prepared a ***Summary Appraisal Report*** of the above referenced property for the purpose of estimating the market value of the fee simple interest as of December 11, 2011 The terms market value and fee simple interest are defined in the pages of this report. This report has been prepared based on the scope of the work which is detailed on a following page.  The reader of the appraisal is strongly advised to read the scope of work so as to understand the scope of this appraisal.

This report is intended for use only by the client and intended users as noted herein. No additional intended users are identified or intended by the appraiser. Use of this report by others is not intended by the appraiser. No one else, or any other entities, should rely on this appraisal other than those noted herein.

The subject property is located northeast of NW 58th Street and NW 107th Avenue, in Doral, FL. It is a large, "L"-shaped tract of vacant land with a total gross land area of 117.025 acres. Zoning on this site is TND, Traditional Neighborhood Development District by the city of Doral, Florida.

Ms. Mindy A. Mora, P.A.
Bilzin Sumberg Baena Price & Axelrod, LLP
December 20, 2011

In order to prepare the analysis, we were supplied with the following items:

A. A copy of the Limited Offering Memorandum for the Landmark at Doral Community Development District Special Assessment Bonds, including a description of the Landmark at Doral project and an appraisal of the property by Zillah Tarkoe Associates, dated June 20, 2006.
B. A prospectus by Terra Group outlining their proposed development plan for the subject site
C. A summary of unit sales at The Reserve at Doral, a recently built, 294-unit townhouse development by the Terra Group located about one half mile northwest of the subject site

Any deviation from the information supplied and assumptions used herein will likely result in a change of value.

The subject is the site of a planned (and failed) mixed-use development project called Landmark at Doral. The project was approved in 2005-2006 for construction of 1,109 residential units, approximately 418,000 square feet of commercial space, a public parking garage and a recreational facility. A Community Development District (CDD) was established for the purpose of funding infrastructure improvements necessary to support the proposed project. Some site work was completed, including partial construction of some of the interior roads, and the parking garage was partially completed. The analysis concluded that the partially completed improvements contribute no significant value, as they are specific to a previous development plan that failed, any utility would likely be offset by the construction cost of re-configuring them to suit a future development plan.

The subject property is essentially bisected by large power line easements into a large north segment and a smaller south segment. Also, there is a large county landfill / recycling facility to the northeast that emits moderately offensive odors, rendering most uses along the northeast side of the property un-feasible. These man-made and natural factors make it most feasible to develop the site as three somewhat distinct parcels: the large main residential tract (the North Parcel), a smaller South Parcel suitable for commercial development due to its corner exposure along two main roads, and an East Parcel that would serve as a buffer between the main residential tract and the landfill. The East Parcel could potentially be developed with a use that would be complementary to the residential tract, but which would not be unduly hindered by the offensive odors, though such uses are not likely to be feasible until the residential development is substantially complete.

Ms. Mindy A. Mora, P.A.
Bilzin Sumberg Baena Price & Axelrod, LLP
December 20, 2011

In the analysis, the sales comparison approach was employed to compare the three portions of the subject property noted above to similar comparable tracts, considering the uses most likely to be developed on each. Also employed was a residual land value analysis that considers financial projections based on the development plan that a typical purchaser would propose for the site. The value indications from these approaches were reconciled into a single estimate of market value for the subject property.

As a result of our investigation, it is our opinion that the market value of the fee simple interest as of December 11, 2011, is in the amount of

**FORTY THREE MILLION FOUR HUNDRED THOUSAND DOLLARS**
**($43,400,000)**

On the following pages is the table of contents and scope of work followed by the certificate of value and general assumptions and limiting conditions. It is advised that these items be reviewed so the reader has an understanding of the limitations of this appraisal.

Very truly yours,

Lee H. Waronker, MAI, SRA
State-certified general real estate appraiser
RZ#162

Carlos A. Diez
State-certified general real estate appraiser
RZ#3420

# Table of Contents

Title Page
Letter of Transmittal                                                                                          1
Table of Contents                                                                                            4
Scope of Work                                                                                                5
Certificate of Value                                                                                         6
General Assumptions and Limiting Conditions                                                 8

**INTRODUCTION**                                                                                      10

Summary of Pertinent Data                                                                           11
Area Maps                                                                                                    12
Plat Map                                                                                                       13
Aerial Photographs                                                                                       14
Parcel Maps by Folio                                                                                     15
Appraiser Qualifications                                                                                25

**DESCRIPTION & ANALYSES**                                                                  29

Purpose of the Appraisal Report                                                                    30
Client, Intended User and Use of the Appraisal Report                                    30
Definition of Interest Being Appraised                                                           30
Definition of Market Value                                                                            31
Location                                                                                                        32
Legal Description                                                                                          32
Owner of Record                                                                                           33
History of the Subject Property                                                                      33
Site Data                                                                                                      34
Zoning                                                                                                          38
Flood Zone                                                                                                   39
Concurrency                                                                                                 39
Real Estate Assessment and Taxes                                                               40
Description of the Site Improvements                                                           41
Neighborhood Overview                                                                              42
Demographic and Income Profile                                                                 43
Supply and Demand / Market Trends                                                           44
Reasonable Exposure Time                                                                          54
Typical Purchaser of the Subject                                                                  54
Highest and Best Use                                                                                   55
Appraisal Process                                                                                        59
Cost Approach                                                                                             60
Income Capitalization Approach                                                                  61
Sales Comparison Approach                                                                        62
Reconciliation of Value                                                                               120

**ADDENDA**

Addendum A - Miami-Dade County Area Description
Addendum B - Flood Zone Map
Addendum C – Engagement Letter

# Scope of Work

The appraisal problem herein is to estimate the market value of the fee simple interest of the subject property.

The approach used herein is considered sufficient to develop credible assignment results in solving the appraisal problem.

All appraisals begin by identifying the appraisal problem. Data on the subject property is derived from various sources including but not limited to the property owner, the county property appraiser's office, surveys and building plans. When possible, more than one source is utilized to confirm data. Within the appraisal the data source is acknowledged. Land size is based on surveys (when available), public records and recorded plats. Land measurements are not performed.

All vacant land sales are inspected. Sale prices are from public records and are typically confirmed with a party to the transaction, i.e. buyer, seller, real estate agent, or closing attorney. Public records are investigated for mortgage information and terms.

Research of comparables included, but was not limited to, using the following data sources:

CoStar
Real Estate Data Inc. (REDI)
First American Real Estate Solutions Services (FARES)
Newspaper clippings
Board of Realtors' Multiple Listing Service
Tri County Clippings Services (FREDI)
National Multiple Listing Service
Loopnet.com

Real estate agents in the subject area are interviewed to supply up-to-date information of sales and listings. All information is analyzed in processing the appraisal reports and as support for the estimated value.

The scope of work for this assignment has been described above and is to be typical for an assignment of the nature of the subject appraisal problem.

# Certificate of Value

The undersigned does hereby certify that, to the best of my knowledge and belief:

1. The statements of fact contained in this appraisal report are true and correct.

2. The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions.

3. I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

4. I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. My analyses, opinions and conclusions were developed, and this report has been prepared in conformity with the following requirements.

   - The Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute
   - Uniform Standards of Professional Appraisal Practice (USPAP)
   - The State of Florida requirements for state-certified appraisers
   - FIRREA of 1989 – Title XI and its updates
   - Office of the Comptroller of the Currency of the United States of America
   - Federal Deposit Insurance Corporation (FDIC)

8. I have complied with the USPAP Competency Rule.

9. This appraisal report sets forth all of the limiting conditions imposed by the terms of this assignment or by the undersigned affecting the analyses, opinions and conclusions contained in this report.

10. No one provided significant real property appraisal professional assistance to the person signing this report, unless specifically noted herein.

11.     The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives. Additionally, it is subject to review by the state of Florida relating to review by the real estate appraisal subcommittee of the Florida Real Estate Commission.

12.     As of the date of this report Lee H. Waronker, MAI, SRA has completed the continuing education program of the Appraisal Institute.

13.     I, Lee H. Waronker, MAI, SRA have made a personal inspection of the property that is the subject of this report.

14.     I, Carlos A. Diez have made a personal inspection of the property that is the subject of this report.

15.     The estimated market value of the fee simple interest as of December 11, 2011, is in the amount of $43,400,000.

16.     Neither we, nor Waronker & Rosen, Inc. have performed any valuation or professional services involving the subject property in any capacity during the past three years, nor are we presently involved with the management, leasing, disposition, nor any similar service regarding the subject property.

Lee H. Waronker, MAI, SRA
State-certified general real estate appraiser
RZ#162

Carlos A. Diez
State-certified general real estate appraiser
RZ#3420

*Date of Report:*  December 20, 2011

# General Assumptions and Limiting Conditions

This appraisal report has been made with the following general assumptions:

1.  No responsibility is assumed for the legal description or for matters pertaining to legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.  The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.  Responsible ownership and competent property management are assumed.

4.  The information furnished by others is believed to be reliable but, no warranty is given for its accuracy.

5.  All engineering studies are assumed to be correct. Any plot plans or illustrative material in this report are included only to help the reader visualize the property.

6.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering that may be required to discover them. The values estimated herein are subject to typical inspections such as roof, structural, and termite, if applicable.

7.  It is assumed that the property is in full compliance with all applicable federal, state and local environmental regulations and laws unless the lack of compliance is stated, described and considered in the appraisal.

8.  It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a non-conformity has been identified, described and considered in the appraisal.

9.  It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.

10. It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and considered in the appraisal.

11. Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presences of substances such as asbestos, urea formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering

knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.

12. The physical condition of the improvements, if any, described herein was based on visual inspection. No liability is assumed for the soundness of structural members, since no engineering tests were made of same.

13. Neither all nor any part of this appraisal report shall be disseminated to the general public using the appraiser's name or appraisal designation, without prior written consent of the appraisers signing this appraisal report.

14. Authorization is not allowed for the out-of-context quoting from, or partial reprinting of, this appraisal report.

15. By reason of the report, there is no requirement to testify with reference to the property herein appraised, unless arrangements have been previously made.

16. To the best of our ability, the analysis, opinions, and conclusions were developed in this report was prepared in accordance with the standards and reporting requirements of FIRREA of 1989-XI and its updates, the office of the Comptroller of the Currency of the United States of America (OCC), the Federal Deposit Insurance Corporation (FDIC) and the Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation.

17. The reader should be advised that our employment was not contingent on the appraisal providing a minimum valuation, a specific calculation or the approval of a loan. Additionally, we have complied with the USPAP Competency Rule.

# INTRODUCTION



# Summary of Pertinent Data

| | |
|---|---|
| Location: | Northeast of NW 58th Street and NW 107th Avenue, Doral, FL 33178 |
| Type of Use: | Vacant Mixed-Use Land |
| Zoning: | TND, Traditional Neighborhood Development District, by the city of Doral, FL |
| Census Tract: | 12086009008 |
| Flood Zone: | AH (Map 12086C0278L) |
| Land Area: [1] | 117.025 acres |
| Value by the Cost Approach: | Not applicable |
| Value by the Income Capitalization Approach: | Not applicable |
| Value by the Sales Comparison Approach: | $43,400,000 |
| Value using the Residual Land Value method*: | $42,300,000 |
| **Market value estimate of the fee simple interest**: | $43,400,000 |
| Date of Valuation: | December 11, 2011 |
| Date of Report: | December 20, 2011 |

\* Considered as a check on the reasonableness of the indication by the sales comparison approach.

---

[1] Based on the Miami-Dade County Property Appraiser's records (www.miami-dade.gov/pa)

# Area Maps



# Plat Map



# Aerial Photographs



# Parcel Maps by Folio

The subject property comprises five tax folios as shown below:

Folio # 35-3017-001-0240



Folio # 35-3017-001-0241



Folio # 35-3017-001-0365



Folio # 35-3017-001-0250



Folio # 35-3017-001-0362



There are three large portions of the subject property that are encumbered by power line easements. These areas have the effect of separating the larger north segment from the smaller south segment. In addition, the eastern portion of the north segment is not suitable for residential development due to its proximity to the adjacent landfill/recycling facility and the odors that emanate from it. This section is also currently landlocked, and is expected to be accessible in the future via roads to be built inside the main residential portion of the property. These natural and man-made boundaries serve to divide the subject property into three distinct usable parcels: a North Parcel on which residential uses are the most feasible, an East Parcel which would serve as a buffer between the residential portions and the landfill, potentially suitable for certain industrial uses, and a South Parcel that is potentially suitable for mixed uses, but on which commercial use would likely be most profitable. The outlines of these areas are shown on the following map. Following the map is a table indicating the land area of the overall property, and calculations indicating how the total is allocated to each segment and parcel.

## Usable Parcels and Easements



The dotted yellow line indicates the boundaries of the subject property. The colored overlays indicate the boundaries of the easement areas (denoted as A, D and F) and the North, East and South Parcels (denoted as B, C and E, respectively). The sizes of each segment noted above are shown in the table on the following page.

## Total Land Area

|  | Size (acres) | Notes |
|---|---|---|
| **Gross Land Area (by Folio#)** | | |
| 35-3017-001-0240 | 57.097 | |
| 35-3017-001-0365 | 23.662 | |
| 35-3017-001-0241 | 15.720 | |
| 35-3017-001-0250 | 1.610 | |
| 35-3017-001-0362 | 18.936 | |
|  | 117.025 | |
| **FPL Easements** | | |
| East-West FPL Easement | 19.617 | 1 |
| Northwest FPL Easement | 5.152 | 1 |
| Southwest FPL Easement | 4.750 | 1 |
| Total FPL Easements | 29.519 | |
| | | |
| **Total Land Area, Net of FPL Easements** | 87.506 | |
| | | |
| **Allocation by Parcel** | | |
| Total of north segment folios | 98.089 | 2 |
| Less road belonging to south segment | -1.409 | 3 |
| Gross land area / north segment (A+B+C+D) | 96.680 | |
| Less east-west FPL easement (D) | -19.617 | 1 |
| Less northwest FPL easement (A) | -5.152 | 1 |
| Land area of north segment, net of FPL easements (B+C) | 71.911 | |
| East Parcel (C) | -12.576 | 4 |
| North Parcel (B) | 59.335 | |
| | | |
| South segment folio | 18.936 | 5 |
| Plus road counted in Folio # -0365 | 1.409 | 3 |
| Gross Land Area / South Segment (E+F) | 20.345 | |
| Less southwest FPL easement (F) | -4.750 | 1 |
| South Parcel (E) | 15.595 | |
| | | |
| **Summary** | | |
| North Parcel (B) | 59.335 | |
| East Parcel (C) | 12.576 | |
| South Parcel (E) | 15.595 | |
| Total land area, net of FPL easements | 87.506 | |
| | | |
| Northwest FPL easement (A) | 5.152 | |
| East-west FPL easement (D) | 19.617 | |
| Southwest FPL easement (F) | 4.750 | |
| Total land area, FPL easements | 29.519 | |
| | | |
| Total gross land area | 117.025 | |

1 Size of FPL easements was estimated based on dimensions taken from the survey in the recorded plat

2 Folio #s -0240, -0365, -0241 and -0250

3 Land area of road (NW 106th Ct, which runs through the south segment) is indicated on the survey in the recorded plat.

4 The East Parcel (C) is Folio # -0241 less the south 330 feet (the portion of the east-west easement that runs through it)

5 Folio # -0362

# Subject Photographs



South Parcel, looking north from NW 58th Street. Visible is
partially completed parking garage and road



Partially built gate on south side of South Parcel, looking
northwest from NW 58th Street



Southwest power line easement, looking
north from NW 58th Street



Partially completed interior road (NW 66th
Street), looking east from gated entrance on
NW 107th Avenue



Northwest power line easement, looking
northeast from NW 107th Avenue



East-west power line easement, looking west
from partially built portion of NW 102nd
Avenue at southeast corner of north segment



North end of Partially completed portion of
NW 102nd Avenue along east side of north
segment (East Parcel on left, landfill in
background)



Partially completed portion of NW 102nd
Avenue, looking north from middle portion of
East Parcel (subject to left)



Partially completed portion of NW 102nd
Avenue looking south (East Parcel on right)



Partially completed portion of NW 66th
Street, looking west from NW 102nd Avenue
at northeast end of north segment



Lake at northeast corner of north segment
(north part of East Parcel), looking west from
NW 102nd Avenue



Street scene: NW 58th Street looking west
(subject property is on right)



Street scene: NW 58th Street looking east
(subject property is on left)



Street scene: intersection of NW 58th Street
and NW 107th Avenue looking west along
NW 58th St (subject property behind to right)



Street scene: NW 107th Avenue looking south
(subject property is on left)



Street scene: NW 107th Avenue looking north
(subject property is on right)

# Appraiser Qualifications
# LEE H. WARONKER, MAI, SRA

**Education**:    Master of Science in Management, School of Business and Organizational Science, Florida International University, 1981 (Major – Real Estate)

Bachelor of Science Degree, The Florida State University, Tallahassee, Florida 1976 (Major – Real Estate)

**Affiliations**:    MAI Designation (No. 6738) awarded by the Appraisal Institute in 1983.
SRA (SRPA) Designation awarded by the Appraisal Institute in 1981.
State-certified general real estate appraiser, State of Florida, RZ#162, May 1990.
Registered Real Estate Broker, State of Florida, License #BK0152877 (1978)

**Experience**:    Appraised various types of properties, including:

| | | |
|---|---|---|
| Industrial Buildings | Restaurants | Warehouses |
| Office Buildings | Hotels and Motels | Hospitals |
| Service Stations | Retail Stores | Marinas |
| Churches & Synagogues | U.S. Post Offices | Historical Buildings |
| Residences | Condominiums | Special Purpose Properties |

President, *Waronker & Rosen, Inc.,* (formerly Waronker & Associates, Inc.) Miami, Florida, from 1987 to present. Vice President, *Property Consultants, Inc.* from 1979 to 1986. Appraiser, The Keyes Company, 1978 to 1979. Appraiser, Miami-Dade County Department of Right-of-Way, 1977 to 1978.

**Instructor**:    Appraisal Institute. Taught Courses 1A-1, 1A-2, 8-2, 1B-A, 1B-B, 110, 120, 210, 310, 320, 410, 420, 430, 510, 550, 600, 610 and 620, et al

**Author**:    Seminars entitled *"Dynamics of Office Building Valuation", "Why the Capitalization Rate is Always 10" and the "Appraisal of Real Estate 10th vs. 11th Edition".*

**Other***:    Special Master for the Dade County Valuation Adjustment Board, 1989 to 1996. Assisted in the editing of *The Appraisal of Real Estate, 11th Edition and 13th Edition.*

President of the Miami Chapter of the Appraisal Institute, 1990 to 1991.

# Appraiser Qualifications

## CARLOS A. DIEZ

**Education**:   University of Florida (Gainesville, FL)
Bachelor of Arts. Major: Economics
Stevens Institute of Technology (Hoboken, NJ)
Substantial progress towards the degree of Master of Engineering

**Affiliations**:   State-certified general real estate appraiser, State of Florida, RZ#3420
The Appraisal Institute, Associate Member
CCIM Institute, Candidate Member

**Appraisal Experience:**  Waronker & Rosen, Inc.  September, 2007 to Present

Assisted in appraising various types of properties, including:

| | |
|---|---|
| Vacant land | Office properties |
| Restaurants | Shopping centers |
| Hotels | Free-standing retail properties |
| Industrial properties | Apartment Buildings |
| Residential and Commercial Condominiums | Condominium Units |
| Fractured Condominium Interests | Special Purpose Properties |

**Appraisal and Investment Analysis and Real Estate Education:**

The Appraisal Institute

| | |
|---|---|
| 100, 101: | *Basic Appraisal Principles and Procedures* |
| | *15-Hour National USPAP Course* |
| 202: | *Residential Sales Comparison and Income Approaches* |
| 300: | *Real Estate Finance, Statistics and Valuation Modeling* |
| 400: | *General Market Analysis and Highest & Best Use* |
| 402: | *General Appraiser Site Valuation and Cost Approach* |
| 403, 404: | *General Appraiser Income Approach (Parts 1 and 2)* |
| 405: | *General Appraiser Report Writing and Case Studies* |
| 420: | *Business Practices and Ethics* |
| 510: | *Advanced Income Capitalization* |
| 550: | *Advanced Applications* |
| 530: | *Advanced Sales Comparison and Cost Approaches* |
| Seminar: | *Hotel Appraising – New Techniques for Today's Uncertain Times* |

CCIM Institute

| | |
|---|---|
| CI 101: | *Financial Analysis for Commercial Investment Real Estate* |
| CI 102: | *Market Analysis for Commercial Investment Real Estate* |
| CI 103: | *User Decision Analysis for Commercial Investment Real Estate* |
| CI 104: | *Investment Analysis for Commercial Investment Real Estate* |
| Workshop: | *Feasibility Analysis for Retail Properties* |

Baruch College (CUNY) / Steven L. Newman Real Estate Institute

| | |
|---|---|
| NCP2000: | *Urban Land Economics* |
| NCP9000: | *Real Estate Development* |

# Partial Client List

## LENDER

Apollo Bank
BAC Bank
BankAtlantic
BankUnited
Bank of America
Bank of Coral Gables
Bank Leumi
BNY Mellon Bank
Branch Banking and Trust (BB&T)
Broward Bank of Commerce
CNL Bank
California Bank and Trust
Capital Bank
Cigna Investments, Inc.
Citibank and Citicorp
City National Bank of Florida
Coconut Grove Bank
Comerica Bank
Credit Suisse First Boston Mortgage
    Capital, LLC
Eastern National Bank
Enterprise Bank of Florida
Espirito Santo Bank of Florida
Executive National Bank
Fifth Third Bank
First National Bank of South Miami
Florida Community Bank
Gibraltar Private Bank and Trust
Great Florida Bank
Gulf Coast National Bank
HSBC Bank, N.A.
Holliday Fenoglio Fowler, LP
International Finance Bank
Israel Discount Bank of New York
JP Morgan Chase Bank
Lloyds Int'l. Bank (Lloyds of London)
Lutheran Brotherhood
Marine Bank
Mercantile CommerceBank, N.A.
Morgan Stanley Mortgage Capital
Northern Trust Bank
Ocean Bank
Popular Community Bank
Premier American Bank
Professional Bank
Regions Bank
R-G Crown Bank
Sabadell United Bank
Space Coast Credit Union

SunTrust Bank
TD Bank, N.A.
Totalbank
U.S. Century Bank
Wells Fargo Bank
Western Bank – Puerto Rico

## LIFE INSURANCE COMPANIES

Allstate Insurance Company
American General Life Insurance Co.
Fortis Capital Corp. & Life Insurance
    Company
Franklin Life Insurance Company
General American Life Insurance Co.
Independent Order of Foresters
John Alden Life Insurance Company
Kansas City Life Insurance Company
Lumberman's Life Insurance Company
Omaha Woodmen Life Insurance
    Society
Standard Life Insurance Company
Sun Life Insurance Company of
America

## CORPORATIONS

Church of Jesus Christ of the
    Latter-Day Saints
Florida Power and Light Corp. (FPL)
JC Penny Corporation
Wendy's International Corporation
Chevron U.S.A., Inc.
PBS and J
Johnson and Johnson Company

## DEVELOPERS AND INVESTORS

Berkowitz Development Group
Bristol Group, Inc.
Franklin Street Properties
Flagler Development Corporation
Goldman Properties
Hampshire Real Estate Companies
Lennar Corporation
MDM Development, Inc.
Napolitano Realty and Harnap Corp.
Noble House Resorts and Hotels
Ocean Properties, Ltd.
Panther Real Estate
PLC Investments, LLC
R.K. Associates, Inc.

The Scott Robins Companies
Wometco Enterprises, Inc.

## GOVERNMENT AGENCIES

Broward County School Board
City of Coral Gables
City of Miami Beach
City of Miami General Services
    Administration
Federal Deposit Insurance Corp. (FDIC)
Federal Home Loan Mortgage Corp.
    (FHLMC)
Florida Dept. of Environmental
    Protection
Florida Department of Transportation
Florida Keys Aqueduct Authority
Miami-Dade Water and Sewer
    Authority
Miami-Dade Co. -Aviation Authority
Miami-Dade Co. - County Attorney's
    Office
Miami-Dade Co. - General Services Admin.
Miami-Dade Co. - Housing & Urban Dev.
Miami-Dade Co. - Public Works Dept.
Miami-Dade Co. - School Board
Nature Conservancy, Florida Chapter
South Florida Water Management District
United States Department of Justice
United Stated General Services
    Administration
United States Postal Services
Village of Pinecrest

## LAW FIRMS

Akerman, Senterfitt & Eidson
Barranco and Kircher, P.A.
Berman, Wolfe Rennart Vogel &
    Mandler, P.A.
Colson Hicks Eidson, P.A.
Greenberg Traurig, P.A.
Gunster Yoakley Valdes-Fauli &
    Stewart, P.A.
Holland & Knight
Kirkpatrick and Lockhart
Shutts & Bowen, LLP
Stearns, Weaver, Miller, Weissler,
    Alhadeff & Sitterson, P.A.
Steel Hector and Davis
Tripp Scott

# Notable Properties Appraised

## *Miami-Dade County*

| | | | |
|---|---|---|---|
| Miami Seaquarium | Virginia Key | Miami Free Zone – Global Trade Cntr | Miami |
| Miami International Airport | Miami | Metropolitan Hospital of Miami | Miami |
| City of Miami Correctional Facility | Miami | Spinnaker Marina | North Miami |
| Country Club of Miami Golf Course | Miami | Virginia Key & Rickenbacker Marinas | Key Biscayne |
| Mel Reese Golf Course | Miami | Waterways Yacht Basin | Miami |
| Burger King Headquarters – Waterford | Miami | Porto Vita Club and Spa | Aventura |
| Doctors Hospital | Coral Gables | Ocean Steps Entertainment Center | S. Miami Beach |
| Beacon Centre Development | Miami | Indian Creek Country Club | Indian Creek |
| FBI Headquarters | Miami | BIV Tower | Miami |
| Gables Waterway Executive Center | Coral Gables | Courthouse Tower | Miami |
| Joe's Stone Crab restaurant | Miami Beach | South Shore Hospital | Miami Beach |
| Doral Ocean Beach Resort (formerly) | Miami Beach | SouthCom Headquarters | Miami |
| Metro-Dade Bus Facility | Miami | | |

## *Fort Lauderdale/Broward County*

| | |
|---|---|
| Florida Medical Center (Hospital) | Ft. Lauderdale |
| Jackson Marine Center | Ft. Lauderdale |
| Las Olas Centre Office Building | Ft. Lauderdale |
| Martha's Restaurant | Hollywood |
| Various Luxury Single Family Homes | Fort Lauderdale |
| Seneca Industrial Park | Pembroke Park |

## *Monroe County/Florida Keys*

| | |
|---|---|
| Marriott Key Largo Bay Beach Resort | Key Largo |
| Islander Resort | Islamorada |
| Hawk's Cay Resort, Marina and DRI | Duck Key |
| Westin, formerly Hilton Resort and Sunset Key Island | Key West |
| Little Palm Island | Little Torch Key |
| Louis' Backyard Restaurant | Key West |
| Ocean Key Resort | Key West |
| Sloppy Joe's Bar | Key West |
| Truman Annex - Navy Base | Key West |

## *Other Florida Counties*

| | |
|---|---|
| Jupiter Beach Resort | Jupiter, Palm Beach County |
| La Playa Beach Resort | Naples, Collier County |
| Sheraton Four Points | Orlando, Orange County |
| Spring Hill Suites | Tampa, Hillsborough County |
| Hilton Carillon Park | St. Petersburg, Pinellas County |

## *Outside of the United States*

| | |
|---|---|
| Various Single Family Homes | Cat Cay, Bahamas |
| Single Family Home | Casa de Campo, Dominican Republic |
| Sapphire Beach Resort | St. Thomas, U.S. Virgin Islands |
| Hotel Site | Grand Turks and Caicos Islands |
| Montego Beach Resort | Montego Bay, Jamaica |
| Botany Bay Subdivision (400 acres) | St. Thomas, U.S. Virgin Islands |
| Ocean Club Resort | Grand Turks and Caicos Islands |
| Land lease under Ritz Carlton | San Juan, Puerto Rico |
| Various Land Holdings | St. Croix, U.S. Virgin Islands |
| Vacant Land | West End, Grand Bahama Island |

# DESCRIPTION & ANALYSES



# Purpose of the Appraisal Report

The purpose of this appraisal report is to estimate the market value of the fee simple interest as of December 11, 2011. The term fee simple interest is defined below. The term market value is defined on the following page.

# Client, Intended User and Use of the Appraisal Report

The intended user of this appraisal is Mindy A. Mora, P.A. of Bilzin Sumberg Baena Price & Axelrod, LLP (client). The intended use of this appraisal is for asset valuation in connection with a possible acquisition by Terra World Investments, LLC.

# Definition of Interest Being Appraised

The interest appraised herein is that of the unencumbered fee simple interest, described as follows:

> Fee Simple Interest: an absolute fee without limitations to any particular class of heirs, but subject to the limitations of eminent domain, escheat, police power and taxation. An inheritable estate.

# Definition of Market Value

Market Value is a major focus of most real estate assignments. Both economic and legal definitions of market value have been developed and refined. A current economic definition agreed upon by federal financial institutions in the United States of America is:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;

2. both parties are well informed or well advised and acting in what they consider their own best interest;

3. a reasonable time is allowed for exposure to the open market;

4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. the price represents a normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

The above definition is suggested by FIRREA of 1989- Title XI and its updates, the Uniform Standards of Professional Appraisal Practice (USPAP), the Appraisal Institute, the Federal Deposit Insurance Corporation and was the basis of the valuation in this appraisal.

*Source*:    Code of Federal Regulations: Title 12; - Bank and Banking
Chapter I – Comptroller of the Currency, Department of the Treasury;
Part 34 – Real Estate Lending and Appraisals – Subpart C – Appraisals, Section 34.42
Definitions;
*Revised as of January 1, 2000*

# Location

The subject property is located northeast of NW 58th Street and NW 107th Avenue, Doral, FL 33178. It is not currently identified by an address.

# Legal Description

Tracts 24, 25, 33, 34, 35, 36, 45, 46, 47 and 48 of FLORIDA FRUITLAND'S COMPANY'S SUBDIVISION NO. 1, Section 17, Township 53 South, Range 40 East, as recorded in Plat Book 2, Page 17, of the Public Records of Miami-Dade County, Florida. Less all road Right-of-Way of record.

*and*

The West 739.33 feet of Tracts 41, 42, 43 and 44 of FLORIDA FRUITLAND'S COMPANY'S SUBDIVISION NO. 1, Section 17, Township 53 South, Range 40 East, as recorded in Plat Book 2, Page 17, of the Public Records of Miami-Dade County, Florida. Less all road Right-of-Way of record, and Less that portion of Tracts 41, 42, 43, 44 and 45 deeded to Miami-Dade County, by Special Warranty deed dated December 2, 1996, and recorded in Official Record Book 17746, Page 2223 and all exhibits and amendments thereof.

*Source:  Final plat of Landmark at Doral, City of Doral City Council Resolution Z06-07*

# Owner of Record

The subject property is owned by five related entities, as follows:

1. Town Center at Doral, LLC (Folio # 35-3017-001-0240)
2. Landmark at Doral East, LLC (Folio # 35-3017-001-0241
3. Landmark at Doral South (Folio # 35-3017-001-0362)
4. Landmark Club at Doral (Folio # 35-3017-001-0250)
   The four entities above have the following address:
   > 7200 W/ Camino Real, Suite 302
   > Boca Raton, FL 33433

5. Landmark at Doral Community (Folio # 35-3017-001-0365)
   The entity above has the following address:
   > 6131 Lyons Road, Suite 100
   > Coconut Creek, FL 33073

*Source:  www.miamidade.gov/pa*

# History of the Subject Property

The subject property has been owned by E. B. Developers, Inc. or related entities since 2004. In 2005, a Community Development District (CDD) was established to fund infrastructure improvements for a mixed-use development project proposed for the site called Landmark at Doral. In December 2005 a 23.66-acre portion (Folio # 35-3017-001-0365) was deeded to the CDD. No record was found of any sales of any portion of the subject property in the past five years. Construction on the project was stalled after partial completion of some site improvements, portions of some roads, and portions of a parking garage on the South Parcel. Subsequently, the developer's lenders and the Community Development District began foreclosure proceedings, and the owner filed bankruptcy. In December 2011, a bankruptcy judge reportedly approved a proposal by Terra World Investments to fund the property owner's reorganization plan under the bankruptcy in exchange for title to the subject property.

*Source:  www.miamidade.gov/pa* and *www.dailybusinessreview.com*

# Site Data

The subject site consists of a large, "L"-shaped tract of land located northeast of NW 107th Avenue and NW 58th Street in Doral. Total gross land area is 117.025 acres. The site lies approximately one mile east of the Florida Turnpike, 2.8 miles west of the Palmetto Expressway (State Road 826) and three miles north of the Dolphin Expressway (State Road 836). In 2005-2006, the site was re-platted and established as a mixed-use Traditional Neighborhood Development (TND) District known as Landmark at Doral. Approvals were obtained under the TND for a proposed development project by the same name that was to include 1,109 residential units, approximately 418,000 square feet of commercial space, a public parking garage and a recreational facility. At that time, a Community Development District (CDD) was established for the purpose of funding infrastructure improvements necessary to support the proposed project. Some site work was completed, including partial construction of some of the interior roads. In addition, the parking garage was partially completed.

The site is encumbered by two Florida Power & Light power line easements that cover a relatively large portion of the land area. As indicated in the aerial map on page 19 and the land area calculations on page 20, the FPL easements total 29.519 acres. The remaining 87.506 acres consists of a 59.335-acre North Parcel (indicated on the map as area B), a 12.576-acre East Parcel (C on the map) and a 15.595-acre South Parcel (E on the map).

The west sides of the north and south segments form continuous frontage of approximately 0.54 miles along the east side of NW 107th Avenue, a four-lane road with median. In addition, the south side of the south segment has frontage of approximately 740 feet along the north side of NW 58th Street, also a four-lane road with median. West and southwest of the south segment (across NW 107th Avenue and diagonally across the intersection of 107th Avenue and 58th Street) are neighborhood retail uses, and across NW 58th Street to the south is a single-family residential subdivision. Across NW 107th Street west and northwest of the north segment are residential condominium and fee simple townhouse developments. North of the north segment is vacant land up to NW 74th Street, designated as "Low Density Residential" on the Doral Future Land Use Map, with a density of up to 10 units per acre. Adjacent to the northeast portion of the north segment is the southwest portion of a 156-acre Miami-Dade County landfill and recycling facility. West of the remainder of the north segment (and south of the recycling facility) are vacant industrial tracts. It should be noted that moderately offensive odors were detected emanating from the recycling plant along the northeast perimeter of the north segment. Adjacent to the South Parcel on the east side is a residential tract recently purchased by Terra World Investments for development of a 160-unit fee simple townhouse project. South of the North Parcel (and west of the Terra townhouse tract) are vacant industrial parcels, and a 63,000 square foot religious facility with frontage along NW 58th Street.

Roads that have been partially constructed as part of the project include NW 66th Street, which transects the site east to west near the north end of the north segment, and NW 102nd Avenue abutting the east perimeter of the north segment. NW 66th Street is paved, but gated at NW 107th

Avenue, as it dead-ends at the east end of the north segment where it connects to NW 102nd Avenue. The portion of NW 102nd Avenue that abuts the site does not connect to any other roads, though there is a dirt road leading from the northeast corner of the site to NW 74th Street. The Landmark at Doral plat specifies a number of additional interior roads within the site that have been partially constructed, but mostly not paved.

The site is level and at approximate street grade in some areas, with portions that may require fill. However, some of these areas may be required for storm water management, in which case they would not be filled. According to a representative of Terra World Investments, which is pursuing a plan to acquire the site, no utilities have been brought to the site.

On the following two pages are diagrams indicating the boundaries of the subject property, the locations of the planned interior roads, and the distribution of the various uses, based on the original Landmark at Doral development plan.

# Landmark at Doral District Boundary



LEGEND

- - -    DISTRICT BOUNDARY

     BUILDING

## Landmark at Doral Land Use Allocation



LEGEND
- PARK TRACT
- RESIDENTIAL TRACT
- COMMERCIAL TRACT

# Zoning

The subject property is zoned TND, Traditional Neighborhood Development District by the city of Doral, Florida. The Doral TND District is a mixed use district "designed to ensure development of land along the lines of traditional neighborhoods" and attempts to "adapt the urban conventions which were normal in the United States from colonial times until the 1940s". Its intent is to re-create the pedestrian-friendly environment reminiscent of small-town America, which combines live, work and recreation areas, public parks and green space, tree-lined streets, and a street plan that promotes walking to work and shopping. In order to achieve this, the TND District imposes a number of development guidelines on each of six land use categories: public and semipublic uses, civic use, shop front use, rowhouse use, house use, and workshop use.

Generally, the TND District requires an overall site size of between 40 and 200 acres, an overall Floor Area Ratio (FAR) of 4.0 or less, and allows a residential density of up to 18 units per acre. It also requires that the mix of uses include 51% to no more than 90% residential, 5% to 40% office and 1% to 20% "retail and services", according to the Director of Planning and Zoning for the City of Doral.

The Landmark at Doral project received approval in 2005-2006 for phased development of 1,109 residential units (consisting of 807 condominium units and 302 townhouses), approximately 94,700 square feet of retail space, 93,346 square feet of office space above the retail, 230,000 square feet of office space located on an "office outparcel" in the northeast portion of the site, a 929-space public parking garage and a 12,000 square foot recreational facility. According to the Director of Planning and Zoning, the site is currently approved only for what is stipulated in the Landmark at Doral development plan. Any new proposal would require approval by the City of Doral, and would have to conform to the underlying land use allocation and density requirements noted previously. The detailed design guidelines may be found in the City of Doral Land Development Code, available online at:

*Source:*
   http://www.cityofdoral.com/index.php?option=com_docman&task=doc_download&gid=4467&Item id=100

# Flood Zone

The subject property is located in Flood Zone AH. This identification was located on Flood Insurance Rate Map, Community Panel No. 12086C0278L revised September 11, 2009. **For insurance purposes, a surveyor should be contacted to verify the exact zone by a flood elevation certificate, as well as its impact on insurance.** A copy of the flood zone map is located in the addenda to this report.

*Source:*   *www.interflood.com*

# Concurrency

There are currently no known concurrency problems for the subject site which would hinder any proposed construction. Properties can go in and out of concurrency and it is therefore necessary to reserve concurrency for a platted parcel. This reservation lasts up to two years before it expires and construction must be completed within that period. It is recommended that a concurrency reservation be made for any proposed future construction, if not already done.

# Real Estate Assessment and Taxes

The subject property is identified by the Miami-Dade County Property Appraiser as the tax folios 35-3017-001-0240, -0365, -0241, -0250 and -0362. The following is a summary of the assessment:

| Tax Assessment Analysis | Total Assessment | Sq.Ft. Size* | Assessment Per Sq.Ft. |
|---|---|---|---|
| Assessed Land Value | $36,492,291 | 5,097,609 | $ 7.16 |
| Assessed Value of Improvements | $0 | N/A | N/A |
| Total Assessed Value | $36,492,291 | 5,097,609 | $ 7.16 |

*This is the size per the Miami-Dade County Property Appraiser's records.

The applicable millage rate is 19.1456. Therefore, the real estate taxes may be estimated as follows:

| Tax Calculation | Taxes | Per Sq.Ft. |
|---|---|---|
| Millage Rate (Millage Rate ÷1,000) | .0191456 | |
| Times Total Assessed Value | x $36,492,291 | $ 7.16 |
| Estimated Real Estate Taxes | $751,971 | $ .154 |

There is a 4% discount given for early (November) payment of taxes which would reduce the estimated real estate taxes to $721,892 ($751,971 minus 4%).

Florida Statutes require assessments to be at 100% of market value less costs of sales. Costs of sale range from nothing to 15%, with the Miami-Dade County Property Appraiser's office typically designating in the range of 10% to 15%. Based upon the market value, estimated herein, the assessment is close to what is appropriate.

# Description of the Site Improvements

As noted in the site description, some site work has been partially completed, including some paving of interior roads. In addition, a 929-space parking garage located along the east side of the South Parcel appears from the NW 58th Street to have been substantially completed, though it could not be inspected because no access was provided to the interior of the site. Based on the highest and best use analysis, it is unlikely that this structure would be substantially usable when development on the South Parcel becomes financially feasible, and any utility that portions of it may have as part of a future development plan would likely be offset by the cost of re-configuring the structure to conform to a new plan. Similarly, the partially completed site work would have utility to a developer who was to complete the original development plan, but since that plan is not viable due to shifting market conditions, any new development would incur additional cost to re-configure the site, reconstruct roads, etc. Any utility of the existing site work would be offset by the cost of reconfiguring the site. On balance, therefore, the site work has no significant value. In addition to the partially completed site work and parking garage, there is approximately 3,000 to 4,000 feet of chain-link fencing along portions of the south perimeter of the south segment and the west perimeter of the north and south segments.

# Neighborhood Overview

## General Neighborhood Data

| | |
|---|---|
| Location: | Suburban |
| Built Up: | 80% to 90% |
| Growth Rate: | Stable |
| Property Values: | Stable |
| Demand/Supply: | Single-family and townhouse residential are in balance, residential condominium and commercial sectors are oversupplied |
| Present Land Use: | Residential, industrial and retail |
| Change in Present Land Use: | Not likely |
| Predominant Use: | Residential |

## Neighborhood Rating

| | |
|---|---|
| Adequacy of Shopping: | Average |
| Employment Opportunity: | Above average |
| Recreational Facilities: | Average |
| Adequacy of Utilities: | Average |
| Property Compatibility: | Average |
| Protection from Detrimental Condition: | Average |
| Police and Fire Protection: | Average |
| General Appearance of Properties: | Above average |
| Appeal to Market: | Average |

## Adjacent Uses

| | |
|---|---|
| East: | County solid waste recycling facility and vacant industrial land |
| West: | Residential condominium, fee simple townhouse s and neighborhood retail |
| South: | Single-family residential |
| North: | Vacant land (residential) |

## Linkage

| Linkage | Distance | Access |
|---|---|---|
| Public Transportation: | One to two miles | Below average |
| Employment Centers: | Three to five miles | Good |
| Expressway Access: | One mile | Above average |
| Miami International Airport: | Five to seven miles | Above average |

# Demographic and Income Profile

The table below provides a summary of key population and income metrics for the areas contained within a one-, three- and five-mile radius of the subject site. This data is based on US Census data and forecasts by Esri, a company specializing in Geographic Information Systems (GIS) software tools and geodatabase management applications. Following the table is a map indicating the boundaries of the three areas.

| Demographic and Income Summary | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Miami-Dade County | | | Landmark at Doral | | | | | | | | |
| | | | | 1 mile radius | | | 3 mile radius | | | 5 mile radius | | |
| | 2010 | 2015 | % Chg | 2010 | 2015 | % Chg | 2010 | 2015 | % Chg | 2010 | 2015 | % Chg |
| Population | 2,463,726 | 2,521,289 | 2.3% | 17,930 | 21,200 | 18.2% | 44,297 | 51,145 | 15.5% | 290,732 | 298,541 | 2.7% |
| Households | 846,319 | 865,556 | 2.3% | 6,090 | 7,191 | 18.1% | 16,058 | 18,458 | 14.9% | 93,297 | 95,842 | 2.7% |
| Avg. Household Size | 2.85 | 2.86 | 0.4% | 2.94 | 2.95 | 0.3% | 2.76 | 2.77 | 0.4% | 3.04 | 3.04 | 0.0% |
| Median HH Income | $46,323 | $53,119 | 14.7% | $83,586 | $101,119 | 21.0% | $69,750 | $79,434 | 13.9% | $45,117 | $52,108 | 15.5% |
| Avg. HH Income | $62,740 | $69,978 | 11.5% | $99,034 | $111,135 | 12.2% | $89,485 | $100,346 | 12.1% | $56,774 | $64,028 | 12.8% |
| Per Capita Income | $21,869 | $24,376 | 11.5% | $35,422 | $39,681 | 12.0% | $32,445 | $36,220 | 11.6% | $18,640 | $21,020 | 12.8% |

*Source:   ESRI forecasts for 2010 and 2015; US Census Bureau, 2000 Census of Population and Housing*



# Supply and Demand / Market Trends

It is well-known that the badly weakened economy caused by the recent financial crisis and ensuing recession resulted in the failure of many new real estate developments and increased vacancy rates across many sectors of the commercial real estate market. Worst hit was the residential condominium market, where many thousands of newly completed units were brought to market just as demand began to decline dramatically. Much of the new residential construction activity was concentrated in the condominium market, so that the single-family and townhouse sectors of the residential market did not see the extreme oversupply conditions of the condominium market. Shortly after the residential market collapsed the retail, office and industrial sectors experienced sharp increases in vacancy rates as a result of declines in demand, consumer confidence and exports, weak employment levels and widespread business failures.

During 2010 the real estate market showed signs of improvement. As the financial sector continued to repair itself, and as opportunistic investors began to acquire attractively-priced distressed assets (serving to stabilize declining prices), the market began to show signs that it was beginning to return to more stable conditions. In the residential sector, the markets for new single-family and fee simple townhouse product have shown significant improvement since 2009, with new units permitted in Miami-Dade County rising from a decade-low of 565 in 2009 to 930 in 2010, and with 2011 forecast to end at 1,250, according to the Third Quarter 2011 Quarterly Housing Report by Reinhold P. Wolff Economic Research. The report forecasts 1,635 units permitted for 2012, a nearly 190% increase over 2009 levels, providing a strong indication that the single-family and townhouse market has begun to rebound. However, the residential condominium market continues to be plagued by excess supply and uncertainty about how long it will take to return to equilibrium conditions. Many of the newly built condominium units have been purchased in bulk (at significant discounts) by investors who have put them into production as rental apartments, but this is an interim strategy to generate positive cash flows during the holding period, while a large part of the anticipated profit is expected to derive from retail sales of the individual units to owner-occupants once that market has strengthened. This has begun to occur at some of the most desirable locations, but is expected to take some time yet to reach the broader market.

On the commercial side, retail vacancy rates began to pull back steadily for the past two years from multi-year highs reached in mid-2010, while industrial vacancy rates, which experienced very sharp increases, have pulled back more slowly. Office vacancy rates also saw sharp increases as a result of the recession and very large declines in office employment levels, but a sluggish economic recovery, the lack of a rebound in employment levels and a generally poor outlook for rapid improvements in the near term have caused them to remain persistently high.

On the following pages are charts indicating important metrics for the various markets discussed above, accompanied by brief comments.

The chart below indicates combined authorized building permits (equivalent to "housing starts") for single-family and townhouse product in Miami-Dade County and Doral. The figures indicate recent increases in new development, with more notable increases in Doral compared to prior quarters.



The following chart indicates average monthly sales rates for new single-family and townhouse developments in Miami-Dade County and a submarket that includes Doral. The Doral data is aggregated with surrounding areas in order to mask the absorption rates of specific developments. The figures, which are based on closed sales, indicate recent improvements in the average pace of sales for the county, and significant increases in Doral due to the completion and successful sales efforts of a several new projects.



Notably, the appraisers were provided a closing summary for The Reserve at Doral, a 318-unit townhouse project recently completed by Terra World Investments and located about one half mile northwest of the subject site. 294 units have been sold and closed, with the 195-unit eastern part selling out in September 2011, and 24 units remaining in the 123-unit western part. Sales commenced in February 2008, for an average sales pace of 6.4 units per month over 46 months. With average unit sizes of 2,090 square feet, the project has achieved an average price per square foot of $193. However, the average price per square foot declined sharply during 2008 and 2009, and showed signs of leveling off and slight improvement during 2010 and early 2011, and recent average prices in the $180 to $200 per square foot range. The Reserve at Doral closing summary is shown below.

**The Reserve**
**Location: Doral**
**Closing Summary**

Total

| Period | Count | Total Sellout | Total SF | Avg. Price | Avg. SF | Avg. Price PSF |
|---|---|---|---|---|---|---|
| Feb. - June 2008 | 13 | 7,121,573 | 27,642 | 547,813 | 2,126 | 258 |
| July 2008 - Dec 2008 | 24 | 11,903,146 | 49,177 | 495,964 | 2,049 | 242 |
| Jan 2009 - June 2009 | 22 | 9,466,399 | 47,977 | 430,291 | 2,181 | 197 |
| July 2009 - Dec 2009 | 69 | 26,543,500 | 145,872 | 384,688 | 2,114 | 182 |
| Jan 2010 - June 2010 | 71 | 27,355,000 | 148,045 | 385,282 | 2,085 | 185 |
| July 2010 - Dec 2010 | 39 | 14,979,000 | 79,631 | 384,077 | 2,042 | 188 |
| Jan - Jun 2011 | 39 | 14,860,000 | 80,887 | 381,026 | 2,074 | 184 |
| July 2011 - Present | 17 | 6,463,000 | 35,115 | 380,176 | 2,066 | 184 |
| **Total** | **294** | **118,691,618** | **614,346** | **403,713** | **2,090** | **193** |

East

| Period | Count | Total Sellout | Total SF | Avg. Price | Avg. SF | Avg. Price PSF |
|---|---|---|---|---|---|---|
| Feb. - June 2008 | 13 | 7,121,573 | 27,642 | 547,813 | 2,126 | 258 |
| July 2008 - Dec 2008 | 24 | 11,903,146 | 49,177 | 495,964 | 2,049 | 242 |
| Jan 2009 - June 2009 | 19 | 8,366,399 | 41,744 | 440,337 | 2,197 | 200 |
| July 2009 - Dec 2009 | 44 | 17,802,000 | 93,037 | 404,591 | 2,114 | 191 |
| Jan 2010 - June 2010 | 47 | 18,855,000 | 98,157 | 401,170 | 2,088 | 192 |
| July 2010 - Dec 2010 | 31 | 12,099,000 | 63,239 | 390,290 | 2,040 | 191 |
| Jan - Jun 2011 | 14 | 5,340,000 | 28,455 | 381,429 | 2,033 | 188 |
| July 2011 - Present | 3 | 1,200,000 | 5,996 | 400,000 | 1,999 | 200 |
| **Total** | **195** | **82,687,118** | **407,447** | **424,037** | **2,089** | **203** |

West

| Period | Count | Total Sellout | Total SF | Avg. Price | Avg. SF | Avg. Price PSF |
|---|---|---|---|---|---|---|
| Feb. - June 2008 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 2008 - Dec 2008 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jan 2009 - June 2009 | 3 | 1,100,000 | 6,233 | 366,667 | 2,078 | 176 |
| July 2009 - Dec 2009 | 25 | 8,741,500 | 52,835 | 349,660 | 2,113 | 165 |
| Jan 2010 - June 2010 | 24 | 8,500,000 | 49,888 | 354,167 | 2,079 | 170 |
| July 2010 - Dec 2010 | 8 | 2,880,000 | 16,392 | 360,000 | 2,049 | 176 |
| Jan - Jun 2011 | 25 | 9,520,000 | 52,432 | 380,800 | 2,097 | 182 |
| July 2011 - Present | 14 | 5,263,000 | 29,119 | 375,929 | 2,080 | 181 |
| **Total** | **99** | **36,004,500** | **206,899** | **363,682** | **2,090** | **174** |

The fact that the average absorption rate increased sharply in the subject area from two to three per month during 2009 and 2010 to seven per month in late 2010 and early 2011 indicates that demand for single-family and townhouse product in the subject area is strong enough to absorb larger volumes of product than prior quarter results would indicate. It is notable that The Reserve at Doral achieved an average sales pace on par with the submarket (and significantly above the county) but with a peak sales pace of nearly twice that rate during late 2009 and early 2010, as evidenced by the closing summary on the previous page. The ability to achieve high absorption rates is dependent of course on the product being of sufficient quality and priced appropriately to compete with other projects in the market. In general, the data suggests that there is unmet demand for single-family and townhouse product in the area. This is because when supply and demand are near equilibrium, the delivery of new product to the market tends to *reduce* average absorption rates at individual projects, since the same level of demand must be diluted among a larger number of projects. The fact that absorption rates jumped significantly concurrently with the completion of several new projects is an indication that those projects satisfied demand that was not being met before (and which presumably was being met by other product in other areas due to the lack of attractive alternatives in the subject area).

A closer look at sales data for the Doral area indicates that there have been declines in the median price of both single-family and townhouse product without significant increases in sales volumes. This suggests that the price declines reflect the market's on-going adaptation to a weaker market, and to buyers' expectations that a weak market should allow them to buy at significant discounts. In other words, demand exists, but market momentum continues to favor buyers at this stage of the real estate cycle. The three charts which follow indicate the number of units sold, together with median price, median price per square foot, and median size, for single-family residences less than 10 years old sold in Doral in the last four years.







Note that the data reflects sales in the $350,000 to $550,000 price range. This is the range in which a single-family or townhouse residential project at the subject site would experience the strongest demand and be most likely to achieve a profitable result. The data was compiled by the appraisers from recorded sales in the public record.

On the following pages are charts indicating the corresponding data for townhouse sales. Note that the data reflects a significant decline in townhouse sales volume during the past year. However, the data is suspect because it indicates townhouse sales levels for Doral below those known to have occurred at the Reserve at Doral project alone. It is likely that a significant number of actual sales occurring at some of the new developments were not recorded, or that the public records reflect a significant lag between sales and recording dates, or perhaps that a

combination of factors is at play. Nevertheless, the data indicates a decline in prices during 2008-2009 with prices stabilizing during 2010-2011. Notably, the average size of units sold has increased for both single-family and townhouse product, reflecting a trend towards larger size observed across the broader market.





*Description & Analyses*          *117 acres of Vacant Land, Doral, Florida 33178*



The following table indicates market statistics for the Miami-Dade County retail market by Costar, a well-known provider of commercial real estate information services. The data shown reflects all retail properties, including free-standing as well as multi-tenant properties of all sizes, going back four years. It provides evidence of a slow but steady decline in vacancy rates since the market shocks of 2007-2009, though rental rates have failed to register substantial increases due to difficult economic conditions. Notably, the data indicates recent increases in the pipeline of new product under construction, after several quarters of very little new development.

## TOTAL RETAIL MARKET STATISTICS     Third Quarter 2011

| | Existing Inventory | | Vacancy | | | Net | Deliveries | | UC Inventory | | Quoted |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period | # Bldg | Total GLA | Direct SF | Total SF | Vac % | Absorption | # Bldg | Total GLA | # Bldg | Total GLA | Rates |
| 2011 3q | 9,343 | 123,658,562 | 5,180,947 | 5,288,066 | 4.3% | 257,967 | 6 | 56,064 | 16 | 297,889 | $24.84 |
| 2011 2q | 9,337 | 123,802,538 | 5,353,540 | 5,489,973 | 4.4% | 165,905 | 4 | 81,529 | 16 | 177,061 | $24.12 |
| 2011 1q | 9,333 | 123,720,979 | 5,457,941 | 5,574,345 | 4.5% | 177,148 | 2 | 4,061 | 13 | 215,097 | $23.46 |
| 2010 4q | 9,333 | 123,724,545 | 5,683,746 | 5,795,063 | 4.7% | 98,445 | 0 | 0 | 9 | 115,246 | $23.76 |
| 2010 3q | 9,333 | 123,724,565 | 5,773,738 | 5,893,528 | 4.7% | 51,746 | 6 | 11,516 | 6 | 89,278 | $24.28 |
| 2010 2q | 9,331 | 123,713,049 | 5,814,768 | 5,893,758 | 4.8% | 181,164 | 3 | 24,899 | 2 | 11,516 | $24.56 |
| 2010 1q | 9,328 | 123,688,190 | 5,963,829 | 6,050,063 | 4.9% | 71,865 | 6 | 138,957 | 5 | 36,375 | $24.30 |
| 2009 4q | 9,322 | 123,549,233 | 5,856,247 | 5,982,971 | 4.8% | 266,896 | 5 | 498,636 | 10 | 170,459 | $24.83 |
| 2009 3q | 9,318 | 123,053,397 | 5,655,014 | 5,753,531 | 4.7% | 467,083 | 6 | 676,702 | 12 | 640,124 | $25.61 |
| 2009 2q | 9,312 | 122,376,695 | 6,402,205 | 5,543,912 | 4.5% | (308,882) | 8 | 90,660 | 15 | 1,293,125 | $26.20 |
| 2009 1q | 9,305 | 122,287,356 | 4,993,385 | 5,145,691 | 4.2% | (214,842) | 11 | 217,615 | 19 | 1,209,419 | $27.41 |
| 2008 4q | 9,294 | 122,069,841 | 4,584,103 | 4,713,334 | 3.9% | 33,271 | 17 | 618,687 | 26 | 1,307,968 | $27.65 |
| 2008 3q | 9,277 | 121,451,154 | 4,064,328 | 4,127,918 | 3.4% | 311,160 | 23 | 780,445 | 36 | 1,556,923 | $27.88 |
| 2008 2q | 9,254 | 120,670,709 | 3,995,263 | 3,658,633 | 3.0% | 696,282 | 16 | 749,354 | 48 | 1,739,457 | $27.85 |
| 2008 1q | 9,238 | 119,921,355 | 3,562,211 | 3,605,561 | 3.0% | 303,026 | 21 | 546,266 | 52 | 2,202,660 | $28.02 |
| 2007 | 9,219 | 119,383,325 | 3,352,619 | 3,370,557 | 2.8% | 4,607,576 | 81 | 3,042,818 | 50 | 2,111,700 | $28.01 |

Source: CoStar Property®

The following table indicates the most recent results of the Costar survey for Miami-Dade County by sub-market. It indicates that the Miami Airport sub-market (which includes the Doral area) is registering vacancy rates near the average for the county, though with negative net

absorption (space leased minus space vacated) for 2011, and a much smaller amount of retail space under construction compared to the most active sub-markets.

## TOTAL RETAIL MARKET STATISTICS                    Third Quarter 2011

| Market | # Bldgs | Total GLA | Direct SF | Total SF | Vac % | YTD Net Absorption | YTD Deliveries | Under Const SF | Quoted Rates |
|---|---|---|---|---|---|---|---|---|---|
| Aventura | 124 | 6,444,941 | 103,182 | 106,412 | 1.7% | 42,322 | 0 | 0 | $34.10 |
| Biscayne Corridor | 198 | 1,357,722 | 116,181 | 116,181 | 8.6% | 57,811 | 0 | 0 | $19.94 |
| Brickell | 58 | 873,760 | 38,991 | 38,991 | 4.5% | 16,494 | 0 | 0 | $43.22 |
| Coconut Grove | 138 | 1,806,048 | 79,706 | 79,706 | 4.4% | 25,591 | 4,000 | 0 | $28.40 |
| Coral Gables | 382 | 3,543,090 | 174,284 | 174,284 | 4.9% | (3,588) | 0 | 0 | $33.12 |
| Coral Way | 324 | 2,624,361 | 71,827 | 71,827 | 2.7% | (9,719) | 0 | 0 | $31.06 |
| Downtown Miami | 157 | 6,266,378 | 395,439 | 395,439 | 6.3% | 31,050 | 0 | 0 | $25.10 |
| Kendall | 698 | 17,086,865 | 707,456 | 717,656 | 4.2% | 115,476 | 7,938 | 0 | $27.66 |
| Medley/Hialeah | 834 | 11,739,355 | 308,972 | 329,372 | 2.8% | 38,257 | 0 | 57,896 | $21.00 |
| Miami | 2,201 | 13,299,611 | 613,515 | 638,015 | 4.8% | 9,155 | 9,420 | 71,421 | $16.95 |
| Miami Airport | 569 | 12,814,200 | 521,381 | 528,250 | 4.1% | (9,177) | 8,236 | 3,410 | $19.84 |
| Miami Beach | 562 | 8,412,984 | 269,666 | 302,080 | 3.6% | 24,550 | 35,945 | 126,243 | $64.35 |
| Miami Lakes | 176 | 4,510,865 | 219,412 | 219,412 | 4.9% | 13,170 | 0 | 0 | $20.67 |
| Miami-Dade Central County | 367 | 2,855,045 | 210,569 | 210,569 | 7.4% | 32,347 | 0 | 0 | $14.95 |
| Northeast Dade | 1,045 | 10,463,653 | 526,800 | 526,800 | 5.0% | (7,488) | 0 | 11,652 | $19.47 |
| Outlying Miami-Dade Cnty | 23 | 326,819 | 48,484 | 48,484 | 14.8% | 1,394 | 0 | 0 | $20.75 |
| South Dade | 837 | 12,883,264 | 607,302 | 612,802 | 4.8% | 217,994 | 76,105 | 22,797 | $18.69 |
| West Miami | 650 | 6,549,501 | 171,780 | 171,780 | 2.6% | 5,381 | 0 | 4,470 | $25.50 |
| **Totals** | **9,343** | **123,858,562** | **5,180,947** | **5,288,060** | **4.3%** | **601,020** | **141,644** | **297,889** | **$24.84** |

Source: CoStar Property®

The Costar data for the retail market is echoed by the Realty Rates market survey, shown in the chart below. The Realty Rates survey reflects the Neighborhood, Community and Strip Retail



**Vacancy Rates**
Neighborhood, Community & Strip Retail
*(Miami-Dade County)*

Source: Realty Rates Market Survey

property categories specifically, and also indicate that vacancy rates have receded from the highs reached in 2010, but have a considerable distance to travel before reaching their pre-recession levels.

The Costar survey results for the office market shown below indicate persistently high vacancy rates for the county, and rates for the sub-market that are well above the county averages. They also indicate that in 2011 the subject sub-market has saw a significant loss in office occupancy (a decline of over 275,000 square feet, or 1.6% of all the office inventory in the sub-market). The office market statistics shown below indicate a very negative near-term outlook for any office development at the subject site.

## TOTAL OFFICE MARKET STATISTICS    Third Quarter 2011

| | Existing Inventory | | Vacancy | | | Net | Deliveries | | UC Inventory | | Quoted |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Period | # Bldgs | Total RBA | Direct SF | Total SF | Vac % | Absorption | # Bldgs | Total RBA | # Bldgs | Total RBA | Rates |
| 2011 3q | 4,341 | 99,591,320 | 14,185,620 | 14,569,669 | 14.6% | 246,217 | 1 | 614,909 | 9 | 452,519 | $28.64 |
| 2011 2q | 4,341 | 99,090,068 | 13,999,205 | 14,414,634 | 14.5% | (67,499) | 2 | 307,167 | 10 | 1,067,424 | $29.12 |
| 2011 1q | 4,339 | 98,782,901 | 13,545,235 | 14,049,977 | 14.2% | 229,580 | 3 | 137,720 | 10 | 1,301,541 | $29.19 |
| 2010 4q | 4,340 | 98,785,267 | 13,737,788 | 14,281,923 | 14.5% | 161,327 | 1 | 24,000 | 8 | 1,280,977 | $29.40 |
| 2010 3q | 4,344 | 98,971,948 | 14,046,064 | 14,629,931 | 14.8% | 73,658 | 4 | 201,200 | 9 | 1,304,977 | $29.71 |
| 2010 2q | 4,340 | 98,770,748 | 13,858,516 | 14,502,389 | 14.7% | 304,328 | 2 | 771,293 | 13 | 1,506,177 | $29.93 |
| 2010 1q | 4,338 | 97,999,455 | 13,359,557 | 14,035,424 | 14.3% | (9,659) | 5 | 1,038,111 | 12 | 2,012,285 | $30.14 |
| 2009 | 4,333 | 96,961,344 | 12,382,892 | 12,987,654 | 13.4% | (1,335,389) | 33 | 1,774,713 | 15 | 2,785,697 | $30.30 |
| 2008 | 4,301 | 95,226,631 | 9,329,893 | 9,917,552 | 10.4% | (98,681) | 50 | 1,872,951 | 39 | 4,246,280 | $32.06 |
| 2007 | 4,256 | 93,491,956 | 7,663,629 | 8,084,796 | 8.6% | 919,935 | 49 | 2,655,272 | 54 | 4,801,822 | $31.10 |
| 2006 | 4,209 | 90,914,644 | 6,246,197 | 6,427,419 | 7.1% | 887,935 | 37 | 1,409,158 | 53 | 3,892,654 | $27.19 |
| 2005 | 4,173 | 89,545,486 | 5,746,161 | 5,945,596 | 6.6% | 3,265,518 | 41 | 1,476,447 | 41 | 2,168,537 | $24.31 |
| 2004 | 4,140 | 88,389,543 | 7,795,267 | 8,055,168 | 9.1% | 2,589,656 | 46 | 1,527,297 | 39 | 1,682,228 | $23.91 |
| 2003 | 4,097 | 86,913,015 | 8,578,900 | 9,168,296 | 10.5% | 1,138,337 | 41 | 1,183,819 | 44 | 1,917,944 | $23.80 |
| 2002 | 4,058 | 85,775,687 | 8,335,352 | 9,169,305 | 10.7% | 973,734 | 42 | 1,432,044 | 45 | 1,736,431 | $24.29 |
| 2001 | 4,017 | 84,345,043 | 7,940,443 | 8,712,395 | 10.3% | (75,894) | 33 | 2,366,581 | 49 | 2,510,095 | $23.59 |

*Source: CoStar Property®*

## TOTAL OFFICE MARKET STATISTICS    Third Quarter 2011

| | Existing Inventory | | Vacancy | | | YTD Net | YTD | Under | Quoted |
|---|---|---|---|---|---|---|---|---|---|
| Market | # Bldgs | Total RBA | Direct SF | Total SF | Vac % | Absorption | Deliveries | Const SF | Rates |
| Aventura | 47 | 2,014,972 | 167,815 | 176,056 | 8.7% | 54,628 | 0 | 115,000 | $35.77 |
| Biscayne Corridor | 134 | 3,761,001 | 843,983 | 843,983 | 22.4% | 4,029 | 0 | 0 | $26.02 |
| Brickell | 66 | 7,448,873 | 1,871,520 | 1,909,905 | 25.6% | 174,863 | 614,909 | 0 | $36.60 |
| Coconut Grove | 98 | 1,951,285 | 247,485 | 247,485 | 12.7% | 29,888 | 0 | 0 | $29.40 |
| Coral Gables | 465 | 10,734,629 | 1,489,875 | 1,530,048 | 14.3% | 197,386 | 0 | 228,185 | $31.92 |
| Coral Way | 227 | 2,223,705 | 186,756 | 186,756 | 8.4% | (25,996) | 0 | 0 | $22.20 |
| Downtown Miami | 78 | 10,491,865 | 1,998,065 | 2,087,003 | 19.9% | (3,146) | 0 | 0 | $33.45 |
| Kendall | 459 | 10,704,546 | 1,128,624 | 1,141,030 | 10.7% | 82,086 | 55,088 | 51,000 | $27.38 |
| Medley/Hialeah | 342 | 4,254,724 | 460,447 | 460,447 | 10.8% | 29,596 | 0 | 0 | $23.70 |
| Miami | 575 | 7,235,700 | 580,649 | 613,253 | 8.5% | 245,346 | 294,799 | 0 | $25.38 |
| Miami Airport | 365 | 16,834,762 | 2,764,997 | 2,871,834 | 17.1% | (275,232) | 90,000 | 0 | $24.04 |
| Miami Beach | 199 | 4,282,947 | 367,162 | 395,977 | 9.2% | 60,392 | 0 | 0 | $31.68 |
| Miami Lakes | 141 | 3,712,150 | 801,997 | 801,997 | 21.6% | 20,148 | 5,000 | 0 | $22.98 |
| Miami-Dade Central County | 50 | 384,500 | 31,371 | 31,371 | 8.2% | (7,444) | 0 | 0 | $17.82 |
| Northeast Dade | 504 | 6,838,199 | 849,986 | 874,436 | 12.8% | (73,509) | 0 | 20,804 | $21.14 |
| Outlying Miami-Dade Cnty | 7 | 176,196 | 2,983 | 2,983 | 1.7% | 462 | 0 | 0 | $22.36 |
| South Dade | 270 | 3,038,597 | 307,146 | 310,346 | 10.2% | (10,434) | 0 | 18,480 | $22.63 |
| West Miami | 354 | 3,502,669 | 84,759 | 84,759 | 2.4% | 15,244 | 0 | 15,050 | $21.90 |
| **Totals** | **4,341** | **99,591,320** | **14,185,620** | **14,569,669** | **14.6%** | **518,307** | **1,059,792** | **452,519** | **$28.64** |

*Source: CoStar Property®*

*Description & Analyses*                                            *117 acres of Vacant Land, Doral, Florida 33178*

The outlook for the industrial market is only slightly less favorable. The Costar survey results below indicate that at the county level vacancy rates have pulled back slightly from their post-recession highs, but remain more than double their pre-recession lows. Of greater concern are the sub-market results, which indicate vacancy rates well above the county average. The industrial sub-market that the subject property lies within (the Miami Airport Industrial sub-market) is the largest and most active in the county. In addition, the adjacent sub-markets of Hialeah, Miami Lakes and Medley all have higher vacancy rates too. The four sub-markets taken together represent approximately two thirds of the total industrial inventory in the county and have a combined vacancy rate of 9.2%, whereas the remaining eight sub-markets, representing one third of total inventory, have a combined vacancy rate of 6.9%, according to the Costar survey. These results point to very unfavorable market conditions for any near-term industrial development at the subject site.

## TOTAL INDUSTRIAL MARKET STATISTICS                                 Third Quarter 2011

| | Existing Inventory | | Vacancy | | | Net | Deliveries | | UC Inventory | | Quoted |
| Period | # Bldgs | Total RBA | Direct SF | Total SF | Vac % | Absorption | # Bldgs | Total RBA | # Bldgs | Total RBA | Rates |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2011 3q | 8,860 | 234,379,369 | 19,465,740 | 19,721,305 | 8.4% | 465,752 | 1 | 338,000 | 0 | 0 | $7.15 |
| 2011 2q | 8,859 | 234,041,369 | 19,558,332 | 19,819,057 | 8.5% | 171,996 | 2 | 15,800 | 1 | 338,000 | $7.07 |
| 2011 1q | 8,857 | 234,025,569 | 19,843,278 | 20,005,253 | 8.5% | 829,887 | 2 | 25,270 | 3 | 353,800 | $6.95 |
| 2010 4q | 8,856 | 234,016,66- | 20,620,335 | 20,825,655 | 8.9% | 465,720 | 1 | 19,500 | 4 | 371,770 | $6.97 |
| 2010 3q | 8,855 | 233,996,584 | 20,932,892 | 21,271,875 | 9.1% | 1,402,925 | 1 | 75,250 | 4 | 383,270 | $7.03 |
| 2010 2q | 8,854 | 233,921,334 | 22,181,600 | 22,599,550 | 9.7% | 961,677 | 3 | 294,384 | 3 | 432,750 | $7.14 |
| 2010 1q | 8,851 | 233,626,950 | 22,500,818 | 23,266,843 | 10.0% | 397,915 | 1 | 19,312 | 6 | 727,134 | $7.20 |
| 2009 | 8,850 | 233,607,638 | 22,794,365 | 23,645,446 | 10.1% | (3,745,520) | 17 | 1,930,580 | 4 | 288,946 | $7.48 |
| 2008 | 8,833 | 231,677,058 | 17,406,955 | 17,969,346 | 7.8% | (3,316,948) | 54 | 1,856,494 | 16 | 1,889,985 | $8.42 |
| 2007 | 8,781 | 229,852,201 | 12,611,158 | 12,827,541 | 5.6% | (619,481) | 102 | 3,455,377 | 46 | 1,403,414 | $8.34 |
| 2006 | 8,682 | 226,533,205 | 8,619,905 | 8,889,064 | 3.9% | 1,596,618 | 80 | 2,367,873 | 61 | 2,536,371 | $7.41 |
| 2005 | 8,605 | 224,226,866 | 7,974,307 | 8,179,343 | 3.6% | 4,304,265 | 110 | 2,072,556 | 63 | 2,196,071 | $6.97 |
| 2004 | 8,497 | 220,376,499 | 10,183,310 | 10,632,241 | 4.8% | 6,288,672 | 101 | 2,735,096 | 95 | 1,968,546 | $6.46 |
| 2003 | 8,400 | 219,770,053 | 13,826,295 | 14,315,467 | 6.5% | 4,498,295 | 92 | 2,538,955 | 77 | 2,093,157 | $6.30 |
| 2002 | 8,309 | 217,388,592 | 15,136,663 | 16,432,301 | 7.6% | 2,389,388 | 109 | 2,789,169 | 73 | 1,922,681 | $6.02 |
| 2001 | 8,208 | 214,794,357 | 14,888,551 | 16,227,454 | 7.6% | 2,280,002 | 126 | 4,510,646 | 93 | 2,224,222 | $6.21 |

Source: CoStar Property®

## TOTAL INDUSTRIAL MARKET STATISTICS                                 Third Quarter 2011

| | Existing Inventory | | Vacancy | | | YTD Net | YTD | Under | Quoted |
| Market | # Bldgs | Total RBA | Direct SF | Total SF | Vac % | Absorption | Deliveries | Const SF | Rates |
|---|---|---|---|---|---|---|---|---|---|
| Central Miami Ind | 197 | 3,395,042 | 391,606 | 391,606 | 11.5% | (104,800) | 0 | 0 | $5.61 |
| East Miami Ind | 334 | 4,624,961 | 334,641 | 334,641 | 7.2% | 9,457 | 8,000 | 0 | $8.94 |
| Hialeah Ind | 1,644 | 37,526,154 | 3,517,147 | 3,559,171 | 9.5% | 417,167 | 0 | 0 | $4.86 |
| Medley Ind | 874 | 29,796,058 | 2,227,113 | 2,292,006 | 7.7% | 283,270 | 0 | 0 | $7.23 |
| Miami Airport Ind | 2,047 | 75,327,746 | 7,018,138 | 7,157,786 | 9.5% | 288,081 | 357,386 | 0 | $8.31 |
| Miami Lakes Ind | 259 | 12,095,097 | 1,235,468 | 1,235,468 | 10.2% | 158,449 | 0 | 0 | $7.23 |
| North Miami Beach Ind | 957 | 32,596,542 | 2,585,344 | 2,585,344 | 7.9% | 219,965 | 14,184 | 0 | $6.38 |
| Outlying Miami-Dade Ind | 9 | 174,207 | 0 | 0 | 0.0% | 0 | 0 | 0 | $7.00 |
| South Central Miami Ind | 1,151 | 15,093,758 | 1,039,125 | 1,039,125 | 6.9% | 4,355 | 0 | 0 | $8.80 |
| South Dixie Hwy Ind | 618 | 8,831,902 | 539,597 | 548,597 | 6.2% | 82,208 | 0 | 0 | $8.58 |
| Southwest Dade Ind | 478 | 9,955,047 | 513,485 | 513,485 | 5.2% | 121,661 | 0 | 0 | $8.90 |
| West Miami/Coral Ter Ind | 292 | 4,962,855 | 64,076 | 64,076 | 1.3% | (12,178) | 0 | 0 | $12.45 |
| Totals | 8,860 | 234,379,369 | 19,465,740 | 19,721,305 | 8.4% | 1,467,635 | 379,570 | 0 | $7.15 |

Source: CoStar Property®

# Reasonable Exposure Time

Reasonable exposure time is always presumed to precede the effective date of the appraisal. Reasonable exposure time is the estimated time the property would have been offered on the market prior to a hypothetical sale at market value on the effective date of the appraisal. The actual exposure time may differ from reasonable exposure time. Reasonable exposure time varies by type of real estate. A property may be exposed to the market for an extended period of time if it is overpriced. This analysis considers the reasonable exposure time at a market related price such as the estimated market value(s) herein in this report.

In estimating a reasonable exposure time for the subject property, conversations with real estate brokers, property owners and other market participants familiar with the subject property type and area were also made. It is estimated that a reasonable exposure time, based upon the subject's large size and complex zoning, would be 12 to 24 months. This takes into consideration the subject's desirable location and the positive near-term outlook for residential development on the site. The estimate also assumes that the property would have been properly marketed and priced. If the property were not to have been priced correctly or marketed through proper channels, then it is not likely that the estimated market value and the estimated reasonable exposure time would have been achieved.

# Typical Purchaser of the Subject

The subject is a 117-acre tract of vacant land designated as mixed-use by the City of Doral. The immediate area of the subject neighborhood consists of residential developments (including single-family, fee simple townhouses and condominiums), industrial uses (including a large county landfill / recycling facility), neighborhood retail centers, and vacant residential and industrial land. The typical purchaser of the subject would be a development company with the resources and experience to bring a large-scale, multi-year development to successful completion. Given the mixed-use zoning and requirements for specific land use allocations, the purchaser would likely have some experience with master-planned, mixed-use projects. However, given the fact that there is a near-term market opportunity for development of residential uses, but that development of commercial uses is not likely to be profitable until a later phase, it is also likely that the purchaser would be a residential developer who would hold the commercial portions of the site until the future and sell them to a third party after residential development is substantially complete (at which time the commercial portions would likely be more valuable).

# Highest and Best Use

The site is valued for its highest and best use, which may be defined as follows:

> That reasonable and probable use that will support value
> as defined as of the effective date of the appraisal.

In analyzing the highest and best use, the following four questions are answered:

1. **Legally Permissible.** What uses are legally permitted on the subject site with respect to zoning ordinances and deed restriction.

2. **Physically Possible.** What uses of those legally allowed are physically possible on the subject site?

3. **Financially Feasible.** Of those uses determined to be physically possible and legally permissible, which ones will produce a positive return?

4. **Maximally Productive.** Of those that are feasible, legally permissible, and physically possible, which will produce the highest rate of return or value?

The above four questions are answered in order.

**Legally Permissible:**

The subject site is subject to the guidelines stipulated in the City of Doral's Traditional Neighborhood Development (TND) District. The Doral TND District is a mixed use district "designed to ensure development of land along the lines of traditional neighborhoods" and attempts to "adapt the urban conventions which were normal in the United States from colonial times until the 1940s". Its intent is to re-create the pedestrian-friendly environment reminiscent of small-town America, which combines live, work and recreation areas, public parks and green space, tree-lined streets, and a street plan that promotes walking to work and shopping. In order to achieve this, the TND District imposes a number of development guidelines on each of six land use categories: public and semipublic uses, civic use, shop front use, rowhouse use, house use, and workshop use. The detailed design guidelines may be found in the City of Doral Land Development Code, available online at:

*http://www.cityofdoral.com/index.php?option=com_docman&task=doc_download&gid=4*
*467&Itemid=100*

Generally, the TND District requires an overall site size of between 40 and 200 acres, an overall Floor Area Ratio (FAR) of 4.0 or less, and allows an overall residential density of up to 18 units per acre. It also requires that the mix of uses include 51% to no more than 90% residential, 5% to 40% office and 1% to 20% "retail and services", according to the Director of Planning and Zoning for the City of Doral.

It should be noted that there are a number of utility easements that run through the property that constrain development, most notably two Florida Power & Light easements that run north-south along the west perimeter of the site and east-west along the south part of the north segment. These have the effect of containing development to two disconnected segments (north and south). No deed restrictions are known which would legally limit the allowable uses on the subject site.

### Physically Possible:

The subject property is a 117-acre "L"-shaped site. The size and shape are such that construction would not be hindered. No soil conditions are known that would restrict construction on the subject site. The Landmark at Doral development plan specified certain areas as dedicated to storm water management / runoff, but these are mostly contained within the utility easement areas and would therefore not unduly constrain development in the usable portions. Therefore, any of the allowable uses would be physically possible on the subject property site.

### Financially Feasible:

Of those uses which are legally permissible and physically possible, a determination must be made as to which uses are financially feasible. Determining financial feasibility on a large mixed-use site is a highly complex matter. However, market conditions indicate that certain uses are more likely to be financially feasible in the near term than others. Though the residential condominium market has begun to show signs of an incipient recovery from the recent development boom and ensuing market collapse, due to continuing oversupply conditions that segment of the residential market is likely to take several years before fully returning to equilibrium. However, the markets for fee simple townhouses and single-family residences has remained somewhat insulated from the worst effects of the recent market shocks, and have recently shown signs that demand is gaining momentum. In addition, the subject area benefits from a significant level of demand from foreign-born buyers, most notably Venezuelans, many of whom have been less directly affected by the economic crisis and have the means to fund a purchase of a home in the area. These buyers are likely to prefer fee simple ownership over a condominium, and many have a preference for townhouse-style living in a newly-built home over older, detached single-family residences. Market evidence indicates that the pace of sales at the most recently completed projects has been strong enough to justify new development. In

general, development of single-family residential and fee simple townhouse product at the subject site appears to be financially feasible at this time.

The outlook for feasibility of commercial uses is less positive. Due to the effects of the recession, which include widespread business failures, declines in consumer spending and confidence, declines in employment levels, and a shrinking of trade, vacancy rates in most commercial sectors have increased significantly in the past three years. At present, there is ample supply of available space across the office and industrial sectors, which would tend to make it very difficult for newly built projects to compete for available space users. The retail sector indicates a more positive outlook, as it has begun to show signs of recovery, especially at the more desirable locations, with vacancy rates beginning to decline after several quarters of increases. However, retail uses are highly dependent on the density of surrounding development (especially residential), the volumes of traffic along attached roads and the quality of transportation linkages. Retail uses at the subject site would benefit greatly from significant additional residential development in the area, but it is unlikely that rapid absorption of retail space can be achieved prior to this development being completed (and occupied), given that existing residential demand is mostly being met by existing neighborhood retail centers. In this respect, retail uses appear to be financially feasible as part of a later phase of development, once a substantial amount of residential product has been developed at the site. By the time a first residential development phase is substantially completed, market conditions are expected to be much more favorable for retail. By that time, the economic recovery is expected to have gained strength, the excess supply of available (competing) space to have been absorbed by rising demand, and other surrounding residential developments that are currently in the planning stages to have achieved successful sales. These factors will support rapid absorption rates for new retail space and justify new development.

It should be noted that there are physical factors that are likely to influence the feasibility of different uses on the site. First, due to prominent frontage along two roads, good exposure to vehicular traffic and its corner location across from existing retail developments, commercial uses are likely to be most feasible in the South Parcel. Though residential development would be allowed and could potentially be feasible (with higher-density residential being perhaps most suitable due to the elongated shape of the parcel), it is likely that commercial uses would be most profitable on the South Parcel.

Also, it is important to note that moderately offensive odors were detected along the north portion of the eastern perimeter of the north segment, emanating from the adjoining landfill / recycling plant. Since no access was provided to the interior of the site, it could not be determined how deep into the site the odors are noticeable. However, it is likely that these odors would render any residential, office or retail development financially unfeasible in the area that has been defined as the East Parcel in this appraisal (which comprises the east 415 feet of the north segment, above the east-west FPL easement). The original Landmark at Doral development plan proposed light industrial and office uses for this area, but it is unlikely that office uses would be financially feasible due to the odors, and industrial uses would be a poor complement to the bulk of the residential development in the adjoining North Parcel. Notably, the Terra

World Investments proposal is to hold that area for development in the future, when they envision it to be suitable for a storage facility that would cater mainly to the residents of the adjoining North Parcel. Such a use, which could include both mini-storage type warehouses and larger enclosed garage type units, would have the benefit of being complementary to the residential project (as it could be positioned as an amenity) while serving as a buffer between the source of the odors and the residential tract. Given the significant land area of the East Parcel, another potential related use would be open storage for boats (dry storage) and other vehicles, again to serve the residents of both the North Parcel and even surrounding areas. Since the East Parcel is landlocked between the North Parcel, the landfill, and surrounding vacant tracts, with no road access except what would be provided *through* the North Parcel (NW 66th Street) once that is opened up, it is likely to be the last portion of the subject site where any other uses would conceivably become feasible in the distant future, if the odors from the landfill were to be mitigated.

**Maximally Productive:**

Based on the observations above, the most profitable approach for a potential purchaser of the subject site would be to capture the existing residential opportunity by developing single-family and townhouse product in the near term, concentrated on the North Parcel. Development of commercial uses would be deferred until those sectors of the market regain sufficient strength to justify development. Commercial development is likely to be the most profitable use of the South Parcel, with retail uses being likely to be the first to be profitable once the residential development is substantially completed, as the increased density of nearby households will support more rapid lease-up or sellout of retail space. The most profitable use for the East Parcel would be to develop it with a use that would be a good complement to the residential development on the North Parcel. Since few uses would be financially feasible there due to the odors from the landfill, a storage facility serving neighboring residents would seem to be the most profitable. This would be feasible to develop only after a substantial portion of the residential development is completed.

# Conclusion of the Highest and Best Use

Based on the previous analysis, the highest and best use of the subject site would be a phased mixed-use development that would deliver single-family and fee simple townhouse residential product during the early phases and defer development of commercial uses until a later phase when improved market conditions and the increased density of newly built housing will support more rapid lease-up and sellout of commercial space. The most profitable approach would be to build the bulk of the residential product on the North Parcel, the bulk of the commercial product on the South Parcel, and to select a use for the East Parcel that would be complementary to the adjoining residential development but not be unduly hindered by the odors from the adjacent landfill (such as a storage facility catering to neighboring households).

# Appraisal Process

An analysis of three separate approaches to value, sales comparison approach, cost approach, and income capitalization approach will be considered to estimate the value of the subject property. Although these three approaches to value are considered within every appraisal report, they may not be applicable to each and every property being appraised.

The cost approach is based on the principle of substitution which states that an informed purchaser would not pay more for a property than the cost of reproducing a property with the same utility. The cost approach can often yield reliable estimates of value for new construction. This approach entails estimating the cost of producing the improvements, deducting an estimate of depreciation, then adding the value of the site as if vacant. To this value an entrepreneurial incentive is added to arrive at the estimated value by the cost approach.

The income capitalization approach is based on the concept that value is created by the expectations of future benefits and higher earnings should result in higher values. Income producing real estate is purchased for the right to receive future income. The income capitalization approach consists of methods to analyze a property's capacity to generate income, and a reversion, and convert these monetary benefits into an estimate of value.

The sales comparison approach is based on the principle of substitution which suggests that, within competitive markets, similar products will realize similar prices. Inherent in this concept is the premise that a purchaser would not pay more for a property than the cost to acquire another property with the same amenities and utility.

The final steps in the appraisal process are review and reconciliation of the data and conclusions. In reaching a final conclusion of value, the entire process involving the approaches that were estimated must be reviewed for accuracy, completeness and consistency. After analysis, evaluation and reconciliation of the indications a value is estimated. The essence of this final reconciliation should be a defensible and rational conclusion of value.

The only approach used in this appraisal is the sales comparison approach. The cost approach and the income capitalization approach were considered not applicable in the valuation of the subject property.

# Cost Approach

The basis of the cost approach is the principle of substitution. This principle suggests that a prudent buyer would not pay more for a property than the cost to acquire a similar site and construct comparable improvements.

Following are the procedures for preparing the cost approach.

1.  Estimate the value of the land as though vacant and available to be developed to its highest and best use.

2.  Determine which cost basis is most applicable to the assignment: reproduction cost or replacement cost.

3.  Estimate the direct (hard) and indirect (soft) costs of the improvements as of the effective appraisal date.

4.  Estimate an appropriate entrepreneurial profit or incentive from analysis of the market.

5.  Add estimated direct costs, indirect costs, and the entrepreneurial profit or incentive to arrive at the total cost of the improvements.

6.  Estimate the amount of depreciation in the structure and, if necessary, allocate it among the three major categories: physical deterioration, functional obsolescence, and external obsolescence.

7.  Deduct the estimated depreciation from the total cost of the improvements to derive an estimate of their depreciated cost.

8.  Estimate the contributory value of any site improvements that have not already been considered. (Site improvements are often appraised at their contributory value - i.e., directly on a depreciated-cost basis - but may be included in the overall cost calculated in Step 2 and depreciated, if necessary).

9.  Add the land value to the total depreciated cost of all the improvements to arrive at the indicated value of the property.

10. Adjust the value conclusion if for any personal property (e.g., furniture, fixtures, and equipment) or intangible assets are included in the appraisal assignment. If necessary this value, which reflects the value of the fee simple interest, may be adjusted for the property interest being appraised to arrive at the indicated value of the specified interest in the property. [1]

A cost approach was not estimated as purchasers of this type property do not typically rely on a cost approach. As the subject property is unimproved vacant land, the cost approach is not applicable. Land value has been estimated in the sales comparison approach herein.

---

[1] *The Appraisal of Real Estate,* 13th Edition, 2008, Page 384 and 385

# Income Capitalization Approach

Income producing real estate is typically purchased as an investment, and from an investor's point of view earning power is the critical element affecting property value. One basic investment premise holds that the higher the earnings, the higher value, provided the amount of the risk remains constant. An investor who purchases income-producing real estate is essentially trading present dollars for the expectation of receiving future dollars. The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value.[1]

In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach.[2]

The subject property is vacant land to which the income capitalization approach does not apply. Although rental income can be derived from vacant land, it is not generally purchased based on its income. Therefore, this approach to value was considered not applicable.

---

[1]    Appraisal of Real Estate, 13th Edition, 2008, Page 445
[2]    Ibid., 445

# Sales Comparison Approach

The *sales comparison approach* is based on the principle of substitution. *The principle of substitution holds that the value of a property tends to be set by the price that would be paid to acquire a substitute property of similar utility and desirability within a reasonable amount of time.*[1]

In the sales comparison approach, an opinion of market value is developed by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract (i.e., for which purchase offers and a deposit have been recently submitted). A major premise of the sales comparison approach is that an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties.

Qualitative analysis is a relative comparison process without mathematics. Sales are ranked based upon their desirability as compared to the subject. Comparisons can be expressed as plus or minus as opposed to dollar or percentage adjustments.

Quantitative analysis is the process of applying mathematical techniques. Sales are adjusted to the subject property on a dollar or a percentage basis. One method of supporting adjustments is through *paired data analysis*. This method analyzes two sales and attributes the difference in their sales prices to the characteristic which is different. This analysis requires an abundance of sales data which is frequently not available.

Qualitative analysis is used herein to estimate a value by the *sales comparison approach*. Characteristics of the sales considered superior to the subject are given a minus (-) adjustment. Those characteristics of the sales considered inferior to the subject are given a plus (+) adjustment. Each sale is given an overall adjustment indicating how it compares to the subject.

On the following page is a grid of the sales used for comparison.

---

[1] The Appraisal of Real Estate 13th Addition, 2008, page 298-299

# Land Value by Sales Comparison

In the following section a number of vacant land sales are considered for analysis in comparison to the subject property. Based on the previous conclusion that the North, South and East Parcels are likely to be developed with different uses, the comparable sales selected are grouped for comparison to each of the three parcels. Therefore, since the North Parcel is expected to be a residential tract, the analysis considers comparable sales of residential tracts. For the South and East Parcels, sales of commercial and industrial land were considered.

For each parcel, the comparable sales are shown in a summary grid, followed by a map indicating their location relative to the subject, detailed information on each sale, and analysis of necessary adjustments. The sales are numbered with prefix N, S or E, based on which parcel they are applicable to. Each parcel is considered separately. The indications from the analysis are then reconciled into a value estimate for the entire property to a single buyer.

## Adjustments and Analysis

After each set of comparable sales is a grid that illustrates qualitative adjustments used to compare the sales to the respective parcel. Percentage adjustments were not utilized. In order to utilize percentage adjustments it would be necessary to pair (compare) sales to extract value differences. This is difficult as there is normally insufficient data to provide pairing for all value differences. Below is a grid of the applicable adjustments. A plus (+) sign indicates the unit of comparison of the sale must be adjusted upward as that characteristic is inferior to the subject. A minus (–) sign indicates the price unit of comparison of the sale must be adjusted downward since the characteristic is superior to the subject. An equal (=) sign indicates the comparable sale characteristic is similar to the subject. After considering the individual differences, either a plus (+), minus (–) or equal (=) sign was placed in the "Overall" column. This indicates the overall adjustment that the sale would require as compared to the subject site. The adjustment grids are followed by narrative discussions explaining the reasoning behind the adjustments.

Following the discussion of comparable sales and adjustments is a discussion of the reconciliation of the indications for the three parcels into a value estimate for the overall property.

# Comparable Sales Applicable to the North Parcel

| Sale No. | Sale Date | Location | Zoning | Sale Price | Site Size (Acres) | Price / Acre | Price / Sq. Ft. |
|---|---|---|---|---|---|---|---|
| N1 | 9/11 | East side of NW 107th Ave., between NW 66th and 74th St. Doral | PUD | $14,000,000 | 20.0 | $700,000 | $16.07 |
| N2 | 9/11 | West side of NW 102nd Ave., between NW 66th and 74th St. Doral | GU | $16,500,000 | 32.4 | $509,102 | $11.69 |
| N3 | 8/11 | NW of NW 58th St. & 104th Ave. Doral | PUD | $9,000,000 | 17.0 | $529,412 | $12.15 |
| N4 | 7/11 | North side of SW 72nd St., between SW 163rd and 164th Ave. Miami | RU-3M | $2,150,000 | 10.0 | $215,000 | $4.94 |
| N5 | 11/09 | NEC of Pacific Blvd. and SW 147th Ave., Homestead | PUD | $8,353,100 | 25.23 | $331,078 | $7.60 |
| N6 | 8/09 | East side of NW 27th Ave. at NW 191st St. Miami Gardens | PCD | $8,964,000 | 39.91 | $224,605 | $5.16 |
| **Subj.** | | **NW of NW 107th Ave. and NW 58th St. Doral** | **TND** | | 59.34 | | |

# Vacant Land Sales Map
*(North Parcel Sales)*



## Comparable Vacant Land Sale N1

### Pertinent Data

| | |
|---|---|
| Location: | East side of NW 107th Avenue, between NW 66th and 74th Streets, Doral, Florida 33178 |
| Sale Price: | $14,000,000 |
| Sale Date: | September 2011 |
| Land Size: | 871,200 sq.ft., equal to 20 acres |
| Price Per Sq.Ft.: | $16.07 |
| Price Per Acre: | $700,000 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 27898/0742 |
| Grantor: | Renegade at Doral, LLC |
| Grantee: | M&M Doral Investments, LLC |
| Legal Description: | Tracts 28 and 29, in Section 17, Township 53 South, Range 40 East, FLORIDA FRUIT LAND COMPANY'S SUBDIVISION NO. 1, as recorded in Plat Book 2, Page 17, as recorded in the public records of Miami-Dade County, Florida |
| Folio No.: | 35-3017-001-0280 and -0290 |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

### Property Description

| | |
|---|---|
| Zoning: | PUD, Planned Unit Development, by the City of Doral |
| Shape: | Rectangular |
| Topography: | Grade level |

### Comments

This parcel has frontage of approximately 650 feet along the east side of NW 107th Avenue. The west approximately 170 feet is encumbered by a power line easement. This transaction is between partially related parties. The grantee is a joint venture in which the grantor has an interest. The venture partner is a development company (Terra World Investments) that has completed several residential projects in the area and recently purchased several similar nearby parcels. The company plans to build approximately 190 units, mostly townhouses with some single-family. Based on this, the parties valued the land at approximately $74,000 per buildable lot, at a density of 9.5 units per acre (or 10.9 units after deduction of the easement).

**Database Tracking**

WRI No.:                   302854

*Comparable Vacant Land Sale N1 (continued)*

# AERIAL MAP



*Sales Comparison Approach*                    *117 acres of Vacant Land, Doral, Florida 33178*

## Comparable Vacant Land Sale N2

### Pertinent Data

| | |
|---|---|
| Location: | West of NW 102nd Avenue, between NW 66th and 74th Streets, Doral, Florida 33178 |
| Sale Price: | $16,500,000 |
| Sale Date: | September 2011 |
| Land Size: | 1,411,605 sq.ft., equal to 32.41 acres |
| Price Per Sq.Ft.: | $11.69 |
| Price Per Acre: | $509,102 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 27837/0271 |
| Grantor: | Doral Palms Development, LLC |
| Grantee: | Terra Acon Doral Palms, LLC |
| Legal Description: | Lengthy. Refer to recording deed. |
| Folio No.: | 35-3017-001-0181, -0191, -0219, -0221 and -0231 |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | $31,800,000 in March 2008 |

### Property Description

| | |
|---|---|
| Zoning: | GU, Interim District by Miami-Dade County, Florida |
| Shape: | Irregular |
| Topography: | Grade level |

### Comments

This property consists of two separate tracts of approximately eight acres each, separated by several hundred feet, located just north of the planned Landmark at Doral district. The seller had purchased the site in March 2008 for $31,800,000 from developer Sergio Pino with 100% financing from Pino's US Century Bank. The bank filed to foreclose on the loan in July 2010. This is a short sale occurring before the bank took the property back. The buyer is a local development company that has completed numerous residential projects in the area, has recently purchased several large tracts in the immediate vicinity.

**Database Tracking**

| | |
|---|---|
| WRI No.: | 302852 |

*Sales Comparison Approach*                    *117 acres of Vacant Land, Doral, Florida 33178*

**Comparable Vacant Land Sale N2** *(continued)*

## AERIAL MAP



## Comparable Vacant Land Sale N3

### Pertinent Data

| | |
|---|---|
| Location: | Northwest of NW 58th Street and NW 104th Avenue, Doral, Florida 33178 |
| Sale Price: | $9,000,000 |
| Sale Date: | August 2011 |
| Land Size: | 740,520 sq.ft., equal to 17 acres |
| Price Per Sq.Ft.: | $12.15 |
| Price Per Acre: | $529,412 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 27790/2881 |
| Grantor: | Doranda, LLC |
| Grantee: | Terra Acon Doranda Developments, LLC |
| Legal Description: | The East 2/3 of the East 865 Feet, Tracts 41, 42, 43 and 44 of the FLORIDA FRUIT LANDS COMPANY'S SUBDIVISION of Section 17, Township 53 South, Range 40 East, as recorded in Plat Book 2, Page 17, as recorded in the public records of Miami-Dade C |
| Folio No.: | 35-3017-001-0430 and -0431 |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | $4,400,000 in seller financing |
| Prior Sale: | None in the past five years |

### Property Description

| | |
|---|---|
| Zoning: | PUD, Planned Unit Development, by the City of Doral |
| Shape: | Rectangular |
| Topography: | Grade level |

### Comments

This site is located just east of NW 107th Avenue with approximately 575 feet of frontage along the north side of NW 58th Street and a depth of approximately 1,290 feet. The buyer is a development company that has completed numerous residential projects in the area, most recently a 318-unit townhouse development called The Reserve at Doral, located one mile to the northwest, which was nearly sold out at the time of this sale. The buyer intends to develop the site with a 160-unit townhouse project called Doral Cay, with planned completion in 2014.

**Database Tracking**
WRI No.:                            302853

*Comparable Vacant Land Sale N3 (continued)*

# AERIAL MAP



## Comparable Vacant Land Sale N4

### Pertinent Data

| | |
|---|---|
| Location: | North side of SW 72nd Street, between SW 163rd and and 164th Avenues, Miami, Florida 33193 |
| Sale Price: | $2,150,000 |
| Sale Date: | July 2011 |
| Land Size: | 435,600 sq.ft., equal to 10 acres |
| Price Per Sq.Ft.: | $4.94 |
| Price Per Acre: | $215,000 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 27752/3882 |
| Grantor: | HL At Sunset, LLC |
| Grantee: | Lennar Homes, LLC |
| Legal Description: | Tract 59, Section 29, Township 54 South, Range 39 East, of MIAMI EVERGLADE LAND CO., LTD., as recorded in Plat Book 2, Page 3, as recorded in the public records of Miami-Dade County, Florida |
| Folio No.: | 30-4929-001-0610 |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | $5,884,000 in September 2007 |

### Property Description

| | |
|---|---|
| Zoning: | RU-3M, Minimum Apartment House District by Miami-Dade County, Florida |
| Shape: | Square |
| Topography: | Grade level |

### Comments

This is a multi-family residential site purchased by Lennar Homes. It is a square 10-acre tract with existing frontage of approximately 650 feet along SW 72nd Street. The north 30% to 40% of the site consists of a man-made lake. The seller, an entity related to developer Sergio Pino, had purchased the site in September 2007 for $5,884,000 ($13.52 per sq. ft), but development never advanced beyond clearing of the site and construction of a sidewalk and curb cuts along the south perimeter. According to a recorded agreement with Miami-Dade County to bring water and sewer services to the site, the buyer plans to construct 58 townhouses. Based on this, the sale price represents a price per buildable lot of $37,069.

**Database Tracking**

| | |
|---|---|
| WRI No.: | 302851 |

*Sales Comparison Approach*                                    *117 acres of Vacant Land, Doral, Florida 33178*

*Comparable Vacant Land Sale N4 (continued)*

## AERIAL MAP



### Comparable Vacant Land Sale N5

#### Pertinent Data

| | |
|---|---|
| Location: | NEC of Pacific Boulevard and SW 147th Avenue, Homestead, Florida 33033 |
| Sale Price: | $8,353,100 |
| Sale Date: | November 2009 |
| Land Size: | 1,099,228 sq. ft., equal to 25.23 acres |
| Price Per Sq. Ft.: | $7.60 |
| Price Per Acre: | $331,078 |

#### Recording Information

| | |
|---|---|
| ORB/Page: | 27085/298 |
| Grantor: | Homestead Lots 2008 LLC |
| Grantee: | Lennar Homes, LLC |
| Legal Description: | Lengthy, refer to recording instrument, as recorded in the public records of Miami-Dade County, Florida |
| Folio No.: | 10-7915-011-0010 et al |

#### Financing & Prior Sale

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

#### Property Description

| | |
|---|---|
| Zoning: | PUD, Planned Urban Development District by the city of Homestead, Florida |
| Shape: | Irregular |
| Topography: | Grade level |

#### Comments

This is the sale of 362 lots that are developed with roads and utilities to the sites. Price per lot was $23,074. Note: a plat map could not be obtained.

**Database Tracking**
WRI No.:                    302619

## Comparable Vacant Land Sale N6

### Pertinent Data

| | |
|---|---|
| Location: | East side of NW 27th Avenue at NW 191st Street, Miami Gardens, Florida 33056 |
| Sale Price: | $8,964,000 |
| Sale Date: | August 2009 |
| Land Size: | 1,738,480 sq.ft., equal to 39.91 acres |
| Price Per Sq.Ft.: | $5.16 |
| Price Per Acre: | $224,605 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 26995/2588 and 2593 |
| Grantor: | Cornerstone CW, LLC |
| Grantee: | City of Miami Gardens |
| Legal Description: | Lengthy. Refer to recording deed. |
| Folio No.: | 34-2103-001-0710 and -0715 |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | December 2006 for $8,254,700 |

### Property Description

| | |
|---|---|
| Zoning: | PCD, Planned Corridor Development by the city of Miami Gardens |
| Shape: | Irregular |
| Topography: | Grade level |

### Comments

This sale consists of two sites located along the east side of NW 27th Avenue at NW 191st Street in the city of Miami Gardens. The main parcel consists of 37.69 acres while the smaller parcel consists of 2.21 acres. The PCD zoning allows for a density of 16 units per acre or 638 units total. The sites were purchased by the city of Miami Gardens from a developer, Cornerstone CW, which was being foreclosed on. It was proposed to be improved with a project known as Emerald Place, consisting of 526 homes and commercial uses along NW 27th Avenue. Based purely on the 638 units, the price is $14,050 per unit. The city plans on selling off the smaller site and keeping the large site until the market improves. The sites closed as two separate purchases.

**Database Tracking**
WRI No.:                    302701R

*Comparable Vacant Land Sale N6 (continued)*

# AERIAL MAP



# North Parcel Adjustments

| Sale No. | Price/ Sq. Ft | Conditions of Sale | Market Conditions | Location | Zoning | Size/ Shape | Other | Overall Adjustment |
|---|---|---|---|---|---|---|---|---|
| N1 | $16.07 | - - | = | = | = | - | + | - - |
| N2 | $11.69 | - - | = | + | = | = | = | - |
| N3 | $12.15 | = | = | = | = | - - | = | - |
| N4 | $4.94 | = | = | + + | = | - - | + | + + |
| N5 | $7.60 | = | = | + + + | = | - | - | + |
| N6 | $5.16 | = | = | + + + | = | = | = | + + |

# Analysis of Sales

Following is the discussion and comparison of various characteristics of the sales as compared to the subject property.

### Financing:

No adjustments are indicated for any of the sales for favorable financing. The sales were all financed with loans at or near market rates, or purchased for all cash.

### Conditions of Sale:

All of the sales except Sale N1 were arm's length transactions, meaning that the buyer and seller are each acting prudently, knowledgeably, and not under duress. Note that in Sale N1 the buyer is a joint venture in which the seller has an interest, and no cash was exchanged. The land was valued by the parties based on financial projections for a development plan. The venture partner is a company related to Terra World Investments, a developer that has completed several residential projects in the area, recently purchased other nearby parcels (Sales N2 and N3), and is attempting to acquire the subject property, which is located in between the three sales noted above. Though this sale should be given minimal weight in the analysis due to the fact that the parties are partially related and that no cash was exchanged, a negative adjustment is indicated because the partner's other buying activity indicates they have an interest in assembling multiple tracts in the area. Sale N2 requires a negative adjustment for the same reason.

## Market Conditions (Time):

This adjustment considers current market conditions as compared to market conditions in place at the time of the respective sale. All the sales have occurred since August 2009 and the market for large residential tracts has remained relatively unchanged during that time. No adjustment is needed for market conditions.

## Location:

Sale N2 requires a positive adjustment because it is a landlocked tract (access is only available through adjoining parcels, which are themselves inaccessible via paved roads). Sales N4, N5 and N6 require positive adjustments for their inferior locations (N4 near the county's western development boundary, and N4's and 5's in much less desirable neighborhoods with much lower household incomes and inferior amenities).

## Zoning:

There were no significant differences in zoning between the subject and the comparable sales. Sale N2 is un-zoned, but the underlying density of the site on the Comprehensive Land Use Map is comparable to that of the subject.

## Size and Shape:

A size adjustment is indicated when there is a significant difference between the sizes of the subject and comparable sale. Larger sites tend to sell for less per square foot due to economies of scale, and because larger sites take more time to develop and sell out, pushing projected sales proceeds further into the future. The time value of money, together with the added risk of longer development and sales cycles, require land cost to be lower in order to maintain expected returns. Adjustments for shape are necessary when a site is disadvantaged by a shape that would hinder development (unless the subject is similarly disadvantaged).

Sales N1 through N5 require negative adjustments for their smaller size, but Sale N2 requires an offsetting positive adjustment for its undesirable shape because it consists of two non-contiguous segments.

## Other:

The North Parcel as defined in this appraisal consists of the net acreage after deducting the significant power line easement areas. Sale N1 is encumbered by one of the same easements that run through the subject site. The price per square foot noted for Sale N1 is based on the gross acreage including the easement, but would be higher if only the usable portion of the site were considered. It therefore requires a positive adjustment when compared to the subject without the

easement. Similarly, Sale N4 contains a lake of significant size. If only the usable portion of the site were considered, the price per square foot would be higher, indicating that a positive adjustment is needed. Sale N5 requires a negative adjustment because it consists of finished lots with roads already completed (and not included in the total acreage). If the gross acreage (before deducting roads) were considered and the roads were unfinished, the price per square foot would be lower.

On page 110 is the conclusion of value for each of the North, South and East parcels.