# SUMMARY APPRAISAL REPORT

## PART 2 OF 2

# Comparable Sales Applicable to the South Parcel

| Sale No. | Sale Date | Location | Zoning | Sale Price | Site Size (Acres) | Price / Acre | Price / Sq. Ft. |
|---|---|---|---|---|---|---|---|
| S1 | 8/11 | 21111 South Dixie Highway Miami | CRMUC | $6,250,000 | 6.58 | $949,848 | $21.81 |
| S2 | 5/11 | NEC of NW 41st St. and 117th Ave., Doral | BU-2 | $13,750,000 | 16.41 | $837,904 | $19.24 |
| S3 | 2/11 | NW of W. Okeechobee Rd. and NW 107th Ave. Hialeah Gardens | BU-3 | $2,385,700 | 4.02 | $593,458 | $13.61 |
| S4 | 12/09 | SEC of NW 17th St and NW 111th Ave Miami | BU-2 | $2,800,000 | 2.59 | $1,081,081 | $24.82 |
| S5 | 4/09 | NWC of NW 58th St and NW 102nd Ave Doral | NC | $3,250,000 | 2.49 | $1,305,221 | $29.95 |
| Subj. | | NW of NW 107th Ave. and NW 58th St. Doral | TND | | 15.60 | | |

# Vacant Land Sales Map
*(South Parcel Sales)*



## *Comparable Vacant Land Sale S1*

### *Pertinent Data*
| | |
|---|---|
| Location: | 21111 South Dixie Highway, Miami, Florida 33189 |
| Sale Price: | $6,250,000 |
| Sale Date: | August 2011 |
| Land Size: | 286,625 sq.ft., equal to 6.58 acres |
| Price Per Sq.Ft.: | $21.81 |
| Price Per Acre: | $949,848 |

### **Recording Information**
| | |
|---|---|
| ORB/Page: | 27808/1559 |
| Grantor: | Kimco Autofund, LP |
| Grantee: | Wal-Mart Stores East, LP |
| Legal Description: | Lengthy Legal: A portion of the Southwest 1/4 of the Northeast 1/4 of the Southwest 1/4 and the Southeast 1/4 of the Northwest 1/4 of the Southwest 1/4 of Section 7, Township 56 South, Range 40 East, as recorded in the public records of Miami-Dade Co |
| Folio No.: | 30-6007-000-0080 |

### **Financing & Prior Sale**
| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

### **Property Description**
| | |
|---|---|
| Zoning: | CRMUC, Cutler Ridge Urban Center District by Miami-Dade County, Florida |
| Shape: | Irregular |
| Topography: | Grade level |

### **Comments**
This sale a a former automobile dealership that had closed due to the economy. It is located with South Dixie Highway frontage, at the southeast corner of South Dixie Highway and Cutler Ridge Boulevard (SW 211th Street). There are 32,629 adjusted square feet of improvements on the site, but it was sold as land value and it is to become the site of a new Wal-Mart retail center.

**Database Tracking**
| | |
|---|---|
| WRI No.: | 302834 |

*Comparable Vacant Land Sale S1* *(continued)*

## AERIAL MAP



### Comparable Vacant Land Sale S2

#### Pertinent Data

| | |
|---|---|
| Location: | NEC of NW 41st Street and NW 117th Avenue/Florida Turnpike, Doral, Florida 33178 |
| Sale Price: | $13,750,000 |
| Sale Date: | May 2011 |
| Land Size: | 714,806 sq.ft., equal to 16.41 acres |
| Price Per Sq.Ft.: | $19.24 |
| Price Per Acre: | $837,904 |

#### Recording Information

| | |
|---|---|
| ORB/Page: | 27704/7 |
| Grantor: | Pebble Walk Reph, LLC |
| Grantee: | CC Doral Pebblewalk, LLC |
| Legal Description: | Lengthy. Refer to recording deed. |
| Folio No.: | 35-3019-001-0380 and -0352 |

#### Financing & Prior Sale

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

#### Property Description

| | |
|---|---|
| Zoning: | BU-2, Special Business - Regional Shopping Center and Office Park District by the city of Doral, Florida |
| Shape: | Rectangular |
| Topography: | Grade level |

#### Comments

This sale consists of two, rectangular contiguous sites located along the northeast corner of NW 41st Street and NW 117th Avenue/Florida Turnpike within the city of Doral. The site was slated for construction of a mixed-use development to be built in two phases, however, with the downturn in the real estate market, the plans were placed on hold and later cancelled. The site was purchased by a very well-known developer, Armando Codina, who plans on constructing mixed use. The seller was the foreclosing lender, and the purchase price was reportedly 40% below the loan balance.

**Database Tracking**

| | |
|---|---|
| WRI No.: | 302777R |

*Comparable Vacant Land Sale S2* (continued)

# AERIAL MAP



## Comparable Vacant Land Sale S3

### Pertinent Data

| | |
|---|---|
| Location: | North side of W. Okeechobee Road, just northwest of NW 107th Avenue, Hialeah Gardens, Florida 33018 |
| Sale Price: | $2,385,700 |
| Sale Date: | February 2011 |
| Land Size: | 175,278 sq.ft., equal to 4.02 acres |
| Price Per Sq.Ft.: | $13.61 |
| Price Per Acre: | $593,458 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 27587/4840 |
| Grantor: | Dumas Development, LLC |
| Grantee: | Inversiones La Espiga, LLC |
| Legal Description: | Lengthy. Refer to recording deed. |
| Folio No.: | 27-2030-014-0130 and -0135 |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

### Property Description

| | |
|---|---|
| Zoning: | BU-3, Business, Retail, Office Entertainment District by the city of Hialeah Gardens, Florida |
| Shape: | Irregular |
| Topography: | Grade level |

### Comments

This parcel has frontage of approximately 535 feet along the north side of W. Okeechobee Road, in an area with no parcels fronting Okeechobee Road on the south side due to a canal that runs parallel to the road. The neighborhood consists of mostly industrial uses, with some retail to the northwest and multi-family residential to the east.

**Database Tracking**
WRI No.:                    302790

***Comparable Vacant Land Sale S3*** *(continued)*

## AERIAL MAP



## Comparable Vacant Land Sale S4

### Pertinent Data

| | |
|---|---|
| Location: | SEC of NW 17th Street and NW 111th Avenue, Miami, Florida 33172 |
| Sale Price: | $2,800,000 |
| Sale Date: | December 2009 |
| Land Size: | 112,820 sq.ft., equal to 2.59 acres |
| Price Per Sq.Ft.: | $24.82 |
| Price Per Acre: | $1,081,081 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 27132/3589 |
| Grantor: | Dolphin Boulevard, LLC |
| Grantee: | GNA Dolphin, LLC |
| Legal Description: | A portion of Tract "C" of DOLPHIN MALL, according to the Plat thereof, as recorded in Plat Book 156, at Page 82, as recorded in the public records of Miami-Dade County, Florida |
| Folio No.: | 30-3031-027-0030 |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | Conventional mortgage with SunState Bank in the amount of $2,400,000 |
| Prior Sale: | June 2006 for $897,000 |

### Property Description

| | |
|---|---|
| Zoning: | BU-2, Commercial Medium Intensity District by Miami-Dade County, Florida |
| Shape: | Irregular |
| Topography: | Grade level |

### Comments

This site is located along the southeast corner of NW 17th Street and NW 111th Avenue, across from Dolphin Mall in Miami-Dade County. The site was proposed to be improved with a two-story retail building. The project has been placed on hold.

**Database Tracking**

| | |
|---|---|
| WRI No.: | 302689R |

*Sales Comparison Approach*                    *117 acres of Vacant Land, Doral, Florida 33178*

*Comparable Vacant Land Sale S4* (continued)

## AERIAL MAP



## Comparable Vacant Land Sale S5

### Pertinent Data

| | |
|---|---|
| Location: | Northwest corner of N.W. 58th Street and N.W. 102nd Avenue, Doral, Florida 33172 |
| Sale Price: | $3,250,000 |
| Sale Date: | April 2009 |
| Land Size: | 108,532 sq.ft., equal to 2.49 acres |
| Price Per Sq.Ft.: | $29.95 |
| Price Per Acre: | $1,305,221 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 26858/1020 (parcel 1) and 26931/2901 (parcel 2) |
| Grantor: | Petroleum Investments, Inc. (parcel 1) / Interamerican Bank, FSB (parcel 2) |
| Grantee: | Rita Garden, LLC (parcel 1) / Rita Garden II, LLC (parcel 2) |
| Legal Description: | Lengthy legal; FLORIDA FRUIT LAND COMPANY SUBDIVISION as recorded in Plat Book 2 at Page 17, as recorded in the public records of Miami-Dade County, Florida |
| Folio No.: | 35-3017-001-0402 and -0403 |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

### Property Description

| | |
|---|---|
| Zoning: | NC, Neighborhood Commercial District by the city of Doral |
| Shape: | Rectangular |
| Topography: | Grade level |

### Comments

This sale consists of two sites purchased within two months by the same buyer from different sellers. The lots are non-contiguous, with one lot in between. The purchase price and the site size indicated are for the combined sites. Parcel 1 is a 58,800 sq. ft. corner site with frontage along NW 102nd Avenue and NW 58th Street. The purchase price was $1,800,000, or $30.61 per sq. ft. The sale was subject to the release of a declaration of restrictions on the site. Additionally, the purchaser had to post a bond to cover road improvements along the east side of the property line to the end of the property line (N.W. 102nd Avenue) and for a street light program. Plans were previously approved for a self storage building  with 51,000 square feet of storage space and 3,500 square feet of office space. In October 2009, the buyer obtained approval to build 8,700 sq. ft. of retail space, 6,000 sq. ft. of office space, and 2,000 sq. ft. of restaurant space. In June 2011, the buyer filed a notice that construction was to commence.

*Sales Comparison Approach*                    *117 acres of Vacant Land, Doral, Florida 33178*

**Comparable Vacant Land Sale S5** *(continued)*

Parcel 2 is a 49,732 sq. ft. interior site with frontage along NW 58th Street. The purchase price was $1,450,000, or $29.16 per sq. ft. The seller was a bank, which provided short term financing for 50% of the purchase price.

**Database Tracking**
WRI No.:                    302488R

# AERIAL MAP



# South Parcel Adjustments

| Sale No. | Price/ Sq. Ft | Conditions of Sale | Market Conditions | Location | Zoning | Size/ Shape | Other | Overall Adjustment |
|----------|---------------|--------------------|--------------------|----------|--------|-------------|-------|--------------------|
| S1 | $21.81 | = | = | - | = | = | = | - |
| S2 | $19.24 | + + | = | - - | = | = | = | = |
| S3 | $13.61 | = | = | + + + | - | - | = | + |
| S4 | $24.82 | = | = | - | = | - | = | - - |
| S5 | $29.95 | = | = | - | = | - | = | - - |

# Analysis of Sales

Following is the discussion and comparison of various characteristics of the sales as compared to the subject property.

**Financing:**

No adjustments are indicated for any of the sales for favorable financing. The sales were all financed with loans at or near market rates, or purchased for all cash.

**Conditions of Sale:**

All of the sales were arm's length transactions, meaning that the buyer and seller are each acting prudently, knowledgeably, and not under duress. However, Sale S2 was a short sale, the buyer reportedly purchasing it at 40% below the mortgage balance. Since it was a distressed asset purchased prior to foreclosure, it is likely the lender was motivated to sell, indicating that a positive adjustment is needed.

**Market Conditions (Time):**

This adjustment considers current market conditions as compared to market conditions in place at the time of the respective sale. All the sales occurred since 2009, after which the market for commercial real estate weakened further but then more recently gathered momentum, so that on balance no adjustment is indicated.

**Location:**

Sale S1 requires a negative adjustment for its superior location on US 1, a major retail corridor, and exposure to very high traffic volumes. Sale S2 also benefits from a superior location due to excellent unencumbered frontage along NW 41st Street, a major road, at the intersection of the Florida Turnpike. Note that the subject has significant frontage along NW 107th Avenue, but it is encumbered by a wide power line easement which forces development to be set back from the road, which hinders access and visibility compared to similar sites without easements. Sale S3 must be adjusted upward for an inferior location in a less desirable area with significant industrial uses and much lower household incomes. Sale S4 requires a negative adjustment for a superior location across from Dolphin Mall, with excellent exposure along two roads. Sale S5 is located very close to the subject and consists of two segments, one of which has prominent corner exposure. Access and visibility are not hindered by the power line easement the way the subject site is, making it slightly superior.

**Zoning:**

There were no significant differences in zoning between the subject and the comparable sales, except for Sale S4 that benefits from a higher-density commercial zoning.

**Size and Shape:**

Sale S1 is slightly disadvantaged by an irregular shape but this is offset by its slightly smaller size, so that no adjustment is needed. Sales S3, S4 and S5 require negative adjustments for their smaller size (the adjustment being larger for Sales S4 and S5 as they are much smaller). Sale S5 requires a positive adjustment for shape due to its two non-contiguous segments, which partially offsets the negative adjustment for size.

On page 110 is the conclusion of value for each of the North, South and East parcels.

# Comparable Sales Applicable to the East Parcel

| Sale No. | Sale Date | Location | Zoning | Sale Price | Site Size (Acres) | Price / Acre | Price / Sq. Ft. |
|---|---|---|---|---|---|---|---|
| E1 | 7/11 | NW of NW 19th Ln & NW 132nd Pl, Miami | IU-1 | $9,764,100 | 24.9 | $392,133 | $9.00 |
| E2 | 3/11 | West side of NW 99th Ave., between NW 58th and 62nd St. Doral | IC | $2,750,000 | 5.0 | $550,000 | $12.63 |
| E3 | 2/10 | 9160 NW 93rd St Medley | M-1 | $2,334,500 | 3.9 | $598,590 | $13.74 |
| E4 | 6/09 | 345 E. Palm Drive Florida City | I | $10,365,100 | 37.79 | $274,282 | $6.30 |
| E5 | 10/08 | NWC of NW 96th St and NW 89th Ave Medley | M-1 | $1,051,601 | 2.92 | $360,137 | $8.27 |
| Subj. | | NW of NW 107th Ave. and NW 58th St. Doral | TND | | 12.58 | | |

On the following pages are maps indicating the location of the sales and the subject property.

# Vacant Land Sales Map
### *(East Parcel Sales)*



## Comparable Vacant Land Sale E1

### Pertinent Data

| | |
|---|---|
| Location: | Northwest of NW 19th Lane and NW 132nd Place, Miami, Florida |
| Sale Price: | $9,764,100 |
| Sale Date: | July 2011 |
| Land Size: | 1,084,816 sq.ft., equal to 24.9 acres |
| Price Per Sq.Ft.: | $9.00 |
| Price Per Acre: | $392,133 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 27777/3352 and 27777/3356 |
| Grantor: | Panamerican West |
| Grantee: | KTR Miami I, LLC and KTR Miami II, LLC |
| Legal Description: | Lengthy legal, refer to deeds, as recorded in the public records of Miami-Dade County, Florida |
| Folio No.: | 27 folio numbers. See deeds. |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

### Property Description

| | |
|---|---|
| Zoning: | IU-1, Industrial Light Manufacturing by Miami-Dade County, Florida |
| Shape: | Rectangular |
| Topography: | Grade level |

### Comments

This site consists of 27 parcels in four non-contiguous segments located within two blocks of each other in the Pan American West Business Park, a 67-acre industrial park in the Airport West area. The parcels were purchased from the developer in two transactions on the same day by related entities. Reportedly, the buyer plans to build 500,000 square feet of Class A distribution space.

**Database Tracking**

| | |
|---|---|
| WRI No.: | 302842 |

**Comparable Vacant Land Sale E1** *(continued)*

# AERIAL MAP



## *Comparable Vacant Land Sale E2*

### *Pertinent Data*

| | |
|---|---|
| Location: | West side of NW 99th Avenue, between NW 58th and 62nd Streets, Doral, Florida 33178 |
| Sale Price: | $2,750,000 |
| Sale Date: | March 2011 |
| Land Size: | 217,800 sq.ft., equal to 5 acres |
| Price Per Sq.Ft.: | $12.63 |
| Price Per Acre: | $550,000 |

### **Recording Information**

| | |
|---|---|
| ORB/Page: | 27613/0551 |
| Grantor: | Southern Commerce Park at Doral, LLC |
| Grantee: | The City of Doral |
| Legal Description: | The East 1/2 of Tract 60 of FLORIDA FRUIT LANDS COMPANY'S SUBDIVISION NO. 1, as recorded in Plat Book 2, Page 17, as recorded in the public records of Miami-Dade County, Florida |
| Folio No.: | 35-3017-001-0612 |

### **Financing & Prior Sale**

| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

### **Property Description**

| | |
|---|---|
| Zoning: | IC, Industrial Commercial District by the city of Doral, Florida |
| Shape: | Rectangular |
| Topography: | Grade level |

### **Comments**

This parcel is the east half of a 10-acre tract that had been purchased by the seller in March 2005 for $3,200,000 ($7.35 per sq. ft.). The buyer is the City of Doral, which reportedly plans to use the site as a storage facility for the Public Works Department.

**Database Tracking**
WRI No.:                     302856

*Sales Comparison Approach*                    *117 acres of Vacant Land, Doral, Florida 33178*

*Comparable Vacant Land Sale E2 (continued)*

# AERIAL MAP



## Comparable Vacant Land Sale E3

### Pertinent Data
| | |
|---|---|
| Location: | 9160 N.W. 93rd Street, Medley, Florida  33016 |
| Sale Price: | $2,334,500 |
| Sale Date: | February 2010 |
| Land Size: | 169,884 sq.ft., equal to 3.9 acres |
| Price Per Sq.Ft.: | $13.74 |
| Price Per Acre: | $598,590 |

### Recording Information
| | |
|---|---|
| ORB/Page: | 27182/4308 |
| Grantor: | F03-5, LLC |
| Grantee: | Waste Management  Inc. of Florida |
| Legal Description: | The  West  548  feet  of  the  North  310  feet  of  Tract  5, RESUBDIVISION OF A PART OF SUNNY SLOPE GARDENS, as recorded in Plat Book 33 at Page 13, as recorded in the public records of Miami-Dade County, Florida |
| Folio No.: | 22-3004-003-0052 |

### Financing & Prior Sale
| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

### Property Description
| | |
|---|---|
| Zoning: | M-1, Industrial District by the Town of Medley, Florida |
| Shape: | Rectangular |
| Topography: | Grade level |

### Comments
This rectangular parcel is located along the south side of N.W. 93rd Street in the Town of Medley.  The buyer, Waste Management Inc. of Florida owns several acres adjacent to the west of this site, as well as, a few vacant sites within a few blocks from this property.  The seller is a company related to The Lowell Dunn Company, a major land owner in the area.

**Database Tracking**
| | |
|---|---|
| WRI No.: | 302624R |

*Comparable Vacant Land Sale E3* (continued)

# AERIAL MAP



### *Comparable Vacant Land Sale E4*

#### *Pertinent Data*
| | |
|---|---|
| Location: | 345 E. Palm Drive, Florida City, Florida 33034 |
| Sale Price: | $10,365,100 |
| Sale Date: | June 2009 |
| Land Size: | 1,646,132 sq.ft., equal to 37.79 acres |
| Price Per Sq.Ft.: | $6.30 |
| Price Per Acre: | $274,282 |

#### Recording Information
| | |
|---|---|
| ORB/Page: | 26919/3068 |
| Grantor: | Dolphin Enterprises, LLC |
| Grantee: | Caja De Ahorros de Galicia, Caixa Galicia, Company |
| Legal Description: | Lengthy. See recording instrument., as recorded in the public records of Miami-Dade County, Florida |
| Folio No.: | 16-7930-001-0180,-0190,-0200,-0210 and -0360 |

#### Financing & Prior Sale
| | |
|---|---|
| Financing: | All cash to seller |
| Prior Sale: | None in the past five years |

#### Property Description
| | |
|---|---|
| Zoning: | I, Light Industrial by the city of Florida City |
| Shape: | Rectangular |
| Topography: | Grade level |

#### Comments
This property is located on the southwest corner of E. Palm Drive (S.W. 344th Street) and McMinn Road (S.W. 172nd Avenue) within Florida City. It is a Recreational Vehicle Campground/Resort. The property consists of five contiguous parcels.

**Database Tracking**
WRI No.:                    302642R

**Comparable Vacant Land Sale E4** *(continued)*

## AERIAL MAP



## Comparable Vacant Land Sale E5

### Pertinent Data

| | |
|---|---|
| Location: | NWC of N.W. 96th Street and N.W. 89th Avenue, Medley, Florida 33178 |
| Sale Price: | $1,051,601 |
| Sale Date: | October 2008 |
| Land Size: | 127,195 sq.ft., equal to 2.92 acres |
| Price Per Sq.Ft.: | $8.27 |
| Price Per Acre: | $360,137 |

### Recording Information

| | |
|---|---|
| ORB/Page: | 26614/3772 |
| Grantor: | David Joseph Brosnahan, as Successor Trustee of the "David T. Brosnahan Revocable Trust Agreement" |
| Grantee: | Medley North, LLC |
| Legal Description: | Tract 9C, less the West 900 feet and less the North 150 feet and less the South 35 feet and less the East 35 feet, SUNNY GLADES FARMS, according to the plat thereof, recorded in Plat Book 8, Page 73, as recorded in the public records of Miami-Dade Co |
| Folio No.: | 22-3004-001-0121 and -0122 |

### Financing & Prior Sale

| | |
|---|---|
| Financing: | Loan with CreditLease LLC for $1,050,000 |
| Prior Sale: | None in the past five years |

### Property Description

| | |
|---|---|
| Zoning: | M-1, Industrial District by the Town of Medley, Florida |
| Shape: | Square |
| Topography: | Grade level |

### Comments

This parcel is located on the northwest corner of N.W. 96th Street and N.W. 89th Avenue (Alexander Street) within the town of Medley. The site is being used to store or park large trucks.

**Database Tracking**

| | |
|---|---|
| WRI No.: | 302581 |

*Comparable Vacant Land Sale E5* *(continued)*

# AERIAL MAP



# East Parcel Adjustments

| Sale No. | Price/ Sq. Ft | Conditions of Sale | Market Conditions | Location | Zoning | Size/ Shape | Other | Overall Adjustment |
|----------|---------------|--------------------|--------------------|----------|--------|-------------|-------|--------------------|
| E1 | $9.00 | = | = | - - - | = | + + | - - | - - - |
| E2 | $12.63 | - | = | - - | = | - | - | - - - - - |
| E3 | $13.74 | - - | = | - | = | - - | - | - - - - - - |
| E4 | $6.30 | = | - | - | = | + + | - | - |
| E5 | $8.27 | = | - | - - | = | - | - | - - - - - |

## Analysis of Sales

Following is the discussion and comparison of various characteristics of the sales as compared to the subject property.

### Financing:

No adjustments are indicated for any of the sales for favorable financing. The sales were all financed with loans at or near market rates, or purchased for all cash.

### Conditions of Sale:

All of the sales were arm's length transactions, meaning that the buyer and seller are each acting prudently, knowledgeably, and not under duress. However, Sale E2 is a site purchased by the City of Doral for use as a storage facility. Municipalities have an incentive to pay slightly above market when purchasing real estate because the added cost is more than offset by the savings from avoiding on-going litigation over fair values, which can be very costly. Based on this, a slight negative adjustment is indicated. Sale E3 requires a negative adjustment because the buyer owns most of the surrounding parcels (the adjoining parcel on the south, the parcel across the street to the north, and a large tract to the west). Adjoining owners have an incentive to pay above market due to the economies and efficiencies that can be gained by combining adjacent parcels.

**Market Conditions (Time):**

This adjustment considers current market conditions as compared to market conditions in place at the time of the respective sale. Sales E4 and E5 occurred during 2009 and 2008 when the market for industrial real estate was still experiencing declines, indicating negative adjustments are needed for these sales. During 2010-2011 real estate values leveled off, so that no adjustment is needed for the remaining sales.

**Location:**

All the sales require negative adjustment for location because the subject location is severely disadvantaged. It is adjacent to a county landfill / recycling facility that emits moderately offensive odors, rendering it unusable for residential and most commercial uses. Industrial uses are potentially feasible, but consideration must be given to the impact that certain industrial uses would have on the adjoining residential tract. It is currently a landlocked site which could potentially be accessible via a partially completed road (NW 66th Street) but only through the adjoining residential tract. The road that runs along its east side (NW 102nd Avenue) dead-ends at the adjoining parcel to the south, and is connected only to a dirt road leading north along the landfill to NW 74th Street. Heavy industrial uses at the site would be incompatible with (and limit the profitability of) the adjoining residential tract. Note that though the three parcels are being considered separately due to the distinct uses that are most feasible to develop in each segment, the subject property is being valued as a whole. Also, current zoning would allow exclusively industrial uses on the East Parcel (or exclusively commercial uses on the South Parcel for that matter) only as part of a mixed-use, predominantly residential development.

Sale E1 is slightly set back from an existing main road (NW 25th Street) in a recently developed area west of the Florida Turnpike, but it is located in a recently completed industrial park with excellent transportation linkages and substantial infrastructure improvements. The area is undergoing significant development with many high quality distribution and manufacturing buildings. Sale E2 is located just southeast of the East Parcel, but benefits from frontage along 99th Avenue, which has direct access to NW 58th Street. It is also surrounded by other industrial sites and does not suffer from the effects of the landfill odors. Sale E3 is located in a similar area but is slightly superior because it is accessible from two roads (it is a corner site, though both roads dead-end at the property). Sale E4 has frontage along an existing road that leads directly to the on/off ramps at the terminus of the Homestead Extension of the Florida Turnpike and to South Dixie Highway. The area generally is less desirable, but the site has superior exposure and linkages, and is easily accessible to a large volume of vehicular traffic. Sale E5 is located in a light industrial district with numerous truck storage, lumberyard and manufacturing facilities and mostly older Class C industrial buildings. The location is considered superior mainly due to its corner exposure and better linkages.

*Sales Comparison Approach*                                     *117 acres of Vacant Land, Doral, Florida 33178*

**Zoning:**

There were no significant differences in zoning between the subject and the comparable sales, except for Sale S4 that benefits from a higher-density commercial zoning.

**Size and Shape:**

Sale E1 requires a positive adjustment for its larger size, but also a positive adjustment for its shape because it consists of four non-contiguous segments (which will require construction to consist of four separate buildings). This added development cost would have pushed down the land cost at which the buyer's development plans would have been feasible. Sales E2, E3 and E5 are smaller sites that require slight negative adjustments for size. Sale E4 is a larger site that requires a positive adjustment for size.

**Other:**

The East Parcel as defined in this appraisal consists of the net acreage after deducting a power line easement that runs along the south portion of the tract, but it does not exclude an approximately 2.6-acre lake that occupies the north end of the site. This lake is identified in the original Landmark at Doral site plan as a "preserve / storm water storage area". It is likely not possible to fill it and may be unusable for development. When comparing the price per square foot of comparable sales that are not similarly disadvantaged by large undevelopable areas, a negative adjustment is needed. All the comparable sales require this adjustment. In addition, Sale E1 requires an additional negative adjustment because its land area consists of the net acreage after deducting the interior roads, and for the added benefit that this infrastructure had already been built. If at the purchase this site had included the gross acreage before interior roads were built (like the subject East Parcel), its land area would have been larger and price per square foot would have been lower.

***Special Note:***

As noted previously, the East Parcel is not developable at present because there are no uses that would be financially feasible to develop. Also, due to its location alongside the main residential portion of the subject property, the uses for the East Parcel that would contribute most to the profitability of the *overall project* would be those that complemented the residential tract. Residential uses are unfeasible, and commercial uses are very likely unfeasible, due to the landfill odors. Most industrial uses would likely hinder the success of the residential project, with the exception of storage facilities (including mini-storage warehouses and possibly larger enclosed or open storage for boats and other vehicles) aimed at the neighboring residential market. However, these uses would not be financially feasible to build until the development of the adjoining residential tract was substantially complete. All of the comparable sales are either slated for development in the near term or have some immediate use that has value during the interim period while holding the site for development in the future. Since the subject site does

not have a viable interim use (in the short-term it is landlocked and after that the only feasible uses would be profitable to build only once the residential development is near completion), the indications from all the comparable sales should be discounted to reflect the time value of money. In other words, the value indicated by the comparable sales is a value that the subject would have once it is developable, but if that is the value it will have in the future, then its present value would have to reflect the appreciation in value that a purchaser would expect. To receive $1 in five years, a buyer today would pay less than $1 today. This necessary discounting was taken into account in the reconciliation and conclusion on the next page.

# Reconciliation and Conclusion of Value Indications
# by the Sales Comparison Approach

### North Parcel

The analysis of the comparable sales applicable to the North Parcel indicates that the subject should achieve a price per square foot below Sale N1 ($16.07), slightly below Sale N3 ($12.15) and Sale N2 ($11.69), slightly above Sale N5 ($7.60) and above Sales N4 and N6 ($4.94 and $5.16). Sale N1 should be given minimal weight, though it supports the indications from the other sales. The remaining sales imply a value above $7.60 per square foot and below $11.69 per square foot. A value closer to Sales N2 and N3 is estimated as these sales are closest to the subject property in terms of location. A value of $11.00 per square foot is estimated, or $479,160 per acre. Based on the land area of the North Parcel of 59.335 acres, this equates to a value indication of $28,400,000, rounded.

### South Parcel

The analysis of comparable sales applicable to the South Parcel indicates that the subject should achieve a sales price per square foot above Sale S3 at $13.61, near Sale S2 at $19.24, and below the remaining sales (a range of $21.81 to $29.95). The sales support a value in the $18 to $20 range. A value of $19 per square foot is estimated, or $827,640 per acre. Based on the land area of the South Parcel of 15.595 acres, this equates to a value indication of $12,900,000.

### East Parcel

The analysis of comparable sales applicable to the East Parcel indicates that the subject should achieve a sales price per square foot below all the sales. Due to the East Parcel's severely disadvantaged location, no sales were found of inferior parcels that required net positive adjustments. Sale E4 indicates a value slightly below $6.30 per square foot, whereas the remaining sales all point to a value well below their range ($8.27 to $13.74 per square foot). These indications would seem to support a value estimate in the range of $5 to $6 per square foot. However, it should be noted that the comparable sales all had feasible uses (permanent or interim) at the time of the sale. The subject has a very limited range of potentially feasible uses within the scope of the overall property, and they are not likely to be feasible until the development of the residential tract has made substantial progress. Therefore, the value indication from the sales must be discounted to account for the time that will transpire before any uses become feasible (and the indicated value is achievable). Assuming a holding period of approximately four years and a future value of $5.50 per square foot once development is feasible, the present value at a reasonable discount rate of 10% would be $3.76 per square foot,

or $163,786 per acre. Based on the land area for the East Parcel of 12.576 acres, this equates to a value indication of $2,100,000, rounded.

### Discount to a Single Purchaser

Adding the value indications above together yields a total value of $43,400,000. Consideration should be given to a discount applicable to a single purchaser, who might expect to achieve a discount if buying the entire property over what an individual buyer of each parcel would achieve if each parcel were available separately. In other words, a buyer presented with the alternative of a) buying the entire subject property, or b) buying three separate properties like the three subject parcels, might expect to achieve some discount if buying a single tract. On the other hand, there would be some operational benefits to a combined site that might motivate a buyer to prefer it over separate tracts, which might make the buyer of a combined site willing to pay more. It should be noted that the fact that development is not likely to be feasible on the East and South parcels until development of the residential tract is at least partially complete has been taken into account in the value estimates for the individual parcels.

The largest parcel (the North Parcel) is 59.335 net acres of a total net acreage of 87.506. A size adjustment was considered in valuing that parcel. The east parcel has 12.576 acres and the estimated value considered a holding period and a discount. The south parcel has 15.595 net acres and is considered to have a highest and best use for commercial use. This parcel could be sold immediately if a buyer of the entire site did not want to hold or develop this parcel.

Based on the above analysis, the total value estimate of $43,400,000 does not require a discount to reflect a single purchaser as the estimated value has already considered the size and development timing of the overall subject property.

# Residual Land Value Analysis

An alternative analytical method for valuation of vacant land is residual land value analysis. It is considered here as a check on the reasonableness of the indication by the sales comparison approach for the value of the North Parcel, the portion of the subject property for which reasonable projections for development in the near future can be confidently made. As the South and East parcels are not feasible to develop at this time, any projections for future development would be unreliable. However, residual land value method yields a reliable indication of value for the residential parcel because it is based on a typical development scenario, in keeping with the indications of the highest and best use analysis, and takes the perspective of a typical developer.

The analysis is based on a discounted cash flow model that considers a reasonable set of projections for development costs, gross sales, required profits and discounting for the time value of money for a development scenario similar to what the typical developer would propose on the subject site. The result of the analysis is an estimate of the land value, or the maximum cost that a developer would typically be willing to pay for the site, given the projected sales, costs and required profits. It is a *feasibility land cost* model, in which the land cost at which a project under consideration is feasible fluctuates according to the projections and required profit. In such a model, as the projected sales revenues *increase*, as development costs *decrease*, and as the required entrepreneurial profit (required to induce a developer to embark on the project) *decreases*, the maximum land cost at which the project is financially feasible *increases*, and vice versa. If a developer is able to acquire the site at a lower cost, then he will realize higher profits (assuming actual sales and development costs turn out as projected). However, most real estate markets are sufficiently active, competitive and transparent that the deviation between actual purchase prices and projected feasibility land cost is not normally large. The feasibility land cost is a reliable indication of land value because it takes the perspective of the typical purchaser under typical market conditions, and is based on a development scenario in line with the highest and best use for the site.

The analysis considers only the residential uses that would be feasible to build on the North Parcel, as commercial uses on the South Parcel and industrial uses on the East Parcel are not likely to be financially feasible until the residential tract is substantially developed. Therefore, the indicated value relates only to the North Parcel. The values estimated for the South and East parcels in the sales comparison approach take into consideration the fact that development is not feasible at present.

### *Estimate of Product Type, Mix and Density*

In order to determine whether all or only a portion of the North Parcel could feasibly be developed for residential uses, two factors must first be estimated. First, the optimal number of units of each product type that the typical developer would build must be estimated, based on projected demand. This would be an amount that would be large enough to capture existing demand, but not so large as to result in an extended sellout period which would reduce profits. Second, the density for each product type must be estimated in order to determine how much total land is required to support the initial residential-only development phase.

Estimating the optimal amount of product and product mix is extremely difficult, but as a starting point consideration may be given to the original proposed plan for the Landmark at Doral project in comparison to the proposed plan by Terra World Investments. The original Landmark at Doral plan included 1,109 residential units, consisting of 807 condominium apartment units and 302 fee-simple townhouses. The plan included a residential-only tract in an area corresponding to the North Parcel as defined in this appraisal, containing 292 townhouses and 495 condominium apartment units (indicating a combined residential density of approximately 9.7 units per acre, or 13.3 unit per acre if the easements are excluded). The plan also included industrial and flex/office uses in the area identified here as the East Parcel, and a mix of uses in the south segment. The Landmark at Doral plan was based on aggressive projections made under much more favorable market conditions, before a major financial crisis and ensuing recession and market decline. In particular, the on-going oversupply conditions in the residential condominium market, and lingering uncertainty about how long it will take for that market to return to equilibrium, would make any development in that sector very risky in the immediate future. In general, the fact that the project never got past the earliest stages should be taken as a strong indication that the market conditions necessary for its success simply did not exist. These projections should therefore be considered far too aggressive based on what would be feasible under current market conditions.

The plan by Terra World Investments assumes the North Parcel would also be dedicated to residential, but with only 400 units, of which 280 would be single-family homes and 120 would be fee simple townhouses (a product type mix of 70% single-family and 30% townhouse). The plan leaves the East and South parcels undeveloped in the near term. It assumes that the South Parcel would be sold to a third party as residential development approaches completion, and for the East Parcel contemplates the possibility of mini-storage warehouses as a complement to the residential project. At 400 residential units, the proposed plan indicates a density of approximately 6.7 units per acre on the North Parcel. Though the client did not specify how much land area would be allocated to each product type, assuming a townhouse density of 13.00 units per acre would imply a single-family density of 5.59 units per acre, as shown in the calculations on the following page.

The calculations are meant only provide a reasonable estimate of the relative densities for the two product types, based on Terra World Investments indicated product mix and total land area. These densities, which are based on gross land area, are similar to what has been observed at similar developments across the market, and are a reasonable basis for analysis.

| | |
|---|---|
| Total Acres Available | 59.335 |
| Townhouse Density | 13.00 Units per Acre |
| Single Family Density | 5.59 Units per Acre |
| Unit Mix: | 30% Townhouses |
| | 70% Single Family |
| Total Townhouse Units | 120 |
| Total Single Family Units | 280 |
| Total Units | 400 |
| Total Acres, Townhouses | 9.231 |
| Total Acres, Single Family | 50.104 |
| Total Acres | 59.335 |
| Overall Density | 6.74 Units per Acre |

Terra's plan recognizes the weak market conditions in the residential condominium sector and avoids commercial development altogether. Notably, the plan also calls for development of the North Parcel to be deferred for two years in order to, according to a prospectus describing the proposed plan, "mitigate against the risk of encroaching on buyers that would select at Doral Cay", a 160-unit townhouse project that the developer is planning to build on an adjacent site purchased very recently (Sale N3 in the analysis). The developer also recently purchased two similar tracts just north of the subject site, in an area designated as "Low Density Residential" (up to 10 units per acre) on the Doral Comprehensive Future Land Use Map (Sales N1 and N2 in the analysis). A representative of Terra confirmed that they plan to build additional townhouse product at least one of those tracts. It is likely that the selection of a unit type ratio of 70% to 30% for the subject site is influenced by the fact that plans are already underway to build possibly over 300 townhouses on adjacent and nearly adjacent parcels.

However, the present assignment is to estimate *market value*, which is based on what a *typical purchaser* would pay, under conditions requisite to a fair sale. A valuation based on a specific development plan, incorporating one developer's unique preferences, expertise and risk tolerance, would be considered an estimate of *investment value*, but not market value. A typical developer would be more likely to commence development immediately in order to capture the market opportunity before competing projects are completed. It is likely that the typical developer would select a unit mix that would tilt more heavily toward townhouse product than

the client's plan (which is designed to minimize cross-project competition), as that segment of the market seems to present the most well-defined near-term market opportunity. A development with a larger proportion of townhouses also has the potential to generate higher profits. Another developer would need to be cognizant of the large amount of planned townhouses and would also likely focus less on townhouses and provide an alternative product. However, Terra's proposal relies more heavily on single-family product due to the significant amount of townhouse product they are already planning in the surrounding parcels. This may in fact be optimal to them in view of their overall development strategy for the area, but a valuation based on market value must consider the typical purchaser's point of view. A more realistic scenario from a typical developer's perspective would seem to indicate a unit type mix with a higher proportion of townhouses than 30%. A product mix on the order of 50% each for townhouse and single-family product would seem to be reasonable.

Using the densities extracted from Terra's scenario above (which are reasonable estimates), modifying the product mix to 50% each for townhouse and single-family would yield a higher overall density of 7.82 units per acre, and would allow the construction of a total of 464 units (232 of each product type). This estimate is higher than the 400 units indicated in Terra's plan, but is more realistic based on what the typical developer would seek to build on the subject site. These calculations are shown below:

| | |
|---|---|
| Townhouse Density | 13.00 Units per Acre |
| Single Family Density | 5.59 Units per Acre |
| Unit Mix: | 50% Townhouses |
| | 50% Single Family |
| Total Townhouse Units | 232 |
| Total Single Family Units | 232 |
| Total Units | 464 |
| Total Acres Required, Townhouses | 17.846 |
| Total Acres Required, Single Family | 41.515 |
| Total Acres Required | 59.361 |
| Overall Density | 7.82 Units per Acre |

The product mix indicated above, like Terra's proposal, recognizes that current market conditions make development of residential condominium product financially un-feasible, and defers development of commercial uses until a later phase when they are more likely to achieve successful lease-up or sellout. It also defers development of the East Parcel for the future, when some sort of use complementary to the residential project can be considered. The approach indicated also assumes that all residential development would take place on the North Parcel as

in both the original Landmark plan and Terra's proposal. Assuming absorption rates on the order of three to five units per month for each product type, the 464 units could be sold out within six years if development commenced immediately and the first units could be completed within two years (a reasonable assumption).

The scenario described above, which models what the typical developer would propose for the site, was used as the basis for the discounted cash flow model shown on the following page. The model makes the following additional assumptions:

- Development would commence immediately, with the first units being completed by the end of year two and sold in the beginning of year three

- Average unit sizes would be 2,200 square feet for the townhouse units and 2,500 square feet for the single-family units. This is similar to Terra's proposal and supported by market evidence.

- The average price per square foot would be based on a current value of $185 for the townhouse units and $175 for the single-family units, increasing by $10 per square foot per year through year four. In years five and six a $5 per year increase is projected.

- Absorption rates are projected to be the same for the two product types: starting at an average monthly rate of 4 units in the first year of sales, increasing gradually to 5.8 units per month in the last year of sales. Though market evidence indicates faster absorption rates for townhouse product, the competing townhouse product from other nearby projects will tend to push absorption rates down, making the projected absorption rates reasonable.

- Average development costs are estimated at $100 per square foot for townhouses and $125 per square foot for single-family. This figure includes all development costs except land (since the purpose of the model is to estimate the feasibility land cost). These estimated costs were increased at 3% per year.

- The number of units completed during each period is projected at a level sufficient to meet projected sales and also provide for a necessary sales inventory to support sales in the following period. Half of the units projected to be completed in the second year are counted in the first year to more accurately model actual development costs (which would include substantial site work during the first year)

- An entrepreneurial incentive of 20% of gross sales is projected

**Residual Land Value Method**                    *117 acres of Vacant Land, Doral, Florida 33178*

## Residual Land Value Analysis

| | | Y1 | Y2 | Y3 | Y4 | Y5 | Y6 | Cumulative Totals | % of Gross Sellout |
|---|---|---|---|---|---|---|---|---|---|
| **Townhouses:** | Total Units: | 232 | | | | | | | |
| | Average Unit Size | 2,200 | | | | | | | |
| **Single-Family** | Total Units | 232 | | | | | | | |
| | Average Unit Size | 2,500 | | | | | | | |
| **Total Acres** | | 59.361 | | | | | | | |
| **Income From Unit Sales** | | | | | | | | | |
| *Townhouse Units* | | | | | | | | | |
| Units Sold | | | | 48 | 54 | 60 | 70 | 232 | 48% |
| Average Monthly Absorption | | | | 4.0 | 4.5 | 5.0 | 5.8 | | |
| Average Price per SF | | $185 | $195 | $205 | $215 | $220 | $225 | | |
| Average Price per Unit | | $407,000 | $429,000 | $451,000 | $473,000 | $484,000 | $495,000 | | |
| Gross Sales Proceeds | | $0 | $0 | $21,648,000 | $25,542,000 | $29,040,000 | $34,650,000 | $110,880,000 | 48% |
| *Single-Family Units* | | | | | | | | | |
| Units Sold | | | | 48 | 54 | 60 | 70 | 232 | |
| Average Monthly Absorption | | | | 4.0 | 4.5 | 5.0 | 5.8 | | |
| Average Price per SF | | $175 | $185 | $195 | $205 | $210 | $215 | | |
| Average Price per Unit | | $437,500 | $462,500 | $487,500 | $512,500 | $525,000 | $537,500 | | |
| Gross Sales Proceeds | | $0 | $0 | $23,400,000 | $27,675,000 | $31,500,000 | $37,625,000 | $120,200,000 | 52% |
| **Total Gross Sales Proceeds** | | $0 | $0 | $45,048,000 | $53,217,000 | $60,540,000 | $72,275,000 | $231,080,000 | |
| **Development Costs** | | | | | | | | | |
| *Townhouse Units* | | | | | | | | | |
| Units Built | | 12 | 12 | 50 | 50 | 60 | 48 | 232 | |
| Development Costs @ $100 per SF* | | $2,640,000 | $2,719,200 | $11,669,900 | $12,019,997 | $14,856,716 | $12,241,984 | $56,147,748 | 51% |
| *Single-Family Units* | | | | | | | | | |
| Units Built | | 12 | 12 | 50 | 50 | 60 | 48 | 232 | |
| Development Costs @ $125 per SF* | | $3,750,000 | $3,862,500 | $16,576,563 | $17,073,859 | $21,103,290 | $17,389,111 | $79,755,323 | 66% |
| **Total Development Costs** | | $6,390,000 | $6,581,700 | $28,246,463 | $29,093,856 | $35,960,006 | $29,631,045 | $135,903,071 | 59% |
| **Net Sales Proceeds** | | -$6,390,000 | -$6,581,700 | $16,801,538 | $24,123,144 | $24,579,994 | $42,643,955 | $95,176,929 | 41% |
| Less Entrepreneurial Incentive at 20% of Gross Sales | | $0 | $0 | -$9,009,600 | -$10,643,400 | -$12,108,000 | -$14,455,000 | $46,216,000 | 20% |
| **Net Cash Flows** | | -$6,390,000 | -$6,581,700 | $7,791,938 | $13,479,744 | $12,471,994 | $28,188,955 | $48,960,929 | 21% |

\* Includes hard and soft costs, all site improvements, and all operating expenses. Projected to increase at 3% per year.

| | PV of the Net Cash Flows | | | PV of the Net Sales Proceeds | | |
|---|---|---|---|---|---|---|
| Discount Rate | 9.00% | 10.00% | 11.00% | 25.00% | 26.00% | 27.00% |
| Residual Land Value* | $29,100,000 | $27,500,000 | $26,000,000 | $28,400,000 | $27,100,000 | $26,000,000 |
| Residual Land Value per Buildable Unit | $62,716 | $59,267 | $56,034 | $61,207 | $58,405 | $56,034 |
| Residual Land Value per SF | $11.25 | $10.64 | $10.06 | $10.98 | $10.48 | $10.06 |
| Land Value as % of Gross Sellout | 13% | 12% | 11% | 12% | 12% | 11% |

* rounded to nearest $100,000

Based on the assumptions noted, the model projects total development costs (excluding land) at 59% of total sales, and net cash flows (after deduction of an entrepreneurial incentive) at 21% of total sales.

In order to select appropriate discount rates, a number of market and investor surveys and market participants were consulted. The 2nd Quarter 2011 PwC Real Estate Investor Survey (formerly the Korpacz Survey), the most recent to include survey results for the development land market, indicates discount rates ranging from 15% to 30%, with an average of 21%. The Realtyrates.com 3rd Quarter 2011 Developer Survey (which is based on 2nd Quarter data), indicates discount rates in the range of 14% to 54%, with an average of 35%. For both surveys, the above figures include developer's profit (i.e., they would be applied to cash flows from which profit has *not* been deducted as a line item). Notably, both surveys registered slight declines in pro-forma rates (based on investors' forward-looking projections) for new development compared to prior quarters. More recently, conversations with developers and other market participants have indicated continued declines in required return rates for new residential development. These rates would apply to the projected net sales proceeds, and represent the return required to attract a developer, or investor, to purchase the land for development. They consider alternative investments competing for the investor's dollars. Net cash flows are *after* consideration of required profit as a line item, and should be discounted at a lower rate than the rate used to discount the net sales proceeds (which do not reflect a line item deduction for required profit). Note that the 20% incentive considered would cover some variable costs such as sales and marketing expenses that are costs of the sales operation and are not included in the development cost estimates. Therefore, the discount rates to be applied to the net cash flows (after deduction of the 20% incentive) should not be 20% below the rates applied to the sales proceeds.

Applying a discount rate of 9% to 11% to the net cash flows yields a residual land value (i.e., a feasibility land cost estimate) in the range of $56,034 to $62,716 per buildable unit, or $10.06 to $11.25 per square foot land area. These indications would result in a land cost of 11% to 13% of gross projected sales. Applying a discount rate of 25% to 27% to the net sales proceeds yields a residual land value estimate in the range of $56,034 to $61,207 per buildable unit, or $10.06 to $10.98 per square foot of land area. These indications would result in a land cost of 12% to 12% of projected gross sales.

By way of comparison, a purchaser of income producing property would desire a return in the 6% to 14% range (not including developer profit). The subject property is vacant land, which carries greater risk, indicating that a higher rate would be appropriate. However, it is a desirable product due to the good outlook for development of single-family and townhouse residential product in the near term. Based on this, a discount rate near the middle of the range indicated by the surveys, or 25% to 27% including developer's profit, would be appropriate. This would apply to the net sales proceeds (before deduction of profit as a line item). A corresponding discount rate applicable to the net cash flows (which reflect deduction of required profits as a line item) would be in the range of 9% to 11%.

Reconciling between the two indications, a land value of $27,300,000 is estimated for the North Parcel, based on what is considered a typical development scenario including 464 units and a product mix split 50% between townhouses and single-family. In the projected scenario, this value would result in a land cost of $58,836 per buildable unit, or $459,898 per acre ($10.56 per square foot).

Adding the above value estimate for the North Parcel to the value indications by sales comparison for the South and East parcels ($12,900,000 and $2,100,000, respectively) yields a combined value of $42,300,000.

# Reconciliation of Value

The reconciliation process considers the approaches which were utilized in this report. Each approach to value is analyzed as to its reliability and applicability. These approaches indicated the following values:

| | |
|---|---|
| **Cost Approach** | Not Applicable |
| **Income Capitalization Approach** | Not Applicable |
| **Sales Comparison Approach** | $43,400,000 |
| **Residual Land Value Method** | $42,300,000* |

*Considered as a check on the reasonableness of the indication by the sales comparison approach

The income capitalization approach analyses the projected income and expenses of a property and capitalizes the net income into a value estimate. Typically vacant land is not purchased based on its ability to generate income. This method is not applicable to the subject vacant land. An income capitalization approach was not applicable and not applied herein, though income capitalization techniques were used to model the behavior and expectations of the typical purchaser/investor.

The sales comparison approach compares sales of similar properties to the subject property and is the only applicable approach to value. These sales were analyzed for differences such as conditions of sale, financing, market conditions, location, zoning, shape/size, and other characteristics. The strength of this approach relies on the quality of the comparable sales. Sales which closely resemble and can be compared easily with the subject are most desirable. The sales utilized were considered comparable and make the sales comparison approach the only reliable indication of value.

The residual land value method is based on a discounted cash flow model that considers a reasonable set of projections for development costs, gross sales, required profits and discounting for the time value of money for a development scenario similar to what the typical developer would propose on the subject site. The result of the analysis is an estimate of the land value, or the maximum cost that a developer would typically be willing to pay for the site, given the projected sales, costs and required profits. The method is reliable as a check on the reasonableness of the indication by the sales comparison approach because the projected scenario is considered to be a good estimate of what the typical developer would propose for the site (and on which the typical developer would determine the land cost at which the project is feasible). The indication by the residual land value method is close to the indication by sales comparison and supports the value indication by that method. Additionally, the indication by the sales comparison approach is well-supported by market evidence, as there were a number of comparable sales. Based on the above, the market value of the subject property to a single purchaser as of December 11, 2011 is estimated at $43,400,000.

# ADDENDA



# ADDENDUM A

# COUNTY AREA DESCRIPTION

# Miami-Dade County and Area Description

## General Overview

Miami-Dade County is at the southeastern tip of Florida and is the south-easternmost state in the continental United States. With land area of approximately 1,946 square miles, it is the most populous county in the state and is often referred to as Greater Miami, in combination with its most populous city, Miami. It is bordered on the north by Broward County, on the west and south by Collier and Monroe Counties, respectively, with the east side bordered by the Atlantic Ocean.

Within the county's borders are two national parks (Everglades and Biscayne National), 15 state water conservation and wildlife management areas, four state parks, 135 area-wide parks and 571 local parks, totaling 727 park and recreations areas.

## Demographics

The early 1960's marked the beginning of the arrival of large numbers of Cuban Refugees into Miami-Dade County and South Florida which has transformed Miami into having a Latin flavor. In the years following, have come significant numbers of immigrants from Haiti, Cuba and other Latin American countries.

Miami-Dade County increased 10.8% in population from 2000 (2.3 million) to 2010 (2.5 million). With a slower growth shown in the prior decade to 1990, a prior 2014 projection population of 2,549,776 or 3.3% was projected. This is similar to trends throughout Florida.

| Miami-Dade County Population | | | |
|---|---|---|---|
| 2010 | % Change from 2000 to 2010 | Projected 2015 | % Change from 2010 to 2015 |
| 2,500,000 ± | 10.8% | 2,558,134 | 3.1% |

*Source: MiamiHerald.com and http://EDR.state.fl.us*

The largest city in Miami-Dade County is the city of Miami with 399,457 residents in 2010. This is up 10.2% from 2000. The second largest city, Hialeah decreased in population by 1.4%. Outpacing the 10.8% growth rate of the county are some new cities since 2000 (Cutler Bay and Doral with 20% and 100% increases, respectively). A third city, Miami Gardens incorporated in 2003 and is now ranked 17th with 107,167 persons. The primary industries that support Miami-Dade County's economy through employment are trade, transportation and utilities, followed by education/health services and government. The most known is tourism, a major industry for Miami-Dade County.

## Ports of Entry

The Port of Miami is the world's leading port for cruise line passenger traffic, while also showing impressive strength in international freight. The port's biggest ocean freight trading partner is China, and vice versa. Eight major cruise lines dock at the port, also home to 26 steamship lines. The port is Florida's No. 1 container port with three terminals. It also contributes over $17 billion annually to the local South Florida economy, providing direct and indirect employment of over 176,000 jobs. As part of the growing environmental concerns, the Port has implemented procedures that integrate pollution prevention and waste reduction. It

conserves natural resources by reusing and recycling materials, purchasing recycled materials and products that do not adversely affect the environment, and that can be reused, recycled and disposed of in a safe manner. Scheduled to coincide with the 2014 Panama Canal expansion, the port will be bringing online $1 billion in new infrastructure assets that includes dredging the main channel harbor to accommodate the world's largest container vessels, and increasing intermodal and distribution network with strategic partners. The Port of Miami is approximately nine miles to the southeast of Miami International Airport (MIA).

MIA considered to be the driving force for growth behind the area along with the linkages. The first quarter of 2010 showed a 3.5% increase in passengers (approximately 8.8 million) and 24% more cargo (490,573 tons) from the same period in 2009. The entire year of 2010 is expected to be at least 10% over 2009 per Chris Mangos, director of marketing for the Miami-Dade County Aviation Department.

**Economic Base**

A year-round growing season allows the agricultural industry to be the top vegetable supplier and producer in the country. In Florida, Miami-Dade County is second in three aspects: foliage nurseries, nursery production and aquaculture which includes ornamental fish and fish for consumption. The industry employs more than 20,000 people and produces more than $2.7 billion in economic impact each year. Combining the area's attributes with tourism has led to agri-tourism, locations throughout the agricultural area that visitors can sample and purchase locally grown products. The climate is considered Subtropical Marine with an annual average temperature of approximately 77 degrees, a 70% probability of sunshine and an approximate average annual precipitation of 79 inches. Average elevation is 12 feet. Its semi-tropical location and very suitable climate allow for year round outdoor activity.

In recent years, like most other parts of the country, Miami-Dade County has seen a significant decline in the housing market and continued in 2010. The chart below reflects these issues are considered to continue into the near future.

| Existing Single-Family Home Sales | | Housing | |
|---|---|---|---|
| **Percent Change in Homes Sold** | | *Units Permitted* | |
| 2004-2005 | -12.7% | 2004 | 22,856 |
| 2005-2006 | -21.1% | % change from 2003 to 2004 | 47.1% |
| 2006-2007 | -39.2% | 2005 | 26,120 |
| 2007-2008 | -17.2% | % change from 2004 to 2005 | 14.3% |
| 2008-2009 | 52.7% | 2006 | 20,017 |
| 2009-2010 | 9.3% | % change from 2005 to 2006 | -23.4% |
| **Percent Change in Median Sale Price** | | 2007 | 8,082 |
| 2004-2005 | | % change from 2006 to 2007 | -59.6% |
| 2005-2006 | 28.2% | 2008 | 3,474 |
| 2006-2007 | 7.0% | % change from 2007 to 2008 | -57.0% |
| 2007-2008 | 1.1% | 2009 | 1,395 |
| 2008-2009 | -27.2% | % change from 2008 to 2009 | -59.8% |
| 2009-2010 | -29.4% | 2010 | -- |
| | -3.0% | % change from 2009 to 2010 | -- |

*Source: www.edr.state.fl.us*

## Sports

Professional, college and even local neighborhood sports draw spectators, participants and investors to a high degree and create a positive atmosphere. Professional football (Miami Dolphins), basketball (Miami Heat), baseball (Florida Marlins) and ice hockey (Florida Panthers) are continual draws. There are two horse tracks and a dog track. Several of these tracks have been approved for slot gambling or table gambling, depending upon location in a municipality or Indian reservation. Also offered are golf, tennis, as well as the numerous water sports, given the significant bodies of water.

The Orange Bowl Stadium was the home of the University of Miami Hurricanes. The stadium has recently been demolished and under construction is a new stadium for the Florida Marlins baseball team.

## Linkages

Transportation systems include Metrorail, an elevated rail rapid transit system with 22 stations that connect portions of Miami-Dade County from the Kendall area to above the Hialeah area. The Metromover automated people mover system is located in downtown Miami and is an off-shoot of the Metrorail system. There are also Metrobus buses, most of which are in service daily throughout the county. The Metromover system includes the Brickell Avenue financial district and also runs north to the Omni area. Other transportation services in Miami-Dade County include Tri-Rail, railroads and taxicabs. Railroad service by Amtrak is accessible in northwest Miami-Dade. Tri-Rail is South Florida's commuter train system which services Miami-Dade, Broward and Palm Beach Counties.

In the construction stage and nearing completion is the Miami Intermodal Center (MIC), which will link the airport, East/West Rail (companion project), Amtrack, Tri-Rail, Airport/Seaport Connector and Metrorail mainline rail. Located near the State Road No. 836/State Road 112 Connector, just east of the airport will be parking, retail, commercial, residential and tourist-designed development.

Within Miami-Dade County, major roads include the Palmetto Expressway (State Road No. 826), a major north/south expressway, the Dolphin Expressway (State Road No. 836), a major east/west expressway, Interstate No. 95 and the Florida Turnpike. All of these represent Miami's expressway network and make almost any destination in Miami-Dade County within 30 to 45 minutes driving time.

## Government

Within Miami-Dade County there are 36 individual municipal jurisdictions with the largest jurisdiction being the unincorporated area. Miami-Dade County has a strong mayor form of government, with nine elected individuals (one mayor and eight commissioners) making up the Miami-Dade County Board of Commissioners. The mayor appoints a professional administrator to manage the daily activities of the county government and a county attorney to handle its legal matters. Its largest municipality, Miami, is comprised of a nonvoting executive mayor elected citywide and five commissioners from five districts.

Some governmental activities, services and functions previously handled by individual municipalities are now handled by the county. Among these are real property assessment and valuation, health and welfare, most water and sewers, traffic engineering, public libraries, public transportation, public housing, urban renewal, seaport, airport, regional parks and air and water pollution control. In addition to these, Miami-Dade County provides services to the unincorporated areas of the county such as: police and fire protection, building and zoning regulation, trash and garbage collection and disposal, parks and recreation, consumer protection and corrections and rehabilitation of adults and youth offenders.

### Education

Miami-Dade's education system is governed by an elected 7-member board who in turn appoints a superintendent whose responsibility is to manage the daily activities of the school system. Based upon student population, the Miami-Dade County School system is the fourth largest school system in the nation. Several colleges and universities are located in the county, including Barry University, Florida International University, Miami-Dade Community College, St. Thomas University, Florida Memorial College and Johnson & Wales University. Many private institutions at each academic level exist as alternative choices for the public.

### Medical

Miami-Dade County has the largest concentration of medical facilities in Florida. The largest institution is Jackson Memorial Medical Center, the second largest public hospital in the nation which shares many teaching, treatment and research capacities with the University of Miami.

### Arts and Culture

Known for the wealth of ethnic diversity and heritage, Miami-Dade County has a cultural mix of festivals, concerts, theater and dance performances. A state-of-the art complex, Adrienne Arsht for the Performing Arts of Miami-Dade County, Inc., opened in late 2006. Five companies occupy the two buildings: The Concert Association of Florida, Florida Grand Opera, Florida Philharmonic Orchestra, Miami City Ballet and the New World Symphony. The complex contains an opera house, symphony hall, flexible space studio theater, outdoor performance space, tower, two restaurants, banquet hall, education center and commissioned artwork. Adjacent parking is available.

### Summary

During its history, Miami-Dade County and the Greater Miami area have experienced significant changes and growth. Trends indicate that the growth will continue, albeit at a much lower pace into the future.

The diverse economic base and the bilingual population should continue to attract new residents and businesses into the Greater Miami/Miami-Dade County area.

*Sources*    various websites including, but not limited to,
             www. greatermiami.com/gmcc/about (Greater Miami Chamber of Commerce)
             www.beaconcouncil.com (Beacon Council)
             Rev. 4/11

# ADDENDUM B
# FLOOD ZONE MAP

# Flood Zone Map



© 1999-2010 SourceProse and/or FloodSource Corporations. All rights reserved. Patents 6,631,326 and 6,678,615. Other patents pending.  For Info: info@floodsource.com.

*Waronker & Rosen, Inc.* ❖ *Real Estate Appraisers & Consultants*

# ADDENDUM C
# ENGAGEMENT LETTER

**Waronker & Rosen, Inc.**
Real Estate Appraisers and Consultants

Miami-Dade County Office
5730 S.W. 74th Street, Suite 200
South Miami, Florida  33143

Broward / Palm Beach County Office
10242 N.W. 47th Street, Suites 40&41
Sunrise, Florida 33351

Lee H. Waronker, MAI, SRA
lee@waronkerandrosen.com

Phone: (305) 665-8890 / Fax: (305) 665-5188
www.waronkerandrosen.com

Josh L. Rosen, MAI
josh@waronkerandrosen.com

November 2, 2011

Mindy A. Mora, P.A.
Bilzin Sumberg Baena Price & Axelrod, LLP
1450 Brickell Avenue, 23rd Floor
Miami, Florida 33131

Re:  Approximately 120 acres of Land
     Landmark at Doral East, LLC
     Landmark at Doral South, LLC
     Town Center at Doral, LLC, LLC
     Landmark at Doral Developers, LLC
     Landmark Club at Doral, LLC

Dear Ms. Mora:

*Waronker & Rosen, Inc.* hereby proposes to conduct a market value *Summary Appraisal Report* of the above referenced property. The appraisal will be prepared in compliance with the requirements of, and in accordance to, the codes of ethics and appraisal principles of the professional societies of which we are members.

The report will include applicable approaches to value. Compensation for this service will be $20,000. This will include two original copies of the appraisal. A retainer of $15,000 is requested at time of authorization. At time of completion and receipt of the appraisal, the balance due will be $5,000. Any required conferences, depositions or court appearances resulting from litigation will be billed at $2,400 per day, $1,200 per half day or $300 per hour.

**Time for completion of this assignment will be 45 days from receipt of your authorization, retainer and all of the documentation necessary to complete the assignment.** Kindly return a signed copy of this letter with the retainer check.

Enclosed is the general assumptions and limiting conditions that will be applicable for the appraisal report. We suggest that these assumptions be read to make you aware of the limitations of the appraisal report.

Should either party to this agreement retain the services of an attorney to enforce any of its rights or responsibilities under this agreement, the prevailing party in said dispute shall be entitled to recover attorney's fees and costs incurred from the non-prevailing party (including but not limited to at the trial and appellate level). Any litigation, mediation or arbitration shall be held in Miami-Dade County, Florida.

*Waronker & Rosen, Inc ❖ Real Estate Appraisers & Consultants*                    *Page 1 of 4*

Mindy A. Mora, P.A.
Bilzin Sumberg Baena Price & Axelrod, LLP
November 2, 2011

Guarantee by Terra World Investments, LLC. The guarantee by Terra World Investments, LLC, of the fees and costs billed by Waronker & Rosen, Inc. in this matter, to the extent such fees and costs are allowed by the U.S. Bankruptcy Court for the Southern District of Florida, is a condition precedent to this engagement.

Accepted and agreed as of the date first above written, without incurring any personal liability for the fees and costs billed by Waronker & Rosen, Industrial., in the matter described above:

BILZIN SUMBERG BAENA PRICE & AXELROD, LLP

By:  Mindy A. Mora, P.A.

Name: Mindy Mora, President        Date  11/8/11

PAYMENT OF THE FEES AND COSTS INCURRED BY LANDMARK AT DORAL EAST, LLC; LANDMARK AT DORAL SOUTH, LLC; TOWN CENTER AT DORAL, LLC, LLC; LANDMARK AT DORAL DEVELOPERS, LLC; LANDMARK CLUB AT DORAL, LLC IN THE MATTER DESCRIBED IN THE FOREGOING ENGAGEMENT LETTER IS GUARANTEED THIS 8TH DAY OF November 2011.

TERRA WORLD INVESTMENTS, LLC

By:

Name:  David Martin, Chief Operating Office        Date  11/8/11

The specifics of this proposal are applicable up to one week from the date of this letter. Thank you for considering *Waronker & Rosen, Inc.*

Very truly yours,

Lee H. Waronker, MAI, SRPA
State-certified general real estate appraiser
RZ#162

Enclosure

## General Assumptions and Limiting Conditions

1.  No responsibility is assumed for the legal description or for matters pertaining to legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.  The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.  Responsible ownership and competent property management are assumed.

4.  The information furnished by others is believed to be reliable but, no warranty is given for its accuracy.

5.  All engineering are studies assumed to be correct. Any plot plans or illustrative material in this report are included only to help the reader visualize the property.

6.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering that may be required to discover them. The values estimated herein are subject to typical inspections such as roof, structural, and termite, if applicable.

7.  It is assumed that the property is in full compliance with all applicable federal, state and local environmental regulations and laws unless the lack of compliance is stated, described and considered in the appraisal.

8.  It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a non-conformity has been identified, described and considered in the appraisal.

9.  It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.

10. It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and considered in the appraisal.

11. Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presences of substances such as asbestos, urea formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.

12. The physical condition of the improvements, if any, described herein was based on visual inspection. No liability is assumed for the soundness of structural members, since no engineering tests were made of same.

13. Neither all nor any part of this appraisal report shall be disseminated to the general public using the appraiser's name or appraisal designation, without prior written consent of the appraisers signing this appraisal report.

14. Authorization is not allowed for the out-of-context quoting from, or partial reprinting of, this appraisal report.

15. By reason of the report, there is no requirement to testify with reference to the property herein appraised, unless arrangements have been previously made.

16. To the best of our ability, the analysis, opinions, and conclusions were developed in this report was prepared in accordance with the standards and reporting requirements of FIRREA of 1989-XI and its updates, the office of the Comptroller of the Currency of the United States of America (OCC), The Federal Deposit Insurance Corporation (FDIC) and the Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation.

17. The reader should be advised that our employment was not contingent on the appraisal providing a minimum valuation, a specific calculation or the approval of a loan. Additionally, we have complied with the USPAP Competency Rule.

*Limiting Conditions:*

1. The allocation of total value between land and improvements applies only under the described utilization. The separate valuations for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used.

2. The Americans with Disability Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the requirements of the ADA. It is possible that a compliance survey of the property and a detailed analyses of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the act. If so, this fact could have a negative impact upon the value of the property. Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.