**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:                                          Case No. 11-35884-RAM

TOWN CENTER AT DORAL, L.L.C.,                   Chapter 11
*et al.,*

              Debtors.                          (Jointly Administered)
_____/

<u>**LANDMARK AT DORAL COMMUNITY DEVELOPMENT DISTRICT'S NOTICE OF
FILING TRANSCRIPT OF COMMUNITY DEVELOPMENT DISTRICT MEETING**</u>

PLEASE TAKE NOTICE that Landmark at Doral Community Development District, by

and through undersigned counsel, files the transcript of the Community Development District

Regular Meeting conducted on December 8, 2011, attached as <u>Exhibit 1</u>.

Dated: December 21, 2011.

                                        Respectfully submitted,

                                        **Stearns Weaver Miller Weissler**
                                        **Alhadeff & Sitterson, P.A.**
                                        Museum Tower, Suite 2200
                                        150 West Flagler Street
                                        Miami, Florida 33130
                                        Telephone: (305) 789-3553
                                        Facsimile: (305) 789-3395

                                        By  /s/ Patricia A. Redmond
                                            Patricia A. Redmond
                                            predmond@stearnsweaver.com
                                            Florida Bar No. 303739
                                            Eric J. Silver
                                            esilver@stearnsweaver.com
                                            Florida Bar No. 057262

                                        *Counsel for the District*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served as follows: (i) via transmission of Notices of Electronic Filing generated by CM/ECF to those counsel or parties who are registered to receive Notice of Electronic Filing in this case on each document was entered on the docket, and (ii) e-mail or U.S. Mail to those parties not registered to receive Notice of Electronic Filing in this case, on December 21, 2011 as indicated on the Service List attached hereto.

*/s/ Patricia A. Redmond*
Patricia A. Redmond

## SERVICE LIST

**Notice will be electronically mailed to:**

Jere L. Earlywine on behalf of Interested Party FLORIDA PRIME HOLDINGS, LLC
    jearlywine@hgslaw.com

C Craig Eller on behalf of Creditor AmT CADC Venture, LLC
    celler@broadandcassel.com

Jordi Guso on behalf of Creditor Terra World Investments, LLC
    jguso@bergersingerman.com, fsellers@bergersingerman.com;
    efile@bergersingerman.com

Phillip M. Hudson III on behalf of Interested Party FLORIDA PRIME HOLDINGS, LLC
    pmhudson@arnstein.com, rkcummings@arnstein.com; jtunis@arnstein.com;
    hbabcock@arnstein.com; hpiloto@arnstein.com; akang@arnstein.com;
    befernandez@arnstein.com

John B. Hutton III on behalf of Creditor U.S. Bank National Association as Trustee
    huttonj@gtlaw.com, thompsonc@gtlaw.com; mialitdock@gtlaw.com;
    miaecfbky@gtlaw.com

Mindy A. Mora on behalf of Debtor Landmark Club at Doral, LLC
    mmora@bilzin.com, laparicio@bilzin.com; cvarela@bilzin.com; eservice@bilzin.com;
    lflores@bilzin.com; abeck@bilzin.com

Glenn D Moses on behalf of Creditor Committee Creditor Committee
    gmoses@gjb-law.com, gjbecf@gjb-law.com

Office of the US Trustee
    USTPRegion21.MM.ECF@usdoj.gov

Patricia A Redmond on behalf of Interested Party Landmark at Doral Community Development
    District, predmond@stearnsweaver.com, jrivera@stearnsweaver.com;
    rross@stearnsweaver.com;mmesones-mori@stearnsweaver.com;

Melinda S Thornton on behalf of Creditor Miami-Dade County Tax Collector
    cao.bkc@miamidade.gov

**Notice will be conventionally mailed to:**

| | |
|---|---|
| Michael Eckert | Daniel Y. Gielchinsky |
| POB 6526 | 1450 Brickell Ave #2300 |
| Tallahassee, FL 32314 | Miami, FL 33131 |

#1425508 v1

# EXHIBIT 1

Page 1

1

2  IN RE:

3  LANDMARK AT DORAL
   COMMUNITY DEVELOPMENT
4  DISTRICT
   _____/

5

6

7

8                                    California Club
                                     1031 Ives Dairy Road
9                                    Suite 228
                                     Miami, Florida 33179
10                                   December 8, 2011
                                     2:18 p.m. - 3:02 p.m.
11

12

13

14

15            Community Development District
                     Regular Meeting
16

17

18

19

20

21

22            Reported By:  Maggie Rubio, RPR

23

24

25

Page 2

APPEARANCES:

For Landmark at Doral CDD:

Adam Freedman, Chair
Jim Gielda, Vice Chair
Gary Einfalt, Assistant Secretary
Michael Smith, Assistant Secretary (via telephone)
Kristi Freedman, Assistant Secretary (via telephone)

Also present were:
Craig Wrathell, District Manager
Juan Alvarez, District Engineer
Dennis Lyles, Esquire, District Counsel
Noah Breakstone, Bondholder Representative (BTI)
Beck Daniel, BTI
John Markey

BILZIN SUMBERG BAENA PRICE & AXELROD, by
Mindy Mora, Esquire and
Daniel Gielchinsky, Esquire
on behalf of the Debtor
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, by
Patricia Redmond, Esquire
on behalf of the Landmark at Doral
Community Development District
BERGER SINGERMAN, by
JORDI GUSO, ESQUIRE
on behalf of Terra Landmark, LLC
ARNSTEIN & LEHR, by
MICHAEL C. ECKERT, ESQUIRE
on behalf of Florida Prime Holding, LLC
Nancy Vogel, Fishkind & Associates
Isaac Kodsi, Esquire, Kodsi Law Firm, P.A.
Brian Pearl, Representative of Terra
Richard Shanerman, Esquire, Akerman Senterfitt LLP

Page 3

1          (Thereupon, the following proceedings were had:)

2          MR. WRATHELL:  Good afternoon, everybody.  I'd like

3     to call to order the Landmark Doral Community Development

4     District Meeting.

5          Today is Thursday, December 8, 2011.  The time is

6     approximately 2:18 p.m.

7          Indicate for the record, we have Mr. Freedman,

8     Mr. Gielda, Mr. Gary Einfalt present in person.  We have also

9     Ms. Freedman and Mr. Smith present telephonically.

10         So, we have three out of the five Board members

11    present in person, with the other two over the phone.  So, we

12    have met the quorum requirements in order to proceed with

13    today's meeting.

14         We do have a rather large group today.  Historically

15    large for us.  And Item Number 2 is -- we have as an item

16    regarding Update: CDD Foreclosure.

17         Now, I do understand Mr. Kodsi -- hopefully, I

18    pronounced his name correctly -- wishes to address the Board.

19         Is this something the Board wishes to go ahead and

20    perhaps deal with as an early agenda item here?

21         MR. FREEDMAN:  Sure.

22         MR. EINFALT:  Sure.

23         MR. GIELDA:  Yeah, that's fine.

24         MR. WRATHELL:  Mr. Kodsi, are you anticipating

25    addressing the Board today?

Page 4

1          MR. KODSI:  Yeah, I am.

2          MR. WRATHELL:  Okay.  The floor is yours.

3          MR. KODSI:  Well, I think I'm going to let my

4    attorneys speak first and give a simple presentation to the

5    Board.

6          MS. MORA:  Good afternoon.  My name is Mindy Mora and

7    I am the attorney who's representing the Landmark entities in

8    their bankruptcy case.

9          We appreciate the opportunity to address the Board

10   and I wanted to review with you why the landowner decided to

11   file the bankruptcy case and what we're trying to achieve

12   through it.

13         As all of you know, the landowners were unable for a

14   number of years, because of cash flow issues following Elie

15   Berdugo's death, to make any payment of the special

16   assessments that are due to the District.  And, obviously, the

17   landowner was in a bit of a pickle because of Mr. Berdugo's

18   death and deeply regretted the inability to fund the special

19   assessments that were due.

20         Recently, however, the landowner became aware of a

21   third party unrelated to Mr. Berdugo or his family, another

22   developer in the area who was interested in acquiring the

23   equity of the landowner and attempting to fund the development

24   of this project in the spirit of the original vision of Mr.

25   Berdugo.

1          That group is Terra World Investments, and they've

2    developed a comprehensive redevelopment plan for the project

3    that we think is consistent with Mr. Berdugo's original

4    vision.

5          The purpose of the bankruptcy was filed because it

6    was an effort to protect all the creditors in the case, the

7    District, and other creditors including the mortgagee and

8    unsecured creditors who invested in the project as well.

9          In addition, what we've viewed the bankruptcy is

10   allowing us to do is to obtain funding from Terra World

11   Investments, who under our bankruptcy plan will acquire the

12   equity in the company and allow the company to pay the special

13   assessments that it's obligated on over time.

14         The intention is to restructure the CDD obligations

15   and pay those special assessments as well as the obligations

16   that are due to other creditors in the bankruptcy case.

17         With that general introduction, what I'd like to do

18   is introduce the Board to Jordi Guso, who's sitting two spaces

19   to my left, who represents Terra and is going to provide more

20   specifics about the proposed restructuring of the project.

21         MR. GUSO:  Good afternoon everyone.  My name is Jordi

22   Guso.  I'm with Berger Singerman and we represent Terra

23   Landmark, LLC, which is an affiliate of Terra Worldwide

24   Investments, LLC.  I'll refer to those generally as Terra

25   during my presentation.

1          I'm joined this afternoon by Brian Pearl, who's

2     Terra's representative for purposes of the meeting this

3     afternoon.

4          Terra is a South Florida-based large real estate

5     developer.  It's developed, sold and closed on more than $1

6     billion in property over the last 10 years or so.  Some of you

7     may be familiar with it because of its development in the area

8     where the Landmark property is located.  It recently developed

9     and closed out a development called Reserve At Doral.

10         Landmark, obviously, has no liquidity with which to

11    fund its reorganization, and Terra has agreed to provide the

12    financial support as well as the development expertise to try

13    and redevelop this property in a manner consistent with the

14    original plans of Mr. Berdugo.

15         The arrangement between Terra and the Landmark

16    debtors provides, as Ms. Mora indicated, a $750,000 advance to

17    finance the bankruptcy and restructuring.  For the joint

18    proposal of a plan of reorganization for the Landmark debtors,

19    under that arrangement Terra will contribute approximately $20

20    million of equity, and for the restructuring of a substantial

21    amount of the indebtedness that's currently asserted against

22    the Landmark debtors including indebtedness asserted by,

23    obviously, the senior noteholders in the CDDs, but junior

24    stakeholders in the capital structure as well.

25         In terms of the vision of the development and kind of

Page 7

1   a high altitude overview of what's envisioned, I'm going to

2   defer to Brian and let him tell you a little bit about himself

3   and Terra's vision for the property project and why we think

4   this is something that makes eminent sense for the CDDs and

5   for the other stakeholders in the case.

6           MR. PEARL:  Thank you so much for the opportunity to

7   come and present to you today.  Obviously, what we'd like to

8   do here today, this has really been our first opportunity to

9   be able to talk at a high level about what Terra's vision

10  would be for the property.

11          I think that everybody around this table -- you know,

12  no matter, you know, what their -- you know, what their

13  immediate -- you know, their immediate position might be

14  within the bankruptcy case, everybody's vision is to make

15  this -- is to make this property flourish and bring it back to

16  life.  You know, given the -- given what's happened with the

17  market since, obviously, the -- you know, the development, the

18  land was purchased and the infrastructure that was funded by

19  the CDD that was put in place, you know, we believe that -- we

20  believe that given what's been done with the property, given

21  the location of the property, that there's a lot of -- there's

22  a lot of value that can be added by bringing in an experienced

23  developer such as Terra.

24          Terra has been around for over 10 years and we've

25  developed extensively in Doral.  Currently we own -- in

1    addition to the project that Mr. Guso mentioned, we own about

2    another 80 acres, most of which is fairly close to the

3    Landmark property.  In addition to that, we own about 250

4    acres that's -- it's not too far away as well.  You know, what

5    we propose to do is to inject -- you know, inject the $20

6    million and we'll give -- you know, we're going to give a lot

7    more detail on the plan when we file it formally with the

8    court.  But just so that you understand and, you know, and

9    I'm, of course, more than happy to take questions, you know,

10   at a high level what we plan to do is on the northern piece of

11   the property, begin that first, doing a minimum of around 400

12   residential units, single-family and townhome as the mix.  And

13   then, you know, once that's done, move on to the southern

14   portion of the property and develop it according to its

15   original entitlements.

16          So, the -- you know, the desire of, you know, of

17   Terra is to -- you know, is to try to play a positive role in

18   actually activating this land which has remained fallow, you

19   know, for so long and attempting to -- you know, by attempting

20   to reactivate it, it's serving the interest of -- what we

21   believe serves the interest of the District, which is to

22   stabilize the property and put in place over time residents

23   who are going to be able to pay, least, you know, a portion of

24   the A Bond assessments, you know, throughout the term of the A

25   Bonds to 2038.

1          So, in terms of the financial aspects of the plan, in

2     addition to the equity, you know, what we're -- you know, what

3     we're planning to do is to begin, you know, making payments,

4     interest payments, on the debt.  As soon as confirmation, you

5     know, occurs, you know, that will begin.  And, you know, we

6     expect that in the first year there should be interest

7     payments of, you know, somewhere on the order of about $2

8     million that would be -- that would be paid.  And then,

9     beginning in the second year we start to have closings and so,

10    you know, we believe that -- you know, we believe that in

11    addition to the interest payments principal payments will

12    start to be received, you know, beginning in the second year

13    after confirmation.

14         In order to be able to execute the plan in a

15    responsible manner financially for everybody what we're going

16    to be -- what we're going to be requesting in our plan is an

17    extension of the B Bond maturity from May 2015.  You know,

18    we're still finalizing exactly how much of an extension that

19    we need, but it will be up to a maximum of five years.  It may

20    be a little bit less.  We'll see what we're able to accomplish

21    with -- you know, with the planning that we do over the next

22    couple of weeks.  But, you know, overall, when you step back

23    and look at, you know, capability and financial --

24    financial -- you know, being financially stable, obviously,

25    Terra has the experience to get this done and we think that we

Page 10

1   have the experience to get it done more quickly than anybody

2   else who -- you know, who can potentially take over the land

3   and develop it.

4        MR. WRATHELL:  Okay.  Any questions or comments for

5   Mr. Pearl?

6        MR. FREEDMAN:  Do you have a site plan or unit mix?

7        MR. PEARL:  Yeah, we do have a site plan that we're

8   going to file with the -- that we're going to file with the

9   plan on the 19th.  You know, PPK has been -- is our architect.

10  They're familiar with the area and, you know, we already have

11  everything laid out.  We have two possibilities, right?  One

12  is -- you know, it would require a reworking of some of the

13  infrastructure for us to add more money for, you know, for

14  more infrastructure to be able to do -- you know, to do a less

15  dense product and to make that work in terms of the flows that

16  go through the northern part of the property.  And then

17  they've also done a second plan, which is a little bit more

18  dense, which we would prefer not to do, but we could do if we

19  needed to.  You know, it's a little bit more dense and uses

20  more of the existing infrastructure, more of the original

21  plan.

22        In order to do the -- in order to do the preferred

23  plan, you know, we would need -- we would need to go to the

24  City of Doral to get a PUD.  If we kept with the second plan,

25  then we can just use the existing entitlements as is.

1              MR. FREEDMAN:  Okay.  And you don't have anything to

2    show us today?

3              MR. PEARL:  In terms of the plan, we're still

4    finalizing it.  It will be out the 19th.  This is really --

5    you know, we wanted to take the opportunity at this first

6    meeting to really give you as much information as we could

7    prior to the formal filing with the court.

8              MR. WRATHELL:  Okay.  Any other questions for

9    Mr. Pearl from the Board or staff?

10             MR. PEARL:  There's really just one more matter.

11             MR. WRATHELL:  Yes, sir.

12             MR. PEARL:  We have Richard Shanerman here with

13   Akerman who'd like to speak.

14             MR. KODSI:  We also have Nancy from Fishkind, right?

15             MR. PEARL:  And Nancy as well.  Yeah.

16             Okay.  Nancy -- yeah, I guess Nancy can go first.  If

17   that's okay with you.  I mean, we'll defer to you.

18             MR. WRATHELL:  But certainly is that okay with the

19   Board?  Okay.

20             MR. PEARL:  Okay.  So, Nancy, I don't know if you'd

21   like to speak for a second about -- you know, about your

22   experience.

23             They're -- Fishkind & Associates is a consultant to

24   the debtor in the bankruptcy case.

25             MS. VOGEL:  My experience has been more as a ---

Page 12

1          MR. WRATHELL:  Nancy, if you could just ---

2          MR. LYLES:  Speak up.

3          MR. WRATHELL:  Yeah.

4          MS. VOGEL:  Nancy Vogel.  I've had experience as a

5   district manager for a number of years managing probably 17,

6   18 districts throughout Florida and primarily working with the

7   boards and advising them, and I know that the Board members

8   know their responsibilities.  But we're all hoping that

9   you'll, you know, keep an open mind and to consider any

10  proposals that come before you today.  And if you have any

11  questions for us regarding how the Board would work with us,

12  you know, please let us know.

13         MR. WRATHELL:  Okay.

14         MR. SHANERMAN:  My name is Richard Shanerman.  I'm

15  counsel for Terra.  I have a very limited role here today.

16  And basically, the interested party and the people to realize

17  the vision that Berdugo had requests that a landowner's

18  election be held so that the interested parties can have

19  representation on the Board.  And I don't believe there has

20  been an election last month, but I'm not privy to all of the

21  minutes and whatever else has been conducted over the past

22  year.

23         MR. WRATHELL:  The election was actually advertised

24  and the landowners did not attend the meeting.

25         MR. SHANERMAN:  Okay.  The landowners have their

Page 13

1   representative ---

2           MR. LYLES:  Well, the election -- the election was

3   advertised and held.  There was -- the manager was here and

4   conducted -- prepared to conduct an election, but no one

5   appeared either in person or with a proxy.  So, there were no

6   votes cast, to be accurate as to what happened last month.

7           MR. SHANERMAN:  Thank you.

8           Well, in any event, we believe the landowner is

9   entitled to have an election.  For whatever reason -- I don't

10  why they weren't here.  But we believe that a landowner's

11  election should be held in due course.

12          The current Board, I assume, was appointed years ago

13  and I don't think there's been an active election -- or an

14  attended election I should say.

15          MR. WRATHELL:  Okay.

16          MR. SHANERMAN:  That's basically it.

17          MR. WRATHELL:  Thank you, sir.

18          MR. PEARL:  Thank you so much.

19          MR. WRATHELL:  Anybody else?  Mr. Pearl?

20          MR. PEARL:  No.  That's it.  Thank you so much.

21          MR. WRATHELL:  Thank you very much.

22          Any other discussions regarding this item; or if not,

23  we'll move on in the agenda.  Okay.

24          All right.  Item Number 3, we're going to go ahead

25  and we're working on that particular item regarding the

Page 14

1    extension there.  So, we'll go ahead and move on to Item

2    Number 4.

3         Matt, and there was a question asked at a previous

4    Board meeting regarding have impact fees been paid on behalf

5    of -- by the developer in the past.  Matt did contact

6    Miami-Dade County and they have no record of impact fees being

7    paid by the developer on the property at any time.  So, from

8    what we're able to discern now -- obviously, we're looking at

9    it from the District's perspective.  But from what we're able

10   to discern we cannot find where impacts were paid on behalf of

11   the developer.

12        Item Number 5, we have -- just a copy of

13   correspondence from South Florida Water Management District

14   which granted the time extension that we had requested, the

15   Environmental Resource Permit, and you can actually see a copy

16   of that particular letter.

17        Several years ago we had asked for an extension, had

18   been granted that extension, and then, again, last month -- or

19   actually, in October, after we had prepared a letter, I worked

20   with the general counsel in drafting that letter, I presented

21   the Board and had sent that letter to the South Florida Water

22   Management District and you can see here as well that that

23   permit has, once again, been extended.  So, that's very much a

24   good thing for this project.

25        So, if there aren't any questions or comments on that

1    one, I'll probably just go ahead and move forward.

2            Item Number 6, we just have the October -- we have

3    the October 13th Regular Board Meeting Minutes, and I just ask

4    from the Board if there are any additions, deletions or

5    corrections to those meetings; and if not, we can have a

6    motion to approve.

7            MR. GIELDA:  I'll make a motion to approve.

8            MR. WRATHELL:  Okay.  A motion by Mr. Gielda.  Is

9    there a second?

10           MR. EINFALT:  Second.

11           MR. WRATHELL:  By Mr. Einfalt.

12           All in favor?  Any opposed?

13           Thank you.  Motion passes 5-0.

14           (Thereupon, on motion by Mr. Gielda and seconded by

15   Mr. Einfalt, with all in favor, the October 13, 2011 Regular

16   Meeting minutes, as presented, were approved.)

17           MR. WRATHELL:  Move on to staff reports.

18           Mr. Attorney, any special reports today?

19           MR. LYLES:  I do not have a special report today, but

20   I would be remiss if I didn't introduce to the Board Trish

21   Redmond, our special bankruptcy counsel.  She, understanding

22   that there was a hearing earlier this week and that there

23   would potentially be some questions regarding either that or

24   the matters that were presented earlier today, is attending

25   the meeting today.  So, I just wanted to introduce her to the

1    Board.  Her resume is on record with you, but she has not

2    personally attended a meeting before.  And if you have

3    anything you'd like to update the Board with at this time,

4    absent any questions from the Board, we can take that up now.

5              MS. REDMOND:  Without questions, I think I'm fine

6    right now.

7              MR. LYLES:  Okay.  That's it.

8              MR. WRATHELL:  All right.  Any Board questions for

9    Ms. Redmond?  If not -- okay.  Thank you, Dennis.

10             Juan, any special reports today?

11             MR. ALVAREZ:  Just to mention that the minor

12   contracts that we had opened, one was to replace certain

13   missing inlet covers and they have been completed.  All the

14   plates and the manhole covers have been replaced and welded.

15             The other contract that we had ongoing was the

16   clearing of the land.  That was completed also.  So, both of

17   those contractors have been paid.  So, the contracts have been

18   completed satisfactorily.

19             MR. WRATHELL:  And one item that was mentioned at the

20   court hearing where I was -- I attended earlier was regarding

21   access to the property.  There was a statement made with

22   regard to the access to the property.  And I wanted to, one,

23   just bring that up to the Board and staff and, you know, just

24   remind everybody for the purpose of the record here that the

25   fencing that was put around the property was put around the

Page 17

1   property by the District as to protect against -- particularly

2   from a liability perspective.  We had concerns regarding

3   vandalism or people coming onto the property and injuring

4   themselves.  Also, we had a realistic and actual theft issue

5   that had also occurred, specifically related to manhole covers

6   that were taken.  So, that was the purpose of the fencing.  I

7   know there was a comment about the District accessing that.

8   And also, just to state for the record, that the District

9   accesses the property because the District owns infrastructure

10  in the property and has to take the steps necessary to operate

11  and maintain that infrastructure.  So, just another point of

12  record there.

13          So, I just want to point that out as, obviously, the

14  work that's been undertaken.  We had manholes covers in the

15  past were stolen; thus, put up the fencing and also replace

16  those, tack-welded the manhole covers so that we didn't have

17  the continual disappearance of manhole covers.

18          So, just for the benefit of the entire group we want

19  to put that out there, so ---

20          Juan, any other items?

21          MR. ALVAREZ:  Yes.  Just to mention that with respect

22  to the land clearing, we enter now into the phase of

23  maintenance.  The land looks great right now, but it's not

24  going to look like that forever.

25          So, I just want to remind you that previously I had

1    submitted a proposal from the land clearing company, All Green

2    Nursery, Inc., and they were proposing to do maintenance

3    for -- of the land on a periodic basis, as needed, and they

4    were proposing to do it for $2,970 every time, plus spraying

5    some areas for $350, and they would do this on an as-needed

6    basis.  So, if you want to consider this proposal now or maybe

7    later, but it is something that -- it's not needed

8    immediately, but it's going to be needed soon.

9         MR. FREEDMAN:  Yeah.  I think when we need it, we'll

10   get a couple of proposals.  I know we had a few to get the

11   last work done.  Perhaps we should get a couple.

12        MR. ALVAREZ:  Besides that, I don't have anything

13   else to report.

14        MR. WRATHELL:  Okay.  Very good.  Thank you, Juan.

15        All right.  Any other -- any questions or comments

16   for Juan, District engineer?

17        If not, okay, we'll move on to Item 7(c), Manager.

18   We just have two brief items.  One towards the very back of

19   your agenda.  We have the Unaudited Financial Statements

20   through October 31st, 2011.  Just notate Page 1 is our balance

21   sheet and I just wanted to point out for the benefit of the

22   group a couple of different things.  One is, you'll look on

23   the asset side and in the general fund, which is the first

24   column on the left, you'll notice the special assessments

25   off-roll receivable of 594,964.  These are the previous

Page 19

1   assessment billings for operation of maintenance.

2          One thing I will notate, though, is the 2012

3   budget -- budgeted operation of maintenance assessments have

4   not currently been billed as of yet.  So, we, at some point,

5   would like direction from counsel to go ahead and proceed with

6   billing that out.

7          The other item, if you look to the next category

8   over, the next column over, you see the debt service fund,

9   you'll notice that the special assessments off-role receivable

10  for the debt service component totals over $12,538,000 and

11  that amount is for the last three years.  And that being

12  Fiscal Year 2009, 2010 and 2011.  Those are the assessment

13  bills for debt that were sent out.  Obviously, we have, as a

14  result of foreclosure, excelerated the assessments and,

15  therefore, there was not a debt assessment bill sent out this

16  year because of the assessments having been excelerated.

17         So, that shows you just on the balance sheet from

18  everyone's perspective you can see the amount there.

19         And then, if you slide a little further down on the

20  liability side, you'll see due to other funds debt service and

21  capital projects funds, which you'll see the total there is --

22  and, actually, through the end of October the total there, you

23  can see that the general fund owed the debt service fund as of

24  October 31st, $230,486.  And then the capital projects fund,

25  the general fund owed the capital projects fund another

1   $644,536.  The reason why I spelled that out, of course, is

2   the District has not had assessment paid for three years,

3   three-plus years, and, in fact, the developer was delinquent

4   in developer funding of about $59,000 through the end of 2008,

5   September 30th, 2008 as well.

6          So, thus with the indenture having been cracked open

7   by the original -- you know, with the District.  The original

8   indenture was cracked open to fund the remedial expenditure

9   account with the original bondholders.  And then with the

10  newer bondholders coming in, the District has -- through the

11  trust accounts has continued to fund preservation of the asset

12  for the last several years here, so -- and we've talked about

13  those with Juan.  So, we've -- at least from a booking

14  perspective, we show the general fund owing that money back to

15  the debt service fund.

16         You'll notice there's a difference in between the

17  amounts that have been expended versus the amounts that have

18  been budgeted.  What we've historically had is expenditures

19  have exceeded budgets for every year, specifically legal

20  expenses, not general counsel per se, but special counsel

21  engaged for foreclosure and, obviously, bankruptcy now that we

22  have endeavored to budget our best.  But legal expenses tend

23  to go higher than we budget each year.

24         So, I just wanted to point those out to the -- for

25  the group.

1           And then you can see on Page 2, just your -- simply

2    your general fund activity.  There's not a ton of activity as

3    far as the general operating expenses.  And, again, we haven't

4    billed out those special assessments off-role yet.  For those,

5    you can also see on Page 3, it just shows the activity in the

6    debt service fund, which, obviously, there's little to no

7    activity there.  And then you can see the activity on Page 4

8    in the capital projects fund, which, again, through the -- at

9    least through the period of October 31st we don't have any.

10   But what I want to note is the fiscal year started October

11   1st.  So, we do have requisitions I ran through the trustee

12   and I do understand the trustee had just confirmed with me the

13   other day that they had made payment to a number of the

14   contractors that had done work.  So, from what I understand

15   that's being -- has been taken care on.

16           So, I'll ask if there are any questions or comments

17   from the Board regarding the unaudited financials through

18   October 31st; and if not, can we have a motion to approve?

19           MR. FREEDMAN:  I make a motion to approve.

20           MR. WRATHELL:  Okay.  A motion by Mr. Freedman.

21   Seconded?

22           MR. EINFALT:  Seconded.

23           MR. WRATHELL:  Seconded by Mr. Einfalt.

24           All in present?  Any opposed?

25           Okay.  Motion passes 5-0.

1          (Thereupon, on motion by Mr. Freedman and seconded by

2     Mr. Einfalt, with all in favor, the Unaudited Financial

3     Statements as of October 31, 2011, as presented, were

4     approved.)

5          MR. WRATHELL:  As of right now our next regularly

6     scheduled meeting is scheduled for January 12, 2012 already,

7     and it will be two p.m., at this location, and we anticipate

8     it also being in this room.

9          At this point, I'll move on to Item 8.  And since we

10    do have a large number of the audience members today, I'll ask

11    for any additional public comment for today.

12         MR. PEARL:  I don't know if Isaac has -- do you have

13    anything else you want to say?

14         MR. KODSI:  Yes.  My only comment is I brought

15    everybody here to meet with you guys and we made a

16    presentation and, you know, we were expecting more questions

17    and the only question I got was, "Do you have a site plan,"

18    and that was it.  So, I don't know -- was the plan that clear

19    and -- I just want to know from the Board was the plan that

20    clear that you guys understood it and that the only thing you

21    were missing was just where the house -- where the lots were

22    going to be placed?

23         MR. FREEDMAN:  No, I think what's missing is

24    financials and unit mix and ---

25         MR. KODSI:  Okay.  Well, that's what we wanted to

1    talk about.  We're walking through the -- all you need to do

2    is ask us questions and I think we can probably get you better

3    answers if you're missing something.

4         MR. FREEDMAN:  Well, I like to look -- I like to look

5    at it in black and white and the financial analysis.  And I

6    thought that's what ---

7         MR. KODSI:  Is that what you were expecting today?

8         MR. FREEDMAN:  Yeah, I thought we would get some sort

9    of financial analysis, a site plan, you know, a vision for the

10   project.  Going from 771 units in the north to 400 is a big

11   difference.  You know, and if you have a significant debt

12   reallocation on each unit, so ---

13        MR. PEARL:  If you want -- can I address that just

14   briefly, with your permission?

15        You know, we had a similar situation in a project

16   where we bought a note from Bank of America and there was a

17   CDD, and it's a project called Fontainebleau.  And, you know,

18   essentially -- you know, if you look at what works today with

19   the market, you're better off selling bigger units but fewer

20   number of units.  We have a lot of experience with selling

21   into the Venezuelan, the Brazilian, you know, a lot of the

22   Latin American markets.   We have offices in all those places.

23   And, you know, they'll actually, you know, pay you a higher

24   price per foot, give you bigger deposits for larger units.

25        And so, what we found, you know, in other projects,

1   you know, that we have active right now -- and, you know, you,

2   obviously -- you're welcome to go out and see, you know, the

3   Fontainebleau project any time you want.  There's work

4   underway currently.  You know, there we were able -- you know,

5   by down-zoning the whole project we're able to accelerate

6   things, get things, you know, jumped -- you know, jump-started

7   again and start making CDD payments, you know, in fairly rapid

8   order.

9        MR. KODSI:  Well, just to add to that, just so you

10  understand, it's part of the allocation on repayments.  Okay?

11  So, instead of being on 700 units, it will be recalculated on

12  the 400 units.  So, your principal pay-down will be larger per

13  unit sale as opposed to the old plan that had 700.  And if I

14  remember correctly, it was like three, $4,000 or something at

15  the time, I think, for release price or something per unit.

16  It's going to be a lot higher here.

17       MR. WRATHELL:  Yeah.  And, you know, I think it's a

18  little premature, but I'll mention it anyway, is the --

19  obviously, the assessment methodology was crafted a certain

20  way.  So, you know, assuming it gets there or not.  And,

21  obviously, they're going to have to be -- relook at the

22  methodology.

23       MR. PEARL:  No, absolutely.  And, you know, we went

24  through that process previously and, you know, I think that --

25  you know, what we -- you know, what the plan will contain.

1    And I apologize that we can't, you know, give you the whole

2    thing today, because I agree, it would be great to be able to

3    lay everything out on the table.  But, you know, because of

4    the bankruptcy, in the way that it works, you know, not

5    everybody let's -- let's us do everything we like to, in the

6    order we like to as business people.  But, you know, if you

7    look at it, you know, we're going to be respecting, you know,

8    the allocations from a high level.  You know, north versus

9    south and, you know, B versus A.  But within those -- you

10   know, within respecting the original assessment methodology,

11   you know, obviously -- you know, in order to get things moving

12   as quickly as possible we are going to have to have higher

13   release prices to the CDDs per unit and to be able to get the

14   debt paid down.

15        MR. MARKEY:  At Fontainebleau you restructured the

16   bond debt?  Did you address that?

17        MR. PEARL:  In Fontainebleau we -- what we did was we

18   got a forbearance agreement.  And that -- it was a different

19   situation because the value of the land was higher than the

20   value of the CDD.  And so, you know, the only similarity I was

21   pointing out there is that we down-zoned the product because

22   it was a lot of mid-rise product and things that really

23   weren't sellable in today's market.  And, so, we're moving --

24   you know, we just have single-family homes in the north in

25   that project.  You know, we -- you know, we substantially

1    reduced the number of units.  You know, we've started sales.

2    We have a lot of contracts and we've -- and, you know, we've

3    begun construction on the single-family homes.  We've already

4    closed on some buildings that we had to finish up, you know,

5    once we came in as the new -- as the new managers of that

6    project.

7          MS. MORA:  As Mr. Pearl indicated, we're going to be

8    filing our plan and disclosure statement that's going to

9    provide all the financial information that, I think, the Board

10   is looking for in a very short time frame.  It's due by

11   December 19th.  And so, we're more than happy to provide to

12   each of the Board members a copy of those documents or counsel

13   will be receiving it.  And I think we'd like to request some

14   additional time on next month's agenda so that we can come

15   back and be more responsive to the Board on the particulars of

16   the plan that we're putting forth.

17         MR. PEARL:  And we can put the site plan up on a

18   poster board and talk through the -- you know, bring the

19   architects in; whatever you'd like.

20         MR. KODSI:  Yeah, but the goal is, just so you know,

21   from the original CDDs, that rates -- we're trying to keep the

22   interest rates as they were.  The term, again, to 2038 we're

23   keeping on the A Bond.  The B Bond is what we're going to be

24   requesting an extension of time, you know, to repay and the

25   dollar amount is something that we're working on now.  Brian

Page 27

```
 1    and I both are trying to get an understanding of how
 2    bankruptcy works and what that repayment is.
 3              MR. FREEDMAN:  You said you were going to keep the
 4    interest rate the same.  What about the principal?
 5              MR. KODSI:  Well, that's something we need to rework.
 6    That's what we're trying to understand.  We're not sure how --
 7    it seems like in bankruptcy -- we're having conversation ---
 8              MR. PEARL:  Right.  We've ordered an appraisal and
 9    we'll see -- you know, we'll see how that comes in.  We don't
10    know yet.
11              MR. KODSI:  That's right.  And, again, those are some
12    things that are negotiable.  And those are the things that,
13    you know, we intend to sit down with you guys of the Board and
14    see what numbers work and, you know, if the repayment
15    structure that we have is not exactly what you wanted, then
16    that's the kind of -- you know, the conversation we want to
17    have.  That's the dialogue that we're looking for, you know.
18    Because our goal is to get a plan confirmed by -- I apologize,
19    Mindy.  By?
20              MS. MORA:  End of February.
21              MR. KODSI:  By end of February.  So, we'll have 60
22    days -- approximately 60 days from the time we submit our plan
23    to sit down with you guys and go through it, and all
24    creditors.  Remember, there's also other -- unsecured
25    creditors also that will have to approve our plan.
```

```
 1              MR. WRATHELL:  Okay.  We're good?

 2              MR. KODSI:  I just wanted to show -- you know, I

 3     wanted just to show you guys that, you know -- you know, you

 4     know Terra -- I know you guys know Terra.  John and Adam, I

 5     know you guys know who Terra is.  They've been around.  They

 6     know Doral.  You know, from -- during this recession they're

 7     probably one of the only developers that really just did --

 8     you know ---

 9              MR. PEARL:  We continued building.

10              MR. KODSI:  You know, they continued building in the

11     worst time ever, and in Doral.  You know, they definitely know

12     the market.  They're --

13              MR. PEARL:  It's because we have strong partners.

14              MR. KODSI:  -- solid.  You know, they're solid.

15              MR. PEARL:  Right.  We had strong partners.  In that

16     project it was the Mas family.  And, you know, we -- you know,

17     we really, you know, always partner up with the best people

18     because, you know, we don't -- you know, if there are

19     problems -- you know, for instance, we had a lot of high-rise

20     product and -- which is another product line that Terra has

21     been heavily involved with and is known for.  I don't know if

22     you saw the announcement yesterday, but we -- you know, we

23     finally sold out, you know, 900 Biscayne, which is a 63-story

24     tower across from the American Airlines Arena.  You know, it's

25     very difficult, you know, when you have to sell a building
```

1    twice, right?  And close it in -- you know, in the middle of

2    all the problems that we've all been through.  And, you know,

3    this project has suffered from, you know, the same general

4    problems, you know.

5              So, what we'd like to do is -- you know, as in that

6    instance and as in Fontainebleau, you know, really try to

7    inject some capital and some know-how and get things moving.

8              MR. KODSI:  And to conclude, I'd like to say, you

9    know, everything that's happened in the past up to probably

10   September of this year, you got to look at it as the past.

11   This is, you know -- you know, I don't want you to bring over

12   thoughts or feelings from, you know -- time and what happened,

13   the project, and/or the recession and what's carried over,

14   because I know -- you know, listening to you guys go through

15   the agenda of expenses being paid in the past two years, that

16   was -- you know, that was a different time, a different place.

17   You know, we're sitting in a different place today since

18   September, since we filed the bankruptcy.  Viable -- viable --

19   you know, a viable sponsor here today that can do what needs

20   to be done, which is bring this project back and take care of

21   everybody, not only just the secured creditors, but also the

22   unsecured creditors, which is value -- there's value to that,

23   you know.  And I just want to put -- you know, put that on the

24   record.

25             MR. WRATHELL:  Okay.  Very good.  Mr. Eckert?

Page 30

1          MR. ECKERT:  Are we still on audience comment?

2          MR. WRATHELL:  Yes, sir.

3          MR. ECKERT:  Mike Eckert on behalf of Florida Prime

4    Holdings.

5          I just want the Board to be aware and I don't want

6    to -- I'm representing the bondholder here at this meeting.  I

7    don't want my silence to be misinterpreted as some kind of

8    acquiescence or agreement by the bondholder in relation to the

9    proposal that you've heard kind of a thumbnail sketch of.

10          What I will tell you is that under Sections 9.01 and

11    9.26 of the Master Trust Indenture, and specifically I'll read

12    9.01 to you:  The issuer, and that is the District, shall at

13    all times to the extent permitted by law defend, preserve and

14    protect the pledge created by the indenture and all the rights

15    of the bondholders and any credit facility issuer under the

16    indenture against all claims and demands of all other persons

17    whatsoever.

18          Section 9.26:  The issuer shall not do, or omit to

19    do, or suffer to be done any matter or thing whatsoever

20    whereby the lien of the bonds on the pledged revenues or any

21    part thereof or the priority thereof would be at loss or

22    impaired.

23          And just so the Board is aware, you've heard it here

24    referred to as cramdown.  We heard it referred to in the

25    bankruptcy hearing as lien stripping.  And the bondholders

1  would object to any such plan that includes that.

2          MR. WRATHELL:  Okay.  Very good.  And just --

3  Mr. Kodsi, just for your benefit, I know this is the first

4  meeting you've been to, but as a matter of practice, the

5  financial statements are always on the agenda and I always go

6  over the financial statements.  It's similar to like a --

7          MR. KODSI:  Oh, no, no, no.  I know.

8          MR. WRATHELL:  -- board meeting of a corporate

9  entity, if the financial officer makes a habit of gibingly

10 over the financial statements.  So, that's customary.  So,

11 that when we do conduct our independent audits there's no

12 surprises as to what -- you know, where we stand financially,

13 so ---

14         Very good.  All right.  Yes, sir?

15         MR. BREAKSTONE:  Is it possible to ask more

16 questions?

17         MR. WRATHELL:  Yes.  We're still in the public

18 comments section.  Noah Breakstone.

19         MR. BREAKSTONE:  Thank you.  Noah Breakstone for the

20 bondholders.

21         Just that -- my question was, you mentioned about $20

22 million.  So, I'm assuming you're going to use the $20 million

23 to pay the $12-and-a-half million of back principal and

24 interest, over a million dollars of O & M and then a couple of

25 million dollars of back taxes.  It's over 15 million just for

1   that item.

2             Is that the intent of that money?

3             MR. PEARL:  That is not the intent of that money, as

4   I'm sure you know.  It's to pay interest based on the new

5   value that -- you know, whatever comes in, in terms of the

6   valuation hearing and to inject the bulk of the funds back

7   into the property so that we can get it -- so that we can get

8   it moving.

9             MR. BREAKSTONE:  By the way, I would have no other

10  way to know.  I haven't seen the plan, so ---

11            MR. PEARL:  Right.  That's true, Noah.  That's true.

12            MR. WRATHELL:  All right.  Any other public comment?

13            MR. SHANERMAN:   Yeah, I have a comment.  Just one

14  comment.

15            MR. WRATHELL:  And I'm sorry, if could you just state

16  your name.

17            MR. SHANERMAN:  Yeah.  Richard Shanerman.

18            I would just like to know if the Board has an

19  objection to the sole elector having a landowner's meeting for

20  the purposes of having an election to vote in a new board.

21            There's issues with developer funding.  There's

22  problems with developer funding.  This would facilitate

23  developer funding if there was an election, so that the Board

24  can accurately reflect who has an interest in the District.

25            Thank you.  I guess that's a question if someone

1    cared to answer it.

2         MR. WRATHELL:  The Board, obviously, through its

3    discretion can choose whether it wishes to answer a public

4    comment or not, so -- unless somebody wishes to respond -- the

5    District did notice, advertise, follow the statutory process

6    for the landowner's election; and, in fact, did the same two

7    years ago as well.  So, we've followed that full statutory

8    process.  So, you know, I'm not even aware -- obviously, I'm

9    not an attorney.  But I'm not aware under Chapter 190 even if

10   the District could hold a special election even if it wanted

11   to, but that's a side topic.

12        All right.  Any other public comment?

13        MR. KODSI:  Actually, can I have the response from

14   general counsel on that?  That means that you're not a lawyer.

15   So, general counsel, what would you recommend?

16        MR. LYLES:  Well, first of all, we're hearing this

17   request today for the first time and it is in my experience

18   without precedent.  I'm not aware of any ability to hold a

19   landowner's election a second time after one's already been

20   held.  And without referring again to Chapter 190, which

21   authorizes and provides the conditions for which landowner's

22   meetings are conducted, it has to happen in November after

23   appropriate notice; and once it happens and it's over with, as

24   I read the statute, there really is no provision for a special

25   election.  That term does not appear in Chapter 190.

1          So, I think we would need to have -- maybe hear from

2    Mr. Shanerman a little further, if he's got some information

3    in terms of precedence elsewhere or legal decisions that I'm

4    not aware of.  But sitting here and being asked in real time,

5    I can't respond if there's any provision of 190 that would

6    authorize such an election, one having just been held last

7    month.  So, that's about the best I can do on short notice.

8          MR. SHANERMAN:  On short notice, there's other ways

9    to transition the Board when a landowner changes other than

10   having an election, and those other methods I'm sure you're

11   aware of.

12         MR. LYLES:  Sure.  Sure.  Resignation, voluntary

13   resignations by board members is one of those ways.

14         MR. SHANERMAN:  Correct.

15         MR. LYLES:  And I suppose that's why you phrased your

16   question the way that you did, would the Board want to

17   entertain something like that.  But I think that you're aware,

18   and I think most everybody in this room is aware, that that's

19   something that is an individual discretionary decision on the

20   part of a board member and there is no ability -- again, even

21   when there is a change of landowner, there's no ability to

22   remove a board member from one of these appointed or elected

23   positions.  Once they're legally on the Board, it is up to the

24   member to decide whether or not he or she wants to resign when

25   there's a change in ownership.  So, that's something that

1   would be a discretionary decision for each individual who

2   serves on the Board at this time.

3          MR. SHANERMAN:  Well, I think the Board should also

4   consider that it may be in the best interest of the Board to

5   transition to the new landowner.

6          MR. BREAKSTONE:  I'm sorry.  Is there a new

7   landowner?

8          MR. SHANERMAN:  Yes.

9          MR. BREAKSTONE:  There's a new landowner?

10         MR. KODSI:  No.

11         MS. MORA:  No.  It's just a change of management of

12  the existing landowner.

13         MR. SHANERMAN:  I stand corrected.

14         MR. KODSI:  Right.  The landowner hasn't changed.

15         MR. MARKEY:  Can you explain your comment, it'd be in

16  the best interest of the Board?

17         MR. SHANERMAN:  Well, there's funding proposals on

18  the table from what I understand from this meeting.  And I

19  have to apologize.  I don't have the financial information and

20  all of that material and I've only been on-board with the

21  landowner for the past couple of days.  But there's a lot

22  of -- the reason we think it's in the best interest is because

23  we have a plan, we have a plan for developer funding, there

24  hasn't been developer funding.  One way to accelerate all of

25  the back assessments that haven't been paid is to transition

Page 36

1    the Board so that this developer funding can occur.  And we

2    just think the Board should consider all of those things

3    because right now the District is in dire financial straits.

4            MR. BREAKSTONE:  Do you know if the District hasn't

5    paid any bills over the last year or so?

6            MR. SHANERMAN:  No, I don't know.  I just know what I

7    just listened to.

8            MR. BREAKSTONE:  Got ya.

9            MR. SHANERMAN:  About the fact that it is being

10   developed for funding issues -- or substantial non-developer

11   funding issues.

12           MR. BREAKSTONE:  But you're not aware how the

13   District's maintained itself over the last 12 months?

14           MR. SHANERMAN:  No.

15           MR. WRATHELL:  Okay.  All right.  One last final shot

16   at audience comments.

17           All right.  We'll go ahead and close the public

18   comment section.

19           I ask are there any final Board member requests or

20   comments?

21           THE BOARD MEMBERS:  No.

22           MR. WRATHELL:  All right.  Before we adjourn, I just

23   want to wish everybody a Happy Holidays, Happy New Year, and

24   we'll see everybody in 2012.

25           Is there a motion to adjourn?

Page 37

1          MR. EINFALT:  I make that motion.

2          MR. WRATHELL:  Motion by Mr. Einfalt.

3          MR. FREEDMAN:  Seconded.

4          MR. WRATHELL:  Seconded by Mr. Freedman.  All in

5  favor?

6          Meeting adjourned.  The time is approximately 3:02

7  p.m.  Thank you everybody.

8          (Thereupon, on Motion by Mr. Einfalt and seconded by

9  Mr. Freedman, with all in favor, the meeting adjourned at 3:02

10 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 38

```
 1

 2                        REPORTER'S CERTIFICATE

 3
     STATE OF FLORIDA)
 4                   ) SS
     COUNTY  OF  DADE)
 5

 6            I, Maggie Rubio, RPR, certify that I was

 7       authorized to and did stenographically report the

 8       Meeting of Landmark At Doral Community Development

 9       District herein; and that the foregoing pages numbered

10       from 1 to 38 inclusive is a true and complete record of my

11       stenographic notes of the Meeting.

12            I further certify that I am not a relative,

13       employee, attorney or counsel of any of the

14       parties, nor am I a relative or employee of any of

15       the parties' attorney or counsel connected with

16       the action.

17            Dated at Miami-Dade County, Florida, this 12th

18       day of December, 2011.

19

20
                          MAGGIE RUBIO
21                        Notary Public - State of Florida
                          Commission No. DD975576
22                        My Commission Expires: 4/14/14

23

24

25
```