Page 1

1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF FLORIDA
2

3
     IN RE:                          CASE NO. 11-35884-BKC-RAM
4
     TOWN CENTER AT DORAL,
5    L.L.C.,

6                  Debtor.
     _____/
7

8

9    MOTION TO OBTAIN CREDIT PURSUANT TO SECTIONS 105(a)
      AND 364(c), IN ADDITION TO MOTION TO APPROVE PLAN
10    TERM SHEET AND REIMBURSEMENT OF EXPENSES FILED BY
     DEBTOR (45); MOTION TO ESTABLISH PROCEDURES NUNC PRO
11   TUNC TO THE PETITION DATE TO PERMIT MONTHLY PAYMENT
          OF INTERIM FEE APPLICATIONS OF CHAPTER 11
12   PROFESSIONALS FILED BY DEBTOR; MOTION FOR RELIEF FROM
      STAY FILED BY INTERESTED PARTY LANDMARK AT DORAL
13          COMMUNITY DEVELOPMENT DISTRICT (35)

14

15                      December 5, 2011

16

17          The  above-entitled   cause  came  on  for

18   hearing before the  HONORABLE ROBERT A. MARK,  one of

19   the Judges sitting in the  UNITED  STATES  BANKRUPTCY

20   COURT,  in  and for the SOUTHERN DISTRICT OF FLORIDA,

21   at 51  Southwest  1st Avenue,  Miami,  Dade  County,

22   Florida  on  Monday, December 5, 2011, commencing  at

23   or about 10:00 a.m.,  and  the following  proceedings

24   were had:

25                      Reported By:  Margaret Franzen

Page 2

1                    APPEARANCES:
2

   BILZIN SUMBERG BAENA PRICE & AXELROD, by
3           MINDY A. MORA, ATTORNEY-AT-LAW
         TARA V. TREVORROW, ATTORNEY-AT-LAW
4              on behalf of the Debtor
5

         GENOVESE JOBLOVE & BATTISTA, by
6             GLENN D. MOSES, ESQUIRE
   on behalf of the Official Committee of Unsecured
7                    Creditors
8

      STEARNS WEAVER MILLER WEISSLER
9          ALHADEFF & SITTERSON, by
      PATRICIA A. REDMOND, ATTORNEY-AT-LAW
10       on behalf of the Landmark at Doral
          Community Development District
11
12             BERGER SINGERMAN, by
               JORDI GUSO, ESQUIRE
13       DEBI EVANS GALLER, ATTORNEY-AT-LAW
          on behalf of Terra Landmark, LLC
14
15             GREENBERG TRAURIG, by
           JOHN B. HUTTON, III, ESQUIRE
16               JOHN DODD, ESQUIRE
      on behalf of U.S. Bank as Indenture Trustee
17
18             BROAD and CASSEL, by
             C. CRAIG ELLER, ESQUIRE
19      on behalf of AmT CADC Joint Venture, LLC
20

            ARNSTEIN & LEHR, by
21          PHILLIP HUDSON, III, ESQUIRE
                    and
22          HOPPING GREEN & SAMS, by
            MICHAEL C. ECKERT, ESQUIRE
23       on behalf of Florida Prime Holding, LLC
24                            Continued.....
25

1
       MIAMI-DADE COUNTY ATTORNEY'S OFFICE, by
2
       MELINDA S. THORNTON, ATTORNEY-AT-LAW
on behalf of the Miami-Dade County Tax Collector
3

4
    OFFICE OF THE UNITED STATES TRUSTEE, by
      STEVEN D. SCHNEIDERMAN, ESQUIRE
5
    on behalf of the United States Trustee
6

         ALSO PRESENT:
7

       CRAIG WRATHELL
8
        BRIAN PEARL
9

       - - - - - - -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  Okay.  Let's get appearances,
2    we'll start on the debtor's side.
3            MS. MORA:  Good morning, Judge.  Mindy Mora
4    and Tara Trevorrow from Bilzin Sumberg on behalf of
5    the debtors.
6            MS. REDMOND:  Good morning, your Honor.
7    Patricia Redmond, Stearns Weaver Miller, on behalf of
8    the Community Development District.
9            Your Honor, in the courtroom today with
10   me is Mr. Craig Wrathell, he is The District
11   manager.
12           THE COURT:  I'm sorry, what was the last
13   name?
14           MS. REDMOND:  Your Honor, Wrathell,
15   W-r-a-t-h-e-l-l.
16           THE COURT:  Okay.
17           MR. HUTTON:  Good morning, your Honor.
18   John Hutton from Greenberg Traurig on behalf of
19   U.S. Bank, as Indenture Trustee.  With me in the
20   courtroom is my colleague, John Dodd.
21           MR. MOSES:  Good morning, your Honor.
22   Glenn Moses, Genovese Joblove & Battista, for the
23   creditors' committee.
24           MR. GUSO:  Good morning, your Honor.
25   Jordi Guso and Debi Galler from Berger Singerman on

1  behalf of Terra Landmark, LLC and we are joined in

2  the courtroom by Mr. Brian Pearl, Terra Landmark's

3  representative.

4           MS. THORNTON:  Good morning, your Honor.

5  Mindy Thornton from the County Attorney's Office on

6  behalf of the Miami Dade County Tax Collector.

7           MR. HUDSON:  Good morning, your Honor,

8  Phillip Hudson on behalf of Florida Prime, the

9  bondholders.

10          I also have with me today my

11 co-counsel, Mr. Mike Eckert.  We filed pro hac

12 papers for Mr. Eckert the end of last week, your

13 Honor.  He is a bond expert, he's with the

14 Hopping Green firm in Tallahassee, and I know the

15 Court had a lot of questions last week about the

16 particularities.  Mr. Eckert is capable of

17 answering those questions.

18          THE COURT:  Okay.

19          MR. ELLER:  Good morning, your Honor.

20 Craig Eller of Broad and Cassel on behalf of

21 AmT CADC Venture, LLC.

22          MR. SCHNEIDERMAN:  Steven Schneiderman for

23 the U.S. Trustee.

24          THE COURT:  Mr. Eller, you're the junior

25 lien holder?

1          MR. ELLER:  That is correct, your

2    Honor.  We are in a second position behind the

3    Community Development District.

4          THE COURT:  Okay.

5          MS. MORA:  Judge, we heard what the Court

6    was saying at the conclusion of the last hearing and

7    in that -- on that basis, we went ahead and spoke

8    with Terra about sort of reeling back from the

9    breadth of the relief sought in the motion that we

10   filed as Court Paper 45, and asked if Terra would be

11   willing simply to move forward at this point with the

12   postpetition financing and the limited lock up, and

13   to move away from the term sheet concept that had

14   various provisions about the plan.

15          And so what we were able to do was

16   negotiate the form of a final order authorizing

17   the postpetition financing.  We went ahead last

18   night and filed that proposed form of order,

19   along with a red line showing the changes from

20   the prior form of the order, a revised budget

21   showing advances just being made starting with

22   the month of December, and the sole additional

23   document that Terra has requested that the

24   debtors file, being a form of promissory note to

25   evidence the postpetition loan.

1          THE COURT:  Okay.  Yeah, I'm looking at the

2    red line, but I didn't get a chance to go through it.

3    So can you more -- without going through every

4    difference, what are the major differences?

5          MS. MORA:  Judge, the major differences are

6    that we have eliminated the term sheet, which

7    appeared to have a number of provisions that the

8    parties were concerned about.  The order still does

9    provide for up to $750,000 in postpetition financing

10   under 364(c)(1), so that Terra would be granted a

11   super priority administrative expense claim.

12          The dates have been pushed out a little

13   bit in light of the delay that we've occasioned

14   because of not being able to proceed with the

15   interim financing.

16          We've asked for, and Terra agreed, to

17   delaying the filing of a motion to value the

18   collateral until December 13th, but the debtor is

19   still obligated to file a plan by December 19th,

20   and to work with the Court to obtain the dates

21   for the disclosure statement hearing in January

22   and a confirmation hearing in February.

23          The major differences are there's no

24   term sheet concept, there's no additional

25   provisions that are in this lengthy term sheet,

1    everything is in the order.

2          In addition, the lock up, the limited

3    lock up provision continues to be in there.  The

4    provision that the committee asked for, which is

5    that counsel to the committee be permitted to, on

6    its own, investigate alternative offers and that

7    the debtor be obligated to provide information

8    that third parties may request, has been added.

9    If you're looking at the red line, Judge, it's on

10   Page 21, so that the committee can perform that

11   function for the estate.

12         That's the essential differences,

13   Judge.

14         THE COURT:  And remind me how this works.

15   The other -- in terms of Terra's attorney's fees,

16   that was one issue of concern at the last hearing.

17         MS. MORA:  Judge, the budget still

18   contemplates attorney's fees, but the amount is now

19   capped by the amount in the budget, meaning that the

20   legal fees paid to Terra's counsel, Berger Singerman,

21   are not just, you know -- what had been in the

22   agreement before was, you know, whatever was

23   reasonable and necessary.

24         Now it's limited, it's capped at a

25   hundred thousand dollars, the amount reflected in

1   the budget.  There are other amounts that are due

2   to various consultants, as well, but those are

3   consultants that are being retained by the debtor

4   and not by Terra.  So it's capping the legal fees

5   of the lender's counsel at a hundred thousand

6   dollars during the case.

7          THE COURT:  Okay, and then if this is

8   approved, you're going to go forward with a motion to

9   value, and there was a little bit of uncertainty at

10  the last hearing, but you believe you will be seeking

11  to strip off the second lien position, and remind me

12  where --

13          MS. MORA:  Sure, Judge.

14          THE COURT:  -- you thought you were going

15  on stripping down the first.

16          MS. MORA:  Sure, Judge.  The proposal, as I

17  understand it, seeks to value the property at a

18  number.  We're obviously still waiting to get the

19  appraisal back, but we should have that shortly,

20  within a couple of weeks.

21          What we do know is that the property

22  appraiser's office from Miami-Dade County has

23  valued the debtor's property at $36 million, and

24  so the plan is going to seek to provide for that

25  amount of secured claim being held by The

1  District, but in recognition of the fact that

2  this is such a long-term obligation.  These

3  obligations stretch out under the terms of the

4  original methodology for these assessments

5  through 2038.

6          The interest that's payable will end up

7  effectively creating an 1111(b) election in favor

8  of The District with interest being paid out for

9  the full amount of their claim over the term of

10 the obligations.  So the principal amount does

11 get reduced down to the current value of the

12 property, but with interest the full amount of

13 the debt is paid out over time.

14         And so there would be a stip off of the

15 AmT piece, which is the voluntary mortgage that

16 was put on the property, that would be stripped

17 off and become part of the unsecured debt, and

18 then the secured obligation owed to The District

19 would be valued at the value of the collateral

20 and there would be payments over time aggregating

21 the amount of the debt.

22         THE COURT:  Okay, and then what's your

23 position on stay relief?  We had talked about,

24 perhaps, a parallel track, which would allow the

25 lender, I'll use that term generally, to go forward.

1          MS. MORA:  Well, Judge, obviously it's the

2     debtor's preference, because we're moving with such

3     rapidity through this case, we're getting the plan

4     filed by December 19th, and trying to get to

5     confirmation by the end of February, for the Court

6     not to grant stay relief at this time.

7          Alternatively, if the Court is inclined

8     to do something, we'd prefer that the Court only

9     allow The District to go to judgment and not to

10    sale, in order to reduce the legal expenses that

11    would be incurred by the debtors in the case,

12    obviously to the extent we need to defend or be

13    involved in defending the foreclosure, those

14    additional expenses, but to also have to be the

15    one with the burden to stop the foreclosure sale

16    from happening by coming into this Court.

17          We'd prefer, given the short time

18    period here, that the Court at most grant stay

19    relief going to judgment.

20          THE COURT:  Ms. Redmond, remind what you

21    think the timing would be.  If you get stay relief,

22    you're going to go back to State Court and ask to

23    reset the summary judgment?

24          MS. REDMOND:  Yes, your Honor.

25          THE COURT:  How long do you think it will

1    take to get a hearing on that?

2              MS. REDMOND:  Your Honor, probably 30 days,

3    maybe 60 days.

4              Your Honor, it's the Holiday season, so

5    the State Courts are not having too many

6    calendars.

7              THE COURT:  Okay, and they're -- the debtor

8    is contemplating a disclosure hearing about six or

9    seven weeks out.  So possibly a disclosure hearing

10   before you even get to judgment or about that time

11   and then confirmation by the end of February.

12             What would be your fall back besides

13   complete stay relief?

14             MS. REDMOND:  Well, your Honor, if I could

15   just argue for a second for complete stay relief and

16   then I'll address the fall back?

17             THE COURT:  Sure.

18             MS. REDMOND:  Your Honor, number one, the

19   burden, as your Honor knows there's two, lack of

20   adequate protection, and if you look at the budget

21   and the proposal that the debtors put forth, they

22   still have not provided one cent for any cost

23   involved in preserving the property postpetition.  So

24   the position of The District will diminish during the

25   pendency of this Chapter 11 case.

1          Your Honor, the other standard, of

2    course, is no equity, which is the lender's

3    burden, which the debtors have not and cannot

4    deny or contest, and then the burden shifts over

5    to the debtor to prove that they have a viable

6    plan that can be confirmed within a reasonable

7    time.

8          And we have Mr. Eckert here today, your

9    Honor, because this case presents unique issues

10   of the intersection between state and local law,

11   and bankruptcy, which we think prevent the

12   ability of the debtor to confirm a plan, and we

13   think that his comments to the Court will be

14   relevant to your Honor's determination as to

15   whether or not the debtor can successfully

16   reorganize.

17          And, your Honor, we think that we've

18   met the burden to do that.  Addressing -- we

19   think that the harm to the debtor is little.

20   We've got to go forward, we've got the time --

21   time is not on our side, the debtor is moving

22   fast, and it's a race, but if we have to come

23   back to this Court to get further relief from

24   stay after judgment, it automatically means that

25   the debtor wins the race.

1              If the burden is on the debtor because

2       they've come in, they've filed a case after, your

3       Honor, not making any payments to The District

4       since 2008, there's $13.1 million of interest and

5       O and M, operating and maintenance payments, that

6       are due to The District since 2008.

7              Now we're in a Chapter 11 case and we

8       believe the burden appropriately should sit with

9       the debtor to come back to the Court if it's got

10      a viable plan, and your Honor can evaluate it in

11      the context of a plan, which you haven't seen

12      today, to determine whether your Honor should

13      reimpose the stay.

14             THE COURT:  You mean enjoin the sale?

15             MS. REDMOND:  Exactly, your Honor.

16             THE COURT:  We could get into that today or

17      we could defer that until the disclosure hearing,

18      which would be a time where exactly what they're

19      proposing is better framed, but let's spend a minute

20      or two, at least.

21             What is your proffer or would you

22      rather just have Mr. Eckert speak as to why what

23      you think they're proposing could not be

24      confirmed?

25             MS. REDMOND:  Your Honor, I would prefer,

1  if it's okay with the Court, to defer to Mr. Eckert.

2  He has represented over 150 CDDs, this is his whole

3  practice, and he can explain much better than I can

4  what the issues and the impediments are.

5          THE COURT:  Okay.  All right.  Then since

6  community development bonds are your life ---

7          MR. ECKERT:  I know there are people with

8  more exciting lives.

9          THE COURT:  Not that many in this

10 courtroom.

11         MR. ECKERT:  Again, Mike Eckert, I work

12 with Hopping Green & Sams in Tallahassee.  Our firm

13 serves as general counsel to over 150 CDDs and

14 special districts throughout the State of Florida.

15         I did review the transcript from the

16 last hearing, so I do think I have a good pulse

17 on what some of the issues were where there was

18 some confusion, and I'm hopeful that I can go

19 ahead and remedy that.

20         One of the first things is that there

21 was a statement made here today, that the terms

22 of the bonds are, you know, some 20 years out,

23 and there are two series of bonds here, and I

24 think this is a very important distinction.

25 There is a Series 2006A Bond, which has a

1    maturity date of May 1, 2038, and the amount is

2    $30,320,000.  So that maturity is 2038.

3                THE COURT:  And until maturity there are

4    interest payments?

5                MR. ECKERT:  Until maturity for the A

6    Bonds, there are two semi-annual payments of interest

7    and then there is a sinking fund payment for the

8    principal due every May 1st, and that's the same

9    structure that most community development district

10   long-term bonds have in Florida.

11               The second series of bonds, which is

12   actually the higher amount, is $41,180,000, the

13   maturity on those, and those are interest only

14   bonds, and I'll explain that just in a second,

15   but the maturity on those is May 1, 2015.  It's

16   not 2038, it's nowhere near 20 years out from

17   today.  That maturity is about three and a half

18   years from today.

19               THE COURT:  Do the bonds share the first

20   lien or is there some priority between the two

21   series?

22               MR. ECKERT:  No, it's one lien, one

23   assessment lien that secures both bonds.

24               And the B Bonds, and we also call them

25   short-term bonds, there's really no legal

1   distinction between using A, B or C, but the

2   short-term bonds, those are interest only, and

3   that's paid twice a year, and the principal is

4   either reduced by prepayments that somebody may

5   make towards the bonds before their maturity or

6   there's a balloon payment due.  So currently,

7   right now, there's a balloon payment due on

8   May 1, 2015 of $41,180,000.

9            So I just want to be very clear when

10  we're talking about these bonds that we're not

11  lumping them in together because they have very

12  different maturities, which impact the

13  bondholders' rights.

14           The purpose of community development

15  district bonds, these aren't corporate bonds,

16  they're municipal bonds, much like a city or

17  county would issue bonds to pay for public

18  improvements.  The purpose of these bonds were

19  public roads, parking lots, sidewalks, water,

20  sewer, storm water management and outdoor

21  recreation, all activities that are authorized

22  under Chapter 190 for the issuance of municipal

23  bonds.

24           One of the things that was a little

25  confusing in the last hearing, is that there was

1  kind of a mishmash of the relationships involved

2  in issuing the bonds.  There's only two

3  relationships, and they're dictated and governed

4  by separate documents.

5           The first relationship is the

6  relationship between The District and the

7  bondholders, and essentially, that relationship

8  is controlled not only by federal tax law, but

9  also by a master trust indenture that the parties

10  enter into.  It's a very complex document, but it

11  provides that The District is pledging the

12  amounts on account in like the reserve fund and

13  the construction fund, plus the assessment

14  revenue for the repayment of the bonds.  That's

15  what The District is promising the bondholders,

16  that we will do everything we can to protect the

17  lien, protect the tax exempt status of the bonds,

18  and make sure that we're able to pay you back.

19           So, again, that's the first

20  relationship.

21           THE COURT:  When you say there's a pledge

22  of the assessment revenue, but what about the actual

23  lien rights on the property?

24           MR. ECKERT:  The lien rights on the

25  property are held by The District, not by the

1    bondholders.  The bondholders do not have any lien

2    rights directly on the property.

3            And, again, that's kind of going into

4    the second relationship that I wanted to talk

5    about, and that's the relationship between The

6    District and the developer or the land owner.

7    That relationship is actually governed by

8    assessment resolutions, and Chapter 190, and also

9    various agreements that The District and the

10   developer may enter into at any time.

11           And when I talk about an assessment

12   resolution, Judge, an assessment resolution at

13   the CDD level is the equivalent of a county

14   ordinance doing the same thing.  So if a county

15   has an ordinance that levies assessments, the way

16   a CDD does that is by adoption of a resolution.

17   We don't have powers to adopt ordinances, it's

18   just not the terminology that's used in

19   Chapter 190.

20           In this particular case, The District

21   is the one that imposes an assessment lien on the

22   property owned by the developer and the land

23   owner, and in the event the property owner fails

24   to pay that assessment, under Chapter 170,

25   specifically Section 170.10, when that payment is

1    missed, the statute is self operative, that says

2    that the assessment is accelerated and that

3    The District can foreclose the entire amount of

4    the assessment plus interest, a one percent

5    penalty and all the collection costs.

6                    THE COURT:  Once there's a default on any

7    interest payment, is that what you're saying?

8                    MR. ECKERT:  On any payment, on any payment

9    that's due under the bonds.

10                   And in the foreclosure, because I just

11   want to touch on this briefly, The District is

12   the plaintiff.  The bondholders are not the

13   plaintiff, the trustee is not the plaintiff, in

14   the foreclosure The District is the plaintiff,

15   and the land owners are the defendants, as well

16   as anybody else that may have, you know, a second

17   mortgage or an HOA has liens sometimes and

18   they're also made defendants, but there's no

19   unilateral right to cure by bringing things

20   current in a foreclosure action.

21                   Once it's accelerated under 170.10, the

22   only way that the land owner can avoid

23   foreclosure is to go ahead and pay the entire

24   accelerated amount of the assessments plus

25   interest, penalties and all the collection costs,

1   that's the only way they can save that property

2   from foreclosure.

3           THE COURT:  What about the intersection of

4   bankruptcy law and state law and that issue, are

5   there bankruptcy cases that say, unlike a commercial

6   foreclosure, where the debt has been accelerated, you

7   cannot deaccelerate this kind of debt?

8           MR. ECKERT:  In terms of that the

9   Bankruptcy Court can't deaccelerate this kind of

10  debt?

11          THE COURT:  Right.  I mean, commercial

12  loans, too, are accelerated, the full amount is

13  due --

14          MR. ECKERT:  Right.

15          THE COURT:  -- and you're suing and under

16  state law, once it's accelerated, a borrower has to

17  pay the entire amount.  They file bankruptcy and it's

18  a whole new world.

19          MR. ECKERT:  No, no, and I understand that,

20  too, and I would have to defer to the people who are

21  in front of you regularly on that particular aspect,

22  but there's nothing in the state law that would

23  prevent the deacceleration.

24          THE COURT:  Permit the deacceleration.

25          MR. ECKERT:  Correct, correct.

1          Turning to the point, really, which is
2    more the intersection of the state law and the
3    federal courts, you know, we do -- we get
4    involved in bankruptcy sometimes and usually it's
5    to protect the lien of the special assessments
6    through sale motions and things like that or make
7    sure that the lien rides through the bankruptcy.
8          This is the first case I'm aware of
9    where anybody has attempted to strip a municipal
10   lien in any bankruptcy case that we have seen or
11   been able to find, and, Judge, I think it's
12   important when you talk about those two
13   relationships, what the debtor in this case is
14   really trying to do is merge those relationships
15   into one.
16          And what they're trying to accomplish
17   is a forced restructuring of municipal financial
18   obligations, because we have obligations to the
19   bondholders, okay, The District has obligations
20   to the bondholders, but what they want to do is
21   make it so that The District owes the bondholders
22   $71 million, but they want to strip the lien down
23   that The District can actually get from the land
24   owner to 36 or some other, you know, higher
25   number.

1              I mean, that's a -- that's a serious --
2    that's a serious problem and one of the things
3    that back in 1936, and again the Ashton case,
4    Ashton vs. Camron County Water Improvement
5    District, 56 Supreme Court 892, that was a case
6    where actually the Bankruptcy Court or the U.S.
7    Supreme Court was reviewing some provisions of
8    bankruptcy statutes that had been adopted and was
9    concerned about the infringement on those on
10   basically invading the province of the state to
11   manage their own fiscal affairs.
12              And specifically language the Court
13   observed, an application of the statutory
14   provisions now before us ---
15              THE COURT:  Slow down a little bit.
16              MR. ECKERT:  Sure.
17              THE COURT:  Go ahead, start that quote
18   again.
19              MR. ECKERT:  Yeah, and I'm paraphrasing
20   here, but I'll give you the page number, as
21   application of the statutory provisions now before us
22   might materially restrict respondents control over
23   its fiscal affairs, the trial court rightly declared
24   them invalid.
25              So really what we're talking about is a

1  proposal to strip down The District's liens,

2  which, you know, I contend the application of the

3  bankruptcy laws to accomplish that would

4  materially restrict The District's ability to

5  meet its financial obligations.

6            And in Florida -- and the way that

7  those statutes were cured after the Ashton

8  decision, is the states were given more rights in

9  terms of waiving the sovereign immunity.  In

10 Florida it's very clear how a state or a local

11 government can get permission basically from the

12 state to waive that sovereign immunity, and

13 that's Section 208 or 218.503 of the Florida

14 Statutes, and that's Subsection 5, and it

15 basically states, and I'll just quote it, "A

16 local government entity or district school board

17 may not seek an application of laws under the

18 bankruptcy provisions of the United States

19 Constitution except with the prior approval of

20 the governor for local government entities."

21            THE COURT:  Well, that's to file a Chapter

22 9, I would ---

23            MR. ECKERT:  And I understand that, Judge,

24 but what is being proposed here, is to do indirectly

25 which they can't do directly.  The District couldn't

1  go out and declare bankruptcy to restructure this

2  municipal debt.

3          So what the debtors are really trying

4  to do is come in through a private bankruptcy,

5  where the bondholders aren't creditors, and

6  basically restructure the municipal debt without

7  The District having any say and without, quite

8  frankly, the State of Florida having any say.

9          And the reason why this is important,

10  Judge, is this situation will create The District

11  being in a perpetual default under the indenture

12  to the bondholders, and a district in default on

13  a financial obligation isn't going to be able to

14  get additional financing, so that certainly is

15  one of the concerns, because The District is

16  still going to owe the full amount of the bonds

17  to the bondholders.

18          The second reason why I think that the

19  courts have been hesitant to cross this ---

20          THE COURT:  Let's go back to that point --

21          MR. ECKERT:  Uh-huh.

22          THE COURT:  -- and this goes back to the

23  relationships.

24          You're saying if the obligation of the

25  debtor/land owner to The District was reduced,

1  that would not change The District's obligation

2  to the bondholders.

3           MR. ECKERT:  No.

4           THE COURT:  But it's a -- it's not a

5  general revenue bond, so if you can't pay it, you're

6  perpetually in default, but at some point what?  I

7  mean, what happens if you -- if you foreclose, absent

8  the bankruptcy, what would happen?  Let's play that

9  out for a minute.

10           MR. ECKERT:  Okay.  If The District

11  forecloses, we will get to the point where we'll have

12  a foreclosure sale, and many different things can

13  happen there for the bondholders to protect their

14  investments, one, the property can be sold to a third

15  party who comes in and then what happens with that

16  bond ---

17           THE COURT:  What's the bondholders' rights

18  in the foreclosure process and sale process?

19           MR. ECKERT:  The bondholders' rights in the

20  foreclosure process, absent an agreement with The

21  District, a future agreement with The District,

22  would be they would have the right to bid on the

23  property, okay, and if, in fact -- but if they don't

24  want to, and typically let me tell you how ---

25           THE COURT:  Credit bid or no?

1              MR. ECKERT:  No.  Actually, The District is

2    the one that holds the credit bid rights, your Honor,

3    and what happens in a lot of these cases is there is

4    an agreement worked out between The District and the

5    bondholders, so as not to let the property go to a

6    foreclosure sale at kind of fire sale prices, where

7    The District will create a special purpose entity,

8    assign its rights to the special purpose entity to

9    credit bid, the special purpose entity will then

10   credit bid at the foreclosure sale the amount of The

11   District's judgment, and that special purpose entity

12   holds the property for the benefit of the bondholders

13   until its ultimate distribution or sale or

14   development is decided on.

15              I mean, you may have situations where

16   you have bondholders who feel, you know, that the

17   market goes up and down, and they don't want it

18   to be sold in a foreclosure sale during when the

19   market is down, so they may want to work with

20   The District to make sure that the property is

21   there for when the market goes back up, and

22   that's one of the rights that they get under the

23   indenture, is the right to work with The District

24   on that.

25              If The District says, no, I don't want

1    to work with you, we're selling it at a

2    foreclosure sale, then the bondholders basically

3    have the right to go and bid at the foreclosure

4    sale should they want to keep the property for an

5    extended period of time.

6                THE COURT:  And under the indenture that

7    you described, if it were simply a foreclosure sale

8    and a third-party bidder, the cash would be subject

9    to the lien that the bondholders have?

10                MR. ECKERT:  Correct.  What happens is ---

11                THE COURT:  So they would get the cash and

12    then what, does The District just remain obligated in

13    perpetuity for the remainder of the bond debt?

14                MR. ECKERT:  In this particular case,

15    because all the assessments are delinquent -- because

16    it's a different answer if you have residents that

17    are there paying --

18                THE COURT:  Right.

19                MR. ECKERT:  -- you know, for their

20    assessments, the bonds will remain in place for a

21    long time.

22                But in this particular case, if you

23    presume it's sold at a foreclosure, the clerk of

24    courts would receive the money, take out their

25    fees and costs, remit it to The District, The

1   District would deduct a proportionate share for

2   any outstanding O and M involved in the

3   foreclosure, and remit the proceeds to the

4   trustee, who then remits the proceeds to the

5   bondholders.

6           In that particular scenario, which you

7   have here, then the bondholders are done because

8   The District has done everything it can possibly

9   do to try to maximize the recovery for the

10  bondholders and their rights.

11          THE COURT:  There's nothing left that would

12  secure an obligation, so it doesn't -- there's no

13  obligation that remains because there's nothing left

14  in The District; correct?

15          MR. ECKERT:  We have exhausted all of

16  our -- The District will have exhausted all of its

17  means to be able to provide recovery to the

18  bondholders on what it pledged as security, which is

19  the assessment revenue stream and the amounts in the

20  reserve account and construction fund.

21          THE COURT:  So it's not necessarily a

22  better result for bondholders than a strip down with,

23  perhaps, a stream of payments with present value

24  greater than what they might get at a foreclosure

25  sale?

1        MR. ECKERT:  What I think, your Honor, also

2   that situation will eliminate the flexibility of the

3   bondholders to say, look, we do think the market will

4   come back, we're willing to maintain and hold this

5   property, and have the opportunity to do that until

6   the market comes back, and that's one of the things

7   that they have the right to do by virtue of going to

8   the foreclosure sale and bidding on it or working

9   with The District on getting an assignment of its

10  credit bid rights.

11       Just to summarize the intersection of

12  state law and Federal Court, the application of

13  the bankruptcy law that the debtor is seeking

14  here will materially restrict The District's

15  control over its own financial affairs, and these

16  are the only bonds The District has outstanding.

17  This is the crux of The District's financial

18  affairs.  We believe there is a significant issue

19  of state's rights in effect here given the fact

20  that the CDD is a political subdivision created

21  by statute of the Florida legislature.

22       THE COURT:  But what would be the effect on

23  anything other than the CDD for this particular land?

24       MR. ECKERT:  Well, one of the ---

25       THE COURT:  You said you'd be in default

1    and that would affect your rights, but we're just

2    dealing with one parcel of land --

3                MR. ECKERT:  Right.

4                THE COURT:  -- and obligation; right?

5                MR. ECKERT:  Well, I would say no, and the

6    reason I would say no is because most -- well, most

7    public infrastructure is paid for through debt,

8    regardless of who issues the debt, but most of it is

9    paid for through debt, and in particular, in

10   community development districts, that's certainly the

11   case.

12                I mean, community development districts

13   finance bridges over the intracoastal waterway,

14   environmental remediation at the Orlando Naval

15   Training Center, and things like that.  But what

16   happens is, if this is introduced into the mix,

17   in terms of a bondholder's decision on whether or

18   not to invest, that their lien can get stripped

19   down and they will lose the rights they would

20   have otherwise, the cost of financing public

21   infrastructure is going to go up because the risk

22   went up, and the risk that you're going to get

23   your lien stripped down is now introduced and

24   quite frankly, who pays that increased cost

25   through the increased interest rates is members

1    of the public.

2         So, I don't -- I don't believe that

3    it's strictly limited to this case, but the

4    impact of basically restructuring municipal debt

5    without the municipality ever declaring

6    bankruptcy or the governor actually approving it,

7    has a far wide ranging affect on the financing of

8    how we provide public infrastructure in the State

9    of Florida.

10        THE COURT:  Similar arguments -- and I'm

11   not saying this is the same, but similar arguments

12   have been made in bankruptcy by tax certificate

13   holders that say the whole system of collecting taxes

14   and running the counties is going to collapse if you

15   don't honor the original terms of tax certificates,

16   and so far it isn't.

17        I mean, the county may have problems,

18   but it's not because of restructuring tax

19   certificates.

20        MR. ECKERT:  Right, and I'm not suggesting

21   that the system will collapse, what I'm suggesting is

22   the cost of getting the money is going to go up

23   because the risk has increased.

24        THE COURT:  Okay.  Mr. Hudson, where did

25   you go?

1          MR. HUDSON:  Yes, sir.

2          THE COURT:  Oh, you're there.

3          MR. ECKERT:  Thank you, your Honor.

4          THE COURT:  Mr. Eckert was deferring, I

5     think, to you perhaps on more specific bankruptcy

6     cases.

7          Mr. Eckert said there's -- he's not

8     aware of any successful strip downs.  Have there

9     been any reported decisions rejecting the concept

10    of stripping down these kinds of bonds?

11         MR. HUDSON:  Your Honor, we continue to do

12    the research.  There's not a great deal of research

13    out there, frankly, in either direction.

14         We're continuing to do the sovereign

15    immunity research, we're continuing to do the

16    constitutional research, we're continuing to do

17    the tax research.  You'll recall that it's our

18    position that it's a tax under the Bankruptcy

19    Code and, therefore, we have a priority, as well

20    as the 1129 cram down impairment to negative lien

21    impacting taxes.

22         So we're doing all of that, Judge, but

23    we're sort of fighting a ghost for the moment.  I

24    mean, we can kind of predict what their plan is

25    going to look like, but at this point, without

1   more meat on the bones, it's difficult to address

2   exactly what they're going to do.  We need to see

3   exactly what they're going to do.

4           THE COURT:  Okay.  Well, that kind of feeds

5   into my concept that we should, perhaps, consider

6   final stay relief at the disclosure hearing and grant

7   stay relief now through judgment.

8           MR. HUDSON:  Certainly, Judge, it's the

9   bondholders ---

10          THE COURT:  I'd like to hear, if Mr. Guso

11  or Ms. Mora are willing to disclose at this point,

12  why you think you could do this.

13          MS. MORA:  Judge, the debtors, and I

14  believe I'm speaking for Terra, as well, continue to

15  believe that these are obligations just like tax

16  certificates that can be restructured.

17          Nothing that Mr. Eckert said in

18  describing to the Court the structure of these

19  bonds is -- was unknown to the debtors or to

20  Terra.  We're aware that there's a Series A,

21  we're aware there's a Series B, we're aware that

22  the Series B presently contemplates a shorter

23  maturity than the Series A, but overall, we have

24  a plan that we believe will fairly restructure

25  these obligations, and provide payment of the

1   full face amount of the debt over time.

2            It's going to keep the original

3   maturity of the Class A, the Series A Bonds, the

4   proposal, the plan is going to slightly extend

5   the maturity of the Series B Bonds, but

6   ultimately, The District is going to get the

7   benefit of the bargain that it made originally

8   and the payments that it contemplated receiving

9   under this financing are going to be made to it.

10           THE COURT:  Well, that's not quite

11  accurate.  I mean, they're not getting the benefit of

12  the bargain if they're just getting a payment stream

13  with a present value of the strip down value.

14           MS. MORA:  That's correct.

15           THE COURT:  You're getting the total

16  principal paid over time without interest,

17  effectively.

18           MS. MORA:  They're getting total principal,

19  plus the interest that was accrued through the

20  petition date being paid, that's correct, Judge,

21  which is also a significant amount of money.

22           Judge, there are a couple of points,

23  though, that I did want to make about stay

24  relief.  First of all, what is important in terms

25  of stay relief is that the Court, if it's going

1   to limit it just to The District proceeding to a

2   judgment, ensure that the debtor's interest with

3   respect to its property are being protected.

4            The debtor has become aware that the

5   locks that we have placed on the fence

6   surrounding the property continue to be broken on

7   a regular basis, and we believe it may be because

8   The District is sending in people to work on the

9   property unbeknownst to us.  So we would ask that

10  the Court instruct The District that if it is

11  seeking to have access to the property, it needs

12  to do so on notice and with the ability of the

13  debtors to supervise whatever it is that

14  The District is doing.

15           Ms. Redmond stated that there was some

16  concern about the budget not contemplating any

17  payments for the preservation of the property.  I

18  was not complete when I disclosed to the Court

19  all of the additions that we put into the order,

20  but one of the things that we got Terra to agree

21  to, is to keep an open line item that would

22  enable the debtors to make essentially payments

23  to protect and preserve the property and to

24  supplement the budget with those amounts.

25           After the last hearing, I asked

1   Ms. Redmond to provide me with some information

2   about what it is that The District has expended

3   money on postpetition, and what they anticipate

4   those expenses would be on a going forward basis.

5   I understand I may be getting that information

6   after today's hearing, I didn't have it in

7   advance.

8           So ---

9           THE COURT:  Is that in the text of the red

10  line because the budget doesn't -- I don't see that

11  line item.

12          MS. MORA:  That's correct, Judge, it is in

13  the text of the red line, and I'll point to you

14  exactly where it is.

15          On Page 22, Judge, Paragraph 11.  I'm

16  sorry, Judge, just give me one moment to find the

17  other language.

18          THE COURT:  I'm not sure how much comfort

19  anybody, other than the debtors and lender, would get

20  by a provision that says the two of you can amend,

21  if, in your judgment, you want to.

22          MS. MORA:  Judge, at the bottom of Page 6

23  is the language about amending the budget to make

24  adequate protection payments for the purpose of

25  preserving and protecting the property, and it

1   provides either as amounts that the debtor requests

2   and Terra consents, or that the Court orders.

3           And so to the extent that we can either

4   come to some agreement with The District about

5   the work that needs to be done out at the

6   property, or The District is able to get the

7   Court to order something, we will go ahead and

8   amend the budget on notice to other parties and

9   proceed with taking advances for the purpose of

10  protecting and preserving the property.

11          THE COURT:  Has there been specific amounts

12  and purposes communicated?

13          MS. MORA:  No, there has -- that's my

14  point, Judge.  After the last hearing I asked

15  Ms. Redmond to give me that information, and I

16  haven't received anything yet, although she's advised

17  me that I should receive something after today's

18  hearing.

19          THE COURT:  What kind of numbers would you

20  be looking for out of the budget?

21          MS. REDMOND:  Your Honor, we have, based on

22  our budget, and Mr. Wrathell is here today,

23  approximately 380 some dollars -- 380 some thousand

24  dollars per year that's budgeted for the preservation

25  of the property and the cost to The District of

Page 39

```
 1   maintaining this property and maintaining its
 2   operations.
 3           Your Honor, I have with me today an
 4   invoice that's dated November 7, 2011, which I
 5   understand is for work that was done in October
 6   of 2011.  It's for $47,500, this was work that
 7   was completed under contract to really clearing
 8   and grubbing of approximately 50 acres within
 9   The District.
10           THE COURT:  When was this case filed?
11           MS. REDMOND:  Your Honor, September 19th.
12           MS. MORA:  September 19th, Judge.
13           THE COURT:  You're talking about
14   postpetition --
15           MS. REDMOND:  Yes, your Honor.
16           THE COURT:  -- work, 47 ---
17           MS. REDMOND:  Your Honor, and there's
18   continuing work that is done on the property to be
19   able to maintain it and to protect the infrastructure
20   that has already been put on the property.
21           THE COURT:  So is there -- is there an
22   amount within the 750, given now certain caps on
23   professional fees, that's there that could cover
24   these expenses?  I'm a little unclear on how to do
25   this.
```

1          MS. MORA:  Judge, right now the aggregate

2    amount of professional fees and costs is projected to

3    be about 435,000, so there is available funding under

4    the postpetition budget that could be allocated.

5          I have no idea what's n the debtor --

6    in The District's budget.  We are aware that

7    TransFlorida was on the property doing some work.

8    I'm not aware that TransFlorida has been paid by

9    The District, although Ms. Redmond has an invoice

10   in her hand.  I'm not aware that TransFlorida has

11   been paid for the work that has been done.

12         I don't know if the work was necessary,

13   had to be done at this time, but we intend to get

14   our own consultants out there to look at the

15   property and determine what really needs to be

16   done to protect and preserve the property during

17   this Chapter 11 case.

18         THE COURT:  Why can't we just put in the

19   order that the debtor is authorized and directed to

20   use the D.I.P. funding for necessary maintenance of

21   or preservation of the property?

22         MS. MORA:  There's no problem with that,

23   Judge, that was --

24         THE COURT:  Not from your end.

25         MS. MORA:  -- that's what Terra and the

Page 41

1    debtor contemplated.

2            THE COURT:  Maybe with a cap -- well, the

3    cap is you run out of money, but it could be capped.

4    I would rather not contemplate another hearing and

5    the 430 goes up to 460 in professional fees.

6            MS. MORA:  Judge, that's correct.  I mean,

7    again, I am hopeful that Ms. Redmond and I can work

8    this out.  I don't know what's in The District's

9    budget.  I don't know what really needs to be done in

10   the next three months during the period when it's not

11   the rainy season, other than, you know, making sure

12   that the vegetation doesn't grow out of control on

13   the property, but that's what we want, to sit down

14   and have the type of consultants that would know what

15   really needs to be done to the property, look at ---

16           THE COURT:  What does that mean, I'm just

17   curious, vegetation growing out of control?

18           MS. MORA:  Well, Judge, there's a great

19   portion of the property that's, you know, grass or

20   just vegetation that needs to be maintained in the

21   next three months.

22           THE COURT:  I don't know if I brought the

23   picture back in, but it's all basically cleared,

24   right, so it's cleared and fenced?

25           MS. MORA:  That's correct.

Page 42

```
1              THE COURT:  So does somebody mow it --

2              MS. MORA:  Yeah, somebody has got to go ---

3              THE COURT:  -- grub it, whatever?

4              MS. MORA:  Somebody has to go out there and

5    mow the -- mow the grass occasionally.

6              THE COURT:  Is there -- just to try to

7    resolve it today without specificity, but with a cap,

8    is there -- if we put some language in the financing

9    order authorizing and directing the debtor to

10   maintain the property from the D.I.P. funds and work

11   with the CDD in determining what's necessary up to a

12   certain amount?

13             MS. REDMOND:  Your Honor, my personal

14   opinion is that -- and my client's opinion is that it

15   will be a mess, because as Ms. Mora just told you,

16   she intends to go get people to evaluate what needs

17   to be done to preserve the property.

18             It's strange that that hasn't been done

19   already, if the debtor was going to engage in

20   that process, before submitting a budget that

21   should provide for the preservation of the

22   property.  They didn't do that task, and so,

23   therefore, they don't have that information.

24             What I think will happen is, we'll come

25   forward with what our expenses are to preserve
```

1    the property.  The debtor will say, we need to

2    engage our professionals to evaluate those, and

3    then we'll be further down the road with these

4    expenses needing to be paid and not being paid

5    and not in the budget.

6              That's why normally I would have

7    expected to see the debtor's proposal with

8    respect to what they intended to use to preserve

9    the property.  We could have responded to those

10   line items before today's hearing and said, yes,

11   they're adequate or no, they're inadequate.

12   That's the way it normally happens.

13             To do this after the fact is, I think,

14   to invite dispute with respect to each of the

15   line items and each of the expenses.

16             MS. MORA:  Judge, what we want to make sure

17   is not going to happen here is that there are going

18   to be unreasonable demands in terms of what

19   The District thinks needs to be done to improve the

20   property, as opposed to merely maintain the property

21   during this three-month period, and that's why, first

22   of all, until we had our financing in place in this

23   case, it was difficult to go out and secure

24   consultants to start determining what additional work

25   needs to be done solely for maintenance purposes.

Page 44

1          We don't need to go out and start

2    grading roads and doing other kinds of work for

3    ultimately, as The District sees it, bondholders

4    that are going to take over the property.

5          What we're worried about is simply

6    maintaining the property and doing what has to be

7    done just to get to confirmation of a plan.  I

8    don't believe that we're going to see that the

9    budget that The District has put together, is one

10   that is simply, simply a maintenance function.

11         THE COURT:  All right.  Well, let me toss

12   out something like this and see if we can maybe get

13   some language.  If the debtor is authorized and

14   directed to use the postpetition financing to

15   maintain and preserve the property, and then we put

16   in some provision where The District will request

17   reimbursement for postpetition amounts already

18   expended and also advice the debtor what The District

19   believes is necessary on an ongoing basis, and then

20   the debtor can either agree and pay the reimbursement

21   or seek some court hearing over it, court resolution,

22   and the debtor could then either agree or negotiate

23   with The District on an ongoing plan or come back to

24   court for resolution of disputes.

25         But at least we'd have something in

1   place that says the debtor should use the funds

2   to maintain the property, and if you can't reach

3   agreement on what that is, then come back, rather

4   than some open-ended language for the debtor or

5   the debtor and Terra to unilaterally amend.

6          MS. MORA:  Judge, I hear what you're

7   saying.  I mean, I would assert that I don't know,

8   again, whether or not The District has actually paid

9   anything on account of this work that it asked to be

10  done, which in the debtor's view is more than just

11  preservation of the property, but I would assert in

12  the first instance, Judge, that's just an

13  administrative claim that The District has.

14         I think what we're talking about is on

15  a going forward basis, that the debtor would be

16  expending funds from its D.I.P. facility in order

17  to maintain the property.  We're happy to consult

18  with The District about what The District thinks

19  needs to be done, and we'll take that under

20  advisement as we come up with a plan about what

21  needs to be done over the next three months to

22  protect the property.

23         THE COURT:  Yeah, but you're -- you and the

24  lender are asking for a super priority for everything

25  you're putting in to cover professional fees, and if

1    the thing crashes, then they're stuck with an

2    administrative expense, which isn't going to be paid;

3    right?

4            MS. MORA:  Well, Judge, they would have

5    been stuck with that anyway, and if we get a plan

6    confirmed, then all the administrative expenses have

7    to be paid at confirmation.

8            THE COURT:  Okay.  So you don't love my

9    idea.  What about you?

10            MS. REDMOND:  Your Honor, Ms. Mora really

11    demonstrates the reason that it isn't workable.  The

12    very first expense, without even seeing the invoice,

13    Ms. Mora says, on behalf of the debtor, that she

14    disagrees that the amounts needed to be spent that

15    were spent, or are to be spent, were actually

16    necessary for the property, so we have the first

17    invoice that's causing a problem.

18            That's why the debtor's professionals,

19    including its consultants, were guaranteed their

20    payment by Terra before coming to this Court.

21    They could have started their work, they could

22    have come up with a budget and a proposal with

23    respect to the property and what it would cost to

24    preserve the property, they did not.

25            They put nothing in their budget, the

1   debtor put nothing in its budget to deal with any

2   costs with respect to the property, only the

3   costs with respect to professional fees.  So I

4   think that this -- the mechanism in a perfect

5   world would work, but we're here, we don't have

6   agreement on the very first invoice, I just see

7   that process as engendering more disputes, and

8   more court time, and more time before your Honor

9   asking for resolutions of the issues on each

10  invoice that comes up, rather than resolving

11  them.

12          THE COURT:  So what are you suggesting as

13  the alternative?

14          MS. REDMOND:  Your Honor, I think that if

15  the debtor wishes to add in, the debtor should put

16  its proposal in a line item in a budget.

17          THE COURT:  If we don't resolve it today,

18  then we're contemplating another hearing anyway.

19          MS. REDMOND:  Your Honor, there needs to be

20  a hearing where the items are discussed and it's

21  approved in one way on a wholesale basis based on

22  what the expenses that The District believes are

23  appropriate and based on what the expenses that the

24  debtor believes are appropriate.

25          THE COURT:  Despite the apparent conflict

Page 48

1  now over expenses that aren't even clearly

2  articulated, I don't mean they haven't been incurred,

3  but Ms. Mora doesn't know if you paid and what it is

4  you paid for, so I'm not sure, other than being

5  litigious, how you know that you're going to disagree

6  on what's necessary.

7          I mean, we're probably not talking --

8  if you're talking about 380,000 a year, so that's

9  30 something thousand a month, which is probably

10  ten or 20 percent of the legal fees that are

11  being generated in this case, I mean, I can't

12  imagine why this number would be hotly contested

13  if we put some general language in.

14          I guess even though neither of you like

15  it, that's where we're going to go with this.  So

16  we can try to resolve it today in theory without

17  another hearing over maintenance expenses, but

18  we'll come back to the specifics because we

19  haven't really talked about the objections of all

20  the other parties to the financing order.

21          All right.  So, let's come back to

22  stay relief.  It does seem, at this point, that

23  while Mr. Eckert believes that this shouldn't be

24  done under state law, and probably can't be done

25  under bankruptcy law, we're far from having any

1   definitive law that would preclude the debtor

2   from exploring a strip down plan, so I would

3   rather have the issue of impossibility of

4   confirmation framed at the disclosure hearing.

5           So what I'm going to do, Ms. Redmond,

6   is grant stay relief through judgment.  If you're

7   able to -- well, whether or not you've obtained a

8   judgment by the disclosure hearing, it will be

9   without prejudice to seeking full stay relief.

10          And so when you see their plan, if the

11  bankruptcy lawyers, and Mr. Eckert, and the bond

12  lawyers think that this cannot possibly be

13  confirmed, then -- well, really, we probably

14  won't get past the disclosure hearing anyway, but

15  I would consider final stay relief at that point.

16          I don't think you'll be past or much

17  past your summary judgment hearing at that point,

18  right, if we have a disclosure hearing ---

19          MS. REDMOND:  Your Honor, it should be

20  about the same time.  But, your Honor, if we do get

21  to summary judgment, may we get a sale date and put

22  it on our judgment before we come back so that we

23  don't have another hearing to go back into

24  State Court to set a date?

25          MS. MORA:  Judge, that's not normally how

1   it's done.  Normally the State Court will enter a

2   foreclosure judgment that says we'll set a sale date

3   when we're allowed to do so by the Bankruptcy Court.

4            THE COURT:  If we did it in steps and you

5   had to go back, you could get a hearing fairly

6   quickly just to set a sale, can't you?

7            MS. REDMOND:  Your Honor, not necessarily.

8   You know, I can't predict what the State Court does,

9   it's a little bit better than it was a couple years

10  ago, but, you know, sometimes it does take a long

11  time.  Sometimes calendars get cancelled and things

12  like that, and if it's a contested calendar, it takes

13  much longer.

14           MS. MORA:  And, Judge ---

15           MR. HUDSON:  Judge, I'm actually doing a

16  few of these right now, and that is the way it's

17  done.  Your standard final summary judgment of

18  foreclosure, just on the foreclosure count, contains

19  a sale date in it.  So what happens is the Judge has

20  sale dates, you put it in -- you fill in the blank at

21  the hearing and you have a sale.

22           Now, we're not suggesting we go to

23  sale, we're just suggesting we don't want to have

24  to republish and do all of those things again,

25  Judge, go back into State Court, get another sale

1    date and waste another 60 or 90 days.

2         MS. MORA:  Judge, I'm involved in another

3    case where I happen to be representing the secured

4    creditor.  We were given stay relief by Judge Cristol

5    to go to foreclosure judgment, but not sale.  The

6    State Court was able to enter foreclosure judgment

7    and just reserve jurisdiction on entering a sale date

8    when that occurred.

9         The real concern we have, and I think

10   you'll hear Mr. Eller speak to this, is that

11   there is a real difficulty in slowing down the

12   machine of the state system once the foreclosure

13   sale is set.

14        So we'd ask the Court, if you're just

15   granting relief through foreclosure judgment,

16   that that's all the foreclosure judgment provide

17   for, and that the Court simply be directed to

18   reserve judgment for setting the sale, otherwise,

19   you've got real difficulties and expenses on the

20   part of the estate in having to move to enjoin

21   that.

22        You've already heard The District talk

23   about the fact that, oh, well, they could get a

24   foreclosure judgment maybe entered in another

25   60 -- 30 to 60 days, which means before we'll get

1    to confirmation in this case in February, we're

2    going to have to be trying to stop a sale.

3    That's more expense for the estate, and in

4    addition, there's real problems, you'll hear

5    Mr. Eller describe, in trying to slow down a sale

6    that's already been noticed.

7                Mr. Eller.

8                MR. ELLER:  Your Honor, I have either

9    what you may call the pleasure or displeasure of

10   having about 20 pending cases in commercial

11   foreclosures in the Miami-Dade Circuit Court.

12   There is an ongoing policy or procedure to deny

13   motions to continue foreclosure sales, for

14   whatever reason.  Once the Court in Miami-Dade

15   has set that foreclosure sale date, there is an

16   unwritten policy that that date go forward

17   regardless.

18                So what you're going to be involved in

19   is a situation where the parties need to appear

20   before this Court and obtain an emergency order,

21   and then go before the Miami-Dade Circuit Court

22   on an emergency motion, which these emergency

23   motions are not commonly granted, in order to

24   stop a sale.

25                So as Ms. Mora explains, the machine

1  does get in process and there is a policy, as we

2  have seen, not to allow foreclosure sales to be

3  continued.

4          So if there is a foreclosure sale set,

5  I am concerned that there is going to be, for

6  lack of a better term, a Chinese fire drill for

7  all of the parties in two separate courts in

8  order to stop that, and we would prefer that this

9  Court maintain control over that in the context

10  of the different proceedings that are before this

11  Court.

12          MS. REDMOND:  Your Honor, just to be clear,

13  we're asking to put a sale date in the foreclosure

14  judgment, not to go forward.

15          If the State Court was going forward

16  and refused to cancel a sale, we're governed by

17  this Court and this Court's orders, and I promise

18  this Court that we would be cancelling the sale

19  ourselves if the sale were to take place in

20  violation of this Court's order.

21          All we're asking is for something that

22  will expedite, rather than slow down the process.

23  I understand the debtor wants this process to go

24  as slowly as possible, so it can have whatever

25  bites at the apple it gets with respect to

1   confirmation before we can go forward, but each

2   time we have to go back to court, there's more

3   expense.

4            As I told your Honor before, since 2008

5   there's $13.1 million of interest and other

6   expenses that haven't been paid with respect to

7   this property.  So each hearing causes another

8   delay and another set of expense, and your Honor

9   can look around the room, and commented earlier,

10  the expense of the lawyers in this room in

11  connection with this hearing.

12           So we would ask, your Honor, if we put

13  the date in, we will not go forward, it's not the

14  intent to go forward with the sale, it's just the

15  intent to avoid a second hearing.

16           THE COURT:  Okay.

17           MS. MORA:  Judge, with respect, I don't

18  think there's going to be a second hearing.  If we're

19  not successful at the disclosure statement hearing,

20  if we're not successful at the confirmation hearing,

21  The District will have the right to seek stay relief

22  at that point, they're not going to have to have

23  another hearing.

24           THE COURT:  I'm going to rule on stay

25  relief without further argument, and then we'll get

1    to the financing motion.

2            On the motion for stay relief filed by

3    the Doral Community Development District, Docket

4    Entry 35, the Court has reviewed the motion, the

5    exhibits, and in response, Docket Entry 52, this

6    was preliminarily argued at the November 22nd

7    hearing, and further argument today.

8            As I suggested at the last hearing,

9    this case, like many, essentially single asset

10   real estate cases, often lead to a court order,

11   which I call parallel tracks, where the

12   foreclosure proceeding can move forward while the

13   debtor attempts to reorganize.

14           In many instances, the bankruptcies are

15   filed on the eve of the foreclosure sale, so if

16   there's going to be parallel tracks, it has to by

17   definition be allowing the setting of a sale, and

18   I usually set a not before date to give the

19   debtor a chance to file a plan and get to a

20   disclosure hearing, and then reserve jurisdiction

21   to enjoin the sale for cause, and cause is

22   typically defined in these orders I've entered in

23   the past as putting on a prima facie case for

24   confirmation at the disclosure hearing.

25           This case is in a little bit different

1    posture.  First of all, while the debtor is

2    attempting to move forward very quickly, the size

3    of the case and the issues we may confront, argue

4    against allowing a sale date to be established

5    and then going through the time and expense,

6    perhaps, when we might be in between amendments

7    or with legal issues still subject to resolution,

8    having to consider cause for enjoining the sale.

9            In addition, this is a case where we're

10   not yet at judgment, and we may very well get to

11   disclosure hearing before or right around the

12   time that The District, if it prevails at summary

13   judgment, obtains a judgment.

14           So in this instance, having considered

15   the record and the dynamics of this case, and

16   also in consideration of the fact that as part of

17   the financing order I'm going to require, whether

18   you want to call it adequate protection or just

19   the debtor fulfilling its administrative

20   obligations, I am going to require that funds be

21   used to maintain the property.

22           So in the aggregate, the Court finds

23   that in this instance, certainly there's a lack

24   of equity on the issue of whether the property is

25   necessary for reorganization, Ms. Redmond pointed

1  out under Supreme Court precedent, I think
2  Timbers, that's generally interpreted to mean the
3  likelihood of a reorganization within a
4  reasonable period of time, the Court can't
5  determine that yet, until the plan and disclosure
6  statement are filed, so what I'm going to do is
7  grant stay relief through judgment, and assuming
8  The District is willing to waive any 362(e)
9  timeliness issue, have this be a second
10  preliminary hearing, and set a final hearing
11  without you having to refile a motion, but set a
12  final hearing at disclosure to consider full stay
13  relief.
14          So that will put you in a position
15  where, yes, you'll need a further order to set a
16  sale, but you won't have to file a separate
17  motion.  I mean, you're probably going to be
18  filing an objection to disclosure, arguing why
19  you think the plan is unconfirmable if you're
20  going to show cause to set the sale, but -- so we
21  can, essentially, I guess, once disclosure
22  hearing is set, you can just notice a further
23  hearing.
24          We'll figure out the procedure, but
25  that will be the contemplation, a further hearing

Page 58

1    to consider full stay relief at the disclosure

2    hearing.

3            MS. REDMOND:  And, your Honor, we will

4    waive the 362(e) requirements.

5            THE COURT:  Okay.  All right.

6            So I think just to save some back and

7    forth, we'll do the order on that.  We'll let you

8    spend your time negotiating lawn mower services

9    and the like.  We'll grub through the order.

10            Okay.  So let's now turn to the motion

11    to approve credit.  The Court's general concept

12    here would be to allow the financing provided we

13    put in some language that includes an obligation

14    for funds to be used for maintenance and

15    preservation of the property.

16            With that initial comment, let me hear

17    objections.  I don't know if the other parties in

18    interest were up late last night or up early this

19    morning looking at the red line.

20            MR. HUDSON:  Judge, I have not had a chance

21    to see it.  I would like to have the rest of the day

22    or tomorrow morning to look at it.

23            THE COURT:  I'm not sure what that's going

24    to do because I don't really want to have lengthy

25    e-mails with objections over this provision or other

1   provisions.  I guess we can take a break and let

2   parties have a chance to review it, but from what's

3   already within the knowledge of the other parties in

4   interest, are there any objections to be argued

5   before we, perhaps, take a little break to have the

6   language reviewed?

7           MR. ELLER:  No objections from our end,

8   your Honor.

9           MS. REDMOND:  Your Honor, The District

10  continues to object to the priority being afforded to

11  Terra's professionals.  The issues that were

12  mentioned on the record at the last hearing, your

13  Honor, there's a hundred thousand dollars of

14  attorney's fees and professional fees for people who

15  are working for Terra, and as your Honor has seen,

16  this is Terra's offer to buy or to acquire a hundred

17  percent interest in this property.  They are a loan

18  to own, they're advancing solely for attorney's fees.

19          They are not advancing for keeping an

20  operation in place because there's no operation,

21  there hasn't been an operation here since 2008,

22  and I think it's inappropriate to elevate and to

23  pay from a D.I.P. facility, which is on a super

24  priority administrative basis, ahead of any loss

25  of adequate protection claim, the fees of buyer's

Page 60

1    counsel.

2              THE COURT:  Okay.  Well, before Mr. Guso

3    responds, Ms. Thornton, and I would be interested in

4    Mr. Schneiderman's comments.

5              MS. THORNTON:  Your Honor, this is a little

6    bit out of order, but I figured I would mention this

7    now because I wanted to mention this today before we

8    went further, so that the parties, as they put

9    together their plans for the disclosure statement,

10   can remember that there's almost $2 million in

11   ad valorem taxes, including tax certificates that are

12   owed that need to be considered as they are a first

13   priority lien.

14             Obviously, we're going to have an issue

15   that we'll work out with the Community

16   Development District or that we'll need to argue

17   with them about the priorities, but I would hate

18   to see an analogy be made between the assessments

19   of The District and tax certificates.

20             When your Honor mentioned the prior

21   case law that had allowed the Bankruptcy Court to

22   change the terms of tax certificates, I would

23   suggest that the analogy is especially

24   inappropriate since the change to the Bankruptcy

25   Code, because a lot of the case law that allowed

1    those changes to be made specifically to interest

2    rates that were bid and, of course, the concern

3    had been that if certificate holders knew that

4    their interest rates could be changed, that that

5    might chill bidding.

6            The Bankruptcy Code changed the ability

7    of the Bankruptcy Court to affect the interest

8    rates on ad valorem taxes and tax certificates in

9    Section 511.  So, again, our position would be

10   these assessments are not equivalent to tax

11   certificates or ad valorem taxes.

12           I don't know that we have to deal with

13   that issue today, but I figured since it's coming

14   up and everyone is talking about it and

15   anticipating that the disclosure statement would

16   be the venue for discussing many of these, I

17   figured I would bring it to your attention today

18   because that's an issue for the tax collector.

19           THE COURT:  Aren't many certificates at

20   below market, so does that mean the debtor can just

21   pay, if it's a half percent bid on a tax certificate,

22   they're fortunately stuck with that now under 511?

23           MS. THORNTON:  The statutory interest rate

24   would include on tax certificates what the bid rate

25   is, and the bid rate, depending on the economy, will

1    often be well below the statutory rate for delinquent

2    ad valorem taxes, but that still comes within the

3    rubric of statutory interest rate, so that's

4    consistent with the Code.

5            THE COURT:  After the two years, though,

6    the statutory rate is what?

7            MS. THORNTON:  It's whatever was bid.  It's

8    not going to change ---

9            THE COURT:  But after -- the certificate

10   holder under state law has the right to seek a tax

11   sale --

12           MS. THORNTON:  Right.

13           THE COURT:  -- after the two years, doesn't

14   it -- whatever the bid rate, doesn't it kick into

15   some other rate under the statute?

16           MS. THORNTON:  Well, it's -- I've got to go

17   look at the statute again.  At some point if there

18   isn't a tax deed application that's filed, it will go

19   on the list of liens and revert to the delinquent

20   rate.

21           THE COURT:  Okay.

22           MS. THORNTON:  But even state law

23   acknowledges, for instance, that the payment term can

24   be extended by the Bankruptcy Court, but I think some

25   of the case law really dealt with whether the

1    interest rate could be changed.

2              THE COURT:  Out of the two million in

3    ad valorem, how much is held by certificate holders?

4              MS. THORNTON:  About a million five, your

5    Honor, because there's a couple of years.

6              THE COURT:  Years ago, and I think you

7    worked with the Court in coming up with the

8    procedures, in 13s we came up with a procedure to

9    make sure certificate holders got notice, I think it

10   required the county to provide the names.  Have you

11   done that in this case --

12             MS. THORNTON:  Yes, we have, your Honor.

13             THE COURT:  -- so the debtor knows who they

14   are?

15             MS. THORNTON:  Yes, we have.

16             MS. MORA:  We listed the tax certificate

17   holders as creditors in the case.

18             THE COURT:  Okay.  All right.  So you're

19   prepared in the plan to deal with those certificate

20   holders as permitted under the Code subject to -- as

21   permitted in the confirmation provisions for tax

22   claims, but subject to 511 --

23             MS. MORA:  Yes, Judge.

24             THE COURT:  -- limitations?

25             MS. THORNTON:  And as your Honor knows, I

1  don't represent the certificate holders, but the

2  county certainly has an interest in what we consider

3  to be the integrity and the predictability of the

4  certificate sale system.

5            THE COURT:  But am I right, most of the

6  certificates now get bid at a pretty low interest

7  rate?

8            MS. THORNTON:  I'm sorry, your Honor?

9            THE COURT:  Most tax certificates are bid

10  at a pretty low interest rate?

11            MS. THORNTON:  Right now they have been.

12  Again, it just depends on what's going on in the

13  economy.  Often if there's no bidder, then it's the

14  18 percent delinquent interest, so it changes from

15  certificate to certificate.

16            THE COURT:  Okay.  All right.  So I think

17  the debtor and plan proponent are on notice of that

18  and it will be accounted for in their plan.

19            Mr. Schneiderman.

20            MR. SCHNEIDERMAN:  Yes, your Honor.  Thank

21  you.

22            I think if the debtor were to agree

23  that if their plan doesn't go forward, or perhaps

24  the lender agrees if the plan doesn't go forward,

25  that the protections provided under the proposed

1    lending promissory note go away, they are coming

2    in here to buy the property or take over the

3    property, your Honor.  There's a lock up

4    provision that the debtor can't shop it.  It's

5    $750,000, all to pay for professional fees or

6    management fees, and at a 14 percent interest

7    rate.

8            It seems very unusual for the debtor to

9    borrow money at the risk of the unsecured

10   creditors or creditors of the estate, that if it

11   were to fail, the beneficiaries of the loan are

12   the professionals.

13           The buyer is coming in here to take

14   over, let them propose their plan.  If they want

15   to fund these advances -- and included it in the

16   definition, by the way, of what the use of the

17   D.I.P. loan will be, are the retainers that were

18   already paid to Ms. Mora's firm.

19           It just seems that the idea here is a

20   little bit stretching what I believe the proper

21   use for a D.I.P. financing will be.  That is, as

22   your Honor had in a recent case where we had some

23   single asset real estate matters, because the

24   property needed to get proper permits,

25   construction had to be completed, work had to be

1  done on the property to prepare it for a sale in

2  order to maximize the value.

3         Here there's no money being used for

4  the betterment of the property, it's to prepare

5  the plan and disclosure statement so that the

6  proposed plan proponent or co-proponent can take

7  over the property, avoiding a foreclosure sale,

8  coming in using the bankruptcy process really as

9  a way to get the property without having to

10 compete or bid at the foreclosure sale with

11 anyone else who is interested in this property,

12 and I don't know if there is anyone interested,

13 but the debtor is not going to be shopping it,

14 it's going to be up to Mr. Moses and the

15 committee to go out and look to see if there's

16 any other additional interest.

17        It just doesn't seem to be the right

18 use of D.I.P. financing, your Honor, and I would

19 agree with Ms. Redmond's comment with respect to

20 the line item for the plan proponent or the

21 co-proponent's legal fees, which I think

22 highlights what I've been trying to say as far as

23 it's a very unusual source or use of D.I.P.

24 financing.

25        I would object to it, your Honor.

Page 67

1          THE COURT:  Anyone else?

2          MS. MORA:  Judge, let me just make one

3    comment before Mr. Guso comes up to address the

4    Court, and that is, the reason the debtor is here is

5    because from the debtor's perspective, the claims of

6    the unsecured creditors in the case, including

7    Mr. Eller's client, were going to get wiped out with

8    a foreclosure sale.

9          So from the debtor's perspective and

10   the fiduciary duty that the debtor has to all of

11   its creditors, the point of this Chapter 11 is to

12   get something to them.

13         If by proposing a plan, and the

14   committee is able to find someone else to step up

15   to the plate that will ultimately enable a plan

16   to get confirmed in this case with a plan

17   proponent other than Terra, then there really

18   ought to be some compensation being provided to

19   Terra.  If the plan doesn't get confirmed, Judge,

20   then there's no money to pay Terra.

21         So just from a practical perspective, I

22   don't understand what the concern is about the

23   protections that Terra is asking for.  If we can

24   get a plan confirmed, they're entitled to get

25   paid, although it will be their own funds paying

1   them.  If some other buyer comes into the case,

2   and as a result of the committee's efforts tries

3   to put forward a plan proposed maybe in part by

4   the committee, then -- or comes in and tries to

5   bid on equity in some way, then the beneficiaries

6   of that ultimately would be unsecured creditors,

7   but Terra ought to be compensated for the

8   payments they made to get us to that point.

9        And if ultimately we get to a point

10   where a plan can't go forward, then there's no

11   money to reimburse Terra anyway, and I don't see

12   what impact, therefore, those protections are

13   going to have against the estate.

14        THE COURT:  Before Mr. Guso speaks,

15   although you can start heading up, I certainly

16   understood the argument that Mr. Guso made at the

17   last hearing, which you've just echoed, that if

18   there's another bidder that comes in and money comes

19   into the estate, then the super priority financing,

20   to the extent it's reimbursing Terra, I don't think

21   Mr. Guso phrased it this way, but in concept it's

22   somewhat like a break-up fee, but we're not doing a

23   sale with bid procedures, and I don't have a problem

24   with that.

25        I guess the issue, though, is to simply

1   assume without additional due diligence that

2   there's no avoidance actions here.

3            So I guess my concern, and it goes to

4   Mr. Schneiderman's point, what happens if there's

5   no confirmation, the plan doesn't work, the case

6   is converted, and it turns out that some of the

7   millions of dollars that were spent here are

8   avoidable and money comes into the estate, should

9   Terra have a super priority claim for its own

10  attorney's fees in promoting an unsuccessful plan

11  that has priority over other administrative

12  creditors?  I guess that would be the concern.

13           I mean, I know you don't think there's

14  anything there, and I have no reason to doubt

15  that, other -- but simply to recall that you

16  acknowledged there's been no financial review of

17  exactly where all the money went.

18           MS. MORA:  Judge, the only thing I can

19  suggest in light of the fact that you're right, that

20  none of us know at this point, is to perhaps suggest

21  that in that one scenario, their super priority

22  administrative claim would not attach to proceeds of

23  avoidance actions.

24           THE COURT:  That would end the discussion

25  quickly if you'd just say yes.

1          MR. GUSO:  Your Honor, may I consult with

2    my client for one moment?

3          Just one question, though.  Your Honor

4    is concerned about our client's super priority

5    administrative expense claim coming ahead of

6    other administrative claims.  I'm unaware of any

7    other administrative claims, your Honor, and I

8    would dispute Ms. Redmond's entitlement to a

9    507(b) super priority administrative expense

10   claim on account of her client.

11         The secured creditor is entitled to

12   adequate protection or stay relief, but not both.

13   The District selected to seek stay relief, that

14   is her remedy.  She's not requested, nor has the

15   debtor offered, adequate protection.  So under no

16   circumstances, from my perspective, would the

17   District be entitled to a 507(b) super priority

18   administrative expense claim.

19         That brings it square to the attention

20   of the committee.  The committee negotiated

21   through its counsel the terms that are in this

22   order and the budget, including a limitation or

23   carve out from the limited lock up provisions.

24   They're on board.

25         So, your Honor, in a circumstance where

1    Terra has not requested a break-up fee, has not

2    requested collateral security for its advances,

3    and has requested what is usual and customary,

4    from my perspective, reimbursement of its

5    expenses, and agreed to cap those at a hundred

6    thousand dollars, I think the proposal that is

7    before the Court, your Honor, is imminently

8    reasonable and straight down the middle of the

9    fairway, but with that said, let me consult with

10   my client for one moment.

11           THE COURT:  Well, to put a little finer

12   point, you would still have, in my concept of what

13   was just suggested about avoidance actions, the super

14   priority wouldn't attach to the avoidance action, but

15   any unpaid amounts would still be an administrative

16   expense.

17           MR. GUSO:  Yes, sir, I understand.

18           THE COURT:  It's to take away the

19   priority -- and I don't have any comment at this

20   point that the -- there would be a 507(b) claim for

21   adequate protection, but if there is no agreement,

22   and The District, as it may have the right to do,

23   advances monies postpetition for preservation or

24   maintenance costs, I do think they would have an

25   administrative expense claim.

Page 72

1              All right.  So with that you want

2    to ---

3              MR. GUSO:  Yes, sir.  May I have a moment?

4              THE COURT:  Yes.  If you need more than a

5    moment, I was going to give the other parties in

6    interest a little bit of time to review the language

7    in the order, but perhaps if there's a short

8    answer -- I don't want to take more time and

9    uncertainty if the answer is yes.  If it's no, then

10   let's take more time.

11             MR. GUSO:  I can't remember the Court's

12   question, so I don't know whether to answer no or

13   yes, but the answer is, we will agree, your Honor,

14   that the super priority administrative expense claim

15   would not attach to or be payable from avoidance

16   action proceeds, but we would have an administrative

17   expense claim --

18             THE COURT:  Right.

19             MR. GUSO:  -- with financing.

20             THE COURT:  Yeah, so that would comport

21   with the Court's view that you're entitled to have

22   your expenses reimbursed, whether you want to call it

23   something equivalent to a break-up fee or not, we

24   don't have to specifically tie it to that, but in

25   concept, I have no problem with a super priority

1  administrative expense allowing for reimbursement of

2  everything you're putting forward, including your own

3  fees if there's another buyer and money comes into

4  the estate because of a sale or a plan.

5          If the case, however, is converted the

6  unpaid amounts would be administrative, but not

7  super priority as to proceeds of avoidance

8  actions.

9          MR. GUSO:  Yes, sir.

10         MR. SCHNEIDERMAN:  Just quickly, the note

11 provides for a 14 percent interest rate.  I don't

12 know if your Honor was approving that, too.  Other

13 administrative expenses don't have interest rates.

14         THE COURT:  I think that's the terms of the

15 loan, and I think the debtor, unless somebody wants

16 to request more, the debtor has essentially proffered

17 that there's no other available money out there at a

18 better rate.

19         I mean, there may -- it may have just

20 been a statement, I don't remember whether you

21 had affidavits or proffered testimony on that,

22 but nobody else out there that we've seen,

23 anyway.  So you can address that, but as to the

24 objection to the D.I.P. loan including

25 reimbursement of Terra's professionals, that

1    objection will be overruled subject to the terms

2    just --

3              MR. GUSO:  Yes, sir.

4              THE COURT:  -- announced.

5              So, Mr. Hudson, are you finished

6    reading yet or do you still want a break?

7              MR. HUDSON:  I'm close, Judge.

8              THE COURT:  All right.  Any other comments

9    on the financing?  If not, we'll perhaps take a

10   break, perhaps we'll be there without a break, the

11   last item is the procedures for professional fees.

12             I guess my question, Ms. Mora, I'm

13   looking at what was filed on Friday, and I guess

14   my question is:  Does this pretty much track the

15   procedures we have in our local rules?

16             MS. MORA:  Judge, I believe it does.  What

17   it contemplates is that professionals are going to

18   get their monthly invoices out by the 15th of the

19   month, parties in interest have ten days to file an

20   objection to anything, and if they don't, then

21   professionals can get paid 80 percent of fees and a

22   hundred percent of costs, and then we would true up

23   with a fee application every 120 days.

24             THE COURT:  All right.  So there will be

25   probably a couple of draws, two or three draws, and

Page 75

1  then we would get to the final fee apps at

2  confirmation.

3           MS. MORA:  Correct, Judge.

4           THE COURT:  All right, and then if it

5  crashes, you'll have been paid, and I guess if

6  there's other admins, in theory you might be subject

7  to disgorgement to equalize the distribution to

8  admins, but let's not be negative.

9           MS. MORA:  Right, exactly, Judge.

10           THE COURT:  Okay.  Mr. Schneiderman.

11           MR. SCHNEIDERMAN:  Your Honor, I'll just

12  say what I said in other cases.  Although we have

13  reputable counsel here, big firms, it's a single

14  asset real estate case.  We're now borrowing money,

15  paying 14 percent on that money to pay legal fees, to

16  pay legal fees of the lender of the loan, as well,

17  which I just find very unusual, but I don't see why

18  we need a 30-day invoice.

19           The plan is going to be filed, we're

20  going to have a confirmation hearing, let them

21  file a fee application at the time of the

22  confirmation hearing, which is the traditional

23  way of proceeding in a Chapter 11, which is going

24  to be in three months, your Honor.

25           We're borrowing the money to pay the

1  legal fees.  The draw that's coming down is

2  coming out of that money, I just find it unusual.

3          MS. MORA:  Judge ---

4          THE COURT:  Well, these firms are

5  businesses, they have cash flow issues.

6          MR. SCHNEIDERMAN:  Your Honor ---

7          THE COURT:  Goodwill at the time of the

8  Holidays is important, especially in these tough

9  economic times, to have a little more money to

10  distribute.

11          I mean, I'm only being partially

12  facetious.  I mean, it is a cash flow issue.

13  It's the kind of case, at least in terms of size,

14  maybe not complexity in terms of the number of

15  types of motions and operating 11 issues that we

16  normally face, but it seems like it would fit --

17  or it doesn't fit our local rule, not enough

18  creditors or what?

19          MR. SCHNEIDERMAN:  Your Honor, I don't know

20  how many small firms come before the Court and ask

21  for this same relief and it's denied because it

22  doesn't fit the model, and I have to face this and

23  your Honor has to face it every time small cases are

24  filed by the sole practitioners who ask -- or

25  mid-sized practitioners who ask for this.

Page 77

1          This case doesn't fit the complex case,
2   mega case as was contemplated with the local
3   rules.  Your Honor, I'm just pointing out to your
4   Honor what I have argued before in other cases,
5   and your Honor, and as well as other judges, has
6   agreed with that argument because I remember
7   Mr. Aresty being in front of your Honor asking
8   for this relief, it was either you or Judge
9   Isicoff, and you said, this doesn't fit, and I
10  just don't see why an exception would be made.
11          I understand it's the end of the year
12  and I understand it's a business, I understand
13  cash flow.  I also understand the Code
14  contemplates fee application every 120 days.
15          We're going to be in this case, if the
16  debtor is successful, within 120 days at a
17  confirmation hearing, I think that would be the
18  appropriate time to pay the fees.
19          MS. MORA:  Judge, with all due respect to
20  Mr. Schneiderman, who I'm sure enjoys getting paid on
21  a regular basis by the federal government, the Court
22  is right, this case is going to end up using a great
23  amount of legal resources of my firm, particularly on
24  the accelerated schedule that we're contemplating
25  here.

1           There are significant issues, there are

2     complicated issues, the Court has already heard

3     discussion this morning about sovereign immunity,

4     constitutional issues, tax issues, all of which

5     need to be addressed in a very compressed time

6     frame, and we would respectfully request the

7     Court approve the monthly interim compensation.

8           I would also point out to the Court

9     that this is a different situation that perhaps

10    what the Court hears in other situations.  These

11    are not funds in the bankruptcy estate that would

12    otherwise be available for distribution to

13    creditors.  These are funds that are being

14    advanced by Terra Landmark as a

15    debtor-in-possession loan on an unsecured basis

16    without any collateral, and it's not funds that

17    would otherwise be available for distributions to

18    creditors.

19           I think that's enough to differentiate

20    the situation, Judge.

21           MR. SCHNEIDERMAN:  For the record, your

22    Honor, government -- federal government employees

23    haven't gotten a raise in two years, and it's been

24    reported that the proposal in the House right now

25    will extend that through 2015, so I think Ms. Mora

1    shouldn't make that argument any longer.

2            MS. REDMOND:  Your Honor, one last comment,

3    and that is that retainers have been paid to the

4    professionals in the case, and in addition to that,

5    each of the professionals has their fees -- except

6    for the creditors' committee and the United States

7    Trustee, each of the creditors has their fees

8    guaranteed by Terra before coming to this Court.

9            THE COURT:  All right.  Under Local Rule

10   2016-1(B)(3), the Court -- actually Subsection (b),

11   the Court is going to authorize and grant the motion.

12   That section provides that in larger Chapter 11

13   cases, the Court may consider approval of a procedure

14   for monthly payment of interim fee applications, and

15   provided that the order that you uploaded is

16   consistent with, maybe not word for word, of the

17   local form order, then I'll grant the motion.

18            So that takes us ---

19            MR. HUTTON:  If I may just briefly, since

20   the Court has indicated it is going to approve the

21   interim payment to professionals, one thing I would

22   point out, there is in the motion identified a

23   universe of noticed parties, neither the indenture

24   trustee, nor the bondholder, BTI, is included within

25   that universe, and would simply request that we be

1   included.

2          THE COURT:  Okay.  That's easily done.

3          MS. MORA:  I have no problem giving notice

4   to Mr. Hutton and Mr. Hudson.

5          THE COURT:  Okay.  So Mr. Hudson, do you or

6   anybody else want a few more minutes to look at the

7   nuts and bolts of the financing order?

8          MR. HUDSON:  It's pretty straightforward.

9   The only question I have is there is a section that

10  deals with the bank accounts that the money goes

11  into, and apparently there's a security interest

12  that's referenced, it's new language.  I think we

13  need an explanation with respect to that.

14         THE COURT:  Where's that?

15         MS. MORA:  Judge, what the order

16  contemplates is that the funds that are advanced by

17  Terra are going into a bank account and that Terra

18  will be deemed to have a security interest in that

19  bank account.

20         That just means that if there are funds

21  advanced at the end of this, Judge, and the Court

22  ends up pulling the plug, that Terra will have a

23  first claim to those monies back, that they

24  aren't otherwise funds that are going to be

25  distributed to other creditors in the case.

1          I think that's only fair, Judge, it's

2     the D.I.P. financing they're providing, that's

3     all that it is.

4          THE COURT:  So instead of them just

5     disbursing, at the time of each expenditure there

6     will be an account that will technically be a D.I.P.

7     account, but may have -- may have undisbursed funds?

8          MS. MORA:  That's correct, Judge.

9          MR. HUDSON:  It's on Page 11, Judge, and we

10    wanted an explanation because it's inconsistent with

11    the general theme that it's unsecured at this point.

12    So there shouldn't really be any money.  If they're

13    advancing money, it should be used consistent with

14    the budget, they should be paying it.

15          THE COURT:  Right, but I think for

16    administrative convenience, there may be more money

17    at any point in time in the D.I.P. account than --

18          MR. HUDSON:  I understand.

19          THE COURT:  -- ultimately gets spent.

20          MR. HUDSON:  I understand, Judge.  I just

21    wanted an explanation because it was a new term

22    that ---

23          THE COURT:  I mean, instead of a security

24    interest, it could just say if the facility is

25    terminated, they get back whatever hasn't been spent,

Page 82

1    but ---

2            MR. HUDSON:  As long as there is a credit,

3    as well, to the estate.  I would agree with that,

4    Judge.

5            THE COURT:  What do you mean?

6            MR. HUDSON:  I would agree with that.

7            THE COURT:  Okay.  All right.  I don't

8    think this is an issue.

9            MR. HUDSON:  Right.  Thank you.

10           MR. SCHNEIDERMAN:  One last comment, your

11   Honor, with respect to the retainer issue, just for

12   clarification purposes.

13           On page -- top of Page 11, it says that

14   the money will be used, including the amount of

15   retainers.  I'm just wondering if the amount of

16   retainers that were paid prepetition are included

17   in the $750,000, and the guaranty that I think

18   Ms. Redmond or somebody mentioned, that Terra has

19   guaranteed the payment of the debtor's

20   professionals.

21           THE COURT:  I don't know the answer.  Do

22   you understand the question?

23           MS. MORA:  I do understand the question,

24   Judge, and I believe that we did include retainers in

25   computing these amounts.

1          THE COURT:  So the amounts previously

2     advanced would, in effect, be now credited towards

3     this -- towards this loan or ---

4          MS. MORA:  Would be considered an advance

5     under the facility, correct.

6          THE COURT:  Okay.

7          MR. SCHNEIDERMAN:  So the $750,000 that's

8     being loaned includes the prepetition retainer, I

9     forgot how much that was.

10         THE COURT:  But the 436 that you said was

11    budgeted for professional fees, also includes those

12    retainers?

13         MS. MORA:  That's correct, Judge.

14         THE COURT:  Okay.

15         MS. MORA:  The numbers on the budget

16    include the pretrial retainers.

17         THE COURT:  Okay.

18         MS. REDMOND:  Your Honor, just one last

19    comment.  The legal fees and expenses paid to Terra

20    right now are determined to be reasonable in Terra's

21    sole discretion.  Your Honor, if it is akin to a

22    break-up fee or expense reimbursement, it would

23    normally be subject to a reasonableness determination

24    by the Court and we would ask that the D.I.P. order

25    contain a provision that the fees and expenses paid

1   to Terra should be subject to Bankruptcy Court

2   approval, as well.

3           THE COURT:  I'm going to overrule that with

4   the cap that's been placed on it.

5           All right.  So on the motion to obtain

6   credit pursuant to Section 105(a) and 364(c) of

7   the Bankruptcy Code, in addition to the motion to

8   approve plan term sheet and reimbursement of

9   expenses, Court Paper 45, the Court has

10  considered the motion and attachments, the

11  objection, which was at Docket Entry 54, joined

12  in by other parties, and the modified form of

13  order, which no longer includes approval of the

14  term sheet separate from provisions that are in

15  the financing, itself, and subject to certain

16  changes that have been discussed and will be

17  placed on the record, the Court is going to

18  approve the financing as necessary, and in the

19  best interest of the debtor in its efforts to

20  propose a plan that may provide distributions to

21  creditors, other than the first lien holder, and

22  does not appear to be unbalanced with the changes

23  that have been made.

24          That is to say, the Court finds the

25  super priority provisions acceptable, even with

1    respect to funds advanced for professional fees

2    to Terra in the event that there is a sale

3    through bankruptcy or a plan by a competing

4    bidder that brings money into the estate.

5             Terra, and this needs to be put into

6    the order, has agreed that its super priority

7    lien would not attach to the recovery of

8    avoidance actions, but rather, to the extent of

9    those funds, would be a 503 administrative claim

10   on equal footing with other, if any, unpaid

11   administrative claims.

12            And then the other provision, which

13   I'll come back to, which we discussed earlier,

14   would be to revise the -- let's see where it was.

15   Where was that language that you had about

16   amendments, that was on Page 6?

17            MR. HUTTON:  That was on Pages 6 and 21,

18   your Honor.

19            THE COURT:  Okay.  All right.  So without

20   taking the time to specifically draft it, the concept

21   that I would require you to put in in place of those

22   provisions, would be to authorize and direct the

23   debtor to use available funds from the facility to

24   maintain and preserve the property, and to cooperate

25   with The District in determining what those

1  expenditures and amounts should be; and more

2  specifically, to provide for The District, and you

3  can discuss whether they can do it now or if they

4  need -- how much time they need, but for The District

5  to request reimbursement for any postpetition amounts

6  that have already been expended or to pay invoices

7  for services that have been rendered postpetition,

8  and to further advise the debtor of what The District

9  believes are the necessary expenditures, both

10  qualitatively and quantitatively; for the debtor

11  then, within the general authority and requirement

12  that I'm requiring you to put in here, will either --

13  will just hopefully pay some agreed upon amount at

14  this point without the need for a further order to

15  reimburse The District for any expenses already paid,

16  or to reach agreement with The District on ongoing

17  expenses, then putting in a provision for the Court

18  to resolve any disputes over interpretation of this

19  provision, something close to that.

20          But let's -- I don't really want,

21  unless, Ms. Redmond, you think that what Ms. Mora

22  puts in the order is not close to that, to really

23  be fighting over the language of the order.  My

24  purpose here is to try to get this in place and

25  hope for the best, that in the grand scheme of

1    things with the amounts at issue here and the

2    amounts being spent for professional fees, that

3    there won't be a disproportionate amount of

4    professional time spent arguing over maintenance

5    issues.

6              It doesn't have to be in the order, but

7    in light of what Ms. Redmond said earlier in the

8    hearing, there should be some discussion, too,

9    with access so that if The District is trying to

10   get in there and you need them to open the locks,

11   I'm not sure if they're accusing you of like

12   going out there with lock --

13             MS. REDMOND:  Your Honor, I don't know --

14             THE COURT:  -- cutters.

15             MS. REDMOND:  -- anything about that.  You

16   know, if Ms. Mora would have called me and said there

17   was a problem, I would have investigated it, but I

18   just have no response at this time.

19             MS. MORA:  Well, we'd simply ask, Judge,

20   that ---

21             THE COURT:  It might not have been them, it

22   might have been weed bandits.

23             MS. MORA:  It could have been, Judge.

24             MS. REDMOND:  It could have been people

25   breaking into the property, I don't know what it was,

Page 88

1   I can find out, but again, if I would have known in

2   advance, I would have been prepared to respond today.

3           MS. MORA:  Well, we simply ask that The

4   District respect our ownership of the property and if

5   it's seeking access, to do so with a District

6   representative --

7           THE COURT:  Yeah, okay.

8           MS. MORA:  -- debtor representative.

9           THE COURT:  Well, that should be part of

10  the cooperation over maintenance and preservation

11  costs, cooperation over access to the property.

12          Who's going to be responsible if

13  there's an Occupy Doral movement?

14          MR. SCHNEIDERMAN:  One more clarification,

15  your Honor, and I know I'm striking out today, but on

16  the promissory note.

17          THE COURT:  I don't know if you're keeping

18  score, I think you got significant protection in the

19  event of avoidance actions, if there are any.

20          MR. SCHNEIDERMAN:  Your Honor, my concern

21  over the interest rate issue, if the -- if Terra is

22  allowed an administrative claim, the promissory note

23  provides that the default interest rate after

24  maturity will continue until paid.

25          If this goes through a plan and they're

1    not going to be paid from avoidance actions, but

2    there's other recovery, I don't know what that

3    can be, there should not be an interest rate once

4    it's determined that the debtors' plan is not

5    going forward, the interest rate should go away.

6    It should be whatever the amount of the claim is.

7              You don't pay interest going on -- now

8    I'm not sure if that would apply in a Chapter 7

9    if it got converted, how the claim would go

10   forward, but this promissory note provides for

11   interest accruing until paid in full, and as an

12   administrative claim, I think we need to somehow

13   cap it or put a finite end to when the interest

14   continues to accrue.

15             It goes from 14 up to 18 percent at

16   maturity, which I believe is in April.

17             THE COURT:  But if this gets delayed and

18   somebody else confirms a plan, maybe consensually

19   with some of the other parties in interest, and it

20   gets confirmed next summer, they've negotiated an

21   interest rate on the money they've put out.  Where

22   would we cut it off, and wouldn't cutting it off just

23   be retrading the deal that they made and that's been

24   approved?

25             MR. SCHNEIDERMAN:  Well, you already

1  overruled me on the objection of borrowing money to

2  pay themselves, which I am not going to push that

3  issue any longer, your Honor.

4          I guess the answer comes if the case

5  gets ---

6          THE COURT:  Well, it's sort of themselves.

7  I mean, it's not the same entity.  Terra is putting

8  the money out, but it's going to the attorneys, but

9  they're still out the money.

10          MR. SCHNEIDERMAN:  Your Honor, they came in

11  hand and hand with the attorneys.

12          THE COURT:  All right.  Well, actually

13  we're back peddling to some extent.

14          MR. SCHNEIDERMAN:  I guess in the event the

15  case gets converted, the interest doesn't go forward,

16  so in that event, it may be it's resolved.  If

17  somebody else comes in and confirms a plan, then they

18  get paid.

19          THE COURT:  I mean, as a practical matter

20  here, we're probably not looking at a big battle with

21  other administrative claimants.  I guess the question

22  is, if there's a -- if there's any sizeable avoidance

23  actions down the road, how big is their

24  administrative claim going to be before money reaches

25  other creditors, but I'll overrule that objection and

1    allow the financing to proceed on that basis.

2            Okay.  So I think we're done.  I'm

3    going to do the stay relief order.  Ms. Mora,

4    you'll submit the other two orders --

5            MS. MORA:  Correct.

6            THE COURT:  -- and what's next?  You're

7    going to file -- tell me about the timing on

8    valuation versus disclosure.

9            MS. MORA:  Judge, we're filing the

10   valuation motion on December 13th.  We have ---

11           THE COURT:  You'll have an appraisal that

12   will be referenced in your motion?

13           MS. MORA:  We should have the appraisal by

14   the 15th, Judge.  We can certainly delay filing it

15   until we have the appraisal in hand, but we assumed

16   that we were simply going to exchange our expert's

17   reports with the other parties who were going to

18   respond to that through discovery.

19           THE COURT:  Okay.  It's of no great

20   consequence.  If you file it on the 13th, though,

21   you're going to have to -- are you planning to set

22   out what you think the value is even though you don't

23   have your appraisal yet?

24           MS. MORA:  We're hoping that we'll have a

25   good idea, Judge, even if we don't have the actual

Page 92

1  report.  Yes, we're planning ---

2        THE COURT:  Then maybe a supplement -- I'm

3  not saying you should file the appraisal necessarily,

4  but you can file a supplement -- an amendment if your

5  proposed valuation changes --

6        MS. MORA:  Correct.

7        THE COURT:  -- after you file the motion.

8        MS. MORA:  Correct, Judge.

9        THE COURT:  All right.  So how are you

10  contemplating the determination of value in terms of

11  timing and the disclosure hearing?

12        MS. MORA:  Judge, I would think that it

13  would make sense to have the valuation hearing before

14  the disclosure statement hearing.

15        THE COURT:  You're contemplating ---

16        MS. MORA:  The disclosure statement hearing

17  we have set for on or before January 27th.  So I

18  guess sometime after the 1st of the year to give time

19  for some discovery, maybe around mid January we could

20  try to set a valuation hearing.

21        THE COURT:  Okay.  Mr. Guso, what's your

22  concept there?

23        MR. GUSO:  Your Honor, that's acceptable to

24  Terra, if we could have a valuation hearing before

25  the disclosure statement hearing, and I don't believe

Page 93

1    that the filing of the motion should be delayed

2    pending receipt of the appraisal.  I think Ms. Mora

3    is right, Judge, we'll have a pretty clear indication

4    of where values go by the 13th.

5            THE COURT:  Have you thought through, or

6    the other parties, the timing issues here?  I mean, I

7    could do something like disclosure maybe on

8    January 25th and the valuation hearing on the 18th,

9    but then you get into objection deadlines for the

10   disclosure, and whether those are going to kick in

11   before there might be a ruling on valuation or maybe

12   it's not going to affect it.

13           I mean, the valuation hearing is

14   certainly going to result in some number less

15   than the first debt, right, I mean everybody

16   agrees with that?

17           MS. MORA:  I think that's what everyone

18   expects, Judge.

19           THE COURT:  Okay.  So the legal objections

20   to the plan may not turn on the specific number, is

21   that a fair statement?

22           MR. HUDSON:  Judge, I'm not going to take a

23   position on value today, but we're not conceding at

24   this point, that the value may not be -- depends what

25   number you want to use for the first debt.  Let's use

1    $71 million for the moment.  We're not going to

2    concede that.  It may not get there.

3            THE COURT:  Okay.  Which parties, if you

4    know now, are going to present competing evidence?

5            MS. REDMOND:  Your Honor, we will.

6            THE COURT:  Okay.  So what's your sense,

7    then, of timing?  I'm trying to get it resolved a

8    little -- with a little more time between valuation

9    and disclosure, but not crunch it so much that you

10   can't prepare for the hearing.

11           MS. REDMOND:  Your Honor, it's hard to say.

12   We have an expert that we've retained and we need to

13   talk to the expert in order to really get a good

14   sense on timing.

15           THE COURT:  Okay.  All right.  So let's

16   maybe think about, as a target date, although not fix

17   it yet, January 18th for valuation and the 25th for

18   disclosure, although, maybe we can push -- no, I

19   guess that's about right, that's the week you're

20   targeting for disclosure; right?

21           MS. MORA:  That's correct, Judge.

22           THE COURT:  When you file your plan, is

23   that going to require shortening time or maybe not,

24   probably not?

25           MS. MORA:  Should be okay, Judge, for the

1   disclosure statement hearing and -- should be okay

2   for both dates.

3               THE COURT:  Okay.  All right.  When you

4   file the motion to value, advise somebody in Chambers

5   by e-mail, probably Corinne, and we'll probably do a

6   scheduling order to get that set so that there's some

7   deadline for exchanging appraisals, although, you and

8   Ms. Redmond can talk about that and suggest a

9   scheduling order at the time you file it, but

10  otherwise we'll do it.

11              But we're contemplating ten o'clock on

12  the motion to value on the 18th, and let's say --

13  I think we'll start a little earlier, 9:30 for --

14  no, let's make it 10:00.  I may suggest that the

15  parties get here earlier and kick around some of

16  the -- some of the issues, but ten o'clock for

17  the disclosure hearing on the 25th, and I'll

18  probably keep those days clear.

19              MS. MORA:  Thank you, Judge.

20              THE COURT:  All right.  Anything else?

21              MS. REDMOND:  Your Honor, the only other

22  thing, you know, what we have really here is Terra

23  and an attempt to acquire this property through a

24  bankruptcy process, and it may be helpful in the

25  process to have a termination of exclusivity such

1   that anybody who wishes to file a plan, because this

2   is really a play for the property in this case, so

3   that multiple plans or at least one or two plans can

4   go forward at the same time, so that at the time that

5   your Honor has this before you, you know what the

6   proposals are to each of the creditors.

7            THE COURT:  You have to do that by motion.

8   The only thing ---

9            MS. REDMOND:  Your Honor, can you hear that

10  on an expedited basis?

11           THE COURT:  Depends how compelling the

12  motion seems.  You know, if we were talking about a

13  new value plan and testing the market kind of thing,

14  that lifting exclusivity would probably be a clear

15  winner.

16           If we're talking about the first shot

17  at a plan, having not yet seen the plan, I'm not

18  sure what you're saying the competing plan would

19  look like, so I think we're going to need to set

20  it out by motion.

21           MS. REDMOND:  Your Honor, I think a

22  competing plan would just deal with the same classes

23  of creditors that the debtor is dealing with, and

24  provide some recovery for unsecured versus the

25  debtor's recovery for unsecured, and treat the

1    secured claims probably differently, but it wouldn't

2    be a big difference, it would really be pretty

3    simplistic.

4              MR. GUSO:  Your Honor, the Court has

5    granted The District stay relief, that's the relief

6    they requested, we should terminate this discussion,

7    with respect.

8              THE COURT:  Well, I'll use Herman Cain's

9    words, we'll suspend the discussion for now.  I'm not

10   going to grant it on an ore tenus motion, I'm not

11   going to concede that it will be set on an expedited

12   basis, so it will have to be -- it will have to be

13   filed, and we'll determine whether there should be an

14   expedited hearing so that any competing plan would be

15   able to fit into the same time frames.

16             MS. REDMOND:  Thank you, your Honor.

17             THE COURT:  Okay.  Anything else?  Okay.

18   We're done, thanks.

19             MS. MORA:  Thank you, Judge.

20             MR. HUDSON:  Thank you Judge.

21             THE COURT:  Oh, I'm sorry, one more thing.

22   Since we are provisionally setting a disclosure

23   hearing, I'll probably put that as a further order

24   in -- further hearing in the stay relief order, as

25   well, December -- I mean, January whatever I said.

Page 98

1            MS. REDMOND:  25th.

2            MR. HUDSON:  25th.

3            THE COURT:  January 25th, okay.  That's it,

4    now we're done.

5            (Thereupon, the hearing was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 99

CERTIFICATION

STATE OF FLORIDA:

COUNTY  OF  DADE:


I, Margaret Franzen, Shorthand Reporter and  Notary  Public in  and for the State of Florida at  Large,  do  hereby  certify  that  the  foregoing proceedings  were  taken  before  me  at the date and place  as  stated  in  the caption hereto on  Page 1; that the  foregoing  computer-aided transcription  is a true record of my  stenographic notes taken at said proceedings.

WITNESS  my  hand  this  19th  day  of December, 2011.




_____
Margaret Franzen
Court Reporter and Notary Public
in and for the State of Florida at Large
My Commission Expires:  April 14, 2014