**HREA**

Hanson Real Estate Advisors, Inc.

# THE PROPERTY

## The Property

### Owner of Record

According to information obtained from the Miami-Dade County Property Appraiser's Office, the Subject Property is owned by five separate entities. These entities include Landmark at Doral Community Development District (the District), whose address is 6131 Lyons Road, Suite 100, Coconut Creek, Florida 33073; and Landmark Club at Doral LLC, Landmark at Doral South LLC, Landmark at Doral East LLC, and Town Center at Doral LLC, whose address is 7200 West Camino Real, Suite 302, Boca Raton, Florida 33433.

The Landmark at Doral Community Development District (the District) has ownership of the roadways and other infrastructural components located on-site at The Landmark at Doral. According to a Special Warranty Deed recorded at Official Records Book 24054, Page 0603, of the Public Records of Miami-Dade County, Florida, the District received title to these areas on December 7, 2005.

### Legal Description

The Subject Property is legally described as follows:

Tracts 24, 25, 33, 34, 35, 36, 45, 46, 47 and 48 of FLORIDA FRUITLAND'S COMPANY'S SUBDIVISION NO. 1, Section 17, Township 53 South, Range 40 East, as recorded in Plat Book 2, Page 17, of the Public Records of Miami-Dade County, Florida, less all road right-of-way of record.

AND

The West 739.33 feet of Tracts 41, 42, 43 and 44 of FLORIDA FRUITLAND'S COMPANY'S SUBDIVISION NO. 1, Section 17, Township 53 South, Range 40 East, as recorded in Plat Book 2, Page 17, of the Public Records of Miami-Dade County, Florida. Less all road Right-of-Way of record and Less that portion of Tracts 41, 42, 43, 44 and 45 deeded to Miami-Dade County, by Special Warranty deed dated December 2, 1996, and recorded in Official Record Book 17746, Page 2223 and all exhibits and amendments thereof.

### Property Assessments and Ad Valorem Taxes

The Subject Property is assessed on the 2011 Miami-Dade County tax roll as follows:

| Folio No. | Owner | 2011 Value | 2011 Taxes |
|---|---|---|---|
| 35-3017-001-0365 | Landmark at Doral CDD | $103,067 | $1,973.29 |
| 35-3017-001-0250 | Landmark Club at Doral, LLC | $724,500 | $13,870.99 |
| 35-3017-001-0362 | Landmark at Doral South, LLC | $6,621,975 | $100,141.88 |
| 35-3017-001-0241 | Landmark at Doral East, LLC | $4,745,449 | $90,854.47 |
| 35-3017-001-0240 | Town Center at Doral, LLC | $24,297,300 | $363,636.41 |
| | Total | $36,492,291 | $570,477.04 |



The unpaid taxes on the Subject Property total $1,434,206.77, for the 2009 and 2010 tax years. The Public Records indicate that tax certificates, totaling $960,055.18 for the 2008 tax year were purchased.

## PURCHASE HISTORY OF THE PROPERTY

The Subject Property was purchased on January 31, 2005 for $85.0 million. The Sellers were Adrian-PMBC Homes at Doral LLC and Adrian Development Group, Inc., and the Buyer was E.B. Developers, Inc. The purchase contract was dated June 21, 2004. The Subject Property was purchased on an "as is" basis, but with a final unconditional Tentative Plat and TND approval. The stated acreage for the purchase was 103.75 acres and indicated a price of $819,277 per acre or $18.81 per square foot of gross land area. The Seller was responsible for the payment of $5.0 million to BM International Realty, the Buyer's broker, as well as the payment of an unspecified commission amount to Doran Jason Group of Florida. The Sellers acquired the Subject Property through an assemblage that included ten transactions, occurring between September 1, 2002 and November 1, 2002.

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 11012001

## THE SITE

### LOCATION

The Subject Property is located at the northeast corner of the intersection of NW 58th Street and NW 107th Avenue, in the City of Doral, Miami-Dade County, Florida. The Subject Property is located approximately 3.5-miles northwest of Miami International Airport, and 12.0-miles west of downtown Miami.

The Subject Property is located in proximity to the Miami-Dade County Resource Recovery Facility and the Miami-Dade County Ash Landfill, both of which are used in connection with the County's solid waste management and disposal activities, and operate 24 hours per day, 7 days per week.

### SIZE AND SHAPE

The Subject Property, containing approximately 117.9 gross acres, is an irregular shaped tract. The west boundary measures approximately 2,864.88 feet (exclusive of curvature) along the east side of NW 107th Ave. The south boundary measures approximately 681.46 feet (exclusive of curvature) along the north side of NW 58th Street. The north boundary measures approximately 2,617.93 feet and the east boundary measures approximately 1,649.94 feet along the east side of NW 102nd Ave.

As a result of the shape of the Subject Property and the location of the Florida Power & Light power line easements, the Subject Property consists of three areas or sub-parcels; a north parcel, a south parcel and an east parcel. The size of each parcel is summarized below.

| | Powerline Esmt. | | Net Land Area | | Total Land Area | |
|---|---|---|---|---|---|---|
| | Acres | Sq.Ft | Acres | Sq.Ft | Acres | Sq.Ft |
| North | 24.8 | 1,080,288 | 64.8 | 2,822,688 | 89.6 | 3,902,976 |
| South | 11.2 | 487,872 | 8.8 | 383,328 | 20.0 | 871,200 |
| East | 0 | 0 | 8.3 | 361,548 | 8.3 | 361,548 |
| TOTAL | 36.0 | 1,568,160 | 81.9 | 3,567,564 | 117.9 | 5,135,724 |

### ACCESS

Two public roadways, NW 58th St. and NW 107th Ave., provide vehicular access to the Subject Property. Each of these roadways is multi-lane, median controlled, asphalt paved, and public maintained arterial routes. NW 66th Street runs east-west across the Subject Property. That portion of NW 66th Street located on the Subject Property is not paved and is one component of the District's improvements that are currently in-place.

Access to the Landmark at Doral is provided by NW 107th Ave. at NW 66th Street from the west; NW 58th Street at NW 105th Court from the south. The development, which is approximately 10 miles west of downtown Miami, is in close proximity to major Miami transportation arteries. The Subject Property is approximately 2 miles from the Florida Turnpike, 3 miles west of the Palmetto Expressway (826) and 3.2 miles from the Dolphin Expressway (836).

## AVAILABLE UTILITIES

Public utilities available to the Subject Property include electricity, telephone service, public potable water, public sewerage service, high-speed internet service, and solid waste removal. On-site infrastructure includes a network of roads, streets and alleys, storm drains, stormwater management, water and sanitary sewer systems that will give access and service to the dwellings and to the retail and office buildings that are proposed for the Landmark at Doral mixed-use project.

## ELEVATION AND TOPOGRAPHY

Generally, the Subject Property is of level terrain. Inspection of the Subject Property indicated that the crown of the existing roadways within the Landmark at Doral is approximately two (2) feet to three (3) feet above the residential lot areas. According to Julian R. Alvarez, P.E., the engineer for the District, the finish floor elevation for residential units must be no less than 18" above the crown of the road.

## EASEMENTS

The Subject Property consists of approximately 36.0 acres of lands that are encumbered by Florida Power & Light power line easements. These easements include an east-west easement with an approximate width of 330 feet and runs from the westerly boundary of the Subject Property to the easterly boundary of the Subject Property. A 170-foot wide power line easement runs north from the north side of the east-west power line easement to the north boundary of the Subject Property and a 390-foot wide power line easement runs south from the south side of the east-west power line easement to the south boundary of the Subject Property. These power line easements have been incorporated into the site development plan for the Landmark at Doral and are used for storm water management, open space, and preserve area. It is my opinion that the power line easements do not adversely affect the market value of the Subject Property.

## FEMA FLOOD PLAIN DATA

According to Federal Emergency Management Agency (FEMA) Map Number 12086C0278L, the Subject Property is designated Zone AH (El. 5), Zone AE (El. 5), and Zone X. Zone AH is the flood insurance rate zone that corresponds to areas of shallow flooding with average depths between 1 and 3 feet. Mandatory flood insurance purchase requirements apply. Zone AE is the flood insurance rate zone that corresponds with flood depths greater than 3 feet. Mandatory flood insurance purchase requirements apply. Zone X is the flood insurance rate zone that is outside the flood plain or with average flood depths of less than 1 foot. Flood insurance purchase is not mandatory.



## THE COMMUNITY DEVELOPMENT DISTRICT

According to a document titled "Engineer's Report, Infrastructure Improvements", amended September 25, 2006, prepared by Alvarez Engineers, Inc. for Landmark at Doral Community District Board of Supervisors, "The Landmark at Doral Community Development District (the District) was established under Ordinance No. 05-153 of the Miami-Dade County Commission. The Ordinance was passed on and adopted on August 23, 2005. The District is located in Section 17, Township 53S, Range 40E, in the City of Doral, Miami-Dade County. The boundary of the District begins at the intersection of NW 58 Street and NW 107 Avenue. From this point the boundary of the District runs north along NW 107 Avenue to theoretical NW 66 Terrace. It continues east on NW 66 Terrace, then south on NW 102 Avenue, then west along theoretical NW 63 Street. It continues south on theoretical NW 104 Passage, then west on NW 58 Street to the point of the beginning. The development is located within Zip Code 33178."

The Engineer's Report also states, "The Landmark at Doral Community Development District (the District) was created for the purpose of financing and managing the acquisition, construction, and maintenance of the infrastructure of Landmark at Doral, a 117.94 gross acre mixed-use community located within the City of Doral in Northwest Miami-Dade County, Florida. The development is planned for 1,109 dwelling units consisting of 322 multifamily residences over the retail space, 495 condominium units, 292 townhomes, a 12,000 square feet clubhouse, 94,700 square feet of retail space, 93,346 square feet of offices over the retail space and 230,000 square feet of offices located in the parcel to the northeast of the Development south of NW 66 Street and west of NW 102 Avenue. The net developable acreage is estimated to be 27.74 acres."

Infrastructure within the District includes roadway improvements, a 929-stall four-level parking garage, storm water management facilities, water distribution system, sanitary sewer collection system, and the District will finance the construction of the outdoors recreational areas or parks. As of the Date of the Value Opinion, the District for the construction of this infrastructure has paid approximately $56.85 million. Of this amount, approximately $12.89 million has been paid towards the construction of the public parking garage building.

## THE LANDMARK AT DORAL DEVELOPMENT

The Landmark at Doral Development (the Development) is a mixed-use development, of traditional neighborhood design, that combines both live and work areas within a pedestrian-friendly environment. At completion, the Development was expected to contain 1,109 residential dwelling units consisting of 817 condominium units and 292 townhome units, approximately 94,700 square feet of retail space, 93,346 square feet of office space above retail space and 230,000 square feet of office space located in the northeast section of the Development, a 929 space public parking garage structure and a 12,000 square foot recreation facility.

There are two major parcels that comprise the Development area, the North Parcel and the South Parcel. The North Parcel was expected to contain 292 townhomes, 495 condominiums, a 12,000 square foot clubhouse and approximately 230,000 square feet of office space on the East Parcel. On the North Parcel, the townhomes were expected to range in size from over

1,700 square feet to over 2,900 square feet and were expected to contain mainly 3 bedrooms and 2-1/2 bathrooms with a limited number of 4 bedroom units. Each unit was to have been provided at least one dedicated parking space.

The South Parcel is improved with a partially completed 4-story 929-space public structured parking facility. Approximately $12.9 million has been expended, to date, for the construction of the parking structure. Also, the South Parcel was expected to contain a total of 94,700 square feet of retail space, 93,346 square feet of office space above the retail space and 322 for-sale condominium units. The buildings were designed to contain retail on the ground level, office on the second level and for-sale residential units on floors 3 thru 5. The condominium units were expected to range from 1,000 square feet to over 1,800 square feet and were expected to contain both 2 and 3 bedrooms and a minimum of 2 bathrooms.

According to plan, each homeowner would pay annual taxes, assessments and fees on an ongoing basis as a result of its ownership of property within the District, including ad valorem property taxes, the special assessments were to be levied by the District in connection with the proposed capital improvement plan and maintenance and operating assessments levied by the District. In addition, there would have been homeowner association fees for townhomes and condominiums.

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 1101001

# CITY OF DORAL, FUTURE LAND USE AND LAND DEVELOPMENT CODE

## FUTURE LAND USE

The Subject Property is designated TND (Traditional Neighborhood Development) and I (Industrial) on the Future Land Use Map (FLUM) of the City of Doral Comprehensive Plan. According to the Future Land Use Element (FLUE) of the City of Doral Comprehensive Plan (Adopted plan: 4-26-06), "The TND concept incorporates a broad mixture of uses, unique design, hierarchy of streets, and focus on pedestrian activity, low scale community support activities, and use of community buildings and open spaces as the focal point of the neighborhood. TND areas mandate the vertical and horizontal integration of uses such as residential, business, office, civic, public facilities, education and childcare, artisan and home occupations. Residential density cannot exceed 18 dwelling units per gross residential acre and all types of housing are allowed, including detached single-family units. Building height is limited to no more than eight (8) stories. The floor area ratio shall not exceed 4.0. A conceptual master development plan is required for zoning approval. The use mix for the entire TND category is anticipated to be within the following range: residential 51% - 90%, office 5% - 40%, and retail/services 1% - 20%." For additional information, please refer to the Appraiser's work file.

In regards to the I (Industrial) designation, the Future Land Use Element (FLUE) of the City of Doral Comprehensive Plan (Adopted plan: 4-26-06) states "This category allows industries, manufacturing operations, mini-warehouses, warehouses, office buildings, showrooms, distribution centers, merchandise marts, utility maintenance yards, utility plants, public facilities, hospitals, medical buildings, hotels, convention facilities, restaurants, banks, university and college facilities, hotels, and similar uses. No rock quarrying or ancillary uses are allowed in I. Within the I category, retail and service uses may be integrated within a project (land under unified control) in an amount not to exceed 15 percent of the total floor area. Building height is limited to the width of the public right-of-way fronting the subject property and landscaped open space must comprise a minimum of 15% of project site. Floor area ratio (FAR) is limited to 0.5 for the first floor and 0.25 for every additional floor, exclusive of structured parking."

## ZONING

According to the City of Doral Planning and Zoning Department's "Aerial Zoning Map", the Subject Property is zoned TND (Traditional Neighborhood District) and IC (Industrial Commercial). According to the City of Doral's Land Development Code (LDC), "The TND District is designed to ensure the development of land along the lines of traditional neighborhoods. Its provisions adapt the urban conventions, which were normal in the United States from colonial times until the 1940's. The TND ordinance prescribes the following physical conventions:

1. The neighborhood is spatially understood and limited in size.

2. Residences, shops, workplaces, and civic buildings are interwoven within the neighborhood, all in close proximity.

3. A hierarchy of streets serves equitably the needs of the pedestrian, the bicycle and the automobile.

HREA
Hanson Real Estate Advisors, Inc.

**HREA**

Henson Real Estate Advisors, Inc.

4.  Carefully placed civic buildings, squares, and greens reinforce the identity of the neighborhood.

5.  Spatially defined squares, parks and greens provide places for social activity and recreation.

6.  Civic buildings provide places of assembly for social, cultural and religious activities, becoming symbols of community identity through their architectural clarity.

7.  Private buildings form a disciplined edge, spatially delineating the public street space and the private block interior.

8.  Architecture and landscape respond to the unique character of the region.

According to the City of Doral's Land Development Code (LDC), "The intent and purpose of the Industrial Commercial District ("IC") is to provide for uses with commercial and industrial nature and that are in close proximity to major roadways." Permitted uses within the IC zoning district include (without limitation) professional office, medical office, restaurants, hotels and motels (maximum density of 75 units per acre), retail and services, educational facilities, public schools, trade schools, religious facilities, day care facilities, warehouses, showrooms, light manufacturing, place of assembly, recreation facilities, automotive rental, mini-warehouses, motion production studios, parking lots, bars, night clubs, wine cafes, and kennels. For additional information pertaining to the IC zoning district, please refer to information contained in the Appraiser's work files.

CITY OF DORAL FUTURE LAND USE MAP

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 11012001



Comprehensive Plan
Future Land Use Map

Map I-3





CITY OF DORAL AERIAL ZONING MAP

City of Doral

Planning and Zoning Department

Aerial Zoning Map

Legend

Roads

MF-4    PUD    IPF
SF-4    O-2    NC    GU
SF-5    O-3    CC    IC    CONSERV
MF-1    TND    CC    I    Water
MF-2    CMU
MF-3    DMU    I-R

May 2011

0.25    0.5    1
Mile

HREA
Hanson Real Estate Advisors, Inc.

PAGE 53

PROPOSED SITE PLAN

**HREA**

Hanson Real Estate Advisors, Inc.



787 Condos and Townhomes (North)
322 Condos over Retail and Office Space (South)
94,700 SF of Retail (South)
93,346 SF of Office (South)
250,000 SF Office/Retail Space (North East)

CIVIC BUILDING
MEDITERRANEAN STYLE
DUTCH CARIBBEAN STYLE
FLORIDA VERNACULAR STYLE

**HREA**
Hanson Real Estate Advisors, Inc.

# HIGHEST AND BEST USE ANALYSIS

# Highest And Best Use of the Property

## Introduction

According to The Appraisal of Real Estate – 13th Edition, "The analysis of relevant data to develop a market value opinion requires two important steps in the valuation process before the applicable approaches to value are applied. Market/marketability analysis begins the process of narrowing the focus from a broader macro view to data that is especially pertinent to the appraised property. Highest and best use relies on the analysis to then identify the most probable, competitive use to which the subject property can be put. The competitive forces within the market where the property is located shape the highest and best use. Also, the highest and best use provides the foundation for a thorough investigation of the competitive position of the property in the minds of market participants.

An understanding of market behavior developed through market analysis is essential to the concept of highest and best use. Market forces create market value, so the interaction of market forces that identifies the highest and best use is of crucial importance."

## Application of the Highest and Best Use Analysis – As Though Vacant

Highest and best use analysis builds on the conclusions of market/marketability analysis. The analysis of land as though vacant focuses on alternative uses, with the appraiser testing each reasonably probable use for legal permissibility, physical possibility, financial feasibility, and maximum productivity. These tests are applied sequentially, as follows:

1.  <u>Legal Permissibility of Land as though Vacant</u>: In applying the test of legal permissibility, the appraiser determines which uses are permitted by such public policy as (without limitation) the local government's comprehensive plan and land development code, state governments environmental considerations, and the federal government's regulatory concerns. If information is available, the appraiser may also consider private deed restrictions, easements, leases, or other similar matters.

The Subject Property is designated TND (Traditional Neighborhood Development) and I (Industrial) on the FLUM of the City of Doral Comprehensive Plan. According to the City of Doral's LDC, the Subject Property is zoned TND (Traditional Neighborhood Development) and IC (Industrial Commercial). The Subject Property is the site of a proposed mixed-use development that is generally known as Landmark at Doral (the Development). The Subject Property received all necessary approvals and permits for the development of 1,109 residential dwelling units consisting of 807 condominium units and 302 townhome units, approximately 94,700 square feet of retail space, 93,346 square feet of office space above retail space and 230,000 square feet of office space located in the northeast section of the Development, a 929 space public parking garage structure and a 12,000 square foot recreation facility.

The Development is located within the Landmark at Doral Community Development District (the District). The District has constructed and owns the on-site infrastructure at the Subject Property, which includes (without limitation) a network of roads, streets and alleys, storm drains, storm water management, water and sanitary sewer systems that will give access and service to the dwellings and to the retail and office buildings that were proposed for the Development.

**HREA**
Hanson Real Estate Advisors, Inc.



EARTHWORK IN PROGRESS EXHIBIT

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 11012001

**LEGEND**

DEMUCKING
FILL IMPORTED
CLEAR AND GRUB

| | APPROX. COMPLETE | |
|---|---|---|
| | CDD | NON-CDD |
| | 100% | 100% |
| | 97% | 22% |
| | 80% | 25% |

Wetland Mitigation Areas (Typ) Graded to Receive Planting Material. Planting Contract Has been Signed

PUBLIC PARKING GARAGE BUILDING

Existing Muck Piles (Typ)

Excavated Lake, Currently Awaiting DERM Approval for Disposal of Muck in the Bottom of the Lake

FUTURE LIGHT INDUSTRIAL / OFFICE AREA

HREA
Hanson Real Estate Advisors, Inc.

ALVAREZ ENGINEERS, INC.
LANDMARK AT DORAL C.D.D.
EARTHWORK IN PROGRESS

EXHIBIT 2

1" = 400'

PAGE 57



CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 1101200I

PAVING AND GRADING IN PROGRESS EXHIBIT

**HREA**

Hanson Real Estate Advisors, Inc.

**ALVAREZ ENGINEERS, INC.**
LANDMARK AT DORAL C.D.D.
PAVING AND GRADING IN PROGRESS

EXHIBIT 3

1" = 400'

PAGE 58

**LEGEND**

ROAD SUBGRADE
LIMEROCK
2" ASPHALT
107 Av Complete, 66 St & 102 Av First
Inch of Asphalt Applied
3/4" ASPHALT
CURB AND GUTTER
VALLEY GUTTER
TYPE 'D' CURB

APPROX. COMPLETE
76%
55%
80%
30%
90%
100%
3%

PUBLIC PARKING
GARAGE BUILDING

NW 58 ST

FUTURE LIGHT
INDUSTRIAL/
OFFICE AREA

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 11012001

WATER DISTRIBUTION SYSTEM IN PROGRESS EXHIBIT



LEGEND

WATER DISTRIBUTION SYSTEM

APPROX. COMPLETE 82%

HREA
Hanson Real Estate Advisors, Inc.

ALVAREZ ENGINEERS, INC.
LANDMARK AT DORAL C.D.D.
WATER DISTRIBUTION SYSTEM IN PROGRESS

EXHIBIT 5

1" = 400'

PAGE 59



CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 1101200I

SANITARY SEWER SYSTEM IN PROGRESS EXHIBIT

**HREA**
Hanson Real Estate Advisors, Inc.

**ALVAREZ ENGINEERS, INC.**
LANDMARK AT DORAL C.D.D.
SANITARY SEWER SYSTEM IN PROGRESS
EXHIBIT 6

1" = 400'

PAGE 60

LEGEND
GRAVITY SYSTEM
FORCE MAIN
LIFT STATION

APPROX. COMPLETE
94%
90%
86%

**HREA**
Hanson Real Estate Advisors, Inc.

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 1101200I

2. **Physical Possibility of Land as though Vacant:** The test of physical possibility addresses the physical characteristics associated with the site that might affect its highest and best use. The size, shape, terrain, and accessibility of land and the risk of natural disasters, such as hurricanes or floods affect the uses to which land can be put. The utility of a parcel may also depend on its frontage and depth. Irregularly shaped parcels can cost more to develop and, after development, may have less utility than regularly shaped parcels of the same size. These are but a few examples of those issues or concerns that may affect the highest and best use of land.

As illustrated on the preceding pages, the Subject Property is physically capable of supporting a mixed-use development containing 1,109 residential dwelling units, 94,700 square feet of retail space, 93,346 square feet of office space above retail space and 230,000 square feet of office space located in the northeast section of the Development, a 929 space public parking garage structure and a 12,000 square foot recreation facility.

The Appraiser has reviewed information pertaining to the final plat for the Reserve East and Reserve West developments. This information, along with similar information pertaining to the Development is provided in the table below:

| | Landmark at Doral | | The Reserve East | | The Reserve West | |
|---|---|---|---|---|---|---|
| | Acres | Percent | Acres | Percent | Acres | Percent |
| Residential Area | 40.1 | 34.0% | 10.5 | 39.0% | 6.6 | 38.6% |
| SWMF/Preservation | 30.1 | 25.5% | 5.2 | 19.3% | 3.7 | 21.6% |
| Roadway/Utilities | 44.4 | 37.7% | 9.1 | 33.8% | 5.4 | 31.6% |
| Parks and Recreation | 3.3 | 2.8% | 2.1 | 7.8% | 1.4 | 8.2% |
| TOTALS | 117.9 | 100.0% | 26.9 | 100.0% | 17.1 | 100.0% |
| Residential Units | 1,109 | | 195 | | 123 | |
| Units Per Acre | 9.4 | | 7.2 | | 7.2 | |

The site development information above indicates that approximately 40% of the total site area at The Reserve East and The Reserve West were used for the residential development areas, as compared to 34.0% for the Subject Property. Approximately 20% of the total site was used for storm water management facilities or preservation at each of The Reserve developments, as compared to 25.5% for the Development. Roadways and utility easements accounted for approximately 32% of the total site at each of the Reserve projects, as compared to 37.7% for the Development. The Reserve East and The Reserve West were approved for 195 and 123 townhomes, respectively, with gross project densities of 7.2 units per acre, as compared to the Development, which was approved for 1,109 residential units, at a gross project density of 9.4 units per acre. Regardless of the fact that the Development was designed as a mixed-use project and is considerably larger than the Reserve developments, the land development area allocations are similar. This evidence suggests that the Development's master concept plan and it's land use allocations are consistent with other residential developments within the Doral market area and as such, should reasonably be expected to accommodate a broad range of residential product lines without substantial modifications to the master concept plan or the in-place roadways, water and sewer lines, storm water management or preservation areas.

Two additional issues pertaining to the Subject Property include the presence of Florida Power & Light power line easements and proximity to the Miami-Dade County Resource Recovery Facility and the Miami-Dade County Landfill, both of which are used in connection with the County's solid waste management and disposal activities, and operate 24 hours per day, 7 days per week. The FP&L power line easements encumber approximately 36.0 acres or 30.2% of the Subject Property. The easement area has been utilized in the site development plan for storm water management, preservation and open space. These uses are typically required for all developments regardless of the presence or absence of power line easements. The power line easements are not expected to have a detrimental impact on the Subject Property or cause a diminution in its market value.

In regards to the proximity of the Miami-Dade County Resource Recovery Facility and the Miami-Dade County Ash Landfill, the Appraiser spoke with Jorge A. Davila, a real estate professional with The Katsikos Group, Inc. Mr. Davila was one of the brokers who was involved with the sale of the Subject Property to the previous owner and currently has a listing for a 10.94 acre site located along the west side of NW 102nd Ave. Mr. Davila indicated that the proximity to the resource recovery facility and the ash land fill was an issue that was discussed during the entitlement process for the Development. He stated that it has been his experience that these facilities typically do not "give off" an obnoxious odor, given the nature of their use, but are considered by some to be a visual concern, but that landscaping and buffering would likely ameliorate such concerns.

3.  Financial Feasibility of Land as though Vacant: In determining which uses are legally permissible and physically possible, an appraiser eliminates some uses from consideration. Only those uses that meet the first two criteria are analyzed further. As long as a potential use has value commensurate with its cost and conforms to the first two tests, the use is financially feasible.

In addition to reviewing and analyzing economic and demographic data, the Appraiser interviewed Carlos Gonzalez, Division President, Southeast Florida Region, for Lennar, a public traded residential development company. Mr. Gonzalez indicated that he has been actively involved in the Doral real estate market since the 1980's and joined Lennar, as they moved into the Doral market area during 1993. According to Mr. Gonzalez, over this time period, the Doral market area has transitioned from a "local market" to an "international market with a strong South American influence". He also suggested that currently, there is "massive demand at Doral for residential products, both fee and condominium". Lennar recently acquired option rights to approximately 2,700 residential sites located within four communities within the Doral market area, including the St. Moritz and the Santorini at Islands at Doral. Recently, he oversaw the rezoning of property approved for development of 285 condominiums, to 68 townhomes and 53 single-family lots with an average lot width of 40-feet. Furthermore, he indicated that on January 17, 2012, Lennar is closing on a transaction involving property very similar to the properties within the Development. This transaction will include single-family sites that were priced at $150,000 per site and townhome sites that were priced at $110,000 per site. Mr. Gonzalez reported that the market is very strong and has exceeded his

**HREA**

Human Real Estate Advisors, Inc.

expectations and that Lennar's developments within the Doral market area were typically experiencing "margins of 40%".

Based upon my analysis of economic trends and demographic characteristics of the Doral market area, it is my opinion, that the residential product group should be modified in order to optimize the use, marketability and value of the Subject Property. Specifically, the North Tract, which was planned for 292 townhomes and 495 condominium units, should be reallocated to include a single-family residential lot product line. Based upon my research and investigation, it is my opinion that the North Tract's product allocation should be modified so that it includes 170 townhomes, 160 single-family residential lots, and 270 condominium/apartment units. It is my understanding that this product mix may be developed on the North Tract without requiring any significant change to the existing infrastructure or site development. Furthermore, the South Tract will receive the additional condominium/apartment units that have been reallocated from the North Tract, bringing the total number of condominium/apartment units on the South Tract upwards to approximately 500 units.

4. Maximum Productivity of Land as though Vacant: The test of the maximum productivity is applied to the uses that have passed the first three tests. Of the financially feasible uses, the highest and best use is the use that produces the highest residual land value consistent with the market's acceptance of risk and with the rate of return warranted by the market for that use given the associated risk.

In conclusion, it is my opinion that the highest and best use of the Subject Property is for mixed-use development, but with a reallocation of the entitlements and product lines as summarized above.

**HREA**
Hanson Real Estate Advisors, Inc.

# VALUATION OF THE SUBJECT PROPERTY

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 1101200I

## VALUATION OF THE PROPERTY

### INTRODUCTION

In this section of the Report, the Appraiser will consider the applicability and limitations of each of the three valuation methods identify those valuation methods that are considered applicable and then apply them, in the development of a market value estimate. If more than one valuation method is applied, the Appraiser will then reconcile the value indications into a final estimate of the opinion of value.

### IDENTIFICATION OF THE APPLICABLE VALUATION METHOD

Traditionally, the appraisal profession relies upon one or more of the following valuation methods; the cost approach, sales comparison approach, or the income capitalization approach in the development of a market value estimate. One or more of these valuation techniques may be applicable in a given assignment, depending upon the nature of the property being appraised, its highest and best use, the availability of market data, and the intended use of the appraisal. The following summary of the applicability and limitations of each valuation technique is provided, along with the identification of the applicable valuation method or methods.

1. The Cost Approach: In any market, the value of a building can be related to its cost. The cost approach is particularly important when a lack of market activity limits the usefulness of the sales comparison approach and when the property to be appraised is not amenable to valuation by the income capitalization approach.

   Because cost and market value are usually more closely related when properties are new, the cost approach is important in estimating the market value of new or relatively new construction. The approach is especially persuasive when land value is well supported and the improvements are new or suffer only minor depreciation and, therefore, approximate the ideal improvement that is the highest and best use of the land as though vacant. The cost approach can also be applied to older properties given adequate data to measure depreciation.

   Because the Subject Property is a proposed mixed-use development and without vertical improvements, other than a partially completed four-level 929-stall public parking structure, it is the Appraiser's opinion that the cost approach is not applicable. However, it may be considered in estimating the contributory of some or not all of the land improvements located on the Subject Property or the public parking structure.

2. The Sales Comparison Approach: The sales comparison approach is applicable to all types of real property interests when there are sufficient recent, reliable transactions to indicate value patterns or trends in the market. For property types that are bought and sold regularly, the sales comparison often provides a supportable indication of market value. When data is available, this is the most straightforward and simple way to explain and support an opinion of value.

   Because the Subject Property is of a property class or type that is frequently bought and sold, the sales comparison approach is considered applicable. The quantity and

**HREA**
Hanson Real Estate Advisors, Inc.

**HREA**

Hanson Real Estate Advisors, Inc.

quality of the availability of information pertaining to recent transactions is considered sufficient to provide an accurate and reliable indication of buyer and seller decision patterns.

3. The Income Capitalization Approach: Any property, which generates income, can be valued using the income capitalization approach. When more than one approach to value is used to develop an opinion of value for an income-producing property, the value indication produced by the income capitalization approach might be given greater weight than that of the other approaches in the final reconciliation of the value indications.

   Exclusive of site improvements or infrastructure and a partially completed public parking structure, the Subject Property is an unimproved property. The income capitalization approach is not considered applicable in the valuation of this property class. However, a residual analysis will be used in developing a market value estimate for the retail and office entitlements relating to the South Tract. This procedure incorporates methodologies similar to those used in the application of the income capitalization approach.

4. Summary and Conclusion: Having considered the applicability and limitations of each appraisal method, it is the Appraiser's opinion that the sales comparison approach is the only applicable valuation method for the Subject Property.

## The Sales Comparison Approach

### Introduction

According to The Appraisal of Real Estate–13th Edition, published by the Appraisal Institute, Chicago, IL, p. 297-298:

"In the sales comparison approach, an opinion of market value is developed by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract (i.e., for which purchase offers and a deposit have been recently submitted). A major premise of the sales comparison approach is that studying the market's reaction to comparable and competitive properties can support an opinion of the market value of a property.

Comparative analysis of properties and transactions focuses on similarities and differences that affect value, which may include variations in property rights, financing terms, market conditions, and physical characteristics, among others. Elements of comparison are tested against market evidence using paired sales, trend analysis, statistics, and other techniques to identify which elements of comparison with the data set of comparable sales are responsible for value differences."

### Application of the Sales Comparison Approach

The Appraiser has completed research within the Doral market area and surrounding areas for the purpose of identifying recent transactions of similar properties, pending contracts relating to similar properties and current listings related to similar properties.

The Appraiser has identified four recent transactions involving properties that were purchased for prices ranging from $9.0 million to $16.5 million. Each of the sale properties are considered inferior to the Subject Property because they are undeveloped properties, whereas the Subject Property is a mixed-used development that has been improved with internal roadways, storm water management facilities, water distribution lines, sewage collection lines, and other site improvements. The Subject Property has a competitive advantage that the sale properties do not have, the ability to avoid time risk or market risk by being able to start vertical construction quickly and bring product to the market within 90 to 180 days.

The Appraiser has prepared a sales data summary grid that contains information relating to each of the sale properties. Sale No. 1 was verified with the buyer. The Appraiser was not able to verify Sales No. 2, 3 and 4. A request to verify these transactions was rejected by representatives of the buyers. Consequently, the information that has been presented below has been obtained from other experts and public sources. The Appraiser reserves the right to amend the market data and the market value estimate in the event that information becomes available, regarding these properties, which were not made available to the Appraiser, as requested of the buyer's representatives.

# SALES DATA SUMMARY GRID

| | Land Sale 1 | Land Sale 2 | Land Sale 3 | Land Sale 4 |
|---|---|---|---|---|
| **Transaction Data** | | | | |
| Date of Sale | Dec. 10, 2010 | Aug. 8, 2011 | Sept. 20, 2011 | Sept. 26, 2011 |
| Grantor | Tract 33, LLC | Dorando, LLC | Doral Palms Dev., LLC | Renegade at Doral, LLC |
| Grantee | City of Doral | Terra Acon Dorando Dev., LLC | Terra Acon Doral Palms, LLC | Terra Acon M&M Doral Investments, LLC |
| OR Book/Page | 27520/4463 | 27790/2881 | 27837/0271 | 27898/0742 |
| Sale Price | $9,500,000 | $9,000,000 | $16,500,000 | $14,000,000 |
| Terms of Sale | Cash to Seller | Seller Financing | Cash to Seller | Cash to Seller |
| **Property Data** | | | | |
| Location | E/W NW 114th Ave S/S of NW 82nd St | East of 107th Ave along the N/S of NW 58th St | W of NW 102nd Ave between NW 66th St and NW 74th St | E/S NW 107th Ave between NW 66th St and NW 74th St |
| Access | NW 114th Ave NW 82nd Street | NW 58th Street | Future access from NW 102nd Ave | NW 107th Ave |
| Utilities Available | Yes | Yes | Yes/Extend | Yes |
| Topography | Level | Level | Level | Level |
| Size (Gross Acres) | 10.0 | 17.0 | 32.4 | 20.0 |
| FPL Easement (Ac) | None | None | None | 2.5 |
| Roadway (Acres) | 2.0 | None | None | None |
| Size (Net Acres) | 8.0 | 17.0 | 32.4 | 17.5 |
| Demuck and Fill | Yes | No | No | No |
| Site Improvements | Yes | No | No | No |
| **Use Data** | | | | |
| Zoning | MF-1 | PUD | GU | PUD |
| Future Land Use | MoDR | LDR | LDR | OR |
| Proposed Use | Residential | Residential | Residential | Residential |
| Project Name | Palm Isles at Doral | Doral Cay | Century North/South | Vintage Estates |
| No. of Units | 124 | 160 | 302 | 110 |
| Units Per Gross Ac. | 12.4 | 9.4 | 9.3 | 5.5 |
| Product Type | Townhouse (37) Apartments (87) | Townhouse | Townhouse | Townhouse Single-Family |
| **Units of Comparison** | | | | |
| Dollars/Sq Ft (Gross) | $21.81 | $12.15 | $11.69 | $16.07 |
| Dollars/Sq Ft (Net) | $27.26 | $12.15 | $11.69 | $18.37 |
| Dollars/Res. Unit | $76,613 | $56,250 | $54,636 | $127,273 |

**HREA**
Hanson Real Estate Advisors, Inc.

## APPLICATION OF THE MARKET DATA

The Appraiser has identified four recent transactions as comparable properties for use and consideration in the application of the sales comparison approach. According to the Appraiser's experience and investigation, the appropriate "unit of comparison" for valuing residential development properties is the "dollars per residential dwelling unit" unit of comparison. This metric of oftentimes considered by developers of residential development sites because they obtain their return of and on activated capital through the sales of residential units.

As previously noted, three tracts or parcels of land that each has unique characteristics characterize the Subject Property. As a result of these characteristics, the Appraiser will develop a market value estimate for each of these properties separately and afterwards, reconcile the market value estimate in formulating a final market value estimate for the Subject Property.

1. North Tract (89.6 Acres): The North Tract, containing 89.6 acres of gross land area, is located north of the Florida Power & Light power line easement that transects the Subject Property from east to west. The North Tract was initially proposed for development of 292 townhomes and 495 condominiums. The townhomes, range in size from 1,718 square feet (under air) to 2,506 square feet (under air) and have an average size of approximately 1,982 per square foot (under air). The condominiums range in size from 1,020 square feet (under air) to 1,842 square feet (under air) and have an average size of approximately 1,535 square feet (under air).

   Based upon my review of economic and demographic data, trends within the Doral market area and discussions with knowledgeable parties who are actively involved in the development of residential properties located within the Doral area, it is my opinion that the highest and best use for the North Tract is for development of approximately 170 townhomes, and 160 single-family lots, and 270 condominium units (used as rental apartments). The condominium units would be purchased under a condominium form of ownership but used as rental apartments and subsequently bundled and sold to institutional investors who are acquiring product in this very strong product sector. The townhome product is a 1,600 square foot to 1,900 square foot product similar to what Lennar has developed at Santorini. The single-family residential product is expected to compete within the 40-foot wide lot market and have an end product price ranging from $425,000 to $450,000.

   In developing a market value estimate for the North Tract, each of the product lines will be considered separately:

   - Townhomes (170 Units): In regards to the valuation of the townhome product group, the Appraiser has considered each of the four transactions and information provided by Carlos Gonzalez pertaining to a transaction scheduled to close on January 17, 2012. Of the four transactions, greatest weight is applied to Sale No. 2, an August 2011 transaction of a property located along the east side of the South Tract and proposed for

development of a project generally known as Doral Cay, a 160-unit townhome community. Sale No. 2 was purchased for $56,250 per townhome unit. Sale No. 2 is considered inferior to the North Tract because it does not benefit from the presence of existing infrastructure and will require de-mucking and off-site fill dirt.

Consideration is also given to the purchase price paid by Lennar for 137 townhomes, between February 2010 and March 2011, located at Santorini at Islands at Doral. According to Carlos Gonzalez, Division President, Southeast Florida Division, for Lennar, these properties were purchased for prices ranging from approximately $82,000 to $86,000 per townhome unit. These properties are similar to the North Tract in regards to infrastructure and probable development costs. Furthermore, these purchases are "take downs" of several tracts that were part of a "rolling option agreement" with Starwood Land Ventures, LLC. Accordingly, it is my opinion that the market value of the 170 townhomes at the North Tract is $80,000 per townhome site. Multiplying this unit of value times the number of townhome sites indicates the following market value estimate for this portion of the North Tract:

Market Value Estimate: (170 units) X ($80,000 per unit): $13,600,000

- Single-Family Lots (160 Lots): In regards to the valuation of the single-family residential product group, the Appraiser has considered each of the four transactions and information provided by Carlos Gonzalez pertaining to a transaction scheduled to close on January 17, 2012. Of the four transactions, greatest weight is applied to Sale No. 4, a September 2011 transaction of a property located along the east side of NW 107th Avenue and approximately 700 feet north of the North Tract. Sale No. 4 is proposed for development of a project generally known as Vintage Estates, a two-phase project that includes both single-family and townhome products. The transaction consists of the first phase, a 110 unit single-family residential development. The buyer paid $14.0 million, or approximately $127,273 per residential site. Sale No. 4 is considered inferior to the North Tract because it does not benefit from the presence of existing infrastructure and will require de-mucking and off-site fill dirt.

Consideration is also given to the purchase price paid by Lennar for 24 single-family residential lots, between February 2010 and March 2011, located at Santorini at Islands at Doral. According to Carlos Gonzalez, Division President, Southeast Florida Division, for Lennar, these properties were purchased for prices ranging from approximately $130,000 per single-family lot. These properties are similar to the North Tract in regards to infrastructure and probable development costs. Furthermore, these purchases are "take downs" of several tracts that were part of a "rolling option agreement" with Starwood Land Ventures, LLC. Accordingly, it is my opinion that the market value of the 160 single-family residential lots located within the North Tract is $125,000 per

single-family residential lot. Multiplying this unit of value times the number of single-family residential lots indicates the following market value estimate for this portion of the North Tract:

Market Value Estimate: (160 units) X ($125,000 per unit): $20,000,000

- Condominium Units (270 Units): In regards to the valuation of the condominium product group, it is important that the Intended User understand that the "condominium units" will be used as "rental apartments", similar to Lennar's product group at the St. Moritz, where rents are $1,600 per month for 1,000-square foot rental units in a building that was built in 1991 and occupancies are at approximately 99%. Mr. Gonzalez indicated that there is sufficient pricing power to take rental rates from $1.60 per square foot-per month to over $1.75 per square foot-per month.

Practically every authoritative publication pertaining to the real estate industry identifies rental apartments as the top real estate product because of strong demand caused by demographics and the bust in the housing market. Andrew Goldberg, Vice President, with BTI Developers. Mr. Goldberg indicated that the Cordoba apartment project, located in the downtown Doral market, at 8111 NW 53rd Street, consists of 224 rental units located in a four-story building is approximately 94% occupied and has performed so well that plans are underway to construct Phase 2. Phase 1 includes 1/1 rental units ranging in size from 700 square feet to 1,076 square feet and producing rentals ranging from approximately $2.00 to $2.10 per square foot – per month; 2/2 rental units, containing 1,032 square feet, producing rentals ranging from $1.56 to $2.16 per square foot – per month; and 3/2 rental units, containing 1,303 square feet, producing rentals ranging from $1.47 to $2.21 per square foot – per month.

Because the density is higher for the condominium/apartment product line than the density for the townhome product line, a lower price per unit is typical, all other factors being equal. Land Sale No. 1 is a December 2010 transaction that had a $9.5 million purchase price for a property that was proposed for 124 units, of which 87 were condominium/apartment units. This transaction indicated a price of $76,613 per unit and was a "pad ready" site that had been de-mucked and filled. The property was purchased by the City of Doral. Given the density and the smaller unit size, it is likely that the market value for the condominium/apartment product will be less than the price indicated by Land sale No. 2, or $56,250 per townhome unit. Although these residential products are different, the price paid for Land Sale No. 2 is considered a relevant indicator, particularly when consideration is given to Land Sale No. 2's lack of infrastructure and that it must be de-mucked and fill-dirt brought to the site. Accordingly, it is my opinion that the market value of the 270-unit condominium/apartment product line is $50,000 per unit. Multiplying



**HREA**
Hanson Real Estate Advisors, Inc.

this unit of value times the number of condominium/apartment units indicates the following market value estimate:

Market Value Estimate: (270 units) X ($50,000 per unit): $13,500,000

- **Summary and Conclusion (North Tract):** In summary, the Appraiser has developed market value estimates for each of the three product lines considered to be representative of the highest and best use of the North Tract. In conclusion, the townhome product is estimated to have a contributory value of $13,600,000, the single-family residential lot product is estimated to have a contributory value of $20,000,000, and the condominium/apartment unit product is estimated to have a contributory value of $13,500,000.

In the aggregate, these product lines suggest a total market value for the North Tract of $47,100,000. It is my opinion that this value estimate does not require a discount due to a "sum of the parts" consideration. The value estimate is based on a metric that is commonly used by the residential development community and as such, typically is not discounted.

2. **South Tract (20.0 Acres):** The South Tract, containing 20.0 acres of gross land area, is located south of the Florida Power & Light power line easement that transects the Subject Property from east to west and has frontage along the north side of NW 58th Street and the east side of NW 107th Avenue. The South Tract was initially proposed for development of 94,700 square feet of retail space on the ground level, 93,346 square feet of office space located over the ground level retail, and 322 condominiums located on floors 3 through 5. The 322 condominiums ranged in size from 720 square feet (under air) to 1,065 square feet (under air), and have an average size of approximately 886 square feet (under air).

With the reallocation of residential units at the North Tract, from a total of 787 residential units to approximately 600 units, the South Tract will receive an additional 187 condominium units, increasing the total number of condominium units at the South Tract to approximately 500 units. With this in mind, the South Tract's market value is estimated as follows:

- **Condominium Units (500 Units):** In regards to the valuation of the condominium product group, the Appraiser has given consideration to the same information that was provided in the valuation of the condominium/apartment units located in the North Tract. However, because the number of units located in the South Tract is greater than the number of units located in the North Tract, the price per unit will likely be less. Accordingly, it is my opinion that the condominium/apartment units located in the South Tract have a value of $40,000 per unit. Applying this unit of value to the number of condominium/apartment units allocated to the South Tract results in the following value estimate:

Market Value Estimate: (500 units) X ($40,000 per unit): $20,000,000

- Retail and Office Entitlements: In summary, the South Tract has approvals for the development or construction of 94,700 square feet of retail floor area on the ground level and 93,346 square feet of office area on the second floor. Retail space in Doral is constrained and this market area is considered "under-retailed". The Doral Isle Plaza located at the northwest corner of the intersection of NW 58th Street and NW 107th Avenue is a Publix anchored retail center and inspection of the property suggests that the center's occupancy level is approximately 95%. Discussions with local real estate professionals suggest that there are very few sites within Doral that are available for retail development.

A 4.39-acre site at the southeast corner of NW 58th Street and NW 97th Avenue is currently listed with an asking price of $6.0 million or $31.38 per square foot. The property is at a signalized intersection and is zoned IC (Industrial Commercial). The listing agent is NAI Miami Commercial Real Estate Services Worldwide. The 2013 demographics at this site suggest an average household income of $110,111 within 1-mile of the site and $92,975 within 2-miles of the site. In addition, the property has received a Class IV Wetland Permit.

A 10.94-acre site located along the south boundary of the easterly portion of the Subject Property is listed with an asking price of $13,105,000, or $27.50 per square foot. Discussions with the property representative, Jorge A. Davila, confirmed the lack of supply of retail sites in Doral. Mr. Davila reported that this property has 670 feet of frontage along NW 102nd Avenue and is zoned IU-1 (Light Industrial).

According to the CoStar Retail Report for the Third Quarter of 2011, the Miami Airport submarket has approximately 12.8 million square feet of rentable building area, a 4.1% vacancy level, and quoted rental rates are averaging $19.84 per square foot on a triple-net basis. Retail rental rates in Doral will likely be greater than the aggregate retail rental rate for the Miami Airport submarket. It is my opinion that the market rental rate for retail properties in the Doral market and at the Subject Property are approximately $20.00 per square foot on a triple net basis. With a 5.0% allowance for vacancy and collection loss and applying an overall capitalization rate of 8.5%, as indicated by the RERC Report – 3rd Quarter 2011, the Appraiser obtains a value estimate of approximately $21.3 million for the property's 94,700 square feet of retail area, upon completion and at stabilization. Subtracting direct and indirect cost estimate of $125.00 per square foot, as indicated by the Marshall Valuation Service (Excellent Class C Retail Store – Section 13, Page 26, May 2010) results in a cost estimate of approximately $11.8 million. Adding an entrepreneurial profit allowance of 15%, or $1.8 million, indicates a total project cost of approximately $13.6 million. Subtracting this amount from the estimated project value implies a residual value to the site of approximately $7.7 million, or approximately $81.31 per square

foot FAR. It is my opinion, that this estimate is on the high end of a reasonable range and a value of approximately $60.00 psf FAR or $5.7 million is market oriented and credible.

According to the CoStar Office Report for the Third Quarter of 2011, the Miami Airport submarket has approximately 16.8 million square feet of rentable building area, a 17.1% vacancy level, and quoted rental rates are averaging $24.04 per square foot on a triple-net basis. It is my opinion that the market rental rate for second floor office properties in the Doral market and at the Subject Property are approximately $17.50 per square foot on a triple net basis. With a 15.0% allowance for vacancy and collection loss and applying an overall capitalization rate of 8.5%, as indicated by the RERC Report – 3rd Quarter 2011, the Appraiser obtains a value estimate of approximately $16.3 million for the property's 93,346 square feet of office area, upon completion and at stabilization. Subtracting direct and indirect cost estimate of $100.00 per square foot, as indicated by the Marshall Valuation Service (Good Class C Retail Store – Section 15, Page 17, November 2011) results in a cost estimate of approximately $9.3 million. Adding an entrepreneurial profit allowance of 15%, or $1.4 million, indicates a total project cost of approximately $10.7 million. Subtracting this amount from the estimated project value implies a residual value to the site of approximately $5.6 million, or approximately $60.00 per square foot FAR. It is my opinion, that this estimate is on the high end of a reasonable range and a value of approximately $50.00 psf FAR or $4.7 million is market oriented and credible.

- Summary and Conclusion: In summary, the Appraiser has estimated the contributory value of the condominium/apartment product line to be $20,000,000; the contributory value of the 94,700 square feet of retail area entitlements to be $5,700,000; and the value of the 93,346 square feet of office area entitlements to be $4,700,000. In the aggregate, these estimates indicate a market value for the South Tract of $30,400,000.

3. East Tract (8.3 Acres): The East Tract, containing 8.3 acres of gross land area, is located approximately 1,615 feet north of NW 58th Street along the west side of NW 102nd Avenue (as extended) and along the south side of NW 66th Street, an east-west roadway within the Development. The East Tract was originally planned for development of 230,000 square feet of office area.

Regarding the East Tract, the Appraiser spoke with Jorge A. Davila; a real estate professional with The Katsikos Group, Inc. Mr. Davila is a licensed real estate broker and has specific knowledge relating to the East Tract. During 2005, Mr. Davila had listed the East Tract for $14.0 million. The asking price was based upon a proposed use of the property for the development of two 125,000 square foot two-story office buildings. The property did not attract any offers and the listing agreement expired.

Mr. Davila indicated that development of the East Tract would require the extension of NW 102nd Avenue. This roadway was recently extended and an abutting property owner is currently in the design phase for the further extension of NW 102nd Avenue. Mr. Davila estimated the cost to extend 102nd Avenue, de-muck and bring in fill dirt to the property will likely range from $2.0 to $2.25 million. It is Mr. Davila's opinion, that the highest price for the East Tract would be obtained if the property were to be used for residential purposes, but he did not consider such a use to be reasonably probable at this time. For an industrial commercial office use, as permitted under the current zoning classification, Mr. Davila is of the opinion that the East Tract currently has a market value of approximately $5.00 per square foot of net land area or approximately $1.8 million.

In March 2011, the City of Doral purchased a 5.0-acre tract of land zoned IC (Industrial Commercial) for $2,750,000 or $12.63 per square foot. The property is located along the west side of NW 99th Avenue, between NW 58th Street and NW 62nd Street. This property is similarly zoned as is the East Tract, but is superior to the East Tract because it does not require capital expenditures for the extension of roadways, de-mucking or off-site fill dirt. Multiplying $12.63 per square foot times the East Tract's 361,548 square feet of net land are indicates an unadjusted value of $4,566,351, or approximately $4,565,000. A $2,250,000 deduction is applied to this estimate in order to account for land development costs for the East Tract. Consequently, a market value estimate of $2,315,000 is indicated for the East Tract. Giving equal consideration to this value indication and the information provided by Mr. Davila, it is the Appraiser's opinion that the market value of the East Tract is $2,000,000.

4. <u>Summary and Conclusion:</u> The Appraiser has developed market value estimates for the North Tract, the South Tract, and the East Tract as follows:

- North Tract:  $47,100,000
- South Tract:  $30,400,000
- East Tract:   $2,000,000
- Total         $79,500,000

Because the purpose of the appraisal is to estimate the market value of the Subject Property to an individual purchaser, it is necessary to apply a bulk purchase discount. Typically, such discounts depend upon the amount of the aggregate value and market conditions. In my opinion, a bulk purchase discount of 15% is appropriate. Subtracting $11,925,000 or 15% from the $79,500,000 aggregate market value estimate results in a market value estimate for the Subject Property of $67,575,000.

**HREA**
Hanson Real Estate Advisors, Inc.

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 1101200I

## FINAL OPINION OF VALUE

In conclusion, the market value of the fee simple interest (subject to noted exceptions) of the Subject Property, as of January 11, 2012, is $67,575,000. The market value estimate is reported in terms of cash or it's equivalent. A market exposure term of 12-months to 18-months is considered accurate and reasonable for the sale of a property of this scope and magnitude and located within a strong market, such as the Doral market area.

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 1101001

# CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- I have not performed a previous appraisal involving the subject property within the three years prior to this assignment.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, FIRREA Title XI, 12 CFR part 323 (FDIC) and 12 CFR Part 34 (RTC).

- I have made a personal inspection of the property that is the subject of this report.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- Although the opinions expressed within the Report are solely those of Woodward S. Hanson, State-Certified General Real Estate Appraiser RZ1003; Andrew D. Anderson, State-Certified General Real Estate Appraiser RZ3175, Nelson P. Taylor, State-Registered Trainee Appraiser R123405 and Zachary S. Hanson, State-Registered Trainee Appraiser R123504 provided assistance to Mr. Hanson.

- As of the date of this report, Woodward S. Hanson has completed the continuing education program of the Appraisal Institute and the State of Florida.

Woodward S. Hanson, MAI, CRE, CCIM, FRICS
Cert Gen RZ1003

**HREA**
Hanson Real Estate Advisors, Inc.

CASE NO. 11-35884-RAM, CHAPTER 11
HREA ASSIGNMENT NO. 11012001

# ASSUMPTIONS AND LIMITING CONDITIONS

**A. Extraordinary Assumptions and/or Hypothetical Conditions:** The following extraordinary assumptions and/or hypothetical assumptions have or have not been made in regards to this appraisal assignment:

1. Extraordinary Assumption: An extraordinary assumption is an assumption, directly related to a specific assignment, which, if found to be false, could alter the Appraiser's opinions or conclusions. The Appraisal results are not based on any extraordinary assumptions.

2. Hypothetical Condition: A hypothetical condition is that which is contrary to what exists but is "assumed" for the purpose of the analysis. The Appraisal results are not based upon any hypothetical conditions.

**B. General Assumptions and Limiting Conditions:** General assumptions and limiting conditions typically deal with issues such as legal and title considerations, liens and encumbrances, property management, information furnished by others (e.g., engineering studies, surveys, etc.), concealment of hazardous substances on the property, and compliance with zoning regulations and local, state, and federal laws. Each assumption or condition must be reasonable or supportable in the context of the appraisal and must not conflict with the appraiser's other responsibilities such as the identification of extraordinary assumptions or hypothetical conditions. The general assumptions applying to this appraisal assignment include (without exception):

1. General Assumption(s). The general assumptions applying to this appraisal assignment include (without exception):

   a. The subject property of this appraisal assignment is not characterized by any detrimental conditions, including (without limitation) general descriptive information (e.g. size, access, history, title, etc.); transactional conditions (e.g. foreclosure, assemblage, financing, etc.); violation, crime, or tragedy; legal issues or obligations; neighborhood issues (e.g. noise, odor, power lines, airport, etc.); improvements or construction issues (e.g. defects, termites, pests, ADA, code violations, permits, repairs needed, etc.); soils or geotechnical issues (e.g. drainage, basins, grading, fill, cracking, subsidence, slides, corrosive soils, compaction, groundwater, settlement, etc.); contamination or environmental issues (e.g. septic, spills, hazardous materials, asbestos (1979), lead-based paint (1978), agency lists, radioactive, metals, solvents, biological, or hydrocarbons, etc.); natural or cultural resource issues (e.g. habitat, moratoriums, endangered species, natural or cultural resources, archeological, shore land, wetland, etc.); and natural hazards or problems (e.g. flood, wildfire, seismic, volcano, tornado, storm damage, etc.).

   b. The title is marketable and free and clear of all liens, encumbrances, encroachments, easements and restrictions (subject to noted exceptions).

   c. There are no existing judgments, pending or threatened litigation that could affect the value of the property.

   d. There are no hidden or undisclosed conditions of the land that would render the property more or less valuable.

   e. The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

HREA
Hanson Real Estate Advisors, Inc.

**HREA**

Hanson Real Estate Advisors, Inc.

2. Limiting Conditions. The limiting conditions applying to this appraisal assignment include (without exception)

a. The conclusions stated in this appraisal report apply only as of the effective date of the appraisal, and no representation is made as to the affect of subsequent events.

b. No studies relating to any possible detrimental condition (e.g. soil and/or ground water contamination, etc.) were either requested or made in conjunction with this appraisal, and the appraiser(s) reserve the right to amend any or all of the analyses, opinions or conclusions herein subject to upon any subsequent environmental impact studies.

c. The Client provided the appraiser(s) with a survey. Any sketch or survey of the property included in this report is for illustrative purposes only and should not be considered to be scaled accurately for size. The appraisal covers the property as described in this report, and the areas and dimensions set forth are assumed to be approximately accurate and correct.

d. No opinion is expressed as to the value of subsurface oil, gas or mineral rights (subject to noted exceptions), if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal.

e. The appraiser(s) accept no responsibility for considerations requiring expertise in other fields. Such considerations include, but are not limited to, preparation of legal descriptions, surveys, environment contamination studies, ecological studies, soil studies, and jurisdictional and/or regulatory studies (e.g. wetlands location and quantification, potential wetland impacts, and potential impact(s) on listed, protected, and/or endangered wildlife or vegetative species). The intended user is advised to read General Assumption (1a).

f. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication including (without limitation) prospectuses, private offering memoranda and other offering material provided to prospective investors without prior written consent from Hanson Real Estate Advisors, Inc.

g. Information, estimates and opinions contained in this report are assumed to be reliable and may have or have not been independently verified by one or more of the appraisers, depending on the nature of and relevance (i.e., scope of work) to the subject property and valuation thereof. Processes used by the appraisers (in this regard) are "usual and customary" to the appraisal profession and its members.

h. No consideration has been given to personal property located on the premises or to the cost of moving or relocating such personal property; only the real property has been considered.

i. The current purchasing power of the dollar is the basis for the value stated in our appraisal; we have assumed that no extreme fluctuations in economic cycles will occur.

j.  The value found herein is subject to these and to any other assumptions or conditions set forth in the body of this report.

k.  All parties who use or rely upon any information in this report without the written consent of Hanson Real Estate Advisor's, Inc. do so at their own risk.

**HREA**

Hanson Real Estate Advisors, Inc.

**HREA**
Hanson Real Estate Advisors, Inc.

# ADDENDUM A

## QUALIFICATIONS OF APPRAISER

# WOODWARD S. HANSON, MAI, CRE, CCIM, FRICS

## PROFESSIONAL QUALIFICATIONS

### COMPANY BACKGROUND

Mr. Hanson is President of Hanson Real Estate Advisors, Inc. (HREA), a multi-generation, family-owned, real estate company providing Southwest Florida brokerage, appraisal and/or consulting services prior to the turn of the century. Mr. Hanson's great-grandfather (Dr. William Hanson) arrived in Fort Myers in 1884 and along with his wife (Julia Allen Hanson) bought and subdivided numerous properties in Fort Myers. Mr. Hanson's great-great-grandfather (Capt. Manuel A. Gonzalez) and his family were the first settlers of the abandoned military fort that is known as Fort Myers. Capt. Gonzalez's 40-acre homestead is the location of the Thomas Alva Edison winter estate. His son (Manuel S. Gonzalez) built many of Fort Myers' historic structures.

Mr. Hanson's father (W. Stanley Hanson, Jr.) was appointed Lee County Tax Assessor in August 1955 by Governor LeRoy Collins. W. Stanley Hanson, Jr. was a 1964 Charter Member of the Southwest Florida Chapter of the Society of Real Estate Appraisers (SREA), President of the Southwest Florida Chapter of the SREA, a Senior Real Property Appraiser (SRPA – 1973) of the SREA, a Residential Member (RM – 1971) of the American Institute of Real Estate Appraisers (AIREA), Member (MAI – 1974) of the AIREA, and Member (MAI) of the Appraisal Institute. W. Stanley Hanson, Jr. was a Florida licensed real estate broker throughout his real estate career.

Mr. Hanson joined his father's appraisal practice in September 1979 and in 1991 the firm became known as Hanson Appraisal Company. Mr. Hanson was one of the original 25 shareholders of Integra Realty Resources (IRR), a national real estate valuation firm organized in 1998. Mr. Hanson later sold his shares in IRR to create HREA and continue the family business.

### EDUCATIONAL BACKGROUND AND AWARDS

University of Florida: Associate of Arts (1974).
University of Florida: BSBA with Honors (1976), Major: Real Estate and Urban Land Studies.
University of Florida: Bachelor of Design with Honors (1979), Major: Architecture.
Florida Gulf Coast University: MBA Program and Curriculum.
Phi Kappa Phi: National honor society for engineering and architectural studies.
President's List (4.0 GPA) and Dean's List (3.5 GPA).

### PROFESSIONAL DESIGNATIONS AND LICENSES

MAI (No. 7534 - February 1987) – The Appraisal Institute.
CCIM (No. 8161 - August 1998) – Commercial Institute of Real Estate, NAR.
CRE (No. 1939 - April 1999) – The Counselors or Real Estate, NAR.
FRICS – Fellow of the Royal Institution of Chartered Surveyors.
Florida Certified General Real Estate Appraiser (RZI003).
Florida Real Estate Broker's License (0174419).
Other Certified General State Appraisal Licenses: Washington, Georgia, and Missouri.

## PROFESSIONAL ACTIVITIES AND AFFILIATIONS

2001 Immediate Past National President, The Appraisal Institute, Chicago, Illinois.
2000 National President, The Appraisal Institute, Chicago, Illinois.
1999 President Elect, The Appraisal Institute, Chicago, Illinois.
1998 Vice President, The Appraisal Institute, Chicago, Illinois.
1997 Chair Government Relations, The Appraisal Institute, Chicago, Illinois.
1996 Chair Appraisal Standards Council, The Appraisal Institute, Chicago, Illinois.
1995 Vice Chair Ethics & Counseling - The Appraisal Institute, Chicago, Illinois.
1994 Chair Review & Counseling Division, The Appraisal Institute, Chicago, Illinois.
1994 President, West Coast Florida Chapter of the Appraisal Institute, Tampa, Florida.
National Association of Realtors (NAR).
Fort Myers Board of Realtors.

## INSTRUCTOR, SPEAKER AND AUTHOR

Instructor: American Law Institute of the American Bar Association.
Speaker: The Princeton Conference, Princeton University, Princeton, New Jersey.
Speaker: Pan-American Valuation Conference, Cusco, Peru.
Speaker and Author: Pan-Pacific Valuation Conference, Auckland, New Zealand.
Speaker: Korea Property Appraiser's Association, Seoul, Korea.
Speaker: Japanese Association of Property Appraisers, Tokyo, Japan.
Speaker: Alfred Ring Distinguished Speaker's Series, University of Florida.
Speaker: Regulatory Takings, Florida Chamber of Commerce, Orlando, Florida.
Speaker: Florida Gulf Coast University, Fort Myers, Florida.
Speaker: Real Estate Market Watch, Fort Myers, Florida.
Contributing Author: The Appraisal of Real Estate-11[th] Edition, The Appraisal Institute.
Author: Real Estate and Network Economics, The Counselors of Real Estate.
Author: Public Interest Value and Non-Economic HBU, The Appraisal Institute.
Author: The Valuation of Networks, The Appraisal Institute.
Author: Real Consulting and USPAP Compliance, The Appraisal Institute.

## QUALIFIED AS AN EXPERT IN THE FIELD OF REAL ESTATE APPRAISAL

The Congress of the United States of America, Washington, D.C.
The Chancery Court of Delaware, Wilmington, Delaware.
U. S. Federal Tax Court, Indianapolis, Indiana.
U. S. Federal Court, Middle District of Florida, Fort Myers and West Palm Beach, Florida.
U. S. Federal Court, Northern District of Florida, Jacksonville, Florida.
Various Circuit Courts of the State of Florida: Lee County, Hendry County, Glades County,
Collier County, Dade County, Palm Beach County, Pinellas County, Hillsborough County, Pasco
County, Orange County, Lake County, Leon County, Escambia County, and Brevard County.
State of Washington: Seattle and Tacoma.



## PARTIAL CLIENT LIST

U.S. Dept. of Justice, U.S. Army Corps of Engineers, Internal Revenue Service, Florida Department of Transportation, Florida Department of Environmental Protection, South Florida Water Management District.

Orlando-Orange County Expressway Authority, Dade County Expressway Authority, Orlando International Airport, Southwest Florida International Airport, City of Fort Lauderdale, City of St. Petersburg, City of Fort Myers, The School Board of Lee County, Lee County Property Appraiser's Office, Lee County Board of County Commissioners, and the Collier County Board of County Commissioners.

Wachovia Corporation, SouthTrust Bank, NationsBank, Barnett Bank, Prudential Life Insurance Co., Universal Studios of Florida, WCI Communities, Inc., Lennar Corp., Lykes Bros. Corp., U.S. Sugar Corp., First Boston, Bear Stearns, Thomas Enterprises, Inc., The Davidson Group (Tampa Bay Lightning and Detroit Pistons), Private Equity Group, Estate of Dorothy Fleischman, Estate of Elizabeth Calder, Weyerheuser Corp., Gate Maritime Petroleum, The Bonita Bay Group, and FGTX.

White and Case, Skadden Arps, Brigham Moore, Smith Halsey, Holland Knight, Hill Ward Henderson, Broad & Cassel, Foley Lardner, Gronek & Latham, Mershon-Sawyer, Ellis Li & McKinstry, Ulmer Hicks & Schreiber, and Henderson Franklin.

## CONSULTING ASSIGNMENTS

Mr. Hanson was a member of the CRE Consulting Corps that provided the University of Arkansas – Little Rock Arkansas consulting services. This assignment was to assess the financial feasibility and community acceptance of various approaches for redeveloping the commercial real estate assets of the University District, and to develop a market-driven, realistic, and achievable action plan for the development of those assets that coordinates with the University District Revitalization Plan, the UALR Campus Master Plan, and the UALR Strategic Plan.

## SIGNIFICANT ASSIGNMENTS

Largest Eminent Domain Verdict in Florida History: $167.5 Million, Federal Court.
Largest Settlement for Temporary Taking in U.S. History: Monroe County, Florida.
Lykes Brothers Minority Shareholder Action: $350 Million, Glades County, Florida.
St. Pete Times Forum: $175 Million Reduction in Prop. Assessment, Tampa, Florida.
ESOP Leveraged Buy-Out of U.S. Sugar Corp: $200 Million, Wilmington, Delaware.
Universal Studios Acquisition of Lockheed Martin Property, Orlando, Florida.
Wachovia Corp. funding of the Universal Blvd. Planned Development, Orlando, Florida.
Orlando International Airport's expansion/acquisition of Lake Nona DRI property.
Southwest Florida International Airport's expansion/acquisition of Sanders property.



**HREA**
Hanson Real Estate Advisors, Inc.