Page 1

1                UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF FLORIDA
2

3

   IN RE:                      CASE NO. 11-35884-RAM
4
   TOWN CENTER AT DORAL, LLC,
5
                   Debtor.
6   _____/

7

8          MOTION TO TERMINATE EXCLUSIVITY (83)

9                   December 22, 2011

10

11          The above-entitled cause came on for hearing

12   before the Honorable Robert A. Mark, one of the Judges in

13   the UNITED STATES BANKRUPTCY COURT, in and for the

14   SOUTHERN DISTRICT OF FLORIDA, at 51 SW 1st Avenue, Miami,

15   Miami-Dade County, Florida on December 22, 2011,

16   commencing at or about 2:00 p.m., and the following

17   proceedings were had.

18

19

20

21

22

23                   Reported By:
                   Cheryl L. Jenkins, RPR
24

25

Page 2

1                           APPEARANCES:
2
3

        BILZIN SUMBERG BAENA PRICE & AXELROD, by
4                   MINDY A. MORA, Esquire
                            and
5               JEFFREY SNYDER, Esquire
                On behalf of the Debtors
6
7           GENOVESE JOBLOVE & BATTISTA, by
                    GLENN MOSES, Esquire
8       On behalf of the Creditors' Committee
9
                BERGER SINGERMAN, by
10                  JORDI GUSO, Esquire
                            and
11              DEBBIE GALLER, Esquire
        On behalf of Terra World Investments, LLC
12
13              ARNSTEIN & LEHR, by
            PHILIP HUDSON, III, Esquire
14      On behalf of Florida Prime Holding, LLC
15
                BROAD AND CASSEL, by
16              C. CRAIG ELLER, Esquire
            On behalf of AmT CADC Venture, LLC
17
18              GREENBERG TRAURIG, by
                    JOHN HUTTON, Esquire
19                          and
                    JOHN DODD, Esquire
20      On behalf of U.S. Bank of National Association as
                    Indenture Trustee
21
22              STEARNS WEAVER, by
            PATRICIA REDMOND, Esquire
23                          and
                ERIC SILVER, Esquire
24      On behalf of the Landmark at Doral
            Community Development District
25

1

2              ALEXIS GONZALEZ
   On behalf of the Miami-Dade County Tax Collector

3

              HOPPING GREENS & SAMS, by
4               MICHAEL ECKERT, Esquire
           On behalf of Florida Fund Holdings

5

6

       STEVEN D. SCHNEIDERMAN, Attorney Advisor
7             Office of the U.S. Trustee
                Department of Justice

8

              ALSO PRESENT:

9

               BRIAN PEARL

10

                RICK BROWN

11

              BETTY SHUMENER

12

13

14              - - - - - - -

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right.  Let's get

2    appearances.  Let's start on the debtor's side.

3          MS. MORA:  Judge, good afternoon.

4    Mindy Mora and Jeff Snyder from Bilzin Sumberg on behalf

5    of the debtors.

6          MR. SNYDER:  Good afternoon, Judge.

7          THE COURT:  Good afternoon.

8          MS. REDMOND:  Good afternoon, your Honor.

9    Patricia Redmond, Stearns Weaver, on behalf of the

10   District, the CDD, your Honor.  Mr. Wrathell is wandering

11   outside on Flagler Street somewhere.  He will be here

12   during the course of the hearing.  He is the District

13   Manager.

14         THE COURT:  What is his name again?

15         MS. REDMOND:  Your Honor, Mr. Wrathell,

16   W-r-a-t-h-e-l-l.

17         THE COURT:  Okay.

18         MR. GUSO:  Good afternoon, your Honor.

19   Jordi Guso and Debbie Galler from Berger Singerman on

20   behalf of Terra Landmark, LLC, and we are joined in the

21   courtroom by Mr. Brian Pearl, Terra Landmark's

22   representative.

23         MR. HUTTON:  Good afternoon, your Honor.

24   John Hutton and John Dodd on behalf of U.S. Bank, as

25   Indenture Trustee.

```
 1              MR. MOSES:  Good afternoon, your Honor.
 2   Glenn Moses, Genovese, Joblove & Battista on behalf of the
 3   creditors' committee.
 4              MR. ELLER:  Good afternoon, your Honor.
 5   Craig Eller of Broad and Cassel on behalf of AmT CADC
 6   Venture, and with me in the courtroom this afternoon is
 7   Mr. Rick Brown, of Sable Financial on behalf of AmT.
 8              THE COURT:  Okay.
 9              MR. HUDSON:  Good afternoon, your Honor.
10   Philip Hudson on behalf of Florida Prime Holdings, LLC,
11   the bondholders.
12              I'd like to introduce, Judge, Mrs. Betty
13   Shumener, who filed pro hac papers.  She's from BLA Piper,
14   LA.  She is outside general counsel for the majority
15   partner of Florida Prime.
16              THE COURT:  Okay.  Welcome.
17              MS. SHUMENER:  Good afternoon, your Honor.
18              THE COURT:  Welcome.
19              MS. SCUMENER:  Thank you.
20              MR. ECKERT:  Good afternoon, your Honor.
21   Mike Eckert, with Hopping Greens & Sams, on behalf of
22   Florida Fund Holdings, the bondholder.
23              MR. SCHNEIDERMAN:  Steven Schneiderman for
24   the U.S. Trustee.
25              THE COURT:  Okay.  Just a couple of things I
```

1    want to mention before we talk about the motion that's on

2    today.

3                    The motion to value was filed, and Elaine

4    issued a notice of non-evidentiary hearing, which we need

5    to correct, that's intended to be an evidentiary hearing

6    on the 18th of January.  The question is, is value going

7    to be contested?  If so, I want to set some deadlines for

8    competing appraisals.

9                    MS. REDMOND:  Your Honor, value will be

10   contested.

11                   THE COURT:  Okay.  Is there just going to be

12   one appraisal, probably, for all the people on the bride,

13   or groom side, whichever you choose?

14                   (Laughter.)

15                   MS. REDMOND:  Your Honor, we will have one

16   full appraisal.

17                   THE COURT:  Right, but, I mean, the

18   District, and the bondholders, and the Indenture Trustee

19   are all kind of the same team here?

20                   MR. HUTTON:  Yes, your Honor.

21                   MR. HUDSON:  Correct.

22                   THE COURT:  All right.  So, when will you

23   have your appraisal?

24                   MS. REDMOND:  Your Honor, we just received

25   the debtor's appraisal two days ago, and we have got an

1    appraiser that we have retained, or we're in the process

2    of retaining.  So, he's going to start work now.

3              We have asked him to have his appraisal one

4    week before the hearing.  He's agreed to work over the

5    holidays and get that accomplished.

6              THE COURT:  Was either side intending to

7    depose the appraisers, or we'll just put on their

8    testimony and cross?

9              MS. MORA:  We will be deposing the

10   District's appraiser, Judge.

11             MS. REDMOND:  And we are as well,

12   your Honor, we are deposing the appraiser of the debtor.

13             THE COURT:  Do you need any guidance in the

14   scheduling order, or you'll just work that out?  I can

15   just do a -- what I would do is an order noting that it

16   will be evidentiary, it will be the same time as the -- as

17   was previously set, I think it's the 18th, at 9:30 or

18   10:00, I don't remember which.

19             MS. MORA:  I think it's 10 o'clock.

20             THE COURT:  And I'll set a deadline of the

21   11th for you to furnish the debtor with your appraisal,

22   and then my question is, do you need any language in there

23   about depositions, or you think you'll work that out?

24             MS. MORA:  I think we can probably work out

25   dates, Judge.

1          MS. REDMOND:  Your Honor, we've already

2    noticed the appraiser of the debtor for deposition, but we

3    can work on a schedule with respect to that.  I don't

4    think we need a schedule to do that.

5          THE COURT:  Okay.  Is there an issue of

6    deposing their expert before your appraisal is done, or

7    anything like that?  Or, no, your guy is going to do his

8    independent of any --

9          MS. REDMOND:  We can, your Honor.

10          THE COURT:  -- examination?

11          Okay.  So, in that vein, what about the

12    motion for protective order that was filed, it's not on

13    for hearing today, but it related to a depo, I guess, of

14    Mr. Kodsi, that was noticed for yesterday?

15          MS. REDMOND:  Your Honor, I can address this

16    deposition notice that was sent out, and it was sent out

17    on short order because of the hearing that was scheduled

18    today.

19          The issue is a scheduling one.  You set that

20    for -- other issues for hearing on the 18th of January,

21    but the scheduling, now we have enough time to take

22    Mr. Kodsi's deposition before the other matters, which are

23    to come before the Court.

24          Your Honor, we really just wanted it today,

25    we thought that Mr. Kodsi's marketing efforts, Mr. Kodsi's

1  involvement, and Mr. Kodsi's, whatever he might get out of

2  this transaction might be relevant for today, but we're

3  here today without it, your Honor.  So, the issues today

4  are that we don't need to have the deposition right now.

5  We can probably work out the protective order issues.

6            THE COURT:  All right.  I'm not sure what

7  that means procedurally.  It's essentially granted as to

8  the deposition, but there may be a dispute over documents?

9            MS. MORA:  Judge, the District has sought an

10  extensive amount of production.  We're going to go back

11  and see how long it's going to take us to assemble it, and

12  we will try to work cooperatively with opposing counsel to

13  produce it as quickly as we can locate it.

14            THE COURT:  Okay.  So, Ms. Mora, why don't

15  you do an order that grants the motion for protective

16  order in part, as to the December 21st deposition and

17  production date, and denies it without prejudice as to the

18  document request, and then we'll see how that's narrowed

19  down.

20            MS. REDMOND:  Your Honor we'll arrive at a

21  mutually convenient time to take the deposition.

22            THE COURT:  Okay, and then just, it may be

23  on the docket, I didn't look right before the hearing, but

24  I signed this morning an order setting the disclosure

25  statement hearing on the disclosure statement filed

1    yesterday for the 25th at 10:00, which was the date that

2    we had previously set aside, and it's also the date and

3    time of the further hearing on stay relief.

4                    Okay.  Anything else to report from the

5    debtor's side before we get into the motion for today?

6                    MS. MORA:  No, your Honor.

7                    THE COURT:  Okay.  All right.  I'd like to

8    ask the parties that have not weighed in in writing for

9    their views.  We have -- the District filed the motion,

10   and there is a joinder field by U.S. Bank, as Indenture

11   Trustee, and by Florida Prime.

12                   But, Mr. Eller, we haven't heard from you or

13   from Mr. Moses.  So, I'd like to hear your views.

14                   MR. MOSES:  Thank you, your Honor.

15                   The committee would ask that your Honor

16   actually not terminate exclusivity today, and rather

17   continue the hearing, or otherwise defer ruling on the

18   motion to terminate exclusivity until next month, and

19   that's when the CDD has its request for full stay relief,

20   and obviously it's the debtor's disclosure statement.

21                   Your Honor, terminating exclusivity is not

22   always in the best interest of the unsecured creditors.

23   We do question the CDD's motives, especially given how

24   hard they have been fighting to foreclose on the property.

25                   We believe that continuing the hearing will

1   serve several purposes.  First, it won't trigger a default

2   under the agreement with Terra, allowing Terra to walk if

3   it so chooses.  It will allow the CDD to actually come up

4   with a plan of reorganization that is better than the one

5   that's on the table right now, there is no plan, there is

6   nothing that's been proposed, at least to the unsecured

7   creditors' committee, and in the meanwhile, your Honor,

8   there is nothing that's preventing the CDD from bringing

9   potential buyers or plan sponsors to the committee for the

10  purposes of proposing a competing plan of reorganization.

11          If and when that happens, your Honor, the

12  committee can come back before your Honor and seek to

13  terminate exclusivity at that time, and move forward if

14  there is a better plan on the table.

15          But, your Honor, for now we would request

16  that you defer ruling on the motion to otherwise carry it

17  to the 25th.

18          Thank you.

19          THE COURT:  Well, exclusivity, unless

20  extended, would terminate by then, wouldn't it?  I'm

21  looking at a ---

22          MS. MORA:  Judge, we have a plan filed.

23          THE COURT:  Right.

24          MS. MORA:  And so ---

25          THE COURT:  So exclusivity is really as

Page 12

1    to --

2                    MS. MORA:  Solicit.

3                    THE COURT:  -- soliciting at this point.

4                    MS. MORA:  Which runs for 180 days from the

5    petition date, which would take us out to, I think, some

6    time in March.

7                    THE COURT:  Right, okay.  All right.

8                    MR. ELLER:  Your Honor, we have had

9    extensive discussions with the counsel for the unsecured

10   creditors' committee on this very issue, and we have

11   elected to support the unsecured creditors' committee's

12   position on delaying the outcome of this, the Community

13   Develop District's motion this afternoon until the

14   disclosure statement hearing.  We also believe that that

15   is in the best interest of the unsecured creditors.

16                   In particular, given the different positions

17   of the parties so far, we don't have any type of

18   indication as to what the Community Development District's

19   plan might provide for.  That's nowhere found in the

20   motion to terminate exclusivity.

21                   I don't think it would have been a problem

22   for them to attach a draft plan, so that the unsecured

23   creditors might have had a better idea of what they were

24   to expect, but at this point in time we think that the --

25   giving the debtor the opportunity to go forward, while at

1   the same time giving the CDD the opportunity to possibly

2   formulate their plan, and then seek to have exclusivity

3   terminated at the disclosure statement hearing, will

4   provide for the parallel track that the Court has spoken

5   of, and give all the unsecured creditors a full

6   opportunity to analyze what plan may be in their best

7   interest.

8            THE COURT:  The existing plan is two and a

9   half million dollar pot, is that right?

10           MS. MORA:  That's correct.

11           MR. ELLER:  Correct, Judge.

12           THE COURT:  Is there any ---

13           MR. ELLER:  And just for your information,

14   we're probably about 2 million of that, if you do the

15   math.

16           THE COURT:  Yes, it sounds like a lot of

17   money until you look at how much you put in.

18           MR. ELLER:  Agreed.

19           THE COURT:  All right.  The plan -- does the

20   plan have any other future potential for unsecured

21   creditors?  I didn't have a chance to read through it.

22           MS. MORA:  Judge, the plan ---

23           THE COURT:  It took me a while to figure out

24   the 6-40ths and 16-40ths, and then it finally dawned on me

25   that it was going to add up to 40-40ths.  We did sort it

1  out.

2          MS. MORA:  Just taking you back to algebra,

3  Judge.

4          THE COURT:  Thank you.

5          MS. MORA:  The plan provides for two and a

6  half million dollars being paid over two years.  There is

7  a distribution on the effective date, the first

8  anniversary, and then the second anniversary.

9          Terra, our co-plan proponent, is the one who

10  is really in active negotiations, both with Mr. Moses and

11  Mr. Eller regarding the treatment of unsecured creditors,

12  Judge.  So, if I could, I would defer to Mr. Guso and ask

13  him to address the Court regarding those negotiations.

14          THE COURT:  Well, if you're in negotiations,

15  you don't have to --

16          MR. GUSO:  Thank you.

17          THE COURT:  -- obviously disclose those, but

18  -- all right.  So, as filed, though, it's a two and a half

19  million dollar pot plan, with no other contingent

20  recoveries for the unsecureds?

21          MR. GUSO:  That's correct, your Honor, at

22  the present.

23          THE COURT:  Okay.  All right.  So, then,

24  Ms. Redmond, I guess you're up.

25          MS. REDMOND:  Your Honor, for sure

1  exclusivity is the debtor's chip in a reorganization

2  process, and it's one that allows the debtor the time to

3  breathe and to reorganize internally, or to reorganize

4  through the function of a plan, but that's not what we

5  have here.

6              Also what we don't have here is a situation

7  where the debtor is an honest broker, looking for an

8  alternative that's best for each of the constituents in

9  the case.

10             What we have here, in this case, is a debtor

11 that's totally controlled by Terra with respect to a plan

12 that it proposes, that plan doesn't involve a competitive

13 process, and for sure the District was foreclosing, and

14 that foreclosure was the reason for the filing of the

15 Chapter 11, but the District's foreclosure doesn't mean

16 that the District or the bondholders, particularly, don't

17 wish to participate in a plan process to be ample to

18 create a competitive atmosphere for the equity of this

19 company.

20             THE COURT:  And how ---

21             MS. REDMOND:  It's no longer a foreclosure

22 issue, it's really an issue of competing for the equity.

23             THE COURT:  So how would you do that,

24 Mr. Eller is correct, and I know you can't really solicit

25 at this point, but in terms of suggesting alternatives

1    that would be better for the unsecureds -- it is a

2    somewhat, on the surface of it, an unusual dynamic, where

3    you have the secured creditor who is seeking to foreclose

4    arguing to lift exclusivity for the benefit of the

5    unsecureds, although you may, in part, significant part be

6    unsecured, too, with the majority of the unsecured debt

7    favoring going forward with the debtor's plan for the

8    moment.

9               MS. REDMOND:  Well, your Honor ---

10              THE COURT:  I mean, Mr. Eller has got the

11   biggest unsecured claim by far, right?

12              MS. REDMOND:  He does and, your Honor, in

13   fairness, Century Glove, in the 3rd Circuit says that you

14   can't solicit anything, you can't do much before

15   disclosure statement is approved, which was just today, in

16   terms of even telling other constituents what you wish you

17   would propose if you could file a plan, it is solicitation

18   of a vote, but before the disclosure statement is

19   approved.

20              THE COURT:  Well, I don't get to vote, you

21   can't tell me?

22              I mean, I understand the limitations on

23   disclosure and solicitation, but how do we weigh the risk

24   that the creditors' committee and Mr. Eller, on behalf of

25   the largest unsecured apparently weighed in their decision

1   making, that they do not want to risk losing Terra and two

2   and a half million at this point without having some

3   reason to think that you're going to provide something

4   better.

5            MS. REDMOND:  Judge, Mr. Hudson can address

6   what a plan would look like, but I can tell the Court that

7   it is highly, highly unlikely that the debtor loses Terra

8   in this process.

9            Number one, the debtor, in their response,

10  has said that it will be a default under their financing

11  if this -- your Honor approves the termination of

12  exclusivity.

13           Terra has guaranteed all of the obligations

14  that are provided for in the financing before the filing.

15  Therefore, the only thing the financing did was to upgrade

16  Terra to a super priority administrative claimant with

17  respect to being repaid on their same guarantees.

18           In addition, your Honor, when Mr. Hudson

19  addresses the Court, he's going to talk to you about this

20  chart that's up here.  What that chart depicts is that

21  Terra owns a lot of the properties that are surrounding

22  this particular Landmark parcel, and is looking -- and in

23  its appraisal, it deals with not only this property and

24  its intended use, but it's intended to use in connection

25  with the uses of the various Terra properties, and

1   therefore, the chances of Terra leaving this process if

2   your Honor were to terminate exclusivity and allow another

3   plan in the process, are pretty much slim to none.

4               And, your Honor, I think -- well, let me

5   defer to Mr. Hudson to talk about the plan, because I

6   think that a competitive process really means that the

7   bondholders step up to the plate and say, unsecured

8   creditors, this is what we're willing to do for you, and

9   unsecured creditors then have a choice, do they wish that,

10  or do they wish what Terra is proposing.

11              And, your Honor, I think, and you know, I

12  can address the other issues with respect to reasons I

13  don't think Terra would leave, but I'd rather have

14  Mr. Hudson be able to address you with respect to a plan.

15              THE COURT:  Okay.

16              MR. GUSO:  May I be heard, your Honor?

17              I rise simply to ---

18              COURT REPORTER:  Judge, can you have him

19  come to the microphone?

20              THE COURT:  Yes, we can't hear you.

21              MR. GUSO:  Thank you.

22              Judge, Terra would object to your Honor

23  entertaining argument from Mr. Hudson, on behalf of the

24  bondholders.  They are not creditors of these debtors.

25  They are not owed a penny by the debtor and, as a matter

1    of law, cannot file claims against the estates.

2              The CDD is currently taking direction from

3    the bondholders, and it is the CDD who has the right to be

4    heard in the case, not the bondholders.

5              THE COURT:  Technically you may be correct,

6    but I'll overrule it.

7              Go ahead.

8              MR. HUDSON:  Thank you, your Honor.

9              I'm still getting over the shock of the

10   committee's position and Mr. Eller's position, Judge.  I

11   don't understand how they could possibly think having an

12   auction of one helps them.  My client is the only one that

13   has skin in this game, and they have substantial skin in

14   this game.  They would not stand here and ask you to let

15   them file a plan unless they were going to file a plan

16   that they thought would be confirmed.

17             The plan that's going to get confirmed in

18   this case will likely have the support of the committee

19   and Mr. Eller's client.

20             It's really a pretty simple case, it's a

21   little bit backward, because we think the debtors made it

22   that way for reasons we don't need to get into for the

23   moment but, Judge, there is no dispute this is a disguised

24   sale of the underlying real estate.  There are no other

25   assets here.  It's the real estate.  It's development

1    rights, which are still in place, and they're only in

2    place under this development plan, no other plan.

3                    If you look, and you probably haven't had a

4    chance to look at the appraisal yet that they filed, they

5    put zero value the $40 million in improvements that are in

6    the land, zero.  Their appraisal is $43 million, vacant

7    land, zero for the improvements.

8                    I was the only one who stood up a couple

9    weeks ago and said that there may be some value in this

10   property close to what the bond debt is.

11                   If you take 50 percent of the value of those

12   improvements and add it to the $43 million, you're in the

13   63 to $65 million range.

14                   I'm not going to argue values today Judge,

15   but what I'm saying is, my client is here to protect its

16   position, as it should, because its rights, some of its

17   rights have been taken away, in our view, improperly, we

18   don't have right to credit bid under the current plan, and

19   we don't have the right to bid for equity.

20                   There are legal, practical, and economic

21   answers to your questions, but at the end of the day, our

22   plan would be simple, it would be one of two plans, it

23   would either be a pot plan improves upon the plan that you

24   see before you, which, by the way, we are reserving all of

25   our rights to say it's not confirmable for all the reasons

1    we've talked about, and now that we finally have a

2    disclosure statement, a week later -- a week late, we have

3    some more objections that we think are going to prevent

4    confirmation.

5             So, given all of those legal issues, given

6    LaSalle Partners, Judge, and I don't know if you've had an

7    opportunity to see the Global Oceans Carrier case, but I

8    think it's important that you take a look at that case,

9    and I'm happy to hand one up if you want to look at it

10   today.  Judge Walrath, post-LaSalle, out of Delaware,

11   essentially found LaSalle extends beyond simply old equity

12   being required to auction equity, it says that if old

13   equity is controlling the process, even if they're not

14   keeping equity going forward, that control is exactly what

15   LaSalle was designed to prevent and, therefore, you need

16   to have a component to auction equity.  That's what we've

17   been saying from day one.  We need to have an equity

18   auction, or we need to have a valuation auction through a

19   363 process or sale of the property through a plan.

20   That's all.  That benefits the unsecured creditors, it

21   benefits Mr. Eller's client, whether he's fully unsecured,

22   or he has two claims, it benefits everybody, it benefits

23   the debtor.

24             So I don't understand how they can -- I

25   understand why they're standing here saying don't lift

1    exclusivity for the moment, but it makes no sense, Judge.

2    Bankruptcy Courts are about getting the highest and best

3    offer.  That's all we're asking for.

4              What's the downside?  Well, the only

5    downside they've been able to point to is a default and

6    the risk of Terra going away.

7              If you look at this chart, I don't see it up

8    there.

9              I must have missed that Brown Bag, Judge,

10   I'm sorry.

11             If you look at this piece of paper, Judge,

12   the map, the blue part, the L shaped part is our subject

13   property.  Both the disclosure statement, but more

14   importantly the appraisal, and I'm happy to hand it up and

15   cite you to specific references if you'd like, Judge,

16   suggest a number of things.

17             Well, first the appraisal says we're putting

18   no value, you can see -- I don't know how clearly you can

19   see it, but you can see all the improvements, and the

20   roads and so forth that are in the blue space, that they

21   now value at zero.

22             The yellow parts are all Terra properties.

23   So in the industry, that blue part being in the middle, is

24   what I'm told they call the golden acre, it's a very

25   valuable piece of property.  Yet in their appraisal they

1    say, based upon the Terra plan, they're going to land bank

2    this property for a while, sit on it, because they don't

3    want to compete with their other properties.

4              How do you get the highest and best value

5    for something when you do that?  They don't want to

6    compete against their other properties.

7              So here we are, Judge, we have a debtor who

8    acknowledges it has no future, who abandoned this property

9    three years ago, hasn't done anything, the bondholders

10   have funded over $700,000 in improvements, and all the

11   bondholders and the CDD are asking is that you put

12   everybody on an equal playing field, there is no harm,

13   Terra is not going anywhere, the debtor is in default by

14   being a week late on its disclosure statement, and a day

15   or two late on its appraisal, and we didn't see any

16   default notices or we're walking away, of course not,

17   because Terra is the one behind the machine.

18             This is the Wizard of Oz case, I call it,

19   Judge.  Terra is the one that's running this.  Terra does

20   not get the right, in our view, under the various law that

21   we're going to cite to you, under this Global Oceans

22   Carrier case, that I'm happy to give to you today, they do

23   not have the right to come in here at the sole and

24   unilateral designation of the debtor, and steal the

25   equity.  It's not right, Judge, nobody benefits.

1      All we're asking you to do, let us file a

2  plan that does one of two things, we're going to outbid

3  them in a pot plan, or let's bring somebody in here, let's

4  start an auction for the real estate, which is really what

5  everybody wants.  The District doesn't want the real

6  estate, but they're obligated by the Indenture to

7  foreclose, they are public officials with fiduciary duties

8  who are obligated to foreclose, and that's what they're

9  doing.

10            THE COURT:  So your pot plan would do what?

11            MR. HUDSON:  It would give more money to the

12  unsecureds, and ---

13            THE COURT:  But this is a plan, it

14  restructures the debt, in a way that you think is

15  unconfirmable, but it's not a sale.  It is a plan.  It

16  does deal with the secured debt.

17            MR. HUDSON:  It's a sale of the equity,

18  Judge.  Why else would they do it?  I'll tell you why I

19  think they did it, they did it this way to prevent ---

20            THE COURT:  Well, they're getting the

21  equity, but they're not just assuming all the obligations

22  as they sit, they're restructuring the obligations.

23            So, I'm just asking, what are you going to

24  do with the debt, you're going to just have the -- you say

25  it's a pot plan, but ---

Page 25

1              MR. HUDSON:  The secured debt, our debt?

2              THE COURT:  Yes.

3              MR. HUDSON:  It depends, Judge, on what

4   ultimately -- if it's a pot plan, all of the other debt

5   will be dealt with, as a typical reorganization, 1129 will

6   be complied with, 1125 will be complied with, all of the

7   appropriate sections, and another ---

8              THE COURT:  But if you -- see, I guess what

9   I don't get, is if you defeat confirmation, which you seem

10  confident that you can do, then you may get full stay

11  relief, you, I'm talking --

12             MR. HUDSON:  I understand.

13             THE COURT:  -- collective you.

14             MR. HUDSON:  Right.

15             THE COURT:  And then you get the property

16  without putting in --

17             MR. HUDSON:  We may.

18             THE COURT:  -- something in excess of two

19  and a half million.

20             MR. HUDSON:  We may.

21             THE COURT:  So why do you want to come in

22  now and put in more than two and a half million?

23             MR. HUDSON:  Well, let me be clear, we're

24  not excluding one for the other.  What we're doing, Judge,

25  is we're protecting our interests.

1                        If you want to rule in our favor today and

2       say they can't confirm a plan, I'm happy to send you an

3       order over this afternoon, but I don't think you're going

4       to do that.

5                        So, our -- basically what we're doing is

6       we're saying, if -- we don't want to get to confirmation

7       -- in a case that everybody agrees needs to move quickly,

8       we don't want to get to confirmation in March, have a

9       confirmation dispute, prove ourselves right, and then have

10      a situation where, well, Judge, give us one more shot, let

11      us file another plan, let us do this.  So, in essence,

12      what we're doing, Judge ---

13                       THE COURT:  Well, we may reach that at the

14      disclosure --

15                       MR. HUDSON:  We may.

16                       THE COURT:  -- if we have a final stay

17      relief hearing.

18                       MR. HUDSON:  That's our ---

19                       THE COURT:  What's happened in state court,

20      have you gotten any hearing dates or anything?

21                       MS. REDMOND:  Your Honor, as far as I know,

22      there is -- the case switched jurisdictions, and so our

23      state court counsel is trying to get a hearing in early

24      January with respect to a summary judgment.

25                       MR. HUDSON:  So, Judge, what I'm saying is

1   there is no down side, none, to granting exclusivity --

2   relief from exclusivity, and there is only an upside, for

3   the only people that really need some protection here, and

4   that's the unsecured creditors.

5              If they don't have a position because

6   legally you determine they don't have a position, they

7   didn't have a position prepetition, but if they do, if

8   there is a confirmable plan out there, then open it up,

9   open the process up, let the market test it, as LaSalle

10  Partners said, Judge, and don't let this debtor -- I'm not

11  sure why they would do it -- but don't let this debtor

12  choose its particular horse, when creditors are going to

13  be harmed as a result of that, because we're standing here

14  telling you that we're going to file a plan that's

15  intended -- specifically intended to defeat the current

16  plan on an economic basis.

17             THE COURT:  All right.  You still haven't

18  explained what happens to the rest of the debt.  You just

19  take ---

20             MR. HUDSON:  Which debt, Judge, secured,

21  unsecured?

22             THE COURT:  Well, we're going to have a

23  valuation.  So presumably Mr. Eller --

24             MR. HUDSON:  Right.

25             THE COURT:  -- it doesn't matter how many

1    feet below the surface he is, he's still going to be

2    below.  So, he's going to be an unsecured creditor either

3    way, in all likelihood, and then --

4                    MR. HUDSON:  80 percent ---

5                    THE COURT:  -- the District is partially

6    secured.  So what's your plan, we'll just convey the

7    property in exchange for the debt?

8                    MR. HUDSON:  As I said earlier, Judge, it

9    could be -- that could be one option, and another reason

10   we haven't gone forward, we'd like to go out and find

11   potential stalking horses.

12                   We are also in a position, the bondholders

13   may choose to be the stalking horse as well, Judge, so

14   there are multiple options that we can do.  We can either

15   sell the entire property under, in essence, a 363 within a

16   plan, we don't know who the buyers are going to be, we may

17   be the buyers, and obviously we have to give credit to the

18   estate if we're the buyers, put some money in.

19                   If it's a 336 plan, I mean, let me be clear

20   that we understand that we have to put money in for the

21   unsecureds, if that's your question.  We're not going to

22   do a 363 plan that values out all of the secured debt,

23   makes them unsecured and not leave any money on the table

24   for them, obviously that's not better for them, we

25   understand that, Judge.

```
 1              So, any plan that we have that constitutes

 2    an actual sale of the underlying real estate will leave

 3    value on the table for the unsecureds, and you asked an

 4    interesting question, because we've also, Judge -- and,

 5    again, I'm reserving, but you've asked and I'm telling

 6    you, that we see some scenarios under which, down the

 7    road, depending upon certain valuation triggers, that we

 8    may be able to get additional monies to the unsecureds

 9    down the road.  So ---

10              THE COURT:  Do you perceive, or the

11    District, any problems in getting your summary judgment?

12              MS. REDMOND:  Your Honor, I don't know, as I

13    stand here today.  Mr. Freedman of the Coffey Burlington

14    firm is representing the District in the foreclosure.  I

15    know the only logistical problem that he had encountered

16    was the transfer of the case to another jurisdiction, to

17    another judge in the District, so he needed to get the

18    case reset on that judge's calendar, but I don't know if

19    the debtor is opposing it and if there will be difficulty

20    in getting a summary judgment.

21              THE COURT:  Is your client --

22              MR. ELLER:  Yes, your Honor.

23              THE COURT:  -- making noise in state court?

24              MR. ELLER:  AmT is a party to that

25    foreclosure action as a junior lienholder, and I've been
```

Page 30

1    involved on the state court side from day one.

2                    There were several affirmative defenses, but

3    AmT withdrew its defenses and entered into a stipulation

4    for the entry of summary judgment.  So we're obviously

5    standing by that.

6                    The debtor had filed some basic affirmative

7    defenses, but has not undertaken to do any discovery or

8    otherwise prosecute that.  With the reinitiation of the

9    schedule, I was contacted by Mr. Coffey's firm two weeks

10   ago, on the schedule of the hearing, and I can support

11   what Ms. Redmond said, that it looks like late January,

12   but there has been no additional discovery propounded by

13   the debtor, or any action in that case to defend it.

14                   So, in answer to the question, I believe

15   that it will probably go pretty quickly, because we have

16   withdrawn all our defenses, and the debtor has not put

17   forth any that I'm aware of.

18                   THE COURT:  Okay.  Well, I ask in part

19   because I'm wondering why, if you think you're going to be

20   able to defeat their plan so easily and foreclose, you

21   want to kick in in excess -- something in excess of two

22   and a half million to get the property back.

23                   MR. HUDSON:  Well, Judge our plan would

24   likely contain a -- it's a timing issue.  If we don't

25   start drafting a plan today, we're not going to be able to

1   ever get to a plan, and if you decide we're not

2   confirmable, it seems to me that the creditors certainly,

3   and the Court would rather have a Plan B, Plan B being

4   competing plans where someone is going to get money.

5           I do believe you're going to agree us with,

6   Judge, and our plan will say, to the extent you agree at

7   the end of the day, that they don't have a legal right,

8   they don't have a legal right.

9           THE COURT:  Okay.  So, just back to

10  Mr. Eller and Mr. Moses, any change of heart based on the

11  proffer that there will be potentially more money for

12  unsecureds?

13          MR. ELLER:  Your Honor, we share the same

14  concerns that you do.  From a logical analysis, we don't

15  know why CDD would want to put in that money, given the

16  nature of their foreclosure, but we're certainly willing

17  to listen, and willing to hear.

18          They make it a big point that the debtor is

19  locked in and can't negotiate various terms because they

20  have reached an agreement with Terra, but the unsecured

21  creditors' committee is not in any way limited, and any

22  party, whether before this Court right now, or any real

23  estate developer, or anyone else could go to Mr. Moses and

24  say, hey, I am interested in purchasing this property, I'm

25  interested in filing a competing plan, I'm interested in

Page 32

1    doing these things, that could be brought before the

2    committee, and those issues could, at this point in time,

3    be done, but right now we're looking at $2.5 million

4    versus a big question mark, and given Terra's situation,

5    given the default under the agreement, you know, the big

6    question mark is still of great concern to us.

7         I don't believe that the CDD, and maybe we

8    could answer this question, necessarily violates any

9    exclusivity rules or any rules concerning seeking votes by

10   simply providing a term sheet or a letter of intent, if we

11   were to file a plan, it would say A, B, C and D, that

12   unsecured creditors would be treated in this particular

13   fashion, maybe with some numbers involved.  We've been

14   asking for those things.  We haven't seen them.

15        So, that is the reasoning for our position,

16   is right now the risk to us doesn't seem to justify losing

17   Terra and what Terra is doing at this particular point in

18   time.

19        We'd love to hear the numbers, we would love

20   to hear what those terms would say, but there is nothing

21   for us to latch onto.  So, our position hasn't changed.  I

22   don't know if Mr. Moses' has.

23        MR. MOSES:  Thank you, Mr. Eller, and I do

24   echo those sentiments on behalf of the committee.

25        Remember, Judge, we're not saying grant the

1    motion, deny the motion.  We're just asking you to defer

2    ruling on it until such time that we have something firm

3    in hand that we can compare to the plan that's on the

4    table.

5              And, again, as Mr. Eller indicated, and as I

6    indicated earlier before, nothing is preventing anybody

7    from coming to the committee with respect to proposing a

8    competing plan that's better for unsecured creditors, and

9    we can seek to terminate exclusivity at that point in

10   time.

11             MR. HUDSON:  Judge, I must differ with that,

12   both Mr. Eller and the committee counsel have suggested to

13   you, no one is going to come in right now, in the middle

14   of this mess, and ask to buy this property.

15             In fact, the Terra PR machine has been out

16   there, I don't know if you've seen the articles, basically

17   putting articles out there saying, we've either got an

18   option on it, or we're buying it, or we're funding a plan,

19   all of that stuff.

20             So none of the major players who are

21   interested in this property are going to come in, seeing

22   that, hearing in the press that the Bankruptcy Court is

23   moving forward with the plan of reorganization, no one is

24   going to be able to do their due diligence in that period

25   of time unless they're already -- unless they've already

1   done it, Judge.

2          So, the way the case is proceeding, I have

3   to give debtor's counsel credit, they've done a very good

4   job of blocking everybody out, and that's the point,

5   Judge, we want to open it up so everybody can show up, and

6   there is only two ways to do that, either a 363 process,

7   and we don't control that, we can't control that part of

8   it unless we file a plan and do it through a plan, so,

9   therefore, we want to go out to the world and say, hey,

10  guys if do you want to bid, come on, show up, we can do it

11  through our plan.

12         So, all we're asking, Judge, is put it on an

13  equal footing, let the market -- what are we afraid of?

14  We know Terra is not going to walk away, and that's the

15  only risk they've identified.

16         THE COURT:  Okay.  So, Ms. Redmond, you

17  deferred on the alternative plan.

18         If you wanted to emphasize anything else, I

19  did read the motion, and looked at some of the cases, but

20  go ahead.

21         MS. REDMOND:  Your Honor, the only thing

22  that -- and really to reiterate something Mr. Hudson said,

23  this case is on such a fast track, to defer on the motion

24  today would mean that nobody could possibly be on an equal

25  footing, or an equal timeframe as the debtor's plan

1    because the debtor's plan is going to start to go out to

2    be -- the disclosure statement is going to start to be

3    approved, and the debtor's plan is going to go out to

4    creditors in a very short amount of time.

5                     And, your Honor, what we ---

6                     THE COURT:  Well, not if it's defeated at

7    the disclosure hearing.  I mean, if the plan in

8    unconfirmable as a matter of law, then they shouldn't get

9    past disclosure.  So, if it doesn't seem like they could

10   suggest an amendment that would cure the defects, then

11   you'll have full stay relief.

12                    If they do request time to amend, and at

13   disclosure you convince me that this is the equivalent of

14   a new value plan, and that Judge Walrath is correct, and

15   we need to have an auction, then maybe we do get into a

16   competing plan versus an amended plan, and so it's not

17   necessarily too late.

18                    MS. REDMOND:  Well, your Honor, the last ---

19                    THE COURT:  And if they make it past

20   disclosure, then all this talk from your side, that they

21   have an unconfirmable plan either won't prove correct, or

22   I just may rule wrongly, I guess, but ---

23                    MS. REDMOND:  But, your Honor, today Terra

24   has this plan process locked up.  A competing plan would

25   also cause Terra to come back to the table and look at

1   what it might be offering to unsecured creditor, and

2   that's exactly what Terra doesn't want.

3            And, again, your Honor, this is best

4   illustrated by what has gone on for the past couple of

5   weeks.  At the last District board meeting, Terra and the

6   debtor appeared at the meeting through counsel and through

7   their representatives, and, your Honor, I had filed with

8   the Court a copy of the transcript of that meeting, it

9   took place on December 8th, and it was filed, I think,

10  yesterday afternoon.

11           THE COURT:  Yes, 106.

12           MS. REDMOND:  Your Honor, but on Page 12 and

13  13 of that transcript, Mr. Shanerman appeared, he appeared

14  on behalf of Terra, and he said he had a very limited role

15  that day, basically he was asking that the land -- that a

16  land owner's election be held so that the interest of

17  parties could have representation on the board.

18           And, your Honor, what's happening with this

19  process is Terra is locking out more, and more, and more,

20  and attempting to in some ways intimidate the board

21  members to resign and stop exercising what they believe is

22  their fiduciary duty to the bondholders, and to the

23  property, and to the public in order to be able to have

24  those seats filled by the land owner.

25           Apparently, your Honor, if you look at

1   Pages 33 to 35, Mr. Shanerman believed and represented at

2   that meeting that he was there on behalf of the new land

3   owner, he represented that Terra, at that time, was the

4   new land owner.

5              Ms. Mora had to correct him, and correct him

6   to say that Terra was just the manager and not the new

7   land owner but, your Honor, this is the process that's

8   happening outside of Court.  It is one of the reasons why

9   the District believes that an open plan process, with

10  going on in the sunshine, in the open, and transparently

11  before the Court would be the most fair and equitable way

12  to be able to have this case proceed.

13             THE COURT:  Mr. Hutton, did you want to add

14  anything?

15             MR. HUTTON:  Two points, your Honor.

16             First, and I know Mr. Hudson cited it

17  previously, but Global Ocean, I think, does control this

18  case.

19             THE COURT:  It can't possibly control the

20  case.

21             MR. HUTTON:  Well, it does apply to this

22  case, and the ruling in that case, if applied here, would

23  dictate that exclusivity should be lifted.  It's 251 BR

24  31, a Judge Walrath decision from 2000, and what

25  Judge Walrath found was in a situation where the debtor,

1   the debtor's existing equity are not retaining an

2   interest, but are controlling the process by which it is

3   determined who acquires that equity, and at what price,

4   that is on account of their old equity, and as such the

5   holding in LaSalle applies that the Court must open up the

6   process and allow competing plans.

7            The second point I want to make, your Honor,

8   is that there is -- I want to address what I consider to

9   be a myth in this case, and that is that there is -- the

10  debtor, as your Honor knows, has entered into a no shop

11  clause that precludes it from soliciting any other offers

12  for the equity, or bids to acquire the property in the

13  case, which is really what is going on, and the myth is

14  that the committee is fulfilling that fiduciary role on

15  behalf of the estate, and on behalf of the unsecured

16  creditors.

17           I think that, number one, the committee, and

18  they'd probably be the first to tell you this, hasn't

19  really been provided sufficient resources to do that in

20  any meaningful way.

21           The order on DIP financing that your Honor

22  just entered provides the committee with a budget, a total

23  through the budget property, 20,000 the first month, and

24  15,000 each and every successive month, for fees and

25  expenses of the committee professionals.

1          That's -- I think Mr. Moses would tell you,

2    that doesn't provide them sufficient resources for any

3    investment banker, to retain a business broker, or engage

4    any active solicitation process to attract higher and

5    better offers with regard to the property, or with regard

6    to the equity and, in fact, I think if you take their

7    statements here today, they're, in fact, not doing that,

8    and what they've said is, well, if anyone comes to us,

9    we'll entertain it, but there is no effort being done on

10   behalf of the estate whatsoever to go out and actively

11   market or solicit, nor has -- I don't want to disparage

12   Mr. Moses' firm in any way, they just have not been

13   provided the resources with which to do that.

14          THE COURT:  How long has this been in

15   default, over two years, right?

16          MR. HUTTON:  Three years, your Honor.

17          THE COURT:  Okay, and when did the

18   foreclosure start, two years ago?

19          MS. REDMOND:  I believe it was 2009.

20          THE COURT:  So, I mean, you're talking about

21   a fast track, but your team has known for two years that

22   you're going to try to get out of this deal as best you

23   can, and you haven't been trying to find anybody

24   interested in this property in anticipation of

25   foreclosure?

1            MS. REDMOND:  Your Honor, the foreclosure

2    took a strange turn.  Mr. Eller's client was taken over by

3    the FDIC, and there were stays put in place in the

4    foreclosure.  So the litigation kind of stalled for a long

5    period of time, and then went back on track, but that's

6    just the litigation.

7            THE COURT:  But it still strikes me that

8    you're not newcomers to the deal, give us time to find

9    somebody to --

10           MR. HUDSON:  We believe there are ---

11           THE COURT:  -- shop this to, when it's been

12   in default for two years.  It's been something that

13   presumably you thought was going to be in play.  In fact,

14   your client bought the bonds, right?

15           MR. HUDSON:  That's correct, Judge.

16           THE COURT:  When?

17           MR. BRAKSTONE:  December of 2010.

18           MR. HUDSON:  Noah Brakstone (phonetic) is

19   the managing manager, your Honor.  Did you hear him?  It

20   was December 2010.

21           Just, let's go through the timeline.  The

22   default mid-2008.  I believe foreclosure was commenced in

23   2009.  There was a stay for quite some time as a result of

24   the FDIC.

25           These bonds are typically held by an

Page 41

1    institution, Oppenheimer and some of big -- for their own

2    accounts, municipal bond funds.  So they're sitting there

3    at some point.  Our clients finally get in and start

4    talking to the CDD about where are we, what's happening,

5    they have to fund it because the CDD doesn't have the

6    ability to fund it.  So, it's been a relatively short

7    period of time since my clients have actually been

8    involved, but there is interest out there, we do believe

9    there is interest, Judge, and when I say, one of our

10   options is a stalking horse plan, we intended on going out

11   and talking to those folks that we know that are

12   interested in the property, and hopefully bringing them in

13   to the process, and we want to do it sooner than later, so

14   we have been doing that.

15            THE COURT:  Okay and, Mr. Hutton, I don't

16   know if I cut you off in the middle.

17            MR. HUTTON:  The only point I wanted to make

18   in furtherance on the committee's role, is we received

19   their first interim fee statement and, your Honor, there

20   was $22,000 worth of time billed, a grand total of

21   .3 hours spent on anything that could be characterized as

22   solicitation.  There is one communication by Mr. Moses for

23   a potential alternative transaction.

24            THE COURT:  But this limited lock up, or

25   lock up provision, with a carveout for the committee,

1    means, I think, that, if Mr. Hudson has got some people

2    interested in bidding, putting up money, being stalking

3    horses, that they can talk to the committee, right?

4                I mean, a meeting is two people, it doesn't

5    really matter who initiates it if they both could come.

6                MR. HUDSON:  Judge, people are sitting on

7    the -- our understanding is people are sitting on the

8    sidelines because of the press they've seen on this deal

9    since the debtor has filed.

10                I don't know if you've seen the articles,

11    but they're out there, I'm sure your clerk can find them.

12    I have seen ---

13                THE COURT:  We're not supposed to read

14    articles.

15                MR. HUDSON:  All right.  I apologize, Judge,

16    but there is the press that's out there, and folks are --

17    they're, like, sitting on the sidelines and, frankly, I

18    don't blame them.  So -- because they believe the process

19    is finished, they believe it's over, they believe it's

20    closed, they believe it's locked up.

21                Let's unlock it, Judge, and let them come

22    in.

23                THE COURT:  That doesn't sound right to me,

24    the players that are going to come into a distressed debt

25    situation, with these kind of dollars are so

1    unsophisticated that they're going to be scared by a

2    Miami-Herald story, and not look at what's happening in

3    the bankruptcy case, that doesn't seem to make sense to

4    me, but whether that's the exact reason or not, I'll

5    accept for the moment that you have some people that may

6    be interested, that aren't coming in now, that might if

7    the plan process was open.

8                So, anyway, let's go back to Ms. Mora then.

9    One of the points that the other side seems set on is that

10   Terra is not going away if exclusivity is lifted.

11               MS. MORA:  Judge, all the debtor knows is

12   what's in the agreements that we've signed, and while

13   Mr. Hudson, I believe, made a point of the debtor having

14   filed the disclosure statement three days after the plan,

15   that was with the consent of Terra.

16               Terra has advised that they intend to call a

17   default if exclusivity is terminated, and the debtor

18   simply has to take them at their word.

19               THE COURT:  Does the default then, it's not

20   just a default in the financing, it's a default that

21   relieves them of any commitments they've made as a plan

22   funder?

23               MS. MORA:  Well, remember, the Court did not

24   approve the plan support agreement.  So, that's sort of

25   out there and hasn't really been locked in at all.  They

1  are a co-plan proponent with us of the plan, but what's

2  important, Judge, is that the DIP financing provides, at

3  the request of the District, not only funding for

4  professionals, but also provides now for monies to come in

5  to protect and maintain the property.

6              So, if there is a default under the DIP

7  financing, and Terra stops funding, then where are the

8  obligations that the debtor has agreed to undertake, at

9  the District's request, is we don't have the funds

10  available to protect and maintain the property.  We don't

11  have the money available to pay U.S. Trustee fees.

12              And so, Judge, it's, again, somewhat ironic

13  that we're in a situation where the District came before

14  you and negotiated for itself stay relief in order to

15  pursue its foreclosure judgement, now is also trying to

16  cloak itself as the protector of the unsecured creditors,

17  whose interests are going to be entirely wiped out if they

18  succeed in their other strategy, which is to just

19  foreclose out everyone's interest and take control of the

20  property.

21              Judge, what's really important is that there

22  is no precedent whatsoever in this type of situation, for

23  there to be a termination of exclusivity within the

24  initial 120-day period of a bankruptcy case, of a

25  Chapter 11 case.

Page 45

1            The only cases cited by the District where

2    that was permitted involve facts that don't exist here.

3    Those would be gross mismanagement of the debtor by prior

4    owners, that wasn't alleged by the District, or

5    acrimonious feuding between principals of the debtor,

6    making it unlikely a plan could be filed.

7            Here the debtor has already filed a plan,

8    and the Bankruptcy Code, in virtually every single

9    reported case suggests the debtor should be given an

10   opportunity to solicit acceptances to it during an

11   executive period.

12           The debtor makes -- the District makes an

13   argument in their motion that, the Court should just allow

14   competing plans to be filed, and you've heard Mr. Hudson

15   say that the bondholders position is that, oh, that

16   competing plans should just be filed, as if that's a

17   matter of course.

18           Yet all the cases they've cited only

19   involved those competing plans being considered by a

20   Court, not during the initial exclusivity period, but in

21   connection with subsequent requests by debtors to extend

22   exclusivity, and the courts at that point determining, has

23   the debtor really been doing what it's supposed to be

24   doing in the bankruptcy case to move the case along?

25           None of those competing plans cases that

1    were cited by the District involved a Bankruptcy Court

2    under the facts of this case, where the debtor has already

3    filed a plan, being given permission to file a competing

4    plan.

5              Judge ---

6              THE COURT:  Well, if it was a true new value

7    plan, that would be cause probably, right?  There are some

8    cases that would terminate exclusivity for a new value

9    plan.  I mean, the plan proponent might stipulate to that

10   if they're going to meet LaSalle.

11             MS. MORA:  Judge, again, I have not --

12   again, I have not looked at ---

13             THE COURT:  This is not a -- this is not on

14   it's face a new value plan.  It's what they're arguing for

15   the first time today, under a case decided by the Delaware

16   Court, should be treated similarly, but?

17             MS. MORA:  Judge, I'd like an opportunity,

18   since that case wasn't cited in their papers, to have an

19   opportunity to review it and to respond to the Court.

20             I would imagine the appropriate time to do

21   that is at the disclosure statement hearing.  So, I'm not

22   prepared to address that point to the Court today.

23             All I recognize is that under the case law

24   that was cited in their motion and -- I'm sorry,

25   Mr. Hudson, I'm not real good with osmosis, standing at

Page 47

1    the podium.

2                    All I know is that under the case law that

3    was cited, none of the precedent that they cited in their

4    motion has a Court authorized the termination of

5    exclusivity under a situation where the debtor has done

6    what they had to do, to get a plan filed in the first 90

7    days, and there aren't factors, like acrimonious feuding

8    among the principals, or gross mismanagement that's been

9    alleged.

10                   All the factors that the District has

11   focused on are factors that are considered by courts when

12   an extension of exclusivity is being sought by the debtor,

13   and the Court is considering whether to extend it.

14                   Judge, we are extremely concerned about our

15   obligations under the DIP financing order, the fact that

16   terminating exclusivity will give Terra the right to stop

17   funding under the DIP financing order.

18                   You know, yes, counsel is right, I did seek

19   to protect my law firm and to get a guarantee from Terra,

20   but the debtors have other obligations under the DIP

21   financing order to protect and preserve the property, that

22   was inserted at the request of the District, and if we

23   don't have the funding from Terra to do it, because an

24   event of default that arises when exclusivity is

25   terminated, that will be to the detriment of all

Page 48

1    creditors.

2              Judge, what's also important is we believe

3    that this motion was extremely premature.  The District

4    doesn't have a plan.  You asked Mr. Hudson what exactly is

5    your plan going to say, and Mr. Hudson, speaking on behalf

6    of the groom's side of the room, couldn't really tell you

7    what the plan is.  There is no other offer on the table

8    right now.  You've heard Mr. Moses, you've heard Mr. Eller

9    speak about that.  They know what the offer is from Terra.

10   They didn't know if there is anything else out there

11   besides an effort by the District to cause a default under

12   the DIP financing order and have the Terra offer walk away

13   so that the District can just get stay relief and

14   foreclose out anyone's interest.

15             And, Judge, for those reasons, we'd ask that

16   the Court deny the motion.

17             THE COURT:  Okay.

18             MR. HUDSON:  I just wanted a clarification,

19   Judge.

20             THE COURT:  I was just going to say, the

21   three of you can divide up two minutes.

22             MR. HUDSON:  I'll take 12 seconds, Judge.

23             The bondholders are prepared, Florida Prime

24   is prepared to come, if Terra walks away from the DIP

25   funding, we will meet the same terms and conditions.  So,

Page 49

1    we'll take that issue off the table.

2                    THE COURT:  Okay.  All right.

3                    MS. REDMOND:  Your Honor, firstly, the

4    amounts necessary to preserve and protect the property are

5    not in the budget of the financing order that you signed,

6    and the bondholders have been advancing funds over the

7    last three years to be able to protect the property and

8    won't be -- it would be customary for them to continue to

9    protect the property.

10                   But, your Honor, I thought that opening up

11   the plan process was an eloquent solution to a problem

12   that I focus more on, not so much of having the

13   bondholders, or some other group in the process, but

14   looking at a process that was controlled, locked up, and

15   totally one sided, and I looking at having Terra in this

16   process, locking up the process, seeking to control the

17   District board, doing all the things to make sure that it

18   can get this property at the price it offers, which is an

19   extremely low amount of money, and we have seen zillions

20   of times, that when you have one person involved in a

21   process, or one party involved, you don't get the highest

22   and best alternative, and that's why when we filed this

23   motion on behalf of the District, we came and we said, we

24   think if you open up the process, it's not going to be the

25   District that files a plan, it's going to be somebody else

Page 50

1   that, a plan is put together, so that there are all

2   alternatives, and forces Terra to come to the market as

3   well, not only another plan proponent, but also Terra, so

4   that their side is not just one sided, and not all the

5   pieces are all locked up, so that you don't have a fair

6   and market process, and competitive process before the

7   Court.

8              So, your Honor, those are the reasons we

9   came here, and still believe that opening up the plan

10  process will produce a positive result in the case.

11             THE COURT:  Mr. Schneiderman, I didn't ask

12  if you had a view on this.  It's not mandatory.

13             MR. SCHNEIDERMAN:  I don't envy you today,

14  your Honor.

15             THE COURT:  I feel pretty good today.

16             (Laughter.)

17             THE COURT:  I'm going away for seven days

18  tomorrow.

19             MR. SCHNEIDERMAN:  I believe ---

20             THE COURT:  Last week was much harder.

21             (Laughter.)

22             MR. SCHNEIDERMAN:  It was.

23             I believe when your Honor approved the DIP

24  financing, that we could have actually looked in a crystal

25  ball and saw what was going to happen here, because what I

1    believe one of the parties described this as, it's really

2    competing for the equity.

3                    The property was on the verge of

4    foreclosure, and a developer came in and saw the

5    opportunity to purchase this property at low cost and tie

6    it up.

7                    Your Honor, I would suggest what Mr. Moses

8    has suggested in rolling this for three weeks, let

9    Mr. Moses get in the ear of -- what is this, the groom's

10   side or the bride's side?  This side, with Ms. Redmond's

11   side, and see what ---

12                   THE COURT:  Right now they're the groom,

13   they're not paying for the wedding yet.

14                   (Laughter.)

15                   All right.  So you would support essentially

16   denying it or --

17                   MR. SCHNEIDERMAN:  Continuing it.

18                   THE COURT:  -- continuing it, so it's, in

19   effect, denied, to the extent they want to get on track

20   for a January --

21                   MR. SCHNEIDERMAN:  And in the meantime --

22                   THE COURT:  -- disclosure ---

23                   MR. SCHNEIDERMAN:  -- there is nothing, and

24   there shouldn't be anything stopping anybody from doing

25   due diligence.

1          Those parties, as your Honor identified, are

2    sophisticated.  If they want to come in to this forum and

3    participate in this, are sophisticated developers, and

4    there shouldn't be anything, the debtor shouldn't do

5    anything that would prohibit or impede somebody's ability

6    to do due diligence, and I would encourage the committee,

7    because the committee is the one charged in this case to

8    expose this property to the market, as the debtor's hands

9    are tied.  Perhaps the committee needs to engage a third

10   party to assist, and at least, if not marketing, exploring

11   interest in this property, whether or not that be by the

12   committee, committee representatives, or a third party

13   brought into the case, but those things can take place

14   now, and I think that satisfies some of the issues that

15   Mr. Hudson raised, about not having -- or having our hands

16   tied, let's open up the process.  Okay.  Let's open it up

17   a little bit, allow the debtor to continue on its course,

18   the plan just got filed, but have the committee go out

19   there and at least start exploring the possibilities, and

20   talking to Mr. Hudson and Ms. Redmond to see what -- when

21   we come back in January, maybe Mr. Hudson and Mr. Eller

22   will sit on the other side of the wedding party here, and

23   they ---

24          THE COURT:  That will be a clue, I guess, if

25   we come in and Mr. Eller is on that side.

1          MR. ELLER:  I took the first seat available.

2          MR. SCHNEIDERMAN:  But, your Honor, I think

3    continuing it, with instructions, or encouragement from

4    the Court to the parties, to explore those items may be a

5    good resolution.

6          THE COURT:  Okay.  I didn't give Mr. Guso a

7    chance yet.  Do you have anything you wanted to add?

8          MR. GUSO:  Judge, I think that, with

9    respect, that -- I join in Ms. Mora's arguments,

10   your Honor, and of the cases cited by the District in its

11   motion, your Honor, the most closely on point here, is

12   Geriatric Nursing Home, which is a 1995 opinion out of the

13   District of New Jersey.

14          And, your Honor, to Ms. Mora's points, there

15   are only two cases which deal with termination of

16   exclusivity during the initial 120 days of the case, and

17   in those cases, Judge, the circumstances were dramatically

18   different than those here.

19          And Crescent Beach, the Court found that it

20   was a cyclical business, and that the case needed a quick

21   solution, and that there was acrimony, because one of the

22   directors challenged the authority of the board to file

23   the case, and the Court declined to appoint a trustee, but

24   elected, given the cyclical nature of the business, to

25   terminate exclusivity, and in Texas Excursion, the only

Page 54

1  other case to deal with this issue, there, your Honor, the

2  Court found that there was substantial acrimony between

3  the parties, so as to warrant terminating exclusivity.

4           And here is what Fountain Power Boats said

5  about this issue, Judge, and I'm reading from Page 6 of

6  the WestLaw opinion.

7           THE COURT:  Actually let me cut you off,

8  because I was going to refer to that --

9           MR. GUSO:  Okay.  Thank you, Judge.

10          THE COURT:  -- as the law.

11          MR. GUSO:  Thank you, your Honor.

12          I guess I'll go to my last point, Judge,

13 which is to the relief -- the basis for the relief the

14 District pleads in its motion, at Page 2 it says:  The

15 District simply requests that the Court put all parties in

16 this case on equal footing by allowing competing plans to

17 be filed within a reasonable period of time of the

18 debtor's filing of their initial plan, so as to expose the

19 debtor's property to the market and maximize creditor

20 recoveries in these cases.

21          Your Honor dealt with this issue on

22 December, when you talked not about equal footing,

23 your Honor, but about parallel tracks and, in fact, the

24 first substantive relief that any party sought in this

25 case, other than the debtor filing of the schedules and

1    statements, and the application to retain Ms. Mora and her

2    firm, was the District's motion for stay relief, which it

3    filed on October 28th, that's Docket Entry 35.

4                    The first thing they sought in the case,

5    your Honor, was to terminate the automatic stay in order

6    to go back to state court, and your Honor has set a

7    parallel track, has set the parties on equal footing.

8    They're free to go back and get a summary judgment if

9    they're able to.

10                   And, your Honor, the debtor should be

11   afforded the opportunity to propose a plan and advance its

12   plan, which it has advanced in good faith.

13                   And, Judge, the last point, Mr. Hudson,

14   during his penultimate remarks to the Court, told you that

15   the District is obligated to foreclose, they don't have a

16   choice, and with respect, they do have a choice.

17                   In fact, in another case, your Honor,

18   involving the restructuring of CDD debt, the CDD board of

19   supervisors voted in favor of the restructuring, over the

20   objection of the bondholders, that case was Fiddler's

21   Creek.  Ms. Galler and I represented the committee,

22   Ms. Redmond, coincidently represent the principal of the

23   developer, and Mr. Hutton represented the Indenture

24   Trustee, and there the CDD voted in favor of the plan.

25   They are not obligated to foreclose.  They are obligated

1   to act in the best interest of the land owner, the

2   property and the bondholders.  They are not duty bound to

3   follow solely the direction of the bondholders.

4           THE COURT:  Okay.  I'm prepared to rule.

5   Just a couple of general comments responsive to some of

6   the things said today, that certainly Bankruptcy Courts

7   are always concerned to get the best result for the

8   creditors, but I feel obliged to comment that, you know,

9   we hear in a lot of cases these days arguments that so and

10  so is just in it for this, and so and so is just in it for

11  that, Terra is just controlling this for their strategic

12  purpose and, you know, frankly I'm not that swayed by

13  those arguments.  I'm sure somebody might argue that

14  Florida Prime came in, probably bought the bonds at a deep

15  discount for strategic purposes.  So, I mean, there is

16  lots of players in the distressed real estate industry

17  these days, and they're all, to use a former president's

18  term, they all have their own strategy.

19          So, we -- you know, I just don't -- unless

20  there is some bad faith arguments, which obviously courts

21  look at, and I don't think bankruptcy judges really ought

22  to be getting into, you know, business strategies and

23  whether somebody is utilizing one particular strategy over

24  another.  Instead we just have to look at the law as it

25  applies to the particular facts.

1          So, in that context, and we'll get into it

2    in a minute, the law that really puts a heavy burden on

3    the movants here, that I don't find that they've met.

4          So just to make it a little more of a

5    rigorous ruling, the specific hearing before the Court

6    today is the motion to terminate exclusivity, filed by the

7    Landmark at Doral Community Development District, which

8    I'll refer to as the District, at Docket Entry 83.

9          The District has a first lien on the

10   debtor's property to secure a debt in excess of

11   $71 million.  On December 7th, Docket Entry 75, the

12   District was granted partial stay relief to continue with

13   its state court foreclosure action through judgment, but

14   not sale.  I've been advised today that no hearing has yet

15   been scheduled on the motion for summary judgment.

16         The District's motion seeks to terminate

17   exclusivity to allow a competing plan to be filed, that

18   the District argues, along with the co-proponents of the

19   motion, may yield a better distribution to creditors.

20         Procedurally we have a debtor's plan, joint

21   plan that was filed last week, on December 18th, Docket

22   Entry 94, and a disclosure statement filed yesterday, and

23   as I noted at the beginning of the hearing, the disclosure

24   hearing is set for January 25th at 10 o'clock, along with

25   a further hearing on the motion for stay relief.

1                 U.S. Bank, Indenture Trustee under the

2      bonds, filed a joinder to the District's motion, Docket

3      Entry 88, and a notice of joinder was also filed by

4      Florida Prime Holdings, LLC, which is the owner of the

5      bonds, that's Docket Entry 99.

6                 I've reviewed the record, including the

7      District's motion, the debtor's response, Docket

8      Entry 101, considered the arguments of counsel, and the

9      applicable law.  I have considered the position of the

10     U.S. Trustee, the committee of unsecured creditors and AmT

11     CADC Venture, LLC, which is still officially a junior lien

12     holder, but by all estimations will be an unsecured

13     creditor, with a claim in excess, I believe, of

14     $100 million.

15                 MR. ELLER:  137?

16                 THE COURT:  137?  Okay.  Well, in excess of

17     100.

18                 So as I said, just by way of summary, I

19     conclude from this review that the District has not

20     established cause to terminate exclusivity.

21                 We're talking, of course, about 1121, which

22     gives a debtor, absent relief, 120 days exclusively -- the

23     exclusive right for 120 days to file a plan, and another

24     60 to have it voted on and confirmed.

25                 1121(d) is the predicate for the District's

1   motion.  That section provides, in relevant part, skipping

2   some parts of the statute, quote, on request of a party in

3   interest, the Court may, for cause, reduce or increase the

4   120-day period.

5                    As was pointed out by the debtor and Terra,

6   in most exclusivity battles that we see in Chapter 11s,

7   it's usually a battle over whether the debtor should be

8   granted an extension of the 120-day period, or a second

9   extension, or a third extension, or in New York and

10  Delaware, a seventh or eighth extension.

11                   We don't normally see requests to terminate

12  exclusivity during the initial 120-day period, and you can

13  see from the memos that there is not a whole lot of

14  published law in this context.

15                   Cause under the statute is not defined, but

16  it's clear that the burden is on the moving party, and the

17  debtor argues that this is a heavy burden, where the

18  movant is seeking to terminate exclusivity during the

19  initial 120-day period, and the debtor cites to the case

20  that Mr. Guso was about to quote from, In Re:  Fountain

21  Power Boat Industries, Inc., 2009 WestLaw 4738202

22  Bankruptcy, Eastern District of North Carolina, 2009, and

23  what the Court discusses in that case, citing to some

24  earlier cases, it's pretty clear from the history of that

25  exclusivity, and the presumption in favor of allowing the

1   debtor the 120-days, what the Court discusses at Page 6 is

2   that, and I'm quoting, with the adoption of the Bankruptcy

3   Code, Congress chose to limit exclusivity to 120-days,

4   thereby recognizing that Chapter 11 debtors should have

5   some period of time, in an environment which would foster

6   the debtor's reorganization and rehabilitation, as well as

7   provide the opportunity for consensual terms of a plan to

8   be negotiated.  Citing to In Re:  McQueen Industries,

9   Inc., 87 BR 830, at Page 834, Bankruptcy Southern District

10  of New York, 1987, and then the quote that the debtors had

11  in their memo, which reads, quote:  Therefore, granting

12  such a motion to reduce exclusivity is a serious matter,

13  such a motion should be granted neither routinely nor

14  cavalierly.

15          So we start in that context, and without

16  getting into the case cites again, this Fountain Power

17  Boat case does discuss a couple of cases that were cited

18  in the papers, In Re:  Crescent Beach, and Pickens

19  Industries, and it is true that a few of the cases, and

20  maybe the only published decisions which determine

21  exclusivity, are usually where there has been some

22  acrimony, mismanagement, some problem in which it's

23  perceived that there won't be a plan within the 120 days,

24  and creditors are going to suffer for it.

25          From the papers, frankly, I was unpersuaded

1    that there was sufficient cause, but I, of course, wanted

2    to hear further argument from the parties that submitted

3    the papers, but I also was very interested in the views of

4    Mr. Eller and Mr. Moses.

5              Mr. Eller's client, holding by far, the

6    largest unsecured creditor debt.  We have a plan by Terra

7    that at this point does provide two and a half million

8    dollars to the unsecureds, so that's on the table.  We

9    have a plan tied -- or that was in furtherance of the

10   financing in which retaining exclusivity and certain

11   limited lock up provisions was an integral part of the

12   deal that Terra made with the debtor, to provide funding

13   for the 11.  So, there is the risk of default.

14             At this point the committee and the largest

15   unsecured creditor are opposed to lifting exclusivity, and

16   instead believe any request to lift exclusivity should be

17   continued to the disclosure hearing.

18             About the only thing that I heard today that

19   might affect the analysis, but if it's such an important

20   decision, given the paucity of law in this context, then

21   it should have been cited earlier, and we would have had

22   an opportunity to hear a response, that's the case that

23   Mr. Hudson cited from the District of Delaware, Global

24   Oceans Carrier, and the reason that might be important is

25   because whether there is published law, or just some of

Page 62

1   the treatises have discussed it, or there has been

2   articles, certainly one of the options that is

3   contemplated by North LaSalle, the Supreme Court decision,

4   if you have a new value plan, and it needs to be market

5   tested, which the Supreme Court said, assuming there is a

6   new value option, it would have to be market tested, would

7   be to lift exclusivity.

8             So, if, in fact, this plan was deemed to be

9   equivalent to a new value plan, requiring market testing

10  under the Supreme Court's authority, then perhaps there

11  would be cause to lift exclusivity, but I'm not going to

12  delay the decision, or take it under advisement and study

13  the cases, and take supplemental briefs.  We're going to

14  take that up at disclosure.

15            And, frankly, I'm not sure that it would

16  have convinced me now to lift exclusivity, rather than

17  waiting for disclosure, because there are some other facts

18  at play here that I want to mention for the record.

19            First, and it is important, and may have

20  basically hit this, is the view of the large unsecured

21  creditors.

22            Second, Mr. Guso touched on, it was in the

23  debtor's papers as well, that the District has stay

24  relief.  I don't agree that this was some formal election

25  of remedies, and it doesn't preclude the District, or

Page 63

1    other parties in interest, from filing a competing plan if

2    and when exclusivity terminates, or to support a competing

3    plan, but it's certainly a factor.

4              The District, the Indenture Trustee and the

5    bondholder will obviously oppose the plan, and if they're

6    successful, and there is no hope for reorganization, and

7    this may be something they can prove at the disclosure

8    hearing, then they'll get full stay relief and they'll

9    proceed to sale, which certainly was their goal from the

10   start of the case, and because of what we have termed

11   these parallel tracks, where the District can proceed with

12   the foreclosure, they are going forward, they're not being

13   delayed by this plan process in terms of their foreclosure

14   right now.

15             All the debtor seeks is its parallel

16   opportunity to move towards confirmation of a plan, that

17   they filed well within the 120-day period, and at this

18   point I'm going to give the debtors that opportunity.

19             So, for those two reasons, the motion will

20   not be granted today.  I was prepared to deny it, but at

21   the request of the creditors, since it would be

22   reconsidered, in effect, I think anyway in the context of

23   disclosure, I'll do an order that just incorporates this

24   bench ruling, determining that there isn't presently

25   cause, but rather than requiring the motion to be refiled,

Page 64

1    setting it for further hearing at the disclosure hearing

2    on January 25th.

3              If the District and its side can convince me

4    at that point that an auction is required, or that the

5    plan, as proposed, that calls for a restructuring of the

6    secured debt is unconfirmable, then competing plans and

7    auction process, or perhaps full stay relief, there is

8    various options that may arise out of the proceedings on

9    January 25th.

10              So, I'll let this present motion remain

11    pending, although the order will make it clear that as

12    presented today, there was insufficient cause.

13              So, that will take us from today to the 25th

14    on this motion.  Just to review, I'll do a scheduling

15    order on the valuation issue.  There is no discovery

16    matters that are pending before me yet, and hopefully

17    you'll work out depositions on the experts and otherwise

18    between now and disclosure.

19              The standard order that I entered, and I

20    didn't look to see if it made the docket ---

21              MR. HUDSON:  It did, Judge.

22              MS. REDMOND:  It did.

23              THE COURT:  Okay.

24              MR. GUSO:  Docket Entry 110, your Honor.

25              THE COURT:  Yes, so I think it's got a

1   January 18th objection deadline, which is standard, so

2   we'll leave that in place.

3            You have to mail it out by the -- next

4   Tuesday.  I think we left 30 days, I'm not sure why we

5   didn't go with 28, with every other time deadline going to

6   multiples of seven, but I think with Judge Kimball taking

7   over the Local Rules, I kind of drift off sometimes in

8   those deep discussions at Judge's meetings.

9            So I thought we had until the 28th, but

10  according to the order you have to serve it by the

11  twenty ---

12           MS. MORA:  We'll be able to get it out

13  tomorrow, Judge.

14           MS. REDMOND:  Your Honor, could I just ask

15  that, we have the motion to value, which is an evidentiary

16  hearing, on the 18th, if we could have until the 19th for

17  objections to the disclosure statement, because I think

18  most of the people here, and most of the people who will

19  be fine-tuning the objection, will be participating in the

20  valuation hearing.

21           THE COURT:  Okay.  I don't see a problem

22  with that.  There may be nothing that jumps out at

23  disclosure objections based on whether it's worth

24  43 million, or 53, or 63, but I don't -- I think six days

25  is still sufficient time.

Page 66

1                MS. MORA:  Judge, if we could just ask that

2    they get it to us by noon that day, because it is towards

3    the end of the week.  I mean, they do have the documents

4    on file now, they can be working on their objection, it

5    doesn't have to wait until the 18th to finalize it.

6                MS. REDMOND:  Your Honor, we will work on it

7    right away, but --

8                THE COURT:  All right.

9                MS. REDMOND:  -- my experience has been that

10   the fine-tuning often goes down to the wire, and noon is

11   fine.

12               THE COURT:  Okay.  All right.  So, I guess

13   I'll stick that in one of these orders so everybody knows.

14               All right.  So, anything else that we didn't

15   cover that's coming up between now and then?

16               MS. MORA:  No, Judge.  Thank you.

17               MR. SCHNEIDERMAN:  Thank you.

18               THE COURT:  Thank you.  Have a good holiday.

19               MR. GUSO:  You, too, Judge.

20

21

22               (Thereupon, the hearing was concluded.)

23

24

25

Page 67

1

2

3                          CERTIFICATION

4

5   STATE OF FLORIDA        :

6   COUNTY OF MIAMI-DADE   :

7

8               I, Cheryl L. Jenkins, RPR, Shorthand

9   Reporter and Notary Public in and for the State of Florida

10  at Large, do hereby certify that the foregoing proceedings

11  were taken before me at the date and place as stated in

12  the caption hereto on page 1; that the foregoing

13  computer-aided transcription is a true record of my

14  stenographic notes taken at said proceedings.

15              WITNESS my hand this 6th day of January,

16  2012.

17

18

19          _____

20              CHERYL L. JENKINS, RPR,

21           Court Reporter and Notary Public
            in and for the State of Florida at Large
22               Commission #DD 920461
                  December 27, 2013

23

24

25