UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
**Miami Division**
www.flsb.uscourts.gov

In re:                                                      Chapter 11

                                                            Case No. 11-35884-RAM

TOWN CENTER AT DORAL, L.L.C.,                               Jointly Administered
*et al.,*

        Debtors.

_____/

## JOINT OBJECTION TO DISCLOSURE STATEMENT AND CONFIRMATION

**LANDMARK AT DORAL COMMUNITY DEVELOPMENT DISTRICT** (the "**District**"), a local unit of special purpose government, **U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE** (the **"Trustee,"** as defined more fully below) and **FLORIDA PRIME HOLDINGS LLC**[1] (the "**Bondholders**") (collectively, the "**Objecting Parties**"), though their respective counsel, submit their legal Objections to the "proposed" Disclosure Statement, and to Confirmation, all for consideration by the Court at the Disclosure Statement hearing set for January 25, 2012. The Objecting Parties request that the Court review, and consider these Objections, particularly with respect to confirmation, and determine that the collective Debtors may not confirm the Plan presently filed.[2]  In support the Objecting Parties state:

## INTRODUCTION

The District's research and analysis indicates that a bankruptcy court has never "stripped down" "valued out" or otherwise reduced the secured claim of a community development district

---

[1] Florida Prime Holdings LLC is the current holder of 100% of the outstanding 2006 Bonds.

[2] The Objecting Parties reserve and preserve all potential objections to confirmation that may not be specifically set forth herein. The objections to confirmation contained herein are evident from the face of the Plan and Disclosure Statement and are fatal as a matter of law. As such, this Court may act on these objections prior to confirmation as this Plan is incapable of confirmation. *In re 266 Washington Ass'n*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re E. Maine Elec. Coop., Inc.,* 125 B.R. 329, 333 (Bankr. D. Me. 1991); and *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990).

or a municipal corporation as has been proposed by the five related Debtors under their proposed Plan. The reason appears to be that to do so is legally, constitutionally, and practically, impossible.

As more fully discussed below, community development districts are creatures of state legislatures and are considered arms of the state. The authority to issue community development bonds pursuant to Florida law involves a complex, multi-faceted process that includes creation of specific community development districts, managed by elected public officials within the State of Florida. Validation litigation must be instituted in the Circuit Court for the county wherein the community development district is located, which litigation results in a final judgment adjudicating the validity of the bonds and approving the special assessments, the resulting liens, and all facets of the structure, issuance and enforcement of the bonds. Finally, substantial assessment analysis is conducted and an assessment methodology is approved that supports the specific allocation of the "burden" of the special assessments against specific portions of the subject property. This process normally takes in excess of one year to complete.

To ask a bankruptcy court to rewrite the terms of the complex, state law created and approved bond structure would be (a) an act against the State of Florida without its consent; and (b) an untimely and improper collateral attack on the final judgment adjudicating the validity and propriety of the bonds. Said act would further constitute an inappropriate reassessment and amendment of the assessment methodology contrary to controlling statutes and the resolutions of the relevant community development district. Such an involuntary, nonconsensual restructuring[3] would constitute an inappropriate interference with the taxing powers of the State of Florida and their subsidiary municipal entities and corporations including, but not limited to, community development districts.

---

[3] The Objecting Parties remind this Court that in the case *In re Fiddlers' Creek*, Case No. 8:10-bk-03846-KRM, U.S. Bankruptcy Court for the Middle District of Florida, which is often cited by the Debtors, the restructuring plan was affirmatively supported by the relevant districts and the *Fiddlers' Creek* court did not strip down any liens as part of that plan. In fact, the bondholder in *Fiddlers' Creek* will receive "par" value of the bonds within the maximum 30 year structure provided by Florida Statute. Said otherwise, the *Fiddlers' Creek* court never came close to the type and substance of the proposed restructuring in this case and only modified the bonds in *Fiddlers' Creek* with the express consent of the two districts involved.

2

The combined Debtors in these cases ask this Court to be the first to violate the 10th and 11th Amendments to the United States Constitution, ignore the independent taxing authority of the State of Florida, supersede all state law regarding the creation and/or reassessment and restructuring of municipal development bonds, ignore final judgments of state courts that have long been final and non-appealable, and generally impair the public infrastructure finance market in the State of Florida and beyond. Given that this would be the first time a bankruptcy court ever did so, the dramatic consequences of confirming the Debtors' Plan would reach far beyond the borders of the State of Florida.

Additionally, the Debtors' Plan and Disclosure Statement are fatally flawed as the documents rely upon and are based on assumptions of value that this Court recently rejected and found not credible. Given the Court's recent denial of the Debtors' motion to value, the Plan is facially unconfirmable and the Disclosure Statement lacks adequate information as the final assumptions and disclosures are based upon unsubstantiated and non binding claim amounts. For instance, with respect to the treatment of the District's liens, there is no proper valuation of the real property that secures such liens. This information is critical to any analysis of the Plan because the District's potential recovery is based on that valuation. Further, feasibility can never be tested absent an enforceable valuation of the District's lien claims. Accordingly, the District and other creditors are unable to make an informed decision in light of the Court's recent findings and rejection of the Debtors' valuation analysis. Therefore, approval of the Disclosure Statement must be denied and the Plan deemed unconfirmable on its face.

The District is joined by U.S. Bank N.A., as Trustee (U.S. Bank serves as Indenture Trustee in numerous community development district bond transactions throughout the state and beyond), and Florida Prime Holdings, LLC, the holder of all of the outstanding bonds in this particular case. Collectively, they implore the Court to reject the Debtors' desperate, last minute ploy as constitutionally, legally and practically impossible.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.**     **The Parties**

1.      On September 19, 2011 (the "**Petition Date**"), the Debtors[4] filed separate voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code. Pursuant to the Debtors' filings, the Debtors have elected single asset real estate status under the Bankruptcy Code.  On September 22, 2011, this Court granted the Debtors' motion for joint administration, with the instant case, Case No. 11-35884-RAM, designated as the lead case.

2.      The Debtors are developers and owners of several parcels of real property located in Miami-Dade County Florida, consisting of approximately 120 contiguous acres located on the east side of NW 107 Avenue and the north side of NW 58 Street, a majority of which is zoned TND (Traditional Neighborhood Development) with the remainder zoned IU-1 (for flex office development allowing for light industrial development (the "**Property**").  The Property consists of 16 individual tracts of land that remain without any vertical construction with the exception of substantially complete 4-level parking garage.

3.      LANDMARK AT DORAL COMMUNITY DEVELOPMENT DISTRICT (the "**District**) is a community development district, which is a local unit of special purpose government of the State of Florida pursuant to Chapter 190, Florida Statutes. On or about August 23, 2005, the Board of County Commissioners, Miami-Dade County, Florida, adopted Ordinance No. 05-153 establishing the District pursuant to the provisions of Chapter 190, Florida Statutes. The District has all of the powers granted by Chapter 190, Florida Statutes, including, but not limited to, the authority to impose Special Assessments and to enforce all remedies available in case of default in the payment of Special Assessments.

---

[4] The Debtors include: Landmark at Doral East, LLC, a Florida limited liability company that owns that portion of the Property described in Exhibit A attached as Parcel A; Town Center at Doral, LLC, a Florida limited liability company that owns that portion of the Property described in Exhibit A as Parcel B; Landmark at Doral South, a Florida limited liability company that owns that portion of the Property described in Exhibit A as Parcel C; Landmark at Doral Developers, LLC, a Florida limited liability company that may claim an interest in all or a portion of the Property described in Exhibit A as Parcel D, pursuant to that Warranty Deed dated January 31, 2005 and recorded February 2, 2005 in Official Records Book 23048, Page 189, Public Records of Miami-Dade County, Florida; and Landmark Club at Doral LLC, a Florida limited liability company, which owns that portion of the Property described in Exhibit A as Parcel E.

4.  FLORIDA PRIME HOLDINGS, LLC (the "**Bondholders**") is a Delaware limited liability company.  The Bondholders presently own and control 100% of the outstanding Series 2006 Bonds (defined below).

5.  U.S. BANK NATIONAL ASSOCIATION ACTS AS TRUSTEE (the "**Trustee**") under that Master Trust Indenture and that First Supplemental Trust Indenture, both dated as of October 1, 2006 (collectively, the "**Indentures"**), under which the District issued those Landmark at Doral Community Development District (City of Doral, Florida) Special Assessment Bonds, Series 2006A and Series 2006B (collectively, the "2006 Bonds), U.S. Bank National Association appears in these cases, including without limitation as a part to this Objection, solely in its capacity as Trustee under the Indentures and with regard to the 2006 Bonds.

## B.  The District's Creation and Purpose

6.  A community development district ("**CDD**") is an independent special-purpose unit of local government created pursuant to and governed by Chapter 190, Florida Statutes. §190.003(6), Fla. Stat.  CDDs were established to meet "a need for uniform, focused, and fair procedures in state law to provide a reasonable alternative for the establishment, power, operation, and duration of independent districts to manage and underline finance basic community development services."    § 190.002(1)(a), Fla. Stat. (emphasis supplied).

7.  CDDs possess certain powers similar to cities and counties, including but not limited to, the right to enter into contracts, to acquire and dispose of real and personal property, to adopt rules and regulations, and, importantly, to obtain funds through borrowing, issuing bonds, and levying non-ad valorem assessments and taxes.  *See* § 190.011, Fla. Stat.

8.  CDDs levy and collect special assessments like other governmental units in Florida pursuant to Chapter 190, Florida Statutes.  Specifically, CDDs are empowered to "levy special assessments for the construction, reconstruction, acquisition, or maintenance of district facilities authorized under [Chapter 190] using the procedures for levy and collection provided in chapter 170 or chapter 197."  § 190.022(1), Fla. Stat.  *See also* §§ 190.011(14), 190.021(2), Fla.

5

Stat.  Special assessments are "burden[s] levied under the power of taxation." *Jackson v. City of Lake Worth*, 23 So. 2d 526, 528 (1945).  Assessments levied pursuant to Chapter 170 "shall remain liens, coequal with the lien of all state, county, district, and municipal taxes, superior in dignity to all other liens, titles, and claims, until paid."  § 170.09, Fla. Stat.

9.      CDDs are empowered to issue bonds to finance public improvements pursuant to §§ 190.011(9), 190.012, 190.016(2), 190.016(8), 190.016(13), and 190.023, Florida Statutes. CDDs are further empowered to secure and make such municipal bonds, including principal, interest and any redemption premium, payable from special assessments levied on lands located within their boundaries and benefitted by the subject improvements.  *See* §§ 190.011(14), 190.021(2), 190.022, 190.023, Fla. Stat.   The infrastructure created is operated and maintained by the CDD into perpetuity or, in some instances, may be accepted by the county or city for operations and maintenance.  In fact, in this case, all roads created are owned by the District.  *See* Warranty Deed dated December 7, 2005 (**Exh. A**).

10.     Thus, by statute, the District is empowered to finance and construct public improvements and community facilities such as basic infrastructure (water, sewer, bridges, roads, transportation systems, parking improvements, conservation areas, etc.). Fla. Stat. § 190.012.

11.     Pursuant to Resolution No. 2005-11, adopted September 9, 2005, and Resolution No. 2006-08, adopted August 10, 2006, the District authorized the issuance, sale and delivery of not to exceed $75,000,000 in Special Assessment Bonds.

12.     Pursuant to Resolution No. 2005-09, adopted September 9, 2005, Resolution 2005-10, adopted September 9, 2005, Resolution No. 2005-12, adopted October 19, 2005, Resolution 2006-07, adopted August 10, 2006, and Resolution No. 2006-10, adopted September 14, 2006, copies of which are attached as Exhibits "**B**" and "**C**", respectively ("**Debt Assessment Resolutions**"), the District levied Special Assessments on lands within the boundaries of the District that will specially benefit from the facilities and services to be provided by the District as described in the Debt Assessment Resolutions and the exhibits thereto.  The Special Assessments

6

were levied in accordance with Florida law, and the Property has been benefited by the facilities and services constructed using the 2006 Series Bond funds and is therefore validly subject to the Special Assessments and other rights attendant thereto.

13.    On September 11, 2008, the District adopted Resolution No. 2008-5, a copy of which is attached as Exhibit "**D**" levying a Special Assessment to fund the District's Fiscal Year 2008-2009 operations and maintenance budget, and directing the collection of previously levied debt service assessments on lands within the District for Fiscal Year 2008-2009.[5]  A semi-annual debt service installment on the Special Assessments was due on May 1, 2009.

14.    On October 1, 2006, the District executed a Master Trust Indenture with U.S. Bank National Association, as indenture trustee and a First Supplemental Trust Indenture with U.S. Bank National Association, as indenture trustee.   Exhibits "**E**" and "**F**", respectively (collectively the "**Indenture**").

15.    The validity of the establishment of the District has already been judicially confirmed.  *See* Exhibit "**G**" Validation Final Judgment at paragraph 3.  Specifically, in the Final Judgment, the court ordered, adjudged and decreed that the bonds were thereby validated and confirmed.  *Id.*   It was further ordered that the District's Special Assessments "constitute valid and enforceable first liens on the assessed property within the District coequal with all State of Florida, County, school district and municipal taxes, superior in dignity to all other liens, titles and claim on such real property."  *Id.* at ¶ 18.

**C.    The Series 2006 Bonds**

16.    On or about October 1, 2006, the District executed the Indenture.  *See* Exhibits E and F.

17.    On October 10, 2006, the District issued $30,320,000 Special Assessment Bonds, Series 2006A, and $41,180,000 Special Assessment Bonds, Series 2006B (together, the "**Series 2006 Bonds**"), for the purpose of funding the various improvements included in the

---

[5] The District's fiscal year begins October 1 and ends September 30.

District's Capital Improvement Program.

18.     The Series 2006 Bonds were issued by the District under and pursuant to Chapter 190, Florida Statutes, and the Indenture.  The revenues pledged for the repayment of the Series 2006 Bonds are the amounts paid in connection with Special Assessments imposed pursuant to the Assessment Resolutions and ancillary documents, including but not limited to an Assessment Methodology describing the various parcels and attendant Special Assessments encumbering each respective parcel.

19.     The proceeds from the sale of the Series 2006 Bonds provided, and continue to provide for, capital improvements within the District which specially benefit the Property owned by the Debtors.  These improvements include roadways, utilities and the 969 space parking garage on the South Parcel of the Property.

20.     The Debtors, as owners of the Property, are obligated to pay the Special Assessments as required by the Indenture and the Assessment Methodology.

21.     The Debtors have failed to pay any of the Special Assessment installment payments, which commenced with the installment due on March 31, 2009 and all subsequent installments that have come due as of the date hereof.  In fact, the Debtors never paid any Special Assessments; those paid to date were funded from reserves set up with bond proceeds from inception.

22.     Pursuant to § 170.10, Florida Statutes and consistent with the Indenture, the Special Assessments have been accelerated and are immediately due and payable, for the benefit of the Bondholders.  That amount exceeds $71,500,000.00, accrued interest, cost and penalties as provided by applicable Florida statute and the Indenture. Proofs of claim have been filed that demonstrate the District's collective claim, including delinquent Special Assessments , accrued interest, statutory penalties, O&M Assessments and completion liability.

23.     The Debtors have also failed to pay special assessments levied and imposed on the Debtors' property to fund the District's operations and maintenance budgets for Fiscal Years 2007-2008, 2008-2009, 2009-2010 and 2011-2012 (together, "O&M Assessment Liens").  Such

assessments were imposed by Resolution 2009-4, adopted November 13, 2008, Resolution 2009-9, adopted August 13, 2009, Resolution 2010-9, adopted August 12, 2010 and Resolution 2011-05, adopted August 11, 2011.[6]

**D.    The Debtors' Plan and Disclosure Statement**

21.    On December 18, 2011, the Debtors filed their Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.  [ECF No. 94].

22.    A few days later on December 21, 2011, the Debtors filed their Disclosure Statement Relating to Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code. [ECF No. 108].

**OBJECTION**

For the reasons outlined below, the Objecting Parties object to the Disclosure Statement on the grounds that the Plan is unconfirmable on its face as it violates the U.S. Constitution, Federal and State law and is contrary to public policy.  Further, the Disclosure Statement fails to contain necessary information (as detailed below) that would allow creditors to make an informed decision whether to support or reject the Debtor's Plan.

**I.    The Plan is an Unconstitutional Material Restriction of the District's Right to Control its Fiscal Affairs.**

The Debtors' Plan [ECF No. 94] purports to restructure the Series 2006 Bonds and is, therefore, an unconstitutional material restriction of the right of the State and a political subdivision thereof to control their fiscal affairs.  As set forth above, on matters of financing, CDDs are a component of Florida state government like cities, counties, and water management districts.  Despite the mischaracterization in the Disclosure Statement [ECF No. 108], the District is not "a quasi-governmental body," but, in fact, a governmental body. *See* §190.003(b), Fla. Stat.  Therefore, its right to control its fiscal affairs pursuant to Florida state law is protected by the U.S. Constitution.

---

[6] Resolution 2009-4 imposed special assessments to fund the District's operations and maintenance budget for Fiscal Year 2008-2009 as well as certain expenses from Fiscal Year 2007-2008.

Article I, section 8 of the U.S. Constitution grants Congress the power to establish "uniform laws on the subject of bankruptcies throughout the United States." The Tenth Amendment to the U.S. Constitution provides that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Eleventh Amendment to the U.S. Constitution provides that the "judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign states."

It is well-established that federal bankruptcy law may not infringe upon the powers of a state guaranteed by these provisions. In 1936, utilizing the power granted to it by the Constitution, Congress enacted the Bankruptcy Act of May 24, 1934, allowing municipalities, for the first time, to readjust their debts under certain circumstances. The U.S. Supreme Court ultimately declared that act an unconstitutional infringement upon the State's power to control its fiscal affairs. *See Ashton v. Cameron County Water Imp. Dist. No. 1*, 298 U.S. 513 (1936). The Court reasoned that the act, designed "to authorize a federal court to require objecting creditors to accept an offer by a public corporation to compromise, scale down, or repudiate its indebtedness without the surrender of any property whatsoever", could not be applied to "materially restrict respondent's [a political subdivision of the State] control over its fiscal affairs." *Id.* at 527, 530. The political subdivision's fiscal affairs, the Court held, are "not subject to control or interference by the national government, unless the right so to do is definitely accorded by the Federal Constitution." *Id.* at 528.

Shortly thereafter, Congress enacted Chapter 10 of the Bankruptcy Act of August 16, 1937, a second attempt to allow municipal debt readjustment. The Supreme Court upheld the constitutionality of this act. The Court premised its holding on the act's precondition that the State (or political subdivision thereof) must *consent* to waive sovereign immunity, ensuring the State's ability to retain control over its fiscal affairs:

> We are of the opinion that … chapter 10 is a valid enactment. The statute is carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised in relation to a matter normally within its province and <u>only</u> in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is <u>authorized by state law</u>. It is of the essence of sovereignty to be able to make contracts and give <u>consents</u> bearing upon the exertion of governmental power.

*United States v. Bekins*, 304 U.S. 27, 51-52 (1938) (emphasis supplied).[7]

Although there have been subsequent iterations of this act, the Supreme Court has never retracted from its holding that the U.S. Constitution prohibits federal bankruptcy law from materially restricting a State's ability to control its fiscal affairs.  This principle remains as important today as it was when *Ashton* and *Bekins* were decided.  Very recently, the United States Bankruptcy Court for the District of South Carolina reiterated this principle when it stated "most importantly, the Court remains mindful of its duty not to interfere with the rights and duties of the State and its subordinate political subdivisions."  *In re Barnwell County Hosp.*, 459 B.R. 903, 910 (Bankr. D. S.C. 2011); *see also Addison Cmty. Hosp. Auth.*, 175 B.R. 646 (Bankr. E.D.Mich. 1994) ("A primary distinction between chapter 11 and chapter 9 proceedings is that in the latter, the law must be sensitive to the issue of the sovereignty of the states.").

The sovereignty of the states under the U.S. Constitution has long been recognized and protected in the context of bankruptcy cases.  Nothing in the text of Article I, section 8 of the U.S. Constitution "suggests an abrogation or limitation of the States' sovereign immunity."  *Central Va. Comm. College v. Katz*, 546 U.S. 356. 382 (2006) (Scalia, J., dissenting).  The U.S. Supreme Court in interpreting the application of sovereign immunity in bankruptcy cases has found that, "the Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72-73 (1996).  The Supreme Court has on multiple occasions reviewed the applicability of sovereign immunity in issues arising out of

---

[7] This is of course consistent with the present Chapter 9 of the Bankruptcy Code.  As this Court is aware, a subsidiary unit of government may not seek the protection of Chapter 9 absent the specific consent of the governor of the state. §218.503(5), Fla. Stat.; *see* also 11 U.S.C. §§ 303, 901.  The instant case is in may ways an attempt to affect an involuntary Chapter 9 proceeding against the District without the governor's consent

Article I of the U.S. Constitution and applied the well-settled doctrine to "bar abrogation of state sovereign immunity under various clauses within" Article I, section 8 of the U.S. Constitution. *Katz*, 546 U.S. at 382 (Scalia, J., dissenting) (citing majority opinions in *Seminole Tribe*, 517 U.S. at 76; *Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 627 (1999).

The U.S. Supreme Court has upheld a governmental units' assertion of sovereign immunity in related bankruptcy cases and Congress has explicitly set forth the circumstances in which sovereign immunity may be abrogated in a bankruptcy case. *See* 11 U.S.C. § 106. Within section 106 of the Bankruptcy Code, Congress has enumerated several sections of the Bankruptcy Code in which sovereign immunity in a limited fashion is abrogated as to a governmental unit. 11 U.S.C. § 106(a)(1). None of the abrogated sections apply to the terms of the Debtors' Plan.

It is axiomatic that the Debtors' proposed restructuring of the Series 2006 Bonds and shifting of the District's lien rights constitute a material restriction of the District's ability to control its fiscal affairs and a direct impingement on the sovereignty of the District and the State of Florida with respect to enforcement of the Series 2006 Bonds. The Debtors' intent to restructure the 2006 Bonds is expressly set forth in the Terra Group Prospectus: "the intent during the bankruptcy reorganization Plan is to bifurcate the outstanding CDD bonds between the North and South Sections of the development project." Terra Group Prospectus, p. 2 (emphasis supplied), **Exh. H**.

To confirm the Plan and allow the restructuring of the Bonds and shifting of the District's secured liens (imposed pursuant to Florida statute and the Final Judgment) and/or shifting of the "burdens" of the extant assessments, infringes upon the sovereign immunity of the District, a state created governmental body and runs afoul of the 10th and 11th Amendments of the Constitution. Therefore, on its face, the Plan cannot be confirmed as a matter of law.

## II.    The Debtors' Plan Violates State Law

The Debtors' Plan Sponsor states that its "intent during the bankruptcy re-organization Plan is to bifurcate the outstanding CDD bonds between the North and South sections of the

development" and that they intend to sell the South Parcel "for its cost of carry to a third party near the end of the sellout of the north phase." *See* Terra Group Prospectus at p.2 (**Exh H**). Aside from the constitutional issues discussed above, a Plan which provides for restructuring of state court approved bonds, shifting of perfected liens, and destruction *and conversion* of District owned roads and infrastructure, is not confirmable as a matter of law.

### A.    The Plan Cannot Bifurcate Bonds or Establish New Special Assessment Liens

The existing Special Assessments were levied and imposed based upon, *inter alia*, the District's existing Engineer's Report, the existing Assessment Methodology, the existing product types and ERU[8] factors.  In order for the Debtors to restructure the Series 2006 Bonds, as they attempt to do under the Plan, they would need to alter the Special Assessments and attendant "benefits" analysis.  However, the Debtors have no authority, under the Bankruptcy Code or otherwise, to establish new Special Assessment liens under Chapters 170, 190 and 197 of the Florida Statutes.  Therefore, any Special Assessment liens other than those presently approved would be invalid and unenforceable.

Under Florida law, for a special assessment to be valid: "(1) the property assessed must derive a special benefit from the service provided; and (2) the assessment must be fairly and reasonably apportioned according to the benefits received." *Sarasota County v. Sarasota Church of Christ, Inc.*, 667 So. 2d 180, 183 (Fla. 1995). These determinations were made by, *inter alia*, the Final Judgment.  To modify these approvals would be an improper collateral attack of that Final Judgment. As the Plan attempts to accomplish these improper results, it cannot be confirmed as a matter of law.

Examples in the Plan of these inappropriate attempts to restructure the Series 2006 Bonds

---

[8] "ERU" or "equivalent residential unit," is a unit of measure which provides a basis for comparing the relative benefit provided to different land use types from the District's capital improvement plan and other services.  A parcel's special assessment can be determined by multiplying the number of ERU's assigned to that parcel by the special assessment per ERU.  By way of example, if you assume that 2,000 square feet of retail space has an ERU of 1, a residential unit likewise has an ERU of 1, and the special assessment in question is $50,000 per ERU, then the special assessment for a 4,000 square foot retail store would be $100,000, while a residential unit would only have an assessment of $50,000.

include the Plan's proposed re-allocation scheme between the North and South Parcels.  Under the Plan, the Debt Special Assessments levied on the North Parcels will decrease by $17,831,802, a 31.3% decrease, while Debt Special Assessments levied on the South Parcels will increase by $5,544,627, a 38.2% increase.[9]

The Plan suggests that Series 2006A Assessments[10] will change on the North Parcels without a corresponding proportionate change to Series 2006B Assessments.  This is contrary to Florida law because the Series 2006 Bonds went to fund the same infrastructure, and, as such, the Series 2006A and 2006B Assessments should be allocated to the property in a like manner.  This also impacts the lien claims as the value of those lien claims are necessarily adjusted without complying with Florida law. By way of example, the Plan assumes that the North Parcels collectively will receive a decrease in Series A Assessments by 61.4%, but only receive a decrease in Series 2006B Assessments by 9.1%.  This is contrary to the existing Assessment Methodology, industry standards, and Florida law, which would require such a change to be proportionate (*e.g.*, if there is a 61.4% decrease in Series 2006A Assessments, there should also be a 61.4% decrease in Series 2006B Assessments).  The Plan also creates the same illegality with respect to the South Parcel increasing Series 2006A Assessments by 51.6% and Series 2006B Assessments by 28. 4%.

The Plan's information regarding release prices for different product types shows that again the Plan is not taking into account "benefit" and "fairness," as required by Florida law.  These so called release prices reconfigure and readjust the entire financial underpinning of the Series 2006 Bonds, all validation documents and the Indenture.  This Court has no authority to do so.  The sum total of all of the Plan provisions with respect to the special assessments and lien

---

[9] The assessment figures stated herein are used for illustrative purposes only and subject to the limitation expressed in footnote 13, *infra*.

[10] The undersigned use the terms "Series 2006A Assessments" and "Series 2006B Assessments" loosely to illustrate the way the Debt Assessments are treated under the Plan.  However, it is the Objecting Parties' position that the assessment lien securing the Series 2006 Bonds is a single lien for each parcel of property at issue, and such individual liens secure both the Series A and Series B Bonds.  To modify the liens contract to the existing structure violates Florida law.

structure, dramatically changes the nature of the existing assessment liens, making them far less defensible for the District and far more risky for the Bondholder.

**B.      The Plan Improperly Changes the Nature of the District's and Bondholder's Collateral by Bifurcating the Bonds and Moving Special Assessments to the More Risky Commercial South Parcel, which Will Likely Be Abandoned Post-Confirmation to the Detriment of the District and Its Bondholder.**

The Plan seeks to bifurcate the Series 2006 Bonds and isolate the South Parcel.  In doing so, the Plan improperly seeks to alter the District's collateral, by apparently shifting assessment liens securing the Series 2006 Bonds from the more stable residential North Parcels to the riskier retail and commercial development based South Parcel.[11]  Of course, this strategy is exclusively to the Debtors' benefit and to the detriment of the District.      It is also another example of an improper reassessment and collateral attack on the Final Judgment.

As set forth above, the Plan improperly seeks to reduce assessments on the North Parcel and increase assessments on the South Parcel without regard to (i) the inability to modify assessments under Florida law; and (ii) the value of the Parcels.  The purpose of this improper assessment shifting appears to be to create the opportunity for the Debtor to retain their prime land while walking away from the debt of the 2006 Bonds by abandoning less valuable land.  For example, if the development project begins to fail, the reorganized Debtors could simply stop paying the assessments on the South Parcel, which are increased under the Plan, while continuing to pay the reduced assessments on the North Parcel.  In effect, the Debtors would insulate themselves from approximately $20 million in assessments and leave that loss to the

---

[11] The Debtors' appraisal indicates that the South Parcel is worth significantly less than the North Parcels, finding that the North Parcels together are worth $30,500,00 as compared to $12,900,000 for the South Parcel. According to the Plan, the principal amount of the debt special assessments would decrease on the North Parcels from $57,000,859 to only $39,169,057.  As a result, the debt special assessments on the North Parcels would go from being under-secured by $26,500,859 (46.5% under-secured), to being under-secured by only $8,669,057 (22.1% under-secured).  In contrast, the principal amount of the debt special assessments would increase on the South Parcel from $14,499,141 to $20,043,768.  As a result, the debt special assessments on the South Parcel would go from being under-secured by only $1,599,141 (11% under-secured), to being under-secured by $7,143,768 (35.6% under-secured).  While the Motion to Value Collateral was denied on January 18th, and the Debtors' appraisal therefore held invalid, the preceding analysis using the Debtors' appraisal figures is informative in that it shows the Debtors' intentions – to improperly change the nature of the District's collateral by shifting assessments to the South Parcel.

District and the Bondholders.  The fact that the Debtors acknowledge that they intend to "sell" the South Parcel for its "carrying cost" after building out the North Parcels evidences their clear intent to improperly off load Special Assessments on the South Parcel.

The chart set forth below illustrates the point.  Under the financial projections attached to the Plan, and assuming there is a section 1111(b) election, the South Parcel will receive a $5.5 million, or 38.2%, increase in the special assessments securing the principal amount of the Series 2006 Bonds – up to approximately $20 million, and the North Parcels will see a $17.8 million, or 31.3%, decrease.  The analysis is similar when no section 1111(b) election is made, in that the special assessments securing the principal amount of the Series 2006 Bonds will decrease on the North Parcels by $31,114,589 (-54.6%), yet increase on the South Parcel by $1,032,621 (+7.1%).

| | Parcel Identification No. / Debtor | Debtors' Pre-Plan Special Assessment Principal[12] | Debtors' Post-Plan Special Assessment Principal[13] | Change |
|---|---|---|---|---|
| *North Parcels – Series 2006A Assessment*[14] (Plan Class 4(a)) | 35-3017-001-0240 (Town Center at Doral, LLC) | $18,542,781 | $9,319,057 | ($14,852,496)<br><br>**61.4% Decrease** |
| | 35-3017-001-0241 (Landmark at Doral East, LLC) | $5,105,842 | | |
| | 35-3017-001-0250 (Landmark Club at Doral, LLC) | $522,930 | | |
| | Total Series 2006A Assessments on North Parcels: | $24,171,553 | | |
| *North Parcels – Series 2006B Assessment* (Plan Class 4(c)) | 35-3017-001-0240 (Town Center at Doral, LLC) | $25,184,424 | $29,850,000 | ($2,979,306)<br><br>**9.1% Decrease** |
| | 35-3017-001-0241 (Landmark at Doral East, LLC) | $6,934,650 | | |
| | 35-3017-001-0250 (Landmark Club at Doral, LLC) | $710,232 | | |
| | Total Series 2006B Assessments on North Parcels: | $32,829,306 | | |
| **TOTAL DEBT ASSESSMENTS FOR NORTH PARCELS:** | | $57,000,859 | $39,169,057 | ($17,831,802) 31.3% Decrease |
| *South Parcel – Series 2006A Assessment* (Plan Class 4(b)) | 35-3017-001-0362 (Landmark at Doral South, LLC) | $6,148,447 | $9,319,057 | +$3,170,610<br><br>**51.6% Increase** |
| *South Parcel – Series 2006B Assessment* (Plan Class 4(d)) | 35-3017-001-0362 (Landmark at Doral South, LLC) | $8,350,694 | $10,724,711 | +$2,374,017<br><br>**28.4% Increase** |
| **TOTAL DEBT ASSESSMENTS FOR SOUTH PARCEL:** | | $14,499,141 | $20,043,768 | +$5,544,627 38.2% Increase |

---

[12] These numbers are taken from the Debtors' Special Assessment Roll, which is used for illustration purposes only and may not necessarily reflect the amounts actually owed.

[13] These numbers are taken from the Debtors' financial projections supplied as an exhibit to the Plan.

[14] The use of the terms Series 2006A Assessment and Series 2006B Assessment are for illustrative purposes only. *See* footnote 10, supra.

The Plan's attempt to bifurcate the Series 2006 Bonds into debt obligations applicable to the North Parcels and the South Parcel has numerous negative implications. The bifurcation means that the District and its Bondholders may receive less than what they would otherwise receive in a Chapter 7 liquidation scenario, and, similarly for cramdown purposes, are not receiving the equivalent of the existing Special Assessment liens, because, again, the bifurcation illegally changes the nature of the District's and Bondholders' collateral.

    C.    **The Plan Improperly Attempts to Force the 16 O&M Assessment Liens into Claims Classes 4(a) through 4(d) and Have Those O&M Assessment Liens Repaid on the Same Schedule as Debt Assessments.[15]**

While the Disclosure Statement and Plan provide little detail on this issue, it appears that the Plan would combine the O&M Assessment Liens and debt assessment liens for collection over an extended period of time. Yet, it is nonsensical and improper to place past due annual O&M assessment payments on the same extended payment schedule as debt assessments. O&M assessment liens serve a different function than debt liens (*e.g.*, unlike debt assessment liens, O&M liens are intended to provide funding for the District's annual operating budgets); they are ordinarily collected on a different schedule (*e.g.*, in the year in which they are levied as opposed to in installments over a 30 year period); and the revenues are placed in the District's general fund as opposed to trust estate accounts.

Among other issues this raises, the decision to "merge" the O&M Assessment Liens and debt assessment liens calls into question the legality of the O&M Assessment Liens going forward (*e.g.*, it is doubtful that the District can collect a twenty-five year old O&M assessment, and show that the future owner benefits from the services contemplated to be funded by the original O&M assessment invoiced years earlier). Also, it will create an accounting nightmare because it will be difficult if not impossible for the District to account for what monies from any given assessment payment should be paid to the District's general fund account, or to the

---

[15] The O&M Assessment Liens appear to be included in the definition of "Assessment Obligation" together with the debt assessments. *See* Plan at § 1.9.

District's bondholders for credit against the District's long term debt obligations.

     **D.**     **The Plan is Not Legally Feasible because it Involves Destruction and Conversion of Public Infrastructure.**

The Appraisal relied upon by the Debtors, and which appears to rely on the Terra Development Plan not disclosed to creditors, indicates that public infrastructure installed by the District will have to be removed in order for the reorganized Debtors' development plan to be instituted. Pursuant to the Warranty Deed attached as Exhibit A, all of the roads are owned by and are property of the District. Therefore, destruction of the roads as proposed under the Plan would constitute illegal conversion of the District's property. The Debtors' Plan and Disclosure Statement fail to mention this issue.

Further, the roads and other infrastructure were financed with municipal bond proceeds. Both Florida law and the Indenture prevent this destruction and taking. *See* §806.13(1)(a), Fla. Stat. Sections 9/24 and 9/32 of the Master Trust Indenture affirmatively require the District to protect and maintain the infrastructure funded with the District's municipal bonds. This includes the infrastructure which the Debtors appear to claim will need to be destroyed. The District has not and will not approve this destruction of its infrastructure. Any unilateral action by the Debtors to do so violates, *inter alia*, § 806.13(1)(a)3, Florida Statutes. Therefore, it is impossible for the Debtors to carry out their proposed Plan without violating clearly defined Florida law and converting the District's property.

     **E.**     **Through the Plan, the Debtors Ask this Court to Make Numerous Legislative Determinations that Are Within the Exclusive Purview of the District and its Public Officials**

In order to approve the Plan, this Court will have to make numerous legislative determinations on behalf of the District which is contradictory to Florida law, is against public policy and runs afoul of the U.S. Constitution (as set forth above). *See In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 141 (Bankr. S.D.N.Y. 2010) (citing, 6 Collier on Bankruptcy ¶904.02[2][a]) (Section 903 limits the powers of a Bankruptcy Court to enter an order that would

violate a state law or administrative order.).[16]

Such determinations include, among others:

- Determinations regarding what public improvements the District should construct and/or acquire, or permit to be destroyed

- Determinations regarding who will control the construction of the improvements that will service the community (e.g., the Plan allows the reorganized Debtors to control that process, but the Plan apparently contemplates alterations to property owned by the District)

- Determinations regarding future funding for operations and maintenance services in order to support the constructed improvements

- Determinations regarding how to dispose of the existing public property in order to allow for the construction of the improvements (*see* discussion supra at 15)

- Determinations of benefit from the public infrastructure to the various lands within the District

- Determinations regarding the assignment of assessments to particular product types, and the allocation of assessments (e.g., ERU's)

- Determinations regarding the timing of the collection of assessments

- Determinations regarding the method by which future assessments will be collected (e.g., the Plan appears to contemplate that the assessments cannot be collected using the Uniform Method)

These determinations are legislative in nature. For example, the planning and construction/acquisition of public infrastructure improvements is clearly a legislative function

---

[16]   The legislative history of Chapter 9 generally and Section 903 in particular demonstrate the limited scope of a bankruptcy court's powers to affect a State government or its political subdivisions:

> Thus, the powers of the court are subject to a strict limitation—that no order or decree may in any way interfere with the political or governmental powers of the petitioner, the property or revenue of the petitioner, or any income producing property. The purpose of this limitation derives from Ashton v. Cameron Water Improvement District No. 1, which held the first municipal bankruptcy act unconstitutional on the basis of infringement of state sovereignty. This limitation was included in the second act, and was relied upon in *Bekins v. United States* which upheld the second municipal adjustments statute.

H.R. Rep. No. 95-595, at 263 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6221. While this is not a Chapter 9 proceeding, the same principles of federalism and comity logically would extend to any bankruptcy proceeding potentially impacting a State government or its political subdivisions.

within the discretion of the District.   Moreover, the determinations of whether landowners benefit from public improvements, and how assessments are allocated, are legislative determinations that, unless palpably unjust, are conclusive.  *Atl. Coast Line R. Co. v. City of Winter Haven*, 112 Fla. 807, 151 So. 321, 323-24 (1933); *Davis v. City of Clearwater*, 104 Fla. 42, 139 So. 825, 827 (1932); *Atl. Coast Line R. Co. v. City of Gainesville*, 83 Fla. 275, 91 So. 118. 123 (1922).

Further, all of these determinations are subject to procedural and other constraints imposed by Florida law.  *See, e.g.*, §§ 170.03 - 170.09, Fla. Stat. (creating procedural requirements for the adoption of the District's improvement plan and imposition of special assessments).  This Court should not accept the Debtors' invitation to play the role of the District's Board of Supervisors and make the numerous legislative determinations that are necessary to effect the Debtors' Plan.

Section 1334(c) of Title 28 of the United States Code, which provides for abstention by federal courts where appropriate to protect principles of federalism, supports this conclusion. Again, to avoid the various legislative and governmental determinations that the Plan would necessarily require this Court to make on behalf of the District, and to avoid interference with the Circuit Court's Final Judgment, the Court should abstain from determining matters that would affect the District's Series 2006 Bonds and the Special Assessments, and instead should allow the District to continue the prosecution of the District's pending state court foreclosure suit.  *See also Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976); Burford v. Sun Oil Co.,* 319 U.S. 315 (1943); *Swift v. Bellucci (In re Bellucci)*, 119 B.R. 763, 767 (Bankr. E.D. Cal. 1990) (applying case based abstention principles in a bankruptcy context).

### F.    The Debtors' Plan Violates the Rooker-Feldman Doctrine

The establishment of the District, the structure of the Series 2006 Bonds and the Assessment Methodology has been judicially confirmed by the Final Judgment.  *See* **Exhibit G**. Pursuant to the *Rooker-Feldman* doctrine, this Court does not have jurisdiction to attack the Final Judgment. Confirmation of the Debtors' Plan would constitute such an improper attack.

21

The *Rooker-Feldman* doctrine limits the subject matter jurisdiction of federal courts over certain matters related to previous state court litigation.  *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923); *Dist. of Columbia Court of Appeals v. Feldman*, 450 U.S. 462, 476-82 (1983).

The Eleventh Circuit has previously described the *Rooker-Feldman* doctrine as follows:

> The Rooker-Feldman doctrine provides that federal courts, other than the United States Supreme Court, have <u>no authority to review the final judgments of state courts</u>.  The doctrine extends not only to constitutional claims presented or adjudicated by a state court, but also to claims that are 'inextricably intertwined' with a state court judgment.  A federal claim is inextricably intertwined with a state court judgment if the federal court succeeds only to the extent that the state court wrongly decided the issues before it.

*Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc) (emphasis added).

*Rooker-Feldman* bars lower federal court jurisdiction where four criteria are met:

(1)  the party in federal court is the same as the party in state court;

(2)  the prior state court ruling was a final or conclusive judgment on the merits;

(3)  the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding; and

(4)  the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court's judgment.

*See Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995); *Vincent, Inc. v. Broward County*, 200 F.3d 1325, 1332 (11th Cir. 2000); *Dale v. Moore*, 121 F.3d 624, 626 (11th Cir. 1997); *Goodman v. Sipos*, 259 F.3d 1327, 1332 (11th Cir. 2001).

In this case, the Final Judgment meets all of the above criteria.  Specifically, the District is the same party, "property owners" within the District – such as the Debtors – were named defendants in the case, the prior state court ruling is final, the Debtors participated in and, in fact, solicited the establishment of the District and the Assessment Methodology under the Final Judgment, and the issue before this Court (i.e. the appropriateness of the specific bond, liens and assessment structure) has been determined.  Therefore, the Debtors cannot collaterally attack the validity of or the findings in the Final Judgment through its proposed Plan.  Any attempt to do so

renders the Plan unconfirmable as a matter of law.

**III.    The Plan Violates the Absolute Priority Rule And Is Therefore Not Confirmable As A Matter of Law**

The Plan proposes that "[i]n exchange for the Equity Contribution and in satisfaction of the DIP Financing Claim," the Reorganized Debtors are "authorized to issue 100% of their New Membership Units to the Plan Sponsor or its designees, without the need for further action by the Debtors, the Reorganized Debtors, the Plan Sponsor or Holders of Claims or Interest. The Plan defines Equity Contribution as being equal to not less than $5,000,000 and not more than $20,000,000. Neither the Plan nor the Disclosure Statement provides further information on the value of the Equity Contribution other than the $15 Million spread. Further, the Plan does not provide for any marketing of the New Membership Units, or afford any party the right to bid on the New Membership Units. In truth, as the Objecting Parties have protested from day one, this Plan is a disguised sale of the underlying Property that was negotiated pre-petition to intentionally avoid the credit bid right of the District. Certainly, the insider transaction between the Plan Sponsor and the principal of the Debtor, Isaac Kodsi, further underscores the need for marketing of the Equity Contribution.

In *Bank of Am. Nat'l Trust & Savings Ass'n v. 203 North LaSalle Street P'ship*, 119 S.Ct. 1411 (1999), the Supreme Court held that, if a new value exception to the absolute priority rule existed, it could be invoked only if the debtor relinquished exclusivity or other parties were afforded the opportunity to bid on the equity interests. 119 S.Ct. 1411, 1423 (Where the Plan grants an exclusive right, "the best way to determine value is exposure to a market"). The Supreme Court, however, refused to determine what method exactly constitutes market testing or the most appropriate form of market testing. *Id.* at 1424.

Further in *In re Global Ocean Carriers, Ltd.*, 251 B.R. 31 (Bankr. D. Del. 2000), the court interpreted *LaSalle* as requiring valuation through a public sale or similar mechanism even when the new equity holders are unrelated to current ownership, when current ownership unilaterally determines the identity of the new owners and the price they will pay. *Global Ocean*

23

suggests that *LaSalle* is implicated every time a plan provides for a reorganization in which creditors' claims are compromised and old equity is replaced with new equity. Indeed, unless exclusivity is terminated or a "new value auction" is held, the "exclusive opportunity" will necessarily persist in every case where the debtor alone determines to whom the new equity will be sold and the price that will be paid.

In this case, the Debtors' violation of the absolute priority rule is particularly glaring. First, the value of the new equity is unclear. Is the value of the new equity $5 Million or $20 Million? Second, the Debtors are dictating who the new equity sponsor is, without testing the value of the new equity in the open market. The Plan makes no provision for a public sale of the New Membership Units.

Third, the Plan Sponsor has entered into a "success fee" arrangement with Issac Kodsi ("**Kodsi**"), the Debtor's principal management employee pursuant to which if the Plan as drafted is confirmed, Kodsi is to be paid a $150,000 success fee in addition to his compensation, also paid by the Plan Sponsor. The agreement between Kodsi and Terra Group chills any bidding process and de-incentivizes the Debtor from marketing the equity or the Property and determining the actual value for the Debtors. Said otherwise, this case was designed from prior to its filing to insure a result contrary to the creditors' best interests. Nowhere is that agreement disclosed. The Objecting Parties reserve all rights and remedies with respect to the prepetition agreement.

Finally, this Court recently found that the Debtor's valuation analysis is not credible and made a preliminary observation that the market test would be a better means to determine the Debtors' value. The Debtors' violation of the absolute priority rule prevents any market test of the Debtors' value. As the Plan fails to meet the *LaSalle* standard of new value and fails to provide for an auction of the New Membership Units, confirmation must be denied as a matter of law.

**IV.    The Debtors' Plan is contrary to Well-Established Public Policy**

**A.    If Approved, the Plan could be Detrimental to Public Financing.**

To the extent the Debtors' Plan purports to restructure the Series 2006 Bonds, the Plan is contrary to well-established public policy and, if approved, could be detrimental to public financing throughout the nation.  In *In re Ritter Ranch Dev., L.L.C.*, 255 B.R. 760 (B.A.P. 9th Cir. 2000), the United States Bankruptcy Appellate Panel of the Ninth Circuit held that holders of bonds issued by the city to finance development and construction of public facilities upon property later transferred to a Chapter 11 debtor were not creditors of the debtor subject to the "cramdown" provisions of the Bankruptcy Code.  The court reasoned that the bondholders could not demand payment from any property owner and could not foreclose.  Rather, their only remedy was to insist that the city collect the special taxes or initiate foreclosure proceedings. The court noted that the city's lien was for the special taxes but not for the indebtedness under the bonds.  Finally, the court relied upon the fact that if the city were to foreclose, it would receive title rather than the bondholders.  *Id.* at 764.

The facts of this case mirror those of *Ritter*.  As in that case, the Series 2006 Bonds were issued to finance development and construction of public facilities; the bondholders cannot demand payment from any property owner and cannot foreclose; rather, the bondholders' only remedy is to insist—albeit contractually *via* the Master Trust Indenture (hereinafter defined)— that the District collect the special assessments or initiate foreclosure proceedings; the District's lien is for Special Assessments but not for any indebtedness under the Series 2006 Bonds; and finally, if the District forecloses, the District – not the Bondholder -- receives title to the property.[17]  As the facts of this case and *Ritter* are so closely aligned, the same result should apply—that is, this Court should find that the bondholders are not creditors of the debtors subject to the "cramdown" provisions in the Bankruptcy Code.

---

[17] A CDD and a Trustee may elect to enter into an agreement whereby, instead of the CDD taking title, a special-purpose entity takes title to the property.

The *Ritter* court, in reaching its holding, leaned heavily on public policy considerations, finding "neither a literal reading of the Bankruptcy Code and California law nor public policy reasons justify treating the Bondholders as 'creditors' of Ritter Ranch." *Id.* at 767. The court explained the public policy rationale behind its decision as follows:

> [T]here are strong public policy reasons in terms of having bond financing ... to create facilities, to create housing, to create subdivisions.... [I]t is not the intent of Congress to interfere with that ... [and] in this case, the specific public policy of the State of California to encourage this type of development is going to overwhelm and overrule any more general, very broad definition that Congress put into Section 101[5] ... of the [Bankruptcy] Code.

*Id.* (quoting *Baker & Drake, Inc. v. Public Service Comm'n of Nevada*, 35 F.3d 1348, 1352–1355 (9th Cir. 1994)). Like the *Ritter* court, this Court should examine the wide-ranging and critically important public policy considerations implicated in the debtors' Plan.

The purpose of community development districts is to provide an alternative means to finance *public* infrastructure including but not limited to public roads, parking lots and sidewalks; public parking improvements; stormwater management improvements; water distribution systems; sanitary sewer systems; conservation areas; mitigation areas; and recreation facilities. *See generally* §§ 190.002, 190.012, Fla. Stat. A sizeable portion of public infrastructure in Florida, and in other states, is financed by CDD and other municipal debt. If bankruptcy courts were free to rewrite municipal liens for special assessments—often the sole security for special assessment bonds issued in the range of four to seven percent—the cost of public infrastructure would increase dramatically. Buyers of municipal bonds would no longer be able to rely on a predictable assessment revenue stream or a sale of the property or their rights in the event of default. This increased uncertainty would lead to greater investor risk, resulting in higher interest rates, which in turn would equate to higher costs. The public would be forced to shoulder these higher costs. Accordingly, in the interest of public policy it is imperative that this Court refuse to open the door to bankruptcy courts to materially restructure municipal bond debt.

**B.    Debtors' Proposed Plan of Reorganization Would Cause the District to be in Perpetual Default under the Master Trust Indenture.**

The Indenture governs the relationship between the Trustee and the District and delineates the District's obligations to the Bondholders.  The Indenture provides that Series 2006 Bonds are secured by a pledge of the funds in the various trust estate accounts and, more importantly, by a pledge of the District's assessment revenue.  The Indenture imposes on the District the responsibility to protect the lien of the Special Assessments; to protect the tax exempt status of the Series 2006 Bonds; and to seek collection of the Special Assessments in sufficient amounts to retire the principal amount of the Series 2006 Bonds, with interest.

The Debtors' Plan would have effect of placing the District in perpetual default under the Indenture.  The District's financial obligations under the Indenture would remain unchanged, while its ability to collect on the Series 2006 Bonds through Special Assessments would be compromised under the terms of the proposed Plan.  This scenario would create a devastating financial impact on the District, to the detriment of the public.  Further, the default under the Indenture may lead to an increase of Special Assessments post-confirmation, which would impact the feasibility of the Debtors' projected cash flow.

**C.    The Debtor's Plan shifts the responsibility for paying B Bond Assessments from the Debtors to future residents and creates foreclosure issues for the District.**

Under Section 3 of the True Up Agreement dated October 10, 2006, the Debtors are required to "pay, or cause to be paid" to the District or its designee the amount of the debt special assessments representing the outstanding B Bond principal with accrued interest for each unit. This is required to be paid by the Debtors "no later than the closing date of the first sale following the issuance of a certificate of occupancy for each residential unit or for each commercial or office parcel."  The purpose of this requirement is to ensure that homeowners are not left with the daunting obligation of making a balloon B Bond Assessment – which could be as much as $48,929 or more – in the future when the B Bonds reach maturity.  The payment of

27

outstanding B Bond Assessments by the developer just prior to the closing of a home is the typical approach to B Bond Assessment payments.

Despite the fact that the obligation to pay the B Bond Assessment principal is clearly not intended to be passed on to eventual homeowners, the Debtor's Disclosure Statement indicates that the Debtor may do just that. Specifically, the Disclosure Statement states that whatever the Debtor does not pay down at closing on the B Bond Assessment will become the homeowner's responsibility. [ECF No. 108 at pg. 35]. This provides nothing less than a loophole for Debtors to shift the burden of paying B Bond Assessments from the Debtors to future homeowners.

This creates foreclosure issues for the District. It is highly unlikely that, even with a disclosure statement, buyers will fully appreciate the fact that they will have a significant balloon assessment payment due in a few years. When the bill for the balloon payment is sent by the District, many people will not understand and will not pay. The District will then be forced to foreclose on residents who were forced to pay what the Debtors should have paid in the first place. This is a very problematic structure for this Court to approve.

## V.    The Disclosure Statement fails to provide sufficient information to evaluate the legality of the Plan.

The Bankruptcy Code requires that a disclosure statement provide "adequate information" sufficient to enable claim holders to make an "informed judgment about the Plan." 11 U.S.C. § 1125(a), (b). Among other items, the disclosure statement should include information sufficient to enable a creditor to evaluate "the risks being taken by the creditors and interest holders" and "[t]he tax consequences of the Plan." *See, e.g., In re: Scioto Valley Mortg. Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988).

As previously noted, the Disclosure Statement and Plan do not provide adequate information to, among other things, allow the District, the Trustee, and the Bondholder to fully evaluate the legality of what the Debtors are proposing. One significant consideration is the fact that, in light of the denial of the Debtors' Motion to Value Collateral, there is no proper valuation of the real property that secures the District's liens. This is critical to any analysis of the Plan

28

because the District's potential recovery is based on that valuation. *See* Disclosure Statement at 30-32 (Doc. 108). After all, the Face Amount of the Assessment Obligations is tied to the Appraised Value of the collateral. *Id.* Without a valid appraisal, the District cannot determine what its expected recovery might be. *See, e.g., In re Reilly*, 71 B.R. 132, 134-35 (D. Mont. 1987) (disclosure statement not approved because of inaccuracies in valuation of debtors' real property); In re Olive Street Investments, Inc., 117 B.R. 488, 491 (Bankr. E.D. Mo. 1990) (disclosure statement not approved because of, inter alia, misleading appraisal); *In re Fierman*, 21 B.R. 314 (Bankr. E.D. Pa. 1982) (disclosure statement not approved because of, inter alia, finding that the statement failed to set forth a "factual basis for the purported value of the real property").

Another significant omission in the Disclosure Statement and Plan is the Debtors' failure to disclose the nature of compensation for Kodsi, the Vice President of the Debtors and the existence and terms of the negotiated "success fee" for Kodsi should the Debtors' Plan be confirmed on the terms proposed.

Section 1129(a)(5) requires that a plan disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director or officer…" and "the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider." *See* 11 U.S.C. §1129(a)(5)(A)(i) and (ii)(B). Kodsi testified at a recent deposition relating to the Plan valuation hearing that he is the Vice President of the Debtors, that he runs the day-to-day operations of the Debtors, and he has been guaranteed salary in the amount of $100,000 (in $10,000 monthly installments) from the Plan Sponsor, *plus* an additional $150,000 "success fee" should the Debtors' Plan be confirmed by Terra Group as the Plan Sponsor. Neither the Disclosure Statement nor the Plan discloses Kodsi's guaranteed salary or success fee arrangement. This omission is particularly troubling since the terms of the success fee (i.e. that it only comes to pass if the operational officer of the Debtors is successful in securing a confirmed Plan with no competing Plan sponsors) de-incentivize Kodsi from seeking alternative and competitive bids to the new value proposal of the Plan Sponsor. Further, the

nature of the success fee runs counter to Kodsi's fiduciary duty to creditors to maximize creditor recovery under the Plan.  None of this has been properly disclosed to creditors.

The Disclosure Statement fails to provide other pertinent information which prevents creditors from making an informed decision whether to support the Plan.  The Plan and Disclosure Statement raise numerous questions without providing supporting information, including, but not limited to:

- What does the new capital improvement Plan look like?  What new infrastructure will be developed and how much will it cost to construct?
- How much will the new capital infrastructure cost to maintain going forward?
- Where will the new product types be located and in what numbers?
- How much "benefit" will each product type receive from the existing infrastructure?  The new infrastructure?
- What will happen to the existing infrastructure?  How will the Debtors gain access to the District's property in order to modify or destroy that infrastructure?  How will this impact the ability of the District to enforce its special assessments?
- What are the ERU factors for the new product types?
- How does the Plan take into account future O&M assessments going forward?  Where are those reflected in the financial projections?
- Who will pay for the District to go through the process of reissuing bonds and imposing new assessment liens?
- What do the release prices represent?  Are they considered part of the assessment amounts?   What happens if the release payments aren't made? Can the District foreclose to protect its rights?
- What do the true-up prices represent?  Are they considered part of the assessment amounts?  What happens if the true-up payments aren't made? Can the District foreclose to protect its rights?
- How will the Internal Revenue Service view the bifurcated bonds, which necessarily will constitute a "reissuance" of the existing Series 2006A and B Bonds?  Will the new bonds remain tax exempt?
- How will the District secure a tax opinion to ensure that the bonds remain tax exempt?
- How will the District be able to safeguard its credit when the Plan will place the District in a continuing state of default and a continuing financial state of emergency?  What will the District do in the future if it is short on operating expenses and requires a loan?

Because this and other information is missing, the District and its Bondholder cannot evaluate, among other things, the feasibility or legality of the Plan, and as such cannot make an informed decision about the Plan within the meaning of Section 1125.  Therefore, in addition to

the fact that the Plan is not confirmable on its face, approval of the Disclosure Statement must be denied as it lacks adequate information.

## <u>CONCLUSION</u>

WHEREFORE, **LANDMARK AT DORAL COMMUNITY DEVELOPMENT DISTRICT**, **U.S. BANK N.A.** as Indenture Trustee under that certain Master Indenture as supplemented from time to time dated October 1, 2006 and **FLORIDA PRIME HOLDINGS LLC** respectfully request that this Court enter an order as follows:

(a)     sustaining their Objections to Disclosure and Confirmation

(b)     finding that the collective Debtors may not confirm a plan of reorganization as presently filed; and

(c)     awarding such further relief deemed just and proper, including but not  limited to granting the District full and complete relief from the stay and/or dismissing these Chapter 11 proceedings.

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

Respectfully submitted this 20th day of January 2012.

**STEARNS WEAVER MILLERWEISSLER**
 **ALHADEFF & SITTERSON, P.A.**
*Counsel for the District*
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Phone:   (305) 789-3553 E-Mail:
Fax:       (305) 789-3395

By: */s/ Patricia A. Redmond*
      PATRICIA A. REDMOND
      Florida Bar No. 303739
      predmond@stearnsweaver.com

**ARNSTEIN & LEHR LLP**
Attorneys for **Florida Prime Holdings, LLC**
200 South Biscayne Boulevard, Suite 3600
Miami, Florida  33131
Telephone:    305-374-3330
Facsimile:      305-374-4777
 pmhudson@arnstein.com

By:     */s/ Phillip M. Hudson III (with permission)*
      Phillip M. Hudson III
      Florida Bar No. 518743

**Greenberg Traurig, P.A.**
333 Avenue of the Americas
Miami, Florida 33131
Telephone: (305) 579-0730
Facsimile: (305) 579-0717

By:    */s/ John B. Hutton, III* (with permission)
      John B. Hutton, III
      huttonj@gtlaw.com
      Florida Bar No. 902160
      John R. Dodd
      doddj@gtlaw.com
      Florida Bar No. 38091

      *Counsel to the Indenture Trustee*

#1484913 v1