# EXHIBIT B

Page 1

 1                 UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2

 3
        IN RE:                        CASE NO. 11-35884-BKC-RAM
 4
        TOWN CENTER AT DORAL,
 5      L.L.C., et al.,

 6                     Debtors.
        _____/
 7

 8

 9

10

11                 Stearns Weaver Miller Weissler
                       Alhadeff & Sitterson
12                     150 West Flagler Street
                           Suite 2200
13                        Miami, Florida
                    Thursday, January 12, 2012
14                     10:20 a.m. - 2:25 p.m.

15

16

17                 D E P O S I T I O N

18                        O F

19              I S A A C   K O D S I

20

21

                      Taken pursuant to Notice,
22       on behalf Landmark at Doral Community Development
                           District.
23

24

25

Page 2

1                    APPEARANCES:
2

     BILZIN SUMBERG BAENA PRICE & AXELROD, by
3          DANIEL Y. GIELCHINSKY, ESQUIRE
               on behalf of the Debtor
4
5

          GENOVESE JOBLOVE & BATTISTA, by
6          MARILEE A. MARK, ATTORNEY-AT-LAW
   on behalf of the Official Committee of Unsecured
7                    Creditors
8
9              ARNSTEIN & LEHR, by
           PHILLIP HUDSON, III, ESQUIRE
10                      and
               DLA PIPER, by
11       BETTY M. SHUMENER, ATTORNEY-AT-LAW
         on behalf of Florida Prime Holding, LLC
12
13

          STEARNS WEAVER MILLER WEISSLER
14            ALHADEFF & SITTERSON, by
         PATRICIA A. REDMOND, ATTORNEY-AT-LAW
15        on behalf of the Landmark at Doral
             Community Development District
16
17

               BERGER SINGERMAN, by
18               JORDI GUSO, ESQUIRE
           on behalf of Terra Landmark, LLC
19
20

               GREENBERG TRAURIG, by
21          JOHN B. HUTTON, III, ESQUIRE
        on behalf of U.S. Bank as Indenture Trustee
22
23               ALSO PRESENT:
24             NOAH BREAKSTONE, BTI
25               - - - - - - -

Page 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ISAAC KODSI | | | | |
| By Ms. Shumener | 4 | | 160 | |
| By Mr. Guso | | 157 | | -- |

EXHIBITS MARKED FOR IDENTIFICATION

Number 1...............................Page 4
Number 2...............................Page 4
Number 3...............................Page 4

- - - - - - -

Page 4

```
 1          (Thereupon, Exhibit Numbers 1 - 3 were
 2      marked for Identification, respectively.)
 3  THEREUPON:
 4                    ISAAC KODSI,
 5  after having been first duly sworn, was examined and
 6  testified as follows:
 7                  DIRECT EXAMINATION
 8  BY MS. SHUMENER:
 9      Q    Good morning, Mr. Kodsi.
10      A    Good morning.
11      Q    Is that the way to pronounce your name?
12      A    Yep, yes.
13      Q    Could you please state your full name for
14  the record?
15      A    Isaac Kodsi.
16      Q    And state your address and telephone
17  number.
18      A    Personal or business?
19           MR. GIELCHINSKY:  Business is fine.
20           THE WITNESS:  Okay.  701 West Cypress Creek
21  Road, Fort Lauderdale, Florida 33309.
22  BY MS. SHUMENER:
23      Q    Mr. Kodsi, have you ever had your
24  deposition taken before?
25      A    Yes.
```

Page 5

1        Q    How many times?

2        A    Two or three times.

3        Q    When was the last time?

4        A    I don't remember, maybe -- I don't

5   remember.

6        Q    Can you remember the year?

7        A    No, I really don't.

8        Q    Was it within the last five years?

9        A    Yes.

10       Q    Do you remember the action in which ---

11       A    Oh, I remember, my apologies.  I was

12   deposed in -- in July of this year.

13       Q    In what year?

14       A    This past year, '11, on a plaintiff matter,

15   lender matter.

16       Q    All right.  I'm going to come back to that.

17   Let me -- let me go through some of the instructions

18   just to make sure you're fresh --

19       A    Okay.

20       Q    -- on what's going -- you know, that your

21   memory is refreshed as to protocols, if you will, and

22   rules and procedures.

23            This proceeding is under oath, it's under

24   penalty of perjury.  It's no different than if we

25   were in a court of law.

Page 6

1          The court reporter is taking down every

2    word that we're saying, so -- and you'll have a

3    chance to review her transcript, which will come out

4    in a little booklet.  It's really important that all

5    of our responses are verbal, all of our

6    communications are verbal, no nodding of the head and

7    shrugging of the shoulders or grunts and groans.  I'm

8    talking more to myself than to you on that one.

9          But the most important part of that

10   admonition is really, I'm going to try very hard to

11   let you finish so there's a clear record, and I want

12   you to try very hard to let me finish my questions,

13   so that we don't step on each other and the court

14   reporter doesn't go crazy, is that okay?

15        A     Yes, that's fine.

16        Q     Wonderful.  I am entitled to your best

17   testimony today, that means that you can give me your

18   best recollection.  I don't want you to guess, I do

19   want you to estimate.  I'm entitled to your best

20   estimates.

21          Do you know the difference between guessing

22   and estimating in this context?

23        A     I believe so.

24        Q     Okay.  If you don't understand something, I

25   would like you to ask me for clarification.  If you

1   don't ask me, I'm going to assume that you understand

2   the question, and that your answer is based on that

3   understanding, is that clear?

4       A    Yes.

5       Q    Please don't hesitate to ask for

6   clarification.

7            If you want a break, just ask for it.  We

8   will try to give you a break any time you want.  I

9   would ask that you not ask for a break while a

10  question is pending.  I'd like to get your answer and

11  then we can take a break, is that all right?

12      A    Sure.

13      Q    Okay.  Is there any reason why you can't

14  give me your best testimony today?

15      A    No.

16      Q    So there's no medication impeding your ---

17      A    No.

18      Q    All right.  Going back to depositions.  You

19  said that -- I believe you said that you have been

20  deposed two or three times; correct?

21      A    Correct.

22      Q    And then you just immediately recalled that

23  you had been deposed in July of 2011?

24      A    '11, correct.

25      Q    Okay.  Is that in addition to the two or

Page 8

1    three times?

2        A    That was probably one of them.

3        Q    Okay.  In what proceeding were you deposed

4    in July 2011?

5        A    Foreclosing on a property as a lender and

6    just being questioned for it.

7        Q    Were you -- were you a party to that

8    litigation?

9        A    Yes, the plaintiff.

10       Q    You were -- you were the lender?

11       A    Yes.

12       Q    Okay.  Were you the lender in your

13   individual capacity, Isaac Kodsi as the lender?

14       A    No, through -- through a company.

15       Q    Okay.  What was the name of the company?

16       A    Ark Loan Solutions.

17       Q    I'm sorry?

18       A    Ark.

19       Q    A-r-c-h?

20       A    A-r-k.

21       Q    A-r-k.

22       A    Loan Solutions.

23       Q    Like Noah's Ark?

24       A    Correct.

25       Q    Okay, and who was the defendant in that

Page 9

1   action?

2         A     I don't remember his name.  It was a

3   borrower, it was a residential loan.

4         Q     Okay, and did that action conclude in a

5   foreclosure?

6         A     Yes.

7         Q     And did you acquire title to the property?

8         A     Yes.

9         Q     And the property was a home?

10        A     Yes.

11        Q     Where?

12        A     Venice Beach, Florida.

13        Q     How long did your deposition last?

14        A     Oh, I don't remember.

15        Q     Was it more than one day?

16        A     No, no.

17        Q     What was your position in Ark Loan

18   Solutions?

19        A     Just a manager of the company.

20        Q     Any ownership interest?

21        A     No.

22              MR. GUSO:  I'm going to object to this line

23   of questioning.  It seems to me that we're here in

24   the context of a deposition under Rule 7030 in

25   connection with a contested matter in the bankruptcy

Page 10

1    cases.

2              Ark Solutions is not a party to those

3    cases, nor is the foreclosure of a residential

4    home mortgage relevant to the contested matters

5    that are pending before the Bankruptcy Court.

6              I understand you're entitled to some

7    background about the witness' prior deposition

8    experience, but his ownership interest and the

9    nature of that litigation seems to me to be

10   wholly irrelevant and not likely to lead to the

11   discovery of admissible evidence in connection

12   with the matters that are before the Bankruptcy

13   Court.

14             MS. SHUMENER:  I respectfully disagree, but

15   I note your objection.

16   BY MS. SHUMENER:

17        Q    Any other times in which you were deposed

18   that you can recall?

19        A    Yes, I just don't remember, you know,

20   specifics.

21        Q    Okay.  Can you tell me the action?

22        A    Some of them were in foreclosures that I

23   was a defendant.  In this real estate market there

24   were properties that we owned -- I owned with my

25   family.

1       Q     Did any of those properties include -- have

2  any relationship whatsoever with Elie Berdugo?

3       A     No, none.

4       Q     How many of those foreclosure actions can

5  you recall?

6       A     Two, maybe three.

7       Q     Do you remember the names of any of the

8  parties in those actions?

9       A     The banks and stuff?

10      Q     Yes.

11      A     Yeah, Hillcrest -- Hillcrest Bank, First

12 Southern Bank, BB&T Bank, I think that's about it.

13      Q     Okay, and what were the names of the

14 entities that you had an interest in or your family

15 had an interest in?

16      A     Florida Land Financial Corp, Ark -- Ark

17 Development Ocean View.  I'm sorry, what was the

18 other one again, what other bank did I mention?

19      Q     BB&T --

20      A     Right.

21      Q     -- First Southern Bank, and Hillcrest Bank?

22      A     First Southern would have been Walking

23 Tree, LLC.

24      Q     I'm sorry?

25      A     Walking -- Walking Tree, LLC.

1      Q     Thank you.

2            And all of these actions in which you were

3    a witness were foreclosure actions; correct?

4      A     Correct.

5      Q     Okay.  Are you currently employed?

6      A     Yes.

7      Q     Where are you employed, by what entity or

8    person?

9      A     Well, ALS -- we're switching names of

10   companies, but ALS Management Solutions.

11     Q     That's your employer?

12     A     Yes.

13     Q     Okay.  What is the business of ALS

14   Management Solutions?

15     A     Buying nonperforming residential mortgages.

16     Q     Okay, and how long have you been employed

17   by ALS Management Solutions?

18     A     For about two years.

19     Q     And do you know when ALS Management

20   Solutions was formed?

21     A     ALS Management Solutions was formed at the

22   end of last year, but I've been doing this business

23   for about two years, so it jumped around from Ark

24   Loan Solutions, so, you know.

25     Q     Was it formed as a result of any

1   communications or interactions you've had with Terra

2   Landmark or any of its affiliates?

3        A     No, not at all.

4        Q     Okay.  Are you the owner of ALS Management

5   Solutions?

6        A     I am not, no.

7        Q     Who is the owner of ALS Management

8   Solutions?

9        A     Certain investors out of Israel.

10       Q     Are any of those investors out of Israel

11  members of the Berdugo family?

12       A     No, none.

13       Q     Are you an attorney?

14       A     Yes.

15       Q     Where are you licensed to practice law?

16       A     In the State of Florida.

17       Q     And when did you get your license?

18       A     1993.

19       Q     And can you give me your employment history

20  since you got licensed in the State of Florida?

21       A     Practiced law when I, you know, graduated

22  law school, I practiced for about eight, maybe nine

23  years.

24             Then I, you know, had a -- I brought in

25  partners that ran -- have run -- have ran and run the

Page 14

1    law firm, and then probably since around 2001,

2    approximately, I started getting involved more in

3    real estate and doing my own real estate projects,

4    investing in real estate, and that's basically it.

5            Q    Did you form a firm when you were

6    practicing law from 1993 to 2001?

7            A    Yes, with two different names, but, yes,

8    the most recent firm is Kodsi Law Firm, P.A.

9            Q    Does it still exist?

10           A    Yes.

11           Q    And what was it called before?

12           A    It was Isaac Kodsi, P.A.

13           Q    Okay.

14           A    I'm really fancy.

15           Q    It's good to know.

16                How many -- does Kodsi Law Firm still

17   exist?

18           A    Yes.

19           Q    And are you still a member of Kodsi Law

20   Firm?

21           A    Yes.

22           Q    How many members or partners are in the

23   firm?

24           A    Just two.

25           Q    Who are the two?

Page 15

1      A     Myself and then Steven Amster.

2      Q     How long have you been practicing law with

3  Steven Amster?

4      A     About ten years.

5      Q     I have put before you, and had the court

6  reporter mark, three exhibits.  The first exhibit is

7  a very big, fat notebook, about three inches, most of

8  it consists of really resolutions and bond documents,

9  but if you could pull that forward, take a look at

10  that?

11          I will represent to you that to the best of

12  our ability that is a copy of all of the documents

13  you produced to us in response to the subpoena.

14          If you would open up the notebook and take

15  a look at it and tell me if those are all of the

16  documents that you produced in response to the

17  subpoena?

18      A     Okay.

19      Q     If you look, the vast majority of the

20  documents that have been produced in response to the

21  subpoena that was issued to you in this action, are

22  essentially the bonds, what I will refer to as the

23  bond documents.

24          Do you know what I'm referring to there?

25      A     I believe so, yes.

1     Q    Okay.  It's the Doral Community Development

2   District bonds that are at issue in these bankruptcy

3   cases.

4     A    Okay.

5     Q    Why do you have those documents?

6     A    I believe at the time Kodsi Law Firm

7   represented Elie Berdugo in all of his transactions,

8   so I'm assuming at the time we were representing him

9   and his companies that we were in possession of those

10  documents.

11    Q    Okay.  So the production that you've made

12  here today, is that -- are those documents from the

13  Kodsi Law Firm, as well as your personal documents?

14    A    None of them are personal.  It would either

15  be through potentially Frank DiMarco, who was at the

16  time CFO for the EB Development companies or,

17  perhaps, provided by Steven Amster and the Kodsi Law

18  Firm.

19    Q    Were you assisting Elie Berdugo in

20  obtaining the bond issuance?

21    A    No, no, he was ---

22         MR. GIELCHINSKY:  No.

23         THE WITNESS:  No.

24  BY MS. SHUMENER:

25    Q    What were you going to say?

1      A      I was going to say the name of that law

2  firm -- I don't remember the name of the firm out of

3  Fort Lauderdale.

4      Q      Okay.  All right.  Did Kodsi Law Firm

5  provide legal services to Elie Berdugo prior to his

6  death in February 2008?

7      A      Yes.

8      Q      What legal services was the Kodsi Law Firm

9  providing to Elie Berdugo?

10      A      All real estate transactions, the closings;

11  representation with lenders when he was, you know,

12  borrowing money; preparing condo docs on potential --

13  you know, real estate developments he was going to be

14  building; doing all the residential closings; you

15  know, bond -- you know, completing the building or

16  units in doing the closings, that's it.

17      Q      Do you -- I'm going to list the names of

18  five entities that I'm going to end up calling the

19  debtors in this case, Town Center at Doral, LLC;

20  Landmark at Doral East, LLC; Landmark at Doral South,

21  LLC; Landmark Club at Doral, LLC; and Landmark at

22  Doral Developers, LLC.

23          Do you understand those to be the

24  debtors --

25      A      Yes.

```
 1        Q      -- in this case?
 2               Who made the decision to have these debtors
 3    file bankruptcy?
 4        A      The decision was made by myself,
 5    Yogev Berdugo and Steven Amster.
 6        Q      When did you and Yogev Berdugo and
 7    Mr. Amster make that decision?
 8        A      Probably last summer, sometime in summer of
 9    '11.
10        Q      Why were you considering -- why were you
11    deciding to put these entities into bankruptcy in the
12    summer of 2011?
13               MR. GUSO:  Object to the form.
14               MS. SHUMENER:  Yeah, let me restate that,
15    because that's an ambiguous way of stating it.
16               Thank you.
17    BY MS. SHUMENER:
18        Q      In the summer of 2011, you stated that you
19    had -- the three of you had gone together and made
20    the decision to put these entities into bankruptcy;
21    correct?
22        A      Correct.
23        Q      What caused you to make that decision in
24    the summer of 2011?
25               MR. GIELCHINSKY:  I'm going to partially
```

1   object to the question to the extent it calls for

2   discussions that were had with counsel, namely

3   Mr. Amster.

4          I think the witness can answer your

5   question as it's directed to him, but I'll

6   instruct him not to get into discussions he had

7   with Mr. Amster.

8   BY MS. SHUMENER:

9      Q    Was Mr. Amster acting as legal counsel to

10  the debtors at the time?

11     A    Yes.

12     Q    Was he acting as legal counsel to

13  Yogev Berdugo at the time?

14     A    I'll say yes.

15     Q    Was Mr. Amster not one of the

16  administrators of Elie Berdugo's estate?

17     A    I'm not sure.  I'm not sure of the title.

18  I mean, I know he's working -- he's working on the

19  estate, on the probate estate.

20     Q    Did Mr. Amster prepare any of the

21  bankruptcy papers for the debtors in this case?

22     A    No.

23     Q    Did Mr. Amster -- is Mr. Amster a

24  bankruptcy attorney?

25     A    No.

Page 20

1        Q     Did Mr. Amster give any bankruptcy advice?

2        A     No.

3        Q     Was Mr. Amster giving any legal advice in

4    the meeting in July 2011 regarding the bankruptcy

5    filings?

6        A     Sorry, repeat that question again.

7        Q     Was Mr. Amster -- when you and Mr. Berdugo.

8    Yogev; correct?

9        A     Correct.

10       Q     You and Yogev Berdugo and Steven Amster met

11   in the summer of 2011, was legal advice being given?

12       A     He was there for the purpose of, you know,

13   bringing in the legal side of the -- you know, legal

14   side of the decision.

15       Q     And what were you there for?

16       A     Helping advise Yogev on what would be the

17   best, you know, solution to move forward --

18       Q     Were you there --

19       A     -- best option.

20       Q     -- to give legal advice on the decision?

21       A     No, no, more on the business side.

22       Q     What did you and Mr. Yogev Berdugo discuss

23   as to the decision to file bankruptcy?

24       A     What did we discuss?  The options of

25   filing, the benefit.  You know, there were certain --

Page 21

1    several options potentially on the table at the time,

2    which ones made sense, you know, for everybody, sort

3    of all the parties involved.

4         Q    What were the options that were on the

5    table at the time?

6         A    Well, one was from Terra, you know, Terra

7    Developers and I had been speaking, and the other one

8    was actually AmTrust or the new, I apologize, the

9    new -- AmT something, AmT.

10             They had reached -- they had called us, you

11   know, discussing the possibilities of filing

12   bankruptcy.

13        Q    Why did they -- why did AmTrust call you to

14   discuss the possibility of filing bankruptcy?

15             By the way, just let me -- let me go back

16   for a second.

17        A    Sure.

18        Q    You said AmTrust had called.  Did

19   AmTrust -- some representative of AmT or AmTrust call

20   you?

21        A    Yes.

22        Q    Who was it who called you?

23        A    Steven -- a Steven Swartz, I think it's

24   S-w-a-r-t-z.

25        Q    Thank you, and when did he call you?

1    A    This is an estimate, I would think early

2  summer, but I don't remember.

3    Q    Did he tell you why he was calling you?

4    A    Well, I mean, I knew he was calling me in

5  reference to this matter, but, I mean, you know,

6  discussing potential -- whether -- what we were

7  looking on doing.

8        Am -- AmT is sitting in a second position

9  from the bonds.  I think there was a pending motion

10  for summary judgment, you know, several months down

11  the road, and just discussing options on, you know,

12  how to proceed, you know, how we were going to defend

13  the summary judgment, if there was a defense and

14  then, you know, questions about filing bankruptcy and

15  moving forward or potentially buying -- you know,

16  buying the -- you know, buying the position, buying,

17  you know, the membership interest and them taking it

18  into bankruptcy.

19        You know, it was a couple of things bounced

20  around.

21    Q    Did he make any offer as to buying the

22  interest of the debtors?  I'm assuming when you say,

23  buying the interest and taking it into bankruptcy,

24  you're talking about him offering to buy the

25  interest, the membership interest, of the debtors so

1  that he could control whether they would file

2  bankruptcy; correct?

3      A    That is correct.

4      Q    Okay.  Did he make any offer at that time

5  for those membership interests?

6          MR. GIELCHINSKY:  I just want to make sure

7  I get a full question so I have a chance to object if

8  I have an objection.

9          MS. SHUMENER:  He's not jumping on my

10  questions.

11          THE WITNESS:  Yes.

12  BY MS. SHUMENER:

13      Q    What was the offer?

14      A    The offer was they would release

15  Guila Berdugo, which was Elie's wife, of all

16  liability and offer her I think -- I think $50,000.

17      Q    Was that for the membership interest or was

18  that offer being made to induce the debtors to file

19  bankruptcy?

20      A    To purchase the membership interest.

21      Q    And I take it that offer was rejected;

22  correct?

23      A    Yes.

24      Q    Why was that offer rejected?

25      A    We also had an offer from Terra that we

Page 24

1    had -- I met with David Martin.

2         Q    I'm sorry, who?

3         A    David Martin.

4         Q    Martin?

5         A    Martin.  David Martin.

6         Q    Okay.  What was the offer from Terra?

7         A    It wasn't a direct offer, but it was just,

8    you know, it was -- it was more viable.  I think it

9    had more -- it was more substantive, the offer.

10   Actually, it was no offer to -- to the Berdugos, more

11   of an offer of reorganizing the project, getting

12   money to all the unsecured debtors.

13              MR. GIELCHINSKY:  Debtors?

14              THE WITNESS:  I mean, creditors.  Excuse

15   me, unsecured creditors.

16   BY MS. SHUMENER:

17        Q    Did Mr. Martin know who the unsecured

18   creditors were?

19        A    No, other than I think he knew of the bonds

20   and I think he knew of AmTrust, I don't think he knew

21   of the other unsecured creditors.

22        Q    Did you know how much the unsecured debt

23   was?

24        A    I don't know.

25        Q    Did he put any offer on the table?

1        A     No, I mean -- not really, no.  I really

2    don't understand the question.  What do you mean -- I

3    don't understand the question.

4              He didn't -- he didn't put an offer like,

5    here's $50,000 like to buy the membership interest,

6    it wasn't an offer of that -- in that sense.  It was

7    more of an offer of, you know, let's file bankruptcy,

8    you know, we'll -- we'll -- we'll fund you, we'll

9    sponsor you, whatever, and, you know, go through --

10   and bring this through the bankruptcy process.

11       Q     Did he offer to compensate you for your

12   services in bringing the debtors through the

13   bankruptcy process?

14       A     Yes.

15       Q     What did he offer?

16       A     He offered me a hundred thousand dollars to

17   be paid at $10,000 a month increments during the

18   process and a hundred and fifty thousand dollar

19   success fee if the plan got confirmed.

20       Q     Did he offer anything to Yogev Berdugo for

21   his assistance in -- in getting the debtors to file

22   bankruptcy?

23       A     No.

24       Q     Was any offer made to the Berdugo family?

25             MR. GIELCHINSKY:  By whom?

Page 26

```
 1           MS. SHUMENER:  About Terra.
 2           THE WITNESS:  No.
 3  BY MS. SHUMENER:
 4      Q     Okay.  Before causing the debtors to file
 5  bankruptcy, did you notify Yogev Berdugo of the offer
 6  that Terra had made to compensate you?
 7      A     Yes.
 8      Q     Are you sharing any of your compensation
 9  with the Berdugos?
10      A     No.
11      Q     Is there any offer -- is there any success
12  fee being offered to any of the Berdugos if these --
13  if the debtors plan is confirmed in bankruptcy?
14      A     No.
15      Q     Has Mr. Amster been compensated by Terra
16  for services rendered in connection with this
17  bankruptcy?
18      A     No.
19      Q     Has any offer been made to him that you're
20  aware of from Terra --
21      A     No.
22      Q     -- for such compensation?
23      A     No.
24      Q     Is Mr. Amster involved in any of the
25  decisions regarding these -- the bankruptcy cases of
```

Page 27

1    the debtors?

2        A    Repeat that question again, I'm sorry.

3            MS. SHUMENER:  Could you read that question

4    back?

5            (Thereupon, the above-referred to question

6        was read back by the court reporter.)

7            THE WITNESS:  No.

8    BY MS. SHUMENER:

9        Q    You are involved in the decisions regarding

10    the bankruptcy cases of the debtors, are you not?

11        A    Correct.

12        Q    Did Mr. Yogev Berdugo agree with you to put

13    the debtors into bankruptcy?

14        A    Yes.

15        Q    Why?

16            MR. GIELCHINSKY:  Objection to form, you

17    can answer.

18            THE WITNESS:  I discussed it with him and

19    I -- you know, I explained to him that, you know, if

20    the bond foreclosed, they would wipe out all the

21    other creditors and I thought that putting it through

22    bankruptcy and reorganizing would be a better option,

23    and some of the unsecured creditors on the other end

24    of the stick would actually get -- hopefully get a

25    couple of -- a couple of dollars out of this thing.

Page 28

1    BY MS. SHUMENER:

2        Q    Which creditors did you have in mind who

3    would get a couple of dollars out of this thing?

4        A    There were some unsecured creditors that

5    were investors that invested with Elie Berdugo at the

6    time, a couple of names, Harvey Friedman was one of

7    them, he's an attorney here in Florida or Miami

8    excuse me, there was another guy named -- I forget

9    the first name, but the last name was Pfeffer, I

10   believe, and there were a couple others, I just don't

11   remember all their names at this time.

12       Q    Did you advise Yogev Berdugo that the Terra

13   offer was better then the AmT offer?

14       A    I did, yes.

15       Q    Okay.  What did you tell -- what was it

16   about the AmT offer that you thought was worse than

17   the Terra offer?

18       A    I didn't think that the other unsecured

19   creditors would -- would get anything.

20       Q    Did AmT tell you what plan they would work

21   with you to propose if the debtors had filed

22   bankruptcy?

23       A    They did not.

24       Q    Did you ask them?

25       A    It didn't go that far.

Page 29

1      Q    Did AmT ever offer to compensate you for
2   your services in connection with the bankruptcy
3   filing by the debtors?
4      A    It didn't go that far.
5      Q    But they did offer to release Mrs. Berdugo
6   from her guaranty and offered to pay her $50,000 if
7   the debtors were put into a Chapter 11; correct?
8      A    Right.  Well, they would have put it in
9   Chapter 11.  They would have bought the membership
10  interest --
11     Q    All right.
12     A    -- and they would have put it into Chapter
13  11.
14          You know, at the time we felt it was a
15  little bit complicated because you still had the
16  estate, so we weren't really sure, you know, if we
17  could just sell the membership interest, so it was
18  just -- it just didn't go that far.
19     Q    After you received the offer from Terra,
20  did you go back to AmT and say, you know, Terra is
21  offering to work with us on a bankruptcy, can you
22  make a better offer?
23     A    No.
24     Q    Did you talk to anybody else about an offer
25  for the bankruptcy filings of the debtors?

1       A     No, I did not.

2       Q     Did you have any discussions with anyone

3   about the -- a little housekeeping so that the record

4   is clear, and I apologize --

5       A     Okay.

6       Q     -- I'm doing this a little bit out of

7   order.

8             The property that is owned by the debtors,

9   I realize that the different debtors own different

10  pieces of land within the property, it's typically

11  been called Landmark or Landmark at Doral or the

12  project.

13            Okay.  So if I talk about the project or I

14  talk about Landmark, will you understand that what

15  I'm talking about is the land owned by the debtors in

16  this case?

17      A     Yes.

18      Q     Okay.  What do you call that project?

19      A     Same thing you call it, Landmark or the

20  project.

21      Q     Okay.  Terrific.

22            Did you in -- before the debtors filed

23  bankruptcy, did you have any discussions with anyone

24  about purchasing the project?

25      A     About who purchasing the project?

Page 31

1       Q     Anyone.  Did you talk to any prospective
2   purchasers?
3       A     There were phone calls during -- during
4   those years or these years that people called
5   interested in the property.
6       Q     When you say, "these years," what are you
7   talking about?
8       A     From 2008, from whenever -- from when Elie
9   passed away in February of '08, until -- I don't
10  know, until we filed bankruptcy now in '11.
11      Q     And when you say there were people
12  interested, can you recall any of their names?
13      A     They were brokers, I don't.
14      Q     Okay.  Did you pursue any of those
15  discussions at all?
16      A     No, not really.  You know, between both
17  debt, you know, we had $170 million worth of debt.  I
18  don't think the offers were going to be anything
19  viable, you know.
20            Also AmTrust, you know, had what became a
21  failed bank, went to the FDIC, it was a lot of a
22  mess.  It wasn't exactly something that was, you
23  know, an easy task.
24      Q     Do you know who acquired the assets of
25  AmTrust after it was taken over by the FDIC?

Page 32

1       A     You know, I mean, I've heard, I mean, I
2  read it was AmT something, but I believe it was a
3  joint venture between Toll Brothers and some funds,
4  I'm not sure --
5       Q     Do you know whether ---
6       A     -- Oak Tree or something, was it.  Really,
7  I'm guessing on this one.
8       Q     Do you know whether they had the financial
9  wherewithal to proceed with this project if they had
10 acquired the membership interest of the debtors?
11           MR. GIELCHINSKY:  Object to form, you can
12 answer.
13           THE WITNESS:  I don't know.
14 BY MS. SHUMENER:
15      Q     Okay.  How did you first get introduced to
16 Terra?
17      A     Terra Developers.
18      Q     Yes.
19      A     Okay.  David Martin and I are -- have a
20 personal relationship, certain friends in common, so
21 that's how I met David Martin, I mean, that's how I
22 know Terra.
23      Q     Who -- what friends in common introduced
24 you to David Martin?
25      A     Greg Mirmelli.

Page 33

1        Q    And who and where does ---

2        A    Miami Beach, we all live on the beach.

3        Q    Can you spell his last name?

4        A    M-i-r-m-e-l-l-i.

5        Q    Is Greg Mirmelli employed by Terra?

6        A    No.

7        Q    Is he a broker?

8        A    On certain days.

9        Q    Do you know where he's employed?

10       A    I think he is self employed.

11       Q    Do you know whether he received any

12   compensation from Terra for the introduction or for

13   anything having to do with Landmark?

14       A    Nothing at all.

15       Q    Did you ever seek any competing bids to

16   compete against Terra?

17       A    I did not seek any bids, no.

18       Q    Did you ever talk to any brokers to see if

19   they could come up with anything better than what

20   Terra offered you?

21       A    No, I did not.

22       Q    What did Terra offer you?

23            MR. GUSO:  Object to the form.

24            MR. GIELCHINSKY:  Same objection.  Offer

25   him personally, in his capacity as a representative?

Page 34

1    BY MS. SHUMENER:

2         Q    Other than putting the entities into

3    bankruptcy and paying you a hundred thousand dollars,

4    plus a hundred fifty thousand success fee, what did

5    Terra offer --

6         A    They didn't offer ---

7         Q    -- for the debtors?

8         A    They didn't offer me anything, other than,

9    you know, knowing -- knowing them as a company,

10   knowing that they build in Doral, knowing that

11   they're probably one of the only real players in the

12   Doral market, I felt that they were -- you know,

13   knowing that they're doing assemblages of property

14   all around the Landmark property, they didn't offer

15   me anything other than knowing that they would get

16   this project off the ground, and that they would

17   actually succeed in doing it.

18        Q    Did you talk to anyone from Lennar?

19        A    I did not, no.

20        Q    Isn't Lennar purchasing up land in the

21   vicinity of the Landmark project?

22        A    Yes, I believe so.

23        Q    And they're a very reputable home builder,

24   are they not?

25        A    Yes, they are.

1        Q      Have you ever spoken to anyone from Lennar?

2        A      No, not about this project.

3        Q      Did you ever recommend to Yogev Berdugo

4   that he should speak to Lennar?

5        A      I did not, no.

6        Q      Why didn't you contact someone at Lennar to

7   see if they would be interested in the Landmark

8   project?

9        A      No real reason.

10       Q      What is your position -- let me -- do you

11   have a position in any of the debtors?

12              MR. GUSO:  Object to the form.

13              THE WITNESS:  Other than being

14   vice-president, I don't have any other positions.

15   BY MS. SHUMENER:

16       Q      Okay.  Is your position the same for all

17   the debtors or are there distinctions that I should

18   be making?  Should I be asking you these questions

19   debtor by debtor or can I rely on the fact that

20   you'll notify me if there are any differences?

21       A      There are no differences, and you can

22   consider it as one project.

23       Q      Thank you very much.

24              You are the vice-president of the debtors;

25   correct?

1       A    Correct.

2       Q    When did you become the vice-president of

3  the debtors?

4       A    Right before filing for bankruptcy.

5       Q    Why were you made the vice-president of

6  the -- who named you vice-president of the debtors?

7       A    Yogev.

8       Q    On whose advice did Yogev name you

9  vice-president of the debtors?

10      A    On mine.

11      Q    Why did you advise Yogev Berdugo to name

12  you the vice-president of the debtors?

13      A    We felt it would be a lot better if I be

14  here at deposition instead of him and handling -- and

15  going through the process.

16           MS. SHUMENER:  Could you read back my last

17  question and answer, please?

18           (Thereupon, the above-referred to question

19      and answer were read back by the court

20      reporter.)

21  BY MS. SHUMENER:

22      Q    Why did you think it would be better if you

23  were handing the depositions and this process than

24  Yogev?

25           MR. GIELCHINSKY:  Did you say in this

1   process or and this process?

2             MS. SHUMENER:  I think I said and this

3   process.

4             THE WITNESS:  I felt because -- for a

5   couple of reasons, one, he has lost his father.  I

6   don't think him sitting and rehashing projects that

7   his father, you know, was involved in ---

8             Secondly, Yogev Berdugo does not do

9   anything within real estate today or has any

10  involvement anymore with whatever is left of his

11  father's companies.  That's really basically it

12  from his side.

13            The other side is, you know, going

14  through all the legal process, it was, you know,

15  more than I think he cared for and wanted to

16  handle.

17  BY MS. SHUMENER:

18       Q    Elie Berdugo's estate was in probate;

19  correct?

20       A    Correct.

21       Q    Did the Probate Court approve of you being

22  named as vice-president of the debtors?

23            MR. GIELCHINSKY:  Object to form, you can

24  answer.

25            THE WITNESS:  I'm not sure, but I believe

Page 38

1    it wasn't necessary, but I'm not ---

2    BY MS. SHUMENER:

3         Q    Why do you believe it wasn't necessary?

4         A    Because it was done on a corporate level,

5    not on an estate level, but -- but I'm -- I am

6    actually guessing more than anything else.

7         Q    Did Yogev Berdugo have the authority to

8    delegate to you major decisions regarding assets of

9    the probate estate?

10             MR. GIELCHINSKY:  Objection to the extent

11   it calls for a legal conclusion.  This fact witness

12   is not being produced as a legal authority in the

13   area of probate law.

14             To the extent you have some factual

15   based answer that you would like to offer, you

16   can do so, otherwise, you can answer accordingly.

17             THE WITNESS:  I'm going to assume so, I

18   believe so.

19   BY MS. SHUMENER:

20        Q    Okay.  What leads you to believe that?

21   What do you base that understanding on?

22        A    Nothing, common sense, I don't know,

23   nothing really.

24        Q    Did you sign the bankruptcy petitions for

25   the debtors in this case?

1       A     Yes.

2       Q     And you did that as vice-president of the

3   debtors; correct?

4       A     Correct.

5       Q     The debtors are limited liability

6   companies; correct?

7       A     Correct.

8       Q     What powers does the vice-president of a

9   limited liability company have?

10          MR. GUSO:  Object to the form.

11          MR. GIELCHINSKY:  Same objection.  You can

12   answer it to the extent that you know.  It calls for

13   a legal conclusion.

14          THE WITNESS:  I really don't know what it

15   enables me, but I believe it was -- the purpose was

16   to go through the bankruptcy process.

17   BY MS. SHUMENER:

18       Q     Do you confer with Yogev Berdugo about the

19   decisions you're making in this bankruptcy process?

20       A     Yes, I call him, I keep him up to date.

21       Q     When was the last time you called him?

22       A     I called him, I believe, after a CDD board

23   meeting, which was maybe about -- I don't -- you

24   know, I don't remember when, a few weeks ago, a month

25   ago, I don't remember when, whenever that meeting

Page 40

1   was.

2        Q    Did you call him because of that meeting?

3        A    I called him after that meeting just

4   because there were certain things -- just to update

5   him about the meeting, what I had seen at the

6   meeting, you know, just general, you know, just

7   general conversation about it.

8        Q    Had you called him before the meeting and

9   told him the meeting was coming up?

10       A    I don't think so.

11       Q    Was there -- what was -- what did you

12  report to him about the meeting?

13       A    Just how the meeting went a little bit,

14  about who the board -- you know, the board at the

15  meeting, who was there, they were former employees of

16  EB Developers.  I was giving him an update of who was

17  there, some other things not related to Landmark, you

18  know, that I had discussed with some of the -- some

19  of the people at the meeting.

20       Q    Did you notify him that the board members

21  had not -- the board members of the District had not

22  resigned?

23       A    I don't know -- I don't know if I discussed

24  it with him specifically.

25       Q    Did you discuss with him at all that

1   representatives of Terra were asking the board to set

2   an election for the seats on the board?

3            MR. GUSO:  Object to the form.

4            THE WITNESS:  I don't really remember, but

5   I might have.  You know, again, I talked about the

6   whole thing, so I might have -- I might have brought

7   it up.

8   BY MS. SHUMENER:

9        Q    Did you -- had you ever discussed such an

10  election with Yogev Berdugo before the meeting?

11       A    Before the meeting, I'm not sure.

12       Q    Had you ever had any discussions with

13  anyone at Terra about trying to replace the members

14  of the -- of the board of the District?  By the

15  District we're talking about the Doral Community

16  Development District; correct?

17       A    Correct, I understood you.

18            MR. GIELCHINSKY:  I'm going to object to

19  the question as it calls for his discussions with

20  Terra.  The parties share a common interest privilege

21  and have a joint privilege in that respect, because I

22  know you're asking for discussions that happened

23  within the context of counsel.

24  BY MS. SHUMENER:

25       Q    Have you ever had any discussions with

Page 42

1   David Martin about replacing the members of the

2   District outside of the presence of counsel?

3        A    No.

4        Q    When you had such discussions with -- did

5   you have such discussions with David Martin in the

6   presence of counsel?

7        A    Yes.

8        Q    What counsel was present?

9        A    Mindy Mora, Jordi.

10       Q    What's Jordi's last name?

11            MR. GUSO:  Guso, G-u-s-o.

12            MS. SHUMENER:  Sorry, I forgot.

13            THE WITNESS:  And then some of their

14   assistants or other attorneys, Tara something, I

15   don't know, Tara Teramo, Teramal, something like

16   that, I don't know, and Debbie something, I don't

17   know, they're associates.  I think Dan was there,

18   too, at some of the meetings.

19            MR. GUSO:  Last, but not least.

20            MR. GIELCHINSKY:  Of course.

21            THE WITNESS:  Sorry, sorry for leaving you

22   out.

23            MR. GIELCHINSKY:  That's quite all right.

24   BY MS. SHUMENER:

25       Q    Were you at that District board meeting?

Page 43

1      A      Yes.

2      Q      Did you have any discussions with any of

3   the District board members at that meeting or before

4   that meeting?

5      A      I did try to speak to Adam Friedman prior

6   to the meeting.

7      Q      And who is Adam Friedman?

8      A      He is the chairman of the board.

9      Q      What -- you said you tried to speak to him?

10     A      Well, I did speak to him, we did speak.  I

11  tried to set up a meeting with him prior to -- prior

12  to any, you know, board meetings.

13     Q      When did you speak to him?

14     A      Within a month before the board meeting.

15     Q      What did you and he discuss?

16     A      Loosely about the project, about

17  potential -- the plan, I wanted to meet with him and

18  try to discuss the plan a little bit more, you know,

19  get some input from him prior to a plan being

20  submitted, that was my actual goal.

21     Q      What did you tell him about the plan?

22     A      I didn't tell him much.  The goal was to

23  sit down and have a meeting with him and, you know,

24  lay it out, discuss it with him and see what -- you

25  know if there was any -- I was more interested

1    from -- from -- to know from his side, you know, if

2    there was any -- what's the right word, you know, any

3    particular, you know, specifics they would want to

4    see in the plan, you know, a flow of the money, or

5    you know, a breakdown, or, you know, something --

6    something that I could go back to Terra and report

7    and say, hey, this is what, you know, the CDD

8    District, you know, had a plan that sort of fell --

9    fell in this kind of a model or this kind of a plan,

10   you know, this is what we should probably try to

11   submit.

12       Q    And what did Mr. Friedman say to you?

13       A    He was concerned, felt uncomfortable

14   meeting, you know, without the rest of the board

15   meeting or without, you know, a public forum.  So he

16   called me back and felt that the right thing to do

17   was to make a presentation at the board meeting,

18   which he said was the next week or something like

19   that, you know.

20       Q    Did you, in discussing with Mr. Friedman

21   before the board meeting, did you make him any offers

22   to participate with Terra in the development of the

23   project?

24       A    To participate, no, but to -- you know, the

25   goal was to keep -- to keep the District alive or

Page 45

1   keep, you know, the District moving forward.  You

2   know, I was going to try to reorganize, but the

3   District will -- will remain.

4        Q    Did you talk to him at that time about

5   having an election for the District seats, District

6   board seats?

7        A    Not -- no, not in our phone conversations,

8   no.

9        Q    Did you have that discussion with him at

10  any other time?

11       A    No, no.

12       Q    Did you ever ask him to resign from the

13  board?

14       A    I did not, not personally, no.

15       Q    Did anybody acting for you or the debtors

16  ask Mr. Friedman to resign from the board?

17       A    I believe at the CDD board meeting it was

18  asked.

19       Q    Who asked?

20       A    I believe it was Richard Schanerman.

21       Q    And who did Mr. Schanerman represent at

22  that meeting?

23       A    I'm not really sure.  I mean, I'm assuming

24  either -- I assume the debtors.  I'm not really

25  clear, the debtors, Terra -- Terra and the debtors

Page 46

1   combined, you know, I'll keep it.

2        Q    Was the plan to have you replace a member

3   of the board of the District?

4             MR. GIELCHINSKY:  Objection to form.

5             THE WITNESS:  I'm sorry, I didn't

6   understand the question.

7   BY MS. SHUMENER:

8        Q    If Mr. Friedman had agreed to resign --

9        A    Yes.

10       Q    -- who would have been the replacements on

11   the board --

12            MR. GIELCHINSKY:  Objection to form.

13   BY MS. SHUMENER:

14       Q    -- that you would have proposed?

15       A    There were discussions of certain --

16   certain people, but it was -- there was no one

17   specifically at this time.

18       Q    Was the discussion of certain people within

19   Terra?

20       A    No, no Terra, it would be no Terra -- no

21   one from Terra.

22       Q    Anyone from the Kodsi firm?

23       A    No.

24       Q    Anyone from the debtors?

25       A    No.

Page 47

1          Q      Why would you -- why did you want to

2     replace the members of the District board?

3               MR. GUSO:   Object to the form.

4               THE WITNESS:   They seemed to be -- they

5     seemed to be -- they seemed to be very concerned that

6     they're going to get sued by the bondholders and it

7     seems to me that their decisions seem to be biased at

8     this time.

9     BY MS. SHUMENER:

10         Q      Did they tell you that?

11         A      Also ---

12               MR. GIELCHINSKY:   The witness is still

13    answering.

14    BY MS. SHUMENER:

15         Q      I'm sorry, please finish.   No, no, please,

16    by all means.

17         A      They inferred it, it was inferred.   They --

18    they, you know, they quoted some other bankruptcy

19    case and they sort of said that the directors, you

20    know, were all being threatened to get sued and

21    that's why Adam Friedman was uncomfortable in meeting

22    me in advance or without the rest of the board there.

23         Q      Did Adam Friedman tell you that he was

24    uncomfortable meeting you because he thought he would

25    get sued by the bondholders?

Page 48

1        A    Yeah, not so many words, but, yes -- but,
2   yes.
3        Q    Well, what words did he use?
4        A    It was actually communicated to me through
5   his uncle, that that's what their concern was.
6        Q    Who is his uncle?
7        A    John Markey.
8        Q    When did John Markey tell you that he
9   was -- that Adam Friedman was concerned that he would
10  be sued by the bondholders?
11       A    Again, during the -- during that period of
12  time when I was trying to get ahold of Adam Friedman
13  for -- for a meeting.
14       Q    Did you ever ask Adam Friedman whether he
15  was concerned that he would be sued by the
16  bondholders?
17       A    I might have in conversation.
18       Q    And what did he say?
19       A    I don't remember.  I mean, I don't remember
20  if we actually had a specific conversation about it.
21  Like I said, I do remember him just saying he was
22  uncomfortable in meeting and he didn't want that to
23  happen.
24       Q    Are you aware of any such threats ever
25  being made by any of the bondholders to any of the

Page 49

1    District members in this action?

2         A    No, none.

3              MR. GIELCHINSKY:   Note my belated objection

4    to form.

5              THE WITNESS:   Sorry.

6    BY MS. SHUMENER:

7         Q    Let me ask it a clearer way.

8              Are you aware of any threats made by any of

9    the bondholders to any members of the District?

10             MR. GIELCHINSKY:   Note my continuing

11   objection to form.   You can answer.

12             THE WITNESS:   No.

13   BY MS. SHUMENER:

14        Q    Okay.   Did Mr. Markey tell you that any

15   threats had been made by the bondholders to members

16   of the District?

17        A    No.   He was just telling me that there were

18   other bankruptcy cases out there, that bondholders in

19   other cases, you know, were threatened, directors

20   and, you know, they were concerned that that could

21   potentially happen here.

22        Q    Did you ever threaten to sue the members of

23   the District board?

24        A    No.

25        Q    Other than the hundred fifty thousand

1  dollar success fee, will you get anything else from

2  Terra?

3       A    No.

4       Q    Are you going to be -- continue to be

5  involved with the debtors if Terra acquires the

6  membership interest in the debtors?

7       A    No.

8       Q    Are you going to be involved in any other

9  project that Terra is involved in if the bankruptcy

10 plan is confirmed?

11      A    No.

12      Q    Are you involved today with Terra in any

13 other project?

14      A    No.

15      Q    And by Terra, you know that I am referring

16 to not just Terra Landmark, LLC, but any and all of

17 its affiliates?

18      A    I understood you, and I answered

19 appropriately.

20      Q    Great.  So the answer is the same?

21      A    The answer is the same.

22      Q    Thank you.

23           Can you name for me all of the individuals

24 at Terra with whom you have had conversations?

25      A    Sure.  David Martin, Brian Pearl,

1    Pedro Martin, and Adam Adler, I believe is the last

2    name.

3         Q    I'm sorry, say the last one again.

4         A    Adam Adler.

5         Q    Thank you.

6              Who is David Martin within the Terra

7    organization, if you know?

8         A    I don't know his legal title, but I know he

9    is Pedro's son, and I believe he runs -- he runs --

10   he runs the company, I'm not really sure.

11        Q    When was the last time you spoke to

12   David Martin outside the presence of counsel?

13        A    Wow, outside the presence of counsel,

14   probably prior to the filing of the bankruptcy.

15        Q    How many conversations did you have with

16   David Martin before you filed -- the debtors filed

17   bankruptcy?

18        A    Two, maybe three.

19        Q    And were they all in the summer of 2011?

20        A    I think it was a little bit before that.

21   We might have met, and I'm guessing again or

22   estimating, maybe somewhere around April, May of 2011

23   when we started conversations or discussions.

24        Q    And other than -- do you recall the first

25   conversation you had with David Martin about this

1   project?

2        A    He called me, asked me, you know, if we

3   could go out and have breakfast together.  We went

4   and had breakfast.  He shared with me that he was now

5   in the process of doing an assemblage of properties

6   sort of surrounding Landmark, asked me the status of

7   Landmark, you know, where it stood in the foreclosure

8   matter.

9            And then really, you know, a brief

10  conversation of how do we -- you know, how do we make

11  a move from here, how do we move forward.  That was

12  the general, you know, the general breakfast and it

13  ended up, you know, by saying, hey, we need to meet

14  again soon and, you know, because it was up in the

15  air for him a little bit too, I think.

16           I don't know if he had locked in or bought

17  or got under contract all the other -- the other

18  assemblages that he was working on, I think that had

19  probably factored into, you know, timing.

20       Q    Was anyone else at this breakfast -- this

21  was at the breakfast meeting that you're talking

22  about?

23       A    Yeah, just him and I.

24       Q    I'm sorry?

25       A    Just the two of us alone.

Page 53

1       Q    Where did you have breakfast?

2       A    Icebox.

3       Q    I'm from LA, so I don't know what that

4   means.

5       A    Oh, okay.

6       Q    Is that the name of a restaurant?

7       A    The Icebox is a restaurant in South Beach.

8       Q    Thank you.

9            How long did that breakfast meeting last?

10      A    I don't know, 30 minutes, 45 minutes.

11      Q    Did Mr. Martin tell you what they were --

12  did he tell you what properties near Landmark he was

13  assembling?

14           MR. GIELCHINSKY:  Objection to form, you

15  can answer.

16           THE WITNESS:  Yes.

17  BY MS. SHUMENER:

18      Q    What did he tell you about that?

19      A    He told me -- you know, he showed me a site

20  plan -- not a site plan, but a map and just pointed

21  out that, you know, he was trying to get some of the

22  properties to the east of Landmark, and I believe to

23  the north of Landmark, if I've got my directions

24  correct.

25      Q    Isn't there a landfill to the east of

Page 54

```
 1   Landmark?
 2        A     South of that landfill.
 3        Q     Did he tell you why he wanted Landmark?
 4              MR. GIELCHINSKY:  Objection.
 5              MR. GUSO:  Object to the form.
 6              MS. SHUMENER:  Strike that.
 7   BY MS. SHUMENER:
 8        Q     Did he tell you that he wanted Landmark?
 9              MR. GUSO:  Object to the form.
10              MR. GIELCHINSKY:  You can answer.
11              THE WITNESS:  Yes, that was the purpose of
12   the meeting, I mean.
13   BY MS. SHUMENER:
14        Q     Yes.
15        A     Right.
16        Q     I was trying to circumvent certain
17   objections.
18        A     Correct, that was the purpose of the
19   meeting, yes.
20        Q     Did he tell you why he wanted to get the
21   Landmark project?
22        A     Well, it's a good piece of property, it's,
23   you know, got a great location, and, you know,
24   he's -- they have been as a family or as a business
25   or as a company they're very busy in -- in Doral.
```

Page 55

1           Doral is, you know -- well, at least I

2      know, it's a strong -- you know, it's still a strong

3      area to build.  You know, there's a high -- high

4      demand there for -- for a product or new homes or

5      whatever.

6           I think he had told me also that he had

7      just bought another deal in Landmark -- excuse me, in

8      Doral, I apologize, in Doral and that they were

9      looking to make a long-term commitment to the City of

10     Doral.

11         Q    Did he tell you anything -- did he tell you

12     anything at all about any advantages that his other

13     projects at Doral would get by the acquisition of

14     Landmark?

15         A    No, not really, no.

16         Q    Did he talk to you about the need that some

17     of his other projects might have for parking that

18     could be provided by Landmark at Doral?

19         A    Could you ---

20         Q    Strike that, it's a bad question.

21         A    Yeah, repeat the question again.

22         Q    Let me try it again.

23         A    Okay.

24         Q    Even I couldn't understand my question.

25         A    Okay.  Okay.

Page 56

1       Q       Did he -- did he mention any benefits that

2  owning the Landmark project would have for his other

3  projects?

4       A       No.

5       Q       Is the Landmark project -- isn't the

6  Landmark project about two or three times the size of

7  the other projects that Terra is involved with at

8  Doral?

9       A       I don't know.

10      Q       Did you discuss with Mr. Martin,

11  David Martin, at this breakfast meeting, whether

12  Terra had the ability to develop the Landmark

13  project?

14      A       I did not, but knowing who they are, I knew

15  they had the ability.

16      Q       Did he ---

17      A       That did not come to question for me.

18      Q       Okay.  Did he talk to you at all about any

19  partners that Terra would have in the Landmark

20  project?

21      A       He mentioned that obviously -- yes.  I

22  mean, he didn't -- no, not specifically, but I

23  know -- I'm aware that he has investors or people

24  behind him that would be coming into the project with

25  him.

1        Q    Do you know who those investors are?

2        A    I do not.

3        Q    Did he mention any of them?

4        A    No, he did not.

5        Q    Did he talk to you at all about his plans

6   for Landmark if he acquired the project?

7        A    Not at that time, no.

8        Q    Did he do that at some later point in time?

9        A    It was briefly -- you know, again, it was

10  discussed briefly, you know, what his thoughts -- you

11  know, we bounced ideas, what we thought about the

12  project, what we thought about the real estate market

13  today, you know, what we thought of Doral, what might

14  work, what might not work.

15           You know, he gave me his opinion that today

16  he felt that lower density, bigger homes was a better

17  product, I tended to agree with him, but, you know,

18  really general -- general real estate conversation.

19       Q    Is Terra building larger homes at its other

20  sites within Doral?

21           MR. GUSO:  Object to the form.

22  BY MS. SHUMENER:

23       Q    You said bigger homes, lower density.

24  Is ---

25       A    I don't know for certain, but I am aware or

Page 58

1   again, in brief conversation in another projects that

2   he bought, I think that that's what they're doing

3   now.

4        Q    Isn't it true that most of Terra's projects

5   within Doral are townhomes?

6        A    I don't know, I really don't know.

7        Q    Well, when you talk about larger homes, are

8   you talking about townhomes?

9        A    I was talking about -- yes, I was talking

10  about townhomes, actually, both, both townhomes and

11  single family homes, you know, but on smaller lots.

12  What I was trying to differentiate it from was really

13  from any condos and apartments, that was really ---

14       Q    Well, have you been involved in any

15  resident -- in the development of any residential

16  subdivisions?

17       A    Myself?

18       Q    Yes.

19       A    Yes.

20       Q    Have you as an owner and developer of the

21  residential subdivisions?

22       A    Yes.

23       Q    Okay.  Which residential subdivisions have

24  you been involved in as an owner and developer?

25       A    I built some townhome communities.

Page 59

1     Q    Where?

2     A    In Palm Springs, Florida.

3     Q    Are those the communities that were

4 foreclosed upon, that you testified earlier?

5     A    Yes, correct.

6     Q    Any other residential subdivisions that you

7 have been involved with?

8     A    Another one called Villa Francine, and then

9 the rest were just, you know, some single family

10 homes.

11     Q    Where is Villa Francine?

12     A    Opa Locka.  Sorry, Opa Locka, Florida.

13     Q    Is that one of the other projects that was

14 foreclosed upon or no?

15     A    No.

16     Q    Was that project completed?

17     A    That one is not.  That one never got

18 completed.

19     Q    Are there any homes there?

20     A    Yes.

21     Q    Why did it never get completed?

22     A    It ran into an environmental issue.

23     Q    How many homes are at Villa Francine?

24     A    Forty townhomes.  They were -- these are

25 both townhome communities.

Page 60

1      Q    Okay.  How many townhomes were you
2  intending to build at Villa Francine?
3      A    Seventy.
4      Q    Was it part of a CDD --
5      A    No.
6      Q    -- Villa Francine?
7      A    No.
8      Q    Were the townhome communities in
9  Palm Springs, Florida part of the CDD?
10      A    No.
11      Q    How many townhomes were you planning to
12  build at the townhome community in Palm Springs?
13      A    That was one built completely, I think it
14  was either 64 or 68.
15      Q    And that project had been completed?
16      A    Yes.
17      Q    And how many of those townhomes had been
18  sold?
19      A    Fifty-five of them, maybe.
20      Q    When was the last sale?
21      A    Three, four years ago, maybe.
22      Q    I apologize if I'm misstating prior
23  testimony because I'm going from memory, so bear with
24  me, all right?
25           Before Elie Berdugo died in February 2008,

1   did you render any services to the debtors?

2          MR. GUSO:  Object to the form.

3          THE WITNESS:  I did not, no.

4   BY MS. SHUMENER:

5       Q    Did the Kodsi Law Firm render services to

6   the debtors?

7       A    Yes.

8       Q    So I take it that Steve Amster rendered

9   legal services to the debtors?

10      A    Correct.

11      Q    What kind of work did Mr. Amster do for the

12  debtors?

13      A    I believe, again, he worked on the

14  condominium documents; prepared, you know, purchase

15  and sale contracts; represented the debtors in all

16  the loans -- you know, all the loan transactions,

17  construction loan with AmTrust; construction loan

18  with iStar Financial, and I don't know -- I'm sure

19  other things, I just don't know what.

20      Q    Okay.  Was he paid for his services?

21      A    Yeah, I believe so, yes.

22      Q    Have the debtors ever had any members other

23  than Elie Berdugo?

24      A    I don't believe so, no.

25      Q    If you would open your notebook, please, to

1   Tab 1.  So basically what I'm referring to -- what

2   I'm referring to, for the record right now, is Tab 1

3   in Exhibit 1, and Tab 1 in Exhibit 1 is, it says at

4   the top, balance sheet as of September 30, 2011.

5          Do you see that?

6      A    Yes, I do.

7      Q    And it's Bates Labeled TCD-0000664, and it

8   appears to be a balance sheet for all five debtors in

9   this case.

10          Do you see that?

11      A    Yes.

12      Q    Okay.  Who prepared this balance sheet?

13      A    I believe Frank DiMarco.

14      Q    Did he prepare this balance sheet at your

15  direction?

16      A    Mine and counsel.

17      Q    In September of -- did he -- did you give

18  him any input for this balance sheet?

19      A    No.

20      Q    Why did you ask him to prepare this balance

21  sheet?

22      A    I believe it needed to be prepared for the

23  purpose of bankruptcy.

24      Q    Okay.  Do you know when this balance sheet

25  was prepared?

Page 63

1        A    No, I do not.

2        Q    Was it prepared before or after

3   September 30, 2011?

4        A    I don't know.

5        Q    The top line -- the top line, it's hard to

6   see, you see where it says total assets?

7        A    Yes.

8        Q    Okay.  I'm basically, for the record,

9   looking at the upper left-hand corner and it says --

10  and then under that it says assets, and the first

11  line says construction in progress.

12            Do you see that?

13       A    Yes.

14       Q    What construction exists in progress at the

15  Landmark project?

16       A    Well, again, at the time they were -- they

17  were in the middle of construction in 2008.  At the

18  end of '07, '08, they were in the middle of

19  construction on these projects.

20            I'm assuming these numbers are carrying

21  forward from 2008.

22       Q    For all the four debtors, and it breaks it

23  down, I'm not going to -- the record will speak for

24  itself as far as the document, but it seems to have a

25  total for construction in progress of $6,651,322.22.

Page 64

1          Do you see that?

2     A    Yes, I do.

3     Q    What is being valued there?

4     A    I don't know.

5     Q    Do you know where Mr. DiMarco got the

6  information to put -- to insert there?

7     A    I don't know.  I would be guessing it was

8  from the previous financials from the company prior

9  to Mr. Berdugo's death.

10    Q    You said that at the time of Mr. Berdugo's

11 death, Elie Berdugo's death, there was construction

12 in progress at the site; correct?

13    A    That is correct.

14    Q    The project.  What construction was in

15 progress?

16    A    He was just about to start, I'm going to

17 call it for today Phase 1, which was about a

18 hundred -- a hundred and seventy townhomes, I think

19 he was just about to start coming out of the ground

20 with, but don't hold me to the number.

21    Q    That's all right.  So when you say he was

22 about to start, are you talking about the vertical

23 construction, what I sometimes call, you know, sticks

24 and bricks, the actual structures of the townhomes,

25 themselves?

Page 65

1        A     Correct.

2        Q     So does that mean that there were sewer

3   lines, and water lines, and electrical lines and all

4   that in place for the construction of the hundred and

5   seventy townhomes?

6        A     Yes, the infrastructure to the project

7   was -- was already built or, you know, was being

8   built.

9        Q     And how long was it going to take until the

10  hundred and seventy townhomes were complete, do you

11  know?

12       A     I don't know.  I don't know the -- I don't

13  know the time.  I don't know -- I don't know -- I

14  don't know their timetable at the time.

15       Q     Do you know -- do you know whether it would

16  have taken five years to complete the hundred and

17  seventy townhomes?

18       A     No, no, I don't think this would have taken

19  that long.

20       Q     Would it have taken less than a year?

21       A     It would have taken, no, more than a year,

22  less than five.

23       Q     How many townhomes could be built in the

24  first year?

25       A     It depends, again, on how much -- you know,

1  how much -- you know, how much -- it really depends

2  on your sales velocity more than anything else.  If

3  you've got the sales, you'll bring in the workforce

4  to build them, so ---

5       Q    Were you aware that there were

6  approximately $200 million in presales for the

7  Landmark project?

8       A    Yes.

9       Q    And did those 200 million in presales

10 include these hundred and seventy townhomes that were

11 going up as Phase 1?

12      A    Yes.

13      Q    Okay.  How long do you -- is there any

14 document that the debtors had that would have shown

15 the schedule for the completion of these hundred and

16 seventy townhomes?

17      A    I'm sure there is.  I don't -- I don't --

18 that would be a better question to ask Frank DiMarco.

19      Q    Were the hundred and seventy townhomes to

20 be completed on the north -- what's called the north

21 parcel of the project?

22      A    Yes.

23      Q    In your experience as a builder of

24 townhomes, how many -- if you have presales

25 completed, how many townhomes could you complete in

Page 67

1    the first year?

2         A    Again, it's tough to answer, it really --

3    it just depends.

4         Q    More than one?

5         A    A lot more than one.  I would say at least

6    half of -- half of -- probably about 75.

7         Q    Seventy-five, 80, 90 --

8         A    Right.

9         Q    -- like that?

10        A    Maybe somewhere around there.

11        Q    Okay.

12        A    That would be my estimation.

13        Q    So the hundred and seventy -- so the

14   hundred and seventy townhomes could have been

15   completed in approximately two years; is that

16   correct?

17        A    I would guess two, two and a half years.

18        Q    And the sales could have closed?

19        A    I believe so.

20        Q    Okay.  Did you talk to Terra at all about

21   the fact that these townhomes could be completed

22   within one or two years?

23        A    When?

24        Q    Before the bankruptcy filing.

25        A    I don't really understand the question, but

Page 68

1    I'll say, no.

2         Q    Did you ever talk to -- did you ever --

3    okay, let me try it a different way.

4         A    Okay.

5         Q    Did you ever talk to Terra about the fact

6    that a hundred and seventy -- that there was

7    construction in progress for a hundred and seventy

8    townhomes that had been presold?

9         A    I apologize, because I might have talked --

10   the reason I answered that is because when Elie

11   passed away, I had spoken to Terra and David Martin

12   about Landmark back in 2008, and then -- but if

13   you're asking me now more recently, right prior to

14   the bankruptcy, no, we did not discuss it.

15        Q    Okay, and I take it you didn't discuss it

16   because you assumed they already knew it given your

17   earlier discussions, is that correct or not?

18        A    I wouldn't discuss it because I think they

19   know more than I do about construction.

20        Q    Do you know what Terra's plans are

21   currently for the development of the Landmark

22   project?

23        A    Generally, yes.

24        Q    Is the plan to complete the hundred and

25   seventy townhomes as the first phase of the

Page 69

1   development?

2       A    I don't know that.  First I know that

3   they're intending or planning on potentially taking

4   the north parcel and maybe redesigning it to build

5   approximately 400 townhomes or homes on.

6       Q    And would that require them to reconfigure

7   the hundred and seventy townhomes that were, you

8   know, set for Phase 1 by Elie Berdugo?

9       A    Maybe, I did not compare old -- you know,

10  the old plan to, you know, whatever their new

11  proposed plan is.

12      Q    Going back to Tab 1 in Exhibit 1, the

13  balance sheet, the next line item says personal

14  property, $5 million -- $5,400,000.

15           Do you see that?

16      A    Yes.

17      Q    What does that refer to?

18      A    I don't know.

19      Q    The next line says, land, 64,700,000.

20           Do you see that?

21      A    Yes.

22      Q    Is that referring to the Landmark project?

23      A    I'm assuming so.

24      Q    Okay.  There's no other project owned by

25  the debtors; correct?

Page 70

1        A     No, that's correct.

2        Q     Okay.  Do you know where that number came

3   from?

4        A     I don't.  I'd be guessing that was the

5   purchase price.

6              MR. GUSO:  Don't guess, please.

7              THE WITNESS:  No, I stated for the record

8   I'm guessing.  So I don't know.  No, I do not know.

9   BY MS. SHUMENER:

10       Q     Okay.  The next line has a market

11  adjustment in the assets column.  Have you ever seen

12  a market adjustment in an assets column of a balance

13  sheet?

14       A     No, I have not.

15       Q     Okay.  Market adjustment is not, when it's

16  a negative number, $36,005,170, doesn't usually

17  appear as an asset on a balance sheet, does it?

18       A     I would not know, I'm not an accountant.

19       Q     Do you know whether Mr. DiMarco inserted

20  that number under assets in order to reduce the

21  aggregate number for the total assets?

22       A     I don't know why he did it.

23       Q     Okay.  Do you know where he got that

24  number?

25       A     No, I do not.

Page 71

1       Q    Do you know whether Terra assisted

2  Mr. DiMarco in preparing this balance sheet?

3       A    I don't know.

4       Q    Was Terra paying Mr. Martin --

5  Mr. DiMarco's fees?

6       A    No.

7       Q    Had Terra promised to pay Mr. DiMarco's

8  fees?

9       A    No.

10      Q    Is there any contract in which Terra has

11 agreed to pay Mr. DiMarco's fees?

12      A    No.

13      Q    Would you turn to Tab 3 of Exhibit 1?

14      A    I stand corrected, obviously.

15      Q    Yeah.  Tab 3 is -- Tab 3 is a document

16 titled independent contractor agreement, Bates

17 Labeled TCD-0000695 to TCD-0000702.

18           Please take a look at this document and

19 tell me if you recall having seen it before?

20      A    Yes.

21      Q    Okay.  If you'd turn to Page TCD-0000700,

22 there is a signature above your typed name, it

23 says -- under the name of all the debtors, it says by

24 Isaac Kodsi, vice-president, dated November 11,

25 2000 -- November 8, 2011.

Page 72

1            Do you see that?

2     A     Yes.

3     Q     Is that your signature?

4     A     Yes.

5     Q     And if you'd turn the Page 2 TCD-0000701,

6   it has there a signature for David Martin, chief

7   operating officer, also dated November 8, 2011.

8            Do you see that?

9     A     Yes.

10    Q     And this was a contract for -- and the

11   third page, TCD -- I'm sorry, Page 6 of 6,

12   TCD-0000702, appears to have the signature of

13   Frank DiMarco, dated November 9, 2011.

14           Do you see that?

15    A     Yes.

16    Q     Are you familiar with Mr. DiMarco's

17   signature?

18    A     You mean -- do I recognize his signature,

19   you mean?

20    Q     Yeah, yeah.

21    A     No, I would not say that.

22    Q     Do you doubt that that's his signature?

23    A     Oh, no, I don't doubt it.

24    Q     Did you discuss this contract with

25   Mr. DiMarco?

1    A    No, I think I let -- allowed my counsel to

2   do that.

3    Q    Do you know if any -- if Mr. Martin

4   discussed this contract with Mr. DiMarco?

5    A    I don't know that.

6    Q    Do you see on page TCD-0000701, would you

7   read the paragraph right above the signature of

8   David Martin?

9    A    "Payment of the fees and costs incurred by

10  Landmark at Doral East, LLC; Landmark at Doral South,

11  LLC; Town Center at Doral, LLC; Landmark at Doral

12  Developers, LLC; Landmark Club at Doral, LLC, in the

13  matter described in the foregoing independent

14  contractor agreement, is guaranteed this 8th day of

15  November 2011, Terra World Investments, LLC."

16   Q    Does that refresh your recollection as to

17  whether Terra agreed to pay for the services of

18  Mr. DiMarco?

19   A    Yes, it does.

20   Q    Okay.  As of November 8, 2011, there's been

21  no D.I.P. financing approved by the Bankruptcy Court;

22  isn't that correct?

23   A    As of November 8th?

24   Q    Yes.

25   A    I believe you're correct.

Page 74

1        Q     Okay.  Who hired Mr. DiMarco to render

2   services, accounting services, to the debtors?

3        A     I'm assuming the companies did, the debtors

4   did.

5        Q     Who acting for the debtors hired

6   Mr. DiMarco to render accounting services for the

7   debtors?

8        A     I assume myself and my counsel.

9        Q     Who prepared this agreement?

10       A     I believe counsel for the debtor.

11       Q     Are you sure it was counsel for the debtor

12   or could it have been counsel for Terra?

13       A     It could have been, I don't know, I don't

14   know.

15       Q     Did Terra disclose to you why Terra

16   guaranteed or agreed to guarantee the payment to

17   Mr. DiMarco?

18       A     No.  Oh, sorry.

19            MR. GIELCHINSKY:  Whatever, the answer is

20   out there.

21   BY MS. SHUMENER:

22       Q     Did you have any discussion with

23   Mr. DiMarco about the services that he would be

24   rendering to the debtors?

25       A     Are you okay with that one?

Page 75

1           MR. GIELCHINSKY:  Yeah.

2           THE WITNESS:  Okay.  No, nothing other

3    than, you know, if he had the time and whether he was

4    able to go ahead and, you know, be engaged and, you

5    know, handle this work.

6           MS. SHUMENER:  Can you read me the answer

7    back, please?

8           (Thereupon, the above-referred to answer

9       was read back by the court reporter.)

10   BY MS. SHUMENER:

11      Q    When did you have the discussion about

12   whether he would have the time to be engaged and to

13   handle this work?

14      A    Somewhere in the last -- before he got

15   engaged.

16      Q    Was it before the debtors filed bankruptcy?

17      A    I don't remember.

18      Q    Were you -- was said conversation you had

19   with Mr. DiMarco by phone or in person?

20      A    By phone.

21      Q    Did you initiate the call or did he?

22      A    I did.

23      Q    What prompted you to call him?

24      A    I believe speaking to counsel, they were

25   telling me we needed ---

Page 76

```
 1            MR. GIELCHINSKY:  Objection,
 2   attorney/client.
 3            THE WITNESS:  Oh, sorry, sorry, sorry,
 4   sorry.  I'm sorry.
 5   BY MS. SHUMENER:
 6       Q    Who referred you to Mindy Mora?
 7       A    David Martin.
 8       Q    Did David Martin recommend that you hire
 9   Frank DiMarco?
10       A    No.
11       Q    Did you -- did you introduce Frank DiMarco
12   to David Martin?
13       A    No.
14       Q    Did you know David Martin before meeting
15   Terra?
16            MR. GIELCHINSKY:  David Martin?
17            MS. SHUMENER:  I'm sorry, not David Martin,
18   strike that whole line of questioning.
19            THE WITNESS:  Okay.
20            MS. SHUMENER:  Well, don't strike it, just
21   leave the gibberish in place.
22   BY MS. SHUMENER:
23       Q    I was trying to ask you about
24   Frank DiMarco.
25       A    Oh, okay.
```

Page 77

1          Q     Did you introduce Frank DiMarco to
2    David Martin?
3          A     No.
4          Q     Did David Martin introduce Frank DiMarco to
5    you?
6          A     No.
7          Q     How did you meet Frank DiMarco?
8          A     Frank DiMarco was the CFO of EB Developers
9    and all of Elie's companies, that's how I know him.
10         Q     Was Frank DiMarco working for the debtors
11   in the -- in Elie Berdugo's probate --
12               MR. GUSO:  Object to the form.
13   BY MS. SHUMENER:
14         Q     -- case?
15         A     I don't believe -- I don't know about the
16   probate, but, I mean, I know he worked for Elie and
17   all of his real estate companies.
18               MS. SHUMENER:  Do you want to break?
19   You're sighing.
20               MR. GIELCHINSKY:  Yeah.
21               MS. SHUMENER:  Let's take a break,
22   ten-minute break.
23               MR. GIELCHINSKY:  Sure.
24               (Thereupon, a lunch recess was taken, after
25         which the following proceedings were had:)

Page 78

```
 1            MS. SHUMENER:  Back on.
 2   BY MS. SHUMENER:
 3       Q    How was lunch?
 4       A    Very good, thank you.
 5       Q    I want to get a little bit -- circle back a
 6   little bit and put some closure on some of the topics
 7   we hit this morning.
 8            First of all, are any of the investors in
 9   ALS Management Solutions unsecured creditors of the
10   debtors?
11       A    No.
12       Q    Have any of the investors in ALS Management
13   Solutions done any transactions with Elie Berdugo, of
14   which you're aware?
15       A    No.
16       Q    Going back to your hundred thousand dollars
17   in fees -- the fees that you're getting from Terra,
18   hundred thousand dollars in installments of $10,000 a
19   month --
20       A    Correct.
21       Q    -- and then a hundred and fifty thousand
22   dollar success fee; correct?
23       A    Correct.
24       Q    Is that memorialized in any document?
25       A    I believe there is -- yes, I believe it is.
```

Page 79

1          Q     Okay.  Is there an agreement -- so there's
2     a written contract between you and Terra
3     memorializing the fees that you're going to get?
4          A     I believe there's a document between myself
5     and the debtors, and I believe it's in the same
6     structure as a guaranty, but actually, I don't really
7     remember.
8          Q     Has that document been produced?
9          A     I don't know.
10         Q     Can you look through the notebook and tell
11    me?  It's only a few tabs, frankly, it will take you
12    five minutes to flip tab by tab and tell me if the
13    document is in there.
14         A     I can ask my counsel.  Do you know if it's
15    in there?
16              MR. GIELCHINSKY:  Can we go off the record?
17              THE WITNESS:  Can we go off the record for
18    a minute?
19              MS. SHUMENER:  Of course, of course.
20                  (Discussion off the record.)
21              MS. SHUMENER:  Back on the record.
22    BY MS. SHUMENER:
23         Q     Mr. Kodsi, you stated, I believe, that
24    there is an agreement --
25         A     Yes.

Page 80

1      Q    -- regarding Terra's obligation to pay you

2  a hundred thousand dollars in $10,000 monthly

3  installments and a hundred and fifty thousand dollar

4  success fee; correct?

5      A    Correct.

6      Q    Was that written agreement signed by you?

7  Did you sign that document?

8      A    I believe I did, yes.

9      Q    Did you sign that document for yourself as

10  an individual?

11          MR. GUSO:  Object to the form.

12          THE WITNESS:  I would like to apologize, I

13  just don't remember.

14  BY MS. SHUMENER:

15      Q    Okay.  I'm just trying to figure out who

16  the parties are to the document.  Are the debtors

17  parties to the document?

18          MR. GIELCHINSKY:  Only if you know.

19          THE WITNESS:  I don't -- I really don't

20  know.  I know there was something drafted, I just

21  don't remember, I just don't remember now.

22          MR. GIELCHINSKY:  It's not in here.

23          THE WITNESS:  It's not in here?

24          MR. GIELCHINSKY:  No.

25          THE WITNESS:  Okay.  Sorry.

Page 81

1    BY MS. SHUMENER:

2        Q    Was Terra a signatory to the document?

3        A    Again, I don't know.  I'm not for sure.

4        Q    Do you recall what the document is called?

5        A    I really didn't pay attention, no,

6    agreement, consulting agreement, I don't know.

7        Q    Where would a copy of that document be

8    maintained?

9        A    Perhaps with my counsel.

10        MS. SHUMENER:  Can I get an agreement that

11   that document will be produced to us quickly?

12        THE WITNESS:  Yes, I'll just ask that you

13   please confirm any follow-up requests in writing for

14   my own benefit of recollecting what I'm supposed to

15   do.

16        MS. SHUMENER:  What you're supposed to do

17   is send us the agreement.

18        MR. GIELCHINSKY:  If you can send me an

19   e-mail, I would appreciate it.

20        MS. SHUMENER:  We will send you an e-mail.

21   BY MS. SHUMENER:

22        Q    If the membership interest in the debtors

23   is sold to someone other to Terra, do you get your

24   success fee?

25        MR. GUSO:  Object to the form.

Page 82

1           MR. GIELCHINSKY:  Yeah.

2           THE WITNESS:  I believe my success fee is

3   based on confirmation of a plan.

4   BY MS. SHUMENER:

5       Q    If the plan that is ultimately -- if a plan

6   is confirmed in this case, which does not provide

7   that Terra acquires the membership interest in the

8   debtors, do you get the success fee?

9       A    I don't know.

10      Q    If the property, the project, is sold to a

11  third party over Terra's objection, do you get the

12  success fee?

13      A    I don't know.

14      Q    Who negotiated that agreement?

15      A    I did.

16      Q    Who did you negotiate it with?

17      A    David and Brian.

18      Q    When did you have discussions with David

19  and Brian about your fees?

20      A    Summer of '11.

21      Q    Is that when the discussions began?

22      A    I believe so, yes.

23      Q    Did your agreement with them about your

24  success fee and the hundred thousand dollar fee, was

25  that put in writing before the debtors filed

Page 83

1  bankruptcy?

2      A    I think we had -- I believe we had some

3  sort of, I'll call it a memorandum or maybe a term

4  sheet or something.

5      Q    That term sheet is -- I will represent to

6  you I saw no such term sheet in this notebook.  Was

7  that term sheet signed?

8      A    I don't remember, I think we might have

9  gone right into bankruptcy.

10     Q    Okay.  Where would a copy of that term

11 sheet be maintained?

12     A    My office if I have it.

13         MS. SHUMENER:  Counsel, could I ask that

14 you produce that term sheet, as well as the contract

15 regarding his fees, or memorandum of understanding,

16 whatever the document is?

17         MR. GIELCHINSKY:  I will ask for the same

18 follow up, and we will endeavor to do so.

19         MS. SHUMENER:  Okay.

20         MR. GUSO:  I'm sorry, I missed it.  Which

21 term sheet are you looking for?

22         MR. GIELCHINSKY:  My understanding is that

23 the request is concerning a term sheet concerning

24 fees that would be paid to the deponent.

25 BY MS. SHUMENER:

Page 84

1     Q     When you had the discussions with -- I'm
2  sorry, I'm losing it -- with, I think you said
3  Brian Pearl --
4     A     Correct.
5     Q     -- and David Martin?
6     A     David Martin, correct.
7     Q     When you had the discussions, what did you
8  first ask for in terms of a fee?
9           MR. GIELCHINSKY:  I'm going to -- I'm going
10 to object on the grounds of common interest
11 privilege.
12          MS. SHUMENER:  It's no privilege when it's
13 not counsel, Counsel.
14 BY MS. SHUMENER:
15    Q     Your discussions were -- Mr. Martin is not
16 a lawyer; correct?
17    A     Actually, he is, I believe.
18    Q     Was he acting as ---
19    A     I mean, I know he went to law school.  I
20 don't know if he's a lawyer, though, but I know he
21 went to law school, so I don't know.
22    Q     Are you claiming Mr. Martin is representing
23 Terra?
24    A     I'm not.
25    Q     Did you have a common interest agreement at

1    this time with Terra?  Did you have any agreement at

2    this time with Terra when you were negotiating your

3    fees?

4        A    No.

5        Q    Okay.  Then there's nothing common about

6    it.

7             What did you -- could you tell me how the

8    negotiations started regarding the amount of the fees

9    that you would get?

10       A    I really just don't remember.  I mean, it

11   wasn't -- it wasn't a long -- it wasn't really that

12   long of a conversation.  I think I said I wanted 250

13   or something, and then I think we just broke it down

14   into a portion being, you know, pursuant to a success

15   fee and a portion to be divided on a monthly basis.

16            Again, that's not my goal.  I mean, my goal

17   wasn't really for my fees.  That wasn't really the

18   goal here, the goal was to, you know ---

19       Q    This conversation you said occurred in the

20   summer of 2011; correct?  The first conversation

21   regarding your fees occurred in the summer of 2011;

22   correct?

23       A    Yes, I believe so.

24       Q    Did it occur at the breakfast meeting that

25   you had with Mr. Martin?

Page 86

1        A    No.

2        Q    Was Mister -- were both Mr. Pearl and

3   Mr. Martin present during that conversation?  Was it

4   one conversation in which the three of you were

5   present?

6        A    Yes.

7        Q    Okay.  How many -- I'm trying to understand

8   how many conversations there were regarding your

9   fees.

10            How many conversations were there?

11       A    Maybe two.

12       Q    Okay.  Were the three of you, and by the

13  three of you I mean Mr. Martin, Mr. Pearl and

14  yourself, present in both conversations?

15       A    I believe so, yes.

16       Q    Okay, and the first such conversation took

17  place in the summer of 2011; correct?

18       A    I believe so.

19       Q    Were you the one who originally proposed

20  $250,000 as your fee in the aggregate?

21       A    I don't remember.

22       Q    Was there any negotiation over the amount

23  of that fee?

24       A    Not much, really.

25       Q    What other number was thrown out?

1    A    I don't think there really was a number.  I

2  think it was just, let's come up with something that

3  makes sense.  I mean, my thinking is it was a whole

4  five minutes.  Again, that wasn't the objective here,

5  so ---

6    Q    But it was discussed at two separate

7  meetings; correct?

8    A    There were -- yeah, I mean -- I mean, not

9  including, by the way, the breakfast meet.

10    Q    Not including the breakfast meeting?

11    A    Right, right.

12    Q    Two meetings.

13    A    Two additional meetings after the breakfast

14  meeting.

15    Q    Yes, and I thought you had testified that

16  it wasn't discussed at the breakfast meeting; is that

17  correct?

18    A    Yes, that is correct, that's correct.

19    Q    What is Mr. Pearl's position at Terra?

20    A    I don't know his legal position.

21    Q    Okay.  Now, the discussion regarding your

22  fees with Mr. Martin and Mr. Pearl, occurred before

23  an agreement was reached with Terra for the debtors

24  to file bankruptcy; correct?

25    A    In concept it was agreed upon, I think, but

Page 88

1   the actual formal agreement was only executed or

2   drafted after the bankruptcy was filed.

3        Q    Okay.  So there was a verbal agreement

4   reached before the filing of the bankruptcy --

5        A    Uh-huh.

6        Q    -- that was memorialized in a written

7   contract after the filing of the bankruptcy; correct?

8        A    Correct, correct.

9        Q    Okay.  Did you receive any payments from

10  Terra before the bankruptcy filing?

11       A    No.

12       Q    When did the payments from Terra start, the

13  payments to you?

14       A    I think I got my first check -- I'm -- I'm

15  going to say either late November, early December.

16       Q    And that -- was that a $10,000 check?

17       A    Yes.

18       Q    Okay.  So in 2011, did you receive only

19  $10,000 from Terra?

20       A    Yes.

21       Q    And that $10,000 was received from Terra

22  before the D.I.P. financing was approved; correct?

23       A    I don't know the timing.

24       Q    Are you aware of any document filed with

25  the Bankruptcy Court disclosing to the Bankruptcy

Page 89

1    Court the success fee that you're supposed to be

2    getting from Terra?

3         A    I don't know if it's -- I don't know.

4              MS. SHUMENER:  Let's go off the record for

5    just a moment.

6                   (Discussion off the record.)

7              MS. SHUMENER:  Let's go back on the record,

8    please.

9    BY MS. SHUMENER:

10        Q    If the Bankruptcy Court grants the District

11   relief from stay to complete foreclosure, will you

12   get your success fee from Terra?

13             MR. GIELCHINSKY:  Can I hear the question

14   again?

15                  (Thereupon, the above-referred to question

16        was read back by the court reporter.)

17             MR. GIELCHINSKY:  You can answer.

18             THE WITNESS:  Again, I believe my success

19   fee is based on a confirmation, so I don't know -- I

20   don't know if that answered the question correctly.

21   BY MS. SHUMENER:

22        Q    Earlier, I had you look at the document

23   that is in the notebook as Tab 3 of Exhibit 1.  Just

24   a moment.

25                  When you say confirmation, that your

1    success fee is dependent upon confirmation, is that

2    confirmation of Terra's plan or any plan?

3         A    Again, my -- this is my -- again, my

4    impression is their plan, but I really don't know.

5         Q    Okay, but you negotiated the contract;

6    correct?

7         A    Yes.

8         Q    Okay, and is that -- as a party to the

9    contract, is that your understanding of the terms?

10        A    I believe the terms are if they get the

11   plan confirmed, I get a hundred and fifty thousand

12   dollars.

13        Q    And when you say, "if they get the plan

14   confirmed," I'm just trying to understand, one, who

15   is "they"?

16        A    They, the debtor, or with, you know, with

17   Terra being the sponsor, I'm assuming.

18        Q    Okay, and so it has to be Terra's plan

19   that's confirmed; correct?

20        A    Again, that's my personal impression.

21   Again, I never read it any other way.  I never looked

22   at it any other way.

23        Q    Okay.  Do you remember how many pages that

24   term sheet or memorandum of understanding was that

25   you are referring to?

1        A     One or two pages, maybe.

2        Q     Okay.  Do you remember who wrote it?

3        A     I think Terra might have wrote it and sent

4    it to me.

5        Q     Okay, and is that also true of the

6    agreement regarding your fees, the ultimate contract

7    that was signed?

8             MR. GUSO:  Object to the form.

9             THE WITNESS:  Yeah, I don't understand.  Go

10   ahead, repeat the question.

11            MS. SHUMENER:  Okay.

12   BY MS. SHUMENER:

13       Q     Who prepared the contract regarding your

14   fees and your -- your hundred thousand dollar fee and

15   success fee?

16       A     I don't know, but -- I don't know.

17   Counsel, some lawyer did.

18       Q     Do you know that or you're just guessing?

19       A     I'm guessing, I'm guessing.

20       Q     Do you know who sent that contract to you?

21       A     I believe my counsel did.  I think Mindy

22   sent it to me.

23       Q     Did Terra recommend any other attorneys to

24   you, other than Mindy Mora?

25       A     No.

Page 92

1        Q     Okay.  Do you know if Terra had a

2    discussion with Mindy Mora before you hired her?

3        A     I don't know that.

4        Q     Are there any other professionals that

5    Terra recommended to you, other than lawyers?

6        A     No.  I mean, what other professional?  No,

7    I don't understand the question, I mean.

8        Q     Are there any brokers that Terra

9    recommended to you?

10        A     No.

11        Q     Are there any appraisers that Terra

12    recommended to you?

13        A     No.

14            MR. GIELCHINSKY:  Did you say appraisers?

15    I'm sorry.

16            MS. SHUMENER:  Yes.

17    BY MS. SHUMENER:

18        Q     Before the bankruptcy filing, did you ever

19    propose a plan of development for the Landmark

20    project to Terra?

21        A     No.

22        Q     Do you know whether this, what we're

23    calling the -- the independent contractor agreement

24    that you produced that's Tab 3 to Exhibit 1, do you

25    know if that was ever disclosed to the Bankruptcy

Page 93

1    Court?

2        A    I don't know.  You would have to ask

3    counsel.

4        Q    Okay.  That agreement was signed in

5    November, and I apologize if I asked you this, sir,

6    the independent contractor agreement.

7             Do you know when the negotiations over that

8    agreement first started?

9        A    I do not.

10       Q    Do you recall how much prior to November 8,

11   2011, Mr. DiMarco was approached with the prospect of

12   providing services for the debtors?

13       A    My estimation is probably sometime -- I

14   mean, by the time we filed the bankruptcy in

15   mid-September, so maybe somewhere in that two, three

16   month range.

17       Q    Was he approached before the bankruptcy was

18   filed?

19       A    No, I don't think -- no.

20       Q    Are you the person who approached him for

21   the debtors?

22       A    Yes.

23       Q    So how long, approximately, after the

24   bankruptcy was filed, did you approach him for the

25   debtors?

Page 94

1      A    I don't remember.  Mindy probably told me
2  to do it.
3      Q    Did you approach him to have him prepare
4  the schedules for the bankruptcy, the debtors'
5  schedules?
6      A    Yes.
7      Q    Did you help him prepare those schedules?
8      A    No.
9      Q    Did anyone help him -- other than counsel,
10 I'm not looking for -- did anyone other than counsel
11 help Mr. DiMarco prepare the schedules?
12     A    I don't know.
13     Q    Does Mr. DiMarco have an office?
14     A    I don't think -- I think he's employed by
15 another -- you know, by someone else, another
16 employer, whatever it's called.
17     Q    Another company?
18     A    Another company, yes.  Thank you.
19     Q    The contract between the debtors and
20 Mr. DiMarco, are not between the debtors and
21 Mr. DiMarco's company, correct, or the company that
22 he's working for, it's between the debtors and him as
23 an individual; correct?
24     A    Yes.
25     Q    Okay.  Do you know whether Mr. DiMarco is

Page 95

1    in possession of any historical documents for the

2    debtors?

3        A    I don't know.

4        Q    I'm -- I'm, in particular, interested in

5    knowing whether Mr. DiMarco is in possession of any

6    documents evidencing loans by the creditors listed as

7    unsecured creditors in this bankruptcy case.

8            Do you know what I'm getting at?

9        A    No, say it again.

10       Q    Okay.  I will represent to you, and I'll

11   show you documents in a minute, I just don't want to

12   go to them --

13       A    Okay.

14       Q    -- lala land right now.

15           The debtors' schedules have a section that

16   lists a bunch of unsecured creditors.

17       A    Right.

18       Q    Okay.  I believe some of them may be

19   members of the same temple that Mr. Elie Berdugo was

20   a member of --

21       A    Right.

22       Q    -- correct?

23       A    Correct.

24       Q    Okay, and a lot of those unsecured

25   creditors are listed as having made loans to someone,

Page 96

1    and I was wondering if you knew whether Mr. DiMarco

2    is in possession of any documents evidencing loans

3    made by any of the unsecured creditors?

4         A    I -- I believe he's in possession of some

5    of those documents, yes.

6         Q    Okay.  Do you know where Mr. DiMarco would

7    have gotten those documents?

8         A    From their old offices.

9         Q    Did you provide him with any of those

10   documents?

11        A    No.

12        Q    All right.  Who made the decision that the

13   Probate Court's approval was not required for the

14   debtors' bankruptcy filings?

15             MR. GIELCHINSKY:  Object to form.  You can

16   answer to the best of your knowledge.

17             THE WITNESS:  I don't know specifically.

18   BY MS. SHUMENER:

19        Q    Was that something you and Yogev Berdugo

20   ever discussed?

21        A    I think we did, him and I, and I think

22   Steven Amster.

23        Q    Who represented Elie Berdugo's probate

24   estate in the bankruptcy as counsel?

25             I'm sorry --

1     A   I'm sorry, what's that?

2     Q   -- strike that question.  It's a bad

3 question, I apologize.

4          Who represented Elie Berdugo's estate in

5 the Probate Court?

6     A   I believe Steven Amster did, Kodsi Law Firm

7 does.

8     Q   Are there any other lawyers representing

9 Elie Berdugo's estate in probate?

10    A   I don't know.

11    Q   Were there -- who was representing

12 Elie Berdugo's family in the Probate Court?

13    A   Other than Steven Amster, I don't know

14 really -- I don't know if there are any other

15 attorneys involved.

16    Q   Are you and Steven Amster 50/50 partners in

17 the Kodsi Law Firm?

18    A   Yes.

19    Q   So any fees that Mr. Amster earns from his

20 representation of Elie Berdugo's estate goes to the

21 firm and is split 50/50 with you; correct?

22        MR. GUSO:  Object to the form.

23        THE WITNESS:  After company expenses, yes,

24 theoretically, yes.

25 BY MS. SHUMENER:

Page 98

1       Q     Does Mr. Amster represent you personally in

2   any matters pertaining to Landmark?

3       A     No.

4       Q     Did Mr. Amster represent you in any of the

5   negotiations with Terra?

6       A     No, but I mean I discussed it with him.

7       Q     Did he review any of the documents executed

8   between you and Terra?

9       A     I believe he took a look at the -- the

10  agreement.

11      Q     The agreement regarding your hundred

12  thousand dollar fee and hundred and fifty thousand

13  dollar --

14      A     Correct, correct.

15      Q     -- success fee?

16      A     Yes.

17      Q     Okay.  Did Mr. Amster bill you for his time

18  in looking at that agreement?

19      A     No, he did not.

20      Q     Did he bill the probate estate in looking

21  at that -- time spent looking at that agreement?

22      A     No, I don't think so.

23      Q     Is Mr. Amster representing the debtors in

24  this bankruptcy proceeding in any way?

25            MR. GUSO:  Object to the form.

Page 99

1          THE WITNESS:  Can I answer?

2    BY MS. SHUMENER:

3          Q    Yes, you can answer.

4          A    Yes, in the State Court in the foreclosure

5    matter.

6          Q    Okay.  Is Mr. Amster receiving any funds,

7    any fees from the D.I.P. financing that was approved

8    by the Bankruptcy Court?

9          A    No.

10         Q    Is the Kodsi Law Firm receiving any fees

11   from that D.I.P. financing?

12         A    No.

13         Q    Is there any agreement by -- between the

14   Kodsi Law Firm and Terra for fees?

15         A    No.

16         Q    Are you sharing any of your fees with

17   Mr. Amster?

18         A    No.

19         Q    Did Elie Berdugo leave a will?

20         A    I don't think so, actually, no.

21         Q    Who was the executor -- who is and was the

22   executor of Elie Berdugo's estate, probate estate?

23         A    I believe, I'm not a hundred percent sure,

24   that it's only Yogev Berdugo.

25         Q    Were any papers filed in the Probate Court

1    recommending to the Court that Yogev Berdugo be the

2    only executor of Elie Berdugo's estate?

3         A    I don't know.

4         Q    Did you recommend to Yogev Berdugo that he

5    be the sole executor of the estate?

6         A    I definitely don't remember that.

7         Q    Do you recall having any discussions with

8    Yogev Berdugo about who would be the executor of

9    Elie Berdugo's estate?

10        A    I don't think so.  I don't remember.

11        Q    Did you have any discussions with

12   Mrs. Berdugo -- what's her first name?

13        A    Guila.

14        Q    Guila.

15        A    G-u-i-l-a.

16        Q    Thank you.  Did you ever have any

17   discussions with Guila Berdugo about the offer made

18   to release -- by AmTrust to release her from her

19   guaranty?

20        A    No, I spoke to her son, to Yogev.

21        Q    Did you ever get any authorization from

22   Guila Berdugo to reject that offer?

23        A    No.

24        Q    Is Yogev Berdugo liable -- does he have a

25   guaranty with AmTrust?

1        A     No.

2        Q     Have you ever had any conversations with

3   Guila Berdugo?

4              MR. GIELCHINSKY:  At all?

5              THE WITNESS:  In my lifetime?

6   BY MS. SHUMENER:

7        Q     Yes, in your lifetime.

8        A     Yes.

9        Q     Okay.  Since Elie Berdugo died, have you

10  had communications directly with Guila Berdugo?

11       A     I did right after he died, after he passed

12  away.

13       Q     Okay.  Have you ever had conversations with

14  Guila Berdugo having to do with business matters?

15       A     A little bit after he passed away.

16       Q     Okay.  Was Yogev Berdugo involved in each

17  of those conversations?

18       A     He might have been, yes.

19       Q     Is there any reason why you didn't contact

20  Guila Berdugo directly to relay to her the offer made

21  by AmTrust?

22       A     After Elie's passing, she moved back to

23  Israel, so -- and Yogev lives here in Florida, so I

24  just go through -- I just go through Yogev.

25       Q     Do you know -- do you have Guila Berdugo's

Page 102

1    telephone number in Israel?

2         A    No.

3         Q    Could you have gotten it from Yogev?

4         A    Yes.

5         Q    Is there any reason why you didn't call her

6    in Israel to discuss the AmTrust offer?

7         A    I felt it was unnecessary in light of

8    speaking to Yogev.

9         Q    Did Elie Berdugo have any children other

10   than Yogev Berdugo?

11        A    Yes.

12        Q    How many other children does he have?

13        A    Two other daughters or two more kids.

14        Q    And both of which -- both of them are

15   daughters, I take it; correct?

16        A    Correct, right.

17        Q    Both females.  What are their names?

18        A    Adee (phonetic) -- oh, my God, I'm drawing

19   a blank.  I'm sorry, I'm drawing a blank on the other

20   one.

21        Q    Are the daughters young -- are the

22   daughters younger or older than Yogev Berdugo?

23        A    I believe one is older, one is definitely

24   older, and Yogev is the middle child, and then they

25   have a younger sister.

Page 103

1    Q    Did you discuss the offer made by AmTrust

2  with either of Elie Berdugo's daughters?

3    A    No.

4    Q    Did you discuss the offer made by Terra

5  with either of Elie Berdugo's daughters?

6    A    No.

7    Q    Did you ever discuss with any of the

8  Berdugo family members that possibly his daughters

9  should be the executors of his estate, of

10 Elie Berdugo's estate?

11   A    I don't remember, we're going back four

12 years ago when he passed away.  I don't remember, I

13 just don't remember.

14   Q    Did Mr. Amster represent all of the Berdugo

15 family members in the probate estate?

16        MR. GIELCHINSKY:  Objection to form.  You

17 can answer if you know.

18        THE WITNESS:  Again, I only know

19 Steve Amster is involved, I don't know if there are

20 any other attorneys.

21 BY MS. SHUMENER:

22   Q    No, no, no, I'm sorry.

23   A    I'm sorry, I don't know.  The answer is I

24 just don't know.

25   Q    You don't know if Mr. Amster was

Page 104

1    representing Guila and the two daughters and Yogev?

2        A    I don't know -- I don't know the technical

3    or, you know, exactly who he's representing.

4        Q    Have you ever seen an engagement letter

5    between the Kodsi Law Firm and the Berdugos?

6        A    No, I have not.

7        Q    Is the probate still under way?

8        A    I believe so.

9        Q    What's left to be done in the probate

10    estate?

11        A    I don't know.

12        Q    Is Mr. Amster still representing the

13    estate?

14        A    I believe so.

15        Q    Is the estate a creditor of the debtors?

16        A    Is the estate a creditor of the debtors?  I

17    don't know.

18        Q    Are the -- are any of the creditors of

19    Elie Berdugo's estate also unsecured creditors of the

20    debtors?

21            MR. GIELCHINSKY:  Could you reask that

22    question, please, the court reporter read it back?

23            (Thereupon, the above-referred to question

24        was read back by the court reporter.)

25            THE WITNESS:  I'm not sure.  I'm not sure.

1    I believe so, but I'm not sure.

2    BY MS. SHUMENER:

3        Q    Do all the debtors share the same unsecured

4    creditors?

5        A    I'm not sure.

6        Q    Are you aware of any unsecured creditor

7    that is a creditor of one debtor, but not a creditor

8    of another of the five debtors?

9        A    I would have to look at whatever potential

10   loan documents are out there.  I'm not really sure

11   how -- those documents were not drafted -- they were

12   drafted at EB Developers at the time that they were

13   taking the money, so I don't know.

14       Q    Okay.  Have you spoken -- since the

15   bankruptcy filing, have you spoken to any of the

16   unsecured creditors of the debtors?

17       A    No.

18       Q    Prior to the bankruptcy filing, did you

19   speak to any of the unsecured creditors of the

20   debtors?

21       A    Yes.

22       Q    Who did you speak to?

23       A    I had met with Harvey Friedman.

24       Q    Anyone else?

25       A    Again, I forgot his first name, but

1    Pfeffer, I believe.

2         Q    Man or woman?

3         A    A man.  I went to see Yagudaev, I don't

4    remember exactly the spelling, but Yagudaev is

5    another person I had met with, and I think that might

6    be it.

7              Oh, no, no, his name was Nathan -- his name

8    is Nathan Kalichman, I just don't know -- or his

9    wife, I don't remember his wife's name, that's why I

10   don't remember.  His wife I think might have been an

11   investor.

12             Oh, and then I also spoke to -- I'm sorry,

13   I also spoke to Bensimon.  Again, I'm not sure --

14   last name, Bensimon.

15        Q    You said you met with Harvey Friedman;

16   correct?

17        A    Yes, correct.

18        Q    How much money did Harvey Friedman lend to

19   the debtors, if you know?

20        A    I don't remember.

21        Q    Okay.  How long before the bankruptcy

22   filing did you meet with Harvey Friedman?

23        A    Three and a half years ago.  It was right

24   around the time Elie passed away, and around the time

25   he passed away it was what was going to happen with

1    the project.  He was trying to figure out what was

2    happening with the project.

3        Q    Okay, and what did you tell him?  What did

4    you and he discuss?

5        A    We discussed a bit of everything, you know,

6    the status of the project, you know, whether

7    AmTrust -- what AmTrust was going to do.

8            I don't know if it was before or after

9    AmTrust had already filed suit for foreclosure, so I

10   just don't remember the timing anymore, and just

11   whether or not he had a chance of ever seeing any of

12   his money.

13       Q    And what did you tell him?

14       A    That I had no idea.

15       Q    Why was he meeting with you?

16       A    Because I was counsel to Elie, you know,

17   general counsel -- not general counsel.  I mean, you

18   know, I was representing Elie and all his companies,

19   you know, from the firm and just, you know, I was

20   close to the family, just trying to figure out, sort

21   out what was about to happen here.

22       Q    Did you help Elie Berdugo obtain the loan

23   from Mr. Friedman?

24       A    No.

25       Q    Do you know if Mr. Friedman actually made a

Page 108

1    loan to Elie Berdugo or did he make a loan to the

2    debtors?

3        A    I don't know exactly.

4        Q    Do you know if Mr. Friedman actually made a

5    loan or whether he just invested money --

6        A    I don't know.

7        Q    -- in the project?

8        A    I don't know.

9        Q    Do you know if there are documents

10   evidencing the investment?

11       A    I believe there are some documents, yes.

12       Q    Okay.  What about Mr. Pfeffer, we'll call

13   him Mr. Pfeffer.  I'll show you the list of unsecured

14   creditors in a minute.

15       A    Okay.

16       Q    Frankly, that notebook that we've marked as

17   Exhibit 3 is the list, the schedule.

18       A    Okay.

19       Q    But don't bother right now because ---

20       A    Oh, okay.  No problem, go ahead.

21       Q    You said you spoke with Mr. Pfeffer?

22       A    Yes.

23       Q    How long ago did you speak with

24   Mr. Pfeffer?

25       A    I had a meeting with all of them together,

1   which we ---

2        Q    Oh.

3        A    You know, we sat down, we met together and

4   we were trying to come up with a potential plan of

5   what we should do, if anything, and what can be done

6   and, you know, just there was a lot of money out

7   there that they lost, and they were trying to figure

8   out if there was a way to salvage it.

9        Q    That has been about three and a half years

10  ago?

11       A    They is three and a half -- yes.

12       Q    Did any of them -- and this was in one

13  meeting?

14       A    I -- I think I had one meeting with Harvey

15  alone, and then I think Harvey and I discussed it

16  would probably be worth it to have these investors

17  together, and we sat -- sit down and strategically

18  come up with a plan of what we potentially can or

19  cannot do.

20       Q    Who was at -- okay.  I'm just trying to

21  understand, I'm sorry.

22       A    Okay.

23       Q    When you're saying you were trying to come

24  up with a plan about what you can and cannot do with

25  Harvey Friedman --

Page 110

1        A    Uh-huh.

2        Q    -- was that at the first meeting or

3    conversation with Harvey Friedman that you had alone,

4    or was that the meeting with everybody?

5        A    I just don't remember.

6        Q    Okay.

7        A    I apologize, I just don't remember.

8        Q    No, it's all right.

9        A    Okay.

10       Q    I'm just trying to understand the

11   evolution --

12       A    Okay.

13       Q    -- of how we got here.

14       A    Okay.

15       Q    You said that after that there was a

16   meeting -- after your initial conversation with

17   Harvey Friedman there was a meeting with

18   Harvey Friedman, Mr. Pfeffer ---

19       A    I think Harvey's wife.  I think Harvey's

20   wife was there.

21       Q    Okay.  Was Mr. Pfeffer's wife there?

22       A    I don't think so.

23       Q    You said -- was it Mr. Yagudaev?

24       A    Yes.

25       Q    Was he there?

1        A     I think he was there for part of the

2   meeting, yes.

3        Q     Was someone there with him or was it just

4   him solo?

5        A     I don't know, I think solo.

6        Q     And I think you said Nathan Kalichman?

7        A     Kalichman.

8        Q     Kalichman?

9        A     Yes, correct.

10       Q     And he was there?

11       A     And he was there.

12       Q     Was anyone else -- was his wife there?

13       A     I think his wife was there.

14       Q     And Mr. or Mrs. Bensimon?

15       A     They were not at that meeting, no.

16       Q     They were not?

17       A     No.

18       Q     So you spoke to them separately?

19       A     I spoke to them separately, yes.

20       Q     Okay.  Do you recall what was discussed at

21   the meeting?

22       A     Again, in real general terms, you know, the

23   status of Elie and not only Landmark, itself, but all

24   of Elie's companies and all his projects.  You know,

25   was there -- was there any chance of saving any of

1  the projects and, you know, holding onto them, and if

2  there was, you know, could they get any money, what

3  was the land worth, could it be sold.

4          You know, they were -- you know, they had

5  invested -- like I said to you, as a group, they

6  invested a lot of money with Elie or Landmark or EB

7  or all his companies, in general, and, you know, they

8  were just trying to figure out how to save it.

9      Q    So these individuals had invested not only

10 with Elie Berdugo with respect to Landmark, but with

11 respect to other projects, as well?

12     A    I believe so, yes.

13     Q    Do you know whether the documents clearly

14 disclose what the money that they provided would be

15 used for?

16     A    I don't know.

17     Q    Do you know if there's anyway to tell from

18 these documents whether the monies went for Landmark

19 or went for some other project of Elie Berdugo's?

20     A    I don't know that.

21     Q    Okay.  Do you know -- were any of the

22 Berdugo family members at this meeting?

23     A    No.

24     Q    Did they know that you were having this

25 meeting?

Page 113

1      A      Probably.  I probably did speak to them,

2   yes.

3      Q      Did they ask you to have this meeting?

4      A      Yeah, I mean, Yogev and I -- Yogev and I

5   were speaking at the time -- I mean, speaking about

6   this kind of stuff at the time, yes.

7      Q      Were you there on behalf of the Berdugo

8   family or were you there to just help out these other

9   folks, these unsecured creditors?

10     A      A little bit of both.

11     Q      Did they talk to you at all about how they

12  could get money from the Berdugo family to recoup

13  some of their loses?

14     A      I don't really remember specific questions.

15  You know, again, like I said to you, it was just a

16  general conversation of how do we, you know, salvage

17  and get out of a bad situation.

18     Q      Did they ask you how much the -- how much

19  money the Berdugo family had?

20     A      Not directly, but, I mean, I think they

21  tried -- they were trying to figure out what was in

22  the estate, you know, if there was any money anywhere

23  else that Elie might have, any other projects, you

24  know, just general.

25     Q      Did you tell them?

1        A      I told them, yeah.

2        Q      Did you have authority to tell them?

3              MR. GIELCHINSKY:  Objection to form, you

4    can answer.

5              THE WITNESS:  I don't know if I have

6    authority.  I mean, you know, they were asking me.  I

7    mean, you know, at the time we were taking -- you

8    know, took them -- took -- put the -- put his estate

9    into probate, so, you know, and they knew that we

10   were involved -- you know, again, the Kodsi Law Firm

11   was involved in representing Elie and his companies,

12   and I think they were just trying to figure out,

13   again, what's up or down.

14   BY MS. SHUMENER:

15       Q      Have you spoken to -- did you have any

16   other conversations with Harvey Friedman after that

17   meeting?

18       A      I don't think so.

19       Q      Did you ever discuss the AmTrust offer with

20   Harvey Friedman?

21       A      No.

22       Q      Did you ever discuss with the unsecured

23   creditors whether any of them were interested in

24   taking over the project and negotiating a deal with

25   AmTrust?

1      A    I might have had that conversation back in

2    '08, but, you know, nobody -- nobody there at the

3    meeting had that kind of capacity or capability.

4      Q    Are any of the unsecured creditors, people

5    who invested with Elie Berdugo, gave him money as a

6    loan, as an investment, whatever, are any of those

7    folks developers?

8      A    I don't think so.

9      Q    Did your father at one point in time,

10   Joseph Kodsi, do a transaction with Elie Berdugo?

11     A    I think they did something back in like

12   1994, they did some stuff.

13     Q    Did they develop a project together?

14     A    No, I think my dad owned some lots and I

15   think Elie built some houses for him.

16     Q    Have you had any conversations with

17   Mr. Pfeffer since that meeting three and a half years

18   ago?

19     A    No.

20     Q    How about with Mr. Yagudaev?

21     A    No.

22     Q    How about with Mr. Kalichman?

23     A    No.

24     Q    How about with Mr. and Mrs. Bensimon?

25     A    No.

Page 116

1        Q    Do you recall what the conversation was

2   with Mr. and Mrs. Bensimon?

3        A    Again, same thing, you know, same thing,

4   sort of what's the situation, what's going to happen,

5   is our money really lost, you know, what can be done.

6        Q    Did you notify any of the unsecured

7   creditors that you were planning to file -- planning

8   to have the debtors file bankruptcy?

9        A    No.

10        Q    Did you notify any of them that you -- that

11   the debtors were contemplating a deal with Terra?

12        A    No.

13        Q    You know, it might help, actually, it might

14   make it a little easier, and I don't know, if you

15   take out Tab 11 from your notebook and then use what

16   I've marked as Exhibit 3, the little notebook, and

17   there won't be any surprise here as to what these

18   are.

19             The notebook contains the schedules of

20   unsecured creditors --

21        A    Okay.

22        Q    -- filed by each of the debtors, so you'll

23   see there are five tabs in Exhibit 3 that correspond

24   to the schedules, and Tab 11 of Exhibit 1 appears to

25   be a list of investors that may correspond to the

1   unsecured creditors.

2           It's very tiny print and I can represent to

3   you, counsel, this is how it was produced to us, so I

4   really can't do much about it.

5           MR. GUSO:  Are you using the words investor

6   generically or ---

7           MS. SHUMENER:  I'm reading it off the

8   document.  For the record, Tab 11 in Exhibit 1 is

9   Bates Labeled TCD-0000733, and it says loan number,

10  investor name, that's how I got the word investors.

11          MR. GUSO:  Thank you.

12  BY MS. SHUMENER:

13      Q   Then the name of the project, and then who

14  it was executed by, then some description, then

15  effective date.  These are the columns on Tab 11 of

16  Exhibit 1.

17          Then the initial loan amount, interest

18  rate, pay rate, pay cycle, maturity date, and loan

19  docs.  Those are the columns at the top.

20          And if you would, Mr. Kodsi, the reason I

21  wanted you to take Tab -- Page 11 out was so that you

22  could at the same time --

23      A   Oh, you want me to take it out, take it

24  out.

25      Q   -- take a look at the -- yeah, if you'd put

1    that big notebook away, we'll put Page 11 back in in

2    a minute, but I think it just might be easier.

3        A    Okay.

4        Q    And then, for the record, we're looking at

5    Tab 1 of Exhibit 3, the document that's -- notebook

6    that's been marked as Exhibit 3, and Tab 1 has been

7    filed with the -- it's a document that was filed with

8    the Bankruptcy Court in this case for Town Center at

9    Doral, LLC, one of the debtors.  It's Document 21

10   filed 10/3/11, that's October 3, 2011, it has 26

11   pages.

12            Do you see that?  It starts with summary

13   of schedules.

14       A    Yes.

15       Q    Okay.  Why don't I start with that.  You

16   can put Tab 11 of Exhibit 1 to the side for just a

17   moment and we'll get to it in a minute because I have

18   a bunch of questions I want to ask you about the

19   schedules.

20            If you'd take a look at Page 1 of the

21   schedule, Tab 1 of Exhibit 3?

22       A    Okay.

23       Q    It's Page 1 of 26.  It says real property.

24   The only property owned by this debtor is its portion

25   of the Landmark project; correct?

Page 119

1      A     Yes.

2      Q     Okay.  Do you see where it says on the

3   first page under assets across from real property,

4   $24,297,300?

5      A     Yes.

6      Q     Do you see that?

7      A     Yes.

8      Q     Where did that value come from?

9      A     Well ---

10     Q     And, frankly, if you turn to Page 2 -- turn

11  to the next page ---

12     A     Sorry, go ahead.

13     Q     No, go ahead.

14     A     No, you were about to say, I'll let you

15  finish.

16     Q     I was going to say, if you turn to the next

17  page, it's listed again as the value of the debtors'

18  interest in the property, referring to that same

19  property, as $24,297,300.

20     A     Right, I believe it came from the public --

21  public records or county assessment value.

22     Q     Oh, the tax assessor?

23     A     Tax assessed value.

24     Q     Do you know whether the tax assessor's

25  value includes improvements?

1    A    It would, yes.  I don't know in this

2  particular case, but, yes, they have a breakdown for

3  land value and improvement value.

4    Q    Is this just the land value shown here?

5    A    I would have to look at the tax assessment

6  to tell you that.

7    Q    Would you turn to Page 4 of 26 of the same

8  document, same schedule, and look at Item -- if you

9  look at the top, it will show you Page 4 of 26.

10    A    Oh, 4 of 26.  Sorry, yeah, yeah, yeah,

11  yeah.

12    Q    Do you see it?

13    A    Yeah, yeah, I got it.

14    Q    That's kind of the best way to refer to it.

15    A    Yeah, yeah, I got it.

16    Q    If you look toward the bottom, Item 21 --

17    A    Uh-huh.

18    Q    -- it says claims against AmT CADC Venture,

19  LLC?

20    A    Yes.

21    Q    And it lists $5 million?

22    A    Uh-huh.

23    Q    What does that refer to?

24    A    That was a counterclaim in the foreclosure

25  action with AmTrust originally, and then it went to

1   the FDIC and AmT, for buying back -- if I remember

2   correctly, they bought -- AmTrust bought back the

3   loan from iStar Financial, and instead of allowing

4   the company to move forward with the project -- I

5   don't know if I said that right.

6          Let me back up.

7     Q    Okay.  Take your time.

8     A    The way -- what happened was, there was a

9   CDD loan or bonds, whatever, and then AmTrust had

10  their mortgage.  And then in late '07, I believe,

11  iStar Financial or Elie secured a loan from iStar

12  Financial to go and get a loan -- to start the

13  construction loan to build what I called before

14  Phase 1, that hundred and seventy townhome section.

15         As part of that loan there was an initial

16  payment to AmTrust, from iStar to AmTrust to release

17  that portion so iStar could get a first mortgage on

18  that portion and move forward.

19         When Elie passed away, AmTrust -- AmTrust

20  came right in and bought the loan back from iStar to

21  consolidate the loan, and then didn't allow any

22  construction to happen.

23    Q    Why did that give the debtors a $5 million

24  claim against AmTrust?

25    A    Well, they had -- they were projected to

Page 122

1  build -- again, those townhomes were pretty much all

2  presold and if they had allowed them to build it,

3  there would have been money there, you know, lost

4  money, lost profits to Landmark.

5      Q    On those presold townhomes, was there any

6  termination date for those contracts?

7      A    I don't remember.  I'm sure there was, I

8  just don't remember it.

9      Q    Did each of those prospective -- did each

10  of those purchasers put up a deposit?

11      A    Yes.

12      Q    Do the debtors have any of those deposits

13  left?

14      A    No.

15      Q    What happened to those deposits?

16      A    They were all refunded back to the buyers

17  or prospective purchasers.

18      Q    Was there ever any discussion with AmTrust

19  about building the homes for the prospective

20  purchasers?

21      A    There was after Elie's death, yes.

22      Q    Who had those conversations?

23      A    I did late -- within a couple of months

24  after Elie's passing with existing employees of

25  Elie's -- you know, EB Developers --

1        Q      Right.

2        A      -- with some of the executives of AmTrust,

3   and they just did not feel comfortable in proceeding

4   with, you know, whoever was left.

5        Q      When did you return the deposits to the

6   prospective purchasers?

7        A      All through the last few years.

8        Q      When you say "the last few years" ---

9        A      From '08 until 2010.  I really don't know,

10  Steve Amster was handling it, so I don't really know,

11  in the last -- last couple of years.

12       Q      When was the bulk of the deposits returned?

13       A      Probably 2009, 2010.

14       Q      Were any deposits returned in 2011?

15       A      I think some in the beginning, but I'm

16  not -- I'm guessing, I really am guessing.

17       Q      No, I don't want you to guess.

18       A      Okay.  Sorry, sorry.  I don't know, I'm not

19  really sure.

20       Q      So the person who would know would be

21  Steve Amster?

22       A      Steve Amster would know better.

23       Q      And so, let me see if I understand, and

24  correct me if I'm wrong, I'm not trying to put words

25  in your mouth.  Is the $5 million claim listed on

Page 124

1    Page 4 of --

2         A    26.

3         Q    -- the debtors' schedule, Page 4 of 26 of

4    the debtors' schedule, Document 21 as filed in the

5    Bankruptcy Court, does that $5 million represent the

6    profits that the debtors expected to receive from the

7    construction of the hundred and seventy homes?

8         A    I don't know.

9         Q    You don't know how that ---

10        A    I mean, I don't remember.

11        Q    Okay.  All right.  Take a look -- if you

12   could turn to Page 9 of 26, and now you can pull out

13   Exhibit -- I mean, Tab 11 of Exhibit 1, and let's see

14   if we can line up some of these folks.

15            Before we do that, taking a look at Tab 11

16   of Exhibit 1, do you know who prepared that document?

17        A    This is Tab 11?

18        Q    I'm sorry.

19        A    Oh, this -- I'm sorry, this one.  Sorry,

20   sorry, sorry.  Yeah, yeah.

21        Q    Just for the record, Tab 11 of Exhibit 1 is

22   TCD-0000733, and it's among the documents that you

23   produced in response to the subpoena that was served

24   in this case.

25            So my question to you, sir, is:  Do you

Page 125

1    know who prepared the document that we'll call Tab 11

2    of Exhibit 1?

3         A    I'm not sure, but I believe Frank DiMarco.

4         Q    Okay.  Do you know when this document was

5    prepared?

6         A    No.

7         Q    Did he prepare this document at your

8    request?

9         A    Counsel's request, my counsel's request.

10        Q    Was this document prepared during the

11   bankruptcy -- during this bankruptcy proceeding?

12        A    Yes.

13        Q    Okay.  I just didn't know if it was

14   historical or ---

15        A    Yeah, I don't know when.

16        Q    All right.  If you would take a look at the

17   first name on Tab 11 of Exhibit 1, there's a loan

18   number, it says 125.

19             Do you know what that represents?

20        A    I do not.

21        Q    Okay.  Do you know Frank Alter?

22        A    I know -- yes.

23        Q    Who is Frank Alter?

24        A    An investor -- one of Elie's investors, but

25   he was introduced to Elie through Nathan Kalichman.

1          Q      Through who?

2          A      Nathan Kalichman.

3          Q      Okay, and if you'd take a look at Page 11

4     of 26 of the schedule filed for Town Center at Doral,

5     and if you take a look at the second entry, you will

6     see an entry for Frank Alter.

7                 Do you see that?

8          A      I see it on -- this one, no?  I see it on

9     Page -- I'm sorry, you said Page 11?

10         Q      Page 11 --

11         A      Yes, yes, yes, yes, yes, I see it.

12         Q      -- of 26.

13         A      Yes, I apologize, yes, I see.

14         Q      That's all right.

15         A      Yes.

16         Q      And it's the second entry --

17         A      Yes.

18         Q      -- second creditor listed, and it's for --

19    also for -- it's for the same million or it looks

20    like it's for the same million as listed on Tab 11 of

21    Exhibit 1; correct?

22         A      Correct.

23         Q      Okay, and in Tab 11 of Exhibit 1, there's a

24    notation next to Frank Alter's million dollar loan

25    that says, interest checks indicate Landmark, no

1   documents link loan to Landmark in file.

2          Do you see that?

3      A    Yes.

4      Q    Have you ever reviewed the loan documents

5   pertaining to Frank Alter?

6      A    No.

7      Q    Do you know what the million dollars was

8   used for?

9      A    No.

10     Q    Do you know who received the million

11  dollars?

12     A    No.

13     Q    Has Frank Alter made any claim in this

14  bankruptcy?

15     A    I don't know.

16     Q    Have you had any conversations with

17  Frank Alter?

18     A    No.

19     Q    Has Frank Alter made any demand for payment

20  on any of the debtors, ever, before the Bankruptcy

21  Court?

22     A    I don't know.

23     Q    It says that, at least in Tab 11 of Exhibit

24  1, it lists a maturity date of September 1, 2010 for

25  this million dollar loan.

Page 128

1          Do you see that?

2     A    Yes.

3     Q    Have you ever seen any document demanding

4  payment for this alleged loan, any letters or

5  anything to the debtors demanding repayment of this

6  loan?

7     A    I don't remember, no.

8     Q    If you take a look next to Frank Alter's

9  name on Exhibit -- Tab 11 of Exhibit 1 under project,

10 it says Landmark, but then in parentheses next to it

11 it says, previously other.

12         Do you know what other project that million

13 dollars might have been used for?

14    A    I do not, no.

15    Q    Did you ever talk with Mr. DiMarco about

16 how he picked who to put on the list of unsecured

17 creditors for the debtors in this bankruptcy

18 estate --

19    A    No.

20    Q    -- estates?

21         Do you know who HD Investments is?

22    A    I believe it stands for Harvey and his

23 wife, whatever her name is, Diane or Deborah or

24 something like that.  I think it's HD Investments ---

25    Q    I thought you were going to tell me Dora?

Page 129

1        A     It could be Dora, something with a D.

2        Q     I don't know, I was just making it up.  Not

3   his middle initial, though?

4        A     No, I don't think so.  I think it's him and

5   his wife's initials.

6        Q     Okay.  If you look on the same page as the

7   schedule filed for this debtor, Document 21, Page 11,

8   it shows a $950,000 loan made November 8, 2004,

9   that's what's listed on the schedule.

10            Do you see that?

11       A     Yes.

12       Q     And it characterizes the loan as

13  unliquidated, do you see, X'd in the column?

14       A     Oh, sorry.  Yes, yes, I see that.

15       Q     Do you know why it's listed as

16  unliquidated?

17       A     No.

18       Q     Do you know what that $950,000 was used

19  for?

20       A     No.

21       Q     Do you know whether it was used at the

22  Landmark project?

23       A     I don't know.

24       Q     It says in Tab 11, Exhibit 1, it says,

25  HD Investments, project Landmark, executed by Elie,

Page 130

1    Town Center at Doral, and then it says assignment of

2    profits and principal guaranteed by Town Center of

3    Doral, LLC.

4                Do you see that?

5         A    Yes.

6         Q    Do you know whether Town Center -- first of

7    all, is there an entity called Town Center of Doral,

8    LLC?

9         A    I don't know.

10        Q    It's at Doral, LLC, isn't it?

11        A    Right.

12        Q    Okay.  It's probably just a typo.

13               Do you know whether Town Center at Doral,

14   LLC, the debtor, or one of the debtors, is a

15   guarantor or a borrower?

16        A    I don't know.

17        Q    Do you know whether it's either, either

18   one?

19        A    I don't know.

20        Q    Frankly, if I ask you questions about these

21   unsecured creditors, you're not going to know any of

22   the answers to these kinds of questions for any of

23   them, are you?

24        A    On that one you're correct.

25        Q    Okay.  So is it correct to say that you did

Page 131

1    not help Mr. DiMarco come up with the list of

2    unsecured creditors?

3        A    That is correct.

4        Q    Have you -- okay.  I know that earlier you

5    had mentioned someone named Bensimon.  If you look at

6    Tab 11 to Exhibit 1, you'll see a Rachel Bensimon,

7    this one?

8        A    Right, right, right.

9        Q    Was she the person at that meeting that you

10   had described?

11       A    No, I believe I spoke to her husband.

12       Q    Going up above, back to the HD Investments

13   loan of 950,000.  If you look across the line of

14   Tab 11 of Exhibit 1, it says maturity date.

15            Do you see that?  It says completion or

16   November 8, 2009?

17       A    I see that.

18       Q    Are you aware of any demands made by HD

19   Investments on any of the debtors for repayment of

20   the $950,000 loan?

21       A    I am not aware.

22       Q    And the next line, the one for Rachel

23   Bensimon, it says maturity date is upon completion.

24            Do you see that?

25       A    Yes.

Page 132

1        Q     Do you know whether Elie Berdugo's

2   agreement with Rachel Bensimon was to repay her

3   quote, unquote, "loan," only if the project was

4   completed?

5        A     I don't know.

6        Q     Did you have any discussion with her to

7   find out?

8        A     No, not on that, not on that matter.

9        Q     What services are you rendering to the

10  debtors in the bankruptcy, other than sitting here at

11  your deposition?

12       A     You can read my answer.  Going through all

13  of this.  I don't know, preparing documents, going to

14  the hearings, discussing, you know, how to put a plan

15  together, going to the CDD board meetings, you know,

16  everything and anything that is involved in the

17  bankruptcy matter.

18       Q     Have you prepared any documents for the

19  bankruptcy?

20       A     No.

21       Q     For the debtors in the bankruptcy.  You

22  understood what I was saying.

23             Have you prepared any documents for the

24  debtors to be used in this bankruptcy proceeding?

25       A     No.

1     Q    Have you -- the documents that were

2  produced in response to the subpoena served on you in

3  this bankruptcy case, who gathered those documents

4  together?

5     A    I'm not sure, probably between

6  Frank DiMarco and whatever documents we might have

7  had -- when I say we, Kodsi Law Firm might have had,

8  you know, in our office.

9     Q    Who at Kodsi Law Firm gathered these

10 documents together?

11    A    Steve Amster, primarily, I mean, he

12 controls those files.

13    Q    Do you have any documents at home regarding

14 this matter?

15    A    No.

16    Q    Do you have an office other than at Kodsi

17 Law Firm?

18    A    No.

19    Q    So do you run your other company -- I'm

20 sorry, what is the name of your other company?

21    A    Ark Loan Solutions?

22    Q    Yes.

23    A    That's -- that's, yes, it's out of the same

24 office.

25    Q    It's at the Kodsi Law Firm, same address?

1      A    Same address, yes.

2      Q    Do you have like a different office marked

3 for --

4      A    Yes.

5      Q    -- your Ark company?

6      A    Yes.

7      Q    Do you have two offices in that building?

8      A    Two suites, yes.  Yes, two offices, yes.

9      Q    Oh, so you have a separate suite for Ark --

10 for your Ark company than you do for the Kodsi Law

11 Firm?

12      A    Correct.

13      Q    Do you have an office, you, personally have

14 an office in the Kodsi Law Firm?

15      A    No.

16      Q    Okay.

17      A    It's all mixed today, it's a little -- it's

18 a little -- I'm not trying to be vague, it's mixed up

19 today, so ---

20      Q    Who pays the rent for the -- for Ark?

21      MR. GIELCHINSKY:  Object to form, you can

22 answer.

23      THE WITNESS:  You've got to ask my

24 bookkeeper, I really don't know.

25 BY MS. SHUMENER:

```
 1      Q    Does the Kodsi Law Firm pay the rent for
 2  Ark?
 3           MR. GIELCHINSKY:  Same objection, you can
 4  answer.
 5           THE WITNESS:  No.  I don't really know.  I
 6  really don't know.
 7  BY MS. SHUMENER:
 8      Q    Have you ever spoken to Carla Pfeffer?
 9      A    I don't think so.
10      Q    Have you ever spoken to Mark Finkelstein?
11      A    No.
12      Q    Is the person that you said -- called
13  Yagudaev, is that Elya Yagudaev?
14      A    Yes, I believe so.
15      Q    He's also listed on Tab 11 of Exhibit 1, do
16  you see that, Loan Number 248?
17           Do you see that?
18      A    Yes.
19      Q    Do you know -- there's a listing at the
20  very bottom of Tab 11 of Exhibit 1 for Copper Group,
21  it looks like Roman Numeral I, LLC.
22           Do you see that?
23      A    Yes.
24      Q    Who is Copper Group I, LLC?
25      A    I don't know.
```

Page 136

1        Q     Do you know -- do you know anything about

2   that company at all?

3        A     No.

4        Q     So you don't know who operates it?

5        A     I don't know.

6        Q     What their business is, nothing; correct?

7        A     Nothing.

8        Q     Do you have any understanding of what

9   payments are required under the Copper Group I, LLC

10   $8.5 million loan?

11        A     No.

12        Q     Do you know whether that loan was actually,

13   you know, funded with cash, you know, paid to the

14   debtors?

15        A     I have no idea.

16            MR. GIELCHINSKY:  Would you like to take a

17   break?

18   BY MS. SHUMENER:

19        Q     Let me just ask you one more question and

20   then we'll take a break --

21        A     Okay.

22        Q     -- so that your skin color gets pale again.

23            On Page 9 of 26 of the schedule, it

24   lists -- you can see the third unsecured creditor

25   listed is Copper Group I, LLC, and it lists a loan

1    for 8,500,000, it calls the loan unliquidated.

2            Do you know why --

3    A    No.

4    Q    -- it was listed as unliquidated?

5            Does that address look familiar to you at

6    all, 752 Pacific Street --

7    A    No.

8    Q    -- Brooklyn, New York?

9    A    No.

10            MS. SHUMENER:  Why don't we take a break.

11            (Thereupon, a brief recess was taken, after

12        which the following proceedings were had:)

13            MS. SHUMENER:  Let's go back on the record,

14    please.

15    BY MS. SHUMENER:

16    Q    I think I asked you a bunch of related

17    questions, but I don't think I asked you this one

18    question.  I suspect I know the answer, but I'll ask

19    it anyway.

20    A    Go ahead.

21    Q    Did you speak with Guila Berdugo about

22    filing bankruptcy for these debtors before the

23    bankruptcies were filed?

24    A    I spoke to her son, so, no, not to her

25    directly.

Page 138

1     Q    Okay.  Would you be in breach of your

2  agreement with Terra if you supported a plan with a

3  different sponsor?

4          MR. GUSO:  Objection to form.

5          THE WITNESS:  I would have to go back and

6  read my own agreement.

7  BY MS. SHUMENER:

8     Q    But you might be?

9     A    I think so.  I think -- I think so, I would

10 be.

11    Q    Okay.  Earlier, and you can tell I get

12 sidetracked sometimes, did you notice?

13         Earlier when I had asked you who you had

14 spoken with at Terra other than counsel, you had

15 mentioned four people to me, Brian Pearl, David

16 Martin, Pedro Martin and Adam Adler; correct?

17    A    Correct.

18    Q    Anyone else at Terra that you've spoken to?

19    A    No.

20    Q    Okay.  I believe you testified that you had

21 one meeting with David Martin for breakfast at the

22 Iceberg?

23    A    Icebox.

24    Q    Icebox, and then you had two additional

25 meetings with David Martin and Brian Pearl where your

1    fees were discussed; correct?

2         A    Yes.

3         Q    Anything else that you and Brian Pearl and

4    David Martin discussed in those two other meetings?

5         A    Pertaining to Landmark or in general?

6         Q    Let's start with Landmark and go to in

7    general.

8         A    Okay.

9         Q    Okay.

10        A    Landmark, no, just, you know, whether to

11   put it into bankruptcy.  You know, sort of a couple

12   of guys in a room that don't really know much about

13   bankruptcy talking about bankruptcy, but talking

14   about bankruptcy, you know, whether to reorganize,

15   or, you know, do a liquidation sale, or, you know,

16   just sort of discuss some strategy about it.

17             We briefly touched upon, you know, if he

18   took over the project or whatever, what he would

19   build there.  Discussed briefly, you know, who the

20   players were today in the game, and meaning that we

21   were aware that the bonds were purchased by another

22   group, that the original bondholders are not the

23   bondholders any longer.

24             We discussed that AmTrust today was also

25   not AmTrust and that it was another group of

Page 140

1   investors that had bought the debt, you know, or the

2   loan, the AmTrust loans.

3           That was really it.  So, you know, we were

4   just sort of talking generally of, you know, there

5   were other unsecured creditors, who else was out

6   there, you know, what information did I have in my

7   possession of potential site plans, whether the

8   approvals were still in good standing, you know, just

9   general -- general -- a little bit about bankruptcy

10  and a little bit about, you know, the structure,

11  not -- the deal itself, what was out there, what was

12  going on, that's it.

13      Q    Did you discuss whether Terra -- whether

14  the bankruptcy plan would involve Terra buying the

15  property, as opposed to the membership interest in

16  the debtors?

17      A    It was discussed briefly.

18      Q    What did you guys discuss about that?

19      A    I think they had mentioned -- David, I

20  think, had mentioned he's involved in some other real

21  estate deals that involve bankruptcy or something,

22  and I think on those deals they had done a forced --

23  again, I'm -- forgive me on the terminology, but I

24  think a forced liquidation sale or something, or

25  maybe he would step in as a stalking horse, going

1    down that path, you know, just again, a couple of

2    guys that really don't know much about bankruptcy.

3         Q    Well, you said that he had been through at

4    least one other bankruptcy?

5         A    I believe that's what he had told me, yes.

6         Q    Did he tell you -- what did he tell you

7    about stalking horse bids?

8         A    General information, I think that they have

9    the right to bid, and if somebody outbids them or

10   something, they have the right to counter the bid or

11   something like that.  I really -- I apologize, I

12   really don't remember too much, I didn't really

13   retain that information.

14        Q    Did you discuss -- at that meeting, though,

15   did you discuss the possibility of Terra buying the

16   membership interest?

17        A    I -- I don't remember if it was -- in the

18   first meeting or just in the meetings combined.

19        Q    Combined meetings.

20        A    Yeah, I think it was -- you know, we had

21   discussed both concepts, but really that's when we

22   sort of came to the conclusion that the two of us

23   talking was sort of pointless, and that it was time

24   to really discuss it with bankruptcy counsel and let

25   counsel give us, you know, the better opinion or more

Page 142

1  direction to which way would be better for us.

2      Q    I don't want to go into discussions with

3  counsel --

4      A    No, no, no, I'm just ---

5      Q    -- so let me --

6      A    My point is ---

7      Q    -- take the period before.

8      A    It was before.  My point is, we came to a

9  conclusion that talking too much between us was sort

10  of pointless, what we really need to do is, you know,

11  seek counsel and go down that route.

12      Q    Did you talk about the fact that it might

13  be better for Terra to purchase the membership

14  interest so that there wouldn't be a bidding process?

15      A    No, I think -- I'm confusing -- I don't

16  know if it happened after my meeting with counsel,

17  you know, or before, but I think we had some

18  discussion that if we did a liquidation that the

19  bondholders would be able to do a credit bid up to

20  the full amount of the loan or something, and,

21  therefore, they would not be able to buy it or

22  something.

23          You know, so I think we thought that

24  reorganization was just a better avenue.

25      Q    When you say, "they would not be able to

Page 143

1    buy it," you mean Terra would not be able to buy it?

2         A    Meaning -- right.  Terra, right, if they

3    had stepped in potentially in the stalking horse

4    position.

5         Q    Did you ever determine whether the debtors

6    would get more out of a sale for which bidders could

7    come, a sale of the property at which bidders could

8    come?

9              MR. GUSO:  Object to the form.

10   BY MS. SHUMENER:

11        Q    Did you ever discuss whether you should do

12   a 363 sale of the property so that people could bid

13   for the property?

14             MR. GUSO:  Object to the form.  Do you mean

15   with Mr. Martin?

16             MS. SHUMENER:  With Mr. Martin -- I'm

17   sorry, with Mr. Martin and Mr. Pearl.

18             MR. GUSO:  Thank you.

19             THE WITNESS:  I don't know -- you know, the

20   363 part, I don't know if we actually discussed it

21   by -- by name that way.  I think it was, I don't

22   know, just brought up and I thought -- I think they

23   felt that, you know, that that was not the right way

24   to go.

25             I don't remember what really made us

Page 144

1  decide one way or the other.

2  BY MS. SHUMENER:

3      Q    Did you discuss with David Martin and

4  Brian Pearl why they wanted the Landmark project

5  given that they already owned land nearby in which

6  they were building townhomes?

7      A    That's actually exactly why they wanted the

8  land, because they were building in that area and

9  they know the area, they know the community, they

10 know the -- they know the demand of the buyer and the

11 consumer there.  They're well established in the

12 city, well respected in that city.

13     Q    They haven't built any townhomes yet on any

14 of their land in Doral, have they?

15     A    Incorrect, they built either one or two --

16 I don't know if they call if one or two communities,

17 but I think they built over 200 units during the

18 worst time ever.

19     Q    And they have -- don't they have three

20 projects in Doral?

21     A    I don't know what they have today.

22 Actually, that's not true.  I'm aware of one, I

23 believe they're involved in the Fontainebleau

24 project.

25     Q    Is that the project that's built out?

Page 145

1        A    I don't know.  No, I don't think so.

2        Q    You said you also had discussions with

3  Adam Adler; is that correct?

4        A    He was in the room with us.

5        Q    Oh, so the discussions you had with

6  Brian Pearl and David Martin, also Adam Adler was

7  there, as well?

8        A    Correct, correct.

9        Q    And was Pedro Martin in those meetings?

10       A    He was in -- he was in one of the

11  meetings --

12       Q    Oh, okay.

13       A    -- but briefly, he just sort of came in

14  for, you know, hi, how are you kind of thing.

15       Q    Before those meetings have you ever had any

16  discussions with Pedro Martin?

17       A    No.

18       Q    Had you ever met him?

19       A    Yes.

20       Q    When did you meet him?

21       A    I met him, again, in -- wow, I don't know

22  when I met him.  I don't remember when I met him, but

23  I would say years in advance, somewhere between 2006

24  and 2008.

25       Q    And was it just social or was it business?

Page 146

```
 1        A    I think the first time I met him it was all
 2    business, it was all business.
 3        Q    And what was it about?
 4        A    Other land, other land in Downtown Miami,
 5    about -- I think after Elie's death, pertaining to
 6    Landmark again.
 7        Q    So after Elie's death you had a meeting
 8    with Pedro Martin?
 9        A    Yes.
10        Q    Just you and he?
11        A    No, him and me and David, and again, Pedro
12    attended -- or both of them, actually, I think I met
13    with both of them actually that one time.
14        Q    So are you talking about the breakfast
15    meeting you met with Pedro?
16        A    No, no, I'm talking about three or four
17    years ago, I'm talking a long time ago.
18        Q    Oh, you're ---
19        A    I'm sorry, you're mixing -- you asked me --
20    you asked me -- well, hold on.  The question was have
21    I ever met Pedro Martin, and the answer is, yes,
22    years ago.
23        Q    I apologize.  So, after Elie Berdugo died,
24    in 2008 --
25        A    Yes.
```

1      Q      -- you had a meeting with Pedro Martin and

2  David Martin?

3      A      Yes.

4      Q      And what did you and they discuss at that

5  meeting?

6      A      At that time Elie had three projects in

7  Doral, and they wanted to see if Elie's company,

8  perhaps, needed help, or how could they step in and

9  take over these projects and continue in operating

10 them and, you know, completing those projects, and

11 Landmark was one of those three.

12     Q      And why -- and did you have more than one

13 conversation or just one conversation?

14     A      I don't remember.

15     Q      And why didn't it go anywhere?

16     A      Pricing, values, banks, foreclosures, just

17 a bunch of reasons.

18     Q      Pricing, values, banks, foreclosures of

19 what?

20     A      The banks that owned -- had the debt on

21 those properties or projects, other projects I'm

22 mostly talking about, whether or not they wanted

23 anybody to come in and buy them out and step in --

24 you know, step in or buy them out, you know.

25     Q      Did David Martin and Pedro Martin talk to

Page 148

1    you about maybe putting the debtors into bankruptcy

2    at that point for the Landmark project?

3         A    No.

4         Q    Did they talk to you at all about putting

5    any of the other Berdugo entities into bankruptcy at

6    that point?

7         A    No.

8         Q    Which other projects besides Landmark was

9    discussed at that meeting?

10        A    I don't know the corporate name, but I

11   believe the project name was a project named

12   Promenade Shores, and another project named Promenade

13   Lakes.

14        Q    Are both of those in Doral?

15        A    They are both in Doral.

16        Q    And are those the ones that Lehman is

17   working on now or no?

18        A    No.

19        Q    Okay.  Where did you meet with David Martin

20   and Pedro Martin in 2008?

21        A    At their offices.

22        Q    Did they call you or did you call them?

23        A    I don't remember.

24        Q    Where were their offices?

25        A    Brickell.

1     Q    Is that a street?

2     A    Yes, sorry.

3     Q    In what city?

4     A    Miami, Downtown Miami.  I'm sorry, Downtown

5   Miami, I apologize.

6     Q    That's all right.  Probably everybody else

7   in this room knew what you were talking about other

8   than me and your counsel, who is also not originally

9   from here.

10         MR. GIELCHINSKY:  No, I know where it is.

11         MS. SHUMENER:  Thanks, rub it in.

12         THE WITNESS:  His office is on Brickell.

13   BY MS. SHUMENER:

14     Q    Did you just have one meeting with Pedro

15   and David Martin at that time, in that time period,

16   that 2008 time period?

17     A    No, probably a couple meetings, but, again,

18   it wasn't just Doral, it was just everything that was

19   happening around us here, here in Miami.

20     Q    Why would they talk to you about everything

21   that's happening around us here?

22     A    Other projects that I was involved in, my

23   family was involved in, other projects they were

24   involved in, just different things.  I mean, we're

25   both from Miami, both in the same business, same

Page 150

1  industry.

2       Q     Are you competitors?

3       A     I assume some -- certain days we are.

4       Q     So they called you up in 2008 or you called

5  them in 2008, to discuss the business world in

6  general as far as real estate development goes?

7       A     Correct.

8       Q     And you had never met them before?

9       A     Oh, no, I think I -- I knew David, I knew

10  David socially.

11       Q     Oh, okay.

12       A     Right.

13       Q     All right.

14       A     I knew David socially.

15       Q     How did you meet David?

16       A     Through my friend, Greg Mirmelli.

17       Q     Oh, okay.

18       A     And my brother knows him, so again, my

19  brother knows him, Greg knows him and eventually I

20  met him.

21       Q     Does your brother do any work with

22  David Martin?

23       A     No.

24       Q     This is purely a social relationship?

25       A     Yes.

```
 1        Q     What is Brian Pearl's role in Terra?
 2        A     I don't know.
 3              MR. GIELCHINSKY:  Object to the form.
 4              MR. GUSO:  Join.
 5              MS. SHUMENER:  Huh?
 6              MR. GUSO:  Join, and asked and answered.
 7   BY MS. SHUMENER:
 8        Q     What is Adam Adler's role in Terra?
 9              MR. GIELCHINSKY:  Object to form.
10              THE WITNESS:  I don't know.
11   BY MS. SHUMENER:
12        Q     Okay.  Did Adam Adler ever give you his
13   business card?
14        A     I don't think so.
15        Q     Did he ever tell you what his job functions
16   were?
17        A     No.
18        Q     Did he ever tell you why he was at the
19   meeting?
20              MR. GIELCHINSKY:  Object to form.
21              THE WITNESS:  No.
22   BY MS. SHUMENER:
23        Q     Just to be clear, there were one or two
24   meetings at which Brian Pearl, David Martin,
25   Adam Adler were all present, and at one of those
```

Page 152

1    meetings Pedro Martin stepped in; is that correct?

2        A    Yes.

3        Q    And those two meetings were meetings that

4    took place in 2011 around March, April or later?

5        A    I'll say -- I do not remember, between

6    March, April and July, August.

7        Q    And was it before the debtors' signed

8    resolutions that reference -- well, we're almost

9    done.

10           If you can put Tab 11 back into Exhibit 1,

11   please?  No, that goes in here.

12       A    I know.

13       Q    Yep.  After you do that and you close that

14   tab, if you could turn to Tab 24 of Exhibit 1, and

15   Tab 24 of Exhibit 1, for the record, is a document

16   titled unanimous written consent of the sole member

17   and manager of Landmark at Doral East, LLC, Bates

18   Labeled TCD-0000812 through TCD-0000813, and if

19   you'll notice that the first paragraph, it says,

20   "Resolve that it is desirable and in best interest of

21   the company, its creditors, members, and other

22   interested parties, that the company file for

23   voluntary relief under the Bankruptcy Code."

24           Do you see that?

25       A    Yes.

Page 153

1       Q    Okay.  Was this unanimous written consent

2   of the sole member and manager of Landmark at Doral

3   East, LLC signed after your meetings with Terra?

4       A    I just don't remember.

5            MR. GIELCHINSKY:  There's a date.

6            THE WITNESS:  No, I see the date.  No, I

7   see it.  I don't know -- I don't remember if I met

8   with -- I might have had my initial breakfast meeting

9   with David.  You know, I just don't remember, I just

10  don't remember the timing.

11           Definitely after -- definitely probably

12  after the first -- my first breakfast meeting,

13  after I knew or understood that David was

14  interested in Landmark.

15  BY MS. SHUMENER:

16      Q    So was it after that meeting, that first

17  meeting with David Martin at the Icebox --

18      A    Uh-huh.

19      Q    -- that you decided it would be in the best

20  interest of the debtors to file bankruptcy?

21      A    I -- yeah, I think after that meeting,

22  after that conversation, that it seemed like that was

23  the path we were going to take.

24      Q    Did you ever introduce Yogi Berdugo to

25  David Martin?

Page 154

1      A     No.

2      Q     Did I say something wrong?

3      A     Yeah, Yogev.

4      Q     Yogev.  What did I say, Yogi?

5      A     Yeah.

6      Q     I have a friend I call Yogi --

7      A     Oh, okay.

8      Q     -- that's why I did that, sorry.  Yogev.

9            Did you ever introduce Yogev Berdugo to

10    Brian Pearl?

11     A     No.

12     Q     Did you ever introduce Yogev Berdugo to

13    Pedro Martin?

14     A     No.

15     Q     Did you ever introduce Yogev Berdugo to

16    Adam Adler?

17     A     No.

18     Q     I'm not sure if I asked you this question,

19    so I'll ask it again.

20           Did you tell Yogev Berdugo that you were

21    getting a hundred and fifty thousand dollar success

22    fee for doing the Terra deal?

23     A     Yes.

24     Q     Did you tell him that you were getting a

25    hundred thousand dollars in $10,000 a month

Page 155

1  installments for doing the Terra deal?

2      A    I told him the amount, I don't believe I

3  told him the breakdown, but, yes.

4      Q    Did you give him a copy of your contract

5  with Terra?

6      A    I don't think so.

7      Q    Did you file a copy of your contract with

8  Terra in the probate estate?

9      A    Did I file a copy of my contract with Terra

10  in the probate estate?

11     Q    Yes.

12     A    No.

13     Q    Did Mister -- do you know if Mr. Amster

14  notified the probate estate of the -- of your

15  contract with Terra?

16     A    I don't know.

17     Q    If I asked you this, I apologize.

18          Do you have any arrangement or agreement

19  with Yogev to split any of the fees with him?

20     A    You asked me that, and the answer was no.

21     Q    That's what I thought.  I wasn't sure.

22     A    That's okay.

23          MS. SHUMENER:  I don't believe I have any

24  further questions for you at this time.  I know that

25  you folks had discussed that we reserve the right to

1  depose you again for purposes of the confirmation

2  hearing, and I want to just add a little qualifier to

3  that because I believe that we should have received

4  the contracts that we were talking about regarding

5  your fees for this deposition, and we didn't, so I am

6  clarifying for the record that we will reserve the

7  right to ask you questions about those contracts and

8  the term sheet.

9            THE WITNESS:  Hmm?

10           MS. SHUMENER:  He's telling you not to say

11  anything.  Counsel is telling you not to say

12  anything.

13           THE WITNESS:  No, I realize there wasn't a

14  question, so ---

15           MS. SHUMENER:  And he's saying it really

16  quietly so we can't hear him.

17           THE WITNESS:  Well, you didn't ask a

18  question, you made a statement so ---

19           MS. SHUMENER:  Right.  Thank you.  Nice to

20  meet you.

21           THE WITNESS:  Okay.  Am I done or ---

22           MR. GUSO:  I have a few questions.  Do you

23  have any questions?

24           MS. REDMOND:  No, I have no questions.

25           MS. SHUMENER:  Then I might ask you follow

1    up, but go ahead.

2              MR. GUSO:  Thank you.

3                    CROSS EXAMINATION

4    BY MR. GUSO:

5        Q    You testified that you were appointed as

6    vice-president of the debtors, in part, because as

7    between you and Mr. Yogev Berdugo you would do better

8    in a deposition; is that correct?

9        A    Yes.

10       Q    How long have you known Mr. Yogev Berdugo?

11       A    I've known him since 1994.

12       Q    Do you know what Yogev does for a living?

13       A    Today he is a -- runs a basketball camp and

14   does some private coaching, basketball coaching --

15       Q    Prior to his father's ---

16       A    -- or training.

17       Q    Sorry, I thought you were done.

18       A    That's okay, no problem, I just had the

19   wrong terminology, private training.

20       Q    Prior to his father's passing, what

21   involvement, if any, did Yogev have with the debtors?

22       A    Absolutely none.  Yogev, I believe after

23   college, moved to Israel and was working in Israel.

24       Q    Prior to his father's passing, was Yogev a

25   member of any of the debtors?

1          A    No.

2          Q    Prior to his father's passing, was Yogev an

3     officer of any of the debtors?

4          A    No.

5          Q    Prior to his father's passing, was Yogev an

6     employee of any of the debtors?

7          A    I don't know.  I don't think so, but I

8     don't know.

9          Q    To your knowledge, prior to his father's

10    passing, was Yogev involved in any way in the

11    day-to-day management of the debtors?

12         A    No.

13         Q    Prior to his father's passing, was Yogev

14    involved in any way in making decisions for the

15    debtors?

16         A    No.

17         Q    As between you and Yogev, who is

18    more familiar with the debtors' assets and

19    liabilities?

20              MS. SHUMENER:  I'm going to -- I'm going to

21    object, lack of foundation for the last two

22    questions, but you said them so fast I couldn't ---

23              MR. GUSO:  Lack of foundation?

24              MS. SHUMENER:  Uh-huh.

25              MR. GUSO:  Okay.

Page 159

1    BY MR. GUSO:

2        Q    You can answer the question.

3        A    I presume I knew more -- I knew more than

4    he did.

5        Q    As between you and Yogev, who, in your

6    view, has more experience in real estate development?

7             MS. SHUMENER:  Objection, lack of

8    foundation.

9    BY MR. GUSO:

10       Q    You can answer.

11       A    I do.

12       Q    Did any of the factors that I just

13   identified or walked through in your questioning,

14   play any role in the decision to appoint you as

15   vice-president of the debtors?

16            MS. SHUMENER:  Objection, lack of

17   foundation.

18   BY MR. GUSO:

19       Q    You can answer.

20       A    Yes.

21       Q    Which ones?

22       A    Sort of all of them.

23       Q    You were asked a series of questions about

24   your compensation.  What role, if any, did Yogev have

25   in approving your compensation?

Page 160

1       A     We just had a discussion and he felt it was

2  okay and it was fair, you know.

3       Q     Did he approve your compensation?

4       A     Verbally, yes.

5            MR. GUSO:  No further questions.

6                  REDIRECT EXAMINATION

7  BY MS. SHUMENER:

8       Q     How old is Yogev Berdugo?

9       A     I believe he's about -- less than 30,

10 somewhere between 20 -- I think around 27, 28, maybe,

11 I'm not sure today, maybe 30, maybe tops is 30.

12      Q     How old was he when you asked him whether

13 he approved of your compensation?

14      A     It was only a few months ago, so six months

15 younger.

16      Q     And you didn't ask his mother whether she

17 approved of your compensation; correct?

18            MR. GUSO:  Objection.

19            THE COURT REPORTER:  I'm sorry?

20            THE WITNESS:  I didn't say anything, I

21 didn't say anything.

22            MR. GUSO:  Go ahead, I'll withdraw the

23 objection.

24            THE WITNESS:  Again, I did not speak to

25 her.

1  BY MS. SHUMENER:

2      Q    And you didn't speak to his older sister to

3  see if she approved of your compensation; correct?

4          MR. GUSO:  Objection, lack of foundation,

5  and it assumes facts not in evidence that consent is

6  required.

7          THE WITNESS:  Am I allowed to answer?

8  BY MS. SHUMENER:

9      Q    You are allowed to answer.

10     A    No, I did not speak to her.

11     Q    Did you advise Yogev Berdugo that he should

12 check around to see if there are other people equally

13 or better qualified than you to fulfill the role that

14 you're fulfilling in this bankruptcy?

15         MR. GIELCHINSKY:  Objection to form, you

16 can answer.

17         THE WITNESS:  No, I did not make that

18 statement.

19 BY MS. SHUMENER:

20     Q    Did you -- did you tell Yogev Berdugo ---

21     A    What's that?  Sorry.

22     Q    Did you tell Yogev Berdugo exactly what

23 functions you would be performing for $250,000?

24     A    Not specifically, because I was not aware

25 of it myself.

Page 162

1          MS. SHUMENER:  No further questions.

2          THE WITNESS:  Can I leave now?

3          MS. SHUMENER:  Depends on ---

4          MR. GUSO:  No further questions.

5          MS. REDMOND:  Do you want to read?

6          MR. GIELCHINSKY:  The witness will read.

7          (Thereupon, reading, signing and notice of

8     filing were not duly waived, and the deposition

9     was adjourned at 2:25 p.m.)

10

11

12

13                         _____

14        Sworn to before me this _____day of        Witness
     _____, 2012.

15

16

17                         _____
                                          Notary Public
     My Commission Expires:

18

19

20

21

22

23

24

25

Page 163

```
 1
 2                    CERTIFICATE
 3   STATE OF FLORIDA )
 4   COUNTY OF DADE   )
 5                   I,  Margaret Franzen, Notary  Public
 6   for the State of Florida at Large, do hereby certify
 7   that  I  reported  in  shorthand  the  Deposition of
 8   ISAAC KODSI,  the  witness  herein;  that  the said
 9   witness was first duly sworn  by me;  and that the
10   foregoing  pages,  numbered   from  1  to  162,
11   inclusive, constitute a true record thereof.
12                   I  further  certify  that I am not of
13   counsel, I  am  not  related  to nor employed by any
14   attorney in this case, nor financially interested in
15   the outcome thereof.
16                   Dated at Miami, Dade County, Florida,
17   this 16th day of January, 2012.
18
19
20
21   My Commission Expires:      _____
     April 14, 2014                 Margaret  Franzen
22                                   Notary  Public
                                     STATE OF FLORIDA
23
24
25
```

Page 164

```
 1        OUELLETTE & MAULDIN COURT REPORTERS, INC.
                  28 WEST FLAGLER STREET
 2                        SUITE 808
                   MIAMI, FLORIDA 33130
 3              PHONE:  (305) 358-8875

 4

 5  January 16, 2012

 6  Mr. Isaac Kodsi
    C/O Bilzin Sumberg Baena Price & Axelrod
 7  Mr. Daniel Gielchinsky, Esquire
    1450 Brickell Avenue
 8  Suite 2300
    Miami, Florida  33131

 9

    IN RE:  TOWN CENTER AT DORAL, LLC, et al.
10          DATE TAKEN:  January 12, 2012

11  Dear Mr. Kodsi:

12            Please be advised that your deposition taken
    in the case and on the date described above has been
13  transcribed and is ready for your review.  Please
    contact us for an appointment to read and sign this
14  deposition at your earliest convenience.
              The transcript will be sent to counsel with
15  or without your signature in 30 days or at the time
    of trial, whichever comes first.
16            Our office hours are 9:00 a.m. to 4:30 p.m.,
    Monday through Friday.
17            If you have any questions regarding this
    matter, please feel free to contact us at the above
18  number.

19
                        Sincerely,
20

21
                        _____
22                      Margaret Franzen, Court
                        Reporter and Notary Public
23

24

25
```