UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 11-35884-RAM |
| Town Center at Doral, LLC, et al.,[1] | Chapter 11 |
|            Debtors. _____/ | (Jointly Administered) |

**JOINT REPLY BY DEBTORS AND TERRA LANDMARK LCC
TO JOINT OBJECTION TO
<u>DISCLOSURE STATEMENT AND CONFIRMATION</u>**

TOWN CENTER AT DORAL, LLC, LANDMARK AT DORAL EAST, LLC, LANDMARK AT DORAL SOUTH, LLC, LANDMARK AT DORAL DEVELOPERS, LLC, AND LANDMARK CLUB AT DORAL, LLC (the "<u>Debtors</u>"), and TERRA LANDMARK LLC ("<u>Terra</u>" and together with the Debtors, the "<u>Plan Proponents</u>") by and through undersigned counsel, hereby file this reply (the "<u>Reply</u>") to the *Joint Objection to Disclosure Statement and Confirmation* [ECF No. 169] (the "<u>Objection</u>")[2] filed by Landmark at Doral Community Development District (the "<u>District</u>"), U.S. Bank, N.A., as indenture trustee (the "<u>Indenture</u>

---

[1] The last four digits of each Debtors' tax identification number are: (i) Town Center at Doral, LLC [1866]; (ii) Landmark at Doral East, LLC [6616]; (iii) Landmark at Doral South, LLC [6676]; (iv) Landmark Club at Doral, LLC [6797]; and (v) Landmark at Doral Developers, LLC [6762]. The Debtors' mailing address is 701 W. Cypress Creek Road, Suite 303, Fort Lauderdale, Florida 33309.

[2] The Debtors reserve any and all rights to respond to each of the various objections set forth in the Objection and will respond as necessary at the hearing upon the Disclosure Statement (defined herein) or at confirmation, as the Debtors deem appropriate. In the interests of brevity and expedience, the Debtors have elected to restrict this Reply to the legal issues raised in the Objection, as the Debtors believe doing so conserves the Court's resources and is particularly appropriate given the compressed timeframe for the Court's consideration of the Objection and this Reply.

Trustee"), and Florida Prime Holdings, LLC (the "Bondholder", and collectively with the District and the Indenture Trustee, the "Objectors") and respectfully respond as follows:

**PRELIMINARY STATEMENT**

The legal issues raised by the Objectors to confirmation of the Plan as a basis to deny approval of the Disclosure Statement do not constitute a valid legal basis to deny approval of the Disclosure Statement. Nonetheless, the Plan Proponents intend to amend the Disclosure Statement to clarify certain of the issues raised in the Objection and to include modifications which are the subject of ongoing discussions between the Debtors, the Committee and Terra, as Plan sponsor.

First, sovereign immunity does not bar the restructuring of the Debtors' obligations to the District in a case under chapter 11; moreover, the District is not the type of governmental entity which has standing to raise, and have the protections of, sovereign immunity. Even if the District had the benefit of sovereign immunity, the Bankruptcy Court's *in rem* jurisdiction over the Debtors' Property and the claims of the Debtors' creditors against such Property trumps any allegation of sovereign immunity under Article I of the U.S. Constitution. A final death knell for any assertion of sovereign immunity is the District's consent to Bankruptcy Court jurisdiction through its active participation in these cases.

The Rooker-Feldman Doctrine is not implicated, as the Final Judgment that validated the issuance of the Series 2006 Bonds and the authority of the District to issue them is not disturbed through a restructuring of the special assessment obligations due to the District. Nothing in the Plan affects the priority of the special assessment obligations due the District, as $20 million is being invested as equity by Terra for the development of the Property.

The Plan does not require the Court to substitute its judgment for the legislative determinations that various city, county, and state agencies may make in connection with the development of the Property. Changes in the development plans that are within the purview of these agencies will remain subject to the approval of these agencies. Nothing in the Plan alters or supersedes the development approvals required by applicable non-bankruptcy law. The restructuring contemplated by the Plan does not require the Court to substitute its judgment for that of these agencies with respect to any aspect of the development plans, but only to set the amount of the District's secured claims and approve the repayment of the secured claims, tasks routinely undertaken by bankruptcy courts.

Other arguments made by the Objectors are equally unavailing. Contrary to the Objectors' position, existing case law does permit the bifurcation of liens and the substitution of separate collateral for a single collateral package, so long as the Plan provides the creditor with the indubitable equivalent of its lien. Neither the Debtors nor any principal of or related parties to the Debtors are retaining equity, which renders the Courts' decisions in *LaSalle* and *Global Ocean* inapplicable. The alleged impact on the public finance bond markets resulting from the proposed modification of the special assessment obligations cannot overcome the federal policy embodied in the Bankruptcy Code encouraging the restructuring of obligations for the benefit of the Debtors' estate and its creditors.

The Debtors previously asked the Court to determine the value of the Property, but the Court was unable to do so from the appraisals it received into evidence from the Debtors and the Objectors. Consequently; the Debtors are simultaneously filing a motion to determine the value of the Property through the appointment of a court-appointed expert pursuant to Federal Rule of Evidence 706, whom the Debtors trust will be able to provide the Court with a reasonable basis

to value the Property, armed with the prior analyses undertaken by Waronker and Hansen (the appraisers retained by the Debtor and the District, respectively) and with knowledge of the precise concerns identified by the Court.

As a final note, given that there is significant doubt as to whether the Board of the District is validly constituted, the Court should consider the *ultra vires* nature of all actions undertaken to date by the District in pursuing foreclosure of the Property and opposing approval of the Disclosure Statement and confirmation of the Plan. For this reason, the Court should temper its consideration of the arguments presented by the Indenture Trustee and the Bondholder in the Objection with the view that such opposition is emanating solely from mere parties in interest and not from a creditor of the Debtors.

For the foregoing reasons, the Objection should be overruled.

## JURISDICTION

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3. On September 19, 2011 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

4. Since the Petition Date, the Debtors have been operating as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On October 20, 2011, the United States Trustee appointed an official committee of unsecured creditors.

6. The Debtors are the fee simple owners of land (approximately 117 contiguous acres) located on the east side of NW 107th Avenue and the north side of NW 58th Street in Doral, Florida, (the "Property"). The Property consists of 16 individual tracts of land with substantial infrastructure development completed, but with no vertical construction other than an unfinished 4-level parking garage.

7. On December 18, 2011, the Debtors filed their *Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [ECF No. 94] (the "Plan"). On December 21, 2012, the Debtors filed a disclosure statement in support of the Plan [ECF No. 108] (the "Disclosure Statement"). The Objectors filed the Objection to the Disclosure Statement on January 20, 2012.

## ARGUMENT

### A. Sovereign Immunity Is Inapplicable

8. The Objectors argue that sovereign immunity prevents this Court from restructuring the Debtors' obligations to the District. The Objectors' argument misses the mark for four reasons: (1) unlike the debtors in the cases cited by the Objectors, the Debtors are not governmental entities, (2) the Debtors, each of which is a Florida limited liability company, have filed petitions under chapter 11 of the Bankruptcy Code, not chapter 9, (3) the District may not claim sovereign immunity, and (4) even assuming *arguendo* that sovereign immunity applies to the District and could be asserted in these cases, recent case law in this District provides that the bankruptcy court's *in rem* jurisdiction over a debtor's property authorizes the court to approve any action that does not require an affirmative recovery from the state without offending sovereign immunity. *In re Lake Worth Generation, LLC*, 318 B.R. 894, 900-901 (S.D. Fla. 2004) (*in rem* jurisdiction provided court with authority to determine tax liability, notwithstanding tax collector's sovereign immunity defense); *see also Central Virginia*

5

*Community College v. Katz*, 546 U.S. 356 (2006) (adversary proceeding brought by trustee against state agencies to set aside alleged preferential transfers not barred by sovereign immunity).

*The Debtors Are Privately-Held Corporations*

9. As a preliminary matter, the vast majority of the cases that the Objectors cite in support of their sovereign immunity arguments present situations in which the relevant debtor was a governmental entity. The Objectors stray aimlessly into arguments regarding the history and breadth of chapter 9 without noting the most important defining factor that makes each of these cases thoroughly inapposite: the Debtors, as privately-held corporations, filed petitions for relief under chapter 11, not chapter 9. None of the cases cited by the Objectors presents a situation in which a limited liability company sought to restructure its debts under chapter 11 and was prohibited from doing so by sovereign immunity.

*The States' Ratification of the Bankruptcy Clause Resulted in a Waiver of Sovereign Immunity*

10. The Plan Proponents submit that the lack of any direct reference to sovereign immunity in the Objection demonstrates the breadth of the chasm between existing sovereign immunity case law and the theoretical version of sovereign immunity set forth in the Objection.[3] Rather than concisely setting forth support for their assertions, the Objectors cite to case law on a host of related concepts, including abstention, for the misguided premise that this Court is constitutionally prohibited from exercising authority over property of the bankruptcy estate of a

---

[3] At the Court's direction, following the conclusion of the January 18, 2012 hearings in these cases, counsel to the Bondholder provided a list of arguments and legal concepts that would be set forth in the Objection. First on the list was the assertion of sovereign immunity, and it is for this reason that the Plan Proponents have framed the Reply to address sovereign immunity despite the absence of direct references in the Objection.

debtor-in-possession. Existing constitutional law, including *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006), roundly refutes this contention.

11. *Katz* provides an in-depth analysis of the contours of sovereign immunity in the bankruptcy context. Delving into the history and purpose of bankruptcy law, the *Katz* court emphasized that the exercise of exclusive jurisdiction over a debtor's property, equitable distribution of assets, and the "fresh start" afforded a debtor by bankruptcy relief are critical features of every bankruptcy proceeding. *Id.* at 364. In order to give effect to these essential components of bankruptcy relief, the power of the federal government to enact bankruptcy laws necessarily includes the power to subordinate state sovereignty. *Id.* at 377. The *Katz* court therefore explicitly found that "[i]n ratifying the Bankruptcy Clause, the States acquiesced to a subordination of whatever sovereign immunity the might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts." *Id.* at 378.

*Sovereign Immunity Applies Only to "States"*

12. Moreover, even assuming for the sake of argument that any restructuring of the obligations of the Debtors is tantamount or functionally equivalent to a restructuring of the obligations of the District, thereby invoking (in theory) principles of sovereign immunity, sovereign immunity still does not apply to the District because the District, as an "independent special-purpose unit of local government," (*see* Objection, p. 5) falls outside the purview of the Eleventh Amendment. The Eleventh Amendment applies only to a state or to an entity that may be characterized as an "arm of the state." *Alden v. Maine,* 527 U.S. 706, 756 (1999); *Mount Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 280 (1977) (finding that local school board was not an arm of the state); *In re Polygraphex Sys., Inc.*, 275 B.R. 408 (Bankr. M.D. Fla. 2002) (finding property appraiser was not an arm of the state). The District is not an arm of the state.

7

13. Under *Hufford v. Rodgers*, 912 F.2d 1338, 1340 (11th Cir. 1990), in determining whether an entity is an arm of the state, a court must consider the following four aspects of state law:

    a. how state law defines the entity,

    b. what degree of control the state maintains over the entity,

    c. what is the source of funding for the entity, and

    d. who is responsible for any court-ordered judgment against the entity.

*Id.*; *Polygraphex*, 275 B.R. at 413. Courts have also looked to whether the attorney representing the governmental entity in the action is employed by the county or by the state. 275 B.R. at 413.

14. Applying each of the factors to the District plainly illustrates that the District does not and cannot qualify as an arm of the state.

15. First, although the District is organized pursuant to state statute, each community development district approved by the state operates independently. *See* Florida Statute § 190.002(1). Second, the District is autonomous, and is not generally under the control of the State of Florida. Florida Statute §§ 190.005 and 190.006 collectively provide that upon approval of a proper petition filed with the Florida Land and Water Adjudicatory Commission, the members of the board of directors shall serve as the decision-making body of a community development district. In accordance with § 190.006, the District is authorized to hold elections without state supervision and may issue independent resolutions, provided such elections and resolutions are held and issued in accordance with state law. Third, the source of funding for the District is private, not public. Fourth, in the event of any court-ordered judgment against the District, the District, not the state of Florida, would the primary source of funds. Finally, the

District is being represented by a private law firm, and not the state attorney or the county attorney.

16. Accordingly, the District is not an arm of the state that may claim sovereign immunity under Amendment 11 to the U.S. Constitution.

*The Bankruptcy Court Has In Rem Jurisdiction Over Property of the Estate*

17. Even if the District could reasonably be considered an arm of the state and therefore subject to the protections of the Eleventh Amendment, sovereign immunity is not implicated by a chapter 11 debtor's restructuring of an obligation merely because the debt underlying the obligation is owed to a governmental or quasi-governmental entity. *Katz*, 546 U.S. at 370 (finding that the exercise of bankruptcy jurisdiction "does not, in the usual case, interfere with state sovereignty even when States' interests are affected").

18. In *Lake Worth,* Judge Hyman explicitly held that a bankruptcy court's *in rem* jurisdiction over the *res* of the bankruptcy estate pursuant to 28 U.S.C. § 1334 put the ability of the bankruptcy court to determine the Debtor's tax liability, an obligation clearly owed to a governmental entity, "squarely within the ambit of the Court's authority" without offending sovereign immunity. 318 B.R. at 900-901; *see also* 546 U.S. at 369 ("Bankruptcy jurisdiction, as understood today and at the time of the framing, is principally *in rem* jurisdiction.").

19. Further, 11 U.S.C. §1129(a)(9)(C) and (D) expressly contemplate confirmation of a plan that incorporates the restructuring of claims owed to governmental entities. *See, e.g.*, *In re Gregory Boat Co.*, 144 B.R. 361, 364 (Bankr. E.D. Mich. 1992) (concluding that proposed treatment of tax claim incorporating deferred cash payments complied with § 1129(a)(9)(C)).

20.     Consequently, even if the District could theoretically claim sovereign immunity, *Katz* and *Lake Worth* demonstrate that the ability to modify special assessment obligations is well within this Court's jurisdiction.

*The District Has Waived Any Possible Claim to Sovereign Immunity*

21.     Finally, by the District's substantial participation in this case, including the filing of multiple proofs of claim, two motions seeking stay relief, and other affirmative motions, the Plan Proponents submit that the District has waived any possible assertion that it has not subjected itself to the jurisdiction of this Court, and thereby waived any remote theoretical claim to sovereign immunity.

**B.     The Rooker-Feldman Doctrine Is Inapplicable**

22.     As the Objectors correctly state in the Objection, under the Rooker-Feldman Doctrine, only the United States Supreme Court has the authority to review final decisions from the highest court of a state. *Dale v. Moore*, 121 F.3d 624, 626 (11th Cir. 1997).  However, the Plan Proponents are not seeking to attack the validity of the issuance of the Series 2006 Bonds (as defined in the Objection), nor are they seeking to undermine any findings within the relevant state court judgment regarding the authority of the District to issue the Series 2006 Bonds.  The Plan Proponents have not challenged the authority of the state court to approve the issuance of the Series 2006 bonds or the priority of the liens of the District against the Property, nor do they intend to do so.

23.     Accordingly, any reference to the Rooker-Feldman Doctrine is wholly inapplicable to the facts of this case and any further discussion of the doctrine is a frivolous waste of this Court's time.

**C.      The Plan Does Not Require This Court to Make Legislative Determinations**

24.     The Objectors allege that the Plan requires the Court to make a host of minute determinations regarding the precise development plan for the Property, and further allege that because the determinations are legislative in nature, any attempt by this Court to interfere "runs afoul of the U.S. Constitution." *See* Objection, p. 19.  Happily, the Plan Proponents do not seek this level of granular detail in an order approving the Disclosure Statement or in an order confirming the Plan, nor are these determinations necessary or even appropriate within the chapter 11 context.  The necessary permitting and approval of the reorganized Debtors' development plans will occur through ordinary administrative channels within the city, county and state agencies, and receive the required level of consideration from the appropriate local legislative authorities.

**D.      Existing Case Law Permits Bifurcation of Liens**

25.     The Objectors further argue that the liens securing the Debtors' obligations cannot be altered or amended through the chapter 11 process.  Circuit-level case law, however, provides otherwise.  *See B.M. Brite v. Sun Country Dev't, Inc. (In re Sun Country Dev't, Inc.)*, 764 F.2d 406, 409 (5th Cir. 1985) (affirming bankruptcy court finding that bifurcation of a secured creditor's single lien upon 200 acres into 21 separate liens secured by 21 separate parcels provided the creditor with the "indubitable equivalent" of the first lien upon the 200 acres); *In re Webster*, 66 B.R. 46, 48 (Bankr. D.N.D. 1986) (allowing bifurcation of FmHA single secured claim into two claims secured by two liens on two different parcels); *In re Webster*, Case No. 85-05058, 1987 WL 857556, at *3 (Bankr. D.N.D. 1987) (addressing the issue of bifurcation upon remand and finding that FmHA received the indubitable equivalent of its claim and the

effectiveness of FmHA's § 1111(b) election was not diluted by bifurcation of claim into two claims secured by separate liens on different property).

26.     The Debtors have not and do not intend to challenge the authority of the District to impose special assessments. The value of the collateral securing the Special Assessment Obligations (as defined in the Plan), while still an open issue (s*ee infra*), will determine the amount of the District's secured claim upon the Property. Nothing in the Plan, nor the Court's determination of the value of the Property, will alter the priority of the District's lien on the Property. Any change in the development plan for the Property (and even the District's appraiser recognized that a change from the original plan was needed to address changed market conditions), will result in a change in the allocation of the special assessments. Under the Plan, the Debtors are simply proposing a modification in the repayment of the special assessment obligations in a manner consistent with the existing methodology, to ensure that the repayment of the District's claim complies with the requirements of § 1129(b)(2)(A). Moreover, the Plan[4] provides for the District to receive over $59 million in principal payments over the term of the repayment period, with more than $40 million in principal reductions being paid in the first seven years after the effective date in order to retire the Series 2006B Assessment.[5] *See* attached exhibit "A" and exhibit 4 to the Disclosure Statement. This meaningful principal reduction occurs through regularly scheduled principal paydowns associated with the sale of each residential unit, as well as true-up payments due in connection with each sale if the District

---

[4] The Objectors cite to a document produced in the work file of the Debtors' appraiser that was apparently prepared by the Terra Group regarding terms of a prior development plan for the Property. However, this document was not incorporated into the Plan, and any statements contained in such document which are at odds with the terms of the Plan are expressly disclaimed by the Debtors, including any suggestion that the Property will be subject to a two-year land bank period or that the South Parcel will be sold for its "carrying cost".

[5] Contrary to the assertion made by the Objectors at 27 of the Objection, the Debtor's Plan and Disclosure Statement do not provide for the liability for any Series 2006B Special Assessment to be passed onto any future homeowner. *See* Exhibit 4 to the Disclosure Statement.

makes an § 1111(b) election. As a result, the suggestion that the O&M Assessments will be outstanding for twenty-five years is nonsensical, as more than $40 million in principal reductions are being paid by the Debtors to the District in the first seven years after the Effective Date, far in excess of the principal reduction that is mandated based upon the value of the Property. *See* exhibit 4 to the Disclosure Statement.

27. Through (a) the District's retention of liens on the Property as it is improved, (b) the payment of deferred cash payments to the District, (c) the sale of various homes, townhomes and condominiums with a significant release price payments and true-up payments remitted to the District, and (d) the realization by the District of the indubitable equivalent of its claims on the Property, the Debtors' Plan complies with § 1129(b)(2)(A), rendering the change in the type and nature of the collateral securing the District's claims immaterial.

**E.    The Plan Does Not Provide for Destruction or Conversion of Public Infrastructure**

28. The Objectors argue that the Plan is predicated upon the destruction or conversion of the District's property, namely the roads which have been deeded to the District, or the garage, which is slated to be transferred to the District upon completion. Nothing in the Plan or the Disclosure Statement requires a taking of public property. Merely because the appraiser retained by the Debtors believed the highest and best use of the Property would be achieved with a different road design does not mean that the Debtors will pursue this development plan post-confirmation, absent the District's consent to such changes. Development plans are routinely revised as demand and market conditions change. Here, the original development plan was approved in 2006. Market conditions have changed dramatically si1nce then. The Plan Proponents' development plan will not require a change in the road way system throughout the District nor the destruction of the garage in the South Parcel, without the District's consent..

### F. Neither The Debtors Nor Any Affiliated Party Are Retaining Equity

29. The Objectors cite to *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999), and *In re Global Ocean Carriers, Ltd.,* 251 B.R. 31 (Bankr. D. Del 2000), in support of their contention that the Plan violates the absolute priority rule. In doing so, the Objectors ignore two key distinguishing facts: (1) the Debtors are not retaining equity under the Plan, and (2) no insider to the Debtor is retaining equity under the Plan. In both *La Salle* and *Global Home*, the Debtors either retained equity directly or indirectly through the family member of an insider. Terra, the Plan sponsor, is a wholly separate entity with no affiliation to the Debtors other than its participation in this chapter 11 case as the DIP lender and co-Plan proponent. Accordingly, the Debtors submit that neither *LaSalle* nor *Global Ocean* limits the transfer of equity interests to an unaffiliated third-party.

30. Moreover, given the strong likelihood that the District will make an § 1111(b) election, the District will not have an unsecured claim and consequently will not have standing to raise an absolute priority argument. *See In re Seasons Partners, LLC*, 439 B.R. 505, 514 (Bankr. D. Ariz. 2010). Multiple courts, including this Court, have found that creditors lack standing to challenge those portions of a plan that do not directly affect their own interests. *In re E.S. Bankest, L.C*., 321 B.R. 590, 595 (Bankr. S.D. Fla. 2005); *In re Evans Prods. Co.*, 65 B.R. 870, 874 (S.D. Fla. 1986); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 418 (Bank. S.D. Tex. 2009); *In re Orlando Investors, L.P.¸* 103 B.R. 593, 596-97 (Bankr. E.D. Pa. 1989).

### G. Only the District Is a Creditor of the Debtor

31. The Plan Proponents propose to restructure the Assessment Obligations (as defined in the Plan). The Plan Proponents do not seek to modify or otherwise alter the terms of the Indenture (as defined in the Plan), to which the Debtors are not a party. As the Bondholder

essentially concedes through the Objectors' citation to *Ritter Ranch Development v. City of Palmdale (In re Ritter Ranch Development, LLC),* 255 B.R. 760 (BAP 9th Cir. 2000), only the District is a creditor of the Debtors. The Indenture Trustee and the Bondholder are thus, at best, creditors of a creditor, with limited standing to object to the Debtors' Plan and Disclosure Statement, as this Court has previously noted.[6]

32. Despite this limited standing, the Objectors collectively assert that the proposed Plan treatment of the District violates public policy because it will allegedly wreak havoc upon the bond market. This argument is as unavailing here as it was when voiced by a tax certificate holder and Indian River County in *In re Piper Aircraft Corporation*, 171 B.R. 415, 419 (Bankr. S.D. Fla. 1994). As discussed in detail in section A, *supra*, federal bankruptcy policy permits a debtor to restructure its prepetition obligations, even when those obligations are held by a governmental entity whose funds are derived from a bond offering. *See also In re Fiddler's Creek*, Case No. 08:10-bk-03846-KRM *(Bankr. M.D.Fla. August 29, 2011)*, *Memorandum Opinion and Order Confirming Chapter 11 Plan as Modified at 52*.

**H.    The Debtors Are Proposing an Alternative Method for Determining Value**

33. The Plan Proponents intend to file a motion seeking retention of a court-appointed expert to determine valuation. The Plan Proponents recognize that the Court found that neither of the existing appraisals submitted by the Debtors and the Objectors was supported by sufficient data for the Court to accept either appraisal as conclusive evidence of the value of the Property.[7]

---

[6] At the hearing held on January 23, 2012 on the issue of, *inter alia*, the valuation of the Property, this Court clarified on the record that it found that the Indenture Trustee and Bondholder may appear as interested parties in the proceedings, but that neither party is a creditor of the Debtors.

[7] As noted by counsel to the Debtors at the evidentiary hearing on the Debtors' Motion to Value Collateral (the "valuation hearing"), the Debtors are extremely concerned that a contributing factor to the Court's inability to determine the value of the Property was the Court's direction to the Debtors' appraiser to delay the balance of his testimony responding to the criticism of his appraisal methodology until rebuttal, and then the Court refused to allow

However, the Plan Proponents submit that the underlying relief requested in the original valuation motion—establishing the Property's value—remains an important component of these cases, and to that end, will renew their request that the Court value the Property with the assistance of a court-appointed valuation expert. The Plan Proponents will include any court-determined valuation in a supplement to the Disclosure Statement and will disclose such valuation to all parties in interest.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

---

the presentation of rebuttal evidence, including the testimony of Dr. Henry Fishkind. Notwithstanding, the Plan Proponents believe that a court-appointed expert, with access to the transcript of the valuation hearing and the Waronker and Hansen appraisals, can focus on the areas of concern noted by the Court and provide the Court with a thorough analysis of the market value of the Property upon which the Court can rely to determine the value of the Property for purposes of considering confirmation of the Plan.

WHEREFORE, the Plan Proponents respectfully request that the Court enter an order (i) approving the Disclosure Statement (as modified), (ii) overruling the Objection; and (iii) granting the Plan Proponents such other and further relief as the Court deems just and proper.

Date:  January 24, 2012

Respectfully submitted,

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
*Attorneys for Debtors*
1450 Brickell Ave, Suite 2300
Miami, FL 33131
Telephone:  (305) 374-7580
Facsimile:  (305) 375-7593

By:    */s/ Mindy A. Mora*
      Mindy A. Mora
      Florida Bar No. 678910
      mmora@bilzin.com
      Tara V. Trevorrow
      Florida Bar No. 30959
      ttrevorrow@bilzin.com

and

BERGER SINGERMAN, LLP
*Attorneys for Terra Landmark LLC*
1450 Brickell Ave., Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Facsimile:  (305) 714-4340

By:    */s/ Jordi Guso*
      Jordi Guso
      Florida Bar No. 0863580
      jguso@bergersingerman.com
      Debi Evans Galler
      Florida Bar No. 985236
      dgaller@bergersingerman.com

**EXHIBIT "A"**

| | Pre-Plan | | | Post Plan | | | |
|---|---|---|---|---|---|---|---|
| | Debtors' Special Assessment Principal (North) | % of Total Debt Assessments for (North) | Average Special Assessment Principal Per Unit[2] | Debtors' Special Assessment Principal (North)[1] | % of Total Debt Assessments for (North) | Average Special Assessment Principal Per Unit[3] | % Increase in Average Special Assessment Principal Per Unit |
| North Parcels Series 2006A Assessment (Plan Class 4(a)) | 24,171,533 | 42.4% | 34,092 | 9,319,057 | 23.8% | 23,298 | -31.66% |
| North Parcels Series 2006B Assessment (Plan Class 4(c)) | 32,829,306 | 57.6% | 46,304 | 29,850,000 | 76.2% | 74,625 | 61.16% |
| Total Debt Assessments for North Parcels | 57,000,839 | 100.0% | 80,396 | 39,169,057 | 100.0% | 97,923 | 21.80% |

| | Debtors' Special Assessment Principal (South) | % of Total Debt Assessments for (South) | Average Special Assessment Principal Per Unit[2] | Debtors' Special Assessment Principal (South)[1] | % of Total Debt Assessments for (South) | Average Special Assessment Principal Per Unit[3] | % Increase in Average Special Assessment Principal Per Unit |
|---|---|---|---|---|---|---|---|
| South Parcel - Series 2006A Assessment (Plan Class 4(b)) | 6,148,447 | 42.4% | 15,371 | 9,319,057 | 46.5% | 23,298 | 51.57% |
| South Parcel - Series 2006B Assessment (Plan Class 4(d)) | 8,350,694 | 57.6% | 20,877 | 10,724,711 | 53.5% | 26,812 | 28.43% |
| Total Debt Assessments for South | 14,499,141 | 100.0% | 36,248 | 20,043,768 | 100.0% | 50,109 | 38.24% |

| | Debtors' Special Assessment Principal | % of Total Debt Assessments | Average Special Assessment Principal Per Unit[2] | Debtors' Special Assessment Principal[1] | % of Total Debt Assessments | Average Special Assessment Principal Per Unit[3] | % Increase in Average Special Assessment Principal Per Unit |
|---|---|---|---|---|---|---|---|
| Total Debt Assessments Class A | 30,319,980 | 42.4% | 27,340 | 18,638,114 | 31.5% | 23,298 | -14.79% |
| Total Debt Assessments Class B | 41,180,000 | 57.6% | 37,133 | 40,574,711 | 68.5% | 50,718 | 36.59% |
| Total Debt Assessments | 71,499,980 | 100.0% | 64,472 | 59,212,825 | 100.0% | 74,016 | 14.80% |

[1] Special Assessment Principal Amounts assumes an 1111(b) is elected and True-Up payments are included.

[2] Assumes that of the 1,109 units 709 units are allocated to the North parcels and 400 units are allocated to the South parcel.

[3] Assumes that of the 800 units 400 units are allocated to the North parcels and 400 units are allocated to the South parcel.