Page 1

1          UNITED STATES BANKRUPTCY COURT
           SOUTHERN DISTRICT OF FLORIDA
2

3

4

   IN RE:                    CASE NO. 11-35884-BKC-RAM
5
   TOWN CENTER AT DORAL,
6  L.L.C.,

7               Debtor.
   _____/
8

9

10

11          ALL MOTIONS ON THE CALENDAR
       (81), (131), (143), (132), (143), (146), (157)
12

13

14                January 18, 2012

15

16          The  above-entitled   cause  came  on  for

17  hearing before the  HONORABLE ROBERT A. MARK,  one of

18  the Judges sitting in the  UNITED  STATES  BANKRUPTCY

19  COURT,  in  and for the SOUTHERN DISTRICT OF FLORIDA,

20  at 51  Southwest  1st Avenue,  Miami,  Dade   County,

21  Florida on  Wednesday,  January 18, 2012,  commencing

22  at or about 10:00 a.m., and the following proceedings

23  were had:

24                Reported By:  Margaret Franzen

25

1                       APPEARANCES:
2

         BILZIN SUMBERG BAENA PRICE & AXELROD, by
3               MINDY A. MORA, ATTORNEY-AT-LAW
               DANIEL Y. GIELCHINSKY, ESQUIRE
4            TARA V. TREVORROW, ATTORNEY-AT-LAW
                    on behalf of the Debtor
5
6            GENOVESE JOBLOVE & BATTISTA, by
               MARILEE MARK, ATTORNEY-AT-LAW
7      on behalf of the Official Committee of Unsecured
                         Creditors
8
9                  BERGER SINGERMAN, by
                    JORDI GUSO, ESQUIRE
10         DEBI EVANS GALLER, ATTORNEY-AT-LAW
             on behalf of Terra Landmark, LLC
11
12          STEARNS WEAVER MILLER WEISSLER
               ALHADEFF & SITTERSON, by
13        PATRICIA A. REDMOND, ATTORNEY-AT-LAW
                  ERIC SILVER, ESQUIRE
14         on behalf of the Landmark at Doral
             Community Development District
15
16                 ARNSTEIN & LEHR, by
             PHILLIP M. HUDSON, III, ESQUIRE
17              ANTHONY KANG, ESQUIRE
                         and
18                  DLA PIPER, by
           BETTY M. SHUMENER, ATTORNEY-AT-LAW
19                       and
             HOPPING GREEN & SAMS, by
20            MICHAEL C. ECKERT, ESQUIRE
          on behalf of Florida Prime Holding, LLC
21
22             GREENBERG TRAURIG, by
             JOHN B. HUTTON, III, ESQUIRE
23              JOHN DODD, ESQUIRE
          on behalf of U.S. Bank as Indenture Trustee
24
25
                         Continued....

Page 3

```
 1              BROAD and CASSEL, by
             C. CRAIG ELLER, ESQUIRE
 2        on behalf of AmT CADC Venture, LLC
 3
         MIAMI-DADE COUNTY ATTORNEY'S OFFICE, by
 4        MELINDA S. THORNTON, ATTORNEY-AT-LAW
      on behalf of the Miami-Dade County Tax Collector
 5
 6       OFFICE OF THE UNITED STATES TRUSTEE, by
            STEVEN D. SCHNEIDERMAN, ESQUIRE
 7        on behalf of the United States Trustee
 8
                   ALSO PRESENT:
 9
                 CRAIG WRATHELL, CDD
10               NOAH BREAKSTONE, BTI
             MICHAEL Y. CANNON, Integra
11    HENRY H. FISHKIND, PhD., Fishkind & Associates
          CORINNE AFTIMOS, Judge Mark's Law Clerk
12
                  - - - - - - -
13
                   I N D E X
14
```

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| LEE H. WARONKER | | | | |
| By Ms. Mora | 21 | | 148 | |
| By Mr. Hudson | | 78 | | -- |
| WOODWARD S. HANSON | | | | |
| By Ms. Redmond | 153 | | 269 | |
| By Mr. Gielchinsky | | 218 | | 277 |


        EXHIBITS MARKED ADMITTED INTO EVIDENCE

  Debtors 1 - 5............................Page  20
  Debtors 8...............................Page 280
  Debtors 9...............................Page 280

```
                  - - - - - - -
```

1          THE COURT:  Before we get appearances,

2   what's the issue with the marshal, what aren't they

3   letting in?

4          MR. SILVER:  Your Honor, Eric Silver from

5   Stearns Weaver on behalf of the District.

6          Our expert attempted to bring in a

7   couple of calculators and the marshals aren't

8   letting him upstairs.

9          THE COURT:  Not letting him upstairs?

10         MR. SILVER:  No, they're not letting him

11  upstairs with the calculator.

12         THE COURT:  So where is he and where

13  are ---

14         MR. SILVER:   The witness is here, the

15  calculators are outside.  If we don't get relief from

16  your Honor, then I'm going to have to go back to the

17  office with the calculators.

18         THE COURT:  All right.  Well, we'll look

19  into it.  I don't know if I'll need to write a letter

20  or not, but anyway.

21         MR. SILVER:  Thank you, your Honor.

22         THE COURT:  Okay.  Let's get appearances

23  starting from the debtor.

24         MS. MORA:  Good morning, your Honor.

25  Mindy Mora and Tara Trevorrow on behalf of the

1  debtors.  In addition, shortly I expect to be joined

2  by my colleague, Dan Gielchinsky.

3         MR. GUSO:  Good morning, your Honor.

4  Jordi Guso and Debi Galler from Berger Singerman on

5  behalf of Terra Landmark, LLC.

6         MS. MARK:  Marilee Mark with Genovese

7  Joblove & Battista on behalf of the committee.

8         MR. ELLER:  Good morning, your Honor.

9  Craig Eller of Broad and Cassel on behalf of

10  unsecured creditor, AmT CADC Venture, LLC.

11         MR. HUDSON:  Good morning, your Honor.

12  Philip Hudson, Arnstein & Lehr, on behalf of Florida

13  Prime, LLC, the 100 percent bondholders in the case.

14  With me today I have Ms. Shumener, who is co-counsel

15  from Los Angeles.

16         Mr. Eckert will eventually arrive, he's

17  across the street in a State Court case hearing

18  involving this matter; your Honor, Anthony Kang,

19  my colleague; and Mr. Breakstone of BTI, the

20  managing partner, will be here, he's also across

21  the street for the moment.

22         MR. HUTTON:  Good morning, your Honor.

23  John Hutton from Greenberg Traurig on behalf of

24  U.S. Bank, as Indenture Trustee.  With me in the

25  courtroom is my colleague, John Dodd.

1          MR. SILVER:  Good morning, your Honor,

2    again.  Eric Silver from Stearns Weaver on behalf of

3    Landmark at Doral Community Development District.

4              Also across the street, and will be

5    joining us shortly, is Patricia Redmond, also

6    with the firm, and Craig Wrathell, the District

7    manager.

8          MS. THORNTON:  Good morning, your Honor.

9    Mindy Thornton from the County Attorney's Office on

10   behalf of the Miami-Dade County Tax Collector.

11         MR. SCHNEIDERMAN:  Steven Schneiderman for

12   the U.S. Trustee, your Honor.  I will be in and out

13   of the courtroom, I have a couple other matters to

14   take care of while this is pending.

15         THE COURT:  Okay.  I intend to get through

16   the valuation hearing today, and to do that I intend

17   to give less time and -- less time to the various

18   other motions.

19             The scope of what we do on the other

20   motions that are on the calendar may depend, in

21   part, at least as to some of the motions, on

22   who's going to testify and what the discovery

23   was.

24             So let me ask the debtor, who are you

25   going to call?

1          MS. MORA:  Your Honor, the debtors intend

2    to call Lee Waronker, as the debtors' appraiser, and

3    Dr. Henry Fishkind, the debtors' economist, market

4    analyst and also valuation expert.

5          THE COURT:  I thought his report was to the

6    feasibility of the plan, which is more of a next week

7    issue.

8          MS. MORA:  Your Honor, he's going to be

9    testifying on the issue of market conditions as they

10   impact valuation.

11         In addition, he will be providing, we

12   expect, rebuttal testimony with respect to

13   valuation, as it pertains to Mr. Hanson's

14   appraisal report, the expert called by the

15   District.

16         THE COURT:  Were you planning to call him

17   in rebuttal or put him on after --

18         MS. MORA:  Both, Judge.

19         THE COURT:  -- Mr. Waronker?

20         MS. MORA:  Both, Judge, both on direct, on

21   the issue of market analysis, and on rebuttal.

22         THE COURT:  Okay.  So you filed his report,

23   I believe, on Friday and was he deposed?

24         MS. MORA:  He was, your Honor.

25         THE COURT:  Okay.  So those are your two

1    witnesses?

2                MS. MORA:  Correct.

3                THE COURT:  Okay.

4                MR. HUDSON:  Your Honor, I will reserve the

5    right to seek to exclude that testimony because we

6    agreed those are issues more for confirmation and for

7    next week.

8                THE COURT:  Okay.  Mr. Silver, the CDD is

9    obviously going to call Mr. Hanson?

10               MR. SILVER:  Yes, your Honor, and we will

11   be calling Mr. Michael Cannon on issues of market

12   analysis.

13               THE COURT:  All right.  So the Cannon issue

14   was framed by the motion in limine.  Is he offering a

15   report or just testimony?

16               MR. SILVER:  I'm going to defer to

17   Mr. Hutton on this.

18               MR. HUTTON:  Your Honor, Mr. Cannon is here

19   as a rebuttal witness.  He has not done an appraisal

20   report.  What he has done is a technical appraisal

21   review of Mr. Waronker's report.

22               THE COURT:  So he's going to testify after

23   or before Hanson to comment on Waronker's report?

24               MR. HUTTON:  Well, regardless of the order,

25   your Honor, he's a rebuttal witness.  Our intent was

1    to put him on after Hanson, but we can put him on

2    before Hanson, the point is he is here to testify as

3    to the technical aspects of the Waronker report.

4         THE COURT:  Was he made available for

5    deposition?

6         MR. HUTTON:  Yes, he was, your Honor.  He

7    was deposed on Monday.

8         THE COURT:  All right.  So other than

9    Mr. Hudson's comment from the CDD/indenture

10    trustee/bondholders' side, is there any objection to

11    Waronker's testimony or Fishkind's testimony?

12        MR. HUTTON:  I think there will be

13    objections to Fishkind's testimony, your Honor.  What

14    was produced was a feasibility report, as your Honor

15    pointed out, with respect to the plan.  What he did

16    in that report is simply analyze the feasibility of

17    the so called Terra plan.

18        He did not do -- first of all, he's not

19    an appraiser, he's not an MAI, he's an economist,

20    and what he was really doing, and if you look at

21    that report it's very clear, he's just testing

22    the feasibility of the Terra plan.  He does

23    nothing to determine or assess the highest and

24    best use for the property, which is a component

25    of the appraisal analysis.

1           We don't think, for purposes of today's

2   hearing, which should be focused on valuation,

3   that A, he's competent to testify or that it has

4   any bearing on the Court's decision here today,

5   so ---

6           THE COURT:  Was he deposed on issues

7   relating to value, whether a direct appraisal

8   opinion, or just on the economic conditions?

9           MR. HUTTON:  I'll defer to Mr. Hudson

10  because he actually deposed him.

11          THE COURT:  Okay.

12          MR. HUDSON:  Your Honor, by agreement among

13  the respective lawyers in the case, we took his

14  deposition yesterday, and the deposition was limited

15  to issues with respect to the valuation hearing

16  today.  I believe his testimony yesterday was that he

17  is not an appraiser, as indicated, he wasn't hired

18  ---

19          THE COURT:  Did you depose him on what he's

20  going to testify to today?

21          MR. HUDSON:  I tried to.  It was -- it's

22  still -- it's still a bit unclear on what he -- what

23  he thinks he's testifying to with respect to today.

24  We believe we established yesterday the basis for a

25  motion in limine today, your Honor, that nothing in

1    his report deals with value.  There are no numerical

2    findings in there relative to value, there's nothing

3    in there other than a market feasibility study, which

4    is similar, although contradicts, to some degree, the

5    market feasibility study in Mr. Waronker's.

6              So to the extent that it's accretive as

7    to that particular subset of the appraisal,

8    that's the only thing we see relevant for

9    purposes of today, otherwise the balance of his

10   testimony is all regarding feasibility and he

11   admitted that under oath yesterday.

12             THE COURT:  All right.  Well, I'll reserve

13   on Fishkind and the Fishkind report.

14             Do all the parties stipulate to the

15   Waronker and Hanson reports coming into evidence?

16             MS. MORA:  Yes, your Honor.

17             MR. HUDSON:  We do.

18             THE COURT:  Okay.  All right.

19             So, Ms. Redmond, you've arrived.  Tell

20   me what's going on in State Court.

21             MS. REDMOND:  Your Honor, when I left, the

22   State Court had not decided exactly what to do.

23   Judge Cardonne had heard a status conference and said

24   that the first date she would have available to hear

25   the matters was February 16th, and she had suggested

1  to the parties that they check the availability of

2  Magistrate Schwabedissen, and the parties were doing

3  that at the time, although I don't know if both sides

4  will consent to the matter being adjudicated by a

5  magistrate.

6          So that's where they are.  I left ---

7          THE COURT:  So this was not a hearing on

8  the preliminary injunction?

9          MS. REDMOND:  Your Honor, it was not.  She

10 had set a status conference, and she did not hear the

11 preliminary injunction.  She had suggested if the

12 parties wanted more time, that perhaps her magistrate

13 would have more time.

14         I left then to come over here because

15 it was then ten after 10:00, and felt I should be

16 over here.

17         THE COURT:  Okay.  Is there any objection

18 by the debtor to stay relief, or it's really just a

19 comfort order that they can defend that action and we

20 can reserve on whether it's appropriate to allow a

21 counterclaim?

22         MS. MORA:  There's no objection to them

23 being allowed to defend, Judge.

24         THE COURT:  Is there any prejudice at this

25 point to limiting the relief or comfort order to just

1  being able to defend?

2            MS. REDMOND:  Your Honor, at least in our

3  papers, we would intend to be able to fully brief the

4  issues, including any issues that may create a

5  liability for the debtor, as well.

6            If your Honor wishes, we cannot -- ask

7  the Court to reserve on that, but we would at

8  least like the whole issue to be able to be

9  briefed before the Court.

10           THE COURT:  It's hard to rule in the

11  abstract.  I would just -- I will grant stay relief

12  to defend the action, but not to seek affirmative

13  relief against the debtor, other than, obviously,

14  seeking a -- if it's a declaratory judgment, you're

15  going to be seeking a different judgment on whether

16  the CDD -- if you're -- in defending if you're asking

17  for a declaratory judgment that the CDD is fully

18  authorized, fully stocked with commissioners or

19  whatever they're called, supervisors and fully --

20           MS. REDMOND:  Board members for the

21  District.

22           THE COURT:  -- board members, and fully

23  authorized to do everything they're doing, then

24  that's fine.

25           If you're asking for money damages,

1    that's not fine.  If there's something in between

2    that you can articulate, I can think about it,

3    but ---

4            MS. REDMOND:  Your Honor, there may be

5    consequences to the debtors' actions with respect to

6    affecting public officials, and those things -- if

7    your Honor says that we can go that far and we can't

8    raise those, we just want to make sure that we

9    have -- we don't waive anything by not raising them

10   at the same time as responding to this, and if your

11   Honor orders that, then I think the State Court will

12   be governed by that.

13           THE COURT:  All right.  I'll do an order

14   and I'll try to articulate in the written order

15   pretty much what I just said, save several thousand

16   dollars of attorneys' time arguing over language that

17   you're not going to agree on anyway.

18           MS. MORA:  Thank you, Judge.

19           THE COURT:  What about the motion in limine

20   as to Cannon, if he's just testifying, and not

21   offering a report?  The motion in limine was focused

22   more on a report; right?

23           MS. MORA:  Judge, what we were concerned

24   about -- well, first of all, we believe Cannon is

25   being -- the Cannon report is being offered into

1  evidence by the District/bondholder/indenture trustee

2  side.

3          THE COURT:  There is a written report?

4          MR. HUTTON:  Yes, your Honor.  It's not an

5  appraisal report, it's a technical review of

6  Mr. Waronker's report.  It's 14 pages wherein

7  Mr. Cannon identifies what he perceives to be the

8  omissions, flaws and technical defects in

9  Mr. Waronker's report.

10          THE COURT:  Was that provided prior to his

11  deposition?

12          MR. HUTTON:  Yes, it was.  It was provided

13  on the 13th, coincidentally the same day that we

14  received the report from the debtors with respect to

15  Mr. Fishkind.

16          MS. MORA:  The difference, of course,

17  Judge, was that we served our report in the morning

18  and the report came from Mr. Cannon at 6:30 p.m. on

19  Friday evening.

20          Judge, there was an agreement regarding

21  producing all reports by witnesses two business

22  days in advance, that was the agreement between

23  counsel, notwithstanding the Court's order that

24  any appraisal report was going to have to be

25  delivered by court order by Wednesday,

1   January 11th.

2          Interestingly, Mr. Cannon's report was

3   dated January 11th, but we didn't get it until

4   after the close of business Friday evening.

5          Judge, that's why we filed a motion in

6   limine, because we didn't have a report from

7   Mr. Cannon, who was being deposed on Monday.  All

8   day Thursday we waited for it, we got nothing.

9   We waited all day Friday.  We filed the motion in

10  limine in the morning because we hadn't received

11  anything yet, and then finally after the close of

12  business Friday night was when Mr. Hutton's

13  office decided to serve a copy of it, along with

14  work papers that I think arrived at my office

15  sometime around 8:00 p.m. Friday night.

16         So, Judge, on that basis, it just

17  simply is unfair the way they're trying to

18  proceed with this.  It ignores the requirements

19  of the Court's order, it ignores the agreement of

20  counsel about delivery of documents and reports

21  by witnesses that are going to be deposed at

22  least two business days prior to the deposition.

23         Dr. Fishkind was not deposed until

24  yesterday.  They received Dr. Fishkind's report

25  on Friday in the morning, two business days

1   before the deposition.  We weren't afforded the

2   same kind of courtesies with respect to the

3   Cannon report or the Cannon work papers.

4            THE COURT:  When was Cannon deposed,

5   yesterday?

6            MS. MORA:  Monday -- Monday, Judge, yes.

7   On Monday, not yesterday.  Monday in the afternoon,

8   directly after Mr. Hanson.

9            THE COURT:  Okay.  Well, the debtor and

10  the -- and its buyer put this case on a very fast

11  track.  We set the valuation hearing and we knew

12  timing was going to be tight with appraisal reports

13  and depositions, and since the parties have been able

14  to depose each other's witnesses, I'm going to deny

15  any motions in limine based on the timing of

16  producing reports.

17           The Waronker and Hanson reports by

18  consent are coming into evidence.  I'll reserve

19  on admissibility of the Fishkind and Cannon

20  reports on relevance or other grounds in terms of

21  how they relate to valuation.

22           So we'll proceed with that.  As far as

23  the standing issue, at this point, I take it the

24  CDD and indenture trustee and bondholder are all

25  on the same team?

Page 18

1          MS. REDMOND:  Yes, your Honor.

2          MR. HUDSON:  At the moment that's correct.

3          THE COURT:  So in terms of presentation,

4     are all three of you planning to cross the debtors'

5     witnesses or did you discuss that?

6          MR. HUDSON:  No, your Honor.  We're going

7     to be as efficient as possible.  We've broken it down

8     because there's a lot to do.  Each of us is going to

9     handle distinct phases of today's hearing.

10          I will handle primarily the crosses of

11     both Mr. Fishkind, to the extent that's

12     necessary, and Mr. Waronker.

13          THE COURT:  All right.  Then I'm going to

14     grant the motions, find that the indenture trustee

15     and bondholder have standing because the outcome of

16     what's happening in this bankruptcy will affect them.

17          I may, if necessary, limit the scope of

18     arguments in court on various matters to avoid

19     repetition or just redundancy.  My brief

20     observation is we have an awful lot of lawyers

21     representing the same team, so to speak.

22          It may become an issue down the road in

23     terms of plan issues, voting and objections to

24     confirmation, if there winds up to be a conflict

25     between the three parties, but that may take us

1  into the depths of the indenture, which I don't

2  need to dive into at this point.

3            But while everybody is on the same

4  team, I find that they have standing, and subject

5  to limiting overkill by having three sets of

6  attorneys on the same side, the motions will be

7  granted.

8            I'll do orders on those, too.

9            MS. MORA:  Judge, can I just request a

10  clarification?  The Court's finding is that they have

11  standing as parties in interest, not as creditors?

12            THE COURT:  Right, yes.

13            Okay.  So does that -- did I leave

14  anything out or are we ready for the valuation

15  testimony?

16            MS. MORA:  I think we're ready, Judge.

17            THE COURT:  I think we're ready.  Okay.

18  Well, before they think of something, call your first

19  witness.

20            MS. MORA:  Thanks, Judge.

21            The debtors call Lee Waronker to the

22  stand.

23  THEREUPON:

24                  LEE H. WARONKER,

25  after having been first duly sworn, was examined and

Page 20

1    testified as follows:

2              MS. MORA:  Judge, if I can approach,

3    please?

4              Judge, I apologize in advance, I'm a

5    little old school.  I just handed up an exhibit

6    register with printed references and exhibits.

7    I'm not real good on using the electronics yet in

8    the courtroom.

9              THE COURT:  Happy to have it, but things

10   you've divided into separate exhibits, are some of

11   those part of the appraisal or all of those are

12   separate from the appraisal?

13             MS. MORA:  Judge, Exhibits 2, 3 and 4 are

14   pages out -- 2, 3, 4 and 5 are pages out of the

15   appraisal, we just separated them for ease of

16   reference.

17             THE COURT:  Okay.  So 1 through 5 are

18   admitted.

19             (Thereupon, Debtors' Exhibits 1 through 5

20      are admitted into evidence.)

21             THE COURT:  Have you shared with each other

22   what exhibits -- I didn't get into that in the

23   preliminaries.

24             MS. MORA:  Judge, we had not.  Honestly,

25   with the speed with which this is happening, it's

1  been sort of difficult to do that.

2          THE COURT:  I guess we'll just take up 6

3  through 10 at the time you offer them, we'll see how

4  they fit in and whether they can come in.

5          Okay.  You can begin.

6                  DIRECT EXAMINATION

7  BY MS. MORA:

8      Q    Good morning, sir.  Would you please state

9  your name for the record?

10     A    Lee Waronker.

11     Q    Mr. Waronker, were you engaged to render an

12 appraisal report on the properties owned by the

13 Landmark debtors?

14     A    Yes, I was.

15     Q    I'm sorry, was he sworn in?  Yes?

16     A    Yes.

17     Q    Okay.  Thank you.

18         MR. GUSO:  Sorry, I just wanted to make

19 sure the witness had been sworn in.

20 BY MS. MORA:

21     Q    Mr. Waronker, who is your client in

22 connection with this engagement to render an

23 appraisal report?

24     A    My client was yourself.

25     Q    As debtors' counsel; is that correct?

1      A    That's what I understand.

2      Q    Okay.  At any time did you understand your

3  client to be Terra group?

4      A    No, I did not.

5      Q    What input it Terra group provide in

6  connection with the appraisal report that's in your

7  exhibit register as Exhibit Number 1?

8      A    Terra provided a copy of a proposal --

9  proposed subdivision that they would put on the

10  property, also provided some sales history of a

11  nearby project that they were involved with, as far

12  as sale prices, absorption levels.

13      Q    Did Terra group tell you what they thought

14  the appraised values should be?

15      A    No, they did not.

16      Q    Okay.  Did you prepare your appraisal

17  report with a bias towards the development plan

18  proposed by Terra?

19      A    Absolutely not.

20      Q    Now, if you could, would you describe to

21  the Court the scope of your engagement?

22      A    I was hired to prepare a market value

23  appraisal on the subject property, which is

24  approximately a hundred and seventeen acres, known as

25  the Landmark at Doral project.

1    Q    After I received a copy of Mr. Hanson's

2  report, did the scope of your engagement expand?

3    A    It did.  You had requested that I look at

4  his report and provide comments as to that report.

5    Q    Could you briefly describe for the Court

6  your qualifications as an appraiser?

7    A    Yes.  I have a real estate license.  I have

8  a state certified general appraiser license.  I hold

9  the MAI designation and the SRA designation.  I have

10  an undergraduate degree with a real estate major from

11  Florida State University.  I have a master's degree

12  from Florida International University, majoring in

13  real estate.

14          I teach courses for the Appraisal

15  Institute, I've taught in over 20 states,

16  Puerto Rico, Canada and South Korea.

17          I've been appraising in Miami-Dade County

18  since 1977.

19    Q    What is your prior experience involving

20  valuation of subdivisions?

21    A    Been appraising for 30 years, so we've done

22  some subdivisions over that period of time.  Our log

23  book doesn't keep track specifically as to

24  subdivisions.  We classify everything as vacant,

25  residential, multi-family or individual.  I would

1    have to go back in my log to get a list of

2    properties, but suffice it, there's probably been at

3    least two or three dozen over the years.

4        Q    And have you taught any courses involving

5    the appraisal of subdivisions?

6        A    I still teach a course, a case study of

7    real estate appraising, which one of the modules is

8    on the specific subdivision analysis.

9            MS. MORA:  Your Honor, would that I'd move

10   to qualify Mr. Waronker as an expert in the area of

11   appraising real estate.

12           MR. HUDSON:  No objection, Judge.

13           THE COURT:  All right.  I'll grant that

14   request.

15           MS. MORA:  Thank you.

16   BY MS. MORA:

17       Q    Let's turn to your engagement specifically,

18   Mr. Waronker.  What facts did you consider in

19   rendering your opinion?

20       A    We looked at comparable sales to the

21   subject property, looked at supply and demand trends

22   in the area, as to whether or not the product that

23   was already preapproved, the 1100, plus or minus,

24   residences, condominiums, apartments, et cetera, was

25   the highest and best use as of the current date, so

Page 25

1    we came to a conclusion there that it was not.

2           We found comparable sales in the area, made

3    adjustments to those to come up with a value for the

4    subject property.

5       Q    Did the location of the property factor

6    into your analysis?

7       A    Location always factors into any valuation

8    of any real estate appraisal.

9       Q    Are there any special issues with respect

10   to location of this property?

11      A    This property is unique from the standpoint

12   it has power lines bifurcating the property, I think

13   approximately 330 feet to the middle of the property.

14   On the western boundary, which would be the east side

15   of 107th Avenue, it's a hundred and seventy foot

16   power line easement, and then ---

17          THE COURT:  Hold on.  Do we have a site map

18   you can just put on the overhead?

19          MS. MORA:  Judge, how about if we turn to

20   Exhibit 5?

21          THE COURT:  Okay.  You don't want to try

22   it?  Put it on, it's not real complicated to use.

23   You just have to put a piece of paper down on that

24   thing and it will show up on the screen if you

25   enlarge it.

1          I mean, if it's not going to be big

2     enough ---

3               THE WITNESS:  I can see it, your Honor.

4               THE COURT:  And then the witness can --

5     there's a little -- Corinne will show you, there's a

6     little palet and you can pick a color, a line, and

7     you can draw on it and stuff.

8               MR. HUDSON:  It should probably be a

9     mandatory CLE going forward.

10              THE COURT:  Well, we did have a brown bag,

11    as Mr. Silver would tell you.

12              THE WITNESS:  It's a little bit out of

13    focus.

14              THE COURT:  Hold on.

15              MR. HUDSON:  Judge, I actually have an

16    alternative that lists some of the comparables, as

17    well, if you want to try that.

18              MS. MORA:  I think the witness is doing it,

19    Judge.

20              THE WITNESS:  He's trying.

21              THE COURT:  Okay.

22              THE WITNESS:  Let the record reflect he's

23    trying.

24    BY MS. MORA:

25         Q    Okay.  Mr. Waronker, I believe you were

1  testifying about some power lines.  Where are those

2  power lines on the property?

3      A    The power lines, there's one power line

4  roughly a hundred and seventy feet on the east side

5  of 107th Avenue, on the western side of the property.

6  Right here are additional power lines.

7          THE COURT:  And in between those two

8  parallel blue lines, is that all easement that you

9  can't build on?

10          THE WITNESS:  Yes, sir.  I kind of went up

11  a little bit, so, forgive me, but hopefully -- yeah,

12  on the left-hand side, the western side it cheated up

13  a little bit by accident, but, yes.

14          Where I have it hashed here, that's

15  roughly the large power lines, and there's also

16  power lines over here.

17          Over here is the recycling plant, which

18  this is a good ariel because you can actually see

19  the area that they've actually covered, and when

20  I was at the property yesterday, they were

21  actually working in this area here, and not

22  visible here there's two smoke stacks that are

23  visible.

24          So it's a little bit unique from that

25  standpoint for residential property to have power

Page 28

1    line easements.

2         This will be your north side up here,

3    mostly your residential single family townhouses,

4    single family homes, townhouses, possibly

5    apartments.

6         And then you have power line easements

7    on two sides and over here you have a recycling

8    plant.

9         THE COURT:  The bottom blue line would be

10   the boundary between what you call the north parcel

11   and south parcel?

12        THE WITNESS:  Yes, your Honor, I'm calling

13   everything, if I go back here, I'm calling everything

14   above here the north parcel.

15        THE COURT:  Okay.  So the top blue line?

16        THE WITNESS:  Yes, sir.

17        THE COURT:  And then where it's sort of

18   shaded, is that the boundary for what you call the

19   east ---

20        THE WITNESS:  Over here, I'm calling this

21   the east parcel.

22        THE COURT:  Right.

23        THE WITNESS:  It was pretty much for

24   industrial-type use.

25        THE COURT:  Okay.

Page 29

1          THE WITNESS:  And then our third parcel
2    would be this parcel down here, which I'm referring
3    to as the south parcel.
4          THE COURT:  All right.  Okay.
5    BY MS. MORA:
6       Q    Okay.  Mr. Waronker, is there an
7    infrastructure on the property?
8       A    Yes, there is.
9       Q    Okay, and could you describe to the Court
10   what you mean by the term infrastructure?
11      A    Infrastructure would be roads paved,
12   gutter, there was manhole covers for water, sewer, it
13   looks like in some areas there's electric that's been
14   brought in, possibly water brought in.
15          So anything that helps the builder complete
16   the property in order to then sell it off as
17   residential homes or retail use, that's part of the
18   infrastructure to help in the development process.
19      Q    Okay.  Now ---
20          THE COURT:  Mr. Hanson's report had some
21   pages that I think came from an engineer that talked
22   about the percentage completion of certain
23   infrastructure.
24          Did you look at those and do you know
25   whether -- do you have any reason to question

Page 30

 1    those?

 2             THE WITNESS:  No reason to question those,

 3    your Honor.

 4             THE COURT:  Okay.  So the earth work,

 5    paving and grading, and water distribution, sanitary

 6    sewer, all that in the CDD report, you would accept?

 7             THE WITNESS:  Yes, your Honor.

 8             THE COURT:  Okay.  That was Pages, just for

 9    the record, 57 through 60 of the Hanson report.

10             All right.  Go ahead.

11    BY MS. MORA:

12        Q    All right.  Mr. Waronker, I just put up on

13    the screen a plat map that was obtained from the

14    Dade County Property Appraiser's website.

15             Are you familiar with this diagram or this

16    picture?

17        A    Yes, I am.

18        Q    Can you describe to the Court what this is?

19        A    That is the Miami-Dade County's tax folio

20    number, which takes into consideration the property

21    that would be the streets owned by the CDD.

22        Q    Okay, and how does the infrastructure fit

23    in with those streets owned by the CDD?

24             THE COURT:  Ms. Mora, is this an exhibit

25    that you're ---

1          MS. MORA:  Yes, Judge, it's Page 5D.

2          THE COURT:  All right.  If it's part of 5,

3   it's part of the report?

4          MS. MORA:  Yes.

5          THE COURT:  Okay.  All right.

6          THE WITNESS:  Those would represent the

7   roads that are -- that are built on the property that

8   allows access throughout the subdivision.

9   BY MS. MORA:

10     Q    Okay, and does the infrastructure that you

11  mentioned, the roads, the curbs, the water pipes,

12  sewage pipes, are those on the -- as far as you know,

13  are those on the property that's owned by the

14  District?

15     A    To the best of my knowledge, yes.

16     Q    Now, let's turn to your methodology.  What

17  methodology did you use to value the debtors'

18  property?

19          THE COURT:  Hold on, I'm confused.  The big

20  grid of red is not the debtors' property on this

21  picture?  Where does the debtors' property end?

22          Let me go back to the other map, I

23  guess.

24  BY MS. MORA:

25     Q    Mr. Waronker, can you please explain to the

1   Court what the nature is of the property that is

2   highlighted in red on this map?

3       A    It gets a little bit confusing because,

4   your Honor, these are red lines, so between those red

5   lines are the roads.

6               THE COURT:  Let me go back to something

7   more basic.  The western boundary of the debtors'

8   property is 107th Avenue, and then the southern

9   boundary of the southern parcel is 58th Street;

10  right?

11              THE WITNESS:  Yes, sir.

12              THE COURT:  Okay, and then when it jogs in,

13  what street is that, that kind of intersects or about

14  where would that be?  I don't know if there is a

15  street in between the north and south.

16              THE WITNESS:  This right here would be

17  62nd Street, is the way they identify it right here.

18              THE COURT:  Okay.  All right.  So when we

19  go back to 5D -- wait, maybe I was asking the wrong

20  question.  I was asking, what is the -- when you said

21  62nd Street, that's the northern -- no, that's

22  the ---

23              THE WITNESS:  No, sir, that would be the --

24  right where those power line easements are.

25              THE COURT:  Right.

1           THE WITNESS:  It's like right here.

2           THE COURT:  Okay.  All right.  So what's

3   the northern boundary of the project, it's about 67th

4   or ---

5           THE WITNESS:  It would be approximately

6   67th, yes, your Honor.

7           THE COURT:  Okay.  All right.  So all of

8   the stuff in red, isn't that the north -- what we've

9   been calling the north parcel?

10          THE WITNESS:  It's within what we call the

11  north parcel, but that red that you see is really

12  just outlining -- it's a little bit confusing, but

13  it's really outlining the roads.

14          THE COURT:  All right.  So the District

15  owns the roads once they're in?

16          THE WITNESS:  Correct.

17          THE COURT:  But all the stuff in between

18  the roads is what we've identified as the north

19  parcel?

20          THE WITNESS:  Yes, that would be the north

21  parcel portion that you can actually build on.

22          THE COURT:  Okay.  All right.  So I'm with

23  you.  Go ahead.

24  BY MS. MORA:

25      Q    All right.  Let's turn to methodology, Mr.

1   Waronker.  What methodology did you use to value the

2   debtors' property?

3        A    I used a sales comparison approach, broke

4   down the three tracts as we identified a few minutes

5   ago, as to north parcel, the south parcel, and then

6   the east parcel.  Different sales were used for each

7   one of those tracts.

8        Q    Did you consider using either the cost

9   approach or the income approach?

10       A    No, I did not.

11       Q    And why?

12       A    Those wouldn't be applicable for the

13   specific purpose of this appraisal.

14            THE COURT:  I think the appraisers agree on

15   that; right?  Yes?

16            THE WITNESS:  I believe so, your Honor.

17            THE COURT:  So then let's move on.

18   BY MS. MORA:

19       Q    All right.  Mr. Waronker, did you also

20   consider using the residual land value approach?

21       A    No, I did not.

22       Q    Okay, and why is that?

23       A    Well, we did a -- well, there's --

24   there's -- things are very similar, one is a land

25   residual.  We did a residual analysis, which is

1  really a discounted cash flow analysis, a subdivision

2  analysis for raw land, taking it from currently until

3  it would be developed, selling it out and discounting

4  that back to see what somebody would pay for the

5  property in its current state.

6          You can call it residual analysis, you can

7  call it a discounted sell-out analysis of

8  subdivision.  It has some different nomenclature.

9          THE COURT:  But from an appraisal

10  standpoint, there's too many variables and

11  assumptions for that to really be a basis for market

12  value?

13          THE WITNESS:  Yes, your Honor.  We just did

14  that, and we noted it in our appraisal, we just did

15  it as a -- and we footnoted it, we just did it as a

16  test, a sensitivity test.  One small change in either

17  direction can cause a large degree of change in

18  value.

19  BY MS. MORA:

20      Q    Mr. Waronker, let's start with your sales

21  comparison approach.  How did you undertake the value

22  of the property through that approach?

23      A    Well, we started with north parcel.  We

24  looked at ---

25      Q    If you could, would you turn to Exhibit 2?

1    A    Yes, I will try.  Okay.  Yeah, that's our

2  valuation of the north parcel.  We have six

3  comparable sales labeled N1 through 6, representing

4  the sales we used for the north parcel.

5    Q    What I'm asking you to do, Mr. Waronker, is

6  to describe the methodology that you used in

7  employing the sales comparison approach to the Court?

8    A    Okay.  We looked at the six sales, as you

9  see in front of you, and then we make what we call

10  qualitative adjustments to the sales, indicating

11  whether or not they're better or worse than the

12  subject property.

13        If the comparable is better, you would

14  subtract; if the comparable is inferior, you would

15  add.  We went through adjustments for conditions of

16  sale, market conditions, location, size and shape,

17  other category, and then an overall adjustment of

18  what we felt would represent the value of the

19  property based upon all of the different adjustments

20  and things we looked at, the characteristics we

21  looked at.

22    Q    Why did you choose the properties that you

23  did as sales comparisons in applying this approach?

24    A    Well, Sales 1 through 3 are right there in

25  the subject area or the same section, your Honor, the

Page 37

1    same sales that were used by Mr. Hanson in their

2    appraisal report.

3           Sales 4, 5 and 6 were just used because

4    they were large tracts of recent sales.  In this

5    current market it's difficult to find recent sales,

6    so we ventured out.  On the bottom line, we pretty

7    much relied on Sales 1, 2 and 3.

8        Q    What about for the south and east parcels?

9        A    The south and east parcels would be the

10   same.  We used different sales for the south and east

11   parcels.

12          On the south parcel we used five sales ---

13       Q    Are you now referring to Exhibit 3,

14   Mr. Waronker?

15       A    Yes, I am.

16          THE COURT:  Ms. Mora, are you going to go

17   into the specific adjustments at all, otherwise ---

18          MS. MORA:  Yes, we are, Judge.

19          THE COURT:  Okay.

20          MS. MORA:  We'll come back to that.

21          THE COURT:  Okay.  Good.

22          THE WITNESS:  On the south parcel we used

23   five sales, of which two were in Doral, of which one

24   we thought was the best comparison, which would have

25   been S2, very similar in size to the subject property

1   and having sold in 2011.

2   BY MS. MORA:

3       Q    And the sales that you have listed on

4   Exhibit 3, were all sales of commercial industrial

5   parcels?

6       A    Commercial properties.

7       Q    Okay.  Now, going back to the properties

8   that you have listed in Exhibit 2, why did you choose

9   vacant land for comparison purposes?

10      A    Well, the subject is vacant land that would

11  be bought by a developer in order to then build homes

12  on it.

13      Q    Were there any subdivision sales that you

14  could have used for the sales comparison approach?

15      A    We researched for subdivision sales, land

16  sales.  There's very limited sales data in this

17  marketplace, especially in the residential market,

18  which is -- pretty much is common knowledge it has

19  not been very active in the last few years.

20          THE COURT:  What do you mean by vacant land

21  sales for development and subdivision sales?  You

22  mean a subdivision that's actually already platted or

23  something?

24          THE WITNESS:  Yes, your Honor, you can find

25  a subdivision that's already been platted, maybe

1    somebody is buying up a gross amount of lots in that

2    subdivision.

3              This particular subdivision was not

4    complete.  The pads were not at grade level and

5    per the estimate by Alvarez, there's roughly

6    almost $16 million left to complete the

7    infrastructure, to make it comparable to

8    something that's already completed and ready to

9    build on.

10   BY MS. MORA:

11       Q    All right.  Now, let's turn to the specific

12   listings that you have for the north parcel.

13              Mr. Waronker, what adjustments did you make

14   to each of the comparables in order to determine

15   their impact on the value of the subject property?

16       A    Well, we looked at, as I stated earlier, a

17   few things, one would be conditions of sale.  If

18   there was something -- condition of sale adjustment

19   would be an adjustment that maybe the party was --

20   excuse me, the property was sold to related parties

21   and would indicate a reason why the property might

22   have sold for a higher price.  It could have been

23   undersold because maybe it was distressed, so you

24   would plus that adjustment.

25              So condition of sale is something having to

1   do with some -- something a little bit different than

2   the typical motivation that you would see of a buyer

3   and seller.

4          Market conditions has to do with -- we

5   usually call that time adjustment, market -- what

6   differences of market conditions between when the

7   property -- the comparable sold and then the current

8   date of value.

9          And then we make adjustments for location,

10  zoning, size and shape, other if it's applicable.

11  And then look at the magnitude of the adjustments and

12  come up with a qualitative adjustment at the end.

13     Q   Well, let's now turn to the specific

14  properties that you used as sales comparables, and

15  let's talk about each of them, if we could.

16          Let's start with Sale Number N1.

17     A   Okay.  Sale N1 is located just north of the

18  subject property fronting on 107th Avenue, purchased

19  by the Terra group in September 2011, fairly

20  recently.  I'm sorry, my apologies.  Purchased, yes,

21  September 2011 for $14 million.  It does have an

22  easement on the west side of the property, east side

23  of 107th Avenue, and as I said, the buyer was Terra,

24  with plans to build a townhouse project.

25     Q   What adjustments did you feel needed to be

1   made to Sale Number N1 in order to compare it to the

2   subject property?

3        A     I made a downward adjustment for conditions

4   of sale, as we state on Page 66 of our report,

5   because the grantee is really a joint venture with,

6   per our confirmation, no money put in by the buyer.

7   So it's a very unrisky situation from the buyer's

8   standpoint and really just kind of a joint venture.

9   So this was a price set for the joint ventureship

10  agreement, so it was not exposed to the open market

11  for this particular sale.

12            THE COURT:  How would you know how to

13  adjust that to get to a market value for that

14  property?  I mean, you've got two minus signs.

15            THE WITNESS:  Uh-huh.

16            THE COURT:  How much of an adjustment if

17  it's a joint venture and you don't really know what

18  their business deal was?

19            THE WITNESS:  You don't really, your Honor,

20  other than the fact if they put no money down, that

21  comes under a typical adjustment you would make

22  either under financing or conditions of sale.

23            The ideal textbook way to do it would

24  be to find two sales that are similar in all

25  respects, except for one, and the operative word

1    there is ideal textbook.  It just doesn't happen,

2    there's insufficient sales in the market, but

3    when you talk to people over the years who have

4    bought property, when they get involved and

5    they're not purchasing the property outright and

6    they're purchasing it as part of a joint venture,

7    then the price is set -- can be set at a certain

8    level for a myriad of reasons.  Sometimes it's

9    set high so that the bank will look at that and

10   provide a little higher financing on the

11   property.

12            So to directly answer your question,

13   there really is no way, that's why we use

14   qualitative, understanding that the buyer in this

15   particular case felt that the price was high

16   because it was not a typical transaction, it was

17   a joint venture transaction.

18   BY MS. MORA:

19      Q    Mr. Waronker, let's turn to -- let me ask

20   you if you've finished describing whether or not

21   there are any other adjustments that you had to make

22   to Sale N1?

23      A    Sale 1 we also adjusted for location and --

24   I'm sorry, wrong page, I apologize.

25            THE COURT:  Size, shape, you have ---

1          THE WITNESS:  Yeah, I want to get to my

2    page so I can make sure.  Size and shape, and then

3    other.

4          THE COURT:  Well, you have a negative for

5    size and shape.  Why is that?

6          THE WITNESS:  That parcel is 20 acres.  The

7    subject parcel is roughly 59 acres.  Typically, the

8    larger parcel will sell for less price per square

9    foot, and you kind of see that a little bit.  If you

10   look at N2 and N3, one being 32 acres, one being 17

11   acres, you see a slightly less price per square foot

12   per acre for Sale N2, which is larger than N3.

13   BY MS. MORA:

14      Q    Okay.  Mr. Waronker, let's turn to Sale N2.

15   Can you describe what this property is?

16          THE COURT:  I'm sorry, just very quickly.

17   You have a plus sign for other.  What does that mean?

18          THE WITNESS:  We say here that the north

19   parcel is defined -- we've given the net acreage in

20   Sale N1 is encumbered by one of the same easements

21   that run through the subject property.  We priced it

22   up, we plused it upwards.

23          Probably we would have been better off

24   just taking it out, and just netting it out and

25   show the price per square foot of the net area,

Page 44

1    but we just give it a plus adjustment.

2              THE COURT:  Okay.  So for whatever it

3    translates to, when you have your lines of pluses and

4    minuses, you just see how many negatives and how many

5    positives and that yields whether you've got two

6    minuses or a plus or an equals?

7              THE WITNESS:  Typically some of those

8    issues may be a little bit more -- carry more weight

9    than the others, but it just gives the reader an idea

10   of our thought process and why we're estimating the

11   value of the subject property based upon these

12   characteristics of the sales.

13             Again, ideally if you had a lot of

14   sales, you could make percentage adjustments, but

15   that's not the case, especially in this

16   marketplace.

17             THE COURT:  Okay.

18   BY MS. MORA:

19        Q    All right.  Mr. Waronker, can we turn to

20   Sale N2, and can you describe what that property is

21   to the Court?

22        A    N2 are two tracts, again purchased by Terra

23   in September of 2011, located north of the subject

24   property and just east of -- excuse me, just west of

25   102nd Avenue.

Page 45

```
 1                THE COURT:  So is it right next to N1?
 2                THE WITNESS:  It is just to the east of N1.
 3                THE COURT:  You mean west?
 4                THE WITNESS:  No, N1 is to the east -- N1
 5       is to the west, those two are to the east.  You want
 6       me to go back to that map and maybe ---
 7                THE COURT:  I guess.  I'm just reading, the
 8       location of N1 says east side of Northwest 107th and
 9       N2 says west side of -- oh --
10                THE WITNESS:  102nd.
11                THE COURT:  -- 102nd, I'm sorry.  West side
12       of 102nd.
13       BY MS. MORA:
14          Q    Would it help you to identify on this map,
15       Mr. Waronker, where these properties are?
16                THE COURT:  Which map are we on?
17                MS. MORA:  5A, Judge.
18                THE COURT:  Okay.
19                MR. HUDSON:  Judge, again, I'm happy to
20       tender a map that has them already identified for
21       everyone.
22                MS. MORA:  Well, Mr. Hudson, I'm happy to
23       let you do that when you have ---
24                THE COURT:  All right.  I think I
25       understand it, but go ahead.
```

1            THE WITNESS:  Do you want me to show them,

2    your Honor?

3            THE COURT:  Yes.  I mean, on this -- on

4    this map, which is -- I know where 100 ---

5            THE WITNESS:  N1 would be roughly over

6    here, and then N2 or two tracts that are roughly here

7    and here, if you would.

8            THE COURT:  Okay.  So there is no

9    102nd Avenue?

10           THE WITNESS:  It's a dirt road, your Honor.

11           THE COURT:  Okay.  It would run in between

12   your little circles?

13           THE WITNESS:  Right here is 102nd Avenue.

14   This is 107th.

15           THE COURT:  Okay.

16           THE WITNESS:  This would be like a -- this

17   quarter section line, these things would actually

18   come out like that, like that, and then like that.

19   So you have N1 over here, and then you've got N2.

20           THE COURT:  So those two parcels together

21   are roughly the size of the north parcel, right, or

22   close, 50 something?

23           THE WITNESS:  Thirty-two acres, your Honor,

24   versus 50 ---

25           THE COURT:  No, no, the two parcels, N1 and

Page 47

1    N2 together --

2                THE WITNESS:  Oh.

3                THE COURT:  -- which are right next to each

4    other.

5                THE WITNESS:  Yes, sir.  Yes, your Honor,

6    32 plus 20, yes, sir.

7                THE COURT:  All right.  Okay.  So let's --

8    you were going to get into N2, go ahead.

9    BY MS. MORA:

10        Q    Mr. Waronker, could you describe to the

11   Court what adjustments you felt needed to be made to

12   make N2 comparable to the subject property?

13        A    Condition of sale for N2, I think because

14   they're an adjacent owner, nearby owner; marketing

15   conditions we did not make; location ---

16                THE COURT:  Is it the same grantor?

17                THE WITNESS:  No, your Honor, different

18   grantor.

19                THE COURT:  Also a joint venture between

20   Terra and the seller?

21                THE WITNESS:  No, your Honor.

22                THE COURT:  All right.  Then I don't

23   understand the adjustment, because I thought the

24   adjustment for N1 was because there was a joint

25   venture and you didn't know whether the price may

Page 48

1   have been inflated for -- not -- well, I guess

2   inflated for other reasons.

3           N2 is an unrelated seller?

4           THE WITNESS:  N2 is an unrelated seller.

5           THE COURT:  Why would you have two minuses

6   for conditions of sale?

7           THE WITNESS:  On Page 77 we say the land

8   venture partner is a company related to Terra

9   regarding the last project ---

10          THE COURT:  Wait, wait, wait, slow down a

11  little bit.

12          THE WITNESS:  I apologize.

13          THE COURT:  On 77 ---

14          THE WITNESS:  On Page 77 under conditions

15  of sale, we state the venture partner is a company

16  related to Terra World Investments, a developer that

17  has completed several residential projects in the

18  area and recently purchased other nearby parcels, N2

19  and N3.

20          We go on to say, though this sale

21  should be given minimal weight in the analysis

22  due to the fact that the parties are related ---

23          THE COURT:  Wait, wait.  Read a little

24  slower for the court reporter.

25          THE WITNESS:  I'm sorry.  This sale should

Page 49

1   be given minimal weight, we're talking about N1, in

2   the analysis due to the fact that the party ---

3            THE COURT:  You're not reading any slower.

4            THE WITNESS:  Okay.  I apologize, your

5   Honor.

6            Though this sale should be given

7   minimal weight in the analysis due to the fact

8   that the parties are partially related and no

9   cash was exchanged, a negative adjustment is

10  indicated because of the partner's other buying

11  activity indicates they have an interest in

12  assembling multiple tracts in the area.

13           Sale N2 requires a negative adjustment

14  for the same reason, meaning that the buyer of N2

15  is the same as the other buyer, and they are

16  buying all sorts of properties in the area, and

17  typically, somebody who is buying nearby and/or

18  adjoining property pays a premium because then

19  they can offset some of their costs of marketing

20  with contiguous developments and parcels.

21  BY MS. MORA:

22       Q    Mr. Waronker, what other adjustments did

23  you make to Comp N2?

24       A    We plused it for location, and that was it.

25       Q    All right.  Let's turn to Comp N3.  Can you

Page 50

1    describe what that property is to the Court?

2        A    That is a property that is directly east of

3    the south parcel of the subject property, also

4    purchased by Terra.  That project will be called

5    Doral Cay, to be developed with a hundred and sixty

6    unit townhouses, was purchased in August of 2011 for

7    $9 million.

8        Q    And did you feel it necessary to make any

9    adjustments to this sale comp in order to make it

10   comparable to the subject property?

11       A    The only adjustment there was size and

12   shape, everything else was considered basically

13   comparable.

14       Q    What was the size and shape issue with

15   respect to this property that caused you to make an

16   adjustment?

17       A    That particular parcel is 17 acres and it's

18   less than the 56 acres, roughly, of the -- 59 acres,

19   I apologize, of the north tract.

20            THE COURT:  N3 is ---

21            THE WITNESS:  Adjacent on 58th Street

22   frontage, your Honor, just east of the south tract.

23   That would be this piece right here, your Honor.

24            THE COURT:  Okay.

25            THE WITNESS:  Sold for $12.15 a square foot

Page 51

1    in August of 2011.

2    BY MS. MORA:

3        Q    Okay.  Mr. Waronker, were those all the

4    adjustments that you made to Sale N3?

5        A    Yes, they were.

6        Q    Let's turn to Sale N4.

7        A    All right.

8        Q    Can you describe that property to the

9    Court, please?

10       A    Sale N4 is way west, Miami-Dade County, off

11   of Sunset Drive, 163rd Avenue, sells for 4.94 a

12   square foot, 362 lots that had been developed with

13   roads and utilities to the site.  The price paid was

14   $7.60 a square foot -- I apologize, I'm doing that

15   again, my apologies, that was Sale 5 I was just

16   talking about.

17            Sale 4 is on Sunset Drive, is approximately

18   a ten acre tract that sold for $4.94 a square foot

19   and the buyer is going to do 58 townhouses.

20       Q    What adjustments did you make to Sale N4 to

21   make it comparable to the subject property?

22       A    N4 was inferior in location, so we plused

23   it, smaller in size and shape, and then we had

24   another adjustment.

25       Q    And what was the other adjustment that you

Page 52

1   made?

2        A    Sale 4 contains a lake of significant size,

3   which limited the usable portion of that property, so

4   we felt that it kept the price lower, so we plused it

5   to indicate that it would be a higher price.

6        Q    All right.  Let's turn to Sale N5.  Can you

7   describe that property to the Court?

8        A    N5 is very far south in Homestead.  This

9   was the one that I was talking about that had 362

10  lots.  It was just used because it is a large tract

11  of 25 acres, albeit inferior in location to the

12  subject property.

13       Q    What adjustments did you make to Sale N5 to

14  make it comparable to the subject property?

15       A    Large location adjustment for being way far

16  south, minus adjustment for size, and then a minus

17  adjustment for other.

18       Q    And do you recall what the basis was for

19  the adjustment for other?

20       A    That particular sale had some finished lots

21  with roads already completed, and not included in the

22  total acreage as reported.

23            THE COURT:  I didn't hear the last ---

24            THE WITNESS:  And not reported in the total

25  acreage, so it was like a net amount of land.

Page 53

1          THE COURT:  Okay.  Let's keep going.

2   BY MS. MORA:

3      Q    All right.  Mr. Waronker, let's turn to

4   Sale N6.  Could you please describe that sale -- that

5   property to the Court?

6      A    N6 is a sale of almost 40 acres in

7   Miami Gardens, way north of the subject property, and

8   planning approximately 638 homes, selling in August

9   of '09.  It was used, again, because it was a large

10  tract for a residential purpose.  Adjustments were

11  made for location primarily.

12     Q    All right.  After making these adjustments,

13  Mr. Waronker, what is your opinion of the market

14  value of the north parcel?

15     A    The equivalent value of the north parcel

16  was $11 a square foot for 59.335 acres, with a value

17  of $28,400,000 rounded.

18         THE COURT:  Where did you get the 59.3?

19  There seemed to be -- I don't want to dwell on it if

20  there's not an issue, but there seemed to be a

21  difference between your report and Hanson's in the

22  acreage, or did I miss something?  I was looking at

23  the ---

24         THE WITNESS:  Let me get to that, your

25  Honor.  His net area for the north piece is

Page 54

1    approximately 64.8 and we used 59.35.  I don't

2    know ---

3              THE COURT:  You don't know why?

4              THE WITNESS:  No, sir.

5              THE COURT:  Where did you get your 59.3,

6    how was that calculated?

7              THE WITNESS:  We have a calculation in the

8    beginning of our report, which breaks down how we got

9    it on Page 19 of our report, I believe.

10   BY MS. MORA:

11       Q    Would you explain to the Court how you

12   derived that in methodology?

13       A    Page 19 we start with a total land area by

14   the tax folio numbers and then subtract the power

15   line easements, and then do some calculations to try

16   to get to what we considered to be the north parcel.

17             I do believe, your Honor, our east parcel

18   is 12.576 and Mr. Hanson's is smaller.  I think the

19   two together might ---

20             THE COURT:  Might be where you had the

21   boundary?

22             THE WITNESS:  It might be how we identified

23   it.  8.8 plus 64.8 is 73 something, plus or minus.

24             THE COURT:  Let me interrupt for a second.

25   Is this going to be an issue in argument about value,

1    the different acreage?

2            MS. MORA:  I don't think so, your Honor.

3            MR. HUDSON:  On that particular narrow

4    issue, Judge, no.

5            THE COURT:  Okay.  Then I'll refrain from

6    further questions on that calculation of square

7    footage or acreage for the moment.

8            Go ahead.

9    BY MS. MORA:

10       Q    As long as the Judge has raised it,

11   Mr. Waronker, you did review Mr. Hanson's report;

12   correct?

13       A    Yes, I did.

14       Q    And were the properties you selected to

15   compare with the north parcel, the subject property,

16   different than the properties selected by Mr. Hanson?

17       A    No, he used four sales of which three were

18   the same sales that I used.

19            MR. HUDSON:  I might as well make this

20   objection now.  We're going to object to any

21   testimony regarding this witness with respect to

22   Mr. Hanson.

23            Apparently the scope of his engagement

24   changed after we took his deposition, we were not

25   told that, your Honor.  So we would object to any

1  questions of this witness regarding Mrs. Hanson's

2  report.

3          THE COURT:  I'm going to overrule it.  I

4  think it's implicit that each of the experts was

5  going to talk about the other.

6          So three of his four were the same

7  comps and his fourth one was different?

8          THE WITNESS:  Yes, your Honor, his fourth

9  sale was a sale purchased by the City of Doral that

10 we did not use.  The other three are Sales N1, N2 and

11 N3 in our report.  So we used three -- I don't think

12 there's any argument to the sales.

13          I would say to your Honor, 4, 5 and 6

14 were just there with very little reliance, the

15 best reliance would be on 1, 2 and 3, which are

16 right there in the same section of the subject

17 property.

18          THE COURT:  I didn't go cover to cover, but

19 I think I hit the highlights.  Is there anything

20 quantitative in terms of how you look at all your

21 pluses and minuses, and the price per acre of the

22 comps and wind up at 11 per -- $11 a foot?

23          THE WITNESS:  Looking at N1, N2 and N3,

24 which would be the ones that are of primary

25 relevance, the main reason, if everything else is

Page 57

1   looked aside, we're dealing with a difference of 59

2   acres with the closest sale being 32 acres, which is

3   not quite half the size, but close.

4          Again, I'd point out to your Honor that

5   N3 and N2 are similar, both of us used them as

6   comparables.  N2 is almost twice the size and

7   shows a little bit of a decrease from 12.15 to

8   11.69 per square foot.

9          And then the correlation was 11, mostly

10  on size, also giving some consideration to the

11  subject property, the north parcel has power line

12  easements on the west side and on the south side

13  of it.

14         The other parcels, one had it on --

15  power lines on the west side, one did not have

16  any.  All of them are generally of the recycling

17  plant, so it just would depend on what day the

18  wind is blowing -- you know, what time of the day

19  the wind is blowing when you're there.

20         THE COURT:  When you were out there you

21  actually smelled the recycling or power plant?

22         THE WITNESS:  Yes, your Honor, we were out

23  there yesterday -- yesterday in the morning.  When we

24  first went on the site, the wind was blowing

25  northwest, so it was kind of crossing over the

1    property and we did not smell anything on site.

2             As we were walking around the property,

3    the wind swirled.  I threw up some leaves to see

4    which way it was going, it now was coming back

5    more south and west, and then you could smell, it

6    would be a -- I would describe it as Cuban coffee

7    with a little bit of burnt flavor to it.

8             THE COURT:  Okay.

9    BY MS. MORA:

10       Q    All right.  Mr. Waronker, let's turn to the

11   south parcel, if the Court doesn't have any more

12   questions.

13            THE COURT:  No, okay.  That's fine.

14   BY MS. MORA:

15       Q    What properties did you select for

16   comparison purposes for the south parcel?  Let's

17   start with S1.

18       A    S1 is located far south, but it is a seven

19   acre tract with South Dixie Highway frontage.  In our

20   experience, South Dixie Highway does command a

21   premium of -- for business usage, and it was just an

22   indication of a recent sale, having sold in August

23   2011, where they indicated a value of $22 per square

24   foot.

25       Q    And what adjustments did you make to Sale

1    S1 to make it comparable to the subject property?

2        A    Decreased it for location, because of the

3    frontage on Dixie Highway, overall adjustment

4    downward, very, very slight.

5        Q    Let's turn to Comp S2.  Can you describe

6    that property to the Court?

7        A    S2 is probably the best indication, it's on

8    the northeast corner of 41st Street and 117th Avenue.

9    It sold a couple of times, the most recent sale was

10    in May of 2011.  It's 16.41 acres, very close in size

11    to the subject property, indicating a price of

12    $19.24.

13        Q    Did you make any adjustments to Sale S2 to

14    make it comparable to the subject property?

15        A    It was sold from a bank, so we plused it

16    for that particular reason.  The location is superior

17    in that that sale has extensive frontage on

18    Northwest 41st Street, and limited depth, versus the

19    subject property, who has limited frontage on

20    58th Street and extensive depth.

21        Q    All right.  Let's turn to Sale S3.  Please

22    describe what that property is to the Court.

23        A    That's a sale of a business zoned property

24    in Hialeah Gardens north of the subject property, a

25    large four acre tract, again sold in 2011 for $13.61

Page 60

1    a square foot.

2         Q    And did you need to make any adjustments to

3    make this property, S3, comparable to the subject

4    property?

5         A    Adjusted upwards for location, being that

6    Doral is superior; downward for zoning; size and

7    shape, it's a smaller piece, four acres.  Overall

8    adjustment was we felt that the subject property

9    should be valued higher than $13.61.

10        Q    Let's turn to Comp S4.  Please describe

11   that property.

12        A    S4 is on the southeast corner of

13   Northwest 17th and 111th Avenue, directly east of the

14   Dolphin Mall, a much smaller site, zoned for business

15   use.

16             The adjustment, we felt that it was

17   inferior in that it was adjacent to the Dolphin Mall,

18   which is a good retail location, very small site,

19   only two acres.

20             Therefore, the overall adjustment was

21   negative, indicating that based upon that sale, the

22   subject property should sell for less than 24.82 per

23   square foot.

24        Q    And finally, let's turn to Sale S5.  Please

25   describe that sale to the Court.

Page 61

1          A     S5 is the northwest corner of 58th Street

2    and 102nd Avenue, right in Doral.  It's an older

3    sale, sold in 4 of '09, 2.49 acres, much smaller, for

4    just under $30 a square foot.

5                Our adjustments were location, in that it

6    is a corner property with better direct access, size

7    and shape is much smaller, and overall we felt the

8    subject property should be valued less than 29.95 per

9    square foot.

10               THE COURT:  Why was that even a comp?

11               THE WITNESS:  Well, because it's a

12   commercial property in Doral, your Honor.

13               Lately there's been -- there's better

14   comps than we had a few years ago, but there's

15   still not a plethora of comparable sales, so

16   we -- and it was right there in Doral very close

17   to the subject property.

18   BY MS. MORA:

19         Q    Mr. Waronker, were the properties you

20   selected to compare with the south parcel, the

21   subject property, different then the properties

22   selected by Mr. Hanson?

23         A    Yes, Mr. Hanson did not use comparable

24   sales.  For that property he -- for the south

25   property he used a residual approach for the office

Page 62

1   and retail space, and then a value per unit for the

2   condominiums that he would project to put on that

3   part of the site.

4        Q    All right.  In reaching an opinion of value

5   for the south parcel, were you aware that there was a

6   parking structure on the debtors' property?

7        A    It would be hard to miss that, yes.

8        Q    Perhaps we should go back to the map and

9   you can identify that for the Court.

10       A    It's right ---

11       Q    Sorry, I'll move it back.

12       A    You're trying to challenge me.  It's this

13   structure right here.

14            THE COURT:  So it's on the east side of the

15   south parcel?

16            THE WITNESS:  Yes, your Honor.  It's -- if

17   I can clear -- yes, there's a road access right about

18   here.  This is a road, as you might be able to see

19   it, it goes into the north parcel.  So this parcel is

20   bifurcated by the road here in the middle.  One side

21   is the garage, the other side is vacant.

22   BY MS. MORA:

23       Q    Did you give any value to the parking

24   structure in developing your opinion of value for the

25   south parcel?

Page 63

1    A    I did not.

2    Q    Why not?

3    A    It's my understanding that the garage is
4 owned by the CDD, so it would not be under the
5 ownership of anybody buying this property.

6    Q    After making the adjustments you described
7 and the additional ---

8              THE COURT:  Is that an agreed fact?

9              MR. HUDSON:  No.

10             THE COURT:  Why do you think it's owned by
11 the CDD?

12             THE WITNESS:  Discussion with counsel,
13 Mr. Cannon's deposition, discussion with
14 Mr. Fishkind, all said it was built with public funds
15 and that a public garage -- public funds couldn't
16 be -- government funds, quasi-government funds,
17 couldn't be built -- couldn't be used to build a
18 private garage.

19             THE COURT:  What about the new Marlins
20 Stadium?

21             THE WITNESS:  Anything is possible in
22 Miami, your Honor.

23             THE COURT:  Okay.  We won't get into that.
24 I'm sure that will be a subject of litigation in
25 another court, probably not bankruptcy.

Page 64

BY MS. MORA:

Q    Mr. Waronker, after making these adjustments and undertaking this additional analysis you just described, what is your opinion of the market value of the south parcel?

A    The conclusion for the south parcel was $19 per square foot for 15,000 -- excuse me, 15.595 acres, for a total of 12,900,000.

Q    Let's now turn to the east parcel.  What comparable sales did you select to determine the market value of the east parcel?

A    The east parcel, we looked -- it was for industrial use.  We looked for industrial properties in and around the general area.  We came up with five comparable sales to estimate a value for that property.

Q    All right.  Let's go -- let's go through them one by one.  Let's start with Sale E1.  Can you please describe that property to the Court?

A    Yes, I will.  E1 is on Northwest 19th Lane and 132nd Place, which would be west of the subject property with industrial zoning, selling in July 2011 for $9 per square foot.

Q    What adjustments did you have to make to make that property comparable to the subject

1  property?

2      A    On all of these properties we adjusted

3  downward for location.  The subject industrial

4  portion would be to the very far east part of the

5  site, and not really what we would call a truly

6  accessible industrial use.  So it would have to have

7  some type of like a storage use or something of this

8  nature.

9          So we felt that all the sales were superior

10  to where the subject is, especially for

11  industrial-type use.

12          THE COURT:  Can you repeat that again --

13          THE WITNESS:  Sure, your Honor.

14          THE COURT:  -- about what the limitations

15  are and ---

16          THE WITNESS:  Can we get that map up again,

17  if that's possible?

18          MS. MORA:  Hold on.  Let me get it in

19  place.

20          THE WITNESS:  This is the parcel right

21  here, and a couple of things.  Our highest and best

22  use conclusion would be that if you have residential

23  nearby here, you wouldn't really want to put some

24  really heavy industrial use, something more casual,

25  storage for the homes that are there, and it's not,

Page 66

1    at this point in time, readily accessible other than

2    a dirt road.

3              So it's at the end of a residential

4    subdivision, and I think it would limit who

5    would -- who would you put there because I don't

6    think if you sold townhouses, single family, that

7    you would want to be telling the people there

8    that you have somebody bottling some type of

9    noxious fume product or hammering away and

10   repairing cars, so it does kind of limit your

11   usability.

12             And also it would be accessible through

13   the subdivision, which would not make any sense,

14   and maybe ultimately through 102nd Avenue, so

15   it's just not an industrial location based upon

16   its proximity to the residential.

17             THE COURT:  A coffee warehouse, and maybe

18   the residents would think everything was just from

19   the coffee.  Anyway.

20             So was it in your report or elsewhere

21   that suggested that maybe it would be like a mini

22   storage type would be one use, if you get the

23   residential --

24             THE WITNESS:  We felt ---

25             THE COURT:  -- project built?

1          THE WITNESS:  Yes, your Honor.  We felt

2    that as you have more and more residences being

3    built, which would be to the north of that and

4    obviously to the west of that, that -- and it's a

5    large tract.  Part of the tract is encumbered by a

6    pond area up here, so that's not usable.  So we're

7    talking about the area that's kind of down here.  Our

8    thoughts were more ---

9          MS. MORA:  I'm sorry.  Can you highlight

10   it, Mr. Waronker?

11         THE COURT:  The lighter color is a pond?

12         THE WITNESS:  Up here is a pond.

13         THE COURT:  Oh.

14         THE WITNESS:  Up there is a pond.  So we're

15   really focusing on this area that's down in here.

16   Mini storage, small -- for the -- for the residents,

17   maybe little garages for them to park motorcycles,

18   third cars that they can't put on their own property.

19         Also, one of our thought processes was

20   for boat storage, not high dry rack storage, but

21   where you would have either an RV or a trailer

22   and a boat, no place to put it.  A lot of the

23   subdivisions do not want you having a boat in

24   front of it, so this would be a good place to put

25   a boat with a trailer, maybe rent out strips of

Page 68

1   land, divide it however the person thought it was

2   practical so that somebody could store their RV,

3   a boat, trailer, things that would be not

4   preferred to be within the subdivision itself.

5           THE COURT:  But you didn't do an analysis

6   based on income that could be generated, you looked

7   at comparable sales and you just adjusted downward

8   significantly?

9           THE WITNESS:  Yes, your Honor, and so you

10  know, Mr. Hanson and I are within $100,000 of value

11  of that east parcel, so there's not really a

12  significant difference.

13          I think I'm at two million one and he's

14  at two million before he reduces it for a bulk

15  sale, so we're pretty close on that parcel.

16          THE COURT:  So you're -- maybe we don't

17  want to spend any time on it, then.  You're at 2.1,

18  even after you discount it for the four, five years

19  you think before it could be developed in conjunction

20  with the residential community?

21          THE WITNESS:  Yes, your Honor.  His value

22  is $2 million, but then he does take off 15 percent

23  of everything at the end, so you have to deduct 15

24  percent off of that, but it's not a ---

25          THE COURT:  All right.  Well, I'll leave it

1  to you, Ms. Mora, if you want to go through it in

2  more detail.  I'm not sure going through each of the

3  comps individually makes -- is going to really

4  enhance anything.

5           MS. MORA:  I agree, your Honor.

6           THE COURT:  Okay.

7           MS. MORA:  We'll get it clear on the

8  record.

9  BY MS. MORA:

10      Q    Your opinion of value for the east parcel,

11 Mr. Waronker, is the sum of what?

12      A    $2,100,000.

13      Q    Thank you.  In light of these three values

14 that you determined for the north parcel, the south

15 parcel and the east parcel, what opinion did you

16 arrive at for the total value estimate for the

17 debtors' property?

18      A    The total value estimate, $43.4 million.

19      Q    Did you apply any discount to the aggregate

20 value indications for the three parcels because the

21 appraisal contemplates the value to a single

22 purchaser?

23      A    No, I did not.  We talk about it, but then

24 we do not make an adjustment for that.

25      Q    And why did you not make an adjustment for

Page 70

1    that?

2         A     Kind of looked at them separately.  Part of

3    the thought process was that you would very likely

4    have somebody buy the north parcel as a residential

5    developer, and then that developer could just sell

6    off the south parcel and maybe even sell off the east

7    parcel.

8              So even though it's a large property all

9    together, we felt it could be sold off, and we also

10   recognized the fact that we were making adjustment

11   for the size throughout for the north parcel, so we

12   had already taken into consideration some of the

13   economies of sale of being a large parcel.

14             With all that said, we didn't think it

15   appropriate to do another deduction for a bulk sale

16   to one buyer because somebody could, we think, sell

17   all three parcels off to separate people, or one

18   person, or somebody could buy it and sell them off

19   separately, but it would not be anything that would

20   cause a need to make a reduction.

21        Q     Now, did you employ any sort of methodology

22   check on the sales comparison approach in determining

23   market value?

24        A     Yes, we did.

25        Q     And what did you do?

1        A    We did a land residual analysis, which we

2   also call a discounted sell-out analysis, that would

3   project what you could sell the homes for,

4   subtracting off what it would cost to build, how long

5   it would take them to sell out, and discount all that

6   back to a current value indication that somebody

7   would pay for the land as of today.

8        Q    Could you be a little bit more specific?

9   Is there anything in your report that we can refer to

10  to demonstrate your methodology in doing that?

11       A    All that is covered, excuse me, beginning

12  on Page 112.

13            THE COURT:  This is what I talked about

14  earlier, with all sorts of assumptions about density

15  and price of the units, cost of the units, sell out,

16  discount rate, a whole bunch of variables.

17            THE WITNESS:  Exactly right, your Honor,

18  and that's why we definitely footnoted it and said,

19  you know, it was just done for demonstrative

20  purposes, I don't think that's the exact words that

21  were used, it was done just as a check on the other

22  value.

23            And as your Honor pointed out

24  absolutely correctly, is that any change of price

25  to build it -- I should say, cost to build it,

Page 72

1    price you could sell it for, years of holding,

2    all those things would factor into changing the

3    value, so it was just one way for us just to look

4    at it.

5    BY MS. MORA:

6        Q    Let me ask you to turn to Page 117,

7    Mr. Waronker.  Does this chart summarize your

8    methodology in determining the value through the

9    residual land value analysis?

10       A    Yes, it does.

11       Q    So could you just walk us through, for the

12   record, exactly the analysis you undertook?

13       A    All right.  Well, to get to this level, we

14   came up with a highest and best use for the north

15   parcel, this is just on the north parcel.

16           We looked at the existing plan, which is

17   1100 units.  Excuse me, we looked at the Terra plan,

18   which was 400 units, we estimated 464 units based

19   upon studying what the -- what was happening in the

20   area.

21           We made assumptions as to the price per

22   square foot the properties would sell for, for both a

23   single family townhouse and for single family

24   residences.  We felt it would take two years to get

25   your plans, get your approvals, build -- start

1  building the properties and get them completed,

2  marketing them and then you would start selling them

3  and we projected a four-year sell out -- four years

4  to sell out the 464 units.

5          From that gross sales proceeds, we take

6  away the cost to build the product, both for the

7  townhouse and single family, separately as they sell,

8  and then we ---

9          THE COURT:  Embodied in those numbers is

10  the additional site work that would need to be done,

11  infrastructure and so forth or ---

12          THE WITNESS:  Yeah, it would be embodied in

13  that, and I think we even have a footnote, if I can

14  read it back ---

15          THE COURT:  I'm sorry, I do see the

16  footnote, includes hard and soft costs, all site

17  improvements and operating expenses.  Okay.

18          THE WITNESS:  Your eyes are better than

19  mine, your Honor.  Thank you.

20          Then we come to a net sales proceeds,

21  and then we take off an estimate of 20 percent

22  for entrepreneurial profit, and come out with net

23  cash flows.

24          So any project where you have -- where

25  you are taking land and then building buildings

1  on it, you're going to have a negative cash flow

2  until you start bringing sales dollars into the

3  bank account.

4  BY MS. MORA:

5      Q    Okay.  Mr. Waronker, let me ask you a

6  question about the 20 percent figure that you put in

7  for entrepreneurial profit.

8           Is that number truly all entrepreneurial

9  profit, or does your calculation include any other

10  costs in that number?

11      A    I think we have to go back and look.  I

12  think we said it would include some additional costs

13  in there, we just kind of lumped it in.

14           Profit typically would range from ten to 20

15  percent, and I think we went to the high end saying

16  that would account for some other additional costs.

17           THE COURT:  I don't think I understand how

18  that line item fits into a discounted cash flow.  If

19  you're doing valuation based on income, don't you

20  just look at the income after debt service and taxes,

21  insurance, other expenses, and then apply a cap rate?

22           I mean, if it's rental property there

23  would be a management cost, as well, but ---

24           THE WITNESS:  On rental property you're

25  exactly correct, your Honor.

1            On a subdivision analysis or a

2    valuation of land, on this analysis you have to

3    project -- you're trying to take the developer's

4    standpoint, if he or she buys a piece of

5    property, what expenses do they have over time,

6    what can they sell these units for ultimately and

7    then bring that back.

8            Probably it's better to look at here,

9    even if you take out the 20 percent, what we use

10   is about a 25 percent equity or excuse me,

11   internal rate of return.  So that says that based

12   upon one of the surveys we looked at, the

13   Realtyrates.com survey, they indicated internal

14   rate of return for this type of investment range

15   from 19, I think up to the 50s, and we used 25

16   percent.

17           So this says, for the risk of doing

18   something like this, the developer would want a

19   25 percent internal rate of return.  So you can

20   kind of look past the profit, if you want, and

21   that's discounting the numbers we call here net

22   sale proceeds.  If you discount those numbers at

23   25 percent, that brings you back to the

24   28 million, plus or minus.

25           THE COURT:  Okay.

Page 76

BY MS. MORA:

Q    Mr. Waronker, based upon this analysis you undertook, what opinion of value did you determine for the subject property?

A    Well, again, we relied on the sales comparison method, so our total value was still the $43.4 million.

Q    And so at the end of the day, did the residual land value approach support the opinion you developed using the sales comparison approach?

A    For the south -- excuse me, for the north parcel, yes it did, but again, as your Honor pointed out, we just -- it was kind of a test, it wasn't really given any reliance.

Q    All right.  Now, let's turn to your review of Mr. Hanson's appraisal.

Did you observe that Mr. Hanson's aggregate opinion of value is more than 50 percent greater than your value?

A    Yes.

MR. HUDSON:  Objection.

THE COURT:  Let me interrupt for a second. I know this would be a little unusual, but to try to get this done most efficiently, I was thinking of having Mr. Waronker's direct and cross, redirect,

Page 77

1    then putting on Hanson, getting his --

2              MS. MORA:  That's fine, Judge.

3              THE COURT:  -- direct and cross, and then

4    Hanson, having already heard Waronker, and I've heard

5    Waronker, could then talk about Waronker, and you can

6    bring Mr. Waronker back to talk about Hanson after

7    we've heard it.

8              It would be easier for me to understand

9    his --

10             MS. MORA:  Judge, that's ---

11             THE COURT:  -- criticisms.

12             MS. MORA:  I'm happy to defer the rebuttal

13   until after Mr. Hanson testifies.

14             THE COURT:  Okay.  Then ---

15             MS. MORA:  No further questions of the

16   witness at this time.

17             THE COURT:  So the report is in.  Are you

18   introducing at this point any of the other exhibits

19   through this witness or no?

20             MS. MORA:  Judge, you've already admitted 1

21   through 5 --

22             THE COURT:  Right.

23             MS. MORA:  -- and I think that's all we've

24   referred to so far.

25             THE COURT:  Okay.  All right.  Who's taking

Page 78

1   the lead in the cross?

2          MR. HUDSON:  I will, your Honor, but for

3   housekeeping, I would rather it not be broken up for

4   lunch if we can avoid that, so I have two alternative

5   requests:  One, that we take an early lunch and come

6   back early and start it or, two, that I have a

7   five-minute comfort break, either one.

8          THE COURT:  Well, let's -- when you say

9   broken up, you mean finishing the cross?

10          MR. HUDSON:  I don't want to have to break

11  at noon.

12          THE COURT:  Okay.  That's fine.  Let's take

13  a five-minute break and it would be my intention to

14  finish this witness before lunch.

15          (Thereupon, a brief recess was taken, after

16      which the following proceedings were had:)

17          THE COURT:  Let's proceed.

18          MR. HUDSON:  Thank you, your Honor.

19                  CROSS EXAMINATION

20  BY MR. HUDSON:

21      Q    Good morning, sir.

22      A    Good morning.

23      Q    Almost afternoon.

24      A    Yes, sir.

25      Q    Do you have your report in front of you?

1       A    Yes, sir, I do.

2       Q    That would be exhibits, I believe, 1

3  through 5 that were marked this morning --

4       A    Yes, sir.

5       Q    -- correct?

6            I'm just going to refer to it by page

7  number, I think it's easier for everybody as opposed

8  to exhibits.  If you have any confusion with any of

9  my questions or reference to a particular document,

10 just let me know?

11      A    Yes, sir.  Thank you.

12      Q    Thank you.

13           All right.  Does your copy, sir, have your

14 original cover letter on it?

15      A    Yes, sir?

16      Q    A letter dated December 20, 2011.

17      A    Yes, sir, it does.

18      Q    Does that reference who your client is?

19      A    The letter is written to my client.

20      Q    And that's Ms. Mora?

21      A    As I understand.

22      Q    Did you have any other clients in this

23 engagement?

24      A    We would list the clients in the section of

25 the appraisal report labeled intended use and user.

1        Q    Okay.  Can you go to that, please?

2        A    It says ---

3        Q    What page?

4        A    I'm sorry, I thought you were already

5    there.  Page 30.

6        Q    30?

7        A    Yes, sir, Page 30.

8        Q    Okay.  Go ahead and tell us what it says.

9        A    It says the intended user of this appraisal

10   is Mindy A. Mora, P.A, of Bilzin Sumberg Baena Price

11   & Axelrod, LLP (client).  The intended use of this

12   appraisal is for asset valuation in connection with a

13   possible acquisition by Terra World Investments, LLC.

14       Q    Okay.  That would be an acquisition of the

15   subject property that we're talking about today?

16       A    That was my understanding.

17       Q    Okay.  Who gave you that understanding?

18       A    Ms. Mora.

19       Q    When was that?

20       A    It would have been on the onset of the

21   assignment.

22       Q    When did Ms. Mora first reach out to you

23   regarding this assignment?

24       A    Let me see.  I don't have the exact date.

25   My letter to her to engage me was November 2nd and I

Page 81

1    believe it was a month -- within a month of October,

2    if I recall.

3         Q    Is someone other than Ms. Mora or

4    Ms. Mora's firm paying you in this matter?

5         A    Yes.

6         Q    Who is that?

7         A    Terra.

8         Q    Do you know why Terra is paying you and not

9    Ms. Mora, not your client?

10        A    I assume ---

11             MS. MORA:  Objection, your Honor.  I would

12   ask the witness not to offer any guesses, ask that he

13   testify only from his personal knowledge.

14             THE COURT:  Okay.  I'll sustain it.  Do you

15   know why they're paying?

16             THE WITNESS:  The only thing I would

17   know ---

18             THE COURT:  Were you told why they were

19   paying?

20             THE WITNESS:  Let me refer to my letter of

21   engagement just to make sure there was nothing in

22   there, your Honor.

23             THE COURT:  All right.

24             THE WITNESS:  No, I do not.

25   BY MR. HUDSON:

1      Q     No, you don't know why Terra is paying you?

2      A     No.

3      Q     Okay.  Do you know whether Terra has made

4   an offer to buy this property from the bankruptcy

5   debtor?

6      A     No, I do not.

7      Q     Okay.  Back to your letter, the second

8   paragraph, seems to contain a warning, people other

9   than the client or intended user from relying on this

10  information.

11            Do you see this?

12     A     Yes, sir, I do.

13     Q     What's the purpose of that warning?

14     A     That's just a standard warning that we put

15  in all appraisal reports.

16     Q     Okay.  Who are the intended users with

17  respect to this report?

18     A     Well, the intended user originally would be

19  Ms. Mora, understanding that it's here in Bankruptcy

20  Court, that it would morph into this -- this

21  proceeding.

22     Q     Judge Mark, this Court, the trier of fact?

23     A     Yes, sir, that's what I would understand.

24     Q     So was that an oversight or did something

25  change with respect to this?

1        A    That is a standard paragraph in every

2    appraisal we send out.

3        Q    No, but the fact that you did not include

4    the Court as an intended user, why was that omission

5    in there or not in there?

6        A    My original assignment was -- my client was

7    Ms. Mora for that purpose, nobody corrected it

8    otherwise.

9        Q    Were you retained prior to the bankruptcy

10   to do this?

11       A    Prior to the bankruptcy?  I don't know when

12   the bankruptcy is.

13       Q    Prior to the bankruptcy filing.

14            MS. MORA:  Objection, relevance.

15            THE COURT:  Yes, I want to give you time

16   for cross, but where are we going with this?

17            MR. HUDSON:  Well, I'm trying to find

18   out ---

19            THE COURT:  I mean, ultimately however he

20   described it, as I understand it, he did a market

21   value appraisal, just as Mr. Hanson did.  Maybe they

22   did different methodologies, but ---

23            MR. HUDSON:  Well, I'm trying to find out

24   on this particular question, your Honor, whether he

25   was engaged prior to the bankruptcy and, therefore,

Page 84

1    maybe the market value changed or the scope of work

2    changed or the purpose changed, I don't know.

3              He just testified he doesn't know when

4    he was retained.

5              THE COURT:  I'm going to sustain the

6    objection, I don't think it's relevant.  I may need

7    to reign in the cross in order to get through all

8    this.  Keep in mind we're finishing today.

9              MR. HUDSON:  Understood, Judge.

10   BY MR. HUDSON:

11       Q    Sir, two appraisers signed this appraisal;

12   correct?

13       A    Yes, sir.

14       Q    Who were they?

15       A    Myself and Mr. Carlos Diaz.

16       Q    Who is Mr. Diaz?

17       A    Mr. Diaz is an independent contractor

18   that's been working with us for a few years.  Let me

19   look at his qualifications.  On Page 26 he states

20   he's been with us since 2007, September.

21       Q    Do you know how long he's been a licensed

22   appraiser in the State of Florida?

23       A    He's state certified within the last few

24   years.

25       Q    Okay.  Do you recall at your deposition

1    that you were asked whether you knew that he was

2    licensed in November of 2010?

3         A    I recall somebody asked me that.

4         Q    Okay, and is it your belief, sir, that he

5    was licensed in November of 2010?

6         A    If front of me I have nothing that shows

7    anything different.  I would accept that, it sounds

8    approximately like the timeframe.

9         Q    Okay.  What was the division of labor

10   between you and he with respect to this report?

11        A    Mr. Diaz would be the individual to gather

12   the data, do the market study.  All through the

13   process he would come to me to ask me to go over the

14   comparable sales that he's picked, if I think they're

15   sufficient, if they need more comparable sales.  He

16   would do the discount sell-out analysis and he would

17   write predominantly most of the report and as we --

18   as he did that, we would talk through it.

19             He would complete it, give it to me, I

20   would read through it and then we would publish it.

21        Q    So he did most of the drafting?

22        A    Yes, sir.

23        Q    He did most of the substantive analysis?

24        A    We did the substantive analysis together.

25   In other words, when we talk about the sales and we

1    try to ascertain which sales we think are the best

2    sales and the most reliable, that's the part that we

3    definitely do together.

4         Q    How about inspection of the properties,

5    were all of the comparables inspected physically?

6         A    I cannot testify to that, that's usually

7    what he would do.  Some of the sales come right out

8    of our database, so somebody in our office would have

9    typically looked at the property.

10        Q    Okay.  Take a look at the map that we put

11   up, please.

12        A    Yes, sir.

13        Q    Can you see that okay?

14        A    Yes, sir.

15             MR. HUDSON:  Judge, can you see okay?

16             THE COURT:  Uh-huh.

17   BY MR. HUDSON:

18        Q    All right.  The subject property is orange

19   or red; correct?

20        A    Yes, sir.

21        Q    All right.  Do you see the boxes where we

22   have designations for the various comps that are

23   contained in your report?

24        A    Yes, sir, I do.

25        Q    Okay.  Good.  Are those boxes consistent

1    with your understanding of the appropriate comps as

2    identified as N1, 2 and 3 in your report?

3         A    Yes, sir, they are.

4         Q    So N1 would be to the north and somewhat

5    east, or at least on the eastern portion of the

6    subject property; correct?

7         A    Western.

8         Q    Western, I'm sorry; correct?

9         A    I don't think it was a trick question

10   though.

11        Q    And N2 and N3 are also north, but a little

12   bit on the east side?

13        A    No, N2A and B are north, and 3 is down here

14   to the south.

15        Q    N2A and N2B?

16        A    I apologize.  Okay.

17             THE COURT:  What does that mean N2A and

18   N2B?

19   BY MR. HUDSON:

20        Q    Sir, did you make those designations?

21        A    N2 is one of our comparables, and it had

22   two tracts, A and B.

23             THE COURT:  Okay.  So there's a piece there

24   that -- who owns the piece in between 2A and 2B, does

25   anybody know?

Page 88

1           THE WITNESS:  Offhand I don't know.

2           THE COURT:  Okay.

3   BY MR. HUDSON:

4       Q    So who physically inspected, N1, N2A, N2B

5   and N3, if you know?

6       A    Well, I looked at N3.  I looked at N1.  I

7   looked over the land area to see where N2A and B was.

8   Mr. Diaz told me that he drove down here to get to

9   the subject site, so he looked at N2A and N2B.

10          THE COURT:  Just for the record, down here

11  meaning --

12          THE WITNESS:  I apologize.

13          THE COURT:  -- right along 102nd Avenue?

14          THE WITNESS:  Yes, sir, right through here.

15  On his initial inspection of the sales he went down

16  that road.  I looked at N3, I looked at N1, I looked

17  at N2 and N2A beyond that.

18  BY MR. HUDSON:

19      Q    Okay.  When did you first -- strike that.

20          Did you ever physically have access to the

21  subject property?

22      A    Yes.

23      Q    When did you first inspect it?

24      A    I think it was on the 20th of December.

25      Q    What's the date of your report?

Page 89

1        A    20th of December.

2        Q    So the first time you physically inspected

3   the property was the date of your report?

4        A    Correct.

5        Q    Okay.  Did you have access to the property

6   at that point?

7        A    No, sir.

8        Q    So how did you inspect it?

9        A    From the gate, from the roads, from the

10  perimeter roads.

11       Q    Which ones?

12       A    58th Street, 107th Avenue, and there is

13  little inlets over here, I looked down where 62nd --

14  66th Street is.

15       Q    And what did you observe from the perimeter

16  of the property?

17       A    From the perimeter of the property down

18  here, you observe that there's a road -- roads are

19  in, you see the garage.  Up here you see some

20  infrastructure having begun, more roads, you see some

21  curbing, you see some drainage, you see just what

22  would appear to be ongoing infrastructure that had

23  not been ongoing anymore.

24       Q    And when you personally inspected the

25  comparable sites that you indicated earlier you

Page 90

1    inspected, when did you do that?

2        A    Same day.

3        Q    Same day.  What did you observe there?

4        A    Vacant parcels, overgrown, adjacent to the

5    north of the subject property, pretty -- pretty

6    standard.

7        Q    No signs of improvement of any type?

8        A    No, sir, no signs of improvement.

9        Q    Had the properties been de-mucked, could

10   you tell?

11       A    You can't tell if they've been de-mucked.

12   Typically they would not be, there would be some need

13   to de-muck usually.

14       Q    So there had been no development work, to

15   the best of your ability, to observe them on that

16   particular day; correct?

17       A    That is correct.

18       Q    Is that consistent with N1, 2 and 3?

19       A    I can't testify to the muck, they do

20   definitely need clearing.

21       Q    Which ones -- I'm sorry.  Which ones did

22   Mr. Diaz look at that you did not?

23       A    He went down here and looked at N2A and

24   N2B --

25       Q    So you did not ---

1        A     -- closer.

2        Q     You did not look at those two; correct?

3        A     I looked at them from -- from the street

4   level to see what was going on.  We've done 48

5   different appraisals in this area over the years, of

6   which a bunch was done for the School Board of Miami,

7   so I was tangentially familiar with the area.

8        Q     Do you have any reason to believe the

9   condition of N2A and N2B is any different from what

10  you saw on N1 and N3?

11       A     No.  The other day, in fact, I went down

12  102nd Avenue and it was exactly the way I expected to

13  see it.

14       Q     Okay.  Can you estimate for the Court

15  approximately what percentage of this report was

16  accomplished, both the drafting and the investigation

17  and the analysis, by Mr. Diaz as opposed to yourself?

18       A     I would say probably 80, 90 percent would

19  be typical for the individual appraiser working for

20  us that would do the drafting of it, the writing and

21  the research, and then myself or my business partner

22  would do the supervision and conclusions of value.

23       Q     Did Mr. Diaz come to you with his

24  suggestions regarding conclusions of value before you

25  commented or modified them?

1      A      Generally that's an ongoing process, yes,

2  sir.

3      Q      All right.  On Page 30 of your report,

4  definition of interest being appraised, what does it

5  mean when you say unencumbered fee simple interest?

6      A      Unencumbered means no easements,

7  encroachments, conditions like that.

8      Q      No easements?

9      A      Encroachments.

10     Q      Encroachments.  What about interfering land

11 ownership rights of others, would that be included in

12 there, as well?

13     A      Can you give me an example of what you're

14 saying?

15     Q      For instance, the roads.

16     A      Right.

17     Q      You now acknowledge the roads are owned by

18 the CDD; correct?

19     A      I understand that to be correct.

20     Q      And this morning you testified that you

21 were informed that the garage was owned by the CDD;

22 is that correct?

23     A      That's correct.

24     Q      How did you know -- when did you first

25 determine from your own analysis that the roads were

Page 93

1    owned by the CDD?

2         A    I really didn't determine by my own

3    analysis.  We looked at the property and just didn't

4    feel that the infrastructure there, the roads, added

5    any value over and above what we already estimated

6    the value to be.

7         Q    In fact, that's what your report says;

8    right?

9         A    That is correct.

10        Q    So when you were -- let's start with

11   Mr. Diaz.  When Mr. Diaz was preparing this report,

12   wouldn't he have looked at something, property

13   records or something, to determine who owned the

14   property within the subject site?

15        A    Yes, sir, he did.

16        Q    He did that?

17        A    Yes, sir.

18        Q    How do you know he did that?

19        A    Because I saw the results of what he did.

20        Q    What did you see?

21        A    I saw five tax folio numbers that he

22   printed out, and I don't want to say analyzed, but

23   charted that constitute the property to be appraised.

24        Q    Okay.  Are any of those documents attached

25   to your report?

Page 94

1      A      They're in the report.

2      Q      Where?

3      A      Pages 15, and 16, and 17.

4      Q      And can you point to me in the report where

5   those pages say these roads are owned by the CDD?

6      A      I never said that.

7      Q      Do you know how many acres the CDD roads

8   comprise within the project?

9      A      Well, Tax Folio 0240, I would have to look

10  at the size of that site.

11     Q      Sir, are you trying to calculate, is that

12  what you're trying to do?

13     A      I was looking for the printout of Tax Folio

14  0362.  I don't have that -- the printout.

15     Q      Okay.  As you sit here today, is there

16  anything in your report that will tell us that the

17  CDD owns the roads, number one, and number two, what

18  the acreage of those roads is?

19     A      Not that I see.

20     Q      How would a reader of your report realize

21  that a substantial portion of the subject property

22  was actually owned by someone other than your client

23  in the matter?

24     A      We appraised the entire property.

25     Q      There was no exclusion -- no consideration

1    for an exclusion for the roads?

2        A    Correct.

3        Q    Turn to 33, please.  Under history of the

4    subject property, read the last sentence, please.

5        A    Subsequently, the developer's lenders and

6    the Community Development District ---

7        Q    No, sir, I'm sorry.  Are you on Page 33 of

8    your report --

9        A    Yes, sir.

10       Q    -- under history of the subject property?

11       A    Last sentence.

12       Q    The last sentence that I have says in

13   December 2011.

14       A    I apologize, I was -- I didn't see that up

15   here.

16            In December 2011, a bankruptcy judge

17   reportedly approved a proposal by Terra World

18   Investments to find the property owner's

19   reorganization plan -- to fund the property owner's

20   reorganization plan under the bankruptcy in exchange

21   for title to the subject property.

22       Q    Okay.  Who put that in the report, do you

23   know?

24       A    Mr. Diaz.

25       Q    Do you know why that's in the report?

1        A     No, just a matter of fact, I guess.

2        Q     Please turn to Page 34, under site data.

3   Who made the calculations contained in Paragraph 2?

4        A     Mr. Diaz.

5        Q     Who made the statements that are contained

6   in the last paragraph on the page that begins, roads

7   that have been, and continues onto the next page?  Is

8   that you or Mr. Diaz?

9        A     I'm sorry, what page?  I apologize.

10       Q     34 at the bottom?

11       A     Roads that have been partially constructed?

12       Q     Correct.  Whose statement is that?

13       A     Mr. Diaz.

14       Q     When did Mr. Diaz first view the site, do

15   you know?

16       A     It was a couple weeks before I did.

17       Q     And he didn't have access to the interior

18   either, did he?

19       A     That's correct.

20       Q     Did he ever go on the site, actually?  Did

21   he ever have full and complete access?

22       A     No, sir.

23       Q     So the only person from your office that's

24   been on that site was you on the date of your report?

25       A     Yes, sir.

1    Q    All right.  On Page 35, do you see the

2  middle paragraph, the site is level?

3    A    Yes, sir.

4    Q    Okay.  That first sentence suggests that

5  the site has been graded, de-mucked and fill brought

6  in; correct?

7    A    Correct.

8    Q    Read the last sentence in that paragraph,

9  according to, do you see that?

10    A    According to a representative of Terra

11  World Investments, which is pursuing a plan to

12  acquire the site, no utilities have been brought to

13  the site.

14    Q    Who's responsible for that statement, you

15  or Mr. Diaz?

16    A    Mr. Diaz, I believe, talked to Mr. Pearl.

17    Q    Do you know that for sure or you're

18  guessing?

19    A    I know he talked to Mr. Pearl.

20    Q    Do you know if he talked to Mr. Pearl about

21  this particular issue?

22    A    If he wrote that in there, yes.

23    Q    Is that statement true?

24    A    My inspection, you have utilities to the

25  outskirts and you have some limited utilities on the

1    inskirts.

2        Q    Did you read the engineering report of the

3    District engineer, any of them?

4        A    I looked at Mr. Alvarez' report.

5        Q    Which one?

6        A    Dated January 13, 2011.

7        Q    When did you first look at that report?

8        A    That was given to me recently.

9        Q    After you published your report; correct?

10       A    Yes, sir.

11       Q    You didn't look at the engineering reports

12   prior to publishing the report?

13       A    I did not see them, no, sir.

14       Q    What information is contained in those

15   engineering reports relative to the completion of the

16   infrastructure?

17       A    It says it needs roughly $16 million to

18   complete the infrastructure.

19       Q    And numerically does it say how much is

20   complete to date?

21       A    I believe there were different percentages

22   for different portions.

23       Q    Would you please take a look at the

24   document?

25            THE COURT:  He already acknowledged in

Page 99

1    direct that he had no basis to challenge those

2    percentages.

3         MR. HUDSON:  He's just acknowledged he

4    didn't see those when he was doing his report, your

5    Honor.  He didn't use those or consider them when he

6    published his report.

7         THE COURT:  Right, but -- okay.

8    BY MR. HUDSON:

9         Q    Sir, have you arrived at the pages that

10   will give you that information?

11        A    There's one page with de-mucking and fill,

12   clear and grub was a hundred percent.

13        THE COURT:  Are we looking now at Hanson's

14   report?

15        THE WITNESS:  No, we're looking -- I

16   apologize.

17   BY MR. HUDSON:

18        Q    What are you looking at, sir?

19        A    The Alvarez report dated January 2011.

20        Q    Where are you seeing that particular

21   document?

22        A    It says here -- I got a Bates Stamp of 589.

23        Q    What binder are you looking at, sir?

24        A    My own binder.

25        Q    You have your own binder on the stand?

1        A     Yes, sir.

2        Q     It's not an exhibit binder?

3        A     I have an exhibit binder.  Is that in the

4   exhibit?

5              MR. HUDSON:  Your Honor, I don't know what

6   the witness has.  May we inquire?

7              THE COURT:  Why don't you start your

8   question again, but let's keep in mind, I understand

9   the testimony that he did not give value to the

10  improvements and he's acknowledged on direct that the

11  status of the improvements is as stated in the

12  exhibits to Mr. Hanson's report, so let's work from

13  those two things already being in the record.

14  BY MR. HUDSON:

15       Q     Is it your understanding, sir, having now

16  read some of those engineering reports, that the

17  value of the infrastructure in the ground exceeds

18  $40 million?

19       A     No, sir.

20       Q     What is your understanding?

21       A     My understanding is the cost has exceeded

22  that amount.

23       Q     Does that include the parking garage on the

24  south parcel?

25       A     The parking garage is included in here with

1    a budgeted cost.

2        Q    How much do they have so far invested in

3    the parking garage on the south side?

4        A    In front of me it says, budgeted cost 2006

5    was 14 million, I'm going to round, 700,000 dollars.

6        Q    Okay.  Do you have any idea what the

7    percentage of completion of the parking garage is?

8        A    At the time this was prepared, they were

9    saying it was 99.61 percent complete.

10       Q    So based upon that budget, and based upon

11   the percentage of completion, would it be fair to say

12   that there's in excess of $12 million invested in

13   that parking garage to date?

14            MS. MORA:  Objection, calls for conjecture,

15   Judge.

16            THE COURT:  I'll reserve on that.  I'm not

17   sure what the witness was referring to when he used

18   those other numbers of 13 or 14.

19            What are you looking at?

20            THE WITNESS:  I'm looking at the Alvarez

21   report, which does a -- categorizes the

22   infrastructure, excuse me, on improvements and as to

23   how much percentage in place and how much ---

24            THE COURT:  Is this an exhibit you're going

25   to introduce anyway?

1          MR. HUDSON:  It may be introduced in a

2   different context, your Honor, that's the issue for

3   the moment.

4          THE COURT:  Do you want him to look at the

5   report to answer your questions or no?

6          MR. HUTTON:  We have both the 2009 report

7   and 2011 report by Alvarez Engineering in our exhibit

8   binder as Exhibit ---

9          MR. HUDSON:  Judge, I don't want to slow

10  the cross down because I know we need to get moving,

11  so I just have another question or two on the garage

12  and we'll move forward, and then later if they

13  choose, we may reserve the right to bring him back.

14         THE COURT:  Okay.  I'm going to overrule

15  the objection.

16         Do you have reason to believe from

17  anything you've looked at that there's at least

18  $12 million that went into the garage?

19         THE WITNESS:  By the report there, it would

20  appear that there's at least $12 million that has

21  been spent to construct the garage, yes, your Honor.

22  BY MR. HUDSON:

23     Q    And in your report, sir, you give no value

24  to the garage; correct?

25     A    That's correct.

1      Q      Why?

2      A      In our report we looked at the highest and

3  best use, having originally been approved for 1100

4  units, not being able to be put on the site today.

5  That garage and the road adjacent to the garage

6  basically bifurcates the property.

7          We were under the opinion that you would

8  not, having a clean slate today, the highest and best

9  use would not be to put a garage there and bifurcate

10 it with a road, so you would do something completely

11 different.

12         It would not allow you to put, for example,

13 a Sedanos or some large box space there, you've --

14 you've already, for lack of a better word, messed up

15 the site.

16         THE COURT:  The highest and best -- I'm not

17 sure I understand.  The highest and best use in your

18 contemplation would mean tearing down the garage or

19 that's not what you're saying?

20         THE WITNESS:  What I'm saying is that by --

21 based upon our value, it doesn't -- it doesn't add

22 any value to the situation, and what you have -- what

23 you have there, is now you have, pretty much with a

24 garage there, directed what you're going to do on

25 that property, and then you've taken away some of the

Page 104

1   alternatives that somebody might look at.

2          So ---

3          THE COURT:  The negatives of having the

4   property bifurcated and its use limited, perhaps in

5   terms of availability for certain big box stores,

6   outweighs the value of the garage or neutralizes the

7   value.

8          THE WITNESS:  In our opinion, yes.  You

9   always, as an appraiser, come up with the highest and

10  best use as vacant, and looking at that parcel, if

11  that was a vacant parcel, that would not be what

12  would be recommended for that site.

13         This parcel was -- plans were approved

14  back in -- I shouldn't say approved, started, I

15  think, in '03, '05, '06, and that was a different

16  marketplace, and you would not do what they're

17  doing today there.

18         If it was -- if it was vacant, I would

19  be hard pressed to say that somebody should build

20  a garage on the elongated part of the site on

21  what would be a quasi retail location.

22  BY MR. HUDSON:

23      Q    What does contributory value mean in the

24  context of an appraisal?

25      A    It means if it adds any additional value to

1    the property.

2         Q    We're jumping ahead a little bit, but your

3    valuation on the south parcel is based upon comps

4    that you utilized in a raw land context; correct?

5         A    On the south side, no.  The best -- the

6    best comp would be the Codina sale on the northeast

7    corner of 41st, and all the roads are in, the

8    sidewalk is in, it's at grade level ready to go.

9         Q    But it doesn't have a garage; correct?

10        A    And they're probably thankful that it

11   doesn't.

12        Q    Are you aware that Terra is intending on

13   using that garage?  Is that a surprise to you?

14        A    I have no idea what they're intending to do

15   with the garage.

16        Q    Is there a typical rule of thumb or typical

17   number that a developer would estimate the cost per

18   unit of a garage like this to build?

19        A    Their costs are probably -- that I saw,

20   they were probably in line with what's practical.

21        Q    Is there such a number?  Are you aware of

22   such a number?

23        A    There's numbers in cost manuals, yes, sir.

24        Q    Okay, and what are those numbers per -- per

25   space?

1        A     Cost somewhere in the 15, maybe 20,000,

2    depends upon where you're building it, how high

3    you're building it, what kind of structure it is.

4              This particular case, I think they set

5    aside -- the budget was just under 15 million for 900

6    spaces, so it's pretty much a little over 15,000 per

7    space, that's pretty consistent.

8        Q     So if a developer wanted to replace this

9    particular garage, it would cost him $15 million to

10   do it?

11       A     If they wanted to replace it, yes, it

12   would, sir.

13       Q     If a developer could use the garage in his

14   project, he would contemplate buying a project like

15   this with a garage already built, potentially saving

16   some money; correct?

17       A     The answer to that question would be, if he

18   could use the garage the way it is, and then was

19   happy with the plan that -- the way you would have to

20   build it, yes, he could -- he could use the garage.

21       Q     Has Terra -- has anyone told you at Terra

22   they're not going to use the garage?

23       A     No.

24       Q     Okay.  Are you aware that they do, in fact,

25   intend on using the garage?

Page 107

```
 1        A     I'm not aware one way or the other.

 2        Q     Do you know who Mr. Fishkind is?

 3        A     Yes, I do.

 4        Q     Who is he?

 5        A     The gentleman sitting behind you.

 6        Q     And he's engaged in this matter --

 7        A     Yes, sir.

 8        Q     -- is that correct?

 9        A     Yes, sir.

10        Q     To do what, do you know?

11        A     I know Mr. Fishkind is an expert in

12 marketing and economic studies.

13        Q     Have you spoken with him about this

14 engagement?

15        A     Yes.

16        Q     When?

17        A     Briefly on one phone call, and most

18 recently over the last couple of days.

19        Q     Did you guys ever discuss the garage?

20        A     We've talked about the garage.

21        Q     Did he tell you that his client intended --

22 his client being Terra; correct?

23        A     I don't know that.

24        Q     You don't know that?

25        A     No.
```

Page 108

1       Q     Did he ever tell you that Terra intended on
2   using the garage?
3       A     No.
4       Q     He didn't say that?
5       A     No.
6       Q     What was the purpose of the discussion
7   regarding the garage?
8       A     Part of the discussion was that the garage
9   was owned by the CDD, part of the discussion was --
10  on my benefit was, would you, on the highest and best
11  use, would you put a garage there.
12      Q     Is it your position today, as you sit here,
13  that the garage is owned by the CDD?
14      A     That's what I was informed.
15      Q     Who told you that?
16      A     Counsel, also Mr. Cannon's report where he
17  said or insinuated that the -- that the CDD owned the
18  garage.
19      Q     He insinuated?
20      A     He said that -- I think his critique of me
21  was I did not consider the fact that the CDD owned
22  the garage.
23      Q     Okay.  Earlier in your direct, the only
24  reason you suggested that you didn't include any
25  value was because it was owned by the CDD.

Page 109

1          So if you were in error, and it's, in fact,

2    owned by the debtors, would that change your value

3    opinion at all?

4          A    No, my opinion is it doesn't contribute

5    value to the property.  Secondly, subsequent, if it's

6    not owned or if it is owned by the CDD, then it

7    wouldn't be -- additionally, it wouldn't be valued,

8    so on both cases it would have no value.

9          Q    Okay.  Let's go to your comps, please.

10   What's the approximate acreage of N1?

11         A    Approximately 20 acres.

12         Q    What's the combined acreage of N2A and N2B?

13         A    32.4.

14         Q    32.4?

15         A    Yes, sir.

16         Q    Okay, and N3?

17         A    N3 is 17 acres.

18         Q    And what do the three of those total,

19   approximately?

20         A    Total acreage.

21         Q    Yes.

22         A    I'm getting about 71.4 in my head.

23         Q    So larger than your net calculation of the

24   subject property; correct?

25              THE COURT:  I'm getting like 69.4 in my

```
 1   head.
 2              THE WITNESS:  Well, you've got a better
 3   head than me, your Honor.  Yes, you're right, 69.4.
 4   BY MR. HUDSON:
 5       Q    So larger than your net calculation of the
 6   subject north property, which is what you were
 7   comparing with respect to N1, 2 and 3; correct?
 8       A    That is correct.
 9       Q    And they were all purchased at about the
10   same time, August and September of 2011; correct?
11       A    That is correct.
12       Q    And all purchased -- strike that.
13              Terra has an interest in the ownership of
14   all of them; correct?
15       A    Correct, two are outright purchases and one
16   was part of a joint venture.
17       Q    And the subject property is right in the
18   middle of all three; correct?
19       A    Yes, sir.
20       Q    Now, explain to us with respect to N1,
21   there seems to be a little bit of confusion over the
22   net gross distinction.
23              Do you know what I mean by that?
24       A    Yes, sir.
25       Q    All right.  Explain to the Court.
```

1        A     The gross would include the area underneath
2   the power line easement.
3        Q     Which property are we talking about first?
4        A     N1 you said.
5        Q     N1, right.  Let's go.
6        A     Let me clear that up, maybe we'll start
7   again.  So this area is the gross area, if you would,
8   and then this area is a hundred seventy foot wide
9   power line easement.
10       Q     And that's the same easement that is on the
11  western portion of the subject property; correct?
12       A     Correct, that easement extends all the way
13  down here.
14       Q     When you calculated your square footage
15  price on N1, did you include or exclude the acreage
16  with respect to the power line?
17       A     On N1 we included it, we called it 20 gross
18  acres.
19       Q     Okay, and on the subject property, when you
20  calculated the net on the north, did you include or
21  exclude the easement?
22       A     We excluded.
23       Q     Does that create an apples to oranges
24  problem?
25       A     Yeah, I think that's why I stated earlier

Page 112

1  we made a plus adjustment for that, but that we

2  probably should have just done a net calculation.

3      Q    Okay.  It seems to me you ought to be able

4  to quickly make that calculation.

5          Can you do that calculation for the Court

6  today on a square footage basis?  If you were to

7  do -- you understand the calculation I want to do,

8  sir?

9      A    Yes, sir, I had done it, and I don't

10  know ---

11          THE COURT:  The easement was not removed in

12  looking at the total acres for N1 --

13          THE WITNESS:  Correct.

14          THE COURT:  -- but was for the subject?

15          THE WITNESS:  Correct, we did a plus

16  adjustment, but we probably should have done a net

17  calculation.

18  BY MR. HUDSON:

19      Q    Do you have a calculator with you, sir?

20  Can you do the calculation?

21      A    I do have a calculation, it's a hundred

22  seventy, but I don't know what the -- what the width

23  of that parcel is.

24      Q    Your report indicates, and you do the

25  calculation as you choose, but the report calculates

1    that you subtracted two and a half acres from a 20

2    acre gross.

3         A    Let me get to that, if you would.

4              THE COURT:  Why do you say he subtracted,

5    if he didn't in the comp?  What are you referring to?

6              MR. HUDSON:  Your Honor, with respect to

7    the north parcel, he calculated a value on the

8    reduced -- on the larger portion, including the

9    easement, and on his calculation for the subject

10   property, he excluded the easement from his

11   calculation.

12             THE COURT:  I understand, but where are you

13   getting the two and a half acre easement on N1?

14             THE WITNESS:  You want me to help you on

15   that, your Honor?  It would be a hundred seventy feet

16   wide by 650 foot length.

17             THE COURT:  Okay.  All right.  So we would

18   get a different price per square foot if we used 17

19   and a half acres, which ---

20   BY MR. HUDSON:

21        Q    It would be a higher price, correct, sir?

22        A    Yes, it would.

23             THE COURT:  Is that something that Mr. Diaz

24   did that you just didn't catch, that if you had been

25   doing the nuts and bolts of this comp you would have

1   done with the net?

2          THE WITNESS:  I think I take partial blame,

3   your Honor.  We were shifting from gross to net

4   because there was just so many power line easements.

5   We originally started on gross and we shifted over to

6   net because there was such a significant amount of

7   power line easement.

8          THE COURT:  Okay.  But you acknowledge to

9   make it a more accurate comp, you would go with net

10  of easement, because that's what you used in

11  calculating the value of the subject property?

12         THE WITNESS:  Correct, yes, sir.  As we

13  stated earlier, this is Sale Number N1, and the

14  grantee -- this is the one where there became a joint

15  venture, and we, I think in our conversation, said we

16  didn't really put significant reliance on this

17  because there is a relationship to the parties in

18  that they're now a joint venture, so it's not the, I

19  feel, the best sale.

20  BY MR. HUDSON:

21     Q     Did you complete the calculation, sir?

22     A     Yes, sir.  $18.40 a square foot.

23     Q     Okay.  Instead of 16.07?

24     A     That is correct.

25     Q     How would you, then, adjust your -- the

Page 115

1   balance of your calculations vis-a-vis N1 and the

2   subject property?

3        A    It's a smaller site, therefore -- it's even

4   much smaller than the subject property by another two

5   and a half acres, we would still make a negative

6   because it's not a -- it's an ownership purchased by

7   a joint venture with no money into the investment, so

8   it would still be a negative adjustment.

9        Q    Let's go to 77 and move it forward.  On 77

10  is your chart with your pluses and minuses; correct?

11       A    Yes, sir.

12       Q    So would the chart change?

13       A    No, sir.

14       Q    The chart wouldn't change?

15       A    No, sir.

16       Q    Okay.  You gave the subject property an $11

17  a square foot analysis, the north parcel; correct?

18       A    Yes, sir.

19       Q    For purposes of estimating your $24 million

20  on the north parcel?

21       A    Yes, sir.

22       Q    Okay.  $11 versus $18 is a substantial

23  difference, you would agree with that?

24       A    I would agree with that.

25       Q    Okay.  Now, let's compare the two

1    properties.  Let's start with the map.  They're very

2    close to one another geographically; correct?

3        A    That is correct.

4        Q    They both have access to 107th; is that

5    correct?

6        A    Correct.

7        Q    You've acknowledged that, at least at a

8    minimum, there's de-mucking and there's fill on the

9    subject property, and there isn't on N1; correct?

10       A    Correct.

11       Q    So access would be similar --

12       A    Correct.

13       Q    -- correct?

14            Infrastructure would add value, at a

15   minimum, the de-mucking and the fill; correct?

16       A    Depends on what you have to do on the

17   subject site to make it to the highest and best use.

18   I'd reserve agreement on that.

19       Q    You don't believe that the subject site is

20   more valuable because of its current state of

21   improvement than N1?

22       A    You have improvements on there, but it's

23   not the highest and best use.  So now you have to

24   tear out what's there and redo them to make use of it

25   under the proper highest and best use.

1    Q    Well, that's your opinion, sir --

2    A    That's my opinion --

3    Q    -- right?

4    A    -- and that's other people's opinion, too.

5    Q    Okay.  Is that Terra's opinion?

6    A    Terra's opinion is less units than our
opinion, but that's correct.  That's Mr. Cannon's
opinion, that people are not building to the highest
density anymore.  That's -- the St. Moritz project by
Lennar is doing the same thing, and you have the city
planner from the City of Doral saying the same thing,
all recognizing the fact that the previous approvals
are not being built to those levels, anywhere from
43, I believe, to 69 percent of the previous
approvals.

16         THE COURT:  Are you saying that you would
have to tear out roads --

18         THE WITNESS:  Sir, it's ---

19         THE COURT:  -- to change the density and
mix?

21         THE WITNESS:  Well, if you had -- if you
had your druthers, your Honor, and it was a clean
slate, you wouldn't put those roads where they are
and how they are.

25         If you're stuck with the roads and you

1  have -- you have to readjust your areas, because

2  even their appraiser is saying you should put

3  single family and townhouses over there, and

4  these are not situated right now for single

5  family.

6          THE COURT:  But the value -- the reduction

7  in value based on the existing roads and having a use

8  that you don't think would be highest and best use

9  under current economic conditions, that difference

10 between what somebody might do if it was vacant and

11 what somebody would do now that the roads are in,

12 that limitation on what they could do, that reduction

13 in value is equal and offsets the value of all the

14 roads?

15          THE WITNESS:  Yeah.

16          THE COURT:  That's what I'm ---

17          THE WITNESS:  Yes, your Honor.

18          THE COURT:  If that's not what you're

19 saying, then I'm not sure I understand.

20          THE WITNESS:  No, you're absolutely

21 correct.  What we're saying is there's no

22 contributory value of the roads.  In this current

23 marketplace, you're looking at buying, in this case

24 59 acres, which is a lot of land for residential

25 development, and if you have to work within the

Page 119

1   confines of what's there, you're going to have to

2   restructure the way things are and rebuild.

3          In fact, if you look at their expert's

4   appraisal, it proves exactly my point.

5          MR. HUDSON:  Objection to that last answer,

6   Judge, based upon our ---

7          THE COURT:  Overruled.  He can say what he

8   wants on that.

9          But so it will be clear, though, my

10  construct is correct, that you're saying the

11  reduction in value for business purposes because

12  of where the roads are, offsets the value of the

13  roads?  That's -- that's another way of saying no

14  contributory value?

15         THE WITNESS:  Correct.  There's no --

16  there's no evidence in our analysis that we could

17  find that places any additional value on this because

18  of the understanding that if you build to the highest

19  and best use, for example, and you build single

20  family residences on there, that you're going to have

21  to, in some cases, tear up where things are existing.

22         So you're going to have to tear up and

23  then redo, versus do initially, and, you know,

24  when you talk to the contractors, they would

25  rather build from zero, than tear up and redo.

Page 120

1          THE COURT:  Okay.  All right.  Continue.

2    BY MR. HUDSON:

3          Q    Let's get there, sir.

4               What is the current state of entitlements?

5    Have you researched the current state of entitlements

6    and permitting on the property?

7          A    I talked to the City of Doral, looked at

8    their online website.  Their online website says the

9    permits have been expired and it's not clear whether

10   or not -- what you would have to do to reinstate

11   everything at this point in time.

12              My understanding is the entitlements as

13   approved are approximately 1100 units, approximately

14   90,000 square foot of retail, 90,000 square foot, I'm

15   rounding the numbers, office.

16        Q    When did you conduct that analysis?

17        A    Which analysis?

18        Q    The one you just said, that they're expired

19   permits.  When did you determine that?

20        A    Oh, sometime in the past week.

21        Q    After your report?

22        A    Yes, sir.

23        Q    Okay.  Has anyone at the City of Doral told

24   you that it would be difficult or impossible,

25   assuming the permits have expired, to renew those

1    permits and go in and commence construction, given

2    the current site plan and entitlements and

3    permissions?

4         A    Let me make sure I understand your question

5    before I answer.

6         Q    Sure.

7         A    Could somebody come in there and do exactly

8    as it was planned?

9         Q    Yes.

10        A    It's my understanding that that would not

11   be a difficult procedure.

12        Q    Okay.  So someone could walk in tomorrow,

13   if they had the financial wherewithal, to take the

14   current plan and start construction relatively

15   quickly?

16        A    I don't like that word, relatively, you

17   know, quickly.  I don't -- I don't know, and that was

18   not a definitive answer or I don't think I was

19   actually asked that exact question, so I don't know.

20   You're dealing with cities and you're dealing with

21   approvals, and -- and I don't know how quickly it

22   could be done.

23        Q    Given your experience, your knowledge of

24   this property, and your investigation in this

25   property, a well-financed developer, how long would

1  it take a well-financed developer, do you think, to

2  come in and do what's necessary under the current

3  plan to commence vertical construction?

4      A   As I understand, there's roughly 16 million

5  of infrastructure that needs to be completed.  I

6  would think that you would try to get that done as

7  you went in and tried to get your plan active, redo

8  your permits.

9          I honestly cannot answer the question how

10 long the City of Doral is going to take to go back in

11 and reinstitute the permits.

12     Q   Would 60 to 90 days be a fair estimate?

13     A   If I was to make a guess, I would say

14 probably closer to 90, but I think your timeframe is

15 within reason.

16     Q   And, in fact, the reason the roads aren't

17 complete is they don't like to complete the roads

18 until the infrastructure is complete, so the trucks

19 don't tear them up; correct?

20     A   That is one reason, yes, sir.

21     Q   Let's go back to Comp N1, though.  I'm

22 trying to understand why, when we adjusted apples to

23 apples, you have an $18.40 square foot number, and

24 you have reduced that number by approximately 45

25 percent with respect to a property that has better

Page 123

1    improvements on it and the same access.

2          Can you explain that a little bit better?

3    A     First of all, you've got 30 -- excuse me,

4    you've got 30 percent of the size, so you have a much

5    smaller parcel.

6          Second of all, and I keep on reiterating

7    this, that is not the best sale, and we say that in

8    the report, because of the conditions of sale.

9    Q     Please, let's get very specific.  Explain

10   that again.  I'm sorry, I know you did it on direct,

11   but explain it again, why you're making a negative

12   adjustment to the subject property for conditions of

13   sale.  In fact, you've made two; correct?

14   A     Two minuses.

15   Q     Two minuses.

16   A     Reading from our write up on Sale Number

17   N1, the grantee, which is M & M Doral Investments --

18   going back to the sentence, the grantee is a joint

19   venture in which the grantor has an interest.  The

20   venture partner is a development company, which is

21   Terra World Investments, that has completed several

22   residential projects in the area, and recently

23   purchased several similar nearby parcels.

24          So they're an adjoining owner, and plus

25   they're a joint venture partner.

1      Q    They're an adjoining owner?

2      A    Correct.

3      Q    You give a negative as a result of that,

4  but in this case, particularly given that Terra's

5  properties circle this particular property, wouldn't

6  Terra be willing to pay a premium to get this

7  property?

8           Don't you have it reversed there?

9      A    We're not -- our appraisal is not what the

10  value is to Terra, our appraisal is, what would

11  somebody come in and pay for the property.

12          So Terra -- it's not like what is the value

13  to Terra, it's what is the value to the open market.

14      Q    How can you ---

15          THE COURT:  Wait, Mr. Hudson, if they would

16  pay more because they had other properties, which I

17  think was part of his earlier testimony, that would

18  be a negative adjustment to do in a comp.

19          MR. HUDSON:  Your Honor, I'm trying to

20  understand which property he's giving the premium to,

21  and what I'm arguing is he shouldn't give a premium

22  to either property at this point.

23          THE COURT:  What I understood his testimony

24  to be is that he's not giving much weight to N1

25  because he doesn't necessarily view this as an arm's

1    length transaction in terms of the price, where the

2    buyer was not putting any money up front and there

3    was a joint venture with the seller.

4              Is that a fair summary?

5              THE WITNESS:  Yes, your Honor.

6              MR. HUDSON:  And that's one of his

7    negatives, Judge, and I'll get to that one in a

8    moment.

9              I'm trying to get the other one

10   resolved and determine whether, in fact, in any

11   true value equation there's a difference in

12   value.

13   BY MR. HUDSON:

14        Q    So, please, again, try -- you're suggesting

15   that one or the other properties has a premium on it

16   and, therefore, one or the other should be impacted

17   as a result of the premium.

18              Which property are you putting the premium

19   on, the comparable or the subject?

20        A    You always adjust the comparable sale to

21   the subject property.

22        Q    Okay.  So you're putting a premium on N1

23   and saying N1 deserves a premium, but the comparable

24   doesn't?

25        A    N1 is the comparable.

Page 126

1          THE COURT:  I don't understand that

2    question.

3          Do you understand that question?

4          THE WITNESS:  No, sir, I did not.  N1 is

5    the comparable.

6    BY MR. HUDSON:

7     Q    Yes, it is.

8     A    Okay.

9     Q    And we're trying to get them apples to

10    apples.

11    A    Okay.

12    Q    Your statement in here is that you're doing

13    a negative adjustment because one property is

14    adjacent to the other, that's what you said earlier.

15          So I'm trying to understand why that

16    matters.

17    A    Well, you've got -- first of all, our

18    negative adjustment, I believe would be primarily on

19    the fact that you have no cash down and a joint

20    venture partner.

21    Q    That's one zero or one negative, we'll come

22    back to that.

23    A    To me that's a double negative.  The rest

24    is kind of on top of it.  Then you have somebody who

25    is in the neighborhood who already bought two other

Page 127

1    parcels and is buying parcels in there, so ---

2        Q    Let's stop there then, please.  We agree on

3    that certainly.

4        A    Yes.

5        Q    So are you adjusting the value of the

6    subject property up because of that --

7            THE COURT:  This is wasting time.

8    BY MR. HUDSON:

9        Q    -- or down?

10           THE COURT:  You're off course, is all I can

11   say, so you need to move on because we're wasting

12   time.

13           You're not -- your questions are not

14   consistent with the methodology of using sales

15   comps, as I understand it.  If you're not off

16   course, then you're losing me and that means

17   you're off course.

18           MR. HUDSON:  I would agree with that final

19   statement, Judge.

20           THE COURT:  What he said is you adjust a

21   comp for factors that would be appropriate based on

22   differences between the comp and the subject

23   property.

24           MR. HUDSON:  Correct.

25           THE COURT:  You adjust it negatively

Page 128

1    because they may have paid more because they were

2    incentivized by owning the other properties, so that

3    was a minor adjustment.  He adjusted negatively

4    because they may have set the sale price higher

5    because it was a joint venture, and finally, he

6    didn't rely that much on N1, so I think we've beaten

7    up N1 enough.

8    BY MR. HUDSON:

9         Q    Let's go to N2.

10        A    Your Honor, if I might just add, the easy

11   way to remember is that CBS/CIA, if the comparable is

12   better you subtract, if the comparable is inferior,

13   you add.

14   BY MR. HUDSON:

15        Q    Let's go to N2, please, sir.

16        A    I am there.

17        Q    What are the values you have on N2 --

18        A    N2 --

19        Q    -- on a square footage basis?

20        A    -- $11.69 per square foot.

21        Q    Is N2 land locked?

22        A    I don't know if they're land locked, you

23   can get there.

24        Q    How do you get there?

25        A    You can get there over probably this area

1   here or over this way here.

2       Q   So your testimony is that they're not land

3   locked?

4            THE COURT:  What do you mean, that there's

5   no road?

6            MR. HUDSON:  No access from a major -- any

7   of the major roads that are there to those

8   properties.

9            THE COURT:  What's on the east side, that's

10   102nd Avenue; right?

11            THE WITNESS:  Yes, your Honor.

12            THE COURT:  Okay, and that's a dirt road,

13   though, north of --

14            THE WITNESS:  Yes, sir.

15            THE COURT:  -- north of whatever,

16   58th Street.

17            MR. HUDSON:  There's space, your Honor,

18   between that road, even that dirt road and these

19   properties.  There's other property there that's not

20   owned by Terra or at least it's not in the record.

21            THE COURT:  Okay.

22   BY MR. HUDSON:

23       Q   Is that correct, sir?

24       A   Yes, that's correct.

25            THE COURT:  But are there roads across from

Page 130

1    107th?

2              THE WITNESS:  There's nothing there now.

3    The question is, are there dedications, I guess.

4    BY MR. HUDSON:

5         Q    Do you know?

6         A    I don't know for a hundred percent fact.

7              THE COURT:  Right now there's no roads, is

8    that your point?

9              MR. HUDSON:  Yes, your Honor.

10             THE COURT:  Okay.

11             MR. HUDSON:  There's no roads.

12   BY MR. HUDSON:

13        Q    Does that affect the current value of that

14   comparable?

15        A    If there's no dedicated roads, they just

16   put in a road.

17        Q    Has that process occurred?  Isn't your

18   highest and best use as you find the property today

19   or are you now assuming with respect to these comps

20   something in the future?

21        A    No, as they are today.

22        Q    Is there a road there today?

23        A    Today there's no road there that I can see.

24        Q    Does your value, in either the value of

25   N2 -- I'm sorry.  Does your adjustment grid on 77

Page 131

1   take in the fact -- take into consideration that

2   these properties are land locked?

3        A    I don't consider them land locked, and

4   you've got the same guy buying the adjacent parcel to

5   be able to get into there even better, so, no.

6        Q    Okay.  Let's talk about the easements for a

7   moment on the subject property.  You gave the

8   easement acreage no value; correct?

9        A    That is correct.

10       Q    Why is that?

11       A    Well, I apologize.  You say I gave the

12  easement acreage no value.  You're talking about the

13  FPL easement?

14       Q    Yes.

15       A    We did on the south parcel, we netted out

16  more on the north parcel.

17       Q    I'm sorry, say that again.

18       A    On the south parcel, we looked at the -- I

19  believe we looked at the gross acres, we also looked

20  at the net, and it's my understanding that we should

21  have taken off more from the south parcel than we

22  did.

23       Q    Okay.  Let's stay with the north for a

24  moment.  Did you give any credit or any value to the

25  acreage in the FP&L easement?

1       A     No.

2       Q     Why not?

3       A     Because we valued it based upon the net

4  area.

5       Q     Net meaning what?

6       A     Net meaning not under the FP&L easement.

7       Q     Why did you net out the FP&L easement

8  property?

9       A     Why didn't we?

10       Q     Why did you?

11       A     Because you're not -- you're not building

12  on that, it's land that's going to be used for, I

13  guess, storm drainage or mitigation or something of

14  this nature, it's not going to be used for buildable.

15       Q     You're aware that storm drainage has been

16  approved, waste water has been approved on the

17  easement area?

18       A     That's my understanding.  I saw standing

19  water there also.

20       Q     And if it wasn't approved in the easements,

21  we would have to cannibalize the current property in

22  order to have waste water drainage and storm

23  drainage?

24       A     I don't know about cannibalization, but

25  what -- what you would maybe do is just -- again,

1    refit your plan.

2         Q    Are you aware, also, that the City of Doral

3    allowed the prior developer under the current

4    approved plan to use those spaces as open spaces and

5    green spaces?

6         A    I believe so.

7         Q    Okay.  Does that add any value?

8         A    It's just there.  You know, you have -- you

9    have an offset there.  Is there any value to this

10   land under the power line easements, whereby there's

11   a lot of people who don't want to live anywhere near

12   the power line easements.

13             THE COURT:  Putting aside that last

14   statement, if they're going to be able to use that

15   area for mitigation, storm drainage, open space that

16   may be required -- are there open space requirements

17   for getting permits?

18             THE WITNESS:  Yes, sir.

19             THE COURT:  Doesn't the fact they can use

20   the easement land make it more valuable, all else

21   being equal, than the parcel without the easement

22   land where you have to use -- I mean, Mr. Hudson said

23   cannibalize, but you have to use some of the subject

24   property for those purposes?

25             THE WITNESS:  To a degree, yes, your Honor,

1    but, you know, you go over here to the industrial

2    part and we're at $3 a square foot, what are you

3    going to say, this over here is worth 11 bucks a

4    square foot?

5              You've got -- you've got -- you can't

6    deny they're heavy, 330 something feet of power

7    line easements.  They're not -- they're not

8    pretty.

9              So, yes, there could be some value to

10   that, but also, again, there could be some

11   negative to being under the power line easements.

12   BY MR. HUDSON:

13       Q    Isn't there also some approved parking

14   under some of those easements, sir?

15       A    That's my understanding from the site plan.

16       Q    You gave no value for that either?

17       A    Well, that is inherent in the price per

18   square foot.

19       Q    Did you add any contributory value for the

20   parking in the easements?

21       A    Which easements are you referring to, sir?

22       Q    Any of the easements.

23       A    We included -- we looked at the gross area

24   of the south parcel, and we did include 15.59 is the

25   area, times, I think, $19 a square foot, which did

Page 135

1    include some of the parking area.

2        Q    Did you specifically add any contributory

3    value for parking in the easements in your report?

4        A    I just answered your question, sir.

5        Q    Is that a yes ---

6        A    It's not specific -- it's not a specific,

7    it's involved in the valuation.

8        Q    Okay.  That's fair.  Let's try to wrap up

9    the north parcel.  N3 very quickly, sir, why the two

10   negative size and shape adjustments?

11       A    The size, it's much -- much smaller than

12   the subject property.

13       Q    You didn't aggregate the three Terra

14   properties that surround this one to mitigate that

15   negative number?

16       A    Doing that would not give you an indication

17   of what somebody would pay to one buyer and one

18   seller for totalling all three parcels.  Those were

19   not -- those were not available, all three from

20   one -- if you had from one seller to one buyer, the

21   same seller, the same buyer, that might be a

22   consideration, but this is not a property that was

23   put on the market as 70 plus or minus acres, it was

24   acquired from different sellers.

25       Q    Would it be fair to say that Terra may be

1   willing to pay more for this property than someone

2   else because of the location of their adjoining three

3   properties?

4        A    I think our adjustments indicate that the

5   answer to that question is yes.

6        Q    Now, let's go back to a more macro issue on

7   N1.  Your report assumes that there's going to be a

8   reconfiguration of the infrastructure on N1 and,

9   therefore, gives it no value; correct?

10            THE COURT:  You mean the north parcel?

11            THE WITNESS:  Thank you, your Honor.

12            MR. HUDSON:  The north.

13   BY MR. HUDSON:

14        Q    The north parcel; correct?

15        A    Yes, sir.

16        Q    Okay.  What investigation have you done

17   into the ability of the debtors to build on the

18   current roads that are owned by the CDD?

19        A    The current debtors, I'm sorry?

20        Q    The people -- the current owner of the

21   property are these bankrupt debtors; correct?

22        A    Correct.

23        Q    Five different debtors.

24        A    Okay.

25        Q    What investigation have you undertaken, or

Page 137

1    did Mr. Diaz undertake, that dealt with how the roads

2    would be configured, reconfigured, how they would be

3    destroyed, what the legal ability of the debtors to

4    do that is?

5           Did you do any research with respect to

6    that?

7           MS. MORA:  Judge, objection to the extent

8    it asks the witness to draw a legal conclusion.

9           THE COURT:  I'm going to overrule it.  I

10   think I understand the question.

11          If the premise is that for highest and

12   best use somebody may have to reconfigure, the

13   question is:  Do you know whether -- do you know,

14   I mean, maybe you do, maybe you don't, whether

15   the CDD owning the roads, that a developer could

16   come in and reconfigure if they wanted to in

17   order to change density and mix and so forth?

18          THE WITNESS:  Our analysis of highest and

19   best use looked past the roads.  Now I've come to

20   understand that you're pretty much stuck with the

21   roads.

22   BY MR. HUDSON:

23       Q    I'm sorry, your position today is that

24   you're pretty much stuck with the roads?

25       A    That's my understanding.

1      Q      Have you reviewed the current Terra

2  development plan?

3      A      I looked at it.

4      Q      Okay.  In fact, don't you reference that as

5  one of the three items in your report that you relied

6  on when you prepared the report?

7      A      Yes.

8      Q      Doesn't that plan require substantial

9  reconfiguration of those roads?

10     A      I don't think it does.  Substantial

11  reconfiguration of the roads?

12     Q      Let's start, does it require any

13  reconfiguration whatsoever?

14     A      Last I remember looking at it, I thought it

15  did.

16     Q      Do you know whether the debtor or Terra

17  presently has the ability to do that reconfiguration?

18     A      I would say no.

19     Q      They don't have the present ability to do

20  that?

21     A      That is my understanding.

22     Q      How did that factor into your opinion?

23     A      My initial valuation is looking at it as a

24  clean slate, so I -- you would have to redo that

25  whole area there, all the roads.

1       Q     So your ---

2       A     If those roads were not there, what my --

3    what our highest and best use conclusion is, you

4    would not build what is approved there, and you

5    would, therefore, obviously not build it the way it

6    is.

7             So if you had a clean slate, you would --

8    you would reconstruct.

9       Q     Well, under the highest and best use

10   analysis, doesn't the highest and best use analysis

11   assume it's legally possible?

12      A     Yes.

13      Q     Okay, and do you know whether presently,

14   without the CDD's approval, it's legally possible to

15   do anything with any of those roads?

16      A     That would be similar to any other site,

17   you're going to buy it and you've already talked to

18   the zoning department to see whether or not you can

19   reduce the density.

20      Q     Similar to what other site?

21      A     Other sites in the neighborhood, which were

22   originally approved for something different, for

23   example, condominiums are now being done, single

24   family residences or townhouses.

25      Q     Is there anything like that in your report?

Page 140

1      A      About?

2      Q      Any of those sites.  Did you put any of

3  those sites in --

4      A      No, what we ---

5      Q      -- as comparables or ---

6      A      No, what we said in our report is the

7  highest and best use is not to do condominiums and

8  townhouses on that part.

9             Now, this is a plan that was developed in

10  2006 when everybody was trying to maximize the site,

11  put as much on it as possible, and we've walked away

12  from that.

13             Our market study recognized the fact that

14  you reduce the density on the site.

15      Q      Turn to Page 113 -- actually, 112.

16      A      Yes, sir.

17      Q      Now, on the residual land value analysis, I

18  believe you've made the caveat several times that

19  your report is not dependent on this analysis,

20  correct, you used the sales comparison approach?

21      A      Yes, sir, that's correct.

22      Q      But you did use this as a test, in essence,

23  a test of reasonableness?

24      A      Yes, sir.

25      Q      All right.  This analysis for the next

Page 141

1    several pages references Terra several times;
2    correct?
3           A    Yes, sir.
4           Q    And the Terra development plan; correct?
5           A    It also references the original plan, yes,
6    sir.
7           Q    Okay, and generally, it seems to adopt the
8    Terra plan as the baseline for your residual
9    analysis; is that correct?
10          A    Terra's plan, as I recall, is 400 homes --
11   let me not even guess here.  The Terra plan was 120
12   townhouses and 280 single family.  Our highest and
13   best use was 232 and 232, townhouses and single
14   family, for an increase of roughly 15 percent.
15          Q    Did you talk to any other developers that
16   are active in the area with respect to what they
17   might do?
18          A    We just looked at what they were doing.
19          Q    So the only folks you talked to were Terra;
20   correct?
21          A    The only developer, yes, we talked to,
22   correct.
23          Q    All right.  On the bottom of Page 13, the
24   last paragraph, if you count from the bottom of the
25   page ---

Page 142

```
 1              THE COURT:  113?

 2              THE WITNESS:  113 or 13?

 3              MR. HUDSON:  1-1-3.

 4   BY MR. HUDSON:

 5       Q    If you count from the bottom of the page,

 6   1, 2, 3, 4 lines up in the middle, it starts, though

 7   the client, do you see that sentence?

 8       A    Yes, sir.

 9       Q    Could you read that?

10       A    Though the client did not specify how much

11   land area would be allocated ---

12              THE COURT:  Wait, wait, you're reading too

13   fast and I'm still confused, are you on 113 or 13?

14              MR. HUDSON:  1-1-3, Judge.

15              THE COURT:  Okay, and where?

16              MR. HUDSON:  At the very bottom.

17              THE COURT:  Though the client did not

18   specify?

19              MR. HUDSON:  Correct.

20              THE COURT:  Okay.  I'll read it because I

21   know I can read slowly.  Though the client did not

22   specify how much land area would be allocated to each

23   product type, assuming a townhouse density of 13

24   units per acre would imply a single family density of

25   5.59 units per acre, as shown in the calculations on
```

1    the following page.

2    BY MR. HUDSON:

3         Q    Who is the client there?

4         A    Terra is misrepresented as being the

5    client.

6         Q    That's a mistake?

7         A    Yes.

8         Q    So it should say Terra there?

9         A    It should say Terra.

10         Q    Turn to Page 1-1-4, 114.

11         A    Yes, sir.

12         Q    The very bottom, the last sentence that

13    begins in the middle, it is likely, do you see that?

14         A    Yes, sir.

15              MR. HUDSON:  Judge, I'm going to ask the

16    witness to read it, but if you want to read it.

17              THE COURT:  That's fine.

18              THE WITNESS:  I'll try to do it slow, your

19    Honor.  It is likely that the typical developer would

20    select a unit mix that would tilt more heavily toward

21    townhouse product than the client's plan, which is

22    designated to minimize cross project competition, as

23    that segment of the market seems to present the most

24    well defined near term market opportunity.

25    BY MR. HUDSON:

Page 144

1     Q    Okay.  Is that also a mistake with respect

2  to the client, who the client is?

3     A    Yes.

4     Q    All right.  So that should say Terra there?

5     A    Yes.

6     Q    All right.  What does it mean -- what does

7  the parenthetical mean, which is designed to minimize

8  cross project competition?

9          THE COURT:  Well, I took it to -- well, go

10  ahead.  I don't -- I guess I'm just not that wowed by

11  this part of it, anyway, in terms of the ultimate

12  numbers, but go ahead.

13          MR. HUDSON:  I'm almost done, Judge.

14          THE COURT:  Go ahead.

15          MR. HUDSON:  I'm almost done.

16          THE WITNESS:  I believe what we're trying

17  to say there is that you're going to look to build

18  product that is not -- that is kind of consistent

19  with what's going on, but it might alter depending

20  upon what's going on.

21  BY MR. HUDSON:

22     Q    Doesn't that, in essence, say it doesn't --

23  Terra doesn't want to compete against itself in its

24  adjacent developments?

25     A    I would say anybody buying this site --

Page 145

1  Terra is already looking at N1, N2 and N3.  If I'm a

2  developer to buy the subject property, I'm going to

3  look very closely to what they're doing.  So I would

4  give great consideration to what they're doing and

5  either one, try to beat them at their own game or

6  two, create another product that we -- that as a

7  developer saying, we, as -- I, as a developer, would

8  try to be able to steal some of their thunder or at

9  least capitalize on what's going on.

10      Q    If Terra were to acquire this property and

11  begin development, wouldn't it be competing with

12  itself to some degree?

13      A    To some degree.  Any time you're selling a

14  residential project, I would say, yes, to some degree

15  they would be.

16      Q    Has anyone at Terra indicated to you if

17  they were successful in acquiring the property, that

18  they would slow the development of this property down

19  so they could sell out at the other properties?

20      A    No.

21      Q    Mr. Fishkind never said anything to you

22  like that?

23      A    Nope.

24      Q    Is today the first time that you've

25  personally noticed an odor on the property, the

Page 146

1    coffee odor?

2        A    No, I think I testified at my deposition

3    previously on the south -- part of the south end of

4    the parcel along 58th Street, I noticed a very faint

5    odor, and I think I testified at that time I was

6    coming off a cold, so I really had a little bit

7    of ---

8        Q    But you weren't actually -- didn't

9    physically have access to the property at that time;

10   right?  You were on ---

11       A    I was on the perimeter of the property,

12   yes, sir.

13       Q    Right, on the northeast side.

14            Now, at your deposition you were asked

15   whether or not you could recall any subdivision

16   appraisal experience that you had and you could not.

17            Today on direct, I also note that you have

18   not been able to recall any specific subdivision

19   experience that you have.

20            Are you able to give the Court any names of

21   any subdivisions that you've actually appraised?

22       A    Estate of Botany Bay.

23       Q    Estate of Bodny Bay?

24       A    Botany, B-o-t-a-n-y, Botany Bay, 500 acres.

25       Q    Where is that?

Page 147

1        A    St. Thomas, U.S. Virgin Islands.

2        Q    When was that?

3        A    I've appraised it at least three or four

4   times.

5        Q    When was the most recent?

6        A    Maybe a year and a half, two years ago.

7        Q    What was the status of that site at the

8   various times that you appraised it?

9        A    Getting close to foreclosure.

10       Q    Have you appraised any other properties

11   that are failed CDD properties?

12       A    Failed CDD properties, not that I recall.

13       Q    So you've never dealt with this problem of

14   having CDD land in the middle of an appraised

15   property before?

16       A    We've appraised properties that has had a

17   CDD, nothing that has been in foreclosure that has

18   this issue.

19       Q    Who are some of the other typical

20   purchasers of a site like this?

21           THE COURT:  By name or type?

22           THE WITNESS:  Yes, thank you.

23   BY MR. HUDSON:

24       Q    I'm sorry, by name.

25       A    By name, you would have to look at Lennar.

1   I'm hesitating because there are so many developers

2   that we used to refer to are now out of business,

3   Pedro Adrian, let's see.

4       Q    Do you know whether Lennar, for instance,

5   has any interest in this property?

6       A    I don't know.

7       Q    And you didn't call Lennar; correct?

8       A    No, sir.

9            MR. HUDSON:  Judge, I have no further

10  questions.

11           THE COURT:  I assume you're speaking for

12  the team on this?

13           MR. HUDSON:  Let me just check, but I

14  believe so, Judge.

15           THE COURT:  I mean, if there's some -- they

16  can give you a question or two to ask if they think

17  you missed something.

18           MR. HUDSON:  Thank you, Judge.  We're done.

19           THE COURT:  Redirect.

20           MS. MORA:  Just briefly, Judge.

21                  REDIRECT EXAMINATION

22  BY MS. MORA:

23      Q    Mr. Waronker, would you please turn to

24  Page 33 of your report and read to yourself the

25  paragraph under the heading, history of the subject

1   property?

2          THE COURT:  Read as fast as you'd like.

3          THE WITNESS:  Thank you, your Honor,

4   quicker we get to lunch.

5          Yes.

6   BY MS. MORA:

7      Q    Okay.  Is it the case that this paragraph

8   recounts that there has been a portion of the

9   property deeded to the CDD?

10     A    It appears to read that way, in December a

11  23.66 acre portion was deeded to the CDD.

12     Q    And is that the same portion that we've

13  been referring to as the roads that were deeded to

14  the CDD?

15     A    That is the folio number that is the --

16  looks like it's all red, pretty much.

17     Q    Mr. Waronker, on cross Mr. Hudson asked you

18  about the engineering reports, and I believe you

19  testified that you had not seen them prior to the

20  completion of your report; is that correct?

21     A    That's correct.

22     Q    But now you have reviewed them; is that

23  right?

24     A    That's correct.

25     Q    And has having seen those reports changed

Page 150

1    your opinion of value of the subject property?

2         A    No, I think it's pretty much enhanced my

3    opinion of value.

4         Q    Why is that?

5         A    Well, because it shows how much work is

6    necessary to be done on the site remaining.

7         Q    As part of your appraisal report, did you

8    undertake a market analysis of the Doral market?

9         A    Yes, we did.

10        Q    Did you undertake a market analysis of the

11   Miami-Dade County market generally?

12        A    We did.

13        Q    And did you consider whether or not the

14   debtors' original plan from 2005 was supported by

15   current market conditions?

16        A    Our conclusion was it was not.

17        Q    Why is that?

18        A    Demand levels were not for that type of

19   product that was previously approved.  What's going

20   on in the area is mostly single family housing and

21   townhouses.

22        Q    And, in fact -- Judge, I know you don't

23   want to get too far into this, but just one quick

24   question.

25             In fact, Mr. Hanson's report also

Page 151

1    contemplates a change in the type of product that's

2    going to be developed on the subject property under

3    highest and best use; correct?

4         A    On the north parcel, correct, and adds

5    condominium units to the south parcel.

6              MS. MORA:  Okay.  No further questions on

7    redirect, Judge.

8              THE COURT:  Okay.  So we'll break for

9    lunch, and then the game plan is to put Mr. Hanson on

10   for direct and cross, and then we'll, I guess, come

11   back to -- well, we've got then the -- well, Hanson's

12   direct will include his critique of Mr. Waronker.

13             MR. HUTTON:  Actually, your Honor,

14   Mr. Hanson was retained under USPAP Standard 1 and 2

15   to perform an appraisal of the property.  Mr. Cannon

16   was retained under Standard 3 of USPAP to do a

17   critique of Mr. Waronker.

18             THE COURT:  That's fine.  I guess we'll --

19   the only missing piece here is Fishkind --

20             MS. MORA:  Dr. Fishkind.

21             THE COURT:  -- and when he would come in,

22   and you want him on your direct case or you're okay

23   to do it on rebuttal?

24             MS. MORA:  We can do it all on rebuttal,

25   Judge.  Dr. Fishkind was prepared to testify as to

Page 152

1   economic and market conditions that justify the

2   highest and best use conclusions that he came to.  He

3   can put all that in on rebuttal if it would facility

4   our schedule today.

5             THE COURT:  I think it may make sense in

6   terms of the order of presentation to get

7   Mr. Hanson's opinion, and cross; Cannon's critique of

8   Mr. Waronker's opinion, and that will be basically

9   their case.

10            And then on rebuttal, you can come back

11  with Mr. Waronker's critique of Hanson, and

12  assuming we have time, Fishkind, whether it's

13  technically rebuttal or not.

14            MS. MORA:  Okay.  No problem, Judge.

15            THE COURT:  So let's make it 2:30 just so I

16  have a few minutes to take care of some odds and

17  ends.

18            (Thereupon, a lunch recess was taken, after

19       which the following proceedings were had:)

20            THE COURT:  Okay.  Unless there's

21  announcements, we're ready for Mr. Hanson.

22            MR. GIELCHINSKY:  Your Honor, while

23  Mr. Hanson is getting seated, I would introduce

24  myself since we haven't met before.

25            My name is Dan Gielchinsky, I'm with

1    Bilzin Sumberg.  I joined the firm in July after

2    moving from New York.  I've been a member of the

3    Bars of the State of New Jersey and New York in

4    good standing since 2001 and 2002, also a member

5    in good standing ---

6              THE COURT:  Why don't you come to the

7    podium.

8              MR. GIELCHINSKY:  I'm sorry, Judge.  I'm

9    also a member of the United States Supreme Court in

10   good standing.

11             Your Honor had signed a pro hac vice

12   order, admitting me to practice in this case at

13   the outset of the case.  I figured I would

14   introduce myself since I'll be handling this

15   portion of the testimony for the debtors.

16             THE COURT:  Okay.

17             MR. GIELCHINSKY:  Thanks, Judge.

18             THE COURT:  Welcome.

19   THEREUPON:

20                  WOODWARD S. HANSON,

21   after having been first duly sworn, was examined and

22   testified as follows:

23                  DIRECT EXAMINATION

24   BY MS. REDMOND:

25        Q    Good afternoon, Mr. Hanson.  Could you

Page 154

1    please state your name for the Court?

2        A    Yes, ma'am.  My name is Woodward S. Hanson,

3    H-a-n-s-o-n.

4        Q    What is your profession?

5        A    I'm a real estate appraiser, real estate

6    advisor, and a real estate broker.

7        Q    Could you provide the Court with a summary,

8    I think a somewhat brief summary, of your

9    professional, education and training, as it relates

10   to your appraisal work?

11           MR. GIELCHINSKY:  Your Honor, we would

12   stipulate to Mr. Hanson's credentials as an expert in

13   the field of real estate valuation and appraisal

14   services.

15           THE COURT:  Okay.  I'll find him an expert,

16   but you can provide some background anyway.  But good

17   try, though, we've seen that in Florida.

18           MS. REDMOND:  Your Honor, you do or do not

19   want to hear any more about it?

20           THE COURT:  No, I want to hear a little bit

21   about the background --

22           MS. REDMOND:  Okay.

23           THE COURT:  -- even though I'll qualify

24   him as an expert.

25   BY MS. REDMOND:

Page 155

1          Q    Can you tell the Court about your

2     professional background, education --

3          A    Sure.

4          Q    -- and training as it relates to appraisal

5     work?

6          A    Yes, ma'am, be glad to.

7               My education, I attended the University of

8     Florida.  I double majored, I'm an honors graduate

9     from the University of Florida with a degree in

10    architecture.  I'm also an honors graduate from the

11    University of Florida with a degree in real estate

12    and urban land studies.

13              Following graduation from the University of

14    Florida, I went to work with my father, who was an

15    appraiser, an MAI, 1979, so I have 32 years of

16    experience.

17              I hold four designations, I'm an MAI with

18    the Appraisal Institute; I'm a CCIM, which is

19    Certified Commercial Investment Member of the

20    Commercial Institute of the National Association of

21    Realtors; I'm a CRE, Counselor of Real Estate,

22    invitation only, a thousand members; I'm also a

23    fellow in the Royal Institution of Chartered

24    Surveyors.

25              I've held offices in the Appraisal

1  Institute, I'm past national president of the

2  Appraisal Institute in the year 2000.

3           I have given lectures at the Princeton

4  Conference at Princeton University; Pan American

5  Valuation Conference in Cusco, Peru; Pan Pacific

6  Valuation Conference in Auckland, New Zealand.

7           I am a contributing author of the Appraisal

8  of Real Estate, 13 Edition, as well as other

9  published articles.

10          In terms of my geographic experience, I

11  work on assignments throughout the State of Florida.

12  I've worked in South Florida and Dade County for

13  Florida DOT, at the intermodal project at the Miami

14  International Airport, expansion of the Dolphin

15  Expressway.

16          I recently completed an assignment

17  involving a Walgreens property in Hialeah.  I just

18  did 47 apartment projects, including numerous

19  properties down in South Broward County.

20          I work as an advisor to real estate

21  investors.  I just returned from Seattle working with

22  Schnitzer West.  Just submitted a $250 million offer

23  on a put call agreement to buy what is known as the

24  Amazon Campus in Seattle, Washington.

25          THE COURT:  Let's see if we can move into

Page 157

1    your experience in similar types of properties.

2              THE WITNESS:  Yes, sir.  Other -- other

3    what I'll call mixed use properties, I've been

4    involved in include University Boulevard Planned

5    Development in Orlando, situated next to the Orlando

6    Convention Center.

7              I just recently, in the last 12 months,

8    worked on a CDD project known as the Babcock

9    Ranch, and in Southwest Florida, I have worked on

10   numerous mixed use developments throughout my

11   career all over Florida, and other residential

12   properties.

13             THE COURT:  Unless there's anything else

14   you want to highlight, I think we can get into the

15   meat of it, it's up to you.

16             MS. REDMOND:  Your Honor, I think I'm fine.

17             THE COURT:  Okay.

18   BY MS. REDMOND:

19        Q    Mr. Hanson, were you asked to prepare an

20   appraisal for this matter?

21        A    Yes, ma'am.

22        Q    Did you, in fact, prepare an appraisal?

23        A    Yes, ma'am, I did.

24        Q    And what was the date of the appraisal?

25        A    The date of the ---

1      Q     You can find it at Exhibit 1 in the book.

2      A     Yes, ma'am.  The date of the appraisal,

3  known as the date of the report, is January 11, 2012,

4  and the effective date of the opinions that I've

5  expressed within that report is also January 11,

6  2012.

7      Q     What was the scope of your assignment?

8      A     The scope of my assignment was to estimate

9  the market value of the fee simple interest, subject

10  to noted exceptions, of a property known as the

11  Landmark at Doral, a 117.9 gross acres mixed use

12  development located at the northeast corner of the

13  intersection of Northwest 58th Street and Northwest

14  107th Avenue in City of Doral.

15      Q     Looking at the demonstrative up on the

16  screen there, that's the property that is outlined in

17  red?

18      A     Yes, ma'am.

19      Q     Okay, and could you explain what

20  investigation and research you did in connection with

21  your opinion?

22      A     Yes, ma'am.  Beginning -- we began prior to

23  January 3rd, but on January 3rd, myself and two of my

24  associates began by inspecting the property.  We were

25  able to gain access to the interior of the property,

1    spend about two hours or so on the site, walking

2    around, driving around, climbing over hills, looking

3    at swales, culverts, curbs, looking at the water

4    retention facility that's built within the power line

5    easement, so forth.

6              Then spent the balance of our time that day

7    driving around the sub market and making notes,

8    identifying activity centers and points of interest,

9    that we initially came back and targeted, and began

10   our research and began the process of identifying the

11   appraisal assignment.

12             And after doing so, I then mobilized my

13   staff, small staff, and assigned tasks to do research

14   for looking for transactions, recent transactions of

15   properties within the market area, information

16   related to the legislative history of the property,

17   the comp plan, the zoning, what the property's

18   permitting history has been.

19             Obtained information from the District

20   regarding the infrastructure of the property, percent

21   completion, and anything that relates to the property

22   that would assist me in understanding the property

23   well enough to do the scope of work that could lead

24   to a reasonable, reliable and credible opinion.

25        Q    And the schematic that I've just knocked

1    off of its course, would you take a look at Exhibit 6

2    in the white binder that's in front of you?

3        A    This?

4        Q    Yes.

5        A    Yes, ma'am.

6        Q    Is that a copy of the demonstrative that's

7    on the screen in the courtroom?

8        A    Yes, ma'am.

9        Q    Thank you.

10            And that's what you took and you saw on the

11   property when you went to visit it?

12       A    Yes, ma'am.

13       Q    Thank you.

14            THE COURT:  Wait, I don't understand the

15   question.

16            MS. REDMOND:  That's what the property

17   looked like in terms of the scheme when he went to

18   visit it --

19            THE COURT:  Okay.

20            MS. REDMOND:  -- in terms of not just what

21   he saw in the ground, but what he also saw at the

22   property.

23            THE COURT:  Okay.  Had you been in that

24   area of Miami before?

25            THE WITNESS:  Yes, sir, I have, at a golf

Page 161

1    tournament and working on assignments in the

2    Southwest area of Doral.

3    BY MS. REDMOND:

4        Q    Were you asked to reach any particular

5    conclusions in connection with your report?

6        A    I was -- I was retained for the purpose of

7    developing an opinion of market value of the

8    specified interest in the -- in the property.

9        Q    Okay, and you did visit the property in

10   connection with that -- with your role as an

11   appraiser?

12       A    Yes, ma'am.

13       Q    Could you describe the property that you

14   appraised?

15       A    Sure.  Yes, ma'am.  As I mentioned earlier,

16   it's a 117.9 acre mixed use development.  It's

17   designated TND, traditional neighborhood development,

18   on the future land use map of the City of Doral

19   comprehensive plan.

20            It's similarly zoned, except for the

21   easterly portion of the property, which has an

22   industrial commercial zoning classification.

23            In terms -- explaining in terms of real

24   estate dynamics, Doral is what is referred to

25   recently as a wealth island.  This is an in-fill

Page 162

1    property within a wealth island in an MSA that has a

2    global pathway, and Doral represents this, I think,

3    fairly accurately because of its ties to the

4    Latin American markets, particularly Venezuela.

5              And Doral has unique characteristics,

6    population of approximately 45,000, has grown at an

7    annual compound rate of growth of almost nine percent

8    over the last decade, census year to census year.

9    Its daytime population exceeds a hundred thousand

10   people, which is greater than the daytime population

11   of Downtown Miami, and it's employment hub is

12   characterized by a large number of logistical

13   companies, which I think is very interesting given

14   the dynamics of what's about to occur in the economy

15   when the widening of the Panama Canal is completed in

16   2014.

17             It enjoys linkages to practically every

18   destination in South Florida, due to the Florida

19   Turnpike, its ease and convenience and facility to

20   the Palmetto Expressway, to the Dolphin Expressway,

21   Miami International Airport and so forth.

22             It's a very well-suited community, a very

23   well-positioned property within that community with

24   adequate infrastructure to provide numerous

25   opportunities for that property to the investment

Page 163

1    community, as well as the end user.

2         Q    You mentioned infrastructure.  What

3    infrastructure is in the land or on the property at

4    the Landmark project?

5         A    The infrastructure that is on the land --

6    that I observed on January 3rd, was first and

7    foremost was the roadway systems, the roadways with

8    the curb and gutters, along with the manhole covers

9    for the underground sanitary sewer system lines,

10   distribution lines.

11        There were also covers, metal covers,

12   indicating access to the underground distribution

13   system for water lines, potable water lines.  There

14   is significant development at the property in terms

15   of a comprehensive storm water management facility

16   for the property.  It has already gone through

17   permitting, jurisdictional review by the South

18   Florida Water Management District and various other

19   agencies.

20        The power lines that we've heard about this

21   morning, are being used to the benefit of the

22   subservient interest of this property and the area

23   encumbered by the easements, being used for open

24   space calculations, being used for part -- major part

25   of the storm water management facility.  It provides

Page 164

1    a significant economic benefit to the property.  Even

2    without the power lines, those uses would have had to

3    have been placed somewhere on a piece of property ---

4              THE COURT:  You don't need to get all the

5    points out in one sentence.

6              I wanted to just get a little better

7    understanding, both appraisers have talked about

8    storm management.  What does that actually

9    involve?

10             THE WITNESS:  Yes, sir.  In the State of

11   Florida, there's three criteria for dealing with

12   managing storm water, and post equals pre, you can't

13   have any post development run off, you can't cause a

14   rise upstream or downstream, and you've got to treat

15   your first half inch of rain water on a 25-year,

16   eight-hour storm cycle.

17             That system has already been

18   engineered, designed, based upon a quantity of

19   impervious material that was scheduled through

20   construction on this site, and those bathtubs, so

21   to speak, as well as those conveyance systems, so

22   to speak, have been engineered specifically to

23   handle the amount of storm water given those

24   criteria so this property could be developed at

25   the level of intensity that the entitlement

Page 165

1    suggests.

2            THE COURT:  You're still over my head a

3    little bit.

4            Where does the water go exactly and

5    what do you have to build to get it there?

6            THE WITNESS:  It really has already been

7    built.  Where it will go will be into the retention

8    facilities with -- that have been constructed within

9    the power line easements.

10            I have some photographs, if you wish, I

11    can show them, but the storm water system is

12    designed so that the rain water will run off of

13    the roads into, you have catch basins with the

14    curb and gutter sections, underground

15    distribution that will take it either through the

16    underground storm water system or through surface

17    run off into treatment areas, and then to areas

18    where it can stage up and be detained or retained

19    until it's soaked into -- into the soil, the

20    ground, ground water.

21            THE COURT:  Okay.  I think that's enough

22    detail on that for now, thanks.

23    BY MS. REDMOND:

24        Q    Are there any other unique aspects of the

25    property that you've identified as part of your

1   appraisal?

2        A    Well, yes, ma'am.  There's a 929 space,

3   partially constructed, what we call structured

4   parking facility located on the south portion of the

5   property, almost contiguous to the east property

6   line, in that area of the tract.

7        Q    Okay.

8        A    And one other thing, I'm sorry.  The

9   property has been de-mucked with the exception of

10  what we called the easterly tract.  A huge amount of

11  effort has gone into the earth work at this site.

12  Regardless of what anybody does with it, it's already

13  been de-mucked, earth work has been completed, and

14  it's going to be a unique feature that will

15  differentiate this property from any of the

16  comparable sales that will be discussed today.

17       Q    What is de-mucking?

18       A    De-mucking is a process, part of the land

19  development process, that's unique for properties in

20  South Florida.

21            If you go north to Lake Okeechobee, you

22  have four to six foot of muck, it's used for cane

23  production, and as you head south and the limestone

24  shelf in Florida, the nature of the slope, the muck

25  gets shallower and shallower.  By the time you get

1    into this particular market area, muck is typically

2    between 24 and 36 inches deep.

3          It has to be removed from the property down

4    to the limestone cap, and then off-site fill is

5    brought in from other -- from locations outside of

6    the property to bring the finished grade up to where

7    the finished floors will have to be 18 inches above

8    the crown of the road at the time of completion.

9        Q    Okay.  In your investigation to prepare

10   your appraisal ---

11         THE COURT:  What do they do with the muck?

12         THE WITNESS:  Well ---

13         THE COURT:  It requires heavy machinery.

14   Obviously they're ---

15         THE WITNESS:  That's a good question.

16   There's the Hole in the Donut Mitigation Facility

17   that's out to the west of the lake belt.  A lot of

18   the muck -- some of the muck is shipped out there and

19   it's used in other reclamation processes.

20         THE COURT:  But you literally have to

21   scrape it off and haul it away?

22         THE WITNESS:  Yes, sir.

23   BY MS. REDMOND:

24       Q    In your investigation in preparing your

25   appraisal, did you investigate and ask about how much

1    money was put into this project in order to develop

2    the infrastructure?

3         A    Yes, ma'am, I did.

4         Q    Do you have a conclusion or an opinion on

5    that?

6         A    Yes, ma'am, I do.  Based upon my

7    confirmation with Mr. Alvarez, with Alvarez

8    Engineering, it's my understanding that approximately

9    $56.9 million had been spent on -- as evidenced by

10   the requisition table, and that was dated, I believe,

11   September 2010.

12            A portion of that includes approximately

13   $14 million for monies that were spent to acquire the

14   rights of way for the roads on this property that the

15   CDD owns and the balance has been used for the

16   construction of the storm water management system,

17   roadways, the water lines, the sewer lines, the

18   parking structure and so forth.

19        Q    Okay.  Moving onto another topic.  You had

20   observed the infrastructure that's in place at the

21   Landmark site.

22            Is that infrastructure completed?

23        A    No, ma'am.

24        Q    Could you turn to Page 57 of the notebook

25   that's in front of you of your report?

Page 169

1              Could you tell me what Page 57 is?

2       A    Yes, ma'am.  This is a ---

3                    (Phone rings.)

4            THE COURT:  Keep going, sorry.

5   BY MS. REDMOND:

6       Q    Could you tell me what Page 57 is?

7       A    Yes, ma'am.  It's an illustration titled

8   earth work in progress exhibit, and it was obtained

9   from an engineering report prepared by Alvarez

10  Engineers, Inc., the engineer representing the

11  Community Development District.

12      Q    And what does the chart depict?

13      A    It is an illustration that depicts the

14  percent completion of work done in regards to earth

15  work under three subcategories, clearing and

16  grubbing, fill imported, and de-mucking.

17      Q    And the number besides clear and grub is?

18      A    It indicates approximately -- it indicates

19  that clear and grubbing is 100 percent complete in

20  the area designated with that color of yellow; and

21  then fill, imported fill, 97 percent complete within

22  the CDD area, and only 22 percent complete outside of

23  the CDD area.

24            THE COURT:  The CDD area is basically the

25  roads?

1      THE WITNESS:  Yes, sir, it would be

2  primarily that, as well as the power line areas where

3  improvements have been made for the infrastructure.

4      And then de-mucking area for the CDD,

5  as well, which is 80 percent complete, and then

6  25 percent complete outside of that area.

7  BY MS. REDMOND:

8      Q    Okay, and then can you turn to Page 58?

9      A    Yes, ma'am.

10     Q    And what does Exhibit 58 depict?

11     A    This is an engineer's illustration that

12  depicts the percent completion and location of paving

13  and grading improvements or infrastructure at the

14  property.

15     Q    Okay, and how much -- how complete is the

16  paving and grading progress?

17     A    It's broken down into several categories.

18  The subgrade is 76 percent complete; the lime rock is

19  56 percent complete; and two inch asphalt is located

20  in some portions of the property, is 80 percent

21  complete.

22      And there's also reference to curb and

23  gutter sections, 90 percent complete; a valley

24  gutter, a hundred percent complete, and so forth.

25      THE COURT:  Does this chart all deal with

Page 171

1    the roads?

2              THE WITNESS:  Yes, sir, it does.

3              THE COURT:  Just to be clear, when you're

4    talking about the earth work that's been done, is it

5    your testimony or your opinion that the kind of earth

6    work that's been done would be suitable no matter

7    what mix of use?

8              THE WITNESS:  Yes, sir, that's my opinion.

9    BY MS. REDMOND:

10        Q    When you inspected the property, is the

11   completion that's noted on this chart consistent with

12   your observation of the property?

13        A    Yes, ma'am.

14        Q    Okay.  Could you turn to Page 59?

15        A    Yes, ma'am.

16        Q    What is this exhibit?

17        A    This is also an engineer's illustration and

18   it identifies the percent completion and location of

19   the primary and laterals associated with the water

20   distribution system that will provide water service

21   to the residential development areas of the property.

22        Q    And the yellow is what on this chart?

23        A    The yellow indicates the location, the

24   approximate location of the underground distribution

25   lines, the mains and the laterals.

1      Q     And the 82 percent completion is consistent

2   with your observation of being on the property?

3      A     Well, these lines are underground, so it's

4   hard for me to say yes to that one.

5           THE COURT:  How specific is the water

6   distribution system to the original plan or how

7   generally applicable would it be to other mixes of

8   use, if you know?

9           THE WITNESS:  I spoke with Carlos Gonzalez

10   with Lennar, who's the executive vice-president for

11   their southeast division, during the course of my

12   research.  Lennar is a client of mine and I was able

13   to contact Lennar in this -- in this area, and much

14   to my surprise, Mr. Gonzalez' team has done quite a

15   bit of look and review and due diligence on this

16   property in studying how compatible it is for other

17   uses, and he has conveyed to me a product mix that in

18   his opinion can make close to 90 percent use of this

19   existing infrastructure.

20           THE COURT:  Are you talking more broadly

21   now about all of it, including roads, or are you

22   addressing that to the water distribution?

23           THE WITNESS:  To all of it, yes, sir, and I

24   think there's a certain logic behind that.  As we

25   heard earlier, you want to get in the market first,

1  you want to cannibalize -- you know, be a demand

2  intercepter for the product that Terra is doing next

3  door.

4           Well, this is why -- this is why this

5  has value.  I can avoid the time risk, market

6  risk, permitting risk, political risk, it's in

7  the ground ready to go.

8           According to Mr. Gonzalez, he estimated

9  approximately, you know, three to six months that

10  he could be going vertical, and even suggested

11  that he had met with City of Doral and have their

12  full support, so ---

13          THE COURT:  Just to clarify, and this is --

14  maybe it's obvious, but is the water distribution

15  system linked to the roads?  I mean ---

16          THE WITNESS:  Yes, sir, their locations are

17  proximate to the roads, and in discussing -- in

18  completing my investigation, I spoke with

19  Mr. Alvarez, the engineer, because I was wondering,

20  there's a possibility that these lines could be

21  broken, all sorts of things that could have happened.

22          And he said that in his understanding,

23  everything was in good condition and the only

24  thing that remained to be done was they would run

25  a test, like a pressurized test to see if there's

1    any leaks, and he says, other than that, we need

2    the pumping equipment and the electrical

3    equipment and that would be about it.

4    BY MS. REDMOND:

5        Q    In inspecting the property, did you see

6    what additional work is necessary to be done to

7    complete the infrastructure?

8        A    Yes, to the extent that it's visible from

9    the surface improvements, yes.

10       Q    And when is that normally done?  Is that

11   work done before vertical building or is that work

12   done after or is there a bit of both?

13       A    Well, there's always a bit of both, but

14   what would typically happen is the project would be

15   developed in sections, in phases, and depending upon

16   how you can route the construction vehicles and the

17   traffic, you typically will not put your asphalt

18   pavement on top of the road until the vertical

19   construction is done within a pad parcel or enclave,

20   so you don't run the risk of having another

21   construction vehicle damage, you know, what has

22   already been completed.

23            So that's typically the way it's done.

24       Q    I just wanted to step back for a second.

25   Could you look at Page 60, in addition?

1       A     Yes, ma'am.

2       Q     And what does Page 60 depict?

3       A     Page 60 is also an engineer's drawing or

4  illustration, and it locates -- the green lines are

5  the gravity system portion of the sewer system,

6  subsurface sewer system, and the yellow is the force

7  main, and it indicates that the gravity system, which

8  is the primary distribution lines, is 90 --

9  approximately 94 percent complete, and that the force

10 main system lift station is between 86 and 90 percent

11 complete.

12      Q     Thank you.

13            Moving to another topic.  Have you reached

14 a conclusion about the highest and best value of this

15 property?

16      A     No.

17            THE COURT:  Highest and best use?

18            MS. REDMOND:  Best use, sorry.

19            THE WITNESS:  Highest and best use, yes.

20 BY MS. REDMOND:

21      Q     Yes.

22      A     Yes, ma'am.

23      Q     What is it?

24      A     In my opinion, the highest and best use of

25 this property is for mixed use development of the

1    property as a master plan community.

2              According to my research and investigation,

3    I think it's necessary to move the product mix around

4    to service a different market segment than what this

5    was initially intended to service.  You're going to

6    see more of a low density product, a single family

7    product in the mix.

8              In the before situation, the property was

9    approved for 1,109 residential units.

10             THE COURT:  Over which, just the north

11   parcel or north and ---

12             THE WITNESS:  It would be 787 units on the

13   north parcel, this area, and in addition there would

14   be 322 units on the south parcel, this area.

15             And you're able to achieve that density

16   in this area because of that parking structure,

17   without it it wouldn't be possible.

18             THE COURT:  So the south parcel was

19   originally designed for residential, not retail

20   or ---

21             THE WITNESS:  It's designed to have on the

22   first floor, retail, 94,000 square feet of floor

23   area; the second floor was 93,484 square feet of

24   office; and above that, on Levels 3, 4 and 5, you

25   would have what was called a condominium unit, which

1    is a form of ownership, but in this market it would

2    likely be -- the product would be an apartment

3    product, as opposed to the, you know, for sale type

4    product.

5    BY MS. REDMOND:

6         Q    And so let's go through one by one.  Your

7    highest and best use, not value, of the north project

8    based on your opinion is what?

9         A    Based on my research and analysis, it's my

10   opinion that the north parcel, which once had 787

11   units, will now have a hundred and seventy townhomes,

12   160 single family units, and 270, what we'll call

13   condominium units.

14             THE COURT:  How many?

15             THE WITNESS:  Two hundred and seventy, and

16   that's decreasing the condominium units that had been

17   located on the north parcel by 225 units, and so in

18   the aggregate on the north parcel you would have,

19   let's see, 600 residential units on the north parcel.

20             THE COURT:  And the original plan was?

21             THE WITNESS:  Seven hundred and

22   eighty-seven.

23   BY MS. REDMOND:

24        Q    The highest and best use that your report

25   provides for, is that consistent with the current

1   infrastructure that's under the ground and provided

2   on the property on the north sector?

3       A    Yes, ma'am.  Once again, my highest and

4   best use estimate rests strongly on the information

5   and investigation I was able to focus on with

6   Carlos Gonzalez, executive vice-president of Lennar.

7   He had site plans done, I was surprised, and talked

8   very specifically about the property.

9           I talked to him for almost two and a half

10  hours, and he gave me detailed information from the

11  site plans about what they had determined was

12  physically possible, and particularly in their

13  attempt to optimize the use of this -- of this

14  infrastructure, and Lennar is in this market up at

15  the St. Moritz and Santorini.

16          And he indicated they had entered into a

17  rolling option contract right now to -- option rights

18  to acquire 2,500 lots, and they have been taking them

19  down, I've got a series of six take downs, and he was

20  supposed to close yesterday on a large group of

21  townhomes and single family product, demonstrating

22  rising prices because the demand has been so strong

23  in the market and he indicated that his margins have

24  been approximately 40 percent, which is not what they

25  had expected.

Page 179

1        Q     Okay, and on the south parcel?

2        A     Yes, ma'am.  The south parcel, it's my

3   opinion that the highest and best use would be for

4   500 condominium units for the residential component,

5   and the key to those 500 units is the parking

6   structure, the structured parking.

7              Those units unlock the value of the

8   structured parking.  The structured parking unlocks

9   the value of the units.  Without one or the other, it

10  would be practically impossible to utilize a property

11  for such use.

12             And I do have site plans that we studied

13  closely that we obtained from the City of Doral

14  because it's very interesting because the parking,

15  the surface parking in and around these pads that are

16  shown on the site plan goes underneath the power line

17  easement.  I've never seen that.

18             I've done power line corridor acquisitions

19  for utilities companies, I've done all sorts of

20  corridor valuations, I've never seen a development

21  that had the ability by virtue of agreement to use an

22  easement for a permanent use, such as surface

23  parking, such as retention.

24             THE COURT:  When you said 500 condos, is

25  that it?  That is, your highest and best use would

1   not utilize the prior plan of retail and office

2   space?

3            THE WITNESS:  No, sir, it would keep -- it

4   would keep the 94,000 square feet of retail in the

5   project and the 93,346 square foot of entitlements

6   for the office area, as well.

7   BY MS. REDMOND:

8        Q    On the east project?

9        A    Yes, ma'am.  The east piece is 8.3 acres,

10  we mapped it out, we read a lot of legal descriptions

11  and tracked it, and the highest and best use of that

12  would be a future like industrial flex type use, some

13  light industrial type use, warehousing to support

14  the -- mini warehouses, warehousing, to support the

15  demand for space for the adjoining residents and so

16  forth.

17            And in doing my research I found a broker

18  who happened to have that piece on the market and it

19  was listed for $14 million as an office pad, two

20  pads, it didn't sell.

21            He explained to me how far the property was

22  located from the north side of 58th Street along

23  102nd Avenue and the cost to de-muck, the cost to

24  bring the utilities, the cost to bring the road, and

25  he had detailed information.  I relied upon that in

1  developing my opinion of highest and best use and

2  value.

3      Q    Okay, and could you let the Court know what

4  is highest and best use on the -- how is it

5  determined?

6      A    Well, highest and best use is what is

7  called the most probable use.  It's the use that's

8  physically possible, legally permissible, financially

9  feasible and the optimal use out of those uses.

10          It's the -- it's the use that you would

11  expect a well-informed buyer or seller to bargain a

12  price for the property, either as a seller, as to

13  what I would seek, or a buyer, what I'm willing to

14  pay, would be based upon the anticipation of the

15  property being used for such a use.

16      Q    And does your highest and best use take

17  into account a use of the existing infrastructure?

18      A    Yes, ma'am.

19      Q    Okay, and did you do an analysis of the

20  feasibility of your highest and best use?

21      A    What I -- I tested my feasibility primarily

22  with my investigation with Mr. Gonzalez.  The

23  investigation led to emphasis about changing dynamics

24  in the product mix, going to a lower density product

25  for the north side, fully aware of what the price

1  points are on a square foot basis for the townhomes,

2  for the single family product and so forth, and based

3  upon the information that I gathered in my market

4  research and discussions with Mr. Gonzalez, it's my

5  opinion that this project is feasible if timed out

6  and done in phases to meet market demand.

7        Q    Did you do any independent study to support

8  this evaluation?

9        A    Yes, yes.

10       Q    And what was that?

11       A    Well, I had gone around and I had

12  interviewed people that were -- for example,

13  apartments.  Avery Klon (phonetic) with Apartment

14  Real Estate Advisors, I interviewed him about the

15  depth and scope of the apartment market in Dade

16  County and South Florida, and particularly this area.

17  He advised me as to the scarcity of sales -- scarcity

18  of properties.

19             And also in regards to apartments, right to

20  the north of this property, at the next intersection,

21  is a 30 acre piece that has -- at the end of the year

22  2010, had just gone through a plan amendment to the

23  comp plan, and where it went to PUD and has now been

24  approved for development of 360 apartments, right up

25  here at this next intersection.

1          It's a project that's called Doral Grand

2     Residences and it's being developed by Atlantic

3     Pacific.  There's evidence of demand there and

4     there's also, I mentioned earlier, Cordova, which is

5     being developed by Flagler, is getting ready to build

6     230 additional apartment units and the rents are

7     going to be between a dollar seventy-five and $2 a

8     square foot a month, which is market dead on and so

9     forth.

10         Q     Did your highest and best use contemplate

11    building vertically and beginning selling of units on

12    this property immediately?

13         A     Not immediately, no, ma'am.  You could --

14    what you would do, if I was heading up an advisory

15    team or investing, I would start my marketing

16    immediately, as soon as I took possession of the

17    property, and I would start and accelerate presales

18    activities as rapidly as possible, and then begin

19    completing the infrastructure in phases as I work my

20    way back through the project, so not to interfere or

21    damage any existing infrastructure, and also so that

22    I could make closings as quickly as possible to get

23    cash flow going and not disrupt the lifestyles of the

24    residences as construction continues.

25         Q     Would it be consistent with your analysis

Page 184

1  of highest and best use to mothball or land bank the

2  property for a period of two years?

3         A     No, ma'am, I don't -- no, no.

4         Q     Okay.  Let's talk a minute about your

5  valuation analysis.  What was your final conclusion

6  with respect to valuation of the property?

7         A     It's my opinion that the market value of

8  the subject property as of January 11, 2012, is

9  $67,575,000.

10        Q     Okay.  Did you get to that number by making

11 any adjustments?

12        A     I didn't make -- I didn't -- I don't do

13 qualitative adjustments.  If the evidence is not

14 there to support the adjustment, it's just -- I -- I

15 either give greater weight to one transaction or one

16 type of transaction or another.

17               And I've considered as many relevant

18 dissimilarities between the sales and the subject

19 property that I can note, and I've looked at the

20 transactional information that I deem to be most

21 comparable and relevant, and based upon that

22 information and analysis, I reach my opinion of

23 value.

24        Q     Okay.  Would there be a different number if

25 this were not sold to a bulk buyer?

1        A     Yes, ma'am.

2        Q     And what would that number be?

3        A     If the property were just held as three

4    independent economic units, the number is

5    79.5 million, but because the number of entities that

6    has the economic capacity to buy a property of that

7    scale, that type of capital outlay is limited, it's

8    typically in my practice, my profession, with my

9    clients, we expect a bulk discount has to be applied

10   in order to attract an investor to take all three of

11   those parcels down at one time.

12       Q     And which valuation methodologies did you

13   use?  Let's first start on the north parcel.

14       A     Yes, ma'am.  I used the sales comparison

15   approach to value, and I think the key thing that

16   differentiates the way I approach it and Mr. Waronker

17   did, is the unit of comparison.

18            THE COURT:  Can we hone in on the page of

19   your report where you do your comps on the north

20   parcel?

21            THE WITNESS:  Yes, sir.  Page 68 I have a

22   summary grid.

23            THE COURT:  Okay.

24            THE WITNESS:  So Land Sale Number 1 is --

25   of these four sales, Land Sale Number 1 is the only

Page 186

1    one of these four sales that was not included, I

2    believe, in the primary set that Mr. Waronker had

3    used.

4              This was a sale that we had found that

5    in December of 2010 the City of Doral had

6    purchased and the property had improvements on it

7    like fill dirt, and had some de-mucking and so

8    forth completed, and it indicates that -- I think

9    it's fairly evident by the price.

10             On these sales ---

11             THE COURT:  What's evident by the price?

12             THE WITNESS:  Well, if you look at the

13   price, the unit of comparison that I use and the

14   market uses, and what Lennar uses in buying

15   properties with the highest and best use for

16   residential purposes, is dollars per allowable unit,

17   so that's the very bottom row, it's not a dollar per

18   square foot.

19             They get a return of and on their

20   capital every time they sell a unit.  When they

21   measure value and they measure economic capacity

22   and when they measure economic performance, it's

23   based upon the sales of those units.

24             So when they value dirt, when they're

25   buying sites for development, it's dollars per

1  allowable residential unit, not per square foot.

2  It's okay to use per square foot as a check and

3  balance, nothing wrong with that, but in my

4  experience, and verifying it with Mr. Gonzalez,

5  is this the proper metric for buying residential

6  properties, dollars per residential unit is what

7  I used and what I verified with Mr. Gonzalez

8  Lennar uses.

9  BY MS. REDMOND:

10       Q    Okay, and Land Sale 1, turning to Page 68,

11  that is the one sale that is different than what

12  Mr. Waronker used?

13       A    Yes, ma'am, in this grid.  And I will be

14  talking about other sales throughout the valuation

15  process that are not in this grid, but are part of

16  the data book that has been made available out of my

17  work files to all parties, so there is information in

18  addition to the grid.

19       Q    Okay, and what is that information, what

20  other land sales?

21       A    The other land sales include sales of

22  the -- sales of Lennar's purchases at Santorini at

23  Islands of Doral, a series of their take downs.  I

24  have seven separate conveyances where they're taking

25  down lots, townhome sites, and single family

Page 188

1    residential home sites as part of their rolling

2    option agreement.

3            I have the sale of -- City of Doral bought

4    an industrial site that I consider in the valuation

5    of the easterly track, and I've got several listings

6    that we came across of properties that are even

7    contiguous to the subject property, and I was able to

8    learn a lot, not just about the asking price or the

9    prevailing bid in this market or ask, but what those

10   brokers know about this market when I talked to them,

11   and so that's the information.

12      Q    Okay, and you chose not to use any of the

13   other methodologies for valuation, why is that?

14      A    They're just not applicable in the

15   valuation of this type of property.  This is not a,

16   you know, a Class A, you know, office building, you

17   know, that's being bought and sold based upon its

18   expected ability to produce net income, therefore,

19   the income approach is not applicable and cost

20   approach is not applicable because really it's only

21   used in the valuation of properties where you have

22   new buildings that meet -- that are the highest and

23   best use of the property.

24      Q    And your valuation takes into account the

25   benefit from the infrastructure?

Page 189

1        A     Yes, ma'am.

2        Q     Okay.  Let's turn to the south track.

3   What ---

4              THE COURT:  I'm not sure I really -- I

5   didn't get a chance to read through these pages of

6   the report, so I'm trying to understand how you used

7   unit price versus square foot to come up with these

8   numbers.

9              THE WITNESS:  Yes, sir.  If I may, Land

10  Sale Number 2.  Land Sale Number 2, if you -- if it

11  is on your monitor, is this piece of property right

12  here.

13             THE COURT:  Do you want to try to use the

14  little palet on the right?  See on the right where

15  it's got all those things?

16             THE WITNESS:  Okay.  That's Land Sale

17  Number 2.  That property was purchased by Terra in

18  August of 2011, and that property is being -- is

19  proposed for development of a townhome community

20  called Doral Cay, 160 units.

21             So you take the purchase price

22  $9 million, and you divide it by 160 units, which

23  is proposed for the property, and it indicates a

24  per unit price of $56,250 per unit, and there's a

25  relationship between that price per unit and the

1    end product price.

2           So, for example, if that was just raw

3    dirt, which it is in this case, you would be

4    looking at approximately 12 and a half to 15, 16

5    percent, that price would be 15 percent roughly

6    of the end product price.  So if you multiply

7    that by eight, you'd be looking at an end product

8    that would cost about $450,000.

9           Then, for example, if you go to the

10   Land Sale Number 3, which is -- I'll try this

11   again.

12           THE COURT:  Can you zoom out a little bit?

13           THE WITNESS:  I don't know how to do that.

14           THE COURT:  Okay.

15           THE WITNESS:  Thank you.

16           So Land Sale Number 3 totals 32.4

17   acres, and that's a project that is known as

18   Century North and South, and it was bought by

19   Terra, and it's proposed for 302 townhomes, and

20   when you divide 302 into 16.5 million, you get an

21   indicated purchase price of $54,636 a unit.

22           Now, something is starting to happen

23   immediately.  Those prices are very close.  So

24   what that, in my experience over the years, has

25   done is confirmed that I'm using the right unit

1    of comparison.

2             When you start using dollars per square

3    foot and you have properties with one density, as

4    opposed to properties with another density, the

5    numbers jump all over the board.

6             So this -- so when you see the sale of

7    these two properties with a similar product

8    proposed for each property, and they have similar

9    densities, 9.3 units per acre to 9.4 units per

10   acre, the price being paid for the site, the

11   dirt, and this one had to be de-mucked, it's

12   pretty close, 54,600 a unit for one and 56,300 a

13   unit for the other.

14            So that's -- that's the process that I

15   use, and that I've customarily used in valuing

16   residential development properties that are at

17   this stage of their life cycle with

18   infrastructure and entitlements and known

19   development rights.

20   BY MS. REDMOND:

21       Q    Mr. Hanson, at the basis that Mr. Waronker

22   used to value the same comparables that you valued,

23   and what you just described is the most significant

24   difference between the two of you?

25       A    Yes, ma'am, I think that's where it

1   happens.  I think we -- a fork comes in the road.

2   We're in the same car, but at this moment I'm going

3   down the dollars per dwelling unit highway and he's

4   going down the dollars per square foot highway, which

5   is perfectly fine either way properly applied.

6            And I am not here to critique Mr. Waronker,

7   I'm just not going to do that.  I've done it my way

8   and that's what I believe is correct.

9        Q    Let's move to the south parcel.  What

10  methodology ---

11           THE COURT:  Is it because you're not hired

12  to do that or you don't have a criticism for his

13  analysis?

14           THE WITNESS:  I think it compromises my

15  impartiality and my objectivity and over the years, I

16  just -- I just don't do that unless a judge orders

17  me.

18           THE COURT:  Let's go back to something more

19  specific here.  So you looked at what -- what did you

20  look at to determine what the number of units was

21  intended to be for the Terra sales, Land Sales 2 and

22  3 on Page 68, your grid?

23           THE WITNESS:  Those are the number of units

24  that are proposed for the developments that are going

25  on those properties.

Page 193

1          THE COURT:  Where does that come from, that
2    information?

3          THE WITNESS:  It comes from the site plans
4    and the marketing information.  For example -- may I
5    stand up?  When I was doing my development of this
6    assignment, I laid out the subject property
7    development so I could see the lots and the scale and
8    the size.

9          What I did, I took the site plan out of
10   the marketing brochure for Doral Cay, and I was
11   able to enlarge the scale of it, so I could see
12   exactly how it would fit in terms of the scale
13   and land mass next door, and those are the exact
14   number of units that are in the marketing
15   brochure proposed for that site.

16         THE COURT:  So from their marketing plan
17   you just did a simple calculation to what they were
18   paying per unit in accordance with their plan, and
19   then you came up with a unit price to apply to the
20   number of similar units that you think would be the
21   highest and best on that parcel?

22         THE WITNESS:  Yes, sir.  Like, for example,
23   this is a townhome unit, so that portion of my
24   highest and best use residential component that were
25   townhomes, this would be a good starting point for a

Page 194

1    unit of value.

2           THE COURT:  Okay.  But you used 80,000,

3    right, for townhomes?

4           THE WITNESS:  Yes, sir, and that's because

5    this $56,000 is what I'll call a virgin site, it

6    hasn't been de-mucked, it has had no land

7    development.  It does not have the entitlements, it

8    has not had the engineering, it's basically raw land,

9    it's dirt, and what I'm valuing is not.

10          And additional sales information I have

11   related to transactions involving Lennar, who's

12   buying -- who went in and bought pads similar to

13   the Landmark where infrastructure was in at

14   Santorini in Doral up to the northwest, they were

15   paying approximately $82,000 for townhome pads.

16          THE COURT:  Why aren't those your comps?

17          THE WITNESS:  They are, they're discussed

18   in here.

19          THE COURT:  In the hundred and seventy

20   units that you use in your calculation on Page 70,

21   that's the highest and best use based on what

22   Lennar's guy told you was a highest and best use, or

23   you independently concluded that from various sources

24   or what?

25          THE WITNESS:  I independently concluded it,

1   but I gave great consideration to it, and largely

2   because of the degree and detail, knowledge he had of

3   the site plan, discussions about the ability to use

4   the infrastructure, the motivation to use the

5   infrastructure, and the other information regarding

6   the products that they're marketing in this area, it

7   just confirmed what I had read and what we had put

8   together in our research.

9          THE COURT:  Okay.  Where do you refer to

10  the $80,000 per unit Lennar purchases of properties

11  that has been upgraded --

12         THE WITNESS:  Yes, sir.

13         THE COURT:  -- or graded?

14         THE WITNESS:  Improved.

15         THE COURT:  Improved.

16         THE WITNESS:  On Page 70, for example, in

17  that first full paragraph, consideration is also

18  given to the purchase price paid by Lennar for 137

19  townhomes between February 2010 and March 2011

20  located at Santorini at Islands of Doral.

21         According to Carlos Gonzalez, division

22  president, these properties were purchased for

23  prices ranging from approximately 82,000 to

24  $86,000 per townhouse.

25         THE COURT:  If those would have been the

Page 196

1    comps, why didn't you do it like a real comp and get

2    the actual information, instead of just what Lennar

3    told you they paid?

4              THE WITNESS:  Well, I do have it.  I have

5    it here, and behind each one of these are the deeds,

6    the conveyances.  It's in my work file, as opposed to

7    putting it in a table like the others.  It's a type

8    of information that doesn't lend itself to putting in

9    a table.

10              THE COURT:  Wasn't there a real estate

11    transaction with a closing and a certain number of

12    acres purchased?

13              THE WITNESS:  Yes, sir.

14              THE COURT:  I'm having trouble following

15    why you would choose as your comps under your per

16    unit thing, per unit methodology, the purchases of

17    unimproved, and then refer to what seemed like closer

18    purchases of improved, but you don't have them in a

19    grid and laying out the transaction.

20              THE WITNESS:  Right, yes, sir.  What we did

21    was track them and -- let's see, one, two, three,

22    four, five ---

23              THE COURT:  What are you pointing to, what

24    page?

25              THE WITNESS:  This is material from my work

1   file that's been made available to all parties and

2   was discussed.

3          So we have, for example, the site

4   plans, where the properties are coming from, the

5   deeds behind them for each conveyance, the

6   product line and so forth, and so these are the

7   transactions on each one that Lennar did and

8   because it's a rolling option, it's a series of

9   transactions.

10          THE COURT:  So because it's a rolling

11   option it didn't lend itself to putting it in a grid?

12          THE WITNESS:  I could have put it in a

13   grid.  It's more just I chose to do it on a narrative

14   text, really, more than anything.

15          THE COURT:  But yet it seems that's what

16   you're relying on most to get to your $80,000 number.

17          THE WITNESS:  Yes, sir, it is, and the

18   reason being is that this shows the premium that is

19   being priced in by the market for properties because

20   this is a project that is somewhat -- it's very

21   similar to the Landmark in that there is

22   infrastructure in place when they bought these pads

23   and these parcels, but that's the format ---

24          THE COURT:  There's nothing in your report

25   to indicate the actual level of infrastructure in

```
 1   these Lennar transactions?
 2            THE WITNESS:  Just the discussion within
 3   the narrative of the property.
 4            THE COURT:  Okay.
 5   BY MS. REDMOND:
 6        Q    Okay.  Mr. Hanson, let's turn to the south
 7   parcel.  What methodology did you reach?
 8        A    I used the sales comparison approach.
 9        Q    Could you explain how you did that?
10        A    Sure.  Yes, ma'am.  I used the sales
11   comparison approach for the valuation estimate for
12   the 500 condominium units, which are actually going
13   to be apartment units, and what I did in valuing
14   those, I had gone back and I had looked at the price
15   being paid and the table for the -- for the large
16   tract.  I have a sale next door that's contiguous to
17   the property for 54,000 -- excuse me, $56,250 a unit,
18   but that's going to be a bigger product, it's going
19   to command a higher price than what you can expect
20   for the apartment price or condo price and ---
21            THE COURT:  I'm sorry, what page are you on
22   now?
23            THE WITNESS:  I'm on Page 73 -- excuse me,
24   72.  I had previously on Page 71 discussed -- gone
25   into depth in regards to a discussion of data
```

Page 199

1    pertaining to economic matters relating to the

2    condominium portion of the product group and

3    discussed the issue about pad ready, fill dirt,

4    de-mucking costs and so forth.

5         And looking at the property next door

6    that sold for 56,000 a unit, and realizing that

7    it's going to -- additional capital expenditures

8    will be needed at that site that are not going to

9    be needed at the subject site, that factors into

10   my reconciliation.

11        So I concluded that for the south

12   parcel, the 500 condominium units would have a

13   market value estimate of $40,000 per unit for the

14   500 units, and that's $20 million for that.

15        THE COURT:  Is this a normal?  I mean, I

16   don't have much experience in this kind of appraisal

17   business, so I don't mean to say it accusingly, but

18   I'm having trouble making -- it doesn't seem that

19   logical to me that you would pick how many units you

20   think should be on a particular parcel and then

21   appraise it that way.  I mean, you would get that

22   specific?

23        THE WITNESS:  Yes, sir.  Let me see if I

24   can help out this way.  Going back and starting at

25   the beginning, this is a piece of property that is

1   approved for 1,109 units, it's already got

2   entitlements, it's in place.

3           THE COURT:  I mean, the 500 could be there

4   based on the approval is what you're saying.

5           THE WITNESS:  Right.  Because what's there,

6   now you can move it around, you can allocate it and

7   shift it, and in my opinion, the highest and best use

8   would be to put those units down at that end of the

9   property and it works together synergistically with

10  the parking structure in that particular location of

11  the property, as well.

12          THE COURT:  I'm just puzzled that if you're

13  talking about market value to a universe of buyers,

14  maybe it's not a big universe, with this size parcel

15  in this particular real estate market, but that you

16  would price it based on a specific number of units

17  that you believe should be there largely based on

18  what the guy from Lennar said he would do or am I

19  twisting you a little bit here?

20          THE WITNESS:  No, that's fair, but really

21  very largely due to the fact that the big hurdle has

22  already been overcome, in that you have development

23  approval for 1100 units.

24          So once you have those entitlements,

25  you've met concurrency, you've satisfied all the

1    agencies, you have something of significant

2    value.

3              THE COURT:  But if somebody's intended use

4    was 400 units, they would pay less, or 600, they

5    would pay more based on this methodology?

6              THE WITNESS:  Well, not if I was the owner

7    or if I was -- if we were optimizing the value of the

8    asset based upon the information in the market about

9    product demand and so forth, and what can be done at

10   this property, that is a proper allocation, and to my

11   best estimate that would take place, in that a well

12   informed buyer and seller would most likely agree

13   upon would represent the best use of the property.

14             THE COURT:  Okay.  So the 40,000 -- the

15   actual $40,000 per unit that is reflected on Page 72,

16   that comes from what?

17             THE WITNESS:  That comes from a

18   consideration of the sales that are in the table.

19   For example, Sale Number 2, which is literally

20   contiguous to that parcel, was getting $56,250 a

21   unit.

22             THE COURT:  Those were townhouse units.

23             THE WITNESS:  That's right.

24             THE COURT:  You bumped it up to 80 for the

25   townhouse.  How did you arrive at the 40 for the

Page 202

1    condo?

2         THE WITNESS:  It's a much smaller unit and

3    it doesn't command the same price per square foot in

4    the market.  The townhouse unit was typically going

5    to command, like at The Reserve East and West, $180 a

6    square foot.  It's a larger unit.

7         The condo market is not going to

8    command that, it's softer and the price and the

9    value, contributory value of that product mix or

10   entitlement component is, therefore, lower.

11        THE COURT:  Well, no, I understand why a

12   smaller unit under your methodology would be less.  I

13   just wondered if there was something that's not

14   disclosed that goes into the quantitative jump from

15   56 to 80 for townhouses and 56 to 40 for condos.

16        THE WITNESS:  Well, looking at the end

17   product price, for example, the condos that were

18   approved on this property had an average size -- the

19   total approved plan led to an average size just under

20   a thousand square feet for those units.

21        In this market you're looking at $125,

22   $150 a square foot, so it's $150,000, you know,

23   end product, $175,000 condo unit.  They're

24   getting more than that up at St. Moritz, and at

25   that price you can figure, you know, 25 percent

Page 203

1    of the end product price would be approximate to

2    what the value of the dirt would be in this stage

3    of improvement.

4              THE COURT:  Okay.

5    BY MS. REDMOND:

6         Q    Mr. Hanson, in reaching your conclusions,

7    did you review any market studies?

8         A    I've reviewed a large amount of market

9    information that I collected and gathered through my

10   research and analysis prepared by CoStar Group, I

11   think Wolf Reinhardt, the other authoritative sources

12   of housing and information and office information,

13   industrial information and for each of those

14   submarkets, yes.

15        Q    Is there any other methodology or anything

16   else that you relied on for the south parcel?

17        A    Yes, ma'am, in estimating the value of the

18   entitlements, I used a land residual analysis.  For

19   example, on Page 70 -- 73, in valuing -- in

20   estimating the contributory value of the right to

21   build 94,000 square feet of retail floor area, I used

22   a land residual analysis.

23             I start by looking at the CoStar retail

24   report for the Miami Airport submarket, which

25   includes aggregated data.  This Doral market is

1    superior to the aggregated Miami Airport submarket.

2    12.8 million square feet of rentable area, you have a

3    vacancy level of less than five percent.

4            I talked to brokers in that area.  They

5    used the term, they said that Doral is under

6    retailed.  So based upon that information, I was able

7    to estimate a probable rental rate of 20 bucks a

8    square foot triple net, and subtracting an allowance

9    for vacancy and collection, and applying an overall

10   cap rate from Real Estate Research Corp.'s third

11   quarter report, I obtained an indicated value for the

12   property had I gone vertical with that many square

13   feet, and then subtract the cost.

14           It leaves me a residual of what I conclude

15   to be approximately $60 per square foot of allowable

16   floor area, that's called an FAR unit of value and

17   it's frequently used and when you're valuing

18   entitlements.

19       Q    Okay, and the east parcel, what methodology

20   did you use?

21       A    I relied upon the sales comparison

22   approach.  The east parcel is almost a finger, so to

23   speak, off of what I see as the primary core of the

24   Landmark at Doral property.  It's an 8.33 acre piece.

25   It's located -- I can go ahead and do this again.  It

Page 205

1   does not include the power line, nor does it include

2   the lake, and to have usefulness, the road on 102nd

3   has been brought up to here, you can see.

4        The gentleman I spoke to has this listing

5   right here, and that property is available on the

6   market.  George Avilla (phonetic) has that property

7   available on the market for approximately $25 a

8   square foot, 10.94 acres of land, and the asking

9   price is 13.105 million, and that's 27.50 a square

10  foot.  That's the gentleman who had this property on

11  the market as an office site back in the top of the

12  market, and he was very knowledgeable and explained

13  to me from his previous pro forma the amount of

14  capital outlays that would be necessary before that

15  site would even be capable of being developed because

16  of the amount of infrastructure that would have to be

17  brought to it and the amount of site development work

18  that would be required.

19        So I concluded based upon, you know, the

20  analysis information that I gathered through that

21  research and discussion, that that would be worth

22  approximately $2 million.

23  Q    Okay.  So which particular allocations for

24  value did you assign for each type of development?  I

25  would just like to go through the north and talk

1    about townhomes, how many units you believe is your

2    highest and best use and what value you assigned per

3    unit.

4           A     Sure.  Yes, ma'am.

5                 On the north tract, which had already

6    previously been approved for 787 units, of which 292

7    were townhomes, and of which 495 were condominium

8    units, it's my opinion that the highest and best use

9    would be for 122 townhomes that were valued at 80,000

10   per unit, recognizing the contributory value of the

11   on-site infrastructure, and the fact that it doesn't

12   require de-mucking or fill dirt ---

13                THE COURT:  How many?  I thought your

14   report says 170.

15                THE WITNESS:  I'm doing it on a, I think,

16   component by component basis.

17                THE COURT:  Page 69, townhomes, 170 units.

18   What are you referring to when you say 122?

19                THE WITNESS:  The 122 is the decrease in

20   the amount.  For example, it was approved for 292

21   units.

22                THE COURT:  All right.  I didn't realize

23   you were talking about the decrease, I missed that

24   part.

25                THE WITNESS:  My fault, I'm sure, and then

1  the second component would be a single family
2  product, which would be a 40 foot wide,
3  approximately, with a hundred foot depth, and at
4  125,000 a unit, once again recognizing the
5  contributory value that the infrastructure has on
6  this property, the number is 20 million for that
7  component.
8          And then the third component would be
9  270 condominium units, and keep in mind, just
10  right here, if I could, there's a 360 unit
11  project that just got a plan amendment, so the
12  market can bring in 360 apartment units right
13  here, and so what I'm talking about is doing the
14  same thing in this property.
15          In my experience with other development
16  companies and projects I've been involved in, it
17  is absolutely true, we have a former landfill
18  encapsulated next door, it affects the view.
19          Where will I put my vertical
20  construction, my five story -- my condominium
21  apartments?  Right in the northeast corner of
22  that property.  I can do my site plan in such a
23  way as to minimize the impact of that -- what is
24  call an externality, and so forth, and ---
25          THE COURT:  So the 125,000 per unit for

1  single family you derived primarily from Land Sale 4?

2          THE WITNESS:  Yes, sir, and ---

3          THE COURT:  And other stuff that Carlos

4  told you?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Okay.

7          THE WITNESS:  And then the third component

8  is the 270 unit condominiums, $50,000 per unit, which

9  would then indicate a contributory value of

10  13.5 million for that.

11          And so if you add those three together,

12  that north tract would then, in my opinion, have

13  a market value of $47.1 million.

14  BY MS. REDMOND:

15      Q    You heard testimony earlier today about the

16  power lines that are on this property.  Does that

17  affect your valuation in any respect on the north

18  parcel?

19      A    Yes, ma'am, certainly it affects it.

20      Q    How did it do that?

21      A    Well, it affects it because I'm able to

22  build, so to speak, if I was the developer or the

23  analyst, these units are -- the north tract has the

24  ability to accommodate this number of units and these

25  units because all -- because the kidneys are located

1  underneath the power line, as is the bladder of the

2  property, so to speak, so it frees up the north

3  property to accommodate residential development.

4          The power lines perform a significant and

5  beneficial function to the overall development plan

6  of this property.  So it shows up because I'm able to

7  get that number of units on the property because my

8  storm water is being handled off site, so to speak,

9  within those corridors of that power line.

10    Q    Okay.  Let's move to the south parcel,

11  condo apartments, 500 units.  What is your value for

12  those units per unit and total value?

13    A    $40,000 per unit, 20 million.  Then I have

14  the retail entitlements, where I can build 94,000

15  square feet of retail under the TND new urbanism

16  model, it would be on the first floor, and at $60 a

17  square foot FAR, that's 5.7 million.

18          And then for the second level office, which

19  is a weaker market, and it's going to cost more to

20  construct these structures because of the nature of

21  the structures, $50 per square foot FAR for the

22  office, and that's 4.7 million rounded, which would

23  then indicate a total value for the south parcel of

24  30.4 million, which is very high on a per square foot

25  basis because the site has such a high intensity and

1   density of use being made of it, which was consistent

2   with what was always the town center plan or nature

3   of a TND development.

4            THE COURT:  Of a what development?

5            THE WITNESS:  TND, it's the term

6   traditional neighborhood development.  It's like

7   Celebration in Orlando that Disney did, and Seaside

8   up in the Panhandle, and some of those products.

9   BY MS. REDMOND:

10       Q    Would the current site plan have to be

11   modified in order to accommodate your highest and

12   best use for the south parcel?

13       A    According to my investigation and

14   discussions with Mr. Gonzalez, it doesn't -- it's my

15   impression that it will not have to be modified much.

16   I'm certain it will be, there will be some

17   modifications.

18            Mr. Gonzalez has a site plan he's had done

19   by his land planners and my discussion with him

20   emphasize their effort and attempt to utilize the

21   existing plan and the existing infrastructure and he

22   suggested he's able to do that.

23       Q    And would that modification, if it needed

24   to be done, impede in any way the development of the

25   north parcel?

1     A     I don't think so, no, ma'am.  I think it

2  can be coordinated and planned in such a way so that

3  it wouldn't substantially interfere with the phasing

4  of the project.

5     Q     Okay, and then the east parcel, you've come

6  up with a valuation for it?

7     A     Yes, ma'am.

8     Q     What is that?

9     A     $2 million.  That was based upon a sale,

10  the City of Doral paid $12.63 a square foot for an

11  industrial site, and from that number I subtracted

12  those land development costs that are liabilities

13  against that property, the cost to bring

14  infrastructure to it, which more or less shows you

15  why infrastructure has value.

16          The cost to extend 102nd Ave to that

17  property, just like the property to the south of it

18  did, and to de-muck the property and to bring in fill

19  dirt, leaves a residual economic value of $2 million

20  for that property.

21     Q     Okay.  With respect to the south and the

22  east parcels, do the power lines that were testified

23  about before, this morning before the Court, do they

24  have any impact on the value, does the existence of

25  power lines on the property?

1        A     Yes, they have impact, certainly.  We've

2  done power line studies all over Florida, and what

3  I've noted and what I've observed, when you're in

4  communities with a high density, you have -- you have

5  a community in Doral that contains 15 square miles,

6  approximately, and with a population -- 2010

7  population of Doral, you have a population density of

8  about 3500 people per square mile.

9           When you get to very high density pressures

10  like that in Broward County, you will see the units

11  get pushed closer and closer to the power line and

12  there doesn't seem to be as much demonstrative effect

13  due to, you know, set backs because of concerns over

14  electronmagnetic fields or other considerations.

15           But yet there's a power line there.  We

16  have a beneficial use of the surface, but we still

17  have vertical power lines which will, I believe,

18  effect the marketability of pricing somewhat on the

19  property, yes.

20           But when you follow that power line

21  corridor from that property down 107th, it runs right

22  along, you know, the east side of a series of

23  multi-family residential projects in the Doral

24  community and they're all fully sold out, and it

25  doesn't appear to have any affect -- there's no units

1  sitting there vacant, dark and idle next to a power

2  line, they were all fully functional, securitized and

3  so forth.

4       Q    You've been out to the property on several

5  occasions?

6       A    Yes.

7       Q    You've heard testimony about the smell from

8  the land fill?

9       A    Yes.

10      Q    Did you smell anything?

11      A    No, I had my kid with me.  That's a joke.

12  No.  (Laughter.)

13           Thank you.  Thank you.

14           No, I have not been to the property enough

15  times to have an objective basis about that smell.

16  That's -- that's -- if I was to say I did, I would be

17  misleading you.

18           What I was able to do that helped me

19  address that in my investigation, was talk and

20  interview the broker, Mr. Avilla, who has this

21  property right here, and who is selling this

22  property, and he works this market constantly, and I

23  asked him about it, and he says this is not an odor

24  problem.  He said, this is encapsulated.  This is an

25  incinerator that burns wood products.  He says, it's

1   a view issue.  He said, we dealt with that.

2           He's a broker, one of the brokers that was

3   part of the $85 million transaction of this site when

4   it was purchased in '05, '06, and he said at the time

5   we went through permitting at this property, that was

6   an issue that was brought up, but everyone agreed and

7   concluded it could be dealt with with the landscaping

8   and the buffering that would be used at the

9   development.

10          But he said, no, it's not odor, it's not

11  about odor, it's about view, a view amenity.

12     Q    Okay.  Just a few more questions.  In your

13  investigation, did you discover who owns the

14  infrastructure at Doral?

15     A    Yes.

16     Q    Who's that?

17          THE COURT:  Hold on a second.  I thought I

18  heard somebody ringing at our door, do you want to go

19  check?

20          I'm sorry.  Can you repeat the

21  question, I didn't hear it?

22          MS. REDMOND:  I asked him if in his

23  investigation he knew who owns the infrastructure at

24  Doral.

25          THE COURT:  Okay.

Page 215

1          MS. REDMOND:  And he said, yes.

2          And I said who owns it?

3          THE WITNESS:  According to deeds that are

4    in the public records, the road right of way is

5    particularly what I'm talking about, confirmed with

6    the tax cards, as well, it's owned by the Community

7    Development District, the CDD.

8    BY MS. REDMOND:

9       Q    And if the District owns the

10   infrastructure, how does the infrastructure add

11   value to the property?

12      A    Well, the Community Development District is

13   a special purpose government unit that is created by

14   statute for the purpose of overseeing the

15   construction of infrastructure and maintaining it for

16   the beneficial use of those residents and occupants

17   that will -- that will live there.

18          So even though they own it, so to speak,

19   within their rights of way, it's there for the

20   benefit and use and utility of those lands that are

21   contiguous that are scheduled and designed and

22   planned for residential development.

23      Q    Okay, and lastly, could you just summarize

24   briefly your value conclusions that you reached after

25   your investigation and appraisal of this property?

Page 216

1      A     Sure.  In conclusion, it is -- it's my

2  opinion that the market value of the property sold as

3  to a single purchaser in one transaction in terms of

4  cash, with approximately an 18 month market exposure

5  term is going to be -- is $67,575,000.

6           Now, as three separate independent economic

7  units that are not necessarily sold to an individual

8  purchaser, and without a bulk discount to achieve

9  that sale, the aggregate value of those three sites

10  is 79.5 million.

11           MS. REDMOND:  Your Honor, we would like to

12  admit -- I think the report is already admitted, but

13  Exhibit 6, which is in Mr. Hanson's report, which is

14  the schematic up on the board which he identified.

15           I would like to admit that, as well.

16           THE COURT:  Okay.  Well, it's already in

17  the report.  Either way, I mean, we all have been

18  looking at it.

19           MS. REDMOND:  I don't think it's in the

20  report, your Honor.

21           THE COURT:  All right.  It's in.

22           MS. REDMOND:  Thank you.  Nothing further.

23           THE COURT:  Okay.  Are you going to handle

24  the cross?

25           MR. GIELCHINSKY:  Yes.  Would the Court

1    prefer a five-minute break?

2              THE COURT:  Yes, let's keep it pretty

3    short.  Let's be back promptly at 4:10.

4              (Thereupon, a brief recess was taken, after

5        which the following proceedings were had:)

6              THE COURT:  Okay.  Let's proceed with

7    cross.

8              MR. GIELCHINSKY:  I have a number of images

9    from the Google Earth web service with me that I

10   intend to use for Mr. Hanson's cross.  I've given a

11   stack to counsel.

12             If it would be the Court's pleasure, I

13   have an extra stack for your Honor and for the

14   witness, if that would help people look at the

15   pictures a little better than the overhead?

16             THE COURT:  Okay.  Is there an objection to

17   using these?

18             MS. REDMOND:  Your Honor, I don't have a

19   technical objection.  I don't know when these

20   photographs were taken.  They were taken sometime

21   from Google Earth.  They seem to bear a 2011 and a

22   2012 notation on them.

23             You know, they're not authentic and

24   they're not authenticated, but, you know, I don't

25   know that they hurt us, so I don't think I

1  object.

2            If your Honor ---

3            THE COURT:  I'll reserve to the extent they

4  try to introduce them into evidence and we don't know

5  the date of the pictures, but are you just using them

6  for reference, not ---

7            MR. GIELCHINSKY:  Really for reference

8  purposes, your Honor.

9            THE COURT:  Are you offering them into

10  evidence or probably not?

11            MR. GIELCHINSKY:  I don't intend to.  I

12  intend to ask the witness whether he can identify

13  what's depicted on the photographs.

14            THE COURT:  All right.  I will just answer

15  your question.  Yes, I'll take a stack.

16            MR. GIELCHINSKY:  May I approach, your

17  Honor?

18            THE COURT:  Yes.

19            MR. GIELCHINSKY:  Thank you.

20            THE WITNESS:  Thank you.

21                  CROSS-EXAMINATION

22  BY MR. GIELCHINSKY:

23       Q    Good afternoon, Mr. Hanson.

24       A    Good afternoon, sir.

25       Q    You are familiar with the Google Earth

1    service; correct?

2        A    Yes, sir.

3        Q    You use it from time to time?

4        A    Only when they let me bring my iPad in.

5        Q    Great.

6            THE COURT:  By the way, is anybody getting

7    the shakes today because Wikipedia is off line for

8    the day?  (Laughter)

9            Mr. Fishkind is, okay.  We have one.

10   BY MR. GIELCHINSKY:

11       Q    The first photograph in the stack, the one

12   that's depicted on the monitor now, are you able to

13   identify what is depicted in that photograph?

14       A    Yes, sir.

15       Q    What is depicted in the photograph?

16       A    That's a northerly view from the south side

17   of Northwest 58th Street of the closed model center

18   that was -- that is at the property at this time.

19           And over on the right side of the

20   photograph is the structured parking facility, and

21   then the lines are -- that's the power line easement

22   that runs north/south along the west 390 feet of

23   that -- southern portion of the property.

24       Q    And the only ingress and egress areas for

25   traffic on the south side of the property are

Page 220

1   depicted here, correct, where I've just made a yellow

2   line?

3       A    Incorrect.

4            THE COURT:  That yellow line is 107th?

5   BY MR. GIELCHINSKY:

6       Q    I'll ask if the witness could identify

7   that?

8       A    The yellow line, the way I'm interpreting

9   it, would be the secondary access on the north right

10  of way of 58th Street into the parking area, as

11  opposed to the primary access that would run parallel

12  along the west side of the parking garage, according

13  to the site development plan.

14      Q    That would be behind the white truck,

15  correct, sir?

16      A    Correct, yes, sir.

17      Q    Where I made another yellow line.

18           THE COURT:  I'm not really following this

19  in terms of the property dimensions.  If the line on

20  the left is not 107th Avenue -- okay, that's good.

21  Put up the ---

22           THE WITNESS:  There you go.  The site plan

23  that's been approved for the property, the pink that

24  I colored in is the 929 space parking garage, which

25  is right here, and then the driveway connections.

1   The primary driveway connection, according to the

2   site plan, is there, and then the secondary -- this

3   is a full movement access point driveway connection

4   and then this is what is called right in/right out.

5          So there's two driveway connections on

6   the north side of 58th Street servicing the south

7   parcel and then there's two on the east right of

8   way of 107th.

9          THE COURT:  On the left side of this

10  picture is a road or driveway that is parallel to a

11  hundred seven but east of it.

12         THE WITNESS:  Correct, yes, sir.

13         THE COURT:  All right.

14  BY MR. GIELCHINSKY:

15     Q    And I put the site plan that you were

16  testifying about earlier on the screen.  I painted

17  two yellow lines there.  Do those roughly depict the

18  two areas we were talking about on the photograph?

19     A    Yes, sir, approximate.

20     Q    Going to the next picture in the stack I've

21  handed you, sir.  I'll put that one on the overhead.

22  Are you able to identify what is depicted in that

23  image, sir?

24     A    Yes, sir, I am.

25     Q    And what is depicted in that image?

Page 222

1        A     That is the northerly view from
2    approximately the southwest corner of the site, near
3    the east of the intersection of 58th Street with
4    107th, which would put you approximately dead center
5    of the north/south power line easement that runs
6    along the westerly edge of the property and has a
7    width of 390 feet.
8        Q     These are the power lines that we're
9    talking about, the ones I just drew with the yellow
10   line on the overhead?
11       A     Yes, sir, they are.
12       Q     On Page 47 of your report, sir, there's a
13   paragraph in the middle of the page with the word
14   easements, and at the very last sentence of that
15   paragraph you've indicated, and I'll quote, "It is my
16   opinion that the power line easements do not
17   adversely affect the market value of the subject
18   property."
19             Have I read that sentence correctly, sir?
20       A     You read it correctly, yes, sir.
21       Q     Thank you.
22             You've indicated in the first sentence of
23   that paragraph, that the subject property consists of
24   approximately 36 acres of lands that are encumbered
25   by Florida Power & Light power line easements.

1             Have I read that sentence correctly, sir?

2      A     Yes, sir, you have.

3      Q     I'll let you get your water.

4      A     Thank you.

5      Q     And if one were to calculate the percentage

6  of gross acreage that are consumed by the easements,

7  that number would be 31 percent, correct, sir?

8      A     Yes, sir, that is correct.

9      Q     And you would agree with me, sir, that

10 residential buildings cannot be constructed in the

11 easement; correct?

12     A     Correct.

13     Q     You would agree with me, sir, that offices

14 cannot be constructed in the easement, is that right,

15 sir?

16     A     I agree, yes, sir.

17     Q     You would agree with me, likewise, that

18 apartments cannot be constructed within the easement?

19     A     Yes, sir.

20     Q     You would agree with me, I take it, as

21 well, that commercial development cannot be

22 constructed -- commercial development buildings, I

23 should say, cannot be constructed within the easement

24 area; right?

25     A     No, buildings cannot be, but the parking

Page 224

1  can.

2     Q    And you've indicated that the reason for

3  your belief that the power line easements do not

4  adversely affect the market value, is because of your

5  understanding or opinion that the easement area is

6  being used for storm water management, open space and

7  preserve area; correct?

8     A    That's one of the reasons, yes, sir.

9     Q    As well as infrastructure that may be

10 underneath the easement area; correct?

11    A    That's another one of the reasons, but not

12 all of them.

13    Q    You are not a PE, you don't hold a PE

14 license, a professional engineer?

15    A    No, sir, I do not.

16    Q    You have not calculated whether or not this

17 property needs to have 31 percent of its land mass

18 consumed by subservient uses, such as storm water

19 management; is that correct?

20    A    I have done a market study comparing

21 the ---

22    Q    Sir, you haven't taken the site plan and

23 calculated whether or not this property actually

24 needs 31 percent of its land mass to be consumed by

25 subservient uses; correct?

Page 225

1       A    I have gone to the market and ---

2       Q    Sir, have you taken a site plan and ---

3            THE COURT:  Try to answer the specific

4   question and then you can come back or on redirect

5   you can, through your counsel, bolster your opinion.

6            THE WITNESS:  Yes, sir.  I would ask that

7   you turn your attention to Page 61 of my report, and

8   on that page you will see a table, and what I've done

9   is I've gone to the market and comparing ---

10  BY MR. GIELCHINSKY:

11      Q    Sir, I know you keep trying to tell us

12  about the market and the market comparison.

13           I've asked you if you've taken a site plan

14  and tried to figure out whether or not this

15  project -- property, needs to be consumed of -- 31

16  percent of its land mass, by easements to serve

17  subservient natures or subservient uses of the

18  property?

19           You haven't done that, correct, sir?

20      A    This is information directly from the site

21  plan, so, therefore, I'm using the site plan and

22  comparing it to what is taking place in the market

23  and it's demonstrating these things -- these

24  components are consistent.

25      Q    Up to 31 percent of the land mass of the

1    acreage needs to be used for the subservient uses, is

2    that your testimony?

3         A    Give me just one second.  Landmark at

4    Doral, according to the engineer report, 25.5 percent

5    is storm water management facility and preservation,

6    and that compares to 19.3 percent at the Reserve East

7    community that Terra has, and it compares to 21.6

8    percent, so there is more.

9              So the subject property has three percent

10   of it, of what I will call a marginal impact, of an

11   additional three percent of its site is being used

12   for storm water management facility and preservation,

13   as compared to the other developments.

14        Q    Isn't it true, sir, that at Reserve East

15   and at Reserve West, some of those storm water

16   management and preservation areas are being used as

17   attractive architectural features, such as lakes and

18   ponds in front of the residences, to add a certain

19   amount of beauty, if you will, to the site, rather

20   than pooled off to the side of the site?

21        A    It's yes and no.  That's true, that's what

22   is happening.

23        Q    It is true; right?

24        A    Yes, I also believe it will be true that

25   when this project is -- someone buys it and

1    reactivates this property, those -- those retention

2    facilities will look a lot different than they do

3    today, as opposed to ponds, they are going to be more

4    than likely landscaped and look much different.

5        Q    On top of the 31 percent of the land mass

6    for the easements that you propose will be used for

7    retention, you propose an additional acreage will be

8    used for retention to make those type of facilities,

9    those architectural type of facilities, is that what

10   you think would happen?

11       A    No, sir.  Typically what happens, what you

12   see in the property today on the photographs you

13   have and that I have, at the time that this property

14   would move forward with development, those areas are

15   going to receive the landscape treatments and other

16   improvements that you'll see in most all communities

17   where a retention facility becomes part of the

18   development.

19           THE COURT:  On the right of way?

20           THE WITNESS:  No, no, sir, not on the right

21   of way.

22           THE COURT:  I think that's what counsel was

23   asking, that these additional improvements would be

24   on property, some portion of the other 69 percent of

25   the property, is that -- is that what you're asking?

1              MR. GIELCHINSKY:  Correct, your Honor.

2              THE WITNESS:  The answer is, no.  If

3    that's -- no.

4              THE COURT:  They've got to be somewhere.

5    If they're not on the right of way and they're not on

6    the rest of the property ---

7              THE WITNESS:  Going back to this exhibit,

8    the retention facility, where the bodies of water are

9    actually today, are in here, and the point I'm making

10   is that this residential area that looks back into

11   that, it won't -- you won't be seeing like what you

12   would call a dirty, filthy pond, you would see this

13   water retention facility would be landscaped and

14   cleaned up and different, and it wouldn't require any

15   more land area.

16             THE COURT:  Is that on the right of way?

17             THE WITNESS:  That's within the power line

18   easement.

19             THE COURT:  Easement, that's what I mean.

20             MR. GIELCHINSKY:  Right.

21             THE COURT:  Okay.

22   BY MR. GIELCHINSKY:

23        Q    If I were to ask you, sir, if the market

24   value of the property in your opinion would be

25   different if that 31 percent of the acreage could be

Page 229

1    used for commercial, for residential or for

2    industrial or for office uses, you would tell me

3    that's not within the scope of your assignment, is

4    that correct, sir?

5         A     That's what I said at my deposition and,

6    therefore, that's what I would say today, yes, sir.

7         Q     Thank you.

8               If I could refer your attention, please, to

9    Page 68 of your report, sir?

10              You used, at least in this grid, you used

11   four comparables; is that correct?

12        A     Yes, sir.

13        Q     Okay, and all four comparables were raw

14   land sales; correct?

15        A     Land Sale 1 had some improvements on the

16   site.

17        Q     Okay.  Let's talk about Land Sale 1.  Who

18   was the buyer or grantee listed in Land Sale 1?

19        A     City of Doral.

20        Q     What was the price that the city paid for

21   that property?

22        A     $9.5 million.

23        Q     As you understand it, sir, when a

24   municipality or governmental agency wants to acquire

25   a piece of land, other than buying it on the market,

1    what other remedies does it have available to it?

2        A    If it has the authority to condemn, it may

3    choose to exercise its power of condemnation.

4        Q    As you understand it, sir, condemnation

5    proceedings are lawsuits; correct?

6        A    They're what?

7        Q    Lawsuits?

8        A    Not always.

9        Q    Do they involve lawyers?

10        A    Sometimes.

11        Q    Do they involve costs of legal fees?

12        A    Yes, sir, of course they do.  I'm only --

13    my hesitancy, I've been involved in a number of

14    assignments where property is acquired by condemnees

15    through agreement with private parties that didn't

16    require costly litigation expenses, but typically,

17    lawyers drive up costs when emanant domain is used by

18    public entities.

19        Q    Is it possible, sir, that this land sale,

20    Land Sale Number 1, was motivated to somewhat of a

21    higher price than market so as to avoid those costs

22    attendant to condemnation proceedings?

23        A    Our verification of the transaction ---

24        Q    I'm only asking you if it's possible, sir?

25        A    Then the answer is yes.  It's not what the

Page 231

1    verification suggested, but it's possible.

2         Q    Actually, what were the appraisal reports

3    that had been acquired -- that had been obtained by

4    the city, what were the prices?

5         A    I don't have those with me.

6         Q    They were slightly lower than 9.5 million;

7    right?

8         A    Yeah, I would have to take your word for

9    it, I don't recall the exact amounts.

10        Q    Land Sale Number 2, 3 and 4 were all vacant

11   land; is that correct?

12        A    Yes.

13        Q    Raw land?

14        A    Yes, sir.

15        Q    And none of these land sales in Number 1,

16   2, 3 or 4 actually are being used for the development

17   of condominiums; is that correct?

18        A    No, sir.

19        Q    And Lennar, the gentleman, Mr. Gonzalez,

20   upon whom you relied, he and his company are not

21   building condominium product; is that correct?

22        A    His company does build condominium product

23   and at St. Moritz he is selling condominium products

24   at this time.

25        Q    Is he currently building condominium

Page 232

1   products?

2        A    I don't think he's got any in the pipeline,

3   no, sir.

4        Q    Okay.  The only developer who's currently

5   building condominium product in the Doral submarket

6   is your client, correct, BTI Developments?

7        A    No, sir, that was Flagler Development who's

8   doing Cordova Phase II, not BTI, and it's no, sir

9   twice because just to the north of the property, the

10  subject property, is a 30 acre tract that just

11  received development approval for 360 units in a

12  project called Doral Grand Residences.

13       Q    That's a project you didn't reference in

14  your report and you didn't reference at your

15  deposition on Monday; right?

16       A    It was in my work file, though.  It was in

17  the materials I provided.

18       Q    It wasn't in your report and you didn't

19  discuss it in your deposition; correct?

20       A    No, I only answer the questions I'm asked.

21       Q    At your deposition you answered that the

22  only person developing, the only entity developing

23  apartments or condos in the Doral submarket is your

24  client BTI; isn't that correct?

25       A    I don't -- I don't recall.  I would have to

1    read the depo.

2        Q    We'll come back to that.  If I could refer

3    your attention to Page 70 of your report, sir?  In

4    the first full paragraph, starting with the words,

5    consideration is given, you had discussed take downs.

6            In the middle of the paragraph you use the

7    words, quote, "take downs of several tracts."

8            You actually meant lots; right?

9        A    Yes, sir.

10       Q    And these were under what's called a

11   rolling option agreement; is that correct?

12       A    Yes, sir.

13       Q    Okay.  Is my understanding of a rolling

14   option agreement correct in that it's an arrangement

15   whereby a developer will buy prepackaged land that's

16   already been developed to some extent, from a third

17   party at its option, so to speak, and then decide

18   when it wants to start developing those lots?

19       A    That's generally correct, yes, sir.

20       Q    The take downs that you were talking about

21   are at a project called Satorini at Islands; is that

22   correct?

23       A    Yes, sir.

24       Q    And isn't it a fact that the lots that were

25   being purchased were fully ready for development with

Page 234

1    a building pad down on the site already?

2         A    Yes, sir.

3         Q    Isn't it a fact that there were full water

4    and sewer utilities connected to each and every lot

5    in the Santorini project?

6         A    Yes, sir, and the reason they're selected

7    as comparable evidence ---

8         Q    Sir, I haven't asked you that question.

9              THE COURT:  Just in the interest of time,

10   I'm going to -- if you have to explain, I may let

11   you, but, otherwise, let's just let the cross go

12   forward and redirect can take you back to some of

13   these areas.

14             THE WITNESS:  Yes, sir.

15   BY MR. GIELCHINSKY:

16        Q    Isn't it a fact that at the Santorini

17   project there was landscaping in sight -- in place?

18        A    I don't know.

19        Q    Isn't it a fact that there were street

20   lights in place?

21        A    Yes, sir.

22        Q    Isn't it a fact that there were monument

23   signs in place at the Santorini project?

24        A    Yes, sir.

25        Q    Isn't it a fact that there was direct --

Page 235

1    directional signage in place at that project, the

2    Santorini project?

3                THE COURT:  What does that mean?

4                MR. GIELCHINSKY:  Stop signs.

5                THE COURT:  Oh.

6                THE WITNESS:  Graphics on the road,

7    signage, yes, sir.

8                THE COURT:  Okay.

9    BY MR. GIELCHINSKY:

10       Q    And you indicated that those lots were

11   being purchased under the rolling option agreement

12   for 82 to $86 per lot, correct -- thousand dollars,

13   82 to $86,000 per lot; correct?

14       A    Per town -- yeah, per townhome lot, yes,

15   sir.

16       Q    If I can refer your attention, please, to

17   Page 57 of your report?

18            The Alvarez Engineering report that you

19   relied upon attached to your report indicates that at

20   non-CDD lands, the percentage complete of fill being

21   imported is only 22 percent complete; correct?

22       A    That's correct, yes, sir.

23       Q    And with respect to de-mucking, the Alvarez

24   Engineering report indicates that for de-mucking on

25   non-CDD land, only 25 percent is complete; correct?

Page 236

1        A     Correct, yes, sir.

2        Q     And you've indicated that you have not done

3    an analysis of how much money would need to be

4    expended on each individual lot in the Landmark

5    property in order to bring it up to the same

6    construction readiness as were the lots at Santorini,

7    correct, sir?

8        A     Correct.

9        Q     Do you have the photograph that I just put

10   up on the screen in front of you?

11       A     Yes, sir, I do.

12       Q     Do you know what that photograph depicts?

13       A     Yes, sir, I do.

14       Q     What does that photograph -- I should say,

15   Google Earth image actually depict?

16       A     It appears to be an easterly view of the

17   landfill to the east of the property up at the

18   northeast area of the property.

19       Q     Of the Landmark property?

20       A     Pardon me?

21       Q     Of the Landmark property?

22       A     Yes, sir, yes, sir.

23       Q     Okay.

24       A     Yeah.  To the northeast of the Landmark

25   property and before the landfill had been totally

1    encapsulated.

2         Q    Looking at the screen, I see that there is

3    grass on one side, on the right side, and on the left

4    side there appears to be some earth work going on

5    there; right?

6         A    Yes, sir.

7              THE COURT:  Can you just flip the site plan

8    back on for a second so he can identify where this

9    is.

10             THE WITNESS:  That line here is the line,

11   when you look at the picture, on the left side is the

12   portion of the landfill that has not been

13   encapsulated or vegetated yet, and this side to the

14   bottom of the green line is where it has been.

15             THE COURT:  And the picture is taken from

16   which side?

17             THE WITNESS:  This picture was taken from

18   the subject property, approximately right in here.

19             THE COURT:  Okay.

20             THE WITNESS:  Actually, it would have to be

21   taken off site to get to that line.  It was taken

22   north of the northeast corner of the Landmark

23   property, approximately 330 feet, in order to have

24   that view.

25             THE COURT:  Okay.  So the dirt part is --

1          THE WITNESS:  The dirt part ---

2          THE COURT:  -- is north, north of the green

3    line that you just put there?

4          THE WITNESS:  Yeah, the dirt part is in

5    front of the property that Terra bought, Terra sales,

6    one of the sales in the sales grid.  Terra bought two

7    properties that are also next to the landfill.

8          THE COURT:  Okay.  All right.  Go ahead.

9    BY MR. GIELCHINSKY:

10         Q    If I could direct your attention to the

11   next photo in the package that I handed you, the one

12   that I've put on the screen.

13         Do you know what that photo depicts?

14         A    Yes, sir, that's the -- that is the inbound

15   and outbound lanes into the incinerator facility that

16   is located on the Miami-Dade County incinerator site

17   to the northeast of the -- of the Landmark property,

18   as well, and adjacent to the Terra acquisitions.

19         Q    What are these towers here, sir?

20         A    Those are the stacks that give off what

21   I've been told in other litigation assignments of

22   incinerators, steam and hot vapor.

23         Q    Now, if I can direct your attention to the

24   next image in the series, the one that I put on the

25   screen.  Do you know what that Google Earth image

1   depicts?

2       A    Yes, sir, that's a picture of the security

3   gate and the access point going in and out of the

4   facility from -- it appears to be the north edge of

5   the facility.

6       Q    Are you able to tell me what appears to be

7   on the top of that truck that I've circled, appears

8   to be inbound into the facility?

9       A    Organic debris.

10      Q    Isn't it a fact that the Santorini lot that

11  you -- the Santorini Development that you based your

12  value on to some extent, is not immediately adjacent

13  to a garbage dump or a landfill or smoke stacks from

14  an incinerator?

15      A    That's true.

16      Q    Isn't it a fact that the Santorini project

17  is not immediately -- is not bounded by -- 31 percent

18  of its land mass by power line easements?

19      A    True.

20      Q    If I may refer your attention, sir, to

21  Page 73 of your report.  You've indicated here that

22  the rental rate should be about $20 per square foot

23  on a triple net basis; correct?

24      A    Yes, sir.

25      Q    And there's no grid in here showing

Page 240

1    comparable rentals from the market in your report, is

2    there?

3        A    On Page 33 there is a grid containing the

4    retail market data.

5        Q    The CoStar data?

6        A    Right.

7        Q    That's what I was asking about.  You used

8    the CoStar data, not comparable sales within the

9    submarket, but the available CoStar data that's out

10   there available to everybody; right?

11       A    Yes, sir.

12       Q    Okay, and the method that you used to

13   estimate land value here on Page 73, is called a land

14   residual, is that what you testified?

15       A    Yes, sir.

16       Q    Are you familiar with a text called the

17   Appraisal of Real Estate, 13 Edition?

18       A    Yes, sir, I'm a contributing author.

19       Q    It is one that you reference from time to

20   time?

21       A    Yes, sir, absolutely.

22       Q    It is one that you consider authoritative

23   in many respects?

24       A    Subject to the limitations on the cover

25   page, yes, I do.

1      Q    Do you have our exhibit binder in front of

2  you, it's the smaller black one?

3      A    This one?

4           MR. GIELCHINSKY:  May I approach?

5           THE COURT:  Yes.

6           THE WITNESS:  Maybe this one.  Yes, sir.

7  BY MR. GIELCHINSKY:

8      Q    May I ask you to please turn to what has

9  been marked as Tab 8?

10     A    Yes, sir.

11     Q    At the bottom of the page there is an

12  excerpt in describing the land residual technique,

13  I'll read it to you.

14          It says, historically, the land residual

15  technique was used to estimate land value when sale

16  data on --

17          THE COURT:  Go a little slower, please.

18          MR. GIELCHINSKY:  Yes.

19  BY MR. GIELCHINSKY:

20     Q    -- was used to estimate land value when

21  sales data on similar parcels of vacant land was not

22  available.  Techniques like extraction and

23  allocation, have superseded land residual technique

24  in land valuation because these other techniques rely

25  on fewer variables subject to an appraiser's

1    judgment and expertise and thus, are more persuasive.

2            In current practice, the land residual

3    technique is used almost exclusively in highest and

4    best use analysis to test the productivity of

5    alternate uses of the site as though vacant.

6            Yet you used the land residual technique as

7    your first and foremost technique with respect to

8    this portion of your valuation; correct?

9        A    Yes, sir, I did.

10       Q    If I can direct your attention, please, two

11   pages in to Page 369 of that same tab.

12       A    Yes, sir.

13       Q    At the top of the page, the text reads, as

14   follows:  The land residual technique requires that

15   the following conditions be met:  One, building value

16   is known or can be accurately estimated (Chapter 18

17   discusses procedures for estimating building costs);

18   two, net operating income to the property is known or

19   can be estimated (Chapter 21 discusses the

20   development of income and expense estimates); and

21   three, both building and land capitalization rates

22   can be extracted from the market (Chapter 22

23   discusses the extraction of land and building

24   capitalization rates).

25           Did I read that correctly, sir?

Page 243

1        A     Yes, you did.

2        Q     The text, land and site valuation, Chapter

3   13 -- Edition 13, requires all three of these

4   conditions be met, including the third one, that land

5   and capitalization rates can be extracted; correct?

6        A     That's what it says in what you're reading.

7        Q     That's what it says?

8        A     Yes, sir.

9        Q     Yet you did not extract both land

10  capitalization and building capitalization rates

11  separately; correct?

12       A     No, sir, that's not the type of land

13  residual analysis I used.

14       Q     If I could refer you one page back on Page

15  512?

16       A     Yes, sir.

17       Q     There is a discussion of the land residual

18  technique in the middle of the page.  There is a

19  paragraph that talks about how to apply the land

20  capitalization rates and building capitalization

21  rates, and then there is a model equation shown of

22  removing both land capitalization and building

23  capitalization as separate components, is that

24  correct, sir?

25       A     That is correct, yes.

Page 244

1        Q     Yet you didn't follow that technique, did
2    you, sir?
3        A     No, there's other ways of doing it and I
4    did not use that application, correct.
5        Q     Okay.  If I could direct your attention,
6    please, to Page 73 of your report again.  You've
7    talked about -- at the bottom of Page 73 you discuss
8    the Marshall Valuation Service.
9             Would you please indicate to the Court what
10   that Marshall Valuation Service is?
11       A     Marshall Valuation Service is a cost
12   estimating service that is typically a subscription
13   service that people in the real estate appraisal
14   profession rely upon in estimating replacement costs.
15       Q     And at Page 73 you've indicated that you
16   have used an estimate of $125 per square foot per the
17   Marshall Valuation Service for a category of
18   excellent Class C retail store; correct?
19       A     Correct.
20       Q     And you cited to the page where the
21   Marshall Valuation Service tells you to use $125 per
22   square foot for Class C retail; right?
23       A     Correct, yes, sir.
24       Q     If I could refer you, please, back to Tab
25   8, to Page 387.  Are you at Page 387, sir?

1        A    Yes, sir.

2        Q    There is a box in the upper right-hand

3    corner.  Do you see that, sir?

4        A    Yes, I do.

5        Q    And it talks about indirect costs, and I'll

6    read it to you, expenditures or allowances for items,

7    other than labor and materials, that are necessary

8    for construction but are not typically part of the

9    construction contracts.  Indirect costs may include

10   administrative costs, professional fees, financing

11   costs, and the interest paid on construction loans,

12   taxes and the builder's or developer's all risk

13   insurance during construction, and marketing, sales

14   and lease up costs incurred to achieve occupancy or

15   sale, also called soft costs.

16             Did I read that correctly?

17       A    Yes, sir, you did.

18       Q    And if I could, please, direct your

19   attention to the next page in Tab 8, the last page.

20             Do you have Page 388 of the text in front

21   of you?

22       A    Yes, sir.

23       Q    At the top of the page underneath the chart

24   that breaks out direct and indirect costs, there is a

25   sentence that reads as follows:  When using a cost

1  estimating service, it is important to know which

2  costs are included in the cost estimates, and which

3  need to be added by the appraiser.

4           Did I read that correctly?

5       A    You did, yes, sir.

6       Q    If I could please direct your attention to

7  Tab 9, the first page.  Do you recognize this excerpt

8  as being from the Marshall Valuation Service?

9       A    Yes, sir, I do.

10      Q    The Marshall Valuation Service indicates

11 certain items that are listed 1 through 8, called

12 what they do not contain; is that correct?

13      A    That is correct, yes, sir.

14      Q    And among the items that are not contained

15 in the Marshall numbers are Paragraph 1, costs of

16 buying or assembling land, such as escrow fees, legal

17 fees, property taxes, so forth; three, cost of land

18 planning or preliminary concept and layout for large

19 developments; six, off-site costs, including roads,

20 utilities, park fees, jurisdictional hook up, tap in,

21 impact or entitlement fees and assessments; and

22 eight, marketing costs to create first occupancy,

23 including model or advertising expenses, leasing or

24 broker's commissions, temporary operation of property

25 owners' associations, fill up or membership sales

1    cost and fees.

2              Did I read those correctly, sir?

3        A    Yes, you did.

4        Q    Yet, in your analysis you didn't determine

5    and subtract those soft costs, did you, sir?

6        A    No, I did not.

7        Q    On Page 74 of your report, sir, and just

8    remind me, you indicated that you used the Marshall

9    Valuation Service excellent class retail store for

10   that component of your valuation; correct?

11       A    Yes, sir.

12       Q    At Page 74, I believe you were talking

13   about office in the first full paragraph, according

14   to the CoStar office report; is that correct?

15       A    Correct.

16       Q    The text in the middle of the paragraph,

17   starting with the word subtracting, of your report,

18   says that you -- I'll quote it, "Subtracting direct

19   and indirect cost estimate of $100 per square foot as

20   indicated by the Marshall Valuation Service, good

21   Class C retail store."

22              So here you used good instead of excellent;

23   is that correct?

24       A    Yes, sir.

25       Q    Okay.  Is the number for good, the hundred

Page 248

1   dollars per square foot that you've indicated?

2        A    No, that would be for average.

3        Q    If I could, please, direct your attention

4   to the following page in Tab 9?  Do you recognize

5   this as being the office building component in the

6   Marshall Valuation Service data?

7        A    Yes, sir, I do.

8        Q    If I go to Class C, I go to good, which is

9   what the text says you used in your report, what is

10  the dollar number per square foot that the appraiser

11  is to apply?

12       A    Good is $138.59 a square foot.

13       Q    But your report says that you used a

14  hundred dollars per square foot; correct?

15       A    Yes, sir.

16       Q    If I look below good to average, I see

17  $98.36 per square foot; is that correct?

18       A    That's correct.

19       Q    Are you able to calculate for me, please,

20  the difference had you used the $138.59 shown for

21  good Class C, what the difference in your appraisal

22  would have been?

23       A    There would be a $40.23 per square foot

24  differential.

25       Q    Okay, and as applied to your valuation

Page 249

1  calculation, what would the difference in the overall

2  valuation number have been for that component?

3       A    Approximately 3.78 million.

4       Q    Less than what you've indicated as your

5  final valuation; correct?

6       A    Yes, sir.

7       Q    Because you applied the average C of a

8  hundred dollars rounded, instead of using the good,

9  as you reported, instead of using the corresponding

10  number of $138.59; correct?

11       A    Yes, but it was a typo, the word where I

12  said good, should have been average, and then they

13  would match up like they're supposed to.

14       Q    So you would have used excellent in one

15  part of your analysis, and average in another part of

16  your analysis, for a project that is being built

17  roughly at the same time?

18       A    Yes, sir, I would.

19       Q    Okay.

20            THE COURT:  Just to hone in.  I'm not sure,

21  the 3.7, and I know you're not conceding that it

22  should be the 138, but the 3.7, instead of 4.7 for

23  the office component of the south parcel, is that the

24  difference, or is it a $3.7 million difference?

25            THE WITNESS:  It would be a $3.7 million

Page 250

1    deduction from the value indication that I reported.

2              THE COURT:  For the office?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Doesn't the fact that just

5    choosing one assumption about the average versus good

6    quality of the office construction that's going to

7    have such a material fact, doesn't that, in and of

8    itself, cast doubt on the reliability of using the

9    residual land technique?

10             From what we read earlier in the text,

11   they said exactly that, I thought at some point,

12   change one variable and your results differ so

13   dramatically that that's problematic.

14             THE WITNESS:  I agree.  Yes, sir, I totally

15   agree.

16             THE COURT:  So why should I give any weight

17   to this?

18             THE WITNESS:  Well, I think several

19   reasons.  Number one, these entitlements do have

20   value.  You've got approximately 200,000 square feet

21   of entitlements.  There is market evidence that ---

22             THE COURT:  Why did you say good -- you

23   said good was a typo.

24             THE WITNESS:  I meant that it should have

25   said average.

1          THE COURT:  But why?  I mean, why did you

2    pick -- why did you intend to pick average if we

3    believe it's a typo?

4          THE WITNESS:  Because the office market is

5    not -- is not strong, and I would not recommend

6    pricing in a higher cost structure for the office

7    market because I wouldn't be able to get an adequate

8    return of the investment at that higher price

9    structure, higher cost structure.

10         THE COURT:  So based on the market

11   condition, and I think at some point you did talk

12   about the office market being weaker, but it would

13   make sense for a developer to put higher quality

14   retail above what is lower quality office based on

15   perception of the market at the time of construction?

16         THE WITNESS:  Yes, sir.  I just finished a

17   project in Seattle -- in Bellevue, Washington, that's

18   exactly what was going on.

19         THE COURT:  Okay.  But it's still true that

20   that one assumption, good versus average, changes

21   dramatically the value attributable to the office

22   entitlements under the residual land approach?

23         THE WITNESS:  Absolutely.  This is a

24   valuation application that is highly sensitive to the

25   input assumptions.

1          THE COURT:  Okay.

2   BY MR. GIELCHINSKY:

3          Q    If I may refer your attention, sir, to

4   Page 275 of your report.  Within Paragraph 4, your

5   summary and conclusion, the bullet point entitled

6   south tract, you've indicated a value of $30,400,000;

7   correct?

8          A    Yes, sir.

9          Q    And that's the tract, correct me if I'm

10  wrong, where you propose to put about 500 condos,

11  ninety-some-odd thousand square feet of office and

12  ninety-some-odd thousand square feet of retail --

13         A    Yes, sir.

14         Q    -- correct, as part of your highest and

15  best use analysis?

16         A    Yes, sir.

17         Q    How large is the south tract in acres on a

18  gross basis, sir?

19         A    Twenty acres.

20         Q    How large is it -- let me ask -- let me

21  withdraw that and ask you, what is the indicated

22  value on a per square footage basis of those 20

23  acres?

24         THE COURT:  What would his appraised amount

25  be by square footage of the gross acreage --

Page 253

```
 1            MR. GIELCHINSKY:  Yes, sir.

 2            THE COURT:  -- not net of the easement.

 3            MR. GIELCHINSKY:  Gross, not net of the

 4    easement.

 5            THE WITNESS:  The $30,400,000, when

 6    allocated over the entire 20 acres and converted to a

 7    per square foot number, is $34.89 per square foot.

 8    BY MR. GIELCHINSKY:

 9       Q    Thank you.

10            Now, what is the net area of the south

11    parcel?  I believe it's 8.8 acres roughly?

12       A    Yes, sir, it is.

13       Q    Okay.  What is the indicated value, based

14    on your appraisal, on a net basis of the value per

15    square foot of the south parcel?

16       A    On a net area basis, it's $79.31 per square

17    foot.

18       Q    $79.31 per square foot?

19       A    Yes, sir.

20       Q    On a net basis; correct?

21       A    Yes, sir.

22       Q    And the highest actual comparable property

23    that you located and reported as a sale in your

24    report was about $27 per square foot on a net basis;

25    correct?
```

1        A     Yes, sir.

2        Q     Roughly a third of what you calculated for

3    the Landmark property; correct?

4        A     Yes, sir.

5        Q     Let's test reality, if you would.  Can I

6    ask you to, please, refer your attention to Exhibit 6

7    in the black binder -- I'm sorry, I shouldn't have

8    used exhibit, it's the document marked for

9    identification as 6.

10            Can we agree this is an article from the

11   South Florida Business Journal dated June 2, 2011?

12       A     Yes, sir, it is.

13            THE COURT:  Hold on.

14            MS. REDMOND:  Your Honor, I'm going to

15   object if counsel is attempting to put this into

16   evidence.  This is hearsay, it's an article from the

17   Business Journal, it's not something that is

18   appropriate to be put in, it's hearsay.

19            THE COURT:  Response.

20            MR. GIELCHINSKY:  I'm quite certain, your

21   Honor, that newspapers and publications are an

22   exception to the hearsay rule.  I didn't even intend

23   to move it into evidence until after I had the

24   witness talk about it.

25            THE COURT:  Well, I'm not as certain about

1    the exception to hearsay, but at this point since

2    you're not introducing it, I'll allow you to refer to

3    it.  I'm not going to take anything in there as a

4    fact at this point.

5              I mean, if he reads this and he's

6    familiar with it, some of these facts, or if he

7    assumes certain facts, you can ask questions.

8              MR. GIELCHINSKY:  Thank you, your Honor.

9    BY MR. GIELCHINSKY:

10        Q    At Page 72 of your report you indicated, as

11   part of your market value estimate, all the way at

12   the bottom of Page 72, very last line, for the south

13   portion, south tract you called it, a value of

14   $40,000 per unit 500 units, coming to $20 million.

15             So let's take that price of $40,000 per

16   unit, that's the unit that you, in your opinion,

17   decide is applicable to the condo units that ought to

18   go in the south tract as part of your highest and

19   best use analysis; correct?

20        A    Right, yes, sir.

21        Q    Are you familiar with the Codina sale that

22   is the subject of the article in the South Florida

23   Business Journal that you and I discussed a few days

24   ago?

25        A    That was the first time I had seen it.

Page 256

1        Q    If I could please direct you ---

2             THE COURT:  You're not familiar with any of

3    the facts in this article other than as they may be

4    described here?

5             THE WITNESS:  No, sir.

6    BY MR. GIELCHINSKY:

7        Q    If I could ask you to please take a look at

8    the second page, the transaction entitled Ocean Bank.

9    What is indicated in the paper as being the sale

10   price for the Doral site?

11            THE COURT:  Now, at this point if he's not

12   familiar with the transaction --

13            MS. REDMOND:  I object.

14            THE COURT:  -- we do get back into using

15   this to prove facts.

16            MR. GIELCHINSKY:  That's fine, your Honor.

17            THE COURT:  I'm going to sustain the

18   objection Ms. Redmond may not have fully articulated

19   yet, but about to restate the same objection.

20            MS. REDMOND:  Your Honor, you were speaking

21   for me.

22            MR. GIELCHINSKY:  Thank you, your Honor.

23   BY MR. GIELCHINSKY:

24       Q    If I could ask you, please, to take a look

25   back at the photographs that I handed you.

Page 257

1           THE COURT:  How much more do you have?

2           MR. GIELCHINSKY:  About ten minutes.

3           THE COURT:  Okay.  Keep going.

4    BY MR. GIELCHINSKY:

5      Q    The picture that I put on the screen, are

6    you -- do you have that one in front of you?

7      A    Yes, sir.

8      Q    Do you know what that photograph depicts?

9      A    Yes, sir.

10     Q    What does it depict?

11     A    That's an easterly view along

12   Northwest 58th Street from a location approximate to

13   its intersection with Northwest 107th Avenue.

14     Q    This is at the south portion of the

15   property; correct?

16     A    Yes, sir.

17     Q    This is the portion of the property we were

18   talking about at the beginning of your testimony?

19     A    Yes, sir.

20     Q    This is a four lane road; correct?

21     A    Yes, sir.

22     Q    And is there a break shown on this median

23   for a left-hand movement in or left-hand movement out

24   of the south end of the parcel?

25     A    No, sir, there's not on that photograph.

Page 258

1      Q    How about there?

2      A    Yes, sir, there is.

3      Q    That's the break for the left-hand

4  in/left-hand out movement?

5      A    That's for the full movement access point,

6  yes, sir.

7           THE COURT:  That would be a left onto the

8  road or driveway that was identified earlier in the

9  first picture that's east of 107th.

10          THE WITNESS:  That would be the driveway

11 connection for the proposed site plan coming into the

12 main entry into the -- into the development from the

13 south, where the median opening is depicted on the

14 sketch.

15          THE COURT:  Okay.

16          THE WITNESS:  So that would allow full

17 movement, turning movement, as opposed to a

18 restricted left, directional left or right in/right

19 out.

20 BY MR. GIELCHINSKY:

21     Q    And the next picture in the series, the one

22 I just put on the screen, do you know what this image

23 depicts?

24     A    Yes, sir.

25     Q    What does that image depict?

1        A      That depicts the roadway improvements that

2    are on site that run north from the north side of

3    Northwest 58th Street, north into the south tract and

4    west of the existing parking structure.

5        Q      This is also at the south end of the

6    property; correct?

7        A      Yes, sir.

8        Q      And the curb cuts here, and if this Volvo

9    wasn't here, presumably here, to demarcate the

10   ingress and egress point for the left-hand in and

11   left-hand out movements?

12       A      Yes, sir.

13       Q      I believe we discussed earlier that the

14   only other ingress/egress point at the south end of

15   the property is in the second photograph that you and

16   I talked about, where I've just made yellow lines by

17   the curb cuts; is that correct?

18       A      That's correct.   That's the second one on

19   the south and there's two more on the west.

20       Q      Okay, but these are the only ones on the

21   south; correct?

22       A      Correct.

23       Q      And this is just a right-hand movement

24   because there's no cut in the median; correct?

25       A      It's called a RIRO, right in/right out.

1        Q     Right in/right out, okay.

2              You propose, sir, that 500 condos,

3   ninety-some-odd thousand square feet of retail,

4   90,000-some-odd square feet of office go into this

5   portion of the property; correct?

6        A     Yes, sir, I do.

7        Q     And I know you're not a traffic engineer,

8   but do you believe or understand that a majority of

9   the traffic at the south portion of the property

10  would be handled by these two access roads that we

11  just talked about?

12       A     No, I don't agree with that.  There's four

13  driveway connections handling what's called the

14  distribution of the external trips generated by those

15  proposed uses at that property.

16       Q     Let me put up a site plan for the benefit

17  of the Court.

18       A     Two are on the south edge --

19       Q     Let's make sure the Court is following

20  along.

21       A     -- and two are located along the west side

22  of that tract and would provide driveway and turning

23  movement access to 100 ---

24             THE COURT:  I can't see, and counsel can't

25  see your site plan.  Can you use the image on the

Page 261

1    screen --

2              THE WITNESS:  Sure.

3              THE COURT:  -- and point to it?

4              THE WITNESS:  Yes, sir.  So the site plan

5    shows there would be two additional driveway

6    connections, one here, and then one ---

7              THE COURT:  Off of 107th to the north side

8    of the south parcel?

9              THE WITNESS:  Right, yes, sir, and the

10   site plan shows, including the Doral Cay development

11   next door, where the road would ultimately come over

12   and hit with 102nd.

13             And then there's a second driveway

14   connection shown here, midway, that provides

15   internal access to here, so you would have trip

16   distribution that way.  So there's one, two,

17   three.

18             THE COURT:  So there would be the two

19   entrances that were identified already from the

20   south, and two from 107th Avenue?

21             THE WITNESS:  Yes, sir, as far as the

22   approved plat.

23   BY MR. GIELCHINSKY:

24        Q    Are you familiar with the Institute of

25   Traffic Engineers or what we call the ITE?

Page 262

1      A    ITE Manual, yes, sir, I am.

2      Q    As I understand it, the ITE Manual talks

3    about trip generation or trips that go in and out of

4    a site during certain hours of the day; correct?

5      A    A.m. and p.m. peak cycles, yes, sir.

6      Q    Peak cycles, can you explain what those

7    are?

8      A    Yes, I can.

9      Q    What are those?

10      A    Those would be -- the a.m. would be the

11    morning peak times when the greatest amount of load,

12    traffic load is put onto a highway, and the p.m.

13    would be like what I would call the drive home time,

14    and those are the peak moments where it's the

15    greatest amount of traffic is on those roadways.

16      Q    It's very much like a diurnal curve, sir;

17    right?  It's morning, the bell curve goes up until --

18    to the peak when people are going in and out of this

19    site to get in and out of their homes or in and out

20    of ---

21            THE COURT:  Let's move on.  It's rush hour;

22    right?

23            MR. GIELCHINSKY:  Rush hour.

24            THE COURT:  Okay.

25            MR. GIELCHINSKY:  Okay.

Page 263

1                    (Laughter)

2    BY MR. GIELCHINSKY:

3        Q    And as you understand it, in connection

4    with the approval that was obtained for the project

5    as it currently exists, there was very likely traffic

6    studies done to grade these access points according

7    to levels of service, A, B, C, D, E and F; correct?

8        A    Yes.

9        Q    A being the best, F being the worst;

10   correct?

11       A    Right, yes, sir.

12       Q    What is the current trip generation or

13   grade for the site?  Since there are no trips, it's

14   at the best service, A; right?

15       A    Yes.

16       Q    Okay, and isn't it a fact that you have not

17   seen or conducted a study which would tell us what

18   the level of service would be if we would add the

19   density that you've recommended to the southern

20   portion of the site?

21       A    That's true, I have not done a traffic

22   study.

23       Q    So your highest and best use assumes that

24   when the traffic study is done, it would be

25   acceptable to the governing body, such to issue a

Page 264

1   permit or issue a zoning approval for the amended

2   site plan, doesn't it?

3       A   Yes, sir, and I reasonably expect there

4   will be some traffic impacts that will ---

5       Q   Some additional traffic impacts?

6       A   That would likely have to be mitigated.

7       Q   Nobody has measured those; correct?

8       A   Nobody has, that's correct.

9       Q   We don't know if your plan would actually

10  be approved in the configuration that you recommended

11  as the highest and best use; correct?

12      A   I think it's reasonably probable based upon

13  the evidence that I have and discussions from

14  specific plans that have that specific use, but

15  that's -- you cannot guarantee what a local

16  government will do, but I do believe it's reasonably

17  probable.

18      Q   Okay.  But that study hasn't been

19  conducted?

20      A   No, sir.

21      Q   Okay.  Going back to your discussions that

22  you had with Mr. Alvarez, the engineer?

23      A   Yes, sir.

24      Q   In terms of internal configuration of the

25  infrastructure improvements that are there, you

1  didn't ask Mr. Alvarez whether or not the

2  improvements would be -- would need to be

3  reconfigured to handle the site layout that you

4  recommended as part of your highest and best use, did

5  you?

6      A    No, sir, uh-uh.

7      Q    And he, therefore, couldn't tell you

8  whether or not any of the improvements would need to

9  be reconfigured to handle the layout as you've

10 recommended as part of your highest and best use;

11 correct?

12     A    No, he did not.

13     Q    Okay, and you've done no independent

14 analysis to be able to tell whether or not the site

15 would need to be reconfigured and whether or not the

16 improvements would need to be reconfigured to handle

17 the highest and best use ratio that you've

18 recommended; correct?

19     A    Other than the investigation, I'm relying

20 heavily on what Mr. Gonzalez has explained to me in

21 great detail regarding the site studies that they've

22 completed.

23     Q    Mr. Gonzalez, who is not currently building

24 the condo product that you've recommended as part of

25 this development; correct?

1      A    But is certainly planning and ready to do

2  it here if he gets possession of this property, is my

3  interpretation.

4          THE COURT:  I may have been confusing the

5  two witnesses -- I mean, the two names for a moment.

6          The question you answered no to was you

7  didn't talk to Mr. Alvarez, the engineer, about

8  the suitability of the existing improvements, and

9  as you said in your report and earlier in your

10 testimony, Carlos from Lennar thought what was

11 out there would be suitable to what you've

12 recommended to be the highest and best use?

13         THE WITNESS:  Yes, sir.  He has site plans

14 that he already had completed on it, and that's what

15 he's reporting to me as a demonstrative and what can

16 be done with it, and what I believe Lennar

17 anticipates they would like to do with it.

18 BY MR. GIELCHINSKY:

19     Q    Let's get back to that testimony, sir.  May

20 I hand the witness a copy of his deposition

21 transcript?

22         THE COURT:  I guess, if you want him to see

23 it.  Go ahead.

24 BY MR. GIELCHINSKY:

25     Q    I asked you before, sir, whether, to your

1  knowledge, Lennar was going to build or had plans to

2  build condo projects, and you, I think indicated,

3  that you were aware they would be; correct?

4       A    As I recall, without reading my deposition,

5  I indicated that they had informed me that they

6  had -- I had discussed site plans with them.

7       Q    If I could please direct your attention to

8  Page 58 of your deposition transcript?

9            I conducted your dep on Monday afternoon;

10  correct?

11       A    Yes, sir.

12       Q    And you were under oath at that time, as

13  you are today; correct?

14       A    Yes, sir.

15       Q    At Page 18 the following question was

16  asked ---

17            THE COURT:  I thought you said Page 58.

18  BY MR. GIELCHINSKY:

19       Q    I'm sorry.  Page 58, Line 18, the following

20  question was asked of you:

21            "Q.  Are you aware of any plans by Lennar

22  to build condo or apartment units in the Doral

23  submarket?

24            A.  No.

25            Q.  Are you aware of any plans by any other

Page 268

1   developers to build condo or apartment units in the

2   Doral submarket?

3         A.  Yes."

4         If I could please direct your attention to

5   the next page, Page 59, Line 1:

6         "Q.  Who are the developers who have plans

7   to build apartments or condos in the Doral

8   submarket?"

9         Then Ms. Redmond asked for a discussion off

10  the record.

11        Line 5, the witness:

12        "A.  BTI Developers is currently building

13  Cordova Apartments and planning an additional phase.

14        Q.  Where is that located?

15        A.  Street address of 8111 Northwest 53rd

16  Street.

17        Q.  That's Mr. Breakstone's entity?

18        A.  Yes sir.

19        Q.  Are there any other developers that

20  you're aware of that have plans to build apartments

21  or condos in the Doral submarket?

22        A.  No."

23        Does that refresh your recollection as to

24  how you testified two days ago?

25        A   Yes, sir, it does.

Page 269

1          MR. GIELCHINSKY:  If I may have a moment to

2    discuss with the team?

3          Thank you, sir.

4          THE COURT:  Okay.  Unless anybody needs --

5    do you need a short break before redirect?  How long

6    is redirect going to be?

7          MS. REDMOND:  Five, ten minutes.

8          THE COURT:  Anybody desperately have to go

9    to the bathroom or anything?

10         All right.  On we go.

11               REDIRECT EXAMINATION

12   BY MS. REDMOND:

13       Q    Mr. Hanson, the debtors' counsel asked you

14   about the effect of the power line easements on the

15   property and he enumerated various things that you

16   could or particularly couldn't do with respect to the

17   property.

18         Are there other possible uses for the

19   property that you didn't mention or that you couldn't

20   mention in response to his question that you could

21   tell the Court about now?

22       A    Yes.  The market evidence ---

23         THE COURT:  If he's referring to that,

24   maybe you can put up what he's -- I think that's your

25   Exhibit 6.

Page 270

1              MR. HUDSON:  Here you go.

2              THE COURT:  Is that what you were about ---

3              THE WITNESS:  Yes, sir.

4              If you can either zoom out or slide it

5    down, that would be helpful.  There we go.  Down,

6    all right, right there.  This property here is a

7    20 acre piece and it's got two and a half acres

8    of a power line on it.

9              Now, this piece here is similar in all

10   respects and does not have a power line easement

11   on it.

12             The price paid for this piece of

13   property is on a -- on a net acre basis 18.37,

14   and the price paid for the piece here on a net

15   acre basis is 12.15.  One has an easement, sells

16   for the highest price, one without the easement

17   sells for the lower price.

18             I analyzed these sales, and the data,

19   the hand I'm dealt, does not show that the market

20   is discounting the value of the easement area

21   based upon that data, and that is about as good a

22   paired sales set as you can find in doing

23   easement abstraction analysis.

24   BY MS. REDMOND:

25        Q    You were asked, actually the last

Page 271

1   questions, about your testimony at deposition with

2   respect to the Cordova property and the owner of that

3   property.  I believe your testimony here today was it

4   was owned by Flagler?

5       A    That's correct.

6       Q    And your testimony at deposition was that

7   it was owned by BTI?

8       A    Correct.

9       Q    Was that a misstatement?  Could you just

10  explain to the Court --

11      A    Yeah, I was looking ---

12      Q    -- why there is a difference?

13      A    Yes.  During my deposition a break was

14  taken so I could find photo files, that I had taken

15  about 200 photographs and downloaded them into Google

16  docs, and I could not find my photographs, and I made

17  an error in my answer.  I have not yet had a chance

18  to read my depo to correct it, but the developer was

19  not BTI, it's Flagler, Flagler Development, a

20  different group.  It has no relationship to do with

21  Mr. Breakstone.

22      Q    And, Mr. Hanson, how long did you have to

23  prepare your appraisal in this case?

24      A    About ten days.

25      Q    And, therefore, at deposition you made a

Page 272

1    mistake?

2         A    Yes.

3         Q    Okay.  Counsel talked to you about the

4    Santorini property, and certain things that were on

5    the Santorini property and not on the subject

6    property, talked about street lights, directional

7    signage.  Why did you believe the Santorini property

8    was an appropriate comparable, sales comparable to

9    look at in terms of evaluating the subject property?

10        A    Because it was the best evidence that was

11   available in the market as to what was being paid for

12   sites, multiple home sites bundled together and

13   developments that had infrastructure in place, but

14   that was not finished at the time those prices were

15   agreed to.

16        Q    How would you compare the Santorini

17   property to the subject property in terms of degree

18   of being finished?

19        A    At that time, I would say the subject

20   property would rise to a level of approximately 85 to

21   90 percent complete, as compared to Santorini.

22        Q    Okay, and you were questioned about your

23   reliance upon the CoStar market data.  You used

24   CoStar market data.

25             Why did you use CoStar market data?

1      A     Because it's an authoritative source and

2  not only that, it contains a large amount of market

3  information, as opposed to, you know, identifying a

4  single comp, per se.  This is the entire market.

5  It's very good information, high quality information,

6  the best available, and I chose to use it because

7  that's what members of my profession do frequently.

8      Q     In your experience, have you found it to be

9  consistent with analysis if you did individual comps,

10 the market analysis being consistent on a

11 comprehensive basis?

12     A     I consider it to be reliable, yes, ma'am.

13 It's aggregated data.  Doral, I believe, is a

14 superior market than the aggregated geographic area

15 known as airport west, but I'm going with what Costar

16 reports.

17     Q     Okay, and you had similar questions about

18 Marshall Valuation Service for estimating replacement

19 costs, and counsel asked you about certain soft costs

20 that might not be included in the factor for

21 replacement costs.

22           Why did you believe it appropriate to rely

23 on the Marshall Valuation Service?

24     A     Because it's an authoritative source for

25 information pertaining to replacement costs for

1  various types of structures.

2      Q    Why did you believe it was appropriate in

3  evaluating this particular project?

4      A    Because it was the best information that I

5  had available to me at that time.

6      Q    And I think you answered the Court's

7  question.  You had excellent Class C for retail and

8  average for office.  The difference in the two

9  valuations for a mixed use project is why?

10     A    Is ---

11     Q    Difference between an excellent rating and

12 an average rating.  I think the Court asked you that

13 question, I just had it in my notes and I wanted to

14 go over it.

15     A    Well, the excellent for the retail,

16 typically you have -- this is my recent experience,

17 you have to spend more money on your retail as a

18 driver for the development, for TI allowances,

19 everything, and you can think of going into one of

20 your like retail centers, a specialty -- specialty

21 retail store, as compared to going into a vanilla

22 box, a commodity space for office, that's the

23 difference.

24     Q    Okay, and you had 20 acres on the south --

25 the south tract is made up of 20 acres, and you came

1  up with doing the analysis that counsel asked you to

2  perform, 79.31 a square foot on a net basis.

3          Why is that number different than some of

4  the other comparables that were in the other subject

5  properties?

6      A    Well, because it's the intensity of use

7  that has been permitted for that property.  It's

8  almost like three dimensional.  You've got your

9  residential component in and of itself, but it's also

10 received development approval for some 94,000 square

11 feet of retail and approximately 94,000 square feet

12 of office.

13         So what you're seeing is -- just like you

14 see in intensive downtown cores, per say.  You look

15 at a land sale in Downtown Miami and it's 400 bucks a

16 square foot and you wonder why.  Well, you find out

17 because there's so much development that's been

18 allowed on that -- on that site, which pushes up the

19 value when you look at it on a per square foot basis

20 because of the intensity of the use.

21         MS. REDMOND:  Your Honor, may I have one

22 second to confer with my colleagues?

23         One more question.

24 BY MS. REDMOND:

25     Q    You talked about -- you were asked about

1    the density of the property and the additional 500

2    units, and a potential traffic problem.

3            Could you just explain to the Court one

4    more time why that isn't a problem in your view?

5        A    Because you have the same amount of units.

6    My estimate of highest and best use is that the

7    property would have 1,100 units, residential units.

8    That is the exact number, per se, that is entitled

9    for the property.

10           So you have the same number of units on the

11   property that it's been approved for given

12   concurrency review, compliance, traffic impacts,

13   et cetera.  I'm not increasing the number of external

14   trips at all by this property, it's just the

15   distribution where they would occur, so that's it.

16   The quantity does not change, it's just the

17   distribution may change because of where they're

18   generated internally in the site and which access

19   points those drivers choose to use.

20           MS. REDMOND:  Thank you very much.

21           THE COURT:  Okay.  We're going to take a --

22   unless you have a question or two that you feel

23   compelled to ask?

24           MR. GIELCHINSKY:  Yes, your Honor.

25           THE COURT:  Go ahead.  If it's based on

1    redirect.

2            MR. GIELCHINSKY:  Yes, it is.

3            THE COURT:  Okay.

4                    RECROSS EXAMINATION

5    BY MR. GIELCHINSKY:

6        Q    Mr. Hanson, you took a break during the

7    deposition, you checked your notes, and you

8    determined that your testimony had been in error; is

9    that correct?

10       A    Yes.

11       Q    How many pages is the transcript of the

12   deposition that I handed to you, sir?  On what page

13   does your testimony stop?

14       A    Page 147.

15       Q    I would respectfully direct your attention

16   to 142 of the transcript, sir.  Starting at Line 15

17   Mr. Guso asked you the following question:

18           "Q.  The report that has been marked, I

19   believe as Exhibit A, your report this morning --

20           A.  Yes, sir.

21           Q.  -- sir, is that report final?

22           A.  Yes, sir.

23           Q.  Do you intend to amend it?

24           A.  No.

25           Q.  Do you intend to supplement it?

1          A.  No."

2          Anywhere between Pages 143, which is the

3    next page, and where your deposition testimony

4    stopped at Page 147, did you tell any of us that you

5    had looked through your file during the deposition

6    break and found that you were in error with respect

7    to that ownership of that apartment development?

8        A    No, I didn't.

9          MR. GIELCHINSKY:  Thank you, sir.  Nothing

10   further, your Honor.

11         THE COURT:  Okay.  I'm going to take a

12   short break and then I'll come back and I have some

13   comments on where we are, and we'll talk about how

14   we're going to proceed.

15         MR. GIELCHINSKY:  Should I wait until after

16   the break to move certain exhibits into evidence?

17         THE COURT:  No, let's do that now.

18         MR. GIELCHINSKY:  I would respectfully move

19   the colored photographs into evidence.  The witness

20   testified that he had knowledge of what they

21   depicted, and Exhibits 8 and 9 in our register as

22   learned treatises that the expert, the appraiser,

23   testified that he had knowledge of and relied on

24   those learned treatises.

25         MS. REDMOND:  Your Honor, 8 and 9 are

1   portions of a work and the work in itself could be

2   admitted as an entire work, but not a portion of the

3   work because we don't know what else is there that

4   might have an impact on what's before the Court.

5          And, your Honor, on the pictures,

6   pictures are Google Earth, we don't even know

7   when they were taken.  The witness testified he

8   recognized things from them, but there may be

9   things in the picture that's unreliable and

10  certainly unauthenticated, and the pictures ought

11  not come in.

12         Your Honor allowed them to be shown to

13  the witness, but not for purposes of authentic

14  pictures to come into evidence.

15         THE COURT:  Okay.  I agree with you.  The

16  pictures, no.  We've got the testimony.  I found them

17  helpful as demonstrative aids as we went from the

18  pictures to the site plan just to see where certain

19  things are, but to the extent they are not dated and

20  we don't know if they may depict some particular

21  things, I won't take them into evidence separately.

22         As far as the excerpts, since the

23  witness identified and acknowledged that these

24  were excerpts from the Marshall Valuation Service

25  that he used and these were part of the treatise,

Page 280

1    and he was asked about certain sections, I'm

2    going to allow those to come in.

3              (Thereupon, Debtors' Exhibits 8 and 9

4    are admitted into evidence.)

5              THE COURT:  So we'll take maybe ten

6    minutes.  My intent, though, is not to take any more

7    testimony today, but just to talk about the future.

8              MR. GIELCHINSKY:  Thank you, your Honor.

9              (Thereupon, a brief recess was taken, after

10        which the following proceedings were had:)

11             THE COURT:  Have a seat.  It's been a long

12   day, but we've gotten through the direct and cross of

13   the two primary witnesses on valuation.

14             We're here, of course, on the motion to

15   value collateral filed by the debtors, Court

16   Paper 81.  We set some deadlines and set the

17   hearing on a fairly short notice to comply with

18   the debtors' proposed timetable in conjunction

19   with its co-plan proponent, Terra, for moving

20   forward towards consideration of the plan.

21             The Court has considered the reports

22   and the testimony of the two appraisers, and

23   finds that there is no competent credible

24   evidence from which this Court can determine the

25   value of the property.  Both of the reports have

1  been admitted into evidence, there was no Daubert

2  objection.

3        This is not a case, however, where I

4  can take the weaknesses or critiques or attacks

5  that were validly leveled by each side on the

6  other's report, and with any reason and support

7  make adjustments to reach a valuation

8  determination, and I know that may be surprising

9  and disappointing to the parties who invested a

10  lot of time and money in this process, but

11  unfortunately, that's where we are.

12        We didn't get to, and I don't need for

13  purposes of this ruling, Mr. Cannon's critique of

14  Mr. Waronker's report.  I'm familiar with

15  Mr. Waronker and his excellent reputation in the

16  community, and nothing about this finding is

17  intended to be a personal attack on his

18  representation or character.

19        Likewise with Mr. Hanson, I do not know

20  him or of him, but his credentials are very

21  solid.  I think both witnesses testified

22  honestly, but the Court, in looking at the

23  testimony of expert witnesses under Rule 702,

24  concludes for the reasons that I'll discuss, that

25  neither experts' testimony is testimony that the

1    Court can rely on under Rule 702.

2              702 requires the testimony to be based

3    on sufficient facts or data, that the testimony

4    be the product of reliable principles and

5    methods, and the expert has reliably applied the

6    principles and methods to the facts of the case.

7              As to Mr. Waronker's opinion, I would

8    note, despite having said that I know of his

9    excellent reputation, that his opinion in terms

10   of weight, if it otherwise could be relied on at

11   all, was weakened by the extensive reliance on a

12   rather rookie level appraiser, Mr. Diaz.  I'm not

13   casting any aspersions on Mr. Diaz, but the

14   evidence was that it was, in many respects, his

15   work product.  Although I do understand, and I

16   certainly adopt or accept as accurate, that

17   Mr. Waronker tested and stands behind the

18   opinions.

19             The fundamental problem is not with the

20   methodology.  Mr. Waronker used the sales

21   comparison approach, that's certainly the logical

22   and only reliable, potentially reliable approach,

23   I think, for valuing this property.  He looked at

24   comparables, there's no quarrel that the Court

25   has with his selection of comparables, and he

1    used a traditional methodology.

2            Although I'm more used to seeing the

3    residential appraisers actually give quantitative

4    adjustments instead of pluses and minuses, and

5    then a sort of qualitative conclusion, but the

6    methodology of making adjustments to the

7    comparables based on size, location and so forth,

8    all of that was consistent with normal procedures

9    as I'm aware of them.

10           But I just cannot find that

11   Mr. Waronker's conclusions are the product of

12   reliably applying the principles and methodology

13   to the facts of the case here.

14           The testimony and conclusion that the

15   garage adds no value to the south parcel, is

16   rejected by the Court.  I understand the concept

17   that the uses of the property may be restricted

18   by the existence of the garage, but to find that

19   the net reduced expected value from the uses,

20   compared to what the ideal uses may be if you

21   were starting from vacant land without the

22   garage, would offset the value of the garage, I

23   just reject and do not find credible.

24           I reach the same conclusion with

25   respect to the infrastructure.  Yes, the mix may

1   be constricted by the roads designed for a use

2   that's no longer ideal, but to conclude that the

3   reduced value based on the, perhaps more limited

4   options that you would have in development to

5   make use of the existing infrastructure, would

6   totally offset the value of that infrastructure,

7   I reject and find is not credible.

8          I am less strong in my view on the

9   opinion of no value to the Florida Power & Light

10  easements, given that it is being used for

11  mitigation, storm drainage, green space, uses

12  which might otherwise have to be undertaken on

13  the remaining land.  In other words, if you

14  had -- I'll leave it at that.  I think that

15  should be pretty clear.

16         If you say there's no value to the FP&L

17  easement, then you have to assume the parcel

18  would be valued the same if it didn't have that

19  property at all, which means you would have to

20  use some of the remaining property for those

21  other purposes.

22         I'm not entirely clear with the effect

23  on Mr. Waronker's conclusions when he conceded in

24  cross that now that he's learned more about it,

25  you're stuck with the roads, and whether that

1  affects his methodology and may otherwise affect

2  his highest and best use opinion, but for the

3  reasons already stated, I do not find that his

4  opinion can be relied upon by the Court to

5  determine fair market value of the property and

6  again, I don't find that there is a dollar amount

7  from anything in the record that I could use to

8  make an adjustment to get to a reliable and

9  supportable opinion of value given the defects in

10  the report that I've noted.

11          Mr. Hanson's report, frankly, kind of

12  took me by surprise.  I concede that this Court

13  hasn't had that many valuations of this type of

14  property to determine that using unit price is

15  not a reliable methodology, so I'm not going to

16  be so bold as to say that that, in and of itself,

17  would invalidate the opinion, but there are

18  several other reasons why, even if you can use

19  unit pricing, why this opinion is not reliable.

20          For example, in terms of the element

21  of -- in 702 of having an opinion based on

22  sufficient facts or data, I don't find there was

23  sufficient facts or data with respect to the

24  Santorini project and the Lennar rolling

25  purchases that seemed to be a significant factor

1   in the conclusion for the townhouse price, and

2   based on the testimony in cross, similarly --

3   maybe not similar, but also a lack of sufficient

4   data to present a land residual technique opinion

5   as to the retail and office enhancements based on

6   the report and the testimony.

7            Even if unit price may be a methodology

8   appraisers could use and courts could rely on, I

9   don't find it can be relied on here, where the

10  appraiser took what he believed was an

11  appropriate mix and just mathematically

12  multiplied the units that he thought would be

13  appropriate for highest and best use to a unit

14  price value that he determined.

15           Again, I don't find there was

16  sufficient evidence to have those unit prices be

17  reliable, particularly the townhouse price, but

18  even if the unit prices could have been

19  determined from sufficient data, I don't know

20  that I would have adopted the report based on

21  this methodology of picking a mix, particularly

22  where so much reliance in the mix, as well as

23  other aspects of the report, seem to be based on

24  discussions with a representative of Lennar.

25           I'm disappointed.  I expected more from

1    an appraiser in this case, in this context, than

2    one which relied so heavily on hearsay.  I know

3    experts can rely on hearsay, but when it goes to

4    the material issues of what's the best project

5    and infrastructure work, it's hard for the Court

6    to hang its hat on that.

7             As to the townhouse units, the cross

8    examination was extremely effective on showing

9    how tremendously different the Santorini units

10   were to the units here in terms of how ready they

11   were to go, so to speak, utilities were ready to

12   be hooked up, streets had signage, all the site

13   work was done, the pads were down.

14            It goes back, too, to the fact and

15   methodology of -- and there was no good answer, I

16   didn't think, and I'm the finder of fact, so I

17   guess that's a problem, to my question of, if the

18   Santorini prices were so important in coming up

19   with the townhouse price, why weren't they listed

20   in the traditional sense as comparable sales,

21   where you make adjustments, even if it's not

22   dollar adjustments, even if we're using pluses

23   and minuses.

24            There would have been an awful lot of

25   minus adjustments to that 82 or $85,000 per unit

1   sale price based on the facts that were elicited

2   in cross.  If that's why it wasn't separately

3   listed, because it couldn't have withstood that

4   traditional type of adjustment process, I don't

5   know, but the combination of relying on this as a

6   comp and not having it as a true comp, and then

7   concluding that the townhouse per unit price is

8   80,000 based on these 82 to 85 or $86,000 ready

9   to go prices, was not credible.

10              As to the town -- excuse me.  As to the

11  south parcel, I guess what counsel for the debtor

12  called a reality check, was just that.  I don't

13  find any reality to a methodology, even if,

14  again, the unit pricing could be used by

15  appraisers, that would yield $79 a square foot as

16  a value for the net acreage, net of the easements

17  on the south parcel or even the $35 a square foot

18  on the gross acreage.

19              So for those reasons, I find that while

20  in evidence, neither of the reports meets the

21  criteria of Rule 702 of the Federal Rules of

22  Evidence as an expert opinion that this Court can

23  rely on, to value the property.

24              I'm not happy about this whole process,

25  the cost of it, and we wind up at this result,

1  but I could do no more than look at the evidence

2  and determine whether value can be derived from

3  expert opinions and in this case, it cannot.

4        I'm going to deny the motion without

5  prejudice.  Whether the Court allows further

6  proceedings to determine value will depend on

7  what happens next week.

8        So with that, I'll just ask whether

9  either side wants to just preview where they see

10  things going next week, in other words, is the

11  debtor going to go forward with a disclosure

12  hearing without valuation or does everybody need

13  a chance to absorb?

14        MS. MORA:  Judge, speaking for the debtors,

15  we would like a chance to sort of regroup with our

16  team and determine where we would like to go.  I

17  think our intention is still to proceed with

18  disclosure.

19        We were obviously very disappointed

20  that the Court did not allow us to put

21  Dr. Fishkind on the stand, whose testimony we

22  think on rebuttal to Mr. Hanson's report could

23  have provided the Court with a great deal of

24  clarity as to the issue of valuation of the

25  property from the standpoint of an economic and

Page 290

1    market analysis valuation.

2           THE COURT:  But he was not going to opine

3    directly on value.

4           MS. MORA:  Oh, he was, Judge, he absolutely

5    was, and we, again, had expected to provide his

6    testimony on rebuttal.  Dr. Fishkind has been

7    admitted as an expert in his role as an economist and

8    financial advisor on the issue of real estate market

9    analysis and valuation in state and federal courts

10   throughout the State of Florida.

11          THE COURT:  Well, with the Waronker report

12   rejected, you're telling me Fishkind's testimony and

13   report on its own would provide a sufficient basis

14   for me to value?

15          MS. MORA:  I believe it would, Judge.

16          THE COURT:  All right.  Well, then seek

17   rehearing.

18          Anything from the triumvirate?

19          MR. HUDSON:  It really is dependent upon

20   what the debtor wants to do, your Honor.  We have a

21   deadline of noon tomorrow to file our objections to

22   disclosure/confirmation, at least the legal bars we

23   believe exist with respect to confirmation.

24          Next week is also -- you continued the

25   exclusivity issues, you continued the relief from

1   stay issues, so we simply need some direction

2   from the Court.

3         THE COURT:  Well, when I said just

4   generally we need to determine -- we need to see what

5   happens next week before deciding whether we would

6   re -- or allow further proceedings on value, I guess

7   it was to determine whether, assuming the debtor

8   could value the property at some number, whether it's

9   the number that they were proposing would potentially

10  lead to a confirmable plan.

11        My observation, and I say this really

12  as preliminary, with by no means a finding, but

13  part of what I gather from the testimony today is

14  that there needs to be a, perhaps a market test.

15  I mean, this is a property that perhaps cannot be

16  valued effectively by experts and has to be

17  valued in the marketplace.  I don't know.

18        That's not a ruling, it's just -- and

19  maybe it's not a certainty, maybe it's the nature

20  of these valuations and the reason -- for the

21  reasons I stated, and that other witnesses or

22  these witnesses with additional time could

23  present competent expert evidence.

24        But I think we have to determine

25  whether, if the property is valued by further

Page 292

1    proceedings, do they have a potentially

2    confirmable plan, but, again, you have to

3    determine whether you can go forward without a

4    valuation.

5            I went into this hearing believing that

6    we would come out of it with a valuation that

7    would then be in place and we would get to the

8    other legal issues.  I just can't get there from

9    the evidence that was presented.

10           MR. HUDSON:  Again, your Honor, I don't

11   think they can go forward, but they certainly get to

12   make their decision.

13           THE COURT:  It's late.  I'll let everybody

14   absorb it, unless anybody else wants to make a

15   comment.

16           MS. REDMOND:  Your Honor, I just have one

17   request.  We have a deadline of 12 o'clock tomorrow.

18   Is it possible for the Court to extend that deadline

19   on an objection.  We're objecting primarily to the

20   legal issues, and it's our understanding that the

21   disclosure statement will look at legal impediments

22   to confirmation, rather than factual impediments to

23   confirmation, and not be evidentiary, but if we could

24   have a little bit more time.

25           I don't think we contemplated being

Page 293

1   here this late today.  We have been working on

2   it, we have drafts, but we want to make sure we

3   have a good product before your Honor.

4            THE COURT:  Response.  How much time are

5   you asking for, I guess before they respond --

6            MS. REDMOND:  Additional 24 hours.

7            THE COURT:  -- five o'clock, six o'clock

8   tomorrow?

9            MS. REDMOND:  An additional 24 hours, your

10  Honor.

11           MR. HUDSON:  Another day, Judge.

12           MS. REDMOND:  One day.

13           MR. HUDSON:  I mean, we've been doing a lot

14  of things here, but I think because of the ruling,

15  and it's unfortunate, I think we all are

16  disappointed, as well, but there isn't the time

17  crunch that there may have been had there been

18  another ruling, so an extra day I don't think is

19  really going to matter at this point.

20           MS. MORA:  Judge, the only point that I'd

21  make, of course, is that the delay in delivery of the

22  objection just delays the amount of time that the

23  debtor and its co-proponents -- co-proponent have to

24  review the objection and prepare, you know,

25  appropriate argument in opposition to it or to try to

1    work out any disclosure issues.

2              I imagine ---

3              THE COURT:  Go ahead.

4              MS. MORA:  I imagine I don't -- that, you

5    know, we don't know sitting here today whether or not

6    the triumvirate is going to be using this objection

7    to disclosure statement to essentially make

8    confirmation objections.

9              Normally a disclosure statement

10   objection is going to be, we don't like what

11   you've said in the disclosure statement, so

12   please change X, Y and Z.  It's not giving true

13   factual information about it.  It doesn't

14   imagine -- I don't imagine that that's what the

15   triumvirate is doing right now, and as a result,

16   to the extent that they want to take more time to

17   finalize their objection, which they've known

18   what the deadline was for an extended period of

19   time, since December, if this is really

20   confirmation objections that we're dealing with,

21   you know, I respectfully would request to the

22   Court that we really need the normal week period

23   that a debtor has.  The Court has already

24   shortened it by a day and now they're asking for

25   it to be shortened by another day and ---

1          THE COURT:  Well, I think the solution is

2     if they're looking at a noon deadline, you know what

3     your arguments are; right?

4          MS. REDMOND:  Your Honor, yes, and the

5     reason ---

6          THE COURT:  Do you want to put them on the

7     record or just share them after we recess?

8          MS. REDMOND:  Your Honor, Ms. Mora says

9     that this should be a normal disclosure hearing, but

10    I think that your Honor, when you set the disclosure

11    hearing, you said that this would be more, and you

12    wanted to hear legal bases that would preclude or

13    prevent confirmation at the disclosure stage, not

14    factual issues.

15          The factual issues, obviously, as in

16    every case, are continued to the confirmation

17    hearing, but your Honor wanted to hear any legal

18    bases that would be a bar to confirmation and

19    going forward.

20          So I think that's why the disclosure

21    objection is more than one that just points out

22    things that are not adequately disclosed in the

23    document, it really goes further and tries to set

24    forth and analyze the legal bases that

25    confirmation may be an impossibility.

1          THE COURT:  I think that's right.  We also

2     have a further hearing on stay relief, and I didn't

3     do a parallel tracks order where I said they had to

4     make a prima facie case for confirmation at

5     disclosure, in terms of factually.

6               However, courts can always look at what

7     may be legal impediments at the disclosure stage

8     and not go further, and in this case, I do

9     believe we contemplated looking at potential

10     legal impediments to confirmation at the

11     disclosure stage.

12               I'll give you the extra day until noon

13     on Friday, provided either you put on the record

14     now or just in good faith, you're all

15     professionals and have practiced together for,

16     some of you, for years, that you just tell them

17     these are the -- these are the major arguments.

18     If you already know what the arguments are and

19     you just need more time to flesh them out, just

20     at least give them notice so they can start ---

21          MS. REDMOND:  Your Honor, we're happy --

22     we're happy to disclose to them as soon as the

23     hearing is over exactly what the arguments are.

24          THE COURT:  All right.  Then I'll extend

25     the deadline.

Page 297

1          All right.  So unless somebody files

2     something, I guess we're just here next Wednesday

3     at when, 9:30, 10:00.

4               MS. AFTIMOS:  10:00.

5               THE COURT:  10:00.

6               MS. REDMOND:  Judge, there will be one more

7     issue that comes up at disclosure, and the Bankruptcy

8     Code requires that we make an 1111(b) election, if at

9     all, by the close of the disclosure hearing.

10              I don't think you have to decide it

11    today, but without knowing valuation numbers,

12    it's very hard to do that.  So there will be

13    something that we -- we can file a motion before

14    the disclosure hearing to extend the time on

15    that, and your Honor can deal with that at the

16    disclosure hearing.

17              THE COURT:  Go ahead and file that.

18              MS. MORA:  Judge, I don't know what the

19    Court's calendar is next Wednesday, but let me just

20    inquire, is the Court going to do its own order out

21    of today's hearing or do you want a simple order ---

22              THE COURT:  Yes, I think I said I was going

23    to do all the orders.

24              MS. MORA:  Judge, we would simply make the

25    request now, and we're happy to file the motion for

1  rehearing, but we would very much like the Court to

2  take the testimony of Dr. Fishkind on the issue of

3  valuation next Wednesday, as well.

4       THE COURT:  All right.  Well, I'm not going

5  to grant the rehearing now and say that I'm going to

6  do that.  File the motion for rehearing and if on the

7  face of it I decide that I'll take the testimony,

8  either as part of the motion in order to hear it to

9  decide the motion, or otherwise, then we'll advise

10  you promptly so you can have him available.

11       As far as what we have next Wednesday,

12  Corinne we cleared the day; right?  I'm pretty

13  sure we did.

14       Yes.  So we're gearing up for what

15  could be a longer -- I don't know how much

16  besides Mr. Fishkind's testimony, if we take it,

17  how many hours we need for all the rest, but we

18  have the whole day, I guess is all I can tell

19  you.

20       If you file the motion and I decide

21  that I'll hear the testimony, we'll let you know

22  so you can make him available or find out now if

23  he's going to be available.  Okay.

24       MR. HUTTON:  Your Honor, if I can just

25  preview?

1          I find it absolutely stunning that

2     after hearing the testimony from two qualified

3     MAI appraisers as to the value of this property,

4     that the Court would entertain testimony on value

5     from someone who is not an MAI, who is not an

6     appraiser, and who has not done any written

7     report regarding the valuation of this property.

8          The only report that he's produced goes

9     to feasibility of the debtors' plan, that's it,

10    and there's no report, written report, that he's

11    done opining as to the value of the property, and

12    the fact that the Court would reopen the record

13    and take evidence like that from someone who

14    hasn't done a report, who's not an appraiser,

15    who's not an MAI, to try to establish the value

16    of the property, we would strongly object to

17    that.

18          MS. MORA:  Judge, I'll reserve my argument

19    on this for the motion for rehearing.

20          This witness was already deposed by the

21    triumvirate, and they've had the opportunity to

22    depose specifically Dr. Fishkind's opinion of

23    value with respect to the property.  He testified

24    extensively about that at his deposition.

25          THE COURT:  But the report, Docket Entry

Page 300

1   153, is not an opinion of value; right?

2           MS. MORA:  That's correct, Judge.

3           THE COURT:  The report focuses on the

4   market feasibility of the plan.

5           MS. MORA:  Based upon his market analysis,

6   Dr. Fishkind rendered that report.

7           Upon receipt of Mr. Hanson's report, we

8   asked Dr. Fishkind to expand the scope of his

9   retention and to review what Mr. Hanson had

10  written.

11          In connection with that, and based upon

12  Dr. Fishkind's market analysis, he developed his

13  own opinion of value from his years of experience

14  managing CDDs, providing advice to developers

15  about purchasing property, from running Engle

16  Homes, from his years as a developer himself, and

17  he developed his own opinion of value.

18          At his deposition this week, he was

19  deposed on those opinions, and so, although it's

20  not in a written report, it was intended to be

21  offered as rebuttal evidence to the Hanson

22  report, Judge.

23          THE COURT:  There's nothing to rebut.

24          MS. MORA:  Well, Judge, the Hanson

25  appraisal report was provided to the Court.  The

1  Court was obviously concerned about the conclusions

2  Mr. Hanson reached.

3          The Court indicated that it's

4  struggling with what appears to be lack of

5  credible data upon -- and information and

6  opinions upon which to render its own opinion as

7  to value, and we're only suggesting to the Court

8  that Dr. Fishkind's opinion, his analysis, and --

9  let's just say his analysis and his opinions, we

10  believe, would be extremely helpful to the Court

11  and help the Court get to a sensible bottom line

12  determination on the issue of value of this

13  property.

14          THE COURT:  Standing alone?

15          MS. MORA:  Standing alone, Judge.

16          THE COURT:  He would meet 702(a)'s

17  requirement that the expert's scientific, technical

18  or other specialized knowledge will help the trier of

19  fact to determine the fact in issue here, namely the

20  value?

21          MS. MORA:  I believe it absolutely will,

22  Judge, as have ---

23          THE COURT:  Has he ever testified as to

24  value?

25          MS. MORA:  More than 20 times he's been

1  accepted in court hearings by state and federal

2  courts as an expert on the value of commercial real

3  estate, I'm sorry, on the value of real estate, mixed

4  use developments.

5          THE COURT:  I guess file your motion.  I

6  have my doubts as to whether standing alone somebody

7  who developed an opinion of value as rebuttal

8  testimony to an opinion that I've basically rejected,

9  can now standing alone, provide reliable data or

10  reliable opinion for me to rely on.

11          Go ahead and file your motion, and if

12  Mr. Fishkind can be on hold, I guess they'll need

13  at least a day to respond.

14          MS. MORA:  Okay.  I will ask Dr. Fishkind

15  to make himself available.

16          THE COURT:  Okay.

17          MS. MORA:  Thank you, Judge.

18          THE COURT:  All right.  We're in recess.

19          Ms. Mark.

20          MS. MARK:  Your Honor, I just wanted to

21  clarify one point.

22          Does the extension of the 24 hour

23  objection deadline apply to all parties in

24  interest or just is it limited to the District?

25          MR. GUSO:  We agree to grant the committee

Page 303

1    an extension, as well, your Honor.

2              MS. MARK:  Okay.  Thank you.

3              THE COURT:  All right.  Well, don't forget

4    the commitment to share your -- preview your legal

5    arguments before you leave the building.

6              (Thereupon, the hearing was concluded.)

7                      - - - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 304

1

2                        CERTIFICATION

3

4    STATE OF FLORIDA:

5    COUNTY  OF  DADE:

6

7              I, Margaret Franzen, Shorthand Reporter

8    and  Notary  Public in  and for the State of Florida

9    at  Large,  do  hereby  certify  that  the  foregoing

10   proceedings  were  taken  before  me  at the date and

11   place  as  stated  in  the caption hereto on  Page 1;

12   that the  foregoing  computer-aided transcription  is

13   a true record of my  stenographic notes taken at said

14   proceedings.

15              WITNESS  my  hand  this  24th day  of

16   January, 2012.

17

18

19        _____

                  Margaret  Franzen
20          Court  Reporter and Notary Public
           in and for the State of Florida at Large
21          My Commission Expires:  April 14, 2014

22

23

24

25