Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                              CASE NO. 11-35884-BKC-RAM

TOWN CENTER AT DORAL,
L.L.C.,

                Debtor.
_____/

*** EXCERPT FROM PROCEEDINGS ***

ALL MOTIONS ON THE CALENDAR
(81), (131), (143), (132), (143), (146), (157)

January 18, 2012

        The above-entitled cause came on for
hearing before the HONORABLE ROBERT A. MARK, one of
the Judges sitting in the UNITED STATES BANKRUPTCY
COURT, in and for the SOUTHERN DISTRICT OF FLORIDA,
at 51 Southwest 1st Avenue, Miami, Dade County,
Florida on Wednesday, January 18, 2012, commencing
at or about 10:00 a.m., and the following proceedings
were had:

                        Reported By: Margaret Franzen

Page 2

1                    APPEARANCES:
2

     BILZIN SUMBERG BAENA PRICE & AXELROD, by
3            MINDY A. MORA, ATTORNEY-AT-LAW
            DANIEL Y. GIELCHINSKY, ESQUIRE
4         TARA V. TREVORROW, ATTORNEY-AT-LAW
                 on behalf of the Debtor
5
6          GENOVESE JOBLOVE & BATTISTA, by
              MARILEE MARK, ATTORNEY-AT-LAW
7     on behalf of the Official Committee of Unsecured
                        Creditors
8
9              BERGER SINGERMAN, by
                 JORDI GUSO, ESQUIRE
10        DEBI EVANS GALLER, ATTORNEY-AT-LAW
            on behalf of Terra Landmark, LLC
11
12        STEARNS WEAVER MILLER WEISSLER
              ALHADEFF & SITTERSON, by
13       PATRICIA A. REDMOND, ATTORNEY-AT-LAW
                ERIC SILVER, ESQUIRE
14        on behalf of the Landmark at Doral
          Community Development District
15
16              ARNSTEIN & LEHR, by
           PHILLIP M. HUDSON, III, ESQUIRE
17             ANTHONY KANG, ESQUIRE
                        and
18              DLA PIPER, by
          BETTY M. SHUMENER, ATTORNEY-AT-LAW
19                      and
           HOPPING GREEN & SAMS, by
20           MICHAEL C. ECKERT, ESQUIRE
          on behalf of Florida Prime Holding, LLC
21
22            GREENBERG TRAURIG, by
            JOHN B. HUTTON, III, ESQUIRE
23             JOHN DODD, ESQUIRE
        on behalf of U.S. Bank as Indenture Trustee
24
25
                     Continued....

Page 3

```
 1              BROAD and CASSEL, by
                 C. CRAIG ELLER, ESQUIRE
 2          on behalf of AmT CADC Venture, LLC

 3

        MIAMI-DADE COUNTY ATTORNEY'S OFFICE, by
 4         MELINDA S. THORNTON, ATTORNEY-AT-LAW
      on behalf of the Miami-Dade County Tax Collector
 5

 6       OFFICE OF THE UNITED STATES TRUSTEE, by
               STEVEN D. SCHNEIDERMAN, ESQUIRE
 7         on behalf of the United States Trustee

 8

                    ALSO PRESENT:
 9

                  CRAIG WRATHELL, CDD
10               NOAH BREAKSTONE, BTI
              MICHAEL Y. CANNON, Integra
11     HENRY H. FISHKIND, PhD., Fishkind & Associates
          CORINNE AFTIMOS, Judge Mark's Law Clerk
12

                   - - - - - - -
13

                    I N D E X
14
```

```
   WITNESSES            DIRECT  CROSS  REDIRECT  RECROSS
15 LEE H. WARONKER
    By Ms. Mora          21
16  By Mr. Hudson                                --
   WOODWARD S. HANSON
17  By Ms. Redmond
    By Mr. Gielchinsky
18
19

20    EXHIBITS MARKED ADMITTED INTO EVIDENCE
21   Debtors 1 - 5..........................Page 20
```

```
22
23
24
                   - - - - - - -
25
```

1          THE COURT:  Before we get appearances,

2    what's the issue with the marshal, what aren't they

3    letting in?

4          MR. SILVER:  Your Honor, Eric Silver from

5    Stearns Weaver on behalf of the District.

6          Our expert attempted to bring in a

7    couple of calculators and the marshals aren't

8    letting him upstairs.

9          THE COURT:  Not letting him upstairs?

10          MR. SILVER:  No, they're not letting him

11   upstairs with the calculator.

12          THE COURT:  So where is he and where

13   are ---

14          MR. SILVER:   The witness is here, the

15   calculators are outside.  If we don't get relief from

16   your Honor, then I'm going to have to go back to the

17   office with the calculators.

18          THE COURT:  All right.  Well, we'll look

19   into it.  I don't know if I'll need to write a letter

20   or not, but anyway.

21          MR. SILVER:  Thank you, your Honor.

22          THE COURT:  Okay.  Let's get appearances

23   starting from the debtor.

24          MS. MORA:  Good morning, your Honor.

25   Mindy Mora and Tara Trevorrow on behalf of the

1  debtors.  In addition, shortly I expect to be joined

2  by my colleague, Dan Gielchinsky.

3       MR. GUSO:  Good morning, your Honor.

4  Jordi Guso and Debi Galler from Berger Singerman on

5  behalf of Terra Landmark, LLC.

6       MS. MARK:  Marilee Mark with Genovese

7  Joblove & Battista on behalf of the committee.

8       MR. ELLER:  Good morning, your Honor.

9  Craig Eller of Broad and Cassel on behalf of

10  unsecured creditor, AmT CADC Venture, LLC.

11       MR. HUDSON:  Good morning, your Honor.

12  Philip Hudson, Arnstein & Lehr, on behalf of Florida

13  Prime, LLC, the 100 percent bondholders in the case.

14  With me today I have Ms. Shumener, who is co-counsel

15  from Los Angeles.

16       Mr. Eckert will eventually arrive, he's

17  across the street in a State Court case hearing

18  involving this matter; your Honor, Anthony Kang,

19  my colleague; and Mr. Breakstone of BTI, the

20  managing partner, will be here, he's also across

21  the street for the moment.

22       MR. HUTTON:  Good morning, your Honor.

23  John Hutton from Greenberg Traurig on behalf of

24  U.S. Bank, as Indenture Trustee.  With me in the

25  courtroom is my colleague, John Dodd.

 1          MR. SILVER:  Good morning, your Honor,

 2    again.  Eric Silver from Stearns Weaver on behalf of

 3    Landmark at Doral Community Development District.

 4          Also across the street, and will be

 5    joining us shortly, is Patricia Redmond, also

 6    with the firm, and Craig Wrathell, the District

 7    manager.

 8          MS. THORNTON:  Good morning, your Honor.

 9    Mindy Thornton from the County Attorney's Office on

10    behalf of the Miami-Dade County Tax Collector.

11          MR. SCHNEIDERMAN:  Steven Schneiderman for

12    the U.S. Trustee, your Honor.  I will be in and out

13    of the courtroom, I have a couple other matters to

14    take care of while this is pending.

15          THE COURT:  Okay.  I intend to get through

16    the valuation hearing today, and to do that I intend

17    to give less time and -- less time to the various

18    other motions.

19          The scope of what we do on the other

20    motions that are on the calendar may depend, in

21    part, at least as to some of the motions, on

22    who's going to testify and what the discovery

23    was.

24          So let me ask the debtor, who are you

25    going to call?

1          MS. MORA:  Your Honor, the debtors intend

2   to call Lee Waronker, as the debtors' appraiser, and

3   Dr. Henry Fishkind, the debtors' economist, market

4   analyst and also valuation expert.

5          THE COURT:  I thought his report was to the

6   feasibility of the plan, which is more of a next week

7   issue.

8          MS. MORA:  Your Honor, he's going to be

9   testifying on the issue of market conditions as they

10  impact valuation.

11          In addition, he will be providing, we

12  expect, rebuttal testimony with respect to

13  valuation, as it pertains to Mr. Hanson's

14  appraisal report, the expert called by the

15  District.

16          THE COURT:  Were you planning to call him

17  in rebuttal or put him on after --

18          MS. MORA:  Both, Judge.

19          THE COURT:  -- Mr. Waronker?

20          MS. MORA:  Both, Judge, both on direct, on

21  the issue of market analysis, and on rebuttal.

22          THE COURT:  Okay.  So you filed his report,

23  I believe, on Friday and was he deposed?

24          MS. MORA:  He was, your Honor.

25          THE COURT:  Okay.  So those are your two

1  witnesses?

2          MS. MORA:  Correct.

3          THE COURT:  Okay.

4          MR. HUDSON:  Your Honor, I will reserve the

5  right to seek to exclude that testimony because we

6  agreed those are issues more for confirmation and for

7  next week.

8          THE COURT:  Okay.  Mr. Silver, the CDD is

9  obviously going to call Mr. Hanson?

10          MR. SILVER:  Yes, your Honor, and we will

11  be calling Mr. Michael Cannon on issues of market

12  analysis.

13          THE COURT:  All right.  So the Cannon issue

14  was framed by the motion in limine.  Is he offering a

15  report or just testimony?

16          MR. SILVER:  I'm going to defer to

17  Mr. Hutton on this.

18          MR. HUTTON:  Your Honor, Mr. Cannon is here

19  as a rebuttal witness.  He has not done an appraisal

20  report.  What he has done is a technical appraisal

21  review of Mr. Waronker's report.

22          THE COURT:  So he's going to testify after

23  or before Hanson to comment on Waronker's report?

24          MR. HUTTON:  Well, regardless of the order,

25  your Honor, he's a rebuttal witness.  Our intent was

1    to put him on after Hanson, but we can put him on

2    before Hanson, the point is he is here to testify as

3    to the technical aspects of the Waronker report.

4              THE COURT:  Was he made available for

5    deposition?

6              MR. HUTTON:  Yes, he was, your Honor.  He

7    was deposed on Monday.

8              THE COURT:  All right.  So other than

9    Mr. Hudson's comment from the CDD/indenture

10   trustee/bondholders' side, is there any objection to

11   Waronker's testimony or Fishkind's testimony?

12             MR. HUTTON:  I think there will be

13   objections to Fishkind's testimony, your Honor.  What

14   was produced was a feasibility report, as your Honor

15   pointed out, with respect to the plan.  What he did

16   in that report is simply analyze the feasibility of

17   the so called Terra plan.

18             He did not do -- first of all, he's not

19   an appraiser, he's not an MAI, he's an economist,

20   and what he was really doing, and if you look at

21   that report it's very clear, he's just testing

22   the feasibility of the Terra plan.  He does

23   nothing to determine or assess the highest and

24   best use for the property, which is a component

25   of the appraisal analysis.

1          We don't think, for purposes of today's

2    hearing, which should be focused on valuation,

3    that A, he's competent to testify or that it has

4    any bearing on the Court's decision here today,

5    so ---

6          THE COURT:  Was he deposed on issues

7    relating to value, whether a direct appraisal

8    opinion, or just on the economic conditions?

9          MR. HUTTON:  I'll defer to Mr. Hudson

10   because he actually deposed him.

11         THE COURT:  Okay.

12         MR. HUDSON:  Your Honor, by agreement among

13   the respective lawyers in the case, we took his

14   deposition yesterday, and the deposition was limited

15   to issues with respect to the valuation hearing

16   today.  I believe his testimony yesterday was that he

17   is not an appraiser, as indicated, he wasn't hired

18   ---

19         THE COURT:  Did you depose him on what he's

20   going to testify to today?

21         MR. HUDSON:  I tried to.  It was -- it's

22   still -- it's still a bit unclear on what he -- what

23   he thinks he's testifying to with respect to today.

24   We believe we established yesterday the basis for a

25   motion in limine today, your Honor, that nothing in

1  his report deals with value.  There are no numerical

2  findings in there relative to value, there's nothing

3  in there other than a market feasibility study, which

4  is similar, although contradicts, to some degree, the

5  market feasibility study in Mr. Waronker's.

6          So to the extent that it's accretive as

7  to that particular subset of the appraisal,

8  that's the only thing we see relevant for

9  purposes of today, otherwise the balance of his

10  testimony is all regarding feasibility and he

11  admitted that under oath yesterday.

12          THE COURT:  All right.  Well, I'll reserve

13  on Fishkind and the Fishkind report.

14          Do all the parties stipulate to the

15  Waronker and Hanson reports coming into evidence?

16          MS. MORA:  Yes, your Honor.

17          MR. HUDSON:  We do.

18          THE COURT:  Okay.  All right.

19          So, Ms. Redmond, you've arrived.  Tell

20  me what's going on in State Court.

21          MS. REDMOND:  Your Honor, when I left, the

22  State Court had not decided exactly what to do.

23  Judge Cardonne had heard a status conference and said

24  that the first date she would have available to hear

25  the matters was February 16th, and she had suggested

1  to the parties that they check the availability of

2  Magistrate Schwabedissen, and the parties were doing

3  that at the time, although I don't know if both sides

4  will consent to the matter being adjudicated by a

5  magistrate.

6          So that's where they are.  I left ---

7          THE COURT:  So this was not a hearing on

8  the preliminary injunction?

9          MS. REDMOND:  Your Honor, it was not.  She

10  had set a status conference, and she did not hear the

11  preliminary injunction.  She had suggested if the

12  parties wanted more time, that perhaps her magistrate

13  would have more time.

14          I left then to come over here because

15  it was then ten after 10:00, and felt I should be

16  over here.

17          THE COURT:  Okay.  Is there any objection

18  by the debtor to stay relief, or it's really just a

19  comfort order that they can defend that action and we

20  can reserve on whether it's appropriate to allow a

21  counterclaim?

22          MS. MORA:  There's no objection to them

23  being allowed to defend, Judge.

24          THE COURT:  Is there any prejudice at this

25  point to limiting the relief or comfort order to just

1  being able to defend?

2          MS. REDMOND:  Your Honor, at least in our

3  papers, we would intend to be able to fully brief the

4  issues, including any issues that may create a

5  liability for the debtor, as well.

6          If your Honor wishes, we cannot -- ask

7  the Court to reserve on that, but we would at

8  least like the whole issue to be able to be

9  briefed before the Court.

10          THE COURT:  It's hard to rule in the

11  abstract.  I would just -- I will grant stay relief

12  to defend the action, but not to seek affirmative

13  relief against the debtor, other than, obviously,

14  seeking a -- if it's a declaratory judgment, you're

15  going to be seeking a different judgment on whether

16  the CDD -- if you're -- in defending if you're asking

17  for a declaratory judgment that the CDD is fully

18  authorized, fully stocked with commissioners or

19  whatever they're called, supervisors and fully --

20          MS. REDMOND:  Board members for the

21  District.

22          THE COURT:  -- board members, and fully

23  authorized to do everything they're doing, then

24  that's fine.

25          If you're asking for money damages,

1   that's not fine.  If there's something in between

2   that you can articulate, I can think about it,

3   but ---

4           MS. REDMOND:  Your Honor, there may be

5   consequences to the debtors' actions with respect to

6   affecting public officials, and those things -- if

7   your Honor says that we can go that far and we can't

8   raise those, we just want to make sure that we

9   have -- we don't waive anything by not raising them

10  at the same time as responding to this, and if your

11  Honor orders that, then I think the State Court will

12  be governed by that.

13          THE COURT:  All right.  I'll do an order

14  and I'll try to articulate in the written order

15  pretty much what I just said, save several thousand

16  dollars of attorneys' time arguing over language that

17  you're not going to agree on anyway.

18          MS. MORA:  Thank you, Judge.

19          THE COURT:  What about the motion in limine

20  as to Cannon, if he's just testifying, and not

21  offering a report?  The motion in limine was focused

22  more on a report; right?

23          MS. MORA:  Judge, what we were concerned

24  about -- well, first of all, we believe Cannon is

25  being -- the Cannon report is being offered into

1  evidence by the District/bondholder/indenture trustee

2  side.

3         THE COURT:  There is a written report?

4         MR. HUTTON:  Yes, your Honor.  It's not an

5  appraisal report, it's a technical review of

6  Mr. Waronker's report.  It's 14 pages wherein

7  Mr. Cannon identifies what he perceives to be the

8  omissions, flaws and technical defects in

9  Mr. Waronker's report.

10        THE COURT:  Was that provided prior to his

11  deposition?

12        MR. HUTTON:  Yes, it was.  It was provided

13  on the 13th, coincidentally the same day that we

14  received the report from the debtors with respect to

15  Mr. Fishkind.

16        MS. MORA:  The difference, of course,

17  Judge, was that we served our report in the morning

18  and the report came from Mr. Cannon at 6:30 p.m. on

19  Friday evening.

20        Judge, there was an agreement regarding

21  producing all reports by witnesses two business

22  days in advance, that was the agreement between

23  counsel, notwithstanding the Court's order that

24  any appraisal report was going to have to be

25  delivered by court order by Wednesday,

1  January 11th.

2         Interestingly, Mr. Cannon's report was

3  dated January 11th, but we didn't get it until

4  after the close of business Friday evening.

5         Judge, that's why we filed a motion in

6  limine, because we didn't have a report from

7  Mr. Cannon, who was being deposed on Monday.  All

8  day Thursday we waited for it, we got nothing.

9  We waited all day Friday.  We filed the motion in

10  limine in the morning because we hadn't received

11  anything yet, and then finally after the close of

12  business Friday night was when Mr. Hutton's

13  office decided to serve a copy of it, along with

14  work papers that I think arrived at my office

15  sometime around 8:00 p.m. Friday night.

16         So, Judge, on that basis, it just

17  simply is unfair the way they're trying to

18  proceed with this.  It ignores the requirements

19  of the Court's order, it ignores the agreement of

20  counsel about delivery of documents and reports

21  by witnesses that are going to be deposed at

22  least two business days prior to the deposition.

23         Dr. Fishkind was not deposed until

24  yesterday.  They received Dr. Fishkind's report

25  on Friday in the morning, two business days

1  before the deposition.  We weren't afforded the

2  same kind of courtesies with respect to the

3  Cannon report or the Cannon work papers.

4          THE COURT:  When was Cannon deposed,

5  yesterday?

6          MS. MORA:  Monday -- Monday, Judge, yes.

7  On Monday, not yesterday.  Monday in the afternoon,

8  directly after Mr. Hanson.

9          THE COURT:  Okay.  Well, the debtor and

10 the -- and its buyer put this case on a very fast

11 track.  We set the valuation hearing and we knew

12 timing was going to be tight with appraisal reports

13 and depositions, and since the parties have been able

14 to depose each other's witnesses, I'm going to deny

15 any motions in limine based on the timing of

16 producing reports.

17         The Waronker and Hanson reports by

18 consent are coming into evidence.  I'll reserve

19 on admissibility of the Fishkind and Cannon

20 reports on relevance or other grounds in terms of

21 how they relate to valuation.

22         So we'll proceed with that.  As far as

23 the standing issue, at this point, I take it the

24 CDD and indenture trustee and bondholder are all

25 on the same team?

1              MS. REDMOND:  Yes, your Honor.

2              MR. HUDSON:  At the moment that's correct.

3              THE COURT:  So in terms of presentation,

4    are all three of you planning to cross the debtors'

5    witnesses or did you discuss that?

6              MR. HUDSON:  No, your Honor.  We're going

7    to be as efficient as possible.  We've broken it down

8    because there's a lot to do.  Each of us is going to

9    handle distinct phases of today's hearing.

10             I will handle primarily the crosses of

11   both Mr. Fishkind, to the extent that's

12   necessary, and Mr. Waronker.

13             THE COURT:  All right.  Then I'm going to

14   grant the motions, find that the indenture trustee

15   and bondholder have standing because the outcome of

16   what's happening in this bankruptcy will affect them.

17             I may, if necessary, limit the scope of

18   arguments in court on various matters to avoid

19   repetition or just redundancy.  My brief

20   observation is we have an awful lot of lawyers

21   representing the same team, so to speak.

22             It may become an issue down the road in

23   terms of plan issues, voting and objections to

24   confirmation, if there winds up to be a conflict

25   between the three parties, but that may take us

1    into the depths of the indenture, which I don't

2    need to dive into at this point.

3             But while everybody is on the same

4    team, I find that they have standing, and subject

5    to limiting overkill by having three sets of

6    attorneys on the same side, the motions will be

7    granted.

8             I'll do orders on those, too.

9             MS. MORA:  Judge, can I just request a

10   clarification?  The Court's finding is that they have

11   standing as parties in interest, not as creditors?

12            THE COURT:  Right, yes.

13            Okay.  So does that -- did I leave

14   anything out or are we ready for the valuation

15   testimony?

16            MS. MORA:  I think we're ready, Judge.

17            THE COURT:  I think we're ready.  Okay.

18   Well, before they think of something, call your first

19   witness.

20            MS. MORA:  Thanks, Judge.

21            The debtors call Lee Waronker to the

22   stand.

23   THEREUPON:

24                  LEE H. WARONKER,

25   after having been first duly sworn, was examined and

1    testified as follows:

2             MS. MORA:  Judge, if I can approach,

3    please?

4             Judge, I apologize in advance, I'm a

5    little old school.  I just handed up an exhibit

6    register with printed references and exhibits.

7    I'm not real good on using the electronics yet in

8    the courtroom.

9             THE COURT:  Happy to have it, but things

10   you've divided into separate exhibits, are some of

11   those part of the appraisal or all of those are

12   separate from the appraisal?

13            MS. MORA:  Judge, Exhibits 2, 3 and 4 are

14   pages out -- 2, 3, 4 and 5 are pages out of the

15   appraisal, we just separated them for ease of

16   reference.

17            THE COURT:  Okay.  So 1 through 5 are

18   admitted.

19            (Thereupon, Debtors' Exhibits 1 through 5

20       are admitted into evidence.)

21            THE COURT:  Have you shared with each other

22   what exhibits -- I didn't get into that in the

23   preliminaries.

24            MS. MORA:  Judge, we had not.  Honestly,

25   with the speed with which this is happening, it's

Page 21

1    been sort of difficult to do that.

2                THE COURT:  I guess we'll just take up 6

3    through 10 at the time you offer them, we'll see how

4    they fit in and whether they can come in.

5                Okay.  You can begin.

6                          DIRECT EXAMINATION

7    BY MS. MORA:

8          Q    Good morning, sir.  Would you please state

9    your name for the record?

10         A    Lee Waronker.

11         Q    Mr. Waronker, were you engaged to render an

12   appraisal report on the properties owned by the

13   Landmark debtors?

14         A    Yes, I was.

15         Q    I'm sorry, was he sworn in?  Yes?

16         A    Yes.

17         Q    Okay.  Thank you.

18              MR. GUSO:  Sorry, I just wanted to make

19   sure the witness had been sworn in.

20   BY MS. MORA:

21         Q    Mr. Waronker, who is your client in

22   connection with this engagement to render an

23   appraisal report?

24         A    My client was yourself.

25         Q    As debtors' counsel; is that correct?

Page 22

1       A     That's what I understand.

2       Q     Okay.  At any time did you understand your

3   client to be Terra group?

4       A     No, I did not.

5       Q     What input it Terra group provide in

6   connection with the appraisal report that's in your

7   exhibit register as Exhibit Number 1?

8       A     Terra provided a copy of a proposal --

9   proposed subdivision that they would put on the

10  property, also provided some sales history of a

11  nearby project that they were involved with, as far

12  as sale prices, absorption levels.

13      Q     Did Terra group tell you what they thought

14  the appraised values should be?

15      A     No, they did not.

16      Q     Okay.  Did you prepare your appraisal

17  report with a bias towards the development plan

18  proposed by Terra?

19      A     Absolutely not.

20      Q     Now, if you could, would you describe to

21  the Court the scope of your engagement?

22      A     I was hired to prepare a market value

23  appraisal on the subject property, which is

24  approximately a hundred and seventeen acres, known as

25  the Landmark at Doral project.

1      Q    After I received a copy of Mr. Hanson's

2    report, did the scope of your engagement expand?

3      A    It did.  You had requested that I look at

4    his report and provide comments as to that report.

5      Q    Could you briefly describe for the Court

6    your qualifications as an appraiser?

7      A    Yes.  I have a real estate license.  I have

8    a state certified general appraiser license.  I hold

9    the MAI designation and the SRA designation.  I have

10   an undergraduate degree with a real estate major from

11   Florida State University.  I have a master's degree

12   from Florida International University, majoring in

13   real estate.

14         I teach courses for the Appraisal

15   Institute, I've taught in over 20 states,

16   Puerto Rico, Canada and South Korea.

17         I've been appraising in Miami-Dade County

18   since 1977.

19     Q    What is your prior experience involving

20   valuation of subdivisions?

21     A    Been appraising for 30 years, so we've done

22   some subdivisions over that period of time.  Our log

23   book doesn't keep track specifically as to

24   subdivisions.  We classify everything as vacant,

25   residential, multi-family or individual.  I would

1    have to go back in my log to get a list of

2    properties, but suffice it, there's probably been at

3    least two or three dozen over the years.

4         Q    And have you taught any courses involving

5    the appraisal of subdivisions?

6         A    I still teach a course, a case study of

7    real estate appraising, which one of the modules is

8    on the specific subdivision analysis.

9              MS. MORA:  Your Honor, would that I'd move

10   to qualify Mr. Waronker as an expert in the area of

11   appraising real estate.

12             MR. HUDSON:  No objection, Judge.

13             THE COURT:  All right.  I'll grant that

14   request.

15             MS. MORA:  Thank you.

16   BY MS. MORA:

17        Q    Let's turn to your engagement specifically,

18   Mr. Waronker.  What facts did you consider in

19   rendering your opinion?

20        A    We looked at comparable sales to the

21   subject property, looked at supply and demand trends

22   in the area, as to whether or not the product that

23   was already preapproved, the 1100, plus or minus,

24   residences, condominiums, apartments, et cetera, was

25   the highest and best use as of the current date, so

1    we came to a conclusion there that it was not.

2              We found comparable sales in the area, made

3    adjustments to those to come up with a value for the

4    subject property.

5         Q    Did the location of the property factor

6    into your analysis?

7         A    Location always factors into any valuation

8    of any real estate appraisal.

9         Q    Are there any special issues with respect

10   to location of this property?

11        A    This property is unique from the standpoint

12   it has power lines bifurcating the property, I think

13   approximately 330 feet to the middle of the property.

14   On the western boundary, which would be the east side

15   of 107th Avenue, it's a hundred and seventy foot

16   power line easement, and then ---

17             THE COURT:  Hold on.  Do we have a site map

18   you can just put on the overhead?

19             MS. MORA:  Judge, how about if we turn to

20   Exhibit 5?

21             THE COURT:  Okay.  You don't want to try

22   it?  Put it on, it's not real complicated to use.

23   You just have to put a piece of paper down on that

24   thing and it will show up on the screen if you

25   enlarge it.

1          I mean, if it's not going to be big

2    enough ---

3          THE WITNESS:  I can see it, your Honor.

4          THE COURT:  And then the witness can --

5    there's a little -- Corinne will show you, there's a

6    little palet and you can pick a color, a line, and

7    you can draw on it and stuff.

8          MR. HUDSON:  It should probably be a

9    mandatory CLE going forward.

10         THE COURT:  Well, we did have a brown bag,

11   as Mr. Silver would tell you.

12         THE WITNESS:  It's a little bit out of

13   focus.

14         THE COURT:  Hold on.

15         MR. HUDSON:  Judge, I actually have an

16   alternative that lists some of the comparables, as

17   well, if you want to try that.

18         MS. MORA:  I think the witness is doing it,

19   Judge.

20         THE WITNESS:  He's trying.

21         THE COURT:  Okay.

22         THE WITNESS:  Let the record reflect he's

23   trying.

24   BY MS. MORA:

25      Q    Okay.  Mr. Waronker, I believe you were

1    testifying about some power lines.  Where are those

2    power lines on the property?

3        A    The power lines, there's one power line

4    roughly a hundred and seventy feet on the east side

5    of 107th Avenue, on the western side of the property.

6    Right here are additional power lines.

7              THE COURT:  And in between those two

8    parallel blue lines, is that all easement that you

9    can't build on?

10             THE WITNESS:  Yes, sir.  I kind of went up

11   a little bit, so, forgive me, but hopefully -- yeah,

12   on the left-hand side, the western side it cheated up

13   a little bit by accident, but, yes.

14             Where I have it hashed here, that's

15   roughly the large power lines, and there's also

16   power lines over here.

17             Over here is the recycling plant, which

18   this is a good ariel because you can actually see

19   the area that they've actually covered, and when

20   I was at the property yesterday, they were

21   actually working in this area here, and not

22   visible here there's two smoke stacks that are

23   visible.

24             So it's a little bit unique from that

25   standpoint for residential property to have power

1    line easements.

2          This will be your north side up here,

3    mostly your residential single family townhouses,

4    single family homes, townhouses, possibly

5    apartments.

6          And then you have power line easements

7    on two sides and over here you have a recycling

8    plant.

9          THE COURT:  The bottom blue line would be

10   the boundary between what you call the north parcel

11   and south parcel?

12         THE WITNESS:  Yes, your Honor, I'm calling

13   everything, if I go back here, I'm calling everything

14   above here the north parcel.

15         THE COURT:  Okay.  So the top blue line?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  And then where it's sort of

18   shaded, is that the boundary for what you call the

19   east ---

20         THE WITNESS:  Over here, I'm calling this

21   the east parcel.

22         THE COURT:  Right.

23         THE WITNESS:  It was pretty much for

24   industrial-type use.

25         THE COURT:  Okay.

Page 29

1          THE WITNESS:  And then our third parcel
2    would be this parcel down here, which I'm referring
3    to as the south parcel.
4          THE COURT:  All right.  Okay.
5    BY MS. MORA:
6          Q    Okay.  Mr. Waronker, is there an
7    infrastructure on the property?
8          A    Yes, there is.
9          Q    Okay, and could you describe to the Court
10   what you mean by the term infrastructure?
11         A    Infrastructure would be roads paved,
12   gutter, there was manhole covers for water, sewer, it
13   looks like in some areas there's electric that's been
14   brought in, possibly water brought in.
15             So anything that helps the builder complete
16   the property in order to then sell it off as
17   residential homes or retail use, that's part of the
18   infrastructure to help in the development process.
19         Q    Okay.  Now ---
20             THE COURT:  Mr. Hanson's report had some
21   pages that I think came from an engineer that talked
22   about the percentage completion of certain
23   infrastructure.
24             Did you look at those and do you know
25   whether -- do you have any reason to question

Page 30

1    those?

2            THE WITNESS:  No reason to question those,

3    your Honor.

4            THE COURT:  Okay.  So the earth work,

5    paving and grading, and water distribution, sanitary

6    sewer, all that in the CDD report, you would accept?

7            THE WITNESS:  Yes, your Honor.

8            THE COURT:  Okay.  That was Pages, just for

9    the record, 57 through 60 of the Hanson report.

10            All right.  Go ahead.

11    BY MS. MORA:

12       Q    All right.  Mr. Waronker, I just put up on

13    the screen a plat map that was obtained from the

14    Dade County Property Appraiser's website.

15            Are you familiar with this diagram or this

16    picture?

17       A    Yes, I am.

18       Q    Can you describe to the Court what this is?

19       A    That is the Miami-Dade County's tax folio

20    number, which takes into consideration the property

21    that would be the streets owned by the CDD.

22       Q    Okay, and how does the infrastructure fit

23    in with those streets owned by the CDD?

24            THE COURT:  Ms. Mora, is this an exhibit

25    that you're ---

1          MS. MORA:  Yes, Judge, it's Page 5D.

2          THE COURT:  All right.  If it's part of 5,

3  it's part of the report?

4          MS. MORA:  Yes.

5          THE COURT:  Okay.  All right.

6          THE WITNESS:  Those would represent the

7  roads that are -- that are built on the property that

8  allows access throughout the subdivision.

9  BY MS. MORA:

10     Q    Okay, and does the infrastructure that you

11  mentioned, the roads, the curbs, the water pipes,

12  sewage pipes, are those on the -- as far as you know,

13  are those on the property that's owned by the

14  District?

15     A    To the best of my knowledge, yes.

16     Q    Now, let's turn to your methodology.  What

17  methodology did you use to value the debtors'

18  property?

19          THE COURT:  Hold on, I'm confused.  The big

20  grid of red is not the debtors' property on this

21  picture?  Where does the debtors' property end?

22          Let me go back to the other map, I

23  guess.

24  BY MS. MORA:

25     Q    Mr. Waronker, can you please explain to the

1    Court what the nature is of the property that is

2    highlighted in red on this map?

3         A    It gets a little bit confusing because,

4    your Honor, these are red lines, so between those red

5    lines are the roads.

6              THE COURT:  Let me go back to something

7    more basic.  The western boundary of the debtors'

8    property is 107th Avenue, and then the southern

9    boundary of the southern parcel is 58th Street;

10   right?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Okay, and then when it jogs in,

13   what street is that, that kind of intersects or about

14   where would that be?  I don't know if there is a

15   street in between the north and south.

16             THE WITNESS:  This right here would be

17   62nd Street, is the way they identify it right here.

18             THE COURT:  Okay.  All right.  So when we

19   go back to 5D -- wait, maybe I was asking the wrong

20   question.  I was asking, what is the -- when you said

21   62nd Street, that's the northern -- no, that's

22   the ---

23             THE WITNESS:  No, sir, that would be the --

24   right where those power line easements are.

25             THE COURT:  Right.

1          THE WITNESS:  It's like right here.

2          THE COURT:  Okay.  All right.  So what's

3    the northern boundary of the project, it's about 67th

4    or ---

5          THE WITNESS:  It would be approximately

6    67th, yes, your Honor.

7          THE COURT:  Okay.  All right.  So all of

8    the stuff in red, isn't that the north -- what we've

9    been calling the north parcel?

10         THE WITNESS:  It's within what we call the

11   north parcel, but that red that you see is really

12   just outlining -- it's a little bit confusing, but

13   it's really outlining the roads.

14         THE COURT:  All right.  So the District

15   owns the roads once they're in?

16         THE WITNESS:  Correct.

17         THE COURT:  But all the stuff in between

18   the roads is what we've identified as the north

19   parcel?

20         THE WITNESS:  Yes, that would be the north

21   parcel portion that you can actually build on.

22         THE COURT:  Okay.  All right.  So I'm with

23   you.  Go ahead.

24   BY MS. MORA:

25      Q    All right.  Let's turn to methodology, Mr.

1  Waronker.  What methodology did you use to value the

2  debtors' property?

3       A    I used a sales comparison approach, broke

4  down the three tracts as we identified a few minutes

5  ago, as to north parcel, the south parcel, and then

6  the east parcel.  Different sales were used for each

7  one of those tracts.

8       Q    Did you consider using either the cost

9  approach or the income approach?

10      A    No, I did not.

11      Q    And why?

12      A    Those wouldn't be applicable for the

13  specific purpose of this appraisal.

14           THE COURT:  I think the appraisers agree on

15  that; right?  Yes?

16           THE WITNESS:  I believe so, your Honor.

17           THE COURT:  So then let's move on.

18  BY MS. MORA:

19      Q    All right.  Mr. Waronker, did you also

20  consider using the residual land value approach?

21      A    No, I did not.

22      Q    Okay, and why is that?

23      A    Well, we did a -- well, there's --

24  there's -- things are very similar, one is a land

25  residual.  We did a residual analysis, which is

1    really a discounted cash flow analysis, a subdivision

2    analysis for raw land, taking it from currently until

3    it would be developed, selling it out and discounting

4    that back to see what somebody would pay for the

5    property in its current state.

6            You can call it residual analysis, you can

7    call it a discounted sell-out analysis of

8    subdivision.  It has some different nomenclature.

9            THE COURT:  But from an appraisal

10   standpoint, there's too many variables and

11   assumptions for that to really be a basis for market

12   value?

13           THE WITNESS:  Yes, your Honor.  We just did

14   that, and we noted it in our appraisal, we just did

15   it as a -- and we footnoted it, we just did it as a

16   test, a sensitivity test.  One small change in either

17   direction can cause a large degree of change in

18   value.

19   BY MS. MORA:

20       Q    Mr. Waronker, let's start with your sales

21   comparison approach.  How did you undertake the value

22   of the property through that approach?

23       A    Well, we started with north parcel.  We

24   looked at ---

25       Q    If you could, would you turn to Exhibit 2?

1     A    Yes, I will try.  Okay.  Yeah, that's our

2   valuation of the north parcel.  We have six

3   comparable sales labeled N1 through 6, representing

4   the sales we used for the north parcel.

5     Q    What I'm asking you to do, Mr. Waronker, is

6   to describe the methodology that you used in

7   employing the sales comparison approach to the Court?

8     A    Okay.  We looked at the six sales, as you

9   see in front of you, and then we make what we call

10  qualitative adjustments to the sales, indicating

11  whether or not they're better or worse than the

12  subject property.

13          If the comparable is better, you would

14  subtract; if the comparable is inferior, you would

15  add.  We went through adjustments for conditions of

16  sale, market conditions, location, size and shape,

17  other category, and then an overall adjustment of

18  what we felt would represent the value of the

19  property based upon all of the different adjustments

20  and things we looked at, the characteristics we

21  looked at.

22    Q    Why did you choose the properties that you

23  did as sales comparisons in applying this approach?

24    A    Well, Sales 1 through 3 are right there in

25  the subject area or the same section, your Honor, the

1   same sales that were used by Mr. Hanson in their

2   appraisal report.

3          Sales 4, 5 and 6 were just used because

4   they were large tracts of recent sales.  In this

5   current market it's difficult to find recent sales,

6   so we ventured out.  On the bottom line, we pretty

7   much relied on Sales 1, 2 and 3.

8          Q    What about for the south and east parcels?

9          A    The south and east parcels would be the

10  same.  We used different sales for the south and east

11  parcels.

12         On the south parcel we used five sales ---

13         Q    Are you now referring to Exhibit 3,

14  Mr. Waronker?

15         A    Yes, I am.

16         THE COURT:  Ms. Mora, are you going to go

17  into the specific adjustments at all, otherwise ---

18         MS. MORA:  Yes, we are, Judge.

19         THE COURT:  Okay.

20         MS. MORA:  We'll come back to that.

21         THE COURT:  Okay.  Good.

22         THE WITNESS:  On the south parcel we used

23  five sales, of which two were in Doral, of which one

24  we thought was the best comparison, which would have

25  been S2, very similar in size to the subject property

1    and having sold in 2011.

2    BY MS. MORA:

3        Q    And the sales that you have listed on

4    Exhibit 3, were all sales of commercial industrial

5    parcels?

6        A    Commercial properties.

7        Q    Okay.  Now, going back to the properties

8    that you have listed in Exhibit 2, why did you choose

9    vacant land for comparison purposes?

10       A    Well, the subject is vacant land that would

11   be bought by a developer in order to then build homes

12   on it.

13       Q    Were there any subdivision sales that you

14   could have used for the sales comparison approach?

15       A    We researched for subdivision sales, land

16   sales.  There's very limited sales data in this

17   marketplace, especially in the residential market,

18   which is -- pretty much is common knowledge it has

19   not been very active in the last few years.

20           THE COURT:  What do you mean by vacant land

21   sales for development and subdivision sales?  You

22   mean a subdivision that's actually already platted or

23   something?

24           THE WITNESS:  Yes, your Honor, you can find

25   a subdivision that's already been platted, maybe

1    somebody is buying up a gross amount of lots in that

2    subdivision.

3            This particular subdivision was not

4    complete.  The pads were not at grade level and

5    per the estimate by Alvarez, there's roughly

6    almost $16 million left to complete the

7    infrastructure, to make it comparable to

8    something that's already completed and ready to

9    build on.

10   BY MS. MORA:

11   Q    All right.  Now, let's turn to the specific

12   listings that you have for the north parcel.

13           Mr. Waronker, what adjustments did you make

14   to each of the comparables in order to determine

15   their impact on the value of the subject property?

16   A    Well, we looked at, as I stated earlier, a

17   few things, one would be conditions of sale.  If

18   there was something -- condition of sale adjustment

19   would be an adjustment that maybe the party was --

20   excuse me, the property was sold to related parties

21   and would indicate a reason why the property might

22   have sold for a higher price.  It could have been

23   undersold because maybe it was distressed, so you

24   would plus that adjustment.

25           So condition of sale is something having to

1    do with some -- something a little bit different than

2    the typical motivation that you would see of a buyer

3    and seller.

4         Market conditions has to do with -- we

5    usually call that time adjustment, market -- what

6    differences of market conditions between when the

7    property -- the comparable sold and then the current

8    date of value.

9         And then we make adjustments for location,

10   zoning, size and shape, other if it's applicable.

11   And then look at the magnitude of the adjustments and

12   come up with a qualitative adjustment at the end.

13        Q    Well, let's now turn to the specific

14   properties that you used as sales comparables, and

15   let's talk about each of them, if we could.

16        Let's start with Sale Number N1.

17        A    Okay.  Sale N1 is located just north of the

18   subject property fronting on 107th Avenue, purchased

19   by the Terra group in September 2011, fairly

20   recently.  I'm sorry, my apologies.  Purchased, yes,

21   September 2011 for $14 million.  It does have an

22   easement on the west side of the property, east side

23   of 107th Avenue, and as I said, the buyer was Terra,

24   with plans to build a townhouse project.

25        Q    What adjustments did you feel needed to be

Page 41

1   made to Sale Number N1 in order to compare it to the

2   subject property?

3        A    I made a downward adjustment for conditions

4   of sale, as we state on Page 66 of our report,

5   because the grantee is really a joint venture with,

6   per our confirmation, no money put in by the buyer.

7   So it's a very unrisky situation from the buyer's

8   standpoint and really just kind of a joint venture.

9   So this was a price set for the joint ventureship

10  agreement, so it was not exposed to the open market

11  for this particular sale.

12           THE COURT:  How would you know how to

13  adjust that to get to a market value for that

14  property?  I mean, you've got two minus signs.

15           THE WITNESS:  Uh-huh.

16           THE COURT:  How much of an adjustment if

17  it's a joint venture and you don't really know what

18  their business deal was?

19           THE WITNESS:  You don't really, your Honor,

20  other than the fact if they put no money down, that

21  comes under a typical adjustment you would make

22  either under financing or conditions of sale.

23           The ideal textbook way to do it would

24  be to find two sales that are similar in all

25  respects, except for one, and the operative word

Page 42

1  there is ideal textbook.  It just doesn't happen,

2  there's insufficient sales in the market, but

3  when you talk to people over the years who have

4  bought property, when they get involved and

5  they're not purchasing the property outright and

6  they're purchasing it as part of a joint venture,

7  then the price is set -- can be set at a certain

8  level for a myriad of reasons.  Sometimes it's

9  set high so that the bank will look at that and

10 provide a little higher financing on the

11 property.

12         So to directly answer your question,

13 there really is no way, that's why we use

14 qualitative, understanding that the buyer in this

15 particular case felt that the price was high

16 because it was not a typical transaction, it was

17 a joint venture transaction.

18 BY MS. MORA:

19    Q    Mr. Waronker, let's turn to -- let me ask

20 you if you've finished describing whether or not

21 there are any other adjustments that you had to make

22 to Sale N1?

23    A    Sale 1 we also adjusted for location and --

24 I'm sorry, wrong page, I apologize.

25         THE COURT:  Size, shape, you have ---

Page 43

1        THE WITNESS:  Yeah, I want to get to my

2   page so I can make sure.  Size and shape, and then

3   other.

4        THE COURT:  Well, you have a negative for

5   size and shape.  Why is that?

6        THE WITNESS:  That parcel is 20 acres.  The

7   subject parcel is roughly 59 acres.  Typically, the

8   larger parcel will sell for less price per square

9   foot, and you kind of see that a little bit.  If you

10  look at N2 and N3, one being 32 acres, one being 17

11  acres, you see a slightly less price per square foot

12  per acre for Sale N2, which is larger than N3.

13  BY MS. MORA:

14      Q    Okay.  Mr. Waronker, let's turn to Sale N2.

15  Can you describe what this property is?

16        THE COURT:  I'm sorry, just very quickly.

17  You have a plus sign for other.  What does that mean?

18        THE WITNESS:  We say here that the north

19  parcel is defined -- we've given the net acreage in

20  Sale N1 is encumbered by one of the same easements

21  that run through the subject property.  We priced it

22  up, we plused it upwards.

23        Probably we would have been better off

24  just taking it out, and just netting it out and

25  show the price per square foot of the net area,

Page 44

1    but we just give it a plus adjustment.

2           THE COURT:  Okay.  So for whatever it

3    translates to, when you have your lines of pluses and

4    minuses, you just see how many negatives and how many

5    positives and that yields whether you've got two

6    minuses or a plus or an equals?

7           THE WITNESS:  Typically some of those

8    issues may be a little bit more -- carry more weight

9    than the others, but it just gives the reader an idea

10   of our thought process and why we're estimating the

11   value of the subject property based upon these

12   characteristics of the sales.

13          Again, ideally if you had a lot of

14   sales, you could make percentage adjustments, but

15   that's not the case, especially in this

16   marketplace.

17          THE COURT:  Okay.

18   BY MS. MORA:

19      Q    All right.  Mr. Waronker, can we turn to

20   Sale N2, and can you describe what that property is

21   to the Court?

22      A    N2 are two tracts, again purchased by Terra

23   in September of 2011, located north of the subject

24   property and just east of -- excuse me, just west of

25   102nd Avenue.

Page 45

```
 1              THE COURT:  So is it right next to N1?
 2              THE WITNESS:  It is just to the east of N1.
 3              THE COURT:  You mean west?
 4              THE WITNESS:  No, N1 is to the east -- N1
 5    is to the west, those two are to the east.  You want
 6    me to go back to that map and maybe ---
 7              THE COURT:  I guess.  I'm just reading, the
 8    location of N1 says east side of Northwest 107th and
 9    N2 says west side of -- oh --
10              THE WITNESS:  102nd.
11              THE COURT:  -- 102nd, I'm sorry.  West side
12    of 102nd.
13    BY MS. MORA:
14        Q    Would it help you to identify on this map,
15    Mr. Waronker, where these properties are?
16              THE COURT:  Which map are we on?
17              MS. MORA:  5A, Judge.
18              THE COURT:  Okay.
19              MR. HUDSON:  Judge, again, I'm happy to
20    tender a map that has them already identified for
21    everyone.
22              MS. MORA:  Well, Mr. Hudson, I'm happy to
23    let you do that when you have ---
24              THE COURT:  All right.  I think I
25    understand it, but go ahead.
```

Page 46

1          THE WITNESS:  Do you want me to show them,

2    your Honor?

3          THE COURT:  Yes.  I mean, on this -- on

4    this map, which is -- I know where 100 ---

5          THE WITNESS:  N1 would be roughly over

6    here, and then N2 or two tracts that are roughly here

7    and here, if you would.

8          THE COURT:  Okay.  So there is no

9    102nd Avenue?

10          THE WITNESS:  It's a dirt road, your Honor.

11          THE COURT:  Okay.  It would run in between

12    your little circles?

13          THE WITNESS:  Right here is 102nd Avenue.

14    This is 107th.

15          THE COURT:  Okay.

16          THE WITNESS:  This would be like a -- this

17    quarter section line, these things would actually

18    come out like that, like that, and then like that.

19    So you have N1 over here, and then you've got N2.

20          THE COURT:  So those two parcels together

21    are roughly the size of the north parcel, right, or

22    close, 50 something?

23          THE WITNESS:  Thirty-two acres, your Honor,

24    versus 50 ---

25          THE COURT:  No, no, the two parcels, N1 and

Page 47

1  N2 together --

2          THE WITNESS:  Oh.

3          THE COURT:  -- which are right next to each

4  other.

5          THE WITNESS:  Yes, sir.  Yes, your Honor,

6  32 plus 20, yes, sir.

7          THE COURT:  All right.  Okay.  So let's --

8  you were going to get into N2, go ahead.

9  BY MS. MORA:

10     Q    Mr. Waronker, could you describe to the

11  Court what adjustments you felt needed to be made to

12  make N2 comparable to the subject property?

13     A    Condition of sale for N2, I think because

14  they're an adjacent owner, nearby owner; marketing

15  conditions we did not make; location ---

16          THE COURT:  Is it the same grantor?

17          THE WITNESS:  No, your Honor, different

18  grantor.

19          THE COURT:  Also a joint venture between

20  Terra and the seller?

21          THE WITNESS:  No, your Honor.

22          THE COURT:  All right.  Then I don't

23  understand the adjustment, because I thought the

24  adjustment for N1 was because there was a joint

25  venture and you didn't know whether the price may

1   have been inflated for -- not -- well, I guess

2   inflated for other reasons.

3           N2 is an unrelated seller?

4           THE WITNESS:  N2 is an unrelated seller.

5           THE COURT:  Why would you have two minuses

6   for conditions of sale?

7           THE WITNESS:  On Page 77 we say the land

8   venture partner is a company related to Terra

9   regarding the last project ---

10          THE COURT:  Wait, wait, wait, slow down a

11  little bit.

12          THE WITNESS:  I apologize.

13          THE COURT:  On 77 ---

14          THE WITNESS:  On Page 77 under conditions

15  of sale, we state the venture partner is a company

16  related to Terra World Investments, a developer that

17  has completed several residential projects in the

18  area and recently purchased other nearby parcels, N2

19  and N3.

20          We go on to say, though this sale

21  should be given minimal weight in the analysis

22  due to the fact that the parties are related ---

23          THE COURT:  Wait, wait.  Read a little

24  slower for the court reporter.

25          THE WITNESS:  I'm sorry.  This sale should

Page 49

1   be given minimal weight, we're talking about N1, in

2   the analysis due to the fact that the party ---

3            THE COURT:  You're not reading any slower.

4            THE WITNESS:  Okay.  I apologize, your

5   Honor.

6            Though this sale should be given

7   minimal weight in the analysis due to the fact

8   that the parties are partially related and no

9   cash was exchanged, a negative adjustment is

10  indicated because of the partner's other buying

11  activity indicates they have an interest in

12  assembling multiple tracts in the area.

13           Sale N2 requires a negative adjustment

14  for the same reason, meaning that the buyer of N2

15  is the same as the other buyer, and they are

16  buying all sorts of properties in the area, and

17  typically, somebody who is buying nearby and/or

18  adjoining property pays a premium because then

19  they can offset some of their costs of marketing

20  with contiguous developments and parcels.

21  BY MS. MORA:

22      Q    Mr. Waronker, what other adjustments did

23  you make to Comp N2?

24      A    We plused it for location, and that was it.

25      Q    All right.  Let's turn to Comp N3.  Can you

1    describe what that property is to the Court?

2        A    That is a property that is directly east of

3    the south parcel of the subject property, also

4    purchased by Terra.  That project will be called

5    Doral Cay, to be developed with a hundred and sixty

6    unit townhouses, was purchased in August of 2011 for

7    $9 million.

8        Q    And did you feel it necessary to make any

9    adjustments to this sale comp in order to make it

10    comparable to the subject property?

11        A    The only adjustment there was size and

12    shape, everything else was considered basically

13    comparable.

14        Q    What was the size and shape issue with

15    respect to this property that caused you to make an

16    adjustment?

17        A    That particular parcel is 17 acres and it's

18    less than the 56 acres, roughly, of the -- 59 acres,

19    I apologize, of the north tract.

20            THE COURT:  N3 is ---

21            THE WITNESS:  Adjacent on 58th Street

22    frontage, your Honor, just east of the south tract.

23    That would be this piece right here, your Honor.

24            THE COURT:  Okay.

25            THE WITNESS:  Sold for $12.15 a square foot

Page 51

1    in August of 2011.

2    BY MS. MORA:

3        Q    Okay.  Mr. Waronker, were those all the

4    adjustments that you made to Sale N3?

5        A    Yes, they were.

6        Q    Let's turn to Sale N4.

7        A    All right.

8        Q    Can you describe that property to the

9    Court, please?

10        A    Sale N4 is way west, Miami-Dade County, off

11    of Sunset Drive, 163rd Avenue, sells for 4.94 a

12    square foot, 362 lots that had been developed with

13    roads and utilities to the site.  The price paid was

14    $7.60 a square foot -- I apologize, I'm doing that

15    again, my apologies, that was Sale 5 I was just

16    talking about.

17            Sale 4 is on Sunset Drive, is approximately

18    a ten acre tract that sold for $4.94 a square foot

19    and the buyer is going to do 58 townhouses.

20        Q    What adjustments did you make to Sale N4 to

21    make it comparable to the subject property?

22        A    N4 was inferior in location, so we plused

23    it, smaller in size and shape, and then we had

24    another adjustment.

25        Q    And what was the other adjustment that you

1    made?

2         A    Sale 4 contains a lake of significant size,

3    which limited the usable portion of that property, so

4    we felt that it kept the price lower, so we plused it

5    to indicate that it would be a higher price.

6         Q    All right.  Let's turn to Sale N5.  Can you

7    describe that property to the Court?

8         A    N5 is very far south in Homestead.  This

9    was the one that I was talking about that had 362

10   lots.  It was just used because it is a large tract

11   of 25 acres, albeit inferior in location to the

12   subject property.

13        Q    What adjustments did you make to Sale N5 to

14   make it comparable to the subject property?

15        A    Large location adjustment for being way far

16   south, minus adjustment for size, and then a minus

17   adjustment for other.

18        Q    And do you recall what the basis was for

19   the adjustment for other?

20        A    That particular sale had some finished lots

21   with roads already completed, and not included in the

22   total acreage as reported.

23             THE COURT:  I didn't hear the last ---

24             THE WITNESS:  And not reported in the total

25   acreage, so it was like a net amount of land.

Page 53

1          THE COURT:  Okay.  Let's keep going.

2    BY MS. MORA:

3          Q    All right.  Mr. Waronker, let's turn to

4    Sale N6.  Could you please describe that sale -- that

5    property to the Court?

6          A    N6 is a sale of almost 40 acres in

7    Miami Gardens, way north of the subject property, and

8    planning approximately 638 homes, selling in August

9    of '09.  It was used, again, because it was a large

10   tract for a residential purpose.  Adjustments were

11   made for location primarily.

12         Q    All right.  After making these adjustments,

13   Mr. Waronker, what is your opinion of the market

14   value of the north parcel?

15         A    The equivalent value of the north parcel

16   was $11 a square foot for 59.335 acres, with a value

17   of $28,400,000 rounded.

18         THE COURT:  Where did you get the 59.3?

19   There seemed to be -- I don't want to dwell on it if

20   there's not an issue, but there seemed to be a

21   difference between your report and Hanson's in the

22   acreage, or did I miss something?  I was looking at

23   the ---

24         THE WITNESS:  Let me get to that, your

25   Honor.  His net area for the north piece is

1    approximately 64.8 and we used 59.35.  I don't

2    know ---

3              THE COURT:  You don't know why?

4              THE WITNESS:  No, sir.

5              THE COURT:  Where did you get your 59.3,

6    how was that calculated?

7              THE WITNESS:  We have a calculation in the

8    beginning of our report, which breaks down how we got

9    it on Page 19 of our report, I believe.

10   BY MS. MORA:

11        Q    Would you explain to the Court how you

12   derived that in methodology?

13        A    Page 19 we start with a total land area by

14   the tax folio numbers and then subtract the power

15   line easements, and then do some calculations to try

16   to get to what we considered to be the north parcel.

17             I do believe, your Honor, our east parcel

18   is 12.576 and Mr. Hanson's is smaller.  I think the

19   two together might ---

20             THE COURT:  Might be where you had the

21   boundary?

22             THE WITNESS:  It might be how we identified

23   it.  8.8 plus 64.8 is 73 something, plus or minus.

24             THE COURT:  Let me interrupt for a second.

25   Is this going to be an issue in argument about value,

Page 55

1    the different acreage?

2             MS. MORA:  I don't think so, your Honor.

3             MR. HUDSON:  On that particular narrow

4    issue, Judge, no.

5             THE COURT:  Okay.  Then I'll refrain from

6    further questions on that calculation of square

7    footage or acreage for the moment.

8             Go ahead.

9    BY MS. MORA:

10       Q    As long as the Judge has raised it,

11   Mr. Waronker, you did review Mr. Hanson's report;

12   correct?

13       A    Yes, I did.

14       Q    And were the properties you selected to

15   compare with the north parcel, the subject property,

16   different than the properties selected by Mr. Hanson?

17       A    No, he used four sales of which three were

18   the same sales that I used.

19            MR. HUDSON:  I might as well make this

20   objection now.  We're going to object to any

21   testimony regarding this witness with respect to

22   Mr. Hanson.

23            Apparently the scope of his engagement

24   changed after we took his deposition, we were not

25   told that, your Honor.  So we would object to any

1  questions of this witness regarding Mrs. Hanson's

2  report.

3          THE COURT:  I'm going to overrule it.  I

4  think it's implicit that each of the experts was

5  going to talk about the other.

6          So three of his four were the same

7  comps and his fourth one was different?

8          THE WITNESS:  Yes, your Honor, his fourth

9  sale was a sale purchased by the City of Doral that

10 we did not use.  The other three are Sales N1, N2 and

11 N3 in our report.  So we used three -- I don't think

12 there's any argument to the sales.

13         I would say to your Honor, 4, 5 and 6

14 were just there with very little reliance, the

15 best reliance would be on 1, 2 and 3, which are

16 right there in the same section of the subject

17 property.

18         THE COURT:  I didn't go cover to cover, but

19 I think I hit the highlights.  Is there anything

20 quantitative in terms of how you look at all your

21 pluses and minuses, and the price per acre of the

22 comps and wind up at 11 per -- $11 a foot?

23         THE WITNESS:  Looking at N1, N2 and N3,

24 which would be the ones that are of primary

25 relevance, the main reason, if everything else is

1    looked aside, we're dealing with a difference of 59

2    acres with the closest sale being 32 acres, which is

3    not quite half the size, but close.

4            Again, I'd point out to your Honor that

5    N3 and N2 are similar, both of us used them as

6    comparables.  N2 is almost twice the size and

7    shows a little bit of a decrease from 12.15 to

8    11.69 per square foot.

9            And then the correlation was 11, mostly

10   on size, also giving some consideration to the

11   subject property, the north parcel has power line

12   easements on the west side and on the south side

13   of it.

14           The other parcels, one had it on --

15   power lines on the west side, one did not have

16   any.  All of them are generally of the recycling

17   plant, so it just would depend on what day the

18   wind is blowing -- you know, what time of the day

19   the wind is blowing when you're there.

20           THE COURT:  When you were out there you

21   actually smelled the recycling or power plant?

22           THE WITNESS:  Yes, your Honor, we were out

23   there yesterday -- yesterday in the morning.  When we

24   first went on the site, the wind was blowing

25   northwest, so it was kind of crossing over the

Page 58

1    property and we did not smell anything on site.

2            As we were walking around the property,

3    the wind swirled.  I threw up some leaves to see

4    which way it was going, it now was coming back

5    more south and west, and then you could smell, it

6    would be a -- I would describe it as Cuban coffee

7    with a little bit of burnt flavor to it.

8            THE COURT:  Okay.

9    BY MS. MORA:

10       Q    All right.  Mr. Waronker, let's turn to the

11   south parcel, if the Court doesn't have any more

12   questions.

13           THE COURT:  No, okay.  That's fine.

14   BY MS. MORA:

15       Q    What properties did you select for

16   comparison purposes for the south parcel?  Let's

17   start with S1.

18       A    S1 is located far south, but it is a seven

19   acre tract with South Dixie Highway frontage.  In our

20   experience, South Dixie Highway does command a

21   premium of -- for business usage, and it was just an

22   indication of a recent sale, having sold in August

23   2011, where they indicated a value of $22 per square

24   foot.

25       Q    And what adjustments did you make to Sale

1   S1 to make it comparable to the subject property?

2       A    Decreased it for location, because of the

3   frontage on Dixie Highway, overall adjustment

4   downward, very, very slight.

5       Q    Let's turn to Comp S2.  Can you describe

6   that property to the Court?

7       A    S2 is probably the best indication, it's on

8   the northeast corner of 41st Street and 117th Avenue.

9   It sold a couple of times, the most recent sale was

10  in May of 2011.  It's 16.41 acres, very close in size

11  to the subject property, indicating a price of

12  $19.24.

13      Q    Did you make any adjustments to Sale S2 to

14  make it comparable to the subject property?

15      A    It was sold from a bank, so we plused it

16  for that particular reason.  The location is superior

17  in that that sale has extensive frontage on

18  Northwest 41st Street, and limited depth, versus the

19  subject property, who has limited frontage on

20  58th Street and extensive depth.

21      Q    All right.  Let's turn to Sale S3.  Please

22  describe what that property is to the Court.

23      A    That's a sale of a business zoned property

24  in Hialeah Gardens north of the subject property, a

25  large four acre tract, again sold in 2011 for $13.61

Page 60

1    a square foot.

2        Q    And did you need to make any adjustments to

3    make this property, S3, comparable to the subject

4    property?

5        A    Adjusted upwards for location, being that

6    Doral is superior; downward for zoning; size and

7    shape, it's a smaller piece, four acres.  Overall

8    adjustment was we felt that the subject property

9    should be valued higher than $13.61.

10       Q    Let's turn to Comp S4.  Please describe

11   that property.

12       A    S4 is on the southeast corner of

13   Northwest 17th and 111th Avenue, directly east of the

14   Dolphin Mall, a much smaller site, zoned for business

15   use.

16           The adjustment, we felt that it was

17   inferior in that it was adjacent to the Dolphin Mall,

18   which is a good retail location, very small site,

19   only two acres.

20           Therefore, the overall adjustment was

21   negative, indicating that based upon that sale, the

22   subject property should sell for less than 24.82 per

23   square foot.

24       Q    And finally, let's turn to Sale S5.  Please

25   describe that sale to the Court.

1       A    S5 is the northwest corner of 58th Street

2  and 102nd Avenue, right in Doral.  It's an older

3  sale, sold in 4 of '09, 2.49 acres, much smaller, for

4  just under $30 a square foot.

5           Our adjustments were location, in that it

6  is a corner property with better direct access, size

7  and shape is much smaller, and overall we felt the

8  subject property should be valued less than 29.95 per

9  square foot.

10           THE COURT:  Why was that even a comp?

11           THE WITNESS:  Well, because it's a

12  commercial property in Doral, your Honor.

13           Lately there's been -- there's better

14  comps than we had a few years ago, but there's

15  still not a plethora of comparable sales, so

16  we -- and it was right there in Doral very close

17  to the subject property.

18  BY MS. MORA:

19       Q    Mr. Waronker, were the properties you

20  selected to compare with the south parcel, the

21  subject property, different then the properties

22  selected by Mr. Hanson?

23       A    Yes, Mr. Hanson did not use comparable

24  sales.  For that property he -- for the south

25  property he used a residual approach for the office

1  and retail space, and then a value per unit for the

2  condominiums that he would project to put on that

3  part of the site.

4      Q    All right.  In reaching an opinion of value

5  for the south parcel, were you aware that there was a

6  parking structure on the debtors' property?

7      A    It would be hard to miss that, yes.

8      Q    Perhaps we should go back to the map and

9  you can identify that for the Court.

10     A    It's right ---

11     Q    Sorry, I'll move it back.

12     A    You're trying to challenge me.  It's this

13  structure right here.

14          THE COURT:  So it's on the east side of the

15  south parcel?

16          THE WITNESS:  Yes, your Honor.  It's -- if

17  I can clear -- yes, there's a road access right about

18  here.  This is a road, as you might be able to see

19  it, it goes into the north parcel.  So this parcel is

20  bifurcated by the road here in the middle.  One side

21  is the garage, the other side is vacant.

22  BY MS. MORA:

23     Q    Did you give any value to the parking

24  structure in developing your opinion of value for the

25  south parcel?

Page 63

1        A     I did not.

2        Q     Why not?

3        A     It's my understanding that the garage is

4   owned by the CDD, so it would not be under the

5   ownership of anybody buying this property.

6        Q     After making the adjustments you described

7   and the additional ---

8              THE COURT:  Is that an agreed fact?

9              MR. HUDSON:  No.

10             THE COURT:  Why do you think it's owned by

11  the CDD?

12             THE WITNESS:  Discussion with counsel,

13  Mr. Cannon's deposition, discussion with

14  Mr. Fishkind, all said it was built with public funds

15  and that a public garage -- public funds couldn't

16  be -- government funds, quasi-government funds,

17  couldn't be built -- couldn't be used to build a

18  private garage.

19             THE COURT:  What about the new Marlins

20  Stadium?

21             THE WITNESS:  Anything is possible in

22  Miami, your Honor.

23             THE COURT:  Okay.  We won't get into that.

24  I'm sure that will be a subject of litigation in

25  another court, probably not bankruptcy.

Page 64

BY MS. MORA:

Q    Mr. Waronker, after making these adjustments and undertaking this additional analysis you just described, what is your opinion of the market value of the south parcel?

A    The conclusion for the south parcel was $19 per square foot for 15,000 -- excuse me, 15.595 acres, for a total of 12,900,000.

Q    Let's now turn to the east parcel.  What comparable sales did you select to determine the market value of the east parcel?

A    The east parcel, we looked -- it was for industrial use.  We looked for industrial properties in and around the general area.  We came up with five comparable sales to estimate a value for that property.

Q    All right.  Let's go -- let's go through them one by one.  Let's start with Sale E1.  Can you please describe that property to the Court?

A    Yes, I will.  E1 is on Northwest 19th Lane and 132nd Place, which would be west of the subject property with industrial zoning, selling in July 2011 for $9 per square foot.

Q    What adjustments did you have to make to make that property comparable to the subject

Page 65

1  property?

2      A    On all of these properties we adjusted

3  downward for location.  The subject industrial

4  portion would be to the very far east part of the

5  site, and not really what we would call a truly

6  accessible industrial use.  So it would have to have

7  some type of like a storage use or something of this

8  nature.

9           So we felt that all the sales were superior

10 to where the subject is, especially for

11 industrial-type use.

12           THE COURT:  Can you repeat that again --

13           THE WITNESS:  Sure, your Honor.

14           THE COURT:  -- about what the limitations

15 are and ---

16           THE WITNESS:  Can we get that map up again,

17 if that's possible?

18           MS. MORA:  Hold on.  Let me get it in

19 place.

20           THE WITNESS:  This is the parcel right

21 here, and a couple of things.  Our highest and best

22 use conclusion would be that if you have residential

23 nearby here, you wouldn't really want to put some

24 really heavy industrial use, something more casual,

25 storage for the homes that are there, and it's not,

1   at this point in time, readily accessible other than

2   a dirt road.

3            So it's at the end of a residential

4   subdivision, and I think it would limit who

5   would -- who would you put there because I don't

6   think if you sold townhouses, single family, that

7   you would want to be telling the people there

8   that you have somebody bottling some type of

9   noxious fume product or hammering away and

10  repairing cars, so it does kind of limit your

11  usability.

12           And also it would be accessible through

13  the subdivision, which would not make any sense,

14  and maybe ultimately through 102nd Avenue, so

15  it's just not an industrial location based upon

16  its proximity to the residential.

17           THE COURT:  A coffee warehouse, and maybe

18  the residents would think everything was just from

19  the coffee.  Anyway.

20           So was it in your report or elsewhere

21  that suggested that maybe it would be like a mini

22  storage type would be one use, if you get the

23  residential --

24           THE WITNESS:  We felt ---

25           THE COURT:  -- project built?

1            THE WITNESS:  Yes, your Honor.  We felt

2    that as you have more and more residences being

3    built, which would be to the north of that and

4    obviously to the west of that, that -- and it's a

5    large tract.  Part of the tract is encumbered by a

6    pond area up here, so that's not usable.  So we're

7    talking about the area that's kind of down here.  Our

8    thoughts were more ---

9            MS. MORA:  I'm sorry.  Can you highlight

10   it, Mr. Waronker?

11           THE COURT:  The lighter color is a pond?

12           THE WITNESS:  Up here is a pond.

13           THE COURT:  Oh.

14           THE WITNESS:  Up there is a pond.  So we're

15   really focusing on this area that's down in here.

16   Mini storage, small -- for the -- for the residents,

17   maybe little garages for them to park motorcycles,

18   third cars that they can't put on their own property.

19           Also, one of our thought processes was

20   for boat storage, not high dry rack storage, but

21   where you would have either an RV or a trailer

22   and a boat, no place to put it.  A lot of the

23   subdivisions do not want you having a boat in

24   front of it, so this would be a good place to put

25   a boat with a trailer, maybe rent out strips of

1    land, divide it however the person thought it was

2    practical so that somebody could store their RV,

3    a boat, trailer, things that would be not

4    preferred to be within the subdivision itself.

5                THE COURT:  But you didn't do an analysis

6    based on income that could be generated, you looked

7    at comparable sales and you just adjusted downward

8    significantly?

9                THE WITNESS:  Yes, your Honor, and so you

10   know, Mr. Hanson and I are within $100,000 of value

11   of that east parcel, so there's not really a

12   significant difference.

13               I think I'm at two million one and he's

14   at two million before he reduces it for a bulk

15   sale, so we're pretty close on that parcel.

16               THE COURT:  So you're -- maybe we don't

17   want to spend any time on it, then.  You're at 2.1,

18   even after you discount it for the four, five years

19   you think before it could be developed in conjunction

20   with the residential community?

21               THE WITNESS:  Yes, your Honor.  His value

22   is $2 million, but then he does take off 15 percent

23   of everything at the end, so you have to deduct 15

24   percent off of that, but it's not a ---

25               THE COURT:  All right.  Well, I'll leave it

1   to you, Ms. Mora, if you want to go through it in

2   more detail.  I'm not sure going through each of the

3   comps individually makes -- is going to really

4   enhance anything.

5           MS. MORA:  I agree, your Honor.

6           THE COURT:  Okay.

7           MS. MORA:  We'll get it clear on the

8   record.

9   BY MS. MORA:

10      Q    Your opinion of value for the east parcel,

11  Mr. Waronker, is the sum of what?

12      A    $2,100,000.

13      Q    Thank you.  In light of these three values

14  that you determined for the north parcel, the south

15  parcel and the east parcel, what opinion did you

16  arrive at for the total value estimate for the

17  debtors' property?

18      A    The total value estimate, $43.4 million.

19      Q    Did you apply any discount to the aggregate

20  value indications for the three parcels because the

21  appraisal contemplates the value to a single

22  purchaser?

23      A    No, I did not.  We talk about it, but then

24  we do not make an adjustment for that.

25      Q    And why did you not make an adjustment for

Page 70

1   that?

2       A    Kind of looked at them separately.  Part of

3   the thought process was that you would very likely

4   have somebody buy the north parcel as a residential

5   developer, and then that developer could just sell

6   off the south parcel and maybe even sell off the east

7   parcel.

8           So even though it's a large property all

9   together, we felt it could be sold off, and we also

10  recognized the fact that we were making adjustment

11  for the size throughout for the north parcel, so we

12  had already taken into consideration some of the

13  economies of sale of being a large parcel.

14          With all that said, we didn't think it

15  appropriate to do another deduction for a bulk sale

16  to one buyer because somebody could, we think, sell

17  all three parcels off to separate people, or one

18  person, or somebody could buy it and sell them off

19  separately, but it would not be anything that would

20  cause a need to make a reduction.

21      Q    Now, did you employ any sort of methodology

22  check on the sales comparison approach in determining

23  market value?

24      A    Yes, we did.

25      Q    And what did you do?

1      A    We did a land residual analysis, which we

2 also call a discounted sell-out analysis, that would

3 project what you could sell the homes for,

4 subtracting off what it would cost to build, how long

5 it would take them to sell out, and discount all that

6 back to a current value indication that somebody

7 would pay for the land as of today.

8      Q    Could you be a little bit more specific?

9 Is there anything in your report that we can refer to

10 to demonstrate your methodology in doing that?

11     A    All that is covered, excuse me, beginning

12 on Page 112.

13          THE COURT:  This is what I talked about

14 earlier, with all sorts of assumptions about density

15 and price of the units, cost of the units, sell out,

16 discount rate, a whole bunch of variables.

17          THE WITNESS:  Exactly right, your Honor,

18 and that's why we definitely footnoted it and said,

19 you know, it was just done for demonstrative

20 purposes, I don't think that's the exact words that

21 were used, it was done just as a check on the other

22 value.

23          And as your Honor pointed out

24 absolutely correctly, is that any change of price

25 to build it -- I should say, cost to build it,

Page 72

1   price you could sell it for, years of holding,

2   all those things would factor into changing the

3   value, so it was just one way for us just to look

4   at it.

5   BY MS. MORA:

6        Q    Let me ask you to turn to Page 117,

7   Mr. Waronker.  Does this chart summarize your

8   methodology in determining the value through the

9   residual land value analysis?

10       A    Yes, it does.

11       Q    So could you just walk us through, for the

12   record, exactly the analysis you undertook?

13       A    All right.  Well, to get to this level, we

14   came up with a highest and best use for the north

15   parcel, this is just on the north parcel.

16            We looked at the existing plan, which is

17   1100 units.  Excuse me, we looked at the Terra plan,

18   which was 400 units, we estimated 464 units based

19   upon studying what the -- what was happening in the

20   area.

21            We made assumptions as to the price per

22   square foot the properties would sell for, for both a

23   single family townhouse and for single family

24   residences.  We felt it would take two years to get

25   your plans, get your approvals, build -- start

1  building the properties and get them completed,

2  marketing them and then you would start selling them

3  and we projected a four-year sell out -- four years

4  to sell out the 464 units.

5          From that gross sales proceeds, we take

6  away the cost to build the product, both for the

7  townhouse and single family, separately as they sell,

8  and then we ---

9          THE COURT:  Embodied in those numbers is

10  the additional site work that would need to be done,

11  infrastructure and so forth or ---

12          THE WITNESS:  Yeah, it would be embodied in

13  that, and I think we even have a footnote, if I can

14  read it back ---

15          THE COURT:  I'm sorry, I do see the

16  footnote, includes hard and soft costs, all site

17  improvements and operating expenses.  Okay.

18          THE WITNESS:  Your eyes are better than

19  mine, your Honor.  Thank you.

20          Then we come to a net sales proceeds,

21  and then we take off an estimate of 20 percent

22  for entrepreneurial profit, and come out with net

23  cash flows.

24          So any project where you have -- where

25  you are taking land and then building buildings

1   on it, you're going to have a negative cash flow

2   until you start bringing sales dollars into the

3   bank account.

4   BY MS. MORA:

5       Q    Okay.  Mr. Waronker, let me ask you a

6   question about the 20 percent figure that you put in

7   for entrepreneurial profit.

8            Is that number truly all entrepreneurial

9   profit, or does your calculation include any other

10  costs in that number?

11      A    I think we have to go back and look.  I

12  think we said it would include some additional costs

13  in there, we just kind of lumped it in.

14           Profit typically would range from ten to 20

15  percent, and I think we went to the high end saying

16  that would account for some other additional costs.

17           THE COURT:  I don't think I understand how

18  that line item fits into a discounted cash flow.  If

19  you're doing valuation based on income, don't you

20  just look at the income after debt service and taxes,

21  insurance, other expenses, and then apply a cap rate?

22           I mean, if it's rental property there

23  would be a management cost, as well, but ---

24           THE WITNESS:  On rental property you're

25  exactly correct, your Honor.

1          On a subdivision analysis or a

2    valuation of land, on this analysis you have to

3    project -- you're trying to take the developer's

4    standpoint, if he or she buys a piece of

5    property, what expenses do they have over time,

6    what can they sell these units for ultimately and

7    then bring that back.

8          Probably it's better to look at here,

9    even if you take out the 20 percent, what we use

10   is about a 25 percent equity or excuse me,

11   internal rate of return.  So that says that based

12   upon one of the surveys we looked at, the

13   Realtyrates.com survey, they indicated internal

14   rate of return for this type of investment range

15   from 19, I think up to the 50s, and we used 25

16   percent.

17         So this says, for the risk of doing

18   something like this, the developer would want a

19   25 percent internal rate of return.  So you can

20   kind of look past the profit, if you want, and

21   that's discounting the numbers we call here net

22   sale proceeds.  If you discount those numbers at

23   25 percent, that brings you back to the

24   28 million, plus or minus.

25              THE COURT:  Okay.

1  BY MS. MORA:

2      Q    Mr. Waronker, based upon this analysis you

3  undertook, what opinion of value did you determine

4  for the subject property?

5      A    Well, again, we relied on the sales

6  comparison method, so our total value was still the

7  $43.4 million.

8      Q    And so at the end of the day, did the

9  residual land value approach support the opinion you

10  developed using the sales comparison approach?

11      A    For the south -- excuse me, for the north

12  parcel, yes it did, but again, as your Honor pointed

13  out, we just -- it was kind of a test, it wasn't

14  really given any reliance.

15      Q    All right.  Now, let's turn to your review

16  of Mr. Hanson's appraisal.

17          Did you observe that Mr. Hanson's aggregate

18  opinion of value is more than 50 percent greater than

19  your value?

20      A    Yes.

21          MR. HUDSON:  Objection.

22          THE COURT:  Let me interrupt for a second.

23  I know this would be a little unusual, but to try to

24  get this done most efficiently, I was thinking of

25  having Mr. Waronker's direct and cross, redirect,

Page 77

1    then putting on Hanson, getting his --

2                MS. MORA:  That's fine, Judge.

3                THE COURT:  -- direct and cross, and then

4    Hanson, having already heard Waronker, and I've heard

5    Waronker, could then talk about Waronker, and you can

6    bring Mr. Waronker back to talk about Hanson after

7    we've heard it.

8                It would be easier for me to understand

9    his --

10               MS. MORA:  Judge, that's ---

11               THE COURT:  -- criticisms.

12               MS. MORA:  I'm happy to defer the rebuttal

13   until after Mr. Hanson testifies.

14               THE COURT:  Okay.  Then ---

15               MS. MORA:  No further questions of the

16   witness at this time.

17               THE COURT:  So the report is in.  Are you

18   introducing at this point any of the other exhibits

19   through this witness or no?

20               MS. MORA:  Judge, you've already admitted 1

21   through 5 --

22               THE COURT:  Right.

23               MS. MORA:  -- and I think that's all we've

24   referred to so far.

25               THE COURT:  Okay.  All right.  Who's taking

Page 78

1    the lead in the cross?

2          MR. HUDSON:  I will, your Honor, but for

3    housekeeping, I would rather it not be broken up for

4    lunch if we can avoid that, so I have two alternative

5    requests:  One, that we take an early lunch and come

6    back early and start it or, two, that I have a

7    five-minute comfort break, either one.

8          THE COURT:  Well, let's -- when you say

9    broken up, you mean finishing the cross?

10          MR. HUDSON:  I don't want to have to break

11    at noon.

12          THE COURT:  Okay.  That's fine.  Let's take

13    a five-minute break and it would be my intention to

14    finish this witness before lunch.

15          (Thereupon, a brief recess was taken, after

16       which the following proceedings were had:)

17    * * * * * * * * * * * * * * * * * * * * * * * * *

18

19

20

21

22

23

24

25

Page 79

1

2

3                    CERTIFICATION

4

5   STATE OF FLORIDA:

6   COUNTY  OF  DADE:

7

8            I, Margaret Franzen, Shorthand Reporter

9   and  Notary  Public in  and for the State of Florida

10  at  Large,  do  hereby  certify  that  the  foregoing

11  proceedings  were  taken  before  me  at the date and

12  place  as  stated  in  the caption hereto on  Page 1;

13  that the  foregoing  computer-aided transcription  is

14  a true record of the excerpt requested of my

15  stenographic notes taken at said   proceedings.

16            WITNESS  my  hand  this  20th  day  of

17  January, 2014.

18

19

20         _____
                    Margaret Franzen
21          Court Reporter and Notary Public
           in and for the State of Florida at Large
22          My Commission Expires:  April 14, 2014

23

24

25