**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

---------------------------------------------------------X

In re:                                                   CHAPTER 11

TOWN CENTER AT DORAL, LLC, *et al.*          Case No.  11-35884-BKC-RAM
                                                         Jointly Administered

                            Debtors.
---------------------------------------------------------X

**DISCLOSURE STATEMENT RELATING TO**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE**

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
Mindy A. Mora
Tara V. Trevorrow
1450 Brickell Avenue, Suite 2300
Miami, FL 33131

**Counsel for the Debtors**

Dated: February 8, 2012

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................. 1

II.     SUMMARY OF CLASSIFICATION AND TREATMENT OF ADMINISTRATIVE EXPENSES, CLAIMS AND  EQUITY INTERESTS UNDER THE PLAN.............................................................. 2

    A.      Summary of Voting Procedures................................... 12

    B.      Overview of Chapter 11 Process.................................. 14

III.    DESCRIPTION OF THE BUSINESS ................................. 15

    A.      Corporate Structure....................................................... 15

    B.      Description of the Property........................................... 15

        1.      Prepetition Indebtedness ................................. 16

            a.      Secured District Claims ..................... 17

            b.      AMT Loan Claim ............................... 19

        2.      Other Creditors................................................ 20

        3.      Pre-Petition Litigation..................................... 20

        4.      Post-Petition Litigation ................................... 21

IV.     KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CASES ............... 21

    A.      The Decline in the Real Estate Market and  the Death of the Debtor's Former Principal ............................................................. 21

    B.      The Debtors' Business Plan.......................................... 21

V.      THE REORGANIZATION CASES ................................... 22

    A.      DIP Financing Motion and Order ................................ 22

    B.      Bar Date ....................................................................... 22

    C.      Plan Sponsor ................................................................ 22

VI.     THE PLAN OF REORGANIZATION................................ 23

    A.      Introduction.................................................................. 23

    B.      Classification and Treatment of Claims and Equity Interests under the Plan of Reorganization................................... 23

        1. Unclassified................................................................. 25

            a.      Administrative Expenses ................... 25

            b.      Priority Tax Claims............................ 25

            c.      DIP Financing Claim ......................... 26

        2.      Classified........................................................ 26

## TABLE OF CONTENTS
### (continued)

**Page**

3.  Nonconsensual Confirmation.................................................................. 34

C.  Means of Implementing the Plan ................................................................. 34

1.  Equity Contributions/New Membership Units .................................... 34

2.  Plan Funding and the New Development ............................................. 34

3.  Delivery of Documents ......................................................................... 36

4.  Cancellation of Existing Securities and Agreements............................ 36

5.  Legal Form and Governance.................................................................. 37

    a.  Amendment to Existing Organizational Documents ................... 37

    b.  Managers of the Reorganized Debtors......................................... 37

    c.  Due Authorization........................................................................ 37

D.  Securities Law Matters ................................................................................ 37

1.  Exemptions from Securities Laws ........................................................ 37

2.  Exemption from Transfer Taxes ........................................................... 38

3.  Expedited Tax Determination ............................................................... 39

E.  Plan Provisions Governing Distributions..................................................... 39

1.  Date of Distributions ............................................................................ 39

2.  Distributions Concerning General Unsecured Claims.......................... 39

    a.  Creditor Trust .............................................................................. 39

    b.  Timing of Distributions............................................................... 39

    c.  Recourse....................................................................................... 40

3.  Disbursing Agent .................................................................................. 40

4.  Rights and Powers of Disbursing Agent .............................................. 40

    a.  Powers of the Disbursing Agent ................................................. 40

    b.  Expenses Incurred on or after the Effective Date ....................... 40

5.  Delivery of Distributions ...................................................................... 40

6.  Manner of Payment............................................................................... 41

7.  Setoffs and Recoupment ....................................................................... 41

8.  Allocation of Plan Distributions Between Principal and Interest ........... 41

9.  De Minimis Distributions Less Than $25.00......................................... 41

10. Withholding and Reporting Requirements ............................................ 41

F.  Procedures for Treating Disputed Claims..................................................... 42

# TABLE OF CONTENTS
## (continued)

**Page**

| | | | |
|---|---|---|---|
| | 1. | Objections | 42 |
| | 2. | No Distributions Pending Allowance | 42 |
| | 3. | Distributions After Allowance | 42 |
| G. | | Provisions Governing Executory Contracts and Unexpired Leases | 42 |
| | 1. | Treatment | 42 |
| | 2. | Rejection Damage Claims | 43 |
| H. | | Conditions Precedent to Confirmation | 43 |
| I. | | Conditions Precedent to Effectiveness | 43 |
| | 1. | Waiver of Conditions | 44 |
| | 2. | Satisfaction of Conditions | 44 |
| J. | | Effect of Confirmation | 44 |
| | 1. | Binding Effect | 44 |
| | 2. | Discharge of Debtor | 44 |
| | 3. | Term of Injunctions or Stays | 45 |
| | 4. | Indemnification Obligations | 45 |
| | 5. | Exculpation | 45 |
| | 6. | Releases | 46 |
| | 7. | Causes of Action | 47 |
| K. | | Retention of Jurisdiction | 47 |
| L. | | Miscellaneous Provisions | 49 |
| | 1. | Payment of Statutory Fees | 49 |
| | 2. | Modification of Plan | 49 |
| | 3. | Revocation of Plan | 49 |
| | 4. | Severability of Plan Provisions | 49 |
| | 5. | Governing Law | 49 |
| | 6. | Compliance with Tax Requirements | 49 |
| | 7. | Computation of Time | 50 |
| | 8. | Notices | 50 |
| | 9. | Filing or Execution of Additional Documents | 51 |
| VII. | | CERTAIN FACTORS AFFECTING THE DEBTORS | 51 |
| | A. | Certain Bankruptcy Law Considerations | 51 |

MIAMI 2904666.4 7945135741

# TABLE OF CONTENTS
## (continued)

**Page**

|  |  |  |
|---|---|---|
| 1. | Risk of Non-Confirmation of the Plan of Reorganization | 51 |
| 2. | Non-Consensual Confirmation | 51 |
| 3. | Risk of Non-Occurrence of the Effective Date | 52 |

B.   Additional Factors to Be Considered .................................................. 52

| 1. | The Debtors Have No Duty to Update | 52 |
| 2. | No Representations Outside This Disclosure Statement Are Authorized | 52 |
| 3. | Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary | 52 |
| 4. | Claims Could Be More Than Projected | 52 |
| 5. | No Legal or Tax Advice is Provided to You by this Disclosure Statement | 52 |
| 6. | No Admission Made | 53 |
| 7. | Business Factors and Competitive Conditions | 53 |

|  | a. | General Economic Conditions | 53 |
|---|---|---|---|
|  | b. | Business Factors | 53 |
|  | c. | Competitive Conditions | 53 |
|  | d. | Other Factors | 53 |

| 8. | Access to Financing and Trade Terms | 54 |
| 9. | Lack of Trading Market | 54 |
| 10. | Restrictions on Transfer | 54 |

C.   Certain Tax Matters ............................................................................ 54

VIII.   VOTING PROCEDURES AND REQUIREMENTS ....................................... 54

A.   Voting Deadline .................................................................................. 54

B.   Holders of Claims Entitled to Vote ..................................................... 55

C.   Votes Required for Acceptance by a Class .......................................... 55

D.   Voting Procedures .............................................................................. 56

| 1. | Holder of Class 3A-3H Claims (Secured Tax Certificate Claims) | 56 |
| 2. | Holders of Class 4A-4D Claims (Secured District Claims) | 56 |
| 3. | Holder of Class 5 Claim (AMT CADC Loan Claim) | 56 |
| 4. | Holders of Class 6 Claims (Other Secured Claims) | 56 |
| 5. | Holders of Class 7 Claims (General Unsecured Claims) | 56 |

## TABLE OF CONTENTS
### (continued)

**Page**

| | | | | | |
|---|---|---|---|---|---|
| IX. | CONFIRMATION OF THE PLAN OF REORGANIZATION | | | | 56 |
| | A. | Confirmation Hearing | | | 56 |
| | B. | Requirements for Confirmation of the Plan of Reorganization | | | 57 |
| | | 1. | Requirements of Section 1129(a) of the Bankruptcy Code | | 57 |
| | | | a. | General Requirements | 57 |
| | | | b. | Best Interests Test | 58 |
| | | | c. | Liquidation Analysis | 60 |
| | | | d. | Feasibility | 60 |
| | | 2. | Requirements of Section 1129(b) of the Bankruptcy Code | | 60 |
| | | | a. | No Unfair Discrimination | 60 |
| | | | b. | Fair and Equitable Test | 61 |
| | | | c. | Secured Claims | 61 |
| | | | d. | Unsecured Claims | 61 |
| | | | e. | Equity Interests | 61 |
| X. | FINANCIAL INFORMATION | | | | 61 |
| XI. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | | | 62 |
| | A. | Liquidation under Chapter 7 | | | 62 |
| | B. | Alternative Plan of Reorganization | | | 62 |
| XII. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | | | | 62 |
| | A. | Consequences to Holders of Class 7 Claims | | | 63 |
| | B. | Information Reporting and Withholding | | | 64 |
| XIII. | CONCLUSION | | | | 65 |

# I.

## INTRODUCTION

Town Center at Doral, LLC, Landmark at Doral East, LLC, Landmark at Doral South, LLC, Landmark Club at Doral, LLC, and Landmark at Doral Developers, LLC, as the debtors and debtors-in-possession (collectively, the "Landmark Entities" or the "Debtors") and Terra Landmark, LLC ("Terra Landmark" or the "Plan Sponsor"), are soliciting acceptances of a chapter 11 plan of reorganization (the "Plan of Reorganization" or "Plan") attached as Exhibit 1 to this Disclosure Statement.  This solicitation is being conducted at this time to obtain sufficient votes to enable the Plan of Reorganization to be confirmed by the Bankruptcy Court.  Capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to such terms in the Plan.

Attached as exhibits to this Disclosure Statement are copies of the following documents:

The Plan of Reorganization (Exhibit 1);

Historical Financial Information (Exhibit 2);

Liquidation Analysis (Exhibit 3);

Projections (Exhibit 4);

Biographies of Managers of Reorganized Debtors (Exhibit 5); and

Estimate of Anticipated True-Up Payments (Exhibit 6).

WHO IS ENTITLED TO VOTE:  Pursuant to the Final Order of the Bankruptcy Court approving the Disclosure Statement (the "Disclosure Statement Order"), the Holders of the Allowed Secured Tax Certificate Claims (Class 3), the Allowed Secured District Claims (Class 4), the Allowed AMT CADC Loan Claim (Class 5); the Allowed Other Secured Claims (Class 6), and the Allowed General Unsecured Claims (Class 7) are entitled to vote on the Plan.  A ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of claims in these classes.

**THE DEBTORS RECOMMEND THAT CREDITORS ENTITLED TO VOTE CLAIMS IN CLASS 3, CLASS 4, CLASS 5, CLASS 6, AND CLASS 7 VOTE TO ACCEPT THE PLAN.**  The Debtors' legal advisors are Bilzin Sumberg Baena Price & Axelrod LLP.  They can be contacted at:

Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, Florida  33131
Attn:  Mindy A. Mora
mmora@bilzin.com
Tara V. Trevorrow
ttrevorrow@bilzin.com

The following table summarizes the treatment of Claims and Equity Interests under the Plan.  For a complete explanation, please refer to the discussion in section VI below, entitled "THE PLAN OF REORGANIZATION" and to the Plan itself.

**IRS CIRCULAR 230 NOTICE:**   TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## II.

## SUMMARY OF CLASSIFICATION AND TREATMENT OF ADMINISTRATIVE EXPENSES, CLAIMS AND EQUITY INTERESTS UNDER THE PLAN[1]

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| -- | Administrative Expenses | Except to the extent that a Holder of an Allowed Administrative Expense agrees to a less favorable treatment, as soon as reasonably practicable on | Unknown  (The Debtors anticipate that | 100% |

---

[1]   This table is only a summary of the classification and treatment of claims and equity interests under the Plan and all conditions thereto.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of claims and equity interests.

[2]   The amounts set forth herein are the Debtors' estimates; the actual amounts will depend upon the final reconciliation and resolution of all Administrative Expenses and Claims.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| | | or after the Effective Date, the Reorganized Debtors shall pay Cash in an amount equal to such Allowed Administrative Expense to each Holder of an Allowed Administrative Expense; *provided*, *however*, that Allowed Administrative Expenses representing liabilities incurred in the ordinary course of business by the Debtors shall be assumed and paid by the Reorganized Debtors in the ordinary course of business. | all Administrative Expenses will be paid as part of the DIP Financing Claim.) | |
| -- | Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, commencing as soon as reasonably practicable on or after the Effective Date, and continuing over a period not exceeding five (5) years from the Effective Date, Cash in an aggregate amount equal to such Allowed Priority Tax Claim, together with simple interest at the Applicable Rate, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim at any time without penalty.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors as such obligations become due. | $0  (no known Claims) | 100% |

MIAMI 2904666.4 7945135741

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| -- | DIP Financing Claim | On the Effective Date, in full and final satisfaction of the DIP Financing Claim, and subject to the Plan Sponsor's simultaneous payment of the Initial Equity Contribution to the Reorganized Debtors, the Holder of the DIP Financing Claim shall receive, as soon as reasonably practicable on or after the Effective Date, 100% of the New Membership Units in the Reorganized Debtors. | $750,000 | 100% |
| 1 | Priority Non-Tax Claims | Not impaired; with respect to Allowed Priority Non-Tax Claims not paid pursuant to prior Bankruptcy Court order, as soon as reasonably practicable on or after the Effective Date or the date that is ten (10) days after the date such claim is Allowed, and except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, each Allowed Priority Non-Tax Claim shall be paid in full in Cash in accordance with the priorities set forth in section 507 of the Bankruptcy Code.  All Allowed Priority Non-Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors. | $0 (no known Claims) | 100% |
| 2A-2D | Secured Claims of Miami-Dade County Tax Collector | Unimpaired. As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Miami-Dade County on the Effective Date, which shall | $490,358.08 plus 18% statutory interest, as applicable | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| | | include statutory interest in the event that such taxes are delinquent at the time of payment. | | |
| 3A-3H | Secured Tax Certificate Claims | Impaired.<br><br>In satisfaction of the Allowed Class 3 Secured Tax Certificate Claims, (i) the Holders of Secured Tax Certificate Claims in Class 3 shall each retain a lien on the Property securing such Allowed Claim, and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, each of the Holders of Secured Tax Certificate Claims in Class 3 shall receive an amount in Cash equal to 20% of the Allowed Secured Tax Certificate Claim, plus any accrued interest on such Claim at the applicable certificate interest rate. | $1,417,414.89 (plus interest) | 100% |
| 4A-4D | Secured District Claims | Impaired.<br><br>*Class 4A – Series A, North Parcel*<br><br>As of the Effective Date, in full and final satisfaction of the Class 4A Allowed Secured District Claim, (1) the Holder of the Class 4A Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to the Class 4C Claims, and (2) the Assessment Obligations comprising the Class 4A Allowed Secured | $81.7 million (inclusive of accrued interest through the Petition Date), plus statutory interest from and after the Petition Date | 100% |

MIAMI 2904666.4 7945135741

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| | | District Claim shall (i) mature on the Class A Maturity Date, (ii) bear interest at the per annum rate of 5.5% on the outstanding Face Amount until maturity, which interest shall be paid semi-annually on May 1 and November 1 until maturity, (iii) have a Face Amount equal to 9/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv)  from May 1, 2015 through the Class A Maturity Date, receive principal amortization in the amounts reflected in Schedule 4.4A attached to the Plan, from either the Reorganized Debtors with respect to the portion of the Property owned by the Reorganized Debtors or End Purchasers of residential units with respect to the portion of the Property owned by such End Purchasers.  The foregoing treatment shall apply notwithstanding the Holder of the Class 4A Allowed District Claim making an election under section 1111(b) of the Bankruptcy Code.  *Class 4B – Series A, South Parcel*  As of the Effective Date, in full and final satisfaction of the Class 4B Allowed Secured District Claim, (1) the Holder of the Class 4B Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to the Class 4D Claims, and (2) the | | |

MIAMI 2904666.4 7945135741

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| | | Assessment Obligations comprising the Class 4B Allowed Secured District Claim shall (i) mature on the Class A Maturity Date, (ii) bear interest at the per annum rate of 5.5% on the outstanding Face Amount until maturity, which interest shall be paid semi-annually on May 1 and November 1 until maturity, (iii) have a Face Amount equal to 9/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv) from May 1, 2015 through the Class A Maturity Date, receive principal amortization in the amounts reflected in Schedule 4.4B attached to the Plan, from either the Reorganized Debtors with respect to the portion of the Property owned by the Reorganized Debtors or End Purchasers of units with respect to the portion of the Property owned by such End Purchasers. The foregoing treatment shall apply notwithstanding the Holder of the Class 4B Allowed District Claim making an election under section 1111(b) of the Bankruptcy Code. *Class 4C – Series B, North Parcel* As of the Effective Date, in full and final satisfaction of the Class 4C Allowed Secured District Claim, (1) the Holder of the Class 4C Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 | | |

7

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| | | Claims, and any liens relating to Class 4A Claims, and (2) the Assessment Obligations comprising the Class 4C Allowed Secured District Claim shall (i) mature on the Class B Maturity Date, (ii) bear interest at the per annum rate of 5.2% on the outstanding Face Amount until the Class B Maturity Date, which interest shall be paid semi-annually on May 1 and November 1 until the Class B Maturity Date, (iii) have a Face Amount equal to 16/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv) from the Effective Date through the Class B Maturity Date, receive principal amortization in connection with closings of the sale of single family homes and townhomes in the New Development according to the Release Price Schedule, from or at the direction of the Reorganized Debtors.<br><br>To the extent the Holder of the Class 4C Allowed Secured District Claim does not make an election pursuant to section 1111(b) of the Bankruptcy Code, then the unsecured deficiency portion of the Allowed District Claim shall be payable in and constitute part of Class 7. In the event the Holder of the Class 4C Allowed Secured District Claim makes an election pursuant to section 1111(b) of the Bankruptcy Code, then, in addition to the foregoing, such Holder shall also receive a true-up payment in connection with each closing of the sale of a single family home or townhome, as appropriate, and, if necessary, a balloon payment at the | | |

MIAMI 2904666.4 7945135741

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| | | Class B Maturity Date, that ensures such Holder will receive deferred cash payments totaling at least the Allowed amount of the Class 4C District Claim as of the Petition Date.<br><br>***Class 4D – Series B, South Parcel***<br><br>As of the Effective Date, in full and final satisfaction of the Class 4D Allowed Secured District Claim, (1) the Holder of the Class 4D Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to the Class 4B Claims, and (2) the Assessment Obligations comprising the Class 4D Allowed Secured District Claim shall (i) mature on the Class B Maturity Date, (ii) bear interest at the per annum rate of 5.2% on the outstanding Face Amount until maturity, which interest shall be paid semi-annually on May 1 and November 1 until maturity, (iii) have a Face Amount equal to 6/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv) from the Effective Date through the Class B Maturity Date, receive principal amortization in connection with closings of the sale of residential, office and retail units in the New Development according to the Release Price Schedule, from or at the direction of the Reorganized | | |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| | | Debtors.<br><br>To the extent the Holder of the Class 4D Allowed Secured District Claim does not make an election pursuant to section 1111(b) of the Bankruptcy Code, then the unsecured deficiency portion of the Allowed District Claim shall be payable in and constitute part of Class 7.  In the event the Holder of the Class 4D Allowed Secured District Claim makes an election pursuant to section 1111(b) of the Bankruptcy Code, then, in addition to the foregoing, such Holder shall also receive a true-up payment in connection with each closing of the sale of a unit and, if necessary, a balloon payment at the Class B Maturity Date, that ensures such Holder will receive deferred cash payments totaling at least the Allowed amount of the Class 4D District Claim as of the Petition Date. | | |
| 5 | AMT CADC Loan Claim | Impaired.<br><br>As soon as reasonably practicable on or after the Effective Date, except to the extent that the Holder of the AMT CADC Loan Claim agrees to a less favorable treatment, the Holder of the AMT CADC Loan Claim shall receive (a) to the extent that the Holder of the AMT CADC Loan Claim has an Allowed Secured Claim, (i) a subordinated lien on the Property in an amount equal to such Allowed Secured Claim and (ii) beginning on the Effective Date, or as soon as reasonably practicable thereafter, quarterly payments of principal and interest based on an interest rate of | $103,870,058 | 2%<br><br>(assumes AMT CADC Loan Claim fully payable in Class 7 and 1111(b) election made by the District) |

MIAMI 2904666.4 7945135741

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| | | 5% per annum and a thirty (30) year amortization period through the tenth (10th) anniversary of the Effective Date, on which date all unpaid principal, interest and other charges shall be due and payable in full, and (b) to the extent that the Holder of the AMT CADC Loan Claim has an Allowed General Unsecured Claim, such General Unsecured Claim shall be payable in and constitute part of Class 7. | | |
| 6 | Other Secured Claims | Impaired.<br><br>As soon as reasonably practicable on or after the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, at the sole option of the Reorganized Debtors, (a) payment in full in Cash in the amount of the Allowed Other Secured Claim, (b) reinstatement of the Allowed Other Secured Claim, (c) satisfaction by the surrender of the collateral securing such Allowed Other Secured Claim, or (d) a treatment that otherwise renders the Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. | $0<br><br>(no known Claims) | 100% |
| 7 | General Unsecured Claims | Impaired.<br><br>        On the Effective Date, the Reorganized Debtors shall deposit $3,000,000 of the Initial Equity Contribution into the Creditor Trust. On the second (2nd) anniversary of the Effective Date, the Reorganized | $121,406,259 (inclusive of the AMT Loan Claim, but exclusive of any deficiency claim that may be asserted by the | 2.88%<br><br>(assumes AMT CADC Loan fully payable in Class 7 and 1111(b) |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[2] | Approximate Percentage Recovery[2] |
|---|---|---|---|---|
| | | Debtors shall deposit an additional $1,000,000 into the Creditor Trust. In addition, on the Effective Date the Reorganized Debtors shall transfer Avoidance Actions and General Unsecured Claim Objections to the Creditor Trust. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed General Unsecured Claim shall receive its Ratable Portion of the amounts funded into the Creditor Trust.<br><br>Distributions of such Ratable Portion from the Creditor Trust shall be made in accordance with Section 6.2 of the Plan. | District)<br><br>-and-<br><br>$17,536,201 (exclusive of the AMT Loan Claim or any deficiency claim that may be asserted by the District) | election made by the District) |
| 8 | Old Equity Interests | Impaired.<br><br>On the Effective Date, the Old Equity Interests shall be cancelled and the Holders of Old Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Old Equity Interests. On the Effective Date, all obligations of the Debtors to Holders of Old Equity Interests shall be completely discharged. | N/A<br><br>(no distribution) | 0% |

## A.    Summary of Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for voting purposes. If you hold claims in more than one class and you are entitled to vote claims in more than one class, you will receive separate ballots, which must be used for each separate class of claims. Please vote and return your ballot(s) in accordance with the instructions set forth herein.

MIAMI 2904666.4 7945135741

TO BE COUNTED, YOUR VOTE INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE INSTRUCTIONS ON THE BALLOT, AND MUST BE **ACTUALLY RECEIVED** BY THE CLERK OF THE BANKRUPTCY COURT (THE "<u>CLERK</u>"), **NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME, ON [_____], 2012 (THE "<u>VOTING DEADLINE</u>"**).  PLEASE RETURN YOUR PROPERLY COMPLETED BALLOT TO THE CLERK AT THE FOLLOWING ADDRESS:

> Clerk of Bankruptcy Court
> Claude M. Pepper Federal Building
> 51 SW First Avenue
> Room 1510
> Miami, FL 33130

BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL **NOT** BE COUNTED.  FAXED COPIES OF BALLOTS WILL **NOT** BE COUNTED.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.  ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.  **BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE DEBTORS OR ANY OTHER PLAN PROPONENT.**

If you are a Holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, Suite 2300, Miami, Florida 33131, Attn:  Luisa Flores, Telephone: (305) 350-7205, Facsimile:  (305) 351-2271.

SUMMARIES OF CERTAIN PROVISIONS OF DOCUMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE DOCUMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH DOCUMENT.

1. **IF YOU HAVE THE FULL POWER TO VOTE AND DISPOSE OF AN ALLOWED SECURED TAX CERTIFICATE CLAIM (CLASS 3):**

Please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot, and return your completed Ballot in the enclosed pre-addressed envelope so that it is actually received by the Clerk before the Voting Deadline.

2.      **IF YOU HAVE THE FULL POWER TO VOTE AND DISPOSE OF AN ALLOWED SECURED DISTRICT CLAIM (CLASS 4):**

Please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot, and return your completed Ballot in the enclosed pre-addressed envelope so that it is actually received by the Clerk before the Voting Deadline.

3.      **IF YOU HAVE THE FULL POWER TO VOTE AND DISPOSE OF THE ALLOWED AMT CADC LOAN CLAIM (CLASS 5):**

Please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot, and return your completed Ballot in the enclosed pre-addressed envelope so that it is actually received by the Clerk before the Voting Deadline.

4.      **IF YOU HAVE THE FULL POWER TO VOTE AND DISPOSE OF AN ALLOWED OTHER SECURED CLAIM (CLASS 6):**

Please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot and return your completed Ballot in the enclosed pre-addressed envelope so that it is actually received by the Clerk before the Voting Deadline.

5.      **IF YOU HAVE THE FULL POWER TO VOTE AND DISPOSE OF AN ALLOWED GENERAL UNSECURED CLAIM (CLASS 7):**

Please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot and return your completed Ballot in the enclosed pre-addressed envelope so that it is actually received by the Clerk before the Voting Deadline.

Any Holder that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Clerk before the Voting Deadline.

Any Holder that has delivered a valid ballot may change its vote by delivering to the Clerk a properly completed subsequent ballot so as to be received before the Voting Deadline.

For detailed voting instructions, see the instructions on your ballot.  For a further discussion of voting on the Plan, see section VIII below, entitled "VOTING PROCEDURES AND REQUIREMENTS."

**B.      Overview of Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and all economic parties in interest.  In addition to permitting rehabilitation of a debtor, chapter 11 promotes equality of treatment of similarly situated claims and similarly situated equity interests with respect to the distribution of a debtor's assets.

14

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or holder of an equity interest in, a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

To solicit acceptances of a proposed plan, section 1126 of the Bankruptcy Code requires a debtor and any other plan proponents to conduct such solicitation, pursuant to a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.  The Debtors are submitting this Disclosure Statement in accordance with the Disclosure Statement Order and the requirements of sections 1125 and 1126 of the Bankruptcy Code.

## III.

## DESCRIPTION OF THE BUSINESS

**A.     Corporate Structure**

Each of the Debtors is a limited liability company organized and existing under the laws of the State of Florida.

**B.     Description of the Property**

The Debtors are the fee simple owners of land (approximately 117 contiguous acres) located on the east side of NW 107th Avenue and the north side of NW 58th Street in Doral, Florida, a majority of which is zoned TND (Traditional Neighborhood Development), with the remainder zoned IU-1 (for flex office development allowing for light industrial development) (the "Property").  The Property consists of 16 individual tracts of land on which substantive infrastructure has been constructed.  Other than such infrastructure, the Property remains undeveloped in terms of vertical construction, with the exception of an unfinished 4-level parking garage.  Prior to the Petition Date, the Debtors had sought and obtained approvals for the development of residential units (townhomes and condominiums), retail/office/mixed use, and flex office at the Property.

Until 2009, the Debtors were actively engaged in preparing the Property for a development to be called Landmark at Doral, consisting of 11 acres of industrial/flex office, 17

15

acres of mixed use, and 89 acres of multifamily residential dwellings. After development, the Property was to consist of 188,000 square feet of retail and office, 230,000 square feet of flex office, and 1,109 residential units, featuring an assortment of elevations and architecture thereby creating a community reminiscent of former small towns in suburbs throughout the United States and abroad.

### 1.  Prepetition Indebtedness[3]

As of the Petition Date, the Debtors' obligations[4] include (i) tax claims held by the Miami-Dade County Tax Collector in the aggregate amount of $490,358 (plus statutory interest), (ii) ad valorem tax certificate claims in various amounts, each of which is secured by a statutory lien on the Property, (iii) claims held by Landmark at Doral Community Development District (the "District") in the aggregate principal amount of approximately $71,500,000, which claims are secured by statutory liens on the Property; (iv) claims held by AMT CADC Venture, LLC ("AMT") in the aggregate amount of approximately $103,870,058, which claims are secured by liens on the Property; and (v) claims held by unsecured creditors in the aggregate amount of approximately $17,536,201, as more fully set forth on the following schedule:

| NAME OF CREDITOR | AMOUNT OWED[5] | APPLICABLE DEBTOR | DISPUTED, CONTINGENT OR UNLIQUIDATED | DESCRIPTION OF COLLATERAL |
|---|---|---|---|---|
| Miami-Dade County (2011 ad valorem taxes) | $490,348.08 | All | Unliquidated | The Property |
| Sunshine State Cert III, LLLP | $327,691 | Town Center at Doral, LLC | Unliquidated | The portion of the Property owned by Town Center at Doral, LLC |
| BTI Bluegate FTCF, LLC | $549,758.43 | Town Center at Doral, LLC | Unliquidated | The portion of the Property owned by Town Center at Doral, LLC |

---

[3]  This summary of the Debtors' prepetition indebtedness is provided for information purposes only and shall not constitute an admission, waiver or estoppel concerning the extent, validity and/or priority of any Claims, or otherwise; the Debtors reserve and retain any and all rights and remedies in that regard.

[4]  The amounts listed reflect the Debtors' reasonable estimates as reflected on the Debtors' Schedules. The Debtors reserve their right to dispute the secured nature of any claim or challenge the validity, perfection, or immunity from avoidance of any lien purported to be granted or perfected in any asset to a creditor.

[5]  This amount reflects the approximate principal amount, exclusive of interest, fees and costs.

| NAME OF CREDITOR | AMOUNT OWED[5] | APPLICABLE DEBTOR | DISPUTED, CONTINGENT OR UNLIQUIDATED | DESCRIPTION OF COLLATERAL |
|---|---|---|---|---|
| BTI Bluegate FTCF, LLC | $139,220 | Landmark at Doral East, LLC | Unliquidated | The portion of the Property owned by Landmark at Doral East, LLC |
| Finance Southern Co. | $112,686 | Landmark at Doral East, LLC | Unliquidated | The portion of the Property owned by Landmark at Doral East, LLC |
| Finance Southern Co. | $116,675 | Landmark at Doral South, LLC | Unliquidated | The portion of the Property owned by Landmark at Doral South, LLC |
| BTI Bluegate FTCF, LLC | $41,169 | Landmark Club at Doral, LLC | Unliquidated | The portion of the Property owned by Landmark Club at Doral, LLC |
| Hilda Pico/Ocean Bank | $33,325 | Landmark Club at Doral, LLC | Unliquidated | The portion of the Property owned by Landmark Club at Doral, LLC |
| The District | $71,500,000 | All | | The Property |
| AMT CADC Venture, LLC | $103,870,058 | All | | The Property |
| Unsecured Claims | $17,536,201 | All | Some Claims are disputed, contingent or unliquidated | None |

a.     Secured District Claims.

The Secured District Claims arise from and relate to resolutions issued by the District in its capacity as a quasi-governmental body under applicable Florida statutes.  Pursuant to the provisions of Chapter 190 of the Florida Statutes, the District is a local unit of special

17

purpose government entity of the State of Florida with authority to impose beneficial assessments upon the owners of the parcels identified by folio numbers 35-3017-001-0240, -0241, -0250, and -0362 (the "Parcels").  The Debtors, as the owners of the Parcels, are obligated to the District for the Assessment Obligations imposed by the District to improve and develop the Parcels.  A description of the history and amounts of the Assessment Obligations follows.

Pursuant to Resolution No. 2005-11, adopted September 9, 2005, and Resolution No. 2006-08, adopted August 10, 2006, the District authorized the issuance, sale, and delivery of special assessment bonds not to exceed $75,000,000 in the aggregate.  On November 1, 2005, the Circuit Court for the Eleventh Judicial Circuit in and for Miami-Dade County entered a final judgment validating and confirming the issuance of the proposed special assessment bonds.  On October 1, 2006, the District signed a master trust indenture with U.S. Bank, N.A., as indenture trustee, and a first supplemental indenture with U.S. Bank, N.A., as indenture trustee.  On October 10, 2006, the District issued $30,320,000 Special Assessment Bonds, Series 2006A (the "Series A Bonds") and $41,180,000 Special Assessment Bonds (together with the Series A Bonds, the "Bonds").  The proceeds of the Bonds were and are designated to be used to fund the development of infrastructure and capital improvements for the Property.

Pursuant to Resolution No. 2005-12, adopted October 19, 2005, and Resolution No. 2006-10, adopted September 14, 2006, the District imposed "Special Assessment Obligations" upon the Landmark Entities as the landowners of the Parcels to be benefited by the infrastructure and other capital improvements funded by the proceeds of the Bonds.  On September 11, 2008, the District adopted Resolution No. 2008-5, which levied a special assessment for maintenance and debt service on the Parcels for the fiscal year 2009-2010.

The Debtors have been unable to pay the Special Assessment Obligations since 2008.  As of the Petition Date, the Debtor was obligated to the District for Special Assessment Obligations in the principal face amount of $71,500,000, plus interest.  The principal amount of Special Assessment Obligations allocable to each Debtor on a per acres basis is as follows: (i) Landmark at Doral East, LLC - $12,040,491.58; (ii) Town Center at Doral, LLC - $43,727,205.13; (iii) Landmark at Doral South, LLC - $14,499,141.58; (iv) Landmark Club at Doral, LLC - $1,233,161.71.

On or about November 13, 2008, the District adopted Resolution No. 2009-4, which imposed a "Maintenance Assessment Obligation" on the Parcels for the purpose of funding the District's operations and maintenance budget for the Fiscal Year 2008-2009.

The Debtors have been unable to pay the Maintenance Assessment Obligations since 2008.  As of the Petition Date, the Debtor was obligated to the District for Maintenance Assessment Obligations of $649,817.73.  The amount of Maintenance Assessment Obligations presently allocable to each Debtor on a per acre basis is as follows:  (i) Landmark at Doral East, LLC - $98,543.91; (ii) Town Center at Doral, LLC - $418,651.68; (iii) Landmark at Doral South, LLC - $122,529.50; (iv) Landmark Club at Doral, LLC - $10,092.63.

Pursuant to applicable Florida Statutes, the Assessment Obligations (as such term is defined in the Plan) are secured by liens on the Property *pari passu* with ad valorem tax assessment obligations.  By virtue of the Debtors' prepetition payment default upon the

18

Assessment Obligations, as of the Petition Date, all amounts owed to the District have been accelerated and the entire amount of each Debtor's Assessment Obligations is currently due and owing.

        b.      AMT Loan Claim.

        The AMT Loan Claim relates to three loans:  the Land Loan, the Mezzanine Loan, and the Revolving Loan (each defined herein, and collectively referred to herein as the "AMT Loan").  The original parties to the Land Loan and the Mezzanine Loan were the Landmark Entities and Ohio Savings Bank ("Ohio Savings"); the original parties to the Revolving Loan were the Landmark Entities and iStar Financial, Inc. ("iStar").  Each of the loans was transferred and/or assigned from Ohio Savings or iStar, as applicable, to AmTrust Bank ("AmTrust").

        On October 31, 2008, AmTrust filed a complaint in the Eleventh Judicial Circuit Court in and for Miami-Dade County to foreclose its interests in the Property.  Upon the collapse of AmTrust, the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as the receiver for AmTrust, took over the Land Loan, the Mezzanine Loan, and the Revolving Loan.  The FDIC subsequently assigned the Land Loan, the Mezzanine Loan, and the Revolving Loan to AMT CADC Venture, LLC ("AMT"), which aggregated the loans into the AMT Loan.  AMT is therefore the successor in interest to AmTrust and is the Holder of the AMT Loan Claim.  An expanded description of the Land Loan, the Mezzanine Loan, and the Revolving Loan follows.

        On January 30, 2005, the Landmark Entities and Ohio Savings entered into a land loan (the "Land Loan"), evidenced by a note (the "Original Land Note", and as amended, the "Land Note") in the original principal amount of $55,250,000.  The Original Land Note was secured by a mortgage (the "Land Mortgage") in favor of Ohio Savings and an assignment of leases and rents to Ohio Savings, each of which was recorded on February 2, 2005.  On December 18, 2007, the Landmark Entities and AmTrust entered into a future advance mortgage note in the amount of $32,620,000 (the "Future Advance Note"), an amended, restated, and consolidated mortgage note in the aggregate sum of $87,870,000 (the "Consolidated Note"), a mortgage modification agreement (the "Mortgage Modification Agreement").  The Mortgage Modification Agreement was recorded on December 24, 2007 and provided that the Consolidated Note superseded the Original Land Note and the Future Advance Note in all respects.

        Also on January 30, 2005, the Landmark Entities and Ohio Savings entered into a mezzanine loan (the "Mezzanine Loan"), evidenced by the Revolving Second Mortgage Note (the "Mezzanine Note") in the principal amount of $44,250,000.  A mezzanine mortgage of the same date (the "Mezzanine Mortgage") in favor of Ohio Savings secured the Mezzanine Note.  The parties (or their successors in interest) to the Mezzanine Note amended the Mezzanine Note on October 15, 2005, December 20, 2006, and April 20, 2007, and, in connection with these amendments, executed that certain First Mezzanine Mortgage Modification Agreement on October 12, 2005.  On December 18, 2007, the parties (or their successors in interest) to the Mezzanine Note entered into that certain Amended and Restated Mezzanine Note, which superseded and replaced all other amendments to the Mezzanine Note, and executed that certain

Second Mezzanine Mortgage Modification Agreement, which was recorded on December 24, 2007.

On December 18, 2007, the Landmark Entities and iStar entered into a revolving loan (the "Revolving Loan"), evidenced by the Revolving Promissory Note, dated December 18, 2007, in the principal amount of $25,000,000, and a revolver mortgage (the "Revolver Mortgage") of the same date in favor of iStar, which mortgage was recorded on December 24, 2007. On April 15, 2008, iStar assigned the Revolver Mortgage to AmTrust pursuant to that certain Assignment of Note, Mortgage, and Loan Documents, which was recorded on April 21, 2008.

The parties to each of the Land Loan, Mezzanine Loan, and the Revolving Loan entered into additional security agreements (the "Security Agreements") with respect to each of the applicable loans. The Security Agreements for the Land Loan, Mezzanine Loan, and Revolving Loan were recorded on April 25, 2005, February 2, 2005, and December 24, 2007, respectively.

As of the Petition Date, the aggregate principal amount of the AMT Loan Claim was approximately $103,870,058.

### 2.    Other Creditors

As noted in the above chart, in addition to the indebtedness described in subsections (a) and (b) above, creditors have asserted Claims against the Debtors as follows: (i) a Claim in the approximate amount of $490,358.08 (plus statutory interest) has been asserted by the Miami-Dade County Tax Collector, (ii) approximately $1,417,414.89 in the aggregate (plus interest) has been asserted by Holders of Secured Tax Certificate Claims, and (iii) approximately $17,536,201 in the aggregate has been asserted by multiple Holders of General Unsecured Claims. Claimants with prospective mechanics liens and other potential lien claimants junior in interest to the District and AMT are included within the Class 7 General Unsecured Claims.

### 3.    Pre-Petition Litigation

Prepetition, the Debtors were parties to two foreclosure actions: (a) *AmTrust Bank v. Town Center at Doral, LLC, et al.*, Case No. 08-66650-CA-13 (11th Judicial Circuit, Miami-Dade County) (the "AmTrust Foreclosure Action") and (b) *Landmark at Doral Community Development District v. Landmark at Doral East, LLC, et al.*, Case No. 09-06334 CA 32 (11th Judicial Circuit, Miami-Dade County) (the "District Foreclosure Action"). The AmTrust Foreclosure action seeks enforcement and foreclosure of the Land Note and Land Mortgage, the Mezzanine Note and Mezzanine Mortgage, the Revolving Loan and Revolving Mortgage, and all related security interests. The District Foreclosure Action seeks foreclosure of all lien interests held by the District with respect to the Property, which lien rights are statutorily imposed and senior to any lien rights held by AMT, as successor in interest to AmTrust. In July 2011, the District moved for summary judgment upon its foreclosure complaint. The Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade, Florida scheduled the District's summary judgment motion to be heard in late September 2011.

On the Petition Date, both the AmTrust Foreclosure Action and the District Foreclosure Action were stayed pursuant to section 362 of the Bankruptcy Code. On October 28, 2011, the District filed a motion for relief from the automatic stay to proceed with the District Foreclosure Action. Pursuant to the *Order Granting Partial Stay Relief and Setting Further Hearing* [ECF No. 75], the Bankruptcy Court granted the District relief from the automatic stay imposed by § 362 of the Bankruptcy Code to proceed to a foreclosure judgment, but not to a foreclosure sale.

### 4.    Post-Petition Litigation

As of the filing date of this Disclosure Statement, no adversary proceedings have been commenced by or against the Debtors.

IV.

**KEY EVENTS LEADING TO THE
COMMENCEMENT OF THE CASES**

### A.    The Decline in the Real Estate Market and the Death of the Debtor's Former Principal

The Debtors filed Chapter 11 because of the Debtors' inability to renew, repay, or refinance their existing debt obligations, due to circumstances beyond their control, including the death of Elie Berdugo, the former principal of the Debtors, in 2008, as well as current credit market conditions. Upon his death, Mr. Berdugo's liabilities exceeded his assets. The probate court closed his estate, which was administratively insolvent, prior to the Petition Date.

### B.    The Debtors' Business Plan

The Debtors are optimistic about their long-term economic prospects. The Debtors principal asset is the Property, which consists of approximately 117 contiguous acres of undeveloped land in the Doral area of Miami-Dade County. Immediately prior to the Petition Date, the Debtors engaged in good faith negotiations with Terra Group regarding the terms of a proposed plan support agreement. *See* Section V.C., *infra*. Based upon these negotiations and in an exercise of the Debtors' fiduciary duty, the Debtors determined that a plan of reorganization funded by Terra Landmark, an affiliate of Terra Group, provided the only viable prospect of providing any form of recovery to all claimants, including the Holders of over $100 million in unsecured debt. As a result, the Debtors are pursuing confirmation of a plan of reorganization with Terra Landmark as the Plan Sponsor.

The Debtors' business plan contemplates development of the Property as a single project with residential, commercial, retail, office and industrial components (the "New Development"). The Reorganized Debtors will construct the New Development in phases based upon the geographic location of the parcels. The initial phase of the New Development will

21

focus upon the parcels identified by folio numbers 35-3017-001-0240, 35-3017-001-0241 and 35-3017-001-0365 (collectively, the "North Parcel").  Development within the North Parcel will consist primarily of residential units, including townhomes and single-family homes.  The development of the parcel identified by folio number 35-3017-001-0362 (the "South Parcel") will include both residential, retail, and commercial office components.  The Debtors believe that the restructuring proposed in the Plan will enable the Reorganized Debtors to quickly pursue development of the North and South Parcels for the benefit of all economic parties in interest.

## C.    Negotiations with Terra Entities and Compensation

Prepetition, a principal of Terra World Investments, LLC ("Terra Investments"), an affiliate of the Plan Sponsor, *see* Section V.C., *infra*, met with Isaac Kodsi ("Kodsi") to determine the status of the AmTrust Foreclosure Action and the District Foreclosure Action and to investigate the possibility of Terra Investments or an affiliated entity developing the Property.  After multiple negotiations, the parties determined that, given the pending foreclosure actions, a chapter 11 bankruptcy filing was the only viable means of providing a recovery to unsecured creditors.  The parties further concluded that any proposed plan sponsor would be required to invest significant capital despite the pending liens upon the Property.  Based upon these conversations, Terra Investments agreed to sponsor the Plan through Terra Landmark, with the understanding that Terra Landmark would develop the Property post-confirmation.

Upon consultation with Yogev Berdugo, who expressed an unwillingness to assume an active role in the daily management of the Landmark Entities, Kodsi agreed to assume the role of Vice-President.  As compensation for his duties, Kodsi requested payment of $10,000 on a monthly basis, up to a cap of $100,000, and a success fee of $150,000, payable if the Bankruptcy Court approved a plan of reorganization with Terra Landmark as the Plan Sponsor.  The parties reached an agreement in principal regarding such compensation, but ultimately failed to memorialize the agreement in an executed document.

As part of the DIP Financing Motion (defined herein), the Debtors disclosed the anticipated monthly compensation to be paid to Kodsi for his services and placed line item for such payment in the budget attached to the DIP Financing Motion.  The budget described expenditures during the Cases and did not include post-confirmation expenses, including any expenditure for the proposed success fee.  The Debtors incorporate by reference the affidavits of Kodsi and David Martin which are attached to the Debtors' Response to Motion to Convert as ECF No. 218.

## V.

## THE REORGANIZATION CASES

## A.    DIP Financing Motion and Order

On November 15, 2011, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 363, and 364 and*

MIAMI 2904666.4 7945135741

*Bankruptcy Rules 2002, 4001, 6004 and 6006:  (I) Approving (A) Plan Term Sheet and (B) Reimbursement of Expenses; and (II) Authorizing Postpetition Financing* [ECF No. 45] (the "DIP Financing Motion").  The DIP Financing Motion sought approval of (i) approximately $750,000 in DIP financing, and (ii) the Debtors' entry into a plan term sheet with the Plan Sponsor.  On November 30, 2011, the Bankruptcy Court entered an order continuing the hearing upon the DIP Financing Motion [ECF No. 64].  On December 21, 2011, the Bankruptcy Court entered an order approving the DIP Financing Motion on a final basis as provided therein, including approval of the requested DIP financing, certain limited aspects of the proposed term sheet, and Terra Landmark's role as Plan Sponsor [ECF No. 103] (the "DIP Financing Order").

Because no other party had emerged to provide the financing and plan support necessary to avert a foreclosure of the Debtors' property, after ensuring that the Creditors Committee would retain the right to solicit higher and better offers for plan sponsorship, the Debtors committed to pursuing a plan of reorganization with Terra Landmark serving as the Plan Sponsor to the exclusion of any other party.  The DIP Financing Motion described and disclosed this "lock-up" arrangement to all parties in interest.  The Bankruptcy Court approved the lock-up arrangement as part of the DIP Financing Order, after notice to all parties in interest and having considered the objections of various parties.

## B.    Bar Date

The Bankruptcy Court set January 19, 2012 as the deadline for all creditors other than governmental entities to file proofs of claim in these Cases.

## C.    Plan Sponsor

Terra Landmark, the Plan Sponsor, is part of Terra Group, which has already demonstrated its commitment to the City of Doral through its successful development of The Reserve at Doral, as well as its acquisition of seventeen acres adjacent to the Property and 60 acres directly north of the Property.  Terra Group and Terra Landmark are led by the father and son development team of Pedro Martin (Terra Group's chief executive officer) and David Martin (Terra Group's chief operational officer), whose biographical information is attached hereto as Exhibit 5.  Through a series of high-profile, successful developments in South Florida, Terra Group has established a reputation as a premier real-estate development group with a unique ability to create high-end residential and mixed-use projects notable for their originality, attention to detail, and rich quality of community life.

## D.    Creditors Committee

On October 20, 2011, the United States Trustee appointed [ECF No. 31] an official joint committee of unsecured creditors in the Cases (as defined in the Plan, the "Creditors Committee").   The members of the Creditors Committee are Eric E. Pfeffer, on behalf of the Carl Pfeffer Revocable Trust, Harvey D. Friedman, on behalf of HD Investments, and Rachel Bensimon.  On November 28, 2011, the Bankruptcy Court entered an order approving the

retention of Glenn D. Moses and the law firm of Genovese Joblove & Battista as counsel to the Creditors Committee.

**E.    Significant Post- Petition Motions and Orders**

On October 28, 2011, the District filed a motion for relief from the automatic stay to continue to pursue the District Foreclosure Action [ECF No. 35]. The Bankruptcy Court granted relief to the District to continue prosecution of the District Foreclosure Action through entry of a final judgment, but not a sale [ECF no. 75]. The Bankruptcy Court scheduled a further hearing upon the motion on January 25, 2012. On January 27, 2012, the Bankruptcy Court entered an order denying further stay relief [ECF No. 193].

On December 13, 2011, the Debtors filed the *Debtors' Motion to Value Collateral* [ECF No. 81] (the "Valuation Motion"), seeking a judicial determination that the value of the Property is approximately $43.4 million as determined by the Debtors' appraiser, Waronker & Rosen, Inc. The Bankruptcy Court conducted a hearing on the Valuation Motion on January 18, 2012 at 10:00 a.m., but was unable to conclude a value for the Property based upon the testimony presented. Following such hearing, the Debtors filed their *Renewed Motion to Value Collateral and for Court-Appointed Valuation Expert Pursuant to Federal Rule of Evidence 706* [ECF No. 185] (the "Renewed Valuation Motion"), asserting that a determination of the Property's value remains a necessary and critical component of the Cases, and requesting that the Bankruptcy Court appoint an expert to assist the Bankruptcy Court in concluding a value for the Property pursuant to Federal Rule of Evidence 706. On January 27, 2012, the Bankruptcy Court set a hearing on the Renewed Valuation Motion on February 13, 2012 at 10:00 a.m.

On December 14, 2011, the District filed a motion to terminate exclusivity for filing a plan of reorganization [ECF No. 83]. On January 27, 2011, the Bankruptcy Court entered an order terminating exclusivity and setting February 8, 2011 as the deadline by which any party in interest seeking to file a disclosure statement and chapter 11 plan must do so.

On January 23, 2012, the District, along with U.S. Bank National Association and Florida Prime Holdings, filed a motion to dismiss or convert the Cases [ECF No. 181] (the "Motion to Convert"). The Motion to Convert alleged that the lack of disclosure regarding a success fee arrangement between Kodsi and Terra Landmark provided a sufficient basis to dismiss or convert the Cases, despite the Bankruptcy Court's prior approval of the lock-up arrangement in the DIP Financing Order and the disclosure of Kodsi's monthly compensation in the budget attached to the DIP Financing Motion. The Bankruptcy Court heard preliminary argument on the Motion to Convert on January 27, 2011, and scheduled a further hearing on the matter on March 5, 2012 at 10:00 a.m.

**VI.**

**THE PLAN OF REORGANIZATION**

**A.**      **Introduction**

The Plan provides for a restructuring of the Debtors' financial obligations.  The Debtors believe that the proposed restructuring will provide the Debtors with the necessary liquidity to compete effectively in today's economic environment.

The Debtors also believe, and will demonstrate to the Bankruptcy Court, that, under the Plan, creditors will receive substantially more value than they would receive in a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code.  Absent these Cases, neither AMT nor general unsecured creditors would receive a Distribution on account of their Claims given the foreclosure proceeding being pursued actively by the District.

The following is a general discussion of the provisions of the Plan.  The Plan is attached as Exhibit 1 to this Disclosure Statement.  In the event of any discrepancies, the terms of the Plan shall govern.

**B.**      **Classification and Treatment of Claims and Equity Interests under the Plan of Reorganization**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an "allowed" claim or "allowed" equity interest simply means that a debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the Debtor.  By operation of sections 1111(a), 501(a) and 502(a) of the Bankruptcy Code, a claim or interest that appears in a debtor's Schedules of Assets and Liabilities and is not identified as disputed, contingent, or unliquidated, is deemed "allowed" unless a party in interest objects.  Additionally, section 502(a) of the Bankruptcy Code provides that a timely filed proof of claim or equity interest is deemed "allowed" (regardless of the Schedules) unless the debtor or another party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is timely filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, and contingent claims for contribution and reimbursement.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.  Because an

25

entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from a debtor's insolvency, the commencement of a bankruptcy case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in Cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced. Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Plan, the Holders of Class 1 (Priority Non-Tax Claims) and Classes 2A-2D (Secured Claims of Miami-Dade County Tax Collector) are unimpaired and conclusively presumed to accept the Plan.

Consistent with these requirements, the Plan divides the Allowed Claims against and Allowed Equity Interests in the Debtors into the following classes:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No |
| Classes 2A-2D | Secured Claims of Miami-Dade County Tax Collector | Unimpaired | No |
| Classes 3A-3H | Secured Tax Certificate Claims | Impaired (all) | Yes |
| Classes 4A-4D | Secured District Claims | Impaired (all) | Yes |
| Class 5 | AMT CADC Loan Claim | Impaired | Yes |

26

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 6 | Other Secured Claims | Impaired | Yes |
| Class 7 | General Unsecured Claims | Impaired | Yes |
| Class 8 | Old Equity Interests | Impaired | No (Deemed to Reject) |

### 1.    Unclassified

    a.    Administrative Expenses.

Administrative Expenses are the actual and necessary costs and expenses of the Debtors' Cases that are allowed under sections 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Cases and tax obligations incurred after the Petition Date. Other Administrative Expenses include the actual, reasonable, and necessary professional fees and expenses of the Debtors' advisors incurred during the pendency of the Cases.

Except to the extent that a Holder of an Allowed Administrative Expense agrees to a less favorable treatment, as soon as reasonably practicable on or after the Effective Date, the Reorganized Debtors shall pay Cash in an amount equal to such Allowed Administrative Expense to each Holder of an Allowed Administrative Expense; *provided*, *however*, that Allowed Administrative Expenses representing liabilities incurred in the ordinary course of business by the Debtors shall be assumed and paid by the Reorganized Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2)-(5) of the Bankruptcy Code shall (i) file, on or before the deadline specified in Local Rule 2016-1(c)(1), their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (A) upon the later of (1) the Effective Date and (2) the date on which the order that deemed such Administrative Expense Allowed becomes a Final Order or (B) upon such other terms as may be mutually agreed upon by such Holder and the Reorganized Debtors. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

    b.    Priority Tax Claims.

27

Priority Tax Claims consist of unsecured claims of federal and state governmental authorities for the kinds of taxes specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, such as certain income taxes, unsecured property taxes, excise taxes, and employment and withholding taxes. These unsecured claims are given a statutory priority in right of payment. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0, as no such Claims are known to exist.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, commencing as soon as reasonably practicable on or after the Effective Date, and continuing over a period not exceeding five (5) years from the Effective Date, Cash in an aggregate amount equal to such Allowed Priority Tax Claim, together with simple interest at the Applicable Rate, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim at any time without penalty. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors as such obligations become due.

c.      DIP Financing Claim.

The DIP Financing Claim is the superpriority Allowed Administrative Expense Claim relating to the postpetition financing approved pursuant to the DIP Financing Order, as described more fully in Section V.A. The Debtors estimate that on the Effective Date, the Allowed amount of such Claim will be approximately $750,000.

On the Effective Date, in full and final satisfaction of the DIP Financing Claim, and subject to the Plan Sponsor's simultaneous payment of the Initial Equity Contribution to the Reorganized Debtors, the Holder of the DIP Financing Claim shall receive, as soon as reasonably practicable on or after the Effective Date, 100% of the New Membership Units in the Reorganized Debtors.

### 2.      Classified

The Plan provides for the treatment of each class of Claims or Interests as outlined below.

### Class 1 – Priority Non-Tax Claims
(*Unimpaired; Not Entitled to Vote*)

Priority Non-Tax Claims include certain claims that are granted priority in payment under section 507(a) of the Bankruptcy Code, including certain wage, salary and other compensation obligations to employees of the Debtors up to a statutory cap of $10,000 per employee, and individual customer deposits for the purchase, lease or rental of property up to a statutory cap of $2,600 per Claim. The Debtors estimate that on the Effective Date, the allowed amount of such claims will be $0, as no such Claims are known to exist.

MIAMI 2904666.4 7945135741

With respect to Allowed Priority Non-Tax Claims not paid pursuant to prior Bankruptcy Court order, as soon as reasonably practicable on or after the Effective Date or the date that is ten (10) days after the date such claim is Allowed, and except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, each Allowed Priority Non-Tax Claim shall be paid in full in Cash in accordance with the priorities set forth in section 507 of the Bankruptcy Code.  All Allowed Priority Non-Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors.

### Classes 2A-2D – Secured Claims of Miami-Dade County Tax Collector (Unimpaired; Not Entitled to Vote)

Classes 2A-2D consist of the Secured Claims of the Miami-Dade County Tax Collector.  The Debtors estimate that on the Effective Date, the Allowed amount of the Secured Claims of Miami-Dade County Tax Collector will aggregate approximately $568,503.75, plus statutory interest.

*Class 2A – Ad Valorem Taxes of Town Center at Doral LLC (Folio 35-3017-001-0240)*

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Miami-Dade County on the Effective Date in respect of folio no. 35-3017-001-0240, which shall include statutory interest in the event that such taxes are delinquent at the time of payment.

*Class 2B – Ad Valorem Taxes of Landmark Club at Doral LLC (Folio 35-3017-001-0250)*

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Miami-Dade County on the Effective Date in respect of folio no. 35-3017-001-0250, which shall include statutory interest in the event that such taxes are delinquent at the time of payment.

*Class 2C – Ad Valorem Taxes of Landmark at Doral South LLC (Folio 35-3017-001-0362)*

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Miami-Dade County on the Effective Date in respect of folio no. 35-3017-001-0362, which shall include statutory interest in the event that such taxes are delinquent at the time of payment.

*Class 2D – Ad Valorem Taxes of Landmark at Doral East LLC (Folio 35-3017-001-0241)*

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Miami-Dade County on the Effective Date in respect of folio no. 35-3017-001-0241, which shall include statutory interest in the event that such taxes are delinquent at the time of payment.

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Tax Collector.  Tax Collector's first priority tax liens shall be retained on each property until said liens are paid in full.  Should payment in full of the 2011 ad valorem taxes not be made within the time specified above, Tax Collector shall be authorized to collect said taxes pursuant to Florida law, including the sale of tax certificates at the next available sale.

The amount of 2011 taxes owed, as reflected in the records of the Miami-Dade County Tax Collector, shall only be considered final so long as no Miami-Dade County Value Adjustment Board petitions or any action in Florida's circuit court regarding the 2011 assessments of the Miami-Dade County Property Appraiser with respect to the taxed real property are pending in accordance with Florida law.  In the event that such proceedings are pending, the amount of 2011 taxes owed shall not be deemed final until all administrative or judicial proceedings are concluded.  Any payments toward the 2011 taxes made by Debtors, such as statutorily-required good faith payments made in conjunction with administrative or judicial proceedings, shall be applied toward satisfaction of the Class 2 claims.

Post-petition taxes for the years 2012 forward shall be paid as ordinary course payments pursuant to Florida law, and in a manner consistent with the provisions above with respect to determination of the final tax amounts owed and the issuance of any refunds.

### Classes 3A-3H – Secured Tax Certificate Claims (Impaired; Entitled to Vote)

Classes 3A-3H consist of Secured Tax Certificate Claims.  The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $1,417,414.89, plus interest.

*Class 3A – Sunshine State Certificate III*

Class 3A consists of the Allowed Secured Claim relating to tax certificate number 10-26080, which is secured by a lien on the real estate parcel identified as folio number 35-3017-001-0240 held by Town Center at Doral, LLC.  In satisfaction of the Allowed Class 3A Secured Tax Certificate Claim, (i) the Holder of the Class 3A Secured Tax Certificate Claim shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3A Secured Tax Certificate Claim is satisfied in full pursuant to the terms of the Plan and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4)

anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3A shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3A Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.00% per annum.

### Class 3B – BTI Bluegate FTCF, LLC

Class 3B consists of the Allowed Secured Claim relating to tax certificate number 09-29902, which is secured by a lien on the parcel identified as folio number 35-3017-001-0240 held by Town Center at Doral, LLC.  In satisfaction of the Allowed Class 3B Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3B shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3B Secured Tax Certificate Claim is satisfied in full pursuant to the terms of the Plan and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3B shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3B Claim, plus any accrued interest on such Claim at the certificate interest rate of 9.50% per annum.

### Class 3C - Finance Southern Co.

Class 3C consists of the Allowed Secured Claim relating to tax certificate number 10-26081, which is secured by a lien on the parcel identified as folio number 35-3017-001-0241 held by Landmark at Doral East, LLC.  In satisfaction of the Allowed Class 3C Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3C shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3C Secured Tax Certificate Claim is satisfied in full pursuant to the terms of the Plan and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3C shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3C Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.25% per annum.

### Class 3D – BTI Bluegate FTCF, LLC

Class 3D consists of the Allowed Secured Claim relating to tax certificate number 09-29903, which is secured by a lien on the parcel identified as folio number 35-3017-001-0241 held by Landmark at Doral East, LLC.  In satisfaction of the Allowed Class 3D Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3D shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3D Secured Tax Certificate Claim is satisfied in full pursuant to the terms of the Plan and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3D shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3D Claim, plus any accrued interest on such Claim at the certificate interest rate of 8.50% per annum.

31

### Class 3E – Hilda Pico / Ocean Bank

Class 3E consists of the Allowed Secured Claim relating to tax certificate number 10-26084, which is secured by a lien on the parcel identified as folio number 35-3017-001-0362 held by Landmark at Doral South, LLC.  In satisfaction of the Allowed Class 3E Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3E shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3E Secured Tax Certificate Claim is satisfied in full pursuant to the terms of the Plan and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3E shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3E Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.25% per annum.

### Class 3F – Finance Southern Co.

Class 3F consists of the Allowed Secured Claim relating to tax certificate number 09-29907, which is secured by a lien on the parcel identified as folio number 35-3017-001-0362 held by Landmark at Doral South, LLC.  In satisfaction of the Allowed Class 3F Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3F shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3F Secured Tax Certificate Claim is satisfied in full pursuant to the terms of the Plan and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3F shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3F Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.25%.

### Class 3G – Hilda Pico / Ocean Bank

Class 3G consists of the Allowed Secured Claim relating to tax certificate number 09-26082, which is secured by a lien on the parcel identified as folio number 35-3017-001-0250 held by Landmark Club at Doral LLC.  In satisfaction of the Allowed Class 3G Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3G shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3G Secured Tax Certificate Claim is satisfied in full pursuant to the terms of the Plan and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3G shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3G Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.25%.

### Class 3H – BTI Bluegate FTCF, LLC

Class 3H consists of the Allowed Secured Claim relating to tax certificate number 09-29904, which is secured by a lien on the parcel identified as folio number 35-3017-001-0250 held by Landmark Club at Doral, LLC.  In satisfaction of the Allowed Class 3H Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3H shall retain a

32

lien on the real estate parcel described above until such time as the Allowed Class 3H Secured Tax Certificate Claim is satisfied in full pursuant to the terms of the Plan and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3H shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3H Claim, plus any accrued interest on such Claim at the certificate interest rate of 8.50% per annum.

### Class 4 – Secured District Claims
### (Impaired; Entitled to Vote)

Classes 4A-4D consists of the Allowed Secured District Claims.  The Debtors estimate that on the Effective Date, the aggregate Allowed Face Amount of such Claims will be approximately $81.7 million.

*Class 4A – Series A, North Parcel*

As of the Effective Date, in full and final satisfaction of the Class 4A Allowed Secured District Claim, (1) the Holder of the Class 4A Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to the Class 4C Claims, and (2) the Assessment Obligations comprising the Class 4A Allowed Secured District Claim shall (i) mature on the Class A Maturity Date, (ii) bear interest at the per annum rate of 5.5% on the outstanding Face Amount until maturity, which interest shall be paid semi-annually on May 1 and November 1 until maturity, (iii) have a Face Amount equal to 9/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv) from May 1, 2015 through the Class A Maturity Date, receive principal amortization in the amounts reflected in Schedule 4.4A attached to the Plan, from either the Reorganized Debtors with respect to the portion of the Property owned by the Reorganized Debtors or End Purchasers of residential units with respect to the portion of the Property owned by such End Purchasers. The foregoing treatment shall apply notwithstanding the Holder of the Class 4A Allowed District Claim making an election under section 1111(b) of the Bankruptcy Code.

*Class 4B – Series A, South Parcel*

As of the Effective Date, in full and final satisfaction of the Class 4B Allowed Secured District Claim, (1) the Holder of the Class 4B Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to the Class 4D Claims, and (2) the Assessment Obligations comprising the Class 4B Allowed Secured District Claim shall (i) mature on the Class A Maturity Date, (ii) bear interest at the per annum rate of 5.5% on the outstanding Face Amount until maturity, which interest shall be paid semi-annually on May 1 and November 1 until maturity, (iii) have a Face Amount equal to 9/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims,

(iv)  from May 1, 2015 through the Class A Maturity Date, receive principal amortization in the amounts reflected in Schedule 4.4B attached to the Plan, from either the Reorganized Debtors with respect to the portion of the Property owned by the Reorganized Debtors or End Purchasers of units with respect to the portion of the Property owned by such End Purchasers.  The foregoing treatment shall apply notwithstanding the Holder of the Class 4B Allowed District Claim making an election under section 1111(b) of the Bankruptcy Code.

### Class 4C – Series B, North Parcel

As of the Effective Date, in full and final satisfaction of the Class 4C Allowed Secured District Claim, (1) the Holder of the Class 4C Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to Class 4A Claims, and (2) the Assessment Obligations comprising the Class 4C Allowed Secured District Claim shall (i) mature on the Class B Maturity Date, (ii) bear interest at the per annum rate of 5.2% on the outstanding Face Amount until the Class B Maturity Date, which interest shall be paid semi-annually on May 1 and November 1 until the Class B Maturity Date, (iii) have a Face Amount equal to 16/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv)  from the Effective Date through the Class B Maturity Date, receive principal amortization in connection with closings of the sale of single family homes and townhomes in the New Development according to the Release Price Schedule, from or at the direction of the Reorganized Debtors.

To the extent the Holder of the Class 4C Allowed Secured District Claim does not make an election pursuant to section 1111(b) of the Bankruptcy Code, then the unsecured deficiency portion of the Allowed District Claim shall be payable in and constitute part of Class 7.  In the event the Holder of the Class 4C Allowed Secured District Claim makes an election pursuant to section 1111(b) of the Bankruptcy Code, then, in addition to the foregoing, such Holder shall also receive a true-up payment in connection with each closing of the sale of a single family home or townhome, as appropriate, and, if necessary, a balloon payment at the Class B Maturity Date, that ensures such Holder will receive deferred cash payments totaling at least the Allowed amount of the Class 4C District Claim as of the Petition Date.

### Class 4D – Series B, South Parcel

As of the Effective Date, in full and final satisfaction of the Class 4D Allowed Secured District Claim, (1) the Holder of the Class 4D Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to the Class 4B Claims, and (2) the Assessment Obligations comprising the Class 4D Allowed Secured District Claim shall (i) mature on the Class B Maturity Date, (ii) bear interest at the per annum rate of 5.2% on the outstanding Face Amount until maturity, which interest shall be paid semi-annually on May 1 and November 1 until maturity, (iii) have a Face Amount equal to 6/40 times the difference

34

between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv) from the Effective Date through the Class B Maturity Date, receive principal amortization in connection with closings of the sale of residential, office and retail units in the New Development according to the Release Price Schedule, from or at the direction of the Reorganized Debtors.

To the extent the Holder of the Class 4D Allowed Secured District Claim does not make an election pursuant to section 1111(b) of the Bankruptcy Code, then the unsecured deficiency portion of the Allowed District Claim shall be payable in and constitute part of Class 7.  In the event the Holder of the Class 4D Allowed Secured District Claim makes an election pursuant to section 1111(b) of the Bankruptcy Code, then, in addition to the foregoing, such Holder shall also receive a true-up payment in connection with each closing of the sale of a unit and, if necessary, a balloon payment at the Class B Maturity Date, that ensures such Holder will receive deferred cash payments totaling at least the Allowed amount of the Class 4D District Claim as of the Petition Date.

**Class 5 – AMT CADC Claim**
**(Impaired; Entitled to Vote)**

Class 5 consists of the AMT CADC Loan Claim, which arises from the AMT Loan, as described more fully in Section III.B, *supra*.  To the extent that AMT does not have an Allowed Secured Claim, the Class 5 Claim shall be treated for all purposes as a Class 7 Claim (General Unsecured Claim).  The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $103,870,058.

As soon as reasonably practicable on or after the Effective Date, except to the extent that the Holder of the AMT CADC Loan Claim agrees to a less favorable treatment, the Holder of the AMT CADC Loan Claim shall receive (a) to the extent that the Holder of the AMT CADC Loan Claim has an Allowed Secured Claim, (i) a subordinated lien on the Property in an amount equal to such Allowed Secured Claim and (ii) beginning on the Effective Date, or as soon as reasonably practicable thereafter, quarterly payments of principal and interest based on an interest rate of 5% per annum and a thirty (30) year amortization period through the tenth (10th) anniversary of the Effective Date, on which date all unpaid principal, interest and other charges shall be due and payable in full, and (b) to the extent that the Holder of the AMT CADC Loan Claim has an Allowed General Unsecured Claim, such General Unsecured Claim shall be payable in and constitute part of Class 7.

**Class 6 – Other Secured Claims**
**(Unimpaired; Not Entitled to Vote)**

Class 6 consists of the Other Secured Claims, which are secured Claims other than those classified in Classes 2 through 5.  The Debtors estimate that on the Effective Date, the Allowed amount of Other Secured Claims will aggregate approximately $0.

As soon as reasonably practicable on or after the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each

Holder of an Allowed Other Secured Claim shall receive, at the sole option of the Reorganized Debtors, (a) payment in full in Cash in the amount of the Allowed Other Secured Claim, (b) reinstatement of the Allowed Other Secured Claim, (c) satisfaction by the surrender of the collateral securing such Allowed Other Secured Claim, or (d) a treatment that otherwise renders the Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

### Class 7 – General Unsecured Claims
### (Impaired; Entitled to Vote)

Class 7 consists of Allowed General Unsecured Claims, which generally include the Claims of trade and other business creditors for goods and services provided to the Debtors prior to the Petition Date, Claims for damages arising from the Debtors' rejection of executory contracts and unexpired leases, and Claims asserted in litigation in respect of events arising prior to the Petition Date.  The General Unsecured Claims of Affiliates (other than the Debtors) shall not be included in Class 7.

The Debtors estimate that on the Effective Date, the amount of Allowed General Unsecured Claims will aggregate approximately $17,536,201, exclusive of the AMT Loan Clam and any deficiency claim that may be asserted by the District.

On the Effective Date, the Reorganized Debtors shall deposit $3,000,000 of the Initial Equity Contribution into the Creditor Trust.  On the second (2nd) anniversary of the Effective Date, the Reorganized Debtors shall deposit an additional $1,000,000 into the Creditor Trust.  In addition, on the Effective Date the Reorganized Debtors shall transfer Avoidance Actions and General Unsecured Claim Objections to the Creditor Trust.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed General Unsecured Claim shall receive its Ratable Portion of the amounts funded into the Creditor Trust.

To the extent AMT does not have an Allowed Secured Claim, the Class 5 Claim shall be payable in and constitute part of Class 7.  In such case, the Allowed Amount of Class 7 Claims shall aggregate approximately $121,406,259, assuming the District makes an election under §1111(b) of the Bankruptcy Code.  To the extent that the Bankruptcy Court determines that the value of the collateral securing the District Claim is limited to the Appraised Value (as defined in the Plan), and the District does not make an election under §1111(b), the balance of the Secured District Claim shall be payable in and constituted part of Class 7.  In such case, the aggregate amount of Class 7 Claims, inclusive of the AMT CADC Claims and the anticipated deficiency claim asserted by the District (exclusive of penalties and interest), shall be approximately $149,506,259 million.

Distributions of such Ratable Portion from the Creditor Trust shall be made in accordance with Section 6.2 of the Plan.

MIAMI 2904666.4 7945135741

**Class 8 – Old Equity Interests**
**(Impaired, Not Entitled to Vote; Deemed to Reject)**

Class 8 consists of the Equity Interests, which are the ownership interests in the Debtors.

On the Effective Date, the Old Equity Interests shall be cancelled and the Holders of Old Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Old Equity Interests. On the Effective Date, all obligations of the Debtors to Holders of Old Equity Interests shall be completely discharged.

### 3. Nonconsensual Confirmation

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan, undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

With respect to the impaired class of Old Equity Interests (Class 8) that is deemed to reject the Plan, the Debtors request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### C. Means of Implementing the Plan

### 1. General Overview of the Plan.

The Plan provides for the continued operation and development of the Property by and through the Reorganized Debtors. As of the Effective Date, all of the Debtors' property, including the Property, will vest in the Reorganized Debtors, except as otherwise provided in the Plan. The Reorganized Debtors will thereafter manage such property, construct the New Development, and implement the terms of the Plan, including making Distributions to Holders of Allowed Claims, except for Distributions to Holders of General Unsecured Claims, which shall be made by the Creditor Trustee.

The Plan shall be implemented on the Effective Date. The primary source of funds necessary to implement the Plan will be the Equity Contribution to be funded by the Plan Sponsor. At the present time, the Debtors believe that, inclusive of the Equity Contribution, the Reorganized Debtors will have sufficient funds as of the Effective Date to pay in full the expected payments under the Plan.

### 2. Revesting of Assets.

On the Effective Date, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the Estates of the Debtors, including any pre-paid expenses and deposits with vendors but excluding the assets to be vested in the Creditor Trust in accordance with section 4.7 the Plan, shall vest in the Reorganized Debtors. From and after the Effective Date, the

MIAMI 2904666.4 7945135741

Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, subject to the terms and conditions of this Plan.  As provided in Section 10.7 of the Plan, the Reorganized Debtors shall retain the Estate Causes of Action, other than those released in Section 10.7 of the Plan and those transferred to the Creditor Trust pursuant to Section 4.7 of the Plan.

3.        **Equity Contributions/New Membership Units**

Plan Distributions will be funded, in part, by the Equity Contribution made by the Plan Sponsor to the Reorganized Debtors.  In exchange for the Equity Contribution and in satisfaction of the DIP Financing Claim, on the Effective Date, the Reorganized Debtors are authorized to issue 100% of their New Membership Units to the Plan Sponsor or its designees, without the need for further action by the Debtors, the Reorganized Debtors, the Plan Sponsor or Holders of Claims or Interests.  The Debtors shall use the Equity Contribution to fund certain of the Distributions provided for under the Plan and to commence construction of the New Development.

From and after the Effective Date, the Reorganized Debtors shall commence the planning, development, and construction of the New Development, which shall consist of residential, commercial, retail, and industrial components.

4.        **Plan Funding and the New Development**

The Plan provides for the continued operation and development of the Property by and through the Reorganized Debtors.  As of the Effective Date of the Plan, all of the Debtors' property, including the Property, will vest in the Reorganized Debtors.  The Reorganized Debtors will thereafter manage such property, construct the New Development, and implement the terms of the Plan, including making Distributions to Holders of Allowed Claims.

The primary source of funds necessary to implement the Plan will be the Equity Contribution to be funded by the Plan Sponsor and the proceeds of unit sales in the New Development.  At the present time, the Debtors believe that, inclusive of the Equity Contribution, the Reorganized Debtors will have sufficient funds as of the Effective Date to pay in full the expected Distributions under the Plan.

The Debtors and the Plan Sponsor have formulated a business plan to develop the Property into the premier residential and downtown destination in Doral, Florida (i.e., the New Development), using a "Traditional Neighborhood Development" (or "TND") zoning structure. The first step in this process is to develop the North Parcel of the Property, which will consist of horizontal construction in the form of single family homes and townhomes.  The proposed residential development will be a gated community in a park-like setting and will include a clubhouse and multi-purpose park facility.  The single family homes will be located in the section of the North Parcel which is south of the clubhouse, whereas the townhomes will be located in the areas of the North Parcel which are directly east and west of the clubhouse.

To ensure that the units within New Development do not exceed demand within the residential real estate market, the single family homes and townhomes will be strategically phased to remain competitive with other developments in the Property's vicinity. The Reorganized Debtors will land bank the Property for a one-year period prior to starting construction. The Reorganized Debtors expect to complete construction and sell-out on the North Parcel by the end of 2016.

The Reorganized Debtors intend to begin construction on the South Parcel in 2015. The South Parcel will be comprised of residential units, commercial/office units and retail units set in the same park-like atmosphere as the North Parcel. The Reorganized Debtors expect to begin closing units in the South Parcel in 2016 and complete construction on the Property in 2020.

Cash Distributions to be made under the Plan after the Effective Date to the District on account of Allowed Class 4 Claims will be derived from the (i) the Equity Contribution and (ii) sales of residential and commercial units in the New Development, all as set forth in the Projections attached hereto as Exhibit 4. The outstanding principal amount of the Assessment Obligations will be paid down by either the Reorganized Debtors or End Purchasers, as applicable. When an End Purchaser finalizes its purchase of a unit, a portion of the sale proceeds will be used to pay down principal on the Assessment Obligations, and the End Purchaser will assume liability for the unpaid Assessment Obligations accruing in respect of such End Purchaser's unit from and after the Closing, until the Class A Maturity Date or the Class B Maturity Date, as applicable. For those units that are not sold by the Class A Maturity Date or the Class B Maturity Date, as applicable, the Reorganized Debtors will be obligated to make principal repayments to the District.

The primary difference in treatment between the Claims included within Classes 4A and 4C, on the one hand, and Classes 4B and 4D, on the other hand, is the timing of the Reorganized Debtors' obligation to remit principal repayments in respect of the Assessment Obligations. The Reorganized Debtors will make principal repayments of the portion of the Assessment Obligations included in Classes 4A and 4C (the North Parcel) on a semi-annual basis beginning on May 1, 2015, until the earlier of (i) the closing of the sale of a unit within the North Parcel and (ii) the Class A Maturity Date. The Reorganized Debtors will only make principal repayments in respect of the Assessment Obligations included in Classes 4B and 4D (the South Parcel) in connection with the closing of the sale of any units within the South Parcel, and on the Class B Maturity Date to the extent units have not been sold. The interest rate applicable to the Claims within Classes 4A and 4B is 5.5% per annum, while the interest rate applicable to the Claims within Classes 4C and 4D is 5.2% per annum.

With respect to Distributions to the District on account of the Allowed Class 4C and 4D Claims, the amount and timing of the Distributions will change depending on whether the District makes an election pursuant to section 1111(b) of the Bankruptcy Code. If the District does not make the election, the unsecured deficiency portion of the Allowed Claims will be treated as Class 7 General Unsecured Claims (which would therefore increase the aggregate amount of Class 7 General Unsecured Claims).

MIAMI 2904666.4 7945135741

If the District does make the 1111(b) election, then the District will receive "true-up" payments as part of its Distribution. The amount of the true-up payments will fluctuate depending on the timing of sales of units in the North and South Parcels. Attached as Exhibit 6 hereto is a schedule of the initial balance of the Class 4C and 4D Distributions, as well as the estimated interest payments and true-up payments necessary to ensure that the District, as the Holder of Classes 4C and 4D Claims, will receive deferred cash payments equal to the Allowed Amount of such Claims. The quicker the units in the North and South Parcel sell, the sooner the District will receive principal amortization payments,[6] thereby reducing the amount of accrued interest and correspondingly, increasing the amount of true-up payments to ensure that the District will receive, in the aggregate, deferred Cash payments from the Effective Date through the Class B Maturity Date equal to the Allowed Amount of the Class 4C and 4D Claims.[7] The converse is true as well. Therefore, the amount of the projected true-up payments in Exhibits 4 and 6 are estimates only, and will vary depending on when actual sales of the units occur. In any event, the Assessment Obligations included within Classes 4C and 4D are due and payable in full on the Class B Maturity Date.

The Debtors are seeking approval by the Bankruptcy Court of the amount of the Allowed Secured District Claims, as well as the Allowed Amount of the District Claims. Once the Bankruptcy Court determines the Allowed Amount of these Claims held by the District, then the Debtors will seek approval from the District of the special assessment methodology for the payment of these Claims, in connection with the submission for approval by the City of Doral and Miami-Dade County, Florida of the final plat for the development of the Property and the development plan for the New Development. The distributions provided in the Plan to be funded to the District in respect of the Allowed Class 4 Claims are predicated upon the proposed payment schedule for the Assessment Obligations, which are included in the Allowed Amount of the District Claims. The payment schedule will be submitted to the District for final approval, in connection with seeking approval of the plat and development plan for the Property by the City of Doral and Miami-Dade County, Florida. The Bankruptcy Court will not be responsible for approving the payment schedule for the Allowed Assessment Obligations nor the associated assessment methodology.

5.    **Creditor Trust**

On the Effective Date, the Debtors shall establish the Creditor Trust for the benefit of Holders of Allowed General Unsecured Claims, and the Committee shall appoint the Creditor Trustee to administer the assets of the Creditor Trust, including the Cash payments made pursuant to Section 4.7 of the Plan. Counsel to the Committee shall file a copy of the agreement establishing the Creditor Trust and appointing the Creditor Trustee prior to the Confirmation Hearing.

---

[6]    Each time a unit sells, the District receives a pay down of a portion of the principal balance from the proceeds of such sale.

[7]    There are no true-up payments required in connection with Classes 4A and 4B because, regardless of whether an 1111(b) election is made, the Reorganized Debtors and End Purchasers are obligated to make payments according to the amortization schedules attached as Exhibits 4.4A and 4.4B to the Plan.

MIAMI 2904666.4 7945135741

Each Holder of an Allowed General Unsecured Claim shall receive its ratable portion of the amounts funded into the Creditor Trust. On the Effective Date, each Holder of an Allowed General Unsecured Claim shall be deemed to have permanently relinquished its right to receive any payment or Distribution from the Debtors or the Reorganized Debtors in respect of its Claim other than its Distribution(s) from the Creditor Trust. No Distribution will be made to any Holder of a Disputed Claim on account of such Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim pursuant to settlement or Final Order, and shall then be paid only to the extent that such Claim is Allowed. The Creditor Trustee shall establish a reserve for Disputed Claims. If and when a Disputed Claim becomes an Allowed Claim pursuant to settlement or Final Order, any Distribution on account of such Claim shall be made by the Creditor Trustee as soon as practicable, in the Creditor Trustee's sole business judgment.

### 6.      Delivery of Documents

On the Effective Date, each Holder of an Allowed General Unsecured Claim shall be deemed to have permanently relinquished its right to receive any payment or Distribution from the Debtors or the Reorganized Debtors in respect of its Claim other than its Distribution(s) from the Creditor Trust. No Distribution will be made to any Holder of a Disputed Claim on account of such Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim pursuant to settlement or Final Order, and shall then be paid only to the extent that such Claim is Allowed. The Creditor Trustee shall establish a reserve for Disputed Claims. If and when a Disputed Claim becomes an Allowed Claim pursuant to settlement or Final Order, any Distribution on account of such Claim shall be made by the Creditor Trustee as soon as practicable, in the Creditor Trustee's sole business judgment.

### 7.      Delivery of Documents

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver to the Holders of Allowed Claims any relevant modifications or documents relating to their Claims without the need for further action by the Debtors, the Reorganized Debtors, the Plan Sponsor, or Holders of Claims or Interests.

### 8.      Cancellation of Existing Securities and Agreements

On the Effective Date, all agreements, documents and instruments relating to Claims and Old Equity Interests shall be cancelled; *provided, however*, that except to the extent modified hereby and/or the Confirmation Order, the liens securing the Class 2 Secured Claims of the Miami-Dade County Tax Collector, the Class 3 Secured Tax Certificate Claims, the Class 4 Secured District Claims, and the Class 5 AMT CADC Loan Claim, as applicable and if not otherwise disallowed pursuant to section 506 of the Bankruptcy Code, shall continue in effect until such Claims are satisfied in full pursuant to the terms of the Plan.

9.      **Legal Form and Governance**

a.      Amendment to Existing Organizational Documents.

On the Effective Date, or as soon thereafter as practicable, the Debtors shall file the Amended Organizational Documents as required or deemed appropriate, with the appropriate Persons in the applicable jurisdiction of organization, to reflect the issuance of the New Membership Units, among other things, and as otherwise deemed necessary, advisable, or appropriate by the managers of the Reorganized Debtors.    Except to the extent amended or restated by the Amended Organizational Documents, the Existing Organizational Documents will remain in full force and effect after the Effective Date.

b.      Managers of the Reorganized Debtors.

On the Effective Date, the operation of the Reorganized Debtors shall become the general responsibility of the new managers, subject to, and in accordance with, the Amended Organizational Documents.   The initial managers of the Reorganized Debtors shall be Pedro Martin and David Martin.  The biographies of Messrs. Martin and Martin are attached hereto as Exhibit 5.

c.      Due Authorization.

On the Effective Date, the adoption of the Amended Organizational Documents shall be authorized and approved in all respects, to be effective as of the Effective Date, in each case without further action under applicable law, regulation, order, or rule, including without limitation, any action by the managers of the Debtors or the managers or members of the Reorganized Debtors.   On the Effective Date, the cancellation and termination of the Old Equity Interests, the authorization and issuance of the New Membership Units, and all other matters provided in the Plan involving the legal structure or governance of the Reorganized Debtors shall be deemed to have occurred, been authorized, and be in effect from and after the Effective Date, in each case without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the managers or members of the Debtors or the Reorganized Debtors.

D.      **Securities Law Matters**

1.      **Exemptions from Securities Laws**

The issuance of the New Membership Units (to the extent such interests constitute "securities") pursuant to the Plan shall be exempt from any securities law registration requirements pursuant to section 4(2) of the Securities Act of 1933 (or Regulation D promulgated thereunder) and similar provisions of applicable state securities laws.

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in a transaction not involving any public offering is exempt from registration under the Securities Act. Regulation D is a non-exclusive safe-harbor promulgated by the United States Securities and Exchange Commission (the "Commission") under the Securities Act related to, among other things, section 4(2) of the Securities Act. The term "issuer," as used in section 4(2) of the Securities Act, means, among other things a person who issues or proposes to issue any security.

The New Membership Units will be "restricted securities" under applicable federal securities laws upon issuance on the Effective Date. The Securities Act and the rules of the Commission provide in substance that the holders may dispose of the New Membership Units only pursuant to an effective registration statement under the Securities Act or an exemption therefrom. However, the Debtors have no obligation or intention to register any of the New Membership Units, or to take action so as to permit sales pursuant to the Securities Act (including Rule 144 thereunder). Accordingly, under the Commission's rules, the holders may dispose of the New Membership Units principally only in "private placements" which are exempt from registration under the Securities Act, in which event the transferee will acquire "restricted securities" subject to the same limitations as in the hands of the holders. As a consequence, the holders must bear the economic risks of the New Membership Units for an indefinite period of time. There is no public market for the New Membership Units and such a public market may never develop.

The instruments that evidence the New Membership Units will bear a legend substantially in the form below:

**THE ISSUANCE OF THE SECURITIES EVIDENCED BY THIS INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS. SUCH SECURITIES MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE AND OTHER JURISDICTION.**

The Debtors make no representations concerning the right of any person to transfer any securities to be distributed pursuant to the Plan.

## 2.    Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, including, without limitation, the New Membership Units, (ii) the creation of any mortgage, deed of trust, or other security interest, (iii) the making or assignment of any lease or sublease, (iv) the making or

43

delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, (v) any merger agreement, or agreement of consolidation, and (vi) any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.  The Property shall be sold subject to existing real estate taxes.  The sale of units by the Reorganized Debtors after the Effective Date in connection with the New Development shall not be exempt transactions pursuant to section 1146(c) of the Bankruptcy Code.

###     3.      Expedited Tax Determination

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505 of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending before or after the Petition Date through and including the Effective Date.

### E.      Plan Provisions Governing Distributions

###     1.      Date of Distributions

Unless otherwise provided herein, any Distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon as practicable thereafter and deemed made on the Effective Date.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  No distribution shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim pursuant to settlement or Final Order, and shall then be paid only to the extent that such Claim is Allowed.

###     2.      Distributions Concerning General Unsecured Claims

            a.      Maintenance of Creditor Trust.

From and after the Effective Date, all Cash to be distributed on account of any Allowed General Unsecured Claim (i) will be maintained by and in the name of the Creditor Trustee in the Creditor Trust until all litigation relating to General Unsecured Claims has been resolved by settlement or Final Order, (ii) will be held in trust pending Distribution by the Creditor Trustee for the benefit of the Holders of such Claims, and (iii) will be accounted for separately.  The Creditor Trustee will invest any Cash in the Creditor Trust in the manner required by the Creditor Trust Agreement.

            b.      Timing of Distributions.

On or as soon as reasonably practicable after the Effective Date, the Creditor Trustee shall distribute to each Holder of an Allowed General Unsecured Claim its Ratable Portion of the amounts funded into the Creditor Trust as part of the Initial Equity Contribution; provided, however, that no Distribution will be made to any Holder of a Disputed General Unsecured Claim on account of such Disputed General Unsecured Claim unless and until such Disputed General Unsecured Claim becomes an Allowed Claim pursuant to settlement or Final Order, and shall then be paid only to the extent that such Claim is Allowed.

      c.      Disputed Claim Reserve.

The Creditor Trustee shall establish a reserve for Disputed General Unsecured Claims. If and when a Disputed General Unsecured Claim becomes an Allowed Claim pursuant to settlement or Final Order, any Distribution on account of such Claim shall be made by the Creditor Trustee as soon as practicable, in the Creditor Trustee's sole business judgment.

      d.      Recourse.

On the Effective Date, each Holder of an Allowed General Unsecured Claim shall be deemed to have permanently relinquished its right to receive any payment or Distribution from the Debtors or the Reorganized Debtors in respect of its Claim other than its Distribution(s) from the Creditor Trust. Each Holder of a General Unsecured Claim shall have recourse only to the undistributed Cash held in the Creditor Trust for satisfaction of the Distributions to which Holders of Allowed General Unsecured Claims are entitled under this Plan, and not to the Reorganized Debtors, their property, or any assets previously distributed on account of any other Allowed Claim. Each Holder of an Allowed General Unsecured Claim shall receive only one Distribution on account of such Allowed General Unsecured Claim regardless of whether the Holder has asserted that particular Claim against more than one Debtor.

### 3.      Disbursing Agent

All Distributions under the Plan (other than those Distributions funded by End Purchasers of units or Distributions distributed by the Creditor Trustee) shall be funded by the Reorganized Debtors and disbursed by or at the direction of the Reorganized Debtors as Disbursing Agent or such other entity designated by the Reorganized Debtors as a Disbursing Agent on or after the Effective Date and prior to the closing of these Cases. The Disbursing Agent shall not be required to give any bond, surety or other security for the performance of its duties.

### 4.      Rights and Powers of Disbursing Agent

      a.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii)

make or direct all Distributions contemplated hereby, (iii) employ professionals to represent him, her, or it with respect to its responsibilities, if necessary, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

> b.    Expenses Incurred on or after the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date, including, without limitation, attorneys' fees and expenses shall be paid in Cash by the Reorganized Debtors.

### 5.    Delivery of Distributions

Subject to Bankruptcy Rule 9010, all Distributions to a Holder of an Allowed Claim shall be made at the address of such Holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, as applicable, unless the Debtors or the Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim or Interest by such Holder that contains an address for such Holder different from the address reflected for such Holder on the Schedules.   In the event that a Distribution to a Holder is returned as undeliverable, the Disbursing Agent or Creditor Trustee, as applicable, shall use commercially reasonable efforts to determine the current address of such Holder, but no Distribution to such Holder shall be made unless and until the Disbursing Agent or Creditor Trustee, as applicable, has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from the Effective Date, 6 months after such Claim is Allowed, or 90 days after such Distribution is made.  After such date, all unclaimed property or interest in property other than interests in Distributions to General Unsecured Creditors shall revert to the Reorganized Debtors, and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred.

### 6.    Manner of Payment

At the option of the Disbursing Agent or Creditor Trustee, as applicable, any Cash payment to be made hereunder or pursuant to the Creditor Trust Agreement may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

All Distributions of Cash under this Plan to the Holders of Claims against the Debtors, except General Unsecured Claims, shall be made by, or on behalf of, the Reorganized Debtors.  Distributions of Cash to the Holders of General Unsecured Claims shall be made by the Creditor Trustee.

7.      **Setoffs and Recoupment**

The Debtors may, but shall not be required to, set off against, or recoup from any Claim and the Distributions to be made under the Plan, claims of any nature whatsoever that the Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or Reorganized Debtors of any claim the Debtors may have against the Holder of such Claim.

8.      **Allocation of Plan Distributions Between Principal and Interest**

Except as otherwise provided for in the Plan, to the extent that any Allowed Claim entitled to a Distribution under the Plan consists of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

9.      **De Minimis Distributions Less Than $25.00**

No Distribution of less than Twenty-Five Dollars ($25.00) shall be made to any Holder of an Allowed Claim.  Such undistributed amount will be retained by the Reorganized Debtors.

10.     **Withholding and Reporting Requirements**

In connection with the Plan and all Distributions hereunder, the Disbursing Agent or Creditor Trustee, as applicable, shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Disbursing Agent or Creditor Trustee, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent or Creditor Trustee, as applicable, for the payment and satisfaction of such withholding tax obligations.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Section 6.5(a) of the Plan.

### F.     Procedures for Treating Disputed Claims

#### 1.     Objections

Except as otherwise provided for in the Plan, as of the Effective Date, objections to, and requests for estimation of, Claims may be interposed and prosecuted only by the Reorganized Debtors or the Creditor Trustee, as applicable.  Such objections and requests for estimation shall be served on the Holder of the respective Claim and filed with the Bankruptcy Court on or before the latest of (a) the deadline established under Local Rule 3007-1(B)(1), (b) sixty (60) days after a proof of Claim has been filed with the Bankruptcy Court, (c) sixty (60) days after an application for allowance of an Administrative Expense has been filed with the Bankruptcy Court in the Cases, or (d) with respect to certain Claims identified prior to the Confirmation Date by the Debtors, such other date as may be fixed by the Bankruptcy Court.

The Creditor Trustee shall have the power and authority to pursue General Unsecured Claim Objections and Avoidance Actions, with the proceeds thereof to be placed in the Creditor Trust.  Distributions to Holders of Allowed General Unsecured Claims resulting from General Unsecured Claim Objections or derived from Avoidance Actions shall be made by the Creditor Trustee as soon as practicable, in the Creditor Trustee's business judgment.  Any Distributions on account of Claims Objections or Avoidance Actions are highly speculative in nature and the Debtors cannot estimate the potential recovery from such sources.

#### 2.     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is Disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.

#### 3.     Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent or Creditor Trustee, as applicable, shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under this Plan.

### G.     Provisions Governing Executory Contracts and Unexpired Leases

#### 1.     Treatment

Except as otherwise provided for in the Plan, including in Section 10.4 (Indemnification Obligations), in the Confirmation Order or other order of the Bankruptcy Court, or in any contract, instrument, release, indenture, or other agreement, or document entered into in

MIAMI 2904666.4 7945135741

connection with the Plan, as of the Effective Date, each of the Debtors shall be deemed to have rejected each pre-petition executory contract and unexpired lease to which that Debtor is a party, unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) previously expired or terminated pursuant to its own terms, or (c) is the subject of a motion to assume filed on or before the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease rejections described above, as of the Effective Date.

### 2.    Rejection Damage Claims

Proofs of Claim arising out of the rejection of executory contracts and unexpired leases pursuant to the Plan shall be filed with the Bankruptcy Court with proper supporting documentation detailing the calculation of such claim, and served upon the Debtors and their counsel not later than thirty (30) days after the date on which notice of the occurrence of the Effective Date has been served.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors, and their respective properties and interests.

### H.    Conditions Precedent to Confirmation

The Plan shall not be confirmed unless and until the following conditions have been satisfied or waived in accordance with Article IX of the Plan:  (a) the Confirmation Order, in form and substance satisfactory to the Debtors has been entered on the docket maintained by the Clerk of the Bankruptcy Court; and (b) the Plan, all exhibits thereto, and the Confirmation Order are acceptable in form and substance to the Debtors and the Plan Sponsor.

### I.    Conditions Precedent to Effectiveness

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Article IX of the Plan:

a.    The Confirmation Order shall have become a Final Order;

b.    All amounts to be paid by the Plan Sponsor as the Initial Equity Contribution are indefeasibly paid in full, in Cash;

c.    All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan, including those actions identified in Article V of the Plan, are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors and the Plan Sponsor; and

e.    All authorizations, consents, and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked.

49

1.     **Waiver of Conditions**

Each of the conditions precedent in Section 9.2 of the Plan may be waived, in whole or in part by the Debtors.   Any such waivers may be affected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action.

2.     **Satisfaction of Conditions**

Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors determine that one of the conditions precedent set forth in Section 9.2 of the Plan cannot be satisfied and the occurrence of such condition is not waived or cannot be waived, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court and the Confirmation Order may be vacated by the Bankruptcy Court.  If the Confirmation Order is vacated pursuant to this Section, the Plan shall be null and void in all respects, and nothing contained in the Plan shall constitute a waiver or release of any Claims against the Debtors or the allowance of any Claim as an Allowed Claim.

**J.     Effect of Confirmation**

1.     **Binding Effect**

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan, whether or not such Holder has accepted the Plan, and whether or not such Holder is entitled to a Distribution under the Plan.

2.     **Discharge of Debtor**

Except to the extent otherwise provided for in the Plan or in the Confirmation Order, the rights afforded in the Plan and the treatment of all Claims against or Interests in the Debtors under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all debts of, Claims against, and Interests in, the Debtors of any nature whatsoever, known or unknown, including, without limitation, any interest accrued or expenses incurred thereon from and after the Petition Date, or against their Estates, the Reorganized Debtors, or their properties or interests in property.  Except as otherwise provided for in the Plan or in the Confirmation Order, upon the Effective Date, all Claims against and Interests in the Debtors shall be satisfied, discharged and released in full exchange for the consideration, if any, provided under the Plan.  Except as otherwise provided for in the Plan or in the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors or their properties or interests in property including the Property, any other Claims based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

MIAMI 2904666.4 7945135741

3.      **Term of Injunctions or Stays**

Except as otherwise expressly provided for in the Plan or in the Confirmation Order, all Persons who have held, hold, or may hold Claims or Interests will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on such Claim or Interest against the Debtors, the Reorganized Debtors, any of their Affiliates or Representatives, the Plan Sponsor, or any Affiliates or Representatives of the Plan Sponsor, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, any of their Affiliates or Representatives, the Plan Sponsor, or any Affiliates or Representatives of the Plan Sponsor, with respect to such Claim or Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, any of their Affiliates or Representatives, the Plan Sponsor, or any Affiliates or Representatives of the Plan Sponsor, or against the property or interests in property of the Debtors or Reorganized Debtors, including the Property, or the property or interests in property of their respective Affiliates or Representatives, with respect to such Claim or Interest, and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to the Debtors or Reorganized Debtors, or their respective Affiliates or Representatives, or the Plan Sponsor or its Affiliates or Representatives, or against the property or interests in property of the Debtors or Reorganized Debtors, or their respective Affiliates or Representatives, or the Plan Sponsor or its Affiliates or Representatives, with respect to such Claim or Interest.

Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until and after the Effective Date.

4.      **Indemnification Obligations**

The Debtors' obligations under the Insider Indemnities to indemnify any Indemnified Person with respect to Claims arising prior to the Effective Date under state law will be deemed and treated as executory contracts that are assumed by the Reorganized Debtors pursuant to the Plan and sections 365 and 1123(b) of the Bankruptcy Code as of the Effective Date and the occurrence of the Effective Date shall be the only condition necessary to such assumption and all requirements for cure and/or adequate assurance of future performance under section 365 for such assumption shall be deemed satisfied (the "Assumed Insider Indemnities").

5.      **Exculpation**

As of the Confirmation Date, the Debtors and their Affiliates and Representatives, and the Plan Sponsor shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. The Debtors, the Reorganized Debtors, the Plan Sponsor, the Creditors Committee, the Disbursing Agent or Creditor Trustee, as applicable, and each of their respective Affiliates and Representatives shall have no liability to any Holder of any Claim or Interest or any other Person

51

for any act or omission taken or not taken in good faith in connection with, or arising out of, the Cases, the Disclosure Statement, this Plan, the solicitation of votes for and the pursuit of confirmation of this Plan, the offer and issuance of any securities under this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for willful misconduct, gross negligence, or ordinary malpractice with respect to any professionals retained, in each case determined by a Final Order, and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### 6.    Releases

FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING, BUT NOT LIMITED TO, THE DISTRIBUTIONS TO BE MADE UNDER THE PLAN, AND THE EQUITY CONTRIBUTION, EFFECTIVE AS OF THE EFFECTIVE DATE, EACH RELEASEE IS HEREBY RELEASED BY ALL OF THE CREDITORS OF THE DEBTORS, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD ANY CLAIM OR EQUITY INTEREST, ALL OTHER PERSONS, THE DEBTORS, THE ESTATES, AND THE REORGANIZED DEBTORS FROM ANY AND ALL CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, DIRECTLY OR INDIRECTLY ARISING FROM OR RELATED TO THE DEBTORS, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, THAT ANY OF THE CREDITORS OF THE DEBTORS, ANY PERSONS WHO HAVE HELD, HOLD OR MAY HOLD ANY CLAIM OR EQUITY INTEREST, ANY OTHER PERSONS, THE DEBTORS, THE ESTATES OR THE REORGANIZED DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY CREDITORS OF THE DEBTORS, ANY PERSONS WHO HAVE HELD, HOLD OR MAY HOLD ANY CLAIM OR EQUITY INTEREST, OR ANY OTHER PERSON WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF THE DEBTORS OR THE ESTATES OR THE REORGANIZED DEBTORS, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION, CLAIMS, ACTIONS, AND CAUSES OF ACTION ARISING FROM ACTIONS TAKEN OR NOT TAKEN IN GOOD FAITH IN CONNECTION WITH THE CASES, THE PLAN, ALL AGREEMENTS, DOCUMENTS AND INSTRUMENTS RELATING TO THE OLD EQUITY INTERESTS, AND THE RESTRUCTURING OF THE DEBTORS AND OTHER TRANSACTIONS CONTEMPLATED BY THE PLAN; *PROVIDED, HOWEVER,* THAT NOTHING IN THE PLAN SHALL BE DEEMED TO RELEASE ANY RIGHTS, CLAIMS, OR INTERESTS THAT ANY SUCH PARTY MAY BE RECEIVING OR RETAINING PURSUANT TO THE PLAN ON OR AFTER THE EFFECTIVE DATE. ALL PERSONS SHALL BE PRECLUDED AND PERMANENTLY ENJOINED FROM ASSERTING AGAINST THE RELEASEES, AND THEIR RESPECTIVE ASSETS AND PROPERTIES, ANY AND ALL CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS,

**DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER WHICH ARE RELEASED UNDER THIS SECTION 10.6. ANY PERSON INJURED BY ANY WILLFUL VIOLATION OF SUCH INJUNCTION SHALL RECOVER ACTUAL DAMAGES, INCLUDING COSTS AND ATTORNEYS' FEES, AND, IN APPROPRIATE CIRCUMSTANCES, MAY RECOVER PUNITIVE DAMAGES, FROM THE WILLFUL VIOLATOR.**

      7.     **Causes of Action**

      Effective as of the Effective Date, the Estate Causes of Action, including all preference or other avoidance action claims and actions of the Debtors arising under chapter 5 of the Bankruptcy Code shall be retained by the Reorganized Debtors; *provided*, *however*, that any such Estate Causes of Action against current officers or directors of the Debtors, or any of their respective Representatives or Affiliates, are released and extinguished.

**K.     Retention of Jurisdiction**

      The Bankruptcy Court shall have exclusive jurisdiction over all matters, except as expressly noted in the Plan, arising out of, or related to, the Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

      a.     To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims including any Administrative Expenses resulting therefrom;

      b.     To determine any and all adversary proceedings, applications, and contested matters that are pending on the Effective Date;

      c.     To ensure that Distributions to Holders of Allowed Administrative Expenses and Allowed Claims are accomplished as provided for in the Plan;

      d.     To hear and determine any timely objections to, or requests for estimation of, Administrative Expenses or proofs of Claims, including, without limitation, any objections to the classification of any Administrative Expense, or Claim, and to allow or disallow any Disputed Administrative Expense or Disputed Claim, in whole or in part;

      e.     To resolve disputes as to the ownership of any Administrative Expense, Claim, or Equity Interest;

f.    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

g.    To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

h.    To consider any amendments to or modifications of the Plan, or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

i.    To hear and determine all applications of retained professionals under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

j.    To hear and determine disputes or issues arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing, or any settlement approved by the Bankruptcy Court;

k.    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date, or request by the Reorganized Debtors after the Effective Date, for an expedited determination of taxes under section 505(b) of the Bankruptcy Code);

l.    To hear any other matter not inconsistent with the Bankruptcy Code;

m.    To hear and determine all disputes involving the existence, scope, and nature of the discharges, releases, exculpations and injunctions granted under the Plan, the Confirmation Order, or the Bankruptcy Code;

n.    To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any Person with the consummation or implementation of the Plan;

54

o.    To enter a final decree closing the Cases; and

p.    To hear any claim, matter or chose in action, whether or not it has been commenced prior to the Effective Date, that the Debtors or Reorganized Debtors may prosecute, including any Estate Causes of Action which have not been liquidated prior to the Effective Date, including, without limitation, any matter for which the United States District Court for the Southern District of Florida may also have concurrent jurisdiction, in which case the claim, matter, or chose in action may also be heard by such District Court.

## L.    Miscellaneous Provisions

### 1.    Payment of Statutory Fees

Notwithstanding any other provisions of the Plan to the contrary, the Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6), within ten (10) days of the entry of the order confirming the Plan, for pre-confirmation periods and simultaneously file all the Monthly Operating Reports for the relevant periods, indicating the cash disbursements for the relevant period.  The Debtor, as Reorganized Debtor, shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Reorganized Debtor, until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code, and the Reorganized Debtor shall provide to the United States Trustee upon the payment of each post-confirmation payment, and concurrently file with the Bankruptcy Court, Post-Confirmation Quarterly Operating Reports indicating all the cash disbursements for the relevant period.

### 2.    Modification of Plan

The Plan may be modified by the Debtors, in accordance with section 1127 of the Bankruptcy Code.

### 3.    Revocation of Plan

The Debtors reserves the right at any time prior to the entry of the Confirmation Order to revoke and withdraw the Plan.

### 4.    Severability of Plan Provisions

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall

have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

### 5.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws.

### 6.    Compliance with Tax Requirements

In connection with the consummation of this Plan, any party issuing any instrument or making any Distribution under this Plan, including the Reorganized Debtors, the Disbursing Agent or Creditor Trustee, as applicable,, and the Plan Sponsor, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions under this Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution.  Any party issuing an instrument or making a Distribution under this Plan has the right, but not the obligation, to not make such Distribution until the Holder of the applicable Allowed Claim has made arrangements satisfactory to such disbursing party for payment of tax obligations.

### 7.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### 8.    Notices

To be effective, all notices, requests, and demands to or upon the Debtors, Reorganized Debtors and/or the Plan Sponsor relating to the Plan shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided for in the Plan, shall be

MIAMI 2904666.4 7945135741

deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Town Center at Doral, LLC
c/o Kodsi Law Firm, P.A.
701 W. Cypress Creek Road
Suite 303
Fort Lauderdale, FL 33309
Attn:  Isaac Kodsi
Facsimile:  (954) 771-4676
Email:  ikodsi@ark-financial.com

– and –

Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue
Suite 2300
Miami, FL 33131
Attn:  Mindy Mora, Esq.
Tara V. Trevorrow, Esq.
Facsimile:  (305) 351-2242
Email:  mmora@bilzin.com

– and –

Berger Singerman
1450 Brickell Avenue
Suite 1900
Miami, FL 33131
Attn:  Jordi Guso, Esq.
Debi Galler, Esq.
Facsimile:  (305) 714-4340
Email:  jguso@bergersingerman.com

**9.      Filing or Execution of Additional Documents**

On or before the Effective Date, and without the need for any further order or authority, the Debtors or Reorganized Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Debtors or Reorganized Debtors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

MIAMI 2904666.4 7945135741

# VII.

## CERTAIN FACTORS AFFECTING THE DEBTORS

### A.      Certain Bankruptcy Law Considerations

#### 1.      Risk of Non-Confirmation of the Plan of Reorganization

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.  Moreover, the failure of the Debtors to obtain a final and nonappealable Confirmation Order may result in further modification of the Plan.

#### 2.      Non-Consensual Confirmation

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Because Class 8 (Old Equity Interests) is deemed to reject the Plan, these requirements must be satisfied with respect to Class 8.  The Debtors believe that the Plan satisfies these requirements; however, there can be no guarantee that the Bankruptcy Court will make such a finding.

#### 3.      Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

### B.      Additional Factors to Be Considered

#### 1.      The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court, *provided, however*, the Debtor will update the Disclosure Statement if there are material changes.

## 2.        No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Reorganization Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance, or rejection, of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

## 3.        Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be allowed.

## 4.        Claims Could Be More Than Projected

The Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of Distributions to be reduced substantially.  If Administrative Expenses, Priority Tax Claims, Priority Non-Tax Claims, the Secured Claim of Miami-Dade Tax Collector, Secured Tax Certificate Claims, the Secured District Claims, AMT CADC Loan Claims, Other Secured Claims, or General Unsecured Claims exceed projections, it may impair the value of the Creditor Trust anticipated to be distributed to the Holders of the AMT CADC Loan Claim and Allowed General Unsecured Claims.

## 5.        No Legal or Tax Advice is Provided to You by this Disclosure Statement

The contents of this Disclosure Statement should <u>not</u> be construed as legal, business or tax advice.  Each creditor or Equity Interest Holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is <u>not</u> legal advice to you.  This Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

## 6.        No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Equity Interests.

MIAMI 2904666.4 7945135741

7.    **Business Factors and Competitive Conditions**

      a.    General Economic Conditions.

The Debtors believe that the general financial condition of the United States economy will be stable over the next several years.  The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors.  Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.

      b.    Business Factors.

The Debtors believe that they will succeed in implementing and executing their business plan and operational restructuring for the benefit of all of the Debtors' constituencies. However, there are risks that the goals of the Debtors' going-forward business plan and operational restructuring strategy will not be achieved.  In such event, the Reorganized Debtors may be forced to sell all or parts of their assets, develop and implement further restructuring plans not contemplated herein, or become subject to further insolvency proceedings.

      c.    Competitive Conditions.

In addition to uncertain economic and business conditions, the Reorganized Debtors will likely face competitive pressures.  The Reorganized Debtors' anticipated operating performance may be impacted by these and other unpredictable activities by competitors.

      d.    Other Factors.

Other factors that Holders of Claims and Interests should consider are potential regulatory and legal developments that may impact the Reorganized Debtors.  Although these and other such factors are beyond the Debtors' control and cannot be determined in advance, they could have a significant impact on the Reorganized Debtors' operating performance.

8.    **Access to Financing and Trade Terms**

The viability of the Debtors' operations is dependent on the Reorganized Debtors' cash flow and sales of residential units.  The Debtors believe that substantially all of the Reorganized Debtors' needs for funds necessary to consummate the Plan will be met by sales of units and the Equity Contribution, as detailed in the Projections.

MIAMI 2904666.4 7945135741

9.      **Lack of Trading Market**

It is not contemplated that the New Membership Units will be registered under the Securities Act or the Securities Exchange Act of 1934 as of the Effective Date nor is it contemplated that the New Membership Units will be listed on a national securities exchange or the NASDAQ market system.  Accordingly, it is not contemplated that there will be any trading market for such New Membership Units and there can be no assurance that a holder of any of the New Membership Units will be able to sell such interests in the future or as to the price at which any such sale may occur.

10.     **Restrictions on Transfer**

Holders of New Membership Units issued under the Plan will be unable freely to transfer or to sell their securities except pursuant to (i) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws or (ii) pursuant to an available exemption from registration requirements.

C.      **Certain Tax Matters**

For a summary of certain federal income tax consequences of the Plan to holders of claims and equity interests and to the Debtors, see section XII below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN."

**VIII.**

**VOTING PROCEDURES AND REQUIREMENTS**

A.      **Voting Deadline**

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 3 (SECURED TAX CERTIFICATE CLAIMS), CLASS 4 (SECURED DISTRICT CLAIMS), CLASS 5 (AMT CADC LOAN CLAIM), CLASS 6 (OTHER SECURED CLAIMS), AND CLASS 7 (GENERAL UNSECURED CLAIMS) TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.  All known Holders entitled to vote on the Plan have been sent a ballot together with this Disclosure Statement.  Such Holders should read the ballot carefully and follow the instructions contained therein.  Please use only the ballot that accompanies this Disclosure Statement.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE CLERK OF BANKRUPTCY COURT AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M., EASTERN TIME, ON _____, 2012.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE DEBTORS' COUNSEL AT THE NUMBER SET FORTH BELOW.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.

FAXED COPIES OF BALLOTS WILL NOT BE ACCEPTED.  MAIL OR DELIVER YOUR BALLOT TO:

> **CLERK OF BANKRUPTCY COURT**
> 51 SW First Avenue, Room 1510
> Miami, FL 33130

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

> **BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
> 1450 Brickell Avenue, Suite 2300
> Miami, FL 33131
> Attn:  Luisa Flores
> lflores@bilzin.com
> (305) 350-7205

## B.    Holders of Claims Entitled to Vote

Class 3 Secured Tax Certificate Claims, Class 4 Secured District Claims, Class 5 AMT CADC Loan Claim, Class 6 Other Secured Claims, and Class 7 General Unsecured Claims are the only classes of Claims under the Plan that are impaired and entitled to vote to accept or reject the Plan.  Each holder of an Allowed Claim who is entitled to vote in Classes 3 through 7 may vote to accept or reject the Plan.

## C.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims occurs when holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that cast ballots for acceptance or rejection of the Plan of reorganization vote to accept the Plan.  Thus, acceptance of the Class 3 Secured Tax Certificate Claims, Class 4 Secured District Claims, Class 5 AMT CADC Loan Claim, Class 6 Other Secured Claims, and Class 7 General Unsecured Claims will occur only if at least two-thirds in dollar amount and a majority in number of the Holders of the Claims in the respective class that cast their ballots vote in favor of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**D.    Voting Procedures**

    **1.    Holder of Class 3A-3H Claims (Secured Tax Certificate Claims)**

The Holders of the Allowed Secured Tax Certificate Claims should complete the enclosed ballot.  To be counted, properly executed ballots must be returned to the Clerk so that they are received by the Clerk before the Voting Deadline.

    **2.    Holders of Class 4A-4D Claims (Secured District Claims)**

The Holders of Allowed Secured District Claims should complete the enclosed ballot.  To be counted, properly executed ballots must be returned to the Clerk so that they are received by the Clerk before the Voting Deadline.

    **3.    Holder of Class 5 Claim (AMT CADC Loan Claim)**

The Holder of Allowed AMT CADC Loan Claim should complete the enclosed ballot.  To be counted, properly executed ballots must be returned to the Clerk so that they are received by the Clerk before the Voting Deadline.

    **4.    Holders of Class 6 Claims (Other Secured Claims)**

The Holders of the Allowed Other Secured Claims should complete the enclosed ballot.  To be counted, properly executed ballots must be returned to the Clerk so that they are received by the Clerk before the Voting Deadline.

    **5.    Holders of Class 7 Claims (General Unsecured Claims)**

All Holders of Allowed General Unsecured Claims should complete the enclosed ballot.  To be counted, properly executed ballots must be returned to the Clerk so that they are received by the Clerk before the Voting Deadline.

MIAMI 2904666.4 7945135741

# IX.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for [_____].  The confirmation hearing may be adjourned from time-to-time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of claims or interests held or asserted by the objector against the Debtors' Estates or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon (i) Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue., Suite 2300, Miami, FL 33131, Attorneys for the Debtors (Attention:  Mindy A. Mora), (ii) Berger Singerman, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attorneys for Terra Landmark (Attention:  Jordi Guso and Debi Galler), (iii) Genovese, Joblove & Battista, P.A., 100 S.E. Second Street, Suite 4400, Miami, Florida 33131 (Attention:  Glenn D. Moses), and (iv) the Office of the United States Trustee, Southern District of Florida, 51 S.W. 1st Ave., Suite 1204, Miami, FL 33130 so as to be received no later than 4:00 p.m. (Eastern Time) on [_____].

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.    Requirements for Confirmation of the Plan of Reorganization

#### 1.    Requirements of Section 1129(a) of the Bankruptcy Code

a.    General Requirements.

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(3)    The Plan has been proposed in good faith and not by any means proscribed by law.

(4)    Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Cases, or in connection with the Plan and incident to the Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)    The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan of Reorganization, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.  With respect to each class of Claims or Interests, each Holder of an impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan on account of such Holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

(6)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

(7)    Except to the extent that the Holder of a particular Claim or Interest has agreed to a different treatment of such Claim or Interest, the Plan provides that Administrative Expenses and Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred Cash payments, over a period not exceeding six years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the allowed amount of such Claims.

(8)    At least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(9)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any

successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

        b.      Best Interests Test.

As described above, the Bankruptcy Code requires that each Holder of an impaired Claim or Interest either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case.  The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional Administrative Expenses and Priority Claims that may result from the termination of the Debtors' businesses and the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below).  Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a chapter 7 liquidation additional Claims may arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the Cases.

The foregoing types of Claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured Claims.  Under the absolute priority rule, no junior creditor would receive Distribution until all senior creditors were paid in full, with interest, and no equity holder would receive Distribution until all creditors were paid in full, with interest.  The Debtors believe that in a chapter 7 case, Holders of Old Equity Interests would not receive a Distribution of property on account of their Interests.  Accordingly, the Plan satisfies the absolute priority rule.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for Distribution to creditors in a chapter 11 case, including (i) the

increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the same or less than the value of Distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

**The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

c.      Liquidation Analysis.

The Debtors' chapter 7 liquidation analysis and assumptions are set forth in Exhibit 3 to this Disclosure Statement. The Liquidation Analysis demonstrates that under an orderly liquidation, the estimated gross liquidation proceeds would be in the range of approximately $34.2 million. As of the Proposed Confirmation Date, the Secured District Claims are expected to total approximately $81.7 million (including principal, interest, and other costs through the Petition Date).

Following the payment of approximately $25,000 in liquidation costs, approximately $34.19 million would remain in assets available for distribution. The District would only receive a recovery of approximately 42% of the aggregate face value of the Secured District Claims, and the District would recover its collateral subject to outstanding property taxes of approximately $1,907,762.97 (plus interest). Moreover, this analysis demonstrates that there would be no assets left for distribution to Holders of the AMT CADC Loan Claim and General Unsecured Claims.

d.      Feasibility.

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by a liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to

meet their financial obligations as contemplated thereunder.  Based upon this analysis, as a result of the Equity Contribution, the Debtors believe that they will be able to make all payments required to be made pursuant to the Plan and that they will need no further financial reorganization.  The Debtors' projections are set forth in Exhibit 4 to this Disclosure Statement.

## 2. Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### a. No Unfair Discrimination.

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

### b. Fair and Equitable Test.

This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets forth different standards, depending on the type of claims or interests in such class.

### c. Secured Claims.

Each holder of an impaired secured claim either (i) retains its liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred Cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

### d. Unsecured Claims.

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

### e. Equity Interests.

Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or

68

redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement because as to Class 8 (Old Equity Interests), there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the Claims or Interests in such class.

# X.

# FINANCIAL INFORMATION

The pro forma unaudited balance sheets of the Debtors for the period ending October 31, 2011 are contained in Exhibit 2 to this Disclosure Statement, and represent the Debtors' financial condition during the two years preceding the Petition Date. This financial information is provided to permit the holders of claims and equity interests to better understand the Debtors' historical financial condition.

# XI.

# ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

## A.    Liquidation under Chapter 7

If no plan can be confirmed, the Cases may be dismissed or converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. In a chapter 7 liquidation or following dismissal of the Cases, the Debtors believe that there would be no distribution to the Holders of the AMT CADC Loan Claim or General Unsecured Claims.

A discussion of the effects that a chapter 7 liquidation would have on the recovery of Holders of Claims and Interests and the Debtors' liquidation analysis are set forth in section IX.B.1(b) above. The Debtors believe that liquidation under chapter 7 would result in smaller Distributions being made to creditors than those provided for in the Plan – and likely no distributions to any creditors other than the District, which would take the Property subject to existing tax liens and outstanding taxes – because of (a) the loss of any going concern value (since the Debtors could not continue to operate and develop the Property), (b) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion

over a shorter period of time, (c) additional Administrative Expenses involved in the appointment of a trustee and (d) additional expenses and claims that would be generated during the liquidation (some of which may be entitled to priority in treatment) and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

**B.      Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of their assets. With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan.  The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances.

## XII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtors and to the holders of Class 7 Claims.  The following summary does not address the United States federal income tax consequences to Holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan (*e.g.*, Administrative Expenses and the Secured Claims of the Miami-Dade County Tax Collector).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the United States federal income tax consequences described below.

The United States federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the United States federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, persons not holding their Claims as capital assets, financial institutions, tax-exempt organizations, Persons holding Claims who are not the original Holders of those Claims or who acquired such Claims at an acquisition premium, and Persons who have claimed a bad debt deduction in respect of any Claims).

*Accordingly, the following summary of certain United States federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim.*

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, Holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) Holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

## A.    Consequences to Holders of Class 7 Claims

Pursuant to the Plan, the Holders of Allowed General Unsecured Claims (Class 7) will receive a Cash Distribution in satisfaction and discharge of their Claims.

The following discussion does not necessarily apply to Holders who have Claims in more than one class relating to the same underlying obligation. Such Holders should consult their tax advisors regarding the effect of such dual status obligations on the federal income tax consequences of the Plan to them.

In general, each Holder of an Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received by the Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (y) the Holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). Pursuant to the Plan, distributions to any Holder of an Allowed General Unsecured Claim will be allocated first to the original principal amount of such Claim as determined for federal income tax purposes and then, to the extent the consideration exceeds such amount, to any portion of such Claim representing accrued original issue discount ("OID") or accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. In general, to the extent that an amount received by a holder of debt is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder will generally recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full. Each Holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of losses realized in respect of Allowed General Unsecured Claims for federal income tax purposes.

Where gain or loss is recognized by a Holder of an Allowed General Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was originally issued at a discount or a premium, whether the

71

Claim was acquired at a market discount, and whether and to what extent the Holder previously had claimed a bad debt deduction in respect of that Claim.

## B.    Information Reporting and Withholding

All Distributions to Holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under United States federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, the following:  (1) certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds; and (2) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

*The foregoing summary has been provided for informational purposes only. All Holders of Claims receiving a Distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.*

## XIII.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Class 3, Class 4, Class 5, Class 6, and Class 7 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than _____ 4:00 p.m. (Eastern Time) on the Voting Deadline.

Dated:  February 8, 2012

Respectfully submitted,

TOWN CENTER AT DORAL, LLC

By:____s/_____
          Isaac Kodsi, Vice President


LANDMARK AT DORAL EAST, LLC

By:____s/_____
          Isaac Kodsi, Vice President


LANDMARK AT DORAL SOUTH, LLC

By:____s/_____
          Isaac Kodsi, Vice President


LANDMARK CLUB AT DORAL, LLC

By:____s/_____
          Isaac Kodsi, Vice President


LANDMARK AT DORAL DEVELOPERS, LLC

By:____s/_____
          Isaac Kodsi, Vice President

**Exhibit 1**

**(Plan of Reorganization)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

--------------------------------------------------------X

In re:                                                    CHAPTER 11

TOWN CENTER AT DORAL, LLC, *et al.*          Case No.  11-35884-BKC-RAM

                                                          Jointly Administered

          Debtors.

--------------------------------------------------------X

**FIRST AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
Mindy A. Mora
Tara V. Trevorrow
1450 Brickell Avenue, Suite 2300
Miami, FL 33131

**Counsel for the Debtors**

Dated: February 8, 2012

MIAMI 2904888.4 7945135741

# TABLE OF CONTENTS

Page

ARTICLE I         DEFINITIONS AND INTERPRETATION ....................................1

    **A.**         **Definitions** ..........................................................................1

    **B.**         **Interpretation; Application of Definitions and Rules of Construction**..................................................................11

ARTICLE II        PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS AND DIP FINANCING CLAIM ...................................................................11

    2.1      *Administrative Expenses* ........................................11

    2.2      *Priority Tax Claims* .................................................12

    2.3      *DIP Financing Claim* ...............................................12

ARTICLE III       CLASSIFICATION OF CLAIMS AND INTERESTS, IMPAIRMENT, AND VOTING...................................12

ARTICLE IV        PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS ......................................................13

    4.1      *Priority Non-Tax Claims (Class 1)* .........................13

    4.2      *Secured Claim of Miami-Dade County Tax Collector (Class 2)*...................................................................13

    4.3      *Secured Tax Certificate Claims (Classes 3A-3H)* ................13

    *Class 3B – BTI Bluegate FTCF, LLC* ...............................14

    *Class 3C - Finance Southern Co* .......................................14

    *Class 3D – BTI Bluegate FTCF, LLC* ...............................14

    *Class 3E – Hilda Pico / Ocean Bank* .................................15

    *Class 3F – Finance Southern Co.* ....................................15

    *Class 3G – Hilda Pico / Ocean Bank* ................................15

    *Class 3H – BTI Bluegate FTCF, LLC*................................16

    4.4      *Secured District Claims (Classes 4A-4D)* .............16

    4.5      *AMT CADC Loan Claim (Class 5)* .......................19

TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| | 4.6 | *Other Secured Claims (Class 6)* | 19 |
| | 4.7 | *General Unsecured Claims (Class 7)* | 19 |
| | 4.8 | *Old Equity Interests (Class 8)* | 19 |
| | 4.9 | *Nonconsensual Confirmation* | 19 |
| ARTICLE V | | MEANS OF IMPLEMENTATION | 20 |
| | 5.2 | *Revesting of Assets* | 20 |
| | 5.3 | *New Membership Units* | 20 |
| | 5.4 | *Delivery of Documents.* | 20 |
| | 5.5 | *Cancellation of Existing Securities and Agreements* | 21 |
| | 5.6 | *Legal Form and Governance* | 21 |
| | 5.7 | *Exemption from Securities Laws* | 21 |
| | 5.8 | *Exemption from Transfer Taxes* | 22 |
| | 5.9 | *Expedited Tax Determination* | 22 |
| ARTICLE VI | | PROVISIONS GOVERNING DISTRIBUTIONS | 22 |
| | 6.1 | *Date of Distributions* | 22 |
| | 6.2 | *Distributions Concerning General Unsecured Claims* | 22 |
| | 6.3 | *Disbursing Agent* | 23 |
| | 6.4 | *Rights and Powers of Disbursing Agent* | 24 |
| | 6.5 | *Delivery of Distributions* | 24 |
| | 6.6 | *Manner of Payment* | 24 |
| | 6.7 | *Setoffs and Recoupment* | 25 |
| | 6.8 | *Allocation of Plan Distributions Between Principal and Interest* | 25 |
| | 6.9 | *De Minimis Distributions Less Than $25.00* | 25 |
| | 6.10 | *Withholding and Reporting Requirements* | 25 |

TABLE OF CONTENTS
(continued)

Page

ARTICLE VII    PROCEDURES FOR TREATING DISPUTED CLAIMS UNDER
PLAN OF REORGANIZATION .................................................26

7.1    *Objections* ...............................................................................26

7.2    *No Distributions Pending Allowance* ....................................26

7.3    *Distributions After Allowance* ..............................................26

ARTICLE VIII    EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....26

8.1    *Treatment* ...............................................................................26

8.2    *Rejection Damage Claims* .....................................................27

ARTICLE IX    CONDITIONS PRECEDENT TO CONSUMATION DATE ......27

9.1    *Conditions Precedent to Confirmation* ..................................27

9.2    *Conditions Precedent to Effectiveness* ...................................27

9.3    *Waiver of Conditions* .............................................................28

9.4    *Satisfaction of Conditions* .....................................................28

ARTICLE X    EFFECT OF CONFIRMATION ............................................28

10.1    *Binding Effect* ........................................................................28

10.2    *Discharge of Debtor* ..............................................................28

10.3    *Term of Injunctions or Stays* .................................................29

10.5    *Exculpation* ...........................................................................30

10.6    *Releases* .................................................................................30

10.7    *Causes of Action* ...................................................................31

ARTICLE XI    RETENTION OF JURISDICTION ........................................31

ARTICLE XII    MISCELLANEOUS PROVISIONS ...........................................33

12.1    *Payment of Statutory Fees* .....................................................33

12.2    *Modification of Plan* ..............................................................33

12.3    *Revocation of Plan* .................................................................33

12.4    *Severability of Plan Provisions* .............................................33

## TABLE OF CONTENTS
(continued)

Page

12.5 *Governing Law* .......................................................................34

12.6 *Compliance with Tax Requirements* ......................................34

12.7 *Computation of Time* ..............................................................34

12.8 *Notices* ....................................................................................34

12.9 *Filing or Execution of Additional Documents* ......................35

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

----------------------------------------------------------X

In re:                                                    CHAPTER 11

TOWN CENTER AT DORAL, LLC, *et al.*          Case No.  11-35884-BKC-RAM

                                                          Jointly Administered

            Debtors.

----------------------------------------------------------X

## FIRST AMENDED JOINT PLAN OF REORGANIZATION
## <u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

Town Center at Doral, LLC, Landmark at Doral East, LLC, Landmark at Doral South, LLC, Landmark Club at Doral, LLC, and Landmark at Doral Developers, LLC, as Debtors and Debtors in Possession, and Terra Landmark, LLC, as Plan Sponsor, hereby jointly propose the following chapter 11 plan of reorganization (the "<u>Plan</u>"), pursuant to section 1121(a) of the Bankruptcy Code:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

**A.    Definitions**

The following terms used herein shall have the respective meanings defined below:

1.1    ***Administrative Expense*** means any right to payment constituting a cost or expense of administration of the Cases that is Allowed under sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates, (b) any actual and necessary costs and expenses of operating the Debtors' business, (c) any indebtedness or obligations incurred or assumed by the Debtors during the Cases, (d) any compensation for professional services rendered and reimbursement of expenses incurred, to the extent Allowed by Final Order under sections 330 or 503 of the Bankruptcy Code, (e) all fees and charges assessed against the Estates under section 1930 of title 28 of the United States Code, and (f) cure payments for executory contracts and unexpired leases that are assumed under section 365 of the Bankruptcy Code.

MIAMI 2904888.4 7945135741

1.2     ***Affiliate*** (i) with respect to the Debtors, has the meaning set forth in section 101(2) of the Bankruptcy Code, and (ii) with respect to any Person (including, without limitation, the Debtors) means another Person who controls, is controlled by, or is under common control with such Person.

1.3     ***Allowed*** means with respect to any Claim or Interest or any portion thereof (other than a Disputed Claim or Disputed Interest) a Claim or Interest (a) that is the subject of a timely filed proof of Claim or Interest as to which no objection to allowance, request for estimation or motion to expunge or limit recovery of such Claim or Interest has been interposed on or before the applicable period of limitation fixed by Section 7.1 of this Plan or otherwise ordered by the Bankruptcy Court, (b) as to which any objection to its allowance has been settled, waived through payment, withdrawn, or denied by Final Order, (c) that has been allowed by Final Order or this Plan, (d) as to which the liability of the Debtors and the amount thereof are determined by Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (e) which is in an amount and of the classification and type set forth in the Debtors' Schedules, to the extent the Schedules list the Claim or Interest as undisputed, non-contingent and liquidated, and to which no objection is pending or filed, or (f) solely with respect to any Interest or any portion thereof, any Interest held of record as set forth in the books and records maintained by or on behalf of the Debtors; *provided*, *however*, that with respect to an Administrative Expense, "Allowed Claim" means an Administrative Expense as to which a timely request for payment has been made in accordance with Section 2.1 of the Plan (if such written request is required) and as to which the Debtors or another party in interest (i) has not interposed a timely objection or (ii) has interposed a timely objection and such objection has been settled, waived through payment, withdrawn, or denied by Final Order. Unless otherwise specified in this Plan or ordered by the Bankruptcy Court, "Allowed Claim" or "Allowed Administrative Expense" shall not include interest on such Claim or Administrative Expense from and after the Petition Date. ***Allowed*** when used as an adjective herein (such as Allowed Claim or Allowed Interest) shall have a corresponding meaning.

1.4     ***Amended Organizational Documents*** mean any amended and/or restated organizational documents of the Reorganized Debtors.

1.5     ***AMT CADC Loan*** means the debt obligation owed to AMT CADC Ventures, LLC by the Debtors, in the aggregate principal amount of approximately $103,870,058, relating to (i) those certain loans made by Ohio Savings Bank to the Debtors on or about January 30, 2005, as subsequently amended and (ii) that certain loan made by iStar

Financial, Inc. to the Debtors on or about December 18, 2007, as subsequently assigned.

1.6     ***AMT CADC Loan Claim*** means the claim arising from the AMT CADC Loan.

1.7     ***Applicable Rate*** means the lesser of (i) five percent (5%) or (ii) the rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System for the calendar week preceding the Effective Date and identified at http://www.federalreserve.gov/releases/h15/current/.

1.8     ***Appraised Value*** shall mean, with respect to the Property, the market value determined by Waronker & Rosen, Inc. unless such value is objected to, and in such instance, as determined by the Bankruptcy Court.

1.9     ***Assessment Obligations*** means (i) those obligations set forth in Resolutions 2005-12 and 2006-10 issued by the Board of Supervisors of the District, with an aggregate principal amount as of the Petition Date of approximately $71.5 million and (ii) those obligations described in the "Annual Notice of Operating Assessment", dated March 11, 2011, from the District to each of (i) Town Center at Doral, LLC, (ii) Landmark at Doral East, LLC, (iii) Landmark Club at Doral, LLC and (iv) Landmark at Doral South, LLC, which obligations as of the Petition Date had an aggregate Face Amount of $649,818 for the years 2008-2011.

1.10    ***Assumed Insider Indemnities*** shall have the meaning set forth in Section 10.4 hereof.

1.11    ***Avoidance Action*** means a Cause of Action pursuant to Chapter 5 of the Bankruptcy Code.

1.12    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Cases.

1.13    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of Florida, Miami Division.

1.14    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075, title 28 of the United States Code, as amended from time to time, as applicable to the Cases.

1.15    ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.16    ***Cases*** mean the cases commenced by the Debtors in the Bankruptcy Court on the Petition Date under chapter 11 of the Bankruptcy Code.

1.17    ***Cash*** means cash, cash equivalents and other readily available direct obligations of the United States of America, including bank deposits, checks and similar items.  When used in the Plan with respect to a Distribution under the Plan, the term ***Cash*** means the lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from the Reorganized Debtors drawn on a domestic bank.

1.18    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.19    ***Class A Maturity Date*** means May 1, 2038.

1.20    ***Class B Maturity Date*** means May 1, 2020.

1.21    ***Class 2 Claims*** means all Claims arising in Classes 2A, 2B, 2C and 2D.

1.22    ***Class 3 Claims*** means all Claims arising in Classes 3A, 3B, 3C, 3D, 3E, 3F, 3G and 3H.

1.23    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on its docket.

1.24    ***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.25    ***Confirmation Order*** means the order or orders of the Bankruptcy Court confirming this Plan.

1.26    ***Creditor Trust*** means the trust established for the benefit of Holders of Allowed General Unsecured Claims pursuant to, and consistent with the powers set forth in, this Plan and the Creditor Trust Agreement.

1.27    ***Creditor Trust Agreement*** means the agreement to be dated as of the Effective Date by and between the Committee and the Creditor Trustee, which will establish and set forth the provisions of the Creditor Trust.

1.28    ***Creditor Trustee*** means the person or entity appointed as the trustee of the Creditor Trust pursuant to the Creditor Trust Agreement.

1.29    ***Creditors Committee*** means the official joint committee of unsecured creditors appointed in these Cases pursuant to the *Appointment and*

*Notice of Appointment of Joint Committee of Creditors Holding Unsecured Claims* [ECF No. 31].

1.30 **Debtors** mean, collectively, Town Center at Doral, LLC; Landmark at Doral East, LLC; Landmark at Doral South, LLC; Landmark Club at Doral, LLC and Landmark at Doral Developers, LLC.

1.31 **DIP Financing Claim** means the superpriority Allowed Administrative Expense Claim relating to the postpetition financing approved pursuant to the *Final Order Granting Debtors' Emergency Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 363, and 364 and Bankruptcy Rules 2002, 4001, 6004, and 6006: (1) Authorizing Postpetition Financing; and (II) Approving Expense Reimbursement* [ECF No. ___].

1.32 **Disallowed** means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors that has not been Allowed pursuant to the Plan and that (i) has been disallowed, in whole or part, by a Final Order of the Bankruptcy Court; (ii) has been withdrawn by agreement of the Debtors and the Holder thereof, in whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as disputed, contingent or unliquidated and in respect of which a Proof of Claim or a Proof of Interest, as applicable, has not been timely filed or deemed timely filed pursuant to the Plan, the Bankruptcy Code, or any Final Order of the Bankruptcy Court or other applicable bankruptcy law; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any Proof of Claim or Proof of Interest, as applicable; or (vi) is evidenced by a Proof of Claim or a Proof of Interest that has been filed, or that has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court, but as to which such Proof of Claim or Proof of Interest was not timely or properly filed.  In each case a Disallowed Claim or a Disallowed Interest is Disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.  *Disallowed* when used as an adjective herein (such as Disallowed Claim or Disallowed Interest) shall have a corresponding meaning.

1.33 **Disbursing Agent** means the Reorganized Debtors in their capacity as a disbursing agent under this Plan, unless the Reorganized Debtors file a notice prior to the closing of these Cases naming any other Person or entity as the disbursing agent under this Plan.

1.34 **Disclosure Statement** means that certain disclosure statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise

modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, Rule 3017 of the Bankruptcy Rules and Rule 3017-1 of the Local Rules.

1.35    *Disputed* means any Claim, Interest or Administrative Claim that has been neither Allowed nor Disallowed

1.36    *Disputed Claim Reserve* means the reserve established pursuant to **Section 6.2** of this Plan for Disputed General Unsecured Claims.

1.37    *Distribution* means a distribution of Cash or other property, as the context requires, to a Holder of an Allowed Claim on account of such Allowed Claim or a distribution of equity to a Holder of an Allowed Interest on account of such Interest, in all cases pursuant to the terms of the Plan.

1.38    *District* means the Landmark at Doral Community Development District, which is a special purpose government entity authorized, established and governed by Chapter 190 of the Florida Statutes.

1.39    *District Claim* means a Claim arising from the Assessment Obligations.

1.40    *Effective Date* means a Business Day selected by the Debtors, and specified in a notice sent by the Debtors to all parties in interest, within five Business Days of the date on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of this Plan specified in Section 9.2 of this Plan shall have been satisfied or waived as provided in Section 9.3.

1.41    *End Purchasers* mean the purchasers of each of the residential, commercial, office or industrial units in the New Development.

1.42    *Equity Contribution* means the equity contributions to be made or the subordinated debt to be funded by the Plan Sponsor to the Reorganized Debtors to fund the transactions hereunder, including, but not limited to, the funding of the Creditor Trust, the payment of confirmation costs and professional fees associated with the Cases, and amounts necessary to make Distributions hereunder.  In no event shall the Equity Contribution be less than $5,000,000 or more than $20,000,000.

1.43    *Estates* means the Estates of the Debtors as created under section 541 of the Bankruptcy Code.

1.44    *Estate Causes of Action* mean all claims and causes of action of the Debtors against third parties arising under Chapter 5 of the Bankruptcy Code or under related federal or state statutes or common law, including fraudulent conveyance laws.

6

1.45 ***Existing Organizational Documents*** mean, collectively, each of the Debtors' limited liability company certificates of formation, or other charter documents legally forming and/or organizing the Debtors, and all bylaws and limited liability company operating agreements, as amended and/or restated up to, and in existence as of, the time immediately prior to the Effective Date.  Except to the extent amended or restated by the Amended Organizational Documents, such Existing Organizational Documents will remain in full force and effect.

1.46 ***Face Amount*** means either (i) the full stated amount claimed by the Holder of a Claim in any proof of Claim that has been timely filed, if the proof of Claim specifies only a liquidated amount, or (ii) if no proof of Claim has been filed, the proof of Claim has not been timely filed, or if the proof of Claim specifies an unliquidated amount, the amount of the Claim (a) acknowledged by the Debtors or the Reorganized Debtors in an objection to such Claim or in the Schedules as undisputed, non-contingent and liquidated, (b) estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) proposed by the Debtors or the Reorganized Debtors following the Effective Date.

1.47 ***Final Order*** means an order or judgment of a court of competent jurisdiction, which has been entered on the docket maintained by the clerk of such court, and which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or an analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

1.48 ***General Unsecured Claim*** means any Claim that arose or accrued prior to the Petition Date that is not an Administrative Expense, Priority Tax Claim, Priority Non-Tax Claim, DIP Financing Claim, AMT CADC Loan Claim, Secured Claim, or Old Equity Interest, but including, without limitation, Claims arising from the rejection of an unexpired lease or executory contract pursuant to this Plan or Final Order of the Bankruptcy Court.

1.49    ***General Unsecured Claim Objection*** means an objection to a General Unsecured Claim.

1.50    ***Holder*** means a Person that holds a beneficial interest in a Claim or Interest against the Debtors.

1.51    ***Indemnified Person*** means any director, officer, member, manager, agent, Representative or employee of the Debtors or any of their Affiliates before, on or after the Petition Date, and any director, officer, member, manager, agent, Representative or employee of the Reorganized Debtors or any of their Affiliates after the Effective Date.

1.52    ***Initial Equity Contribution*** means that portion of the Equity Contribution to be funded on the Effective Date, solely as new equity (and not subordinated debt), which amount shall be no less than $5,000,000.

1.53    ***Insider Indemnities*** means any obligation of the Debtors pursuant to the Debtors' or the Reorganized Debtors', or any of their Affiliates' pre-Effective Date or post-Effective Date formation documents (including, without limitation any Amended Organizational Documents), bylaws, organizational documents, operating agreements, agreements, contracts, statute or common law to indemnify any former, present, and future directors, officers, managers, members, agents, employees, and/or Representatives of (i) the Debtors, (ii) any Affiliates of the Debtors, or (iii) any Person serving in such capacity at the Debtors' request.

1.54    ***Interest*** or ***Equity Interest*** means the ownership interests in each of the Debtors.

1.55    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.56    ***Local Rules*** means the Local Rules of the United States Bankruptcy Court for the Southern District of Florida, as amended from time to time, as applicable to the Cases.

1.57    ***New Development*** means the real estate project to be developed on the Property by the Reorganized Debtors and the Plan Sponsor, which development will consist of residential, commercial, office, retail, and industrial units.

1.58    ***New Membership Units*** means the new Equity Interests in each of the Reorganized Debtors, as of the Effective Date.

1.59    ***North Parcel*** means the portion of the Property titled in the name of Landmark Club at Doral, LLC, Town Center at Doral, LLC, and Landmark at Doral East, LLC.

MIAMI 2904888.4 7945135741

1.60   **Old Equity Interest** means the Equity Interests in each of the Debtors, as of the Petition Date, represented by any instrument evidencing an ownership interest in the Debtors, whether or not transferable, including (a) any option, warrant, call, subscription, or other right, contractual or otherwise, to acquire any such interest and any redemption, conversion, exchange, put, voting participation, dividend right, liquidation preference, or any other designation, right, or preference whatsoever, relating to any such Equity Interest, and (b) all rights, interests, and Claims against the Debtors or their respective Affiliates or Representatives (including claims for fraud, misrepresentation, rescission, reimbursement, contribution, or damages) arising under, or in connection with, or in any way related to (i) all agreements entered into by the Debtors or their respective Affiliates or Representatives in connection with the issuance of such Equity Interest or any related transaction or (ii) the purchase or sale of such Equity Interest or any related transaction.

1.61   **Other Secured Claim** means a Secured Claim that is not a Secured Claim of the Miami-Dade County Tax Collector, a Secured Tax Certificate Claim, an AMT CADC Loan Claim or a Secured District Claim.

1.62   **Person** means an individual or partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof, or any other form of legal entity.

1.63   **Petition Date** means September 19, 2011, the date on which the Debtors commenced the Cases.

1.64   **Plan** means this Plan of Reorganization, including, without limitation, the Plan Supplement and the exhibits and schedules thereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.65   **Plan Sponsor** means Terra Landmark, LLC.

1.66   **Plan Supplement** means the supplement to this Plan containing certain documents relevant to the implementation of the Plan, including, but not limited to, the Amended Organizational Documents and the list of executory contracts and unexpired leases to be rejected pursuant hereto. The Plan Supplement and the documents contained therein shall be filed with the Bankruptcy Court no later than ten (10) Business Days before the deadline for voting to accept or reject this Plan, provided that the documents included therein may thereafter be amended and supplemented prior to the Confirmation Hearing.

9

1.67    ***Priority Non-Tax Claim*** means an unsecured Claim entitled to priority in payment as specified in sections 507(a)(3)-(7) of the Bankruptcy Code.

1.68    ***Priority Tax Claim*** means an unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.69    ***Property*** means the Debtors' real estate, which consists of approximately 120 contiguous acres located on the east side of NW 107th Avenue and the north side of NW 58th Street in Doral, Florida.

1.70    ***Ratable Portion*** means, with reference to any Distribution on account of an Allowed Claim in any class or classes, as applicable, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of Allowed Claims (plus Disputed Claims until Disallowed) in the same class or classes, as applicable.

1.71    ***Release Price Schedule*** means the schedule of principal payments to be received by the District upon the purchase of a unit in the New Development by an End Purchaser, which schedule is attached hereto as Exhibit "A".

1.72    ***Releasee*** means each of (a) the directors, managers, members, or other officers of the Debtors holding office as of the Effective Date or at any time subsequent to the Effective Date, (b) the Plan Sponsor, as the provider of the Equity Contribution, and (c) each of their respective Representatives and Affiliates, both individually and in their representative capacities.

1.73    ***Reorganized Debtors*** means the Debtors, from and after the Effective Date.

1.74    ***Representatives*** means, with respect to any particular Person, such Person's  present, former or future officers, directors, employees, consultants, members, managers, general or limited partners, principals, agents, advisors (including any attorneys, financial advisors, investment bankers, and other professionals retained by such Person), Affiliates, and any funds under management.

1.75    ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms promulgated by the Bankruptcy Court, as such schedules and statements have been or may be supplemented or amended through the Confirmation Date pursuant to Bankruptcy Rule 1007.

MIAMI 2904888.4 7945135741

1.76    ***Secured Claim*** means (i) a Claim secured by a Lien on the Debtors' property that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, but solely to the extent such Claim is deemed secured by section 506(a) and (b) of the Bankruptcy Code, or (ii) a Claim that is subject to setoff under section 553 of the Bankruptcy Code.

1.77    ***South Parcel*** means the portion of the Property titled in the name of Landmark at Doral South, LLC.

1.78    ***Tax Certificate*** means a valid tax certificate issued by the Miami-Dade County Tax Collector on the Property that remains unpaid as of the Effective Date.

1.79    ***Tax Certificate Claim*** means a Secured Claim arising out of the issuance of a tax certificate by the Miami-Dade County Tax Collector.

1.80    ***Tax Code*** means the Internal Revenue Code of 1986, as amended.

1.81    ***U.S. Trustee*** means the United States Trustee appointed under section 581, title 28 of the United States Code to serve in the Southern District of Florida.

MIAMI 2904888.4 7945135741

B.      **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section, article, schedule or exhibit references in this Plan are to the respective section in, article of, or schedule or exhibit to, this Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

## ARTICLE II

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSES, PRIORITY TAX CLAIMS AND DIP FINANCING CLAIM

2.1     ***Administrative Expenses***.

(a)     Except to the extent that a Holder of an Allowed Administrative Expense agrees to a less favorable treatment, as soon as reasonably practicable on or after the Effective Date, the Reorganized Debtors shall pay Cash in an amount equal to such Allowed Administrative Expense to each Holder of an Allowed Administrative Expense; *provided*, *however*, that Allowed Administrative Expenses representing liabilities incurred in the ordinary course of business by the Debtors shall be assumed and paid by the Reorganized Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

(b)     All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2)-(5) of the Bankruptcy Code shall (i) file, on or before the deadline specified in Local Rule 2016-1(c)(1), their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (A) upon the later of (1) the Effective Date and (2) the date on which the order that deemed such Administrative Expense Allowed becomes a Final Order or (B) upon such other terms as may be mutually agreed upon by such Holder and the Reorganized Debtors.   The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

MIAMI 2904888.4 7945135741

2.2 **Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, commencing as soon as reasonably practicable on or after the Effective Date, and continuing over a period not exceeding five (5) years from the Effective Date, Cash in an aggregate amount equal to such Allowed Priority Tax Claim, together with simple interest at the Applicable Rate, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim at any time without penalty. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors as such obligations become due.

2.3 **DIP Financing Claim.**

On the Effective Date, in full and final satisfaction of the DIP Financing Claim, and subject to the Plan Sponsor's simultaneous payment of the Initial Equity Contribution to the Reorganized Debtors, the Holder of the DIP Financing Claim shall receive, as soon as reasonably practicable on or after the Effective Date, 100% of the New Membership Units in the Reorganized Debtors.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS, IMPAIRMENT, AND VOTING

The categories of Claims and Interests, other than Administrative Expenses, Priority Tax Claims and the DIP Financing Claim, are classified for all purposes, including voting, confirmation, and Distribution pursuant to this Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No |
| Classes 2A-2D | Secured Claims of Miami-Dade County Tax Collector | Unimpaired | No |
| Classes 3A-3H | Secured Tax Certificate Claims | Impaired (all) | Yes |
| Classes 4A-4D | Secured District Claims | Impaired (all) | Yes |
| Class 5 | AMT CADC Loan Claim | Impaired | Yes |
| Class 6 | Other Secured Claims | Impaired | Yes |

13

| Class 7 | General Unsecured Claims | Impaired | Yes |
| Class 8 | Old Equity Interests | Impaired | No (Deemed to Reject) |

## ARTICLE IV

## PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS

Claims and Interests shall receive the treatment set forth below.

4.1    *Priority Non-Tax Claims (Class 1)*.

With respect to Allowed Priority Non-Tax Claims not paid pursuant to prior Bankruptcy Court order, as soon as reasonably practicable on or after the Effective Date or the date that is ten (10) days after the date such claim is Allowed, and except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, each Allowed Priority Non-Tax Claim shall be paid in full in Cash in accordance with the priorities set forth in section 507 of the Bankruptcy Code.  All Allowed Priority Non-Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors.

4.2    *Secured Claims of Miami-Dade County Tax Collector (Class 2)*.

*Class 2A – Ad Valorem Taxes of Town Center at Doral LLC (Folio 35-3017-001-0240)*

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Miami-Dade County on the Effective Date in respect of folio no. 35-3017-001-0240, which shall include statutory interest in the event that such taxes are delinquent at the time of payment.

*Class 2B – Ad Valorem Taxes of Landmark Club at Doral LLC (Folio 35-3017-001-0250)*

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Miami-Dade County on the Effective Date in respect of folio no. 35-3017-001-0250, which shall include statutory interest in the event that such taxes are delinquent at the time of payment.

*Class 2C – Ad Valorem Taxes of Landmark at Doral South LLC (Folio 35-3017-001-0362)*

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount

14

of any 2011 ad valorem taxes owed to Miami-Dade County on the Effective Date in respect of folio no. 35-3017-001-0362, which shall include statutory interest in the event that such taxes are delinquent at the time of payment.

### Class 2D – Ad Valorem Taxes of Landmark at Doral East LLC (Folio 35-3017-001-0241)

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Miami-Dade County on the Effective Date in respect of folio no. 35-3017-001-0241, which shall include statutory interest in the event that such taxes are delinquent at the time of payment.

As soon as reasonably practicable on or after the Effective Date, the Miami-Dade County Tax Collector shall receive payment in full in Cash in the amount of any 2011 ad valorem taxes owed to Tax Collector.  Tax Collector's first priority tax liens shall be retained on each property until said liens are paid in full.  Should payment in full of the 2011 ad valorem taxes not be made within the time specified above, Tax Collector shall be authorized to collect said taxes pursuant to Florida law, including the sale of tax certificates at the next available sale.

The amount of 2011 taxes owed, as reflected in the records of the Miami-Dade County Tax Collector, shall only be considered final so long as no Miami-Dade County Value Adjustment Board petitions or any action in Florida's circuit court regarding the 2011 assessments of the Miami-Dade County Property Appraiser with respect to the taxed real property are pending in accordance with Florida law.  In the event that such proceedings are pending, the amount of 2011 taxes owed shall not be deemed final until all administrative or judicial proceedings are concluded.  Any payments toward the 2011 taxes made by Debtors, such as statutorily-required good faith payments made in conjunction with administrative or judicial proceedings, shall be applied toward satisfaction of the Class 2 claims.

Post-petition taxes for the years 2012 forward shall be paid as ordinary course payments pursuant to Florida law, and in a manner consistent with the provisions above with respect to determination of the final tax amounts owed and the issuance of any refunds.

4.3  **Secured Tax Certificate Claims (Classes 3A-3H).**

### Class 3A – Sunshine State Certificate III

Class 3A consists of the Allowed Secured Claim relating to tax certificate number 10-26080, which is secured by a lien on the real estate parcel identified as folio number 35-3017-001-0240 held by Town Center at Doral, LLC.  In satisfaction of the Allowed Class 3A Secured Tax Certificate Claim, (i) the Holder of the Class 3A Secured Tax Certificate Claim shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3A Secured Tax Certificate Claim is satisfied in full pursuant to the terms hereof and (ii) as soon as reasonably

15

practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3A shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3A Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.00% per annum.

### Class 3B – BTI Bluegate FTCF, LLC

Class 3B consists of the Allowed Secured Claim relating to tax certificate number 09-29902, which is secured by a lien on the parcel identified as folio number 35-3017-001-0240 held by Town Center at Doral, LLC. In satisfaction of the Allowed Class 3B Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3B shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3B Secured Tax Certificate Claim is satisfied in full pursuant to the terms hereof and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3B shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3B Claim, plus any accrued interest on such Claim at the certificate interest rate of 9.50% per annum.

### Class 3C - Finance Southern Co.

Class 3C consists of the Allowed Secured Claim relating to tax certificate number 10-26081, which is secured by a lien on the parcel identified as folio number 35-3017-001-0241 held by Landmark at Doral East, LLC. In satisfaction of the Allowed Class 3C Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3C shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3C Secured Tax Certificate Claim is satisfied in full pursuant to the terms hereof and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3C shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3C Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.25% per annum.

### Class 3D – BTI Bluegate FTCF, LLC

Class 3D consists of the Allowed Secured Claim relating to tax certificate number 09-29903, which is secured by a lien on the parcel identified as folio number 35-3017-001-0241 held by Landmark at Doral East, LLC. In satisfaction of the Allowed Class 3D Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3D shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3D Secured Tax Certificate Claim is satisfied in full pursuant to the terms hereof and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3D shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3D Claim, plus any accrued interest on such Claim at the certificate interest rate of 8.50% per annum.

16

### *Class 3E – Hilda Pico / Ocean Bank*

Class 3E consists of the Allowed Secured Claim relating to tax certificate number 10-26084, which is secured by a lien on the parcel identified as folio number 35-3017-001-0362 held by Landmark at Doral South, LLC.  In satisfaction of the Allowed Class 3E Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3E shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3E Secured Tax Certificate Claim is satisfied in full pursuant to the terms hereof and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3E shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3E Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.25% per annum.

### *Class 3F – Finance Southern Co.*

Class 3F consists of the Allowed Secured Claim relating to tax certificate number 09-29907, which is secured by a lien on the parcel identified as folio number 35-3017-001-0362 held by Landmark at Doral South, LLC.  In satisfaction of the Allowed Class 3F Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3F shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3F Secured Tax Certificate Claim is satisfied in full pursuant to the terms hereof and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3F shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3F Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.25%, to be applied toward satisfaction of the Class 3F Allowed Secured Tax Certificate Claim per annum.

### *Class 3G – Hilda Pico / Ocean Bank*

Class 3G consists of the Allowed Secured Claim relating to tax certificate number 09-26082, which is secured by a lien on the parcel identified as folio number 35-3017-001-0250 held by Landmark Club at Doral LLC.  In satisfaction of the Allowed Class 3G Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3G shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3G Secured Tax Certificate Claim is satisfied in full pursuant to the terms hereof and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3G shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3G Claim, plus any accrued interest on such Claim at the certificate interest rate of 6.25%, to be applied toward satisfaction of the Class 3G Allowed Secured Tax Claim per annum.

### *Class 3H – BTI Bluegate FTCF, LLC*

Class 3H consists of the Allowed Secured Claim relating to tax certificate number 09-29904, which is secured by a lien on the parcel identified as folio number 35-3017-001-0250 held by Landmark Club at Doral, LLC.  In satisfaction of the Allowed Class 3H Secured Tax Certificate Claim, (i) the Holder of the Secured Tax Certificate Claim in Class 3H shall retain a lien on the real estate parcel described above until such time as the Allowed Class 3H Secured Tax Certificate Claim is satisfied in full pursuant to the terms hereof and (ii) as soon as reasonably practicable on or after the Effective Date, and on each of the succeeding four (4) anniversaries thereof, the Holder of the Secured Tax Certificate Claim in Class 3H shall receive an amount in Cash equal to 20% of the Allowed Secured Class 3H Claim, plus any accrued interest on such Claim at the certificate interest rate of 8.50% per annum.

4.4  *Secured District Claims (Classes 4A-4D).*

*Class 4A – Series A, North Parcel*

As of the Effective Date, in full and final satisfaction of the Class 4A Allowed Secured District Claim, (1) the Holder of the Class 4A Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to the Class 4C Claims, and (2) the Assessment Obligations comprising the Class 4A Allowed Secured District Claim shall (i) mature on the Class A Maturity Date, (ii) bear interest at the per annum rate of 5.5% on the outstanding Face Amount until maturity, which interest shall be paid semi-annually on May 1 and November 1 until maturity, (iii) have a Face Amount equal to 9/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv) from May 1, 2015 through the Class A Maturity Date, receive principal amortization in the amounts reflected in Schedule 4.4A attached hereto, from either the Reorganized Debtors with respect to the portion of the Property owned by the Reorganized Debtors or End Purchasers of residential units with respect to the portion of the Property owned by such End Purchasers.  The foregoing treatment shall apply notwithstanding the Holder of the Class 4A Allowed District Claim making an election under section 1111(b) of the Bankruptcy Code.

*Class 4B – Series A, South Parcel*

As of the Effective Date, in full and final satisfaction of the Class 4B Allowed Secured District Claim, (1) the Holder of the Class 4B Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to the Class 4D Claims, and (2) the Assessment Obligations comprising the Class 4B Allowed Secured District Claim shall (i) mature on the Class A Maturity Date, (ii) bear interest at the per annum rate of 5.5% on the outstanding Face Amount until maturity, which interest shall be paid semi-annually on May 1 and November 1 until maturity, (iii) have a Face Amount equal to 9/40 times the difference between the

18

Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv) from May 1, 2015 through the Class A Maturity Date, receive principal amortization in the amounts reflected in Schedule 4.4B attached hereto, from either the Reorganized Debtors with respect to the portion of the Property owned by the Reorganized Debtors or End Purchasers of units with respect to the portion of the Property owned by such End Purchasers. The foregoing treatment shall apply notwithstanding the Holder of the Class 4A Allowed District Claim making an election under section 1111(b) of the Bankruptcy Code.

### Class 4C – Series B, North Parcel

As of the Effective Date, in full and final satisfaction of the Class 4C Allowed Secured District Claim, (1) the Holder of the Class 4C Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to Class 4A Claims, and (2) the Assessment Obligations comprising the Class 4C Allowed Secured District Claim shall (i) mature on the Class B Maturity Date, (ii) bear interest at the per annum rate of 5.2% on the outstanding Face Amount until the Class B Maturity Date, which interest shall be paid semi-annually on May 1 and November 1 until the Class B Maturity Date, (iii) have a Face Amount equal to 16/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv) from the Effective Date through the Class B Maturity Date, receive principal amortization in connection with closings of the sale of single family homes and townhomes in the New Development according to the Release Price Schedule, from or at the direction of the Reorganized Debtors.

To the extent the Holder of the Class 4C Allowed Secured District Claim does not make an election pursuant to section 1111(b) of the Bankruptcy Code, then the unsecured deficiency portion of the Allowed District Claim shall be payable in and constitute part of Class 7. In the event the Holder of the Class 4C Allowed Secured District Claim makes an election pursuant to section 1111(b) of the Bankruptcy Code, then, in addition to the foregoing, such Holder shall also receive a true-up payment in connection with each closing of the sale of a single family home or townhome, as appropriate, and, if necessary, a balloon payment at the Class B Maturity Date, that ensures such Holder will receive deferred cash payments totaling at least the Allowed amount of the Class 4C District Claim as of the Petition Date.

### Class 4D – Series B, South Parcel

As of the Effective Date, in full and final satisfaction of the Class 4D Allowed Secured District Claim, (1) the Holder of the Class 4D Allowed Secured District Claim shall retain a first priority lien on the Property securing such Allowed Claim *pari passu* with any lien relating to the Allowed Secured Claim of Miami Dade County Tax Collector, any liens relating to the Allowed Class 3 Claims, and any liens relating to the Class 4B Claims, and (2) the Assessment Obligations comprising the Class 4D Allowed Secured District Claim shall (i) mature on the Class B Maturity Date, (ii) bear interest at the per annum rate of 5.2% on the outstanding Face Amount

until maturity, which interest shall be paid semi-annually on May 1 and November 1 until maturity, (iii) have a Face Amount equal to 6/40 times the difference between the Appraised Value and the aggregate amount of Class 2 Claims and Class 3 Claims, (iv) from the Effective Date through the Class B Maturity Date, receive principal amortization in connection with closings of the sale of residential, office and retail units in the New Development according to the Release Price Schedule, from or at the direction of the Reorganized Debtors.

To the extent the Holder of the Class 4C Allowed Secured District Claim does not make an election pursuant to section 1111(b) of the Bankruptcy Code, then the unsecured deficiency portion of the Allowed District Claim shall be payable in and constitute part of Class 7. In the event the Holder of the Class 4C Allowed Secured District Claim makes an election pursuant to section 1111(b) of the Bankruptcy Code, then, in addition to the foregoing, such Holder shall also receive a true-up payment in connection with each closing of the sale of a unit and, if necessary, a balloon payment at the Class B Maturity Date, that ensures such Holder will receive deferred cash payments totaling at least the Allowed amount of the Class 4C District Claim as of the Petition Date.

4.5    *AMT CADC Loan Claim (Class 5).*

As soon as reasonably practicable on or after the Effective Date, except to the extent that the Holder of the AMT CADC Loan Claim agrees to a less favorable treatment, the Holder of the AMT CADC Loan Claim shall receive (a) to the extent that the Holder of the AMT CADC Loan Claim has an Allowed Secured Claim, (i) a subordinated lien on the Property in an amount equal to such Allowed Secured Claim and (ii) beginning on the Effective Date, or as soon as reasonably practicable thereafter, quarterly payments of principal and interest based on an interest rate of 5% per annum and a thirty (30) year amortization period through the tenth $(10^{th})$ anniversary of the Effective Date, on which date all unpaid principal, interest and other charges shall be due and payable in full, and (b) to the extent that the Holder of the AMT CADC Loan Claim has an Allowed General Unsecured Claim, such General Unsecured Claim shall be payable in and constitute part of Class 7.

4.6    *Other Secured Claims (Class 6).*

As soon as reasonably practicable on or after the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, at the sole option of the Reorganized Debtors, (a) payment in full in Cash in the amount of the Allowed Other Secured Claim, (b) reinstatement of the Allowed Other Secured Claim, (c) satisfaction by the surrender of the collateral securing such Allowed Other Secured Claim, or (d) a treatment that otherwise renders the Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

MIAMI 2904888.4 7945135741

4.7     *General Unsecured Claims (Class 7).*

On the Effective Date, the Reorganized Debtors shall deposit $3,000,000 of the Initial Equity Contribution into the Creditor Trust.  On the second (2nd) anniversary of the Effective Date, the Reorganized Debtors shall deposit an additional $1,000,000 into the Creditor Trust.  In addition, on the Effective Date the Reorganized Debtors shall transfer Avoidance Actions and General Unsecured Claim Objections to the Creditor Trust.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed General Unsecured Claim shall receive its Ratable Portion of the amounts funded into the Creditor Trust.

Distributions of such Ratable Portion from the Creditor Trust shall be made in accordance with Section 6.2 of this Plan.

4.8     *Old Equity Interests (Class 8).*

On the Effective Date, the Old Equity Interests shall be cancelled and the Holders of Old Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Old Equity Interests. On the Effective Date, all obligations of the Debtors to Holders of Old Equity Interests shall be completely discharged.

4.9     *Nonconsensual Confirmation*.

If any impaired class of Claims entitled to vote shall not accept this Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend this Plan, undertake to have the Bankruptcy Court confirm this Plan under section 1129(b) of the Bankruptcy Code, or both.

With respect to the impaired class of Old Equity Interests (Class 8) that is deemed to reject the Plan, the Debtors request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## ARTICLE V

## MEANS OF IMPLEMENTATION

5.1     *General Overview of the Plan.*

The Plan provides for the continued operation and development of the Property by and through the Reorganized Debtors.  As of the Effective Date, all of the Debtors' property, including the Property, will vest in the Reorganized Debtors, except as otherwise provided in this Plan.  The Reorganized Debtors will thereafter manage such property, construct the New Development, and implement the terms of the Plan, including making Distributions to Holders of Allowed Claims, except for Distributions to Holders of General Unsecured Claims, which shall be made by the Creditor Trustee.

MIAMI 2904888.4 7945135741

The Plan shall be implemented on the Effective Date.  The primary source of funds necessary to implement the Plan will be the Equity Contribution to be funded by the Plan Sponsor.  At the present time, the Debtors believe that, inclusive of the Equity Contribution, the Reorganized Debtors will have sufficient funds as of the Effective Date to pay in full the expected payments under the Plan.

5.2    *Revesting of Assets*.

On the Effective Date, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the Estates of the Debtors, including any pre-paid expenses and deposits with vendors but excluding the assets to be vested in the Creditor Trust in accordance with section 4.7 of this Plan, shall vest in the Reorganized Debtors.  From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, subject to the terms and conditions of this Plan.  As provided in Section 10.7 of this Plan, the Reorganized Debtors shall retain the Estate Causes of Action, other than those released in Section 10.7 of this Plan and those transferred to the Creditor Trust pursuant to Section 4.7 of the Plan.

5.3    *New Membership Units.*

In exchange for the Equity Contribution and in satisfaction of the DIP Financing Claim, on the Effective Date, the Reorganized Debtors are authorized to issue 100% of their New Membership Units to the Plan Sponsor or its designees, without the need for further action by the Debtors, the Reorganized Debtors, the Plan Sponsor or Holders of Claims or Interests.  The Debtors shall use the Equity Contribution to fund certain of the Distributions provided for under the Plan and to commence construction of the New Development.

5.4    *Creditor Trust*

On the Effective Date, the Debtors shall establish the Creditor Trust for the benefit of Holders of Allowed General Unsecured Claims, and the Committee shall appoint the Creditor Trustee to administer the assets of the Creditor Trust, including the Cash payments made pursuant to Section 4.7 of the Plan.  Counsel to the Committee shall file a copy of the agreement establishing the Creditor Trust and appointing the Creditor Trustee prior to the Confirmation Hearing.

Each Holder of an Allowed General Unsecured Claim shall receive its ratable portion of the amounts funded into the Creditor Trust.  On the Effective Date, each Holder of an Allowed General Unsecured Claim shall be deemed to have permanently relinquished its right to receive any payment or Distribution from the Debtors or the Reorganized Debtors in respect of its Claim other than its Distribution(s) from the Creditor Trust.  No Distribution will be made to any Holder of a Disputed Claim on account of such Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim pursuant to settlement or Final Order, and shall

then be paid only to the extent that such Claim is Allowed. The Creditor Trustee shall establish a reserve for Disputed Claims. If and when a Disputed Claim becomes an Allowed Claim pursuant to settlement or Final Order, any Distribution on account of such Claim shall be made by the Creditor Trustee as soon as practicable, in the Creditor Trustee's sole business judgment.

5.5    ***Delivery of Documents.***

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver to the Holders of Allowed Claims any relevant modifications or documents relating to their Claims without the need for further action by the Debtors, the Reorganized Debtors, the Plan Sponsor, or Holders of Claims or Interests.

5.6    ***Cancellation of Existing Securities and Agreements.***

On the Effective Date, all agreements, documents and instruments relating to Claims and Old Equity Interests shall be cancelled; *provided*, *however*, that except to the extent modified hereby and/or the Confirmation Order, the liens securing the Class 2 Secured Claim of the Miami-Dade County Tax Collector, the Class 3 Secured Tax Certificate Claims, the Class 4 Secured District Claims and the AMT CADC Loan Claim shall continue in effect until such Claims are satisfied in full pursuant to the terms hereof.

5.7    ***Legal Form and Governance***.

(a)    Amendment to Existing Organizational Documents. On the Effective Date, or as soon thereafter as practicable, the Debtors shall file the Amended Organizational Documents as required or deemed appropriate, with the appropriate Persons in the applicable jurisdiction of organization, to reflect the issuance of the New Membership Units, among other things, and as otherwise deemed necessary, advisable, or appropriate by the managers of the Reorganized Debtors. Except to the extent amended or restated by the Amended Organizational Documents, the Existing Organizational Documents will remain in full force and effect after the Effective Date.

(b)    Managers of the Reorganized Debtors. On the Effective Date, the operation of the Reorganized Debtors shall become the general responsibility of the new Managers, subject to, and in accordance with, the Amended Organizational Documents. The initial Managers of the Reorganized Debtors shall be Pedro Martin and David Martin.

(c)    Due Authorization. On the Effective Date, the adoption of the Amended Organizational Documents shall be authorized and approved in all respects, to be effective as of the Effective Date, in each case without further action under applicable law, regulation, order, or rule, including without limitation, any action by the managers of the Debtors or the managers or members of the Reorganized Debtors. On the Effective Date, the cancellation and termination of the Old Equity Interests, the authorization and issuance of the New Membership Units, and all other matters provided in this Plan involving the legal structure or governance of the Reorganized

23

Debtors shall be deemed to have occurred, been authorized, and be in effect from and after the Effective Date, in each case without further action under applicable law, regulation, order, or rule, including, without limitation, any action by the managers or members of the Debtors or the Reorganized Debtors.

5.8 *Exemption from Securities Laws*.

The issuance of the New Membership Units (to the extent such interests constitute "securities") pursuant to this Plan shall be exempt from any securities law registration requirements pursuant to section 4(2) of the Securities Act of 1933 (or Regulation D promulgated thereunder) and similar provisions of applicable state securities laws.

5.9 *Exemption from Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer, or exchange of notes or equity securities under or in connection with this Plan, including, without limitation, the New Membership Units, (ii) the creation of any mortgage, deed of trust, or other security interest, (iii) the making or assignment of any lease or sublease, (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, (v) any merger agreement, or agreement of consolidation, and (vi) any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated hereunder shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.  The Property shall be sold subject to existing real estate taxes. The sale of units by the Reorganized Debtors after the Effective Date in connection with the New Development shall not be exempt transactions pursuant to section 1146(c) of the Bankruptcy Code.

5.10 *Expedited Tax Determination*.

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505 of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending before or after the Petition Date through, and including, the Effective Date.

# ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1 *Date of Distributions*.

Unless otherwise provided herein, any Distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon as practicable thereafter and deemed made on the Effective Date.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be

24

MIAMI 2904888.4 7945135741

completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. No distribution shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim pursuant to settlement or Final Order, and shall then be paid only to the extent that such Claim is Allowed.

6.2    ***Distributions Concerning General Unsecured Claims.***

(a)    Maintenance of Creditor Trust. From and after the Effective Date, all Cash to be distributed on account of any Allowed General Unsecured Claim (i) will be maintained by and in the name of the Creditor Trustee in the Creditor Trust until all litigation relating to General Unsecured Claims has been resolved by settlement or Final Order, (ii) will be held in trust pending Distribution by the Creditor Trustee for the benefit of the Holders of such Claims, and (iii) will be accounted for separately. The Creditor Trustee will invest any Cash in the Creditor Trust in the manner required by the Creditor Trust Agreement.

(b)    Timing of Distributions. On or as soon as reasonably practicable after the Effective Date, the Creditor Trustee shall distribute to each Holder of an Allowed General Unsecured Claim its Ratable Portion of the amounts funded into the Creditor Trust as part of the Initial Equity Contribution; provided, however, that no Distribution will be made to any Holder of a Disputed General Unsecured Claim on account of such Disputed General Unsecured Claim unless and until such Disputed General Unsecured Claim becomes an Allowed Claim pursuant to settlement or Final Order, and shall then be paid only to the extent that such Claim is Allowed.

(c)    Disputed Claim Reserve. The Creditor Trustee shall establish a reserve for Disputed General Unsecured Claims (the "Disputed Claim Reserve"). If and when a Disputed General Unsecured Claim becomes an Allowed Claim pursuant to settlement or Final Order, any Distribution on account of such Claim shall be made by the Creditor Trustee as soon as practicable, in the Creditor Trustee's sole business judgment.

(d)    Recourse. On the Effective Date, each Holder of an Allowed General Unsecured Claim shall be deemed to have permanently relinquished its right to receive any payment or Distribution from the Debtors or the Reorganized Debtors in respect of its Claim other than its Distribution(s) from the Creditor Trust. Each Holder of a General Unsecured Claim shall have recourse only to the undistributed Cash held in the Creditor Trust for satisfaction of the Distributions to which Holders of Allowed General Unsecured Claims are entitled under this Plan, and not to the Reorganized Debtors, their property, or any assets previously distributed on account of any other Allowed Claim. Each Holder of an Allowed General Unsecured Claim shall receive only one Distribution on account of such Allowed General Unsecured Claim regardless of whether the Holder has asserted that particular Claim against more than one Debtor.

25

6.3    *Disbursing Agent*.

All Distributions under this Plan (other than those Distributions funded by End Purchasers of units or Distributions distributed by the Creditor Trustee) shall be funded by the Reorganized Debtors and disbursed by or at the direction of the Reorganized Debtors as Disbursing Agent or such other entity designated by the Reorganized Debtors as a Disbursing Agent on or after the Effective Date and prior to the closing of these Cases. The Disbursing Agent shall not be required to give any bond, surety or other security for the performance of its duties.

6.4    *Rights and Powers of Disbursing Agent.*

(a)    Powers of the Disbursing Agent.  The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan, (ii) make or direct all Distributions contemplated hereby, (iii) employ professionals to represent him, her, or it with respect to its responsibilities, if necessary, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)    Expenses Incurred on or after the Effective Date.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date, including, without limitation, attorneys fees and expenses shall be paid in Cash by the Reorganized Debtors.

6.5    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, all Distributions to a Holder of an Allowed Claim shall be made at the address of such Holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, as applicable, unless the Debtors or the Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim or Interest by such Holder that contains an address for such Holder different from the address reflected for such Holder on the Schedules.  In the event that a Distribution to a Holder is returned as undeliverable, the Disbursing Agent or Creditor Trustee, as applicable, shall use commercially reasonable efforts to determine the current address of such Holder, but no Distribution to such Holder shall be made unless and until the Disbursing Agent or Creditor Trustee, as applicable, has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from the Effective Date, 6 months after such Claim is Allowed, or 90 days after such Distribution is made.  After such date, all unclaimed property or interest in property other than interests in Distributions to General Unsecured Creditors shall revert to the Reorganized Debtors, and the Claim of any

26

other Holder to such property or interest in property shall be discharged and forever barred.

### 6.6 *Manner of Payment.*

At the option of the Disbursing Agent or Creditor Trustee, as applicable, any Cash payment to be made hereunder or pursuant to the Creditor Trust Agreement may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

All Distributions of Cash under this Plan to the Holders of Claims against the Debtors, except General Unsecured Claims, shall be made by, or on behalf of, the Reorganized Debtors.  Distributions of Cash to the Holders of General Unsecured Claims shall be made by the Creditor Trustee.

### 6.7 *Setoffs and Recoupment.*

The Debtors may, but shall not be required to, set off against, or recoup from any Claim and the Distributions to be made hereunder, claims of any nature whatsoever that the Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any claim the Debtors may have against the Holder of such Claim.

### 6.8 *Allocation of Plan Distributions between Principal and Interest.*

Except as otherwise provided herein, to the extent that any Allowed Claim entitled to a Distribution under this Plan consists of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 6.9 *De Minimis Distributions Less Than $25.00.*

No Distribution of less than Twenty-Five Dollars ($25.00) shall be made to any Holder of an Allowed Claim.  Such undistributed amount will be retained by the Reorganized Debtors.

### 6.10 *Withholding and Reporting Requirements.*

In connection with the Plan and all Distributions hereunder, the Disbursing Agent or Creditor Trustee, as applicable, shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Disbursing Agent or Creditor Trustee, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting

MIAMI 2904888.4 7945135741

requirements.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent or Creditor Trustee, as applicable, for the payment and satisfaction of such withholding tax obligations.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Section 6.5(a) of this Plan.

## ARTICLE VII

## PROCEDURES FOR TREATING DISPUTED
## CLAIMS UNDER PLAN OF REORGANIZATION

7.1    *Objections.*

Except as otherwise provided herein, as of the Effective Date, objections to, and requests for estimation of, Claims may be interposed and prosecuted only by the Reorganized Debtors or the Creditor Trustee, as applicable.  Such objections and requests for estimation shall be served on the Holder of the respective Claim and filed with the Bankruptcy Court on or before the latest of (a) the deadline established under Local Rule 3007-1(B)(1), (b) sixty (60) days after a proof of Claim has been filed with the Bankruptcy Court, (c) sixty (60) days after an application for allowance of an Administrative Expense has been filed with the Bankruptcy Court in the Cases, or (d) with respect to certain Claims identified prior to the Confirmation Date by the Debtors, such other date as may be fixed by the Bankruptcy Court.

The Creditor Trustee shall have the power and authority to pursue General Unsecured Claim Objections and Avoidance Actions, with the proceeds thereof to be placed in the Creditor Trust.  Distributions to Holders of Allowed General Unsecured Claims resulting from General Unsecured Claim Objections or derived from Avoidance Actions shall be made by the Creditor Trustee as soon as practicable, in the Creditor Trustee's business judgment.

7.2    *No Distributions Pending Allowance.*

Notwithstanding any other provision hereof, if any portion of a Claim is Disputed, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.

7.3    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as practicable after the date that

28

the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent or Creditor Trustee, as applicable, shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under this Plan.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1     *Treatment.*

Except as otherwise provided herein, including in Section 10.4 (Indemnification Obligations), in the Confirmation Order or other order of the Bankruptcy Court, or in any contract, instrument, release, indenture, or other agreement, or document entered into in connection with this Plan, as of the Effective Date, each of the Debtors shall be deemed to have rejected each pre-petition executory contract and unexpired lease to which that Debtor is a party, unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) previously expired or terminated pursuant to its own terms, or (c) is the subject of a motion to assume filed on or before the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease rejections described above, as of the Effective Date.

8.2     *Rejection Damage Claims*.

Proofs of Claim arising out of the rejection of executory contracts and unexpired leases pursuant to this Plan shall be filed with the Bankruptcy Court with proper supporting documentation detailing the calculation of such claim, and served upon the Debtors and their counsel not later than thirty (30) days after the date on which notice of the occurrence of the Effective Date has been served.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors, and their respective properties and interests.

## ARTICLE IX

## CONDITIONS PRECEDENT TO CONSUMATION DATE

9.1     *Conditions Precedent to Confirmation*.

The Plan shall not be confirmed unless and until the following conditions have been satisfied or waived in accordance with Article IX of this Plan: (a) the Confirmation Order, in form and substance satisfactory to the Debtors has been entered on the docket maintained by the Clerk of the Bankruptcy Court; and (b) the Plan, all exhibits thereto, and the Confirmation Order are acceptable in form and substance to the Debtors and the Plan Sponsor.

9.2     *Conditions Precedent to Effectiveness*.

MIAMI 2904888.4 7945135741

The Effective Date shall not occur and this Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Article IX of this Plan:

      (a)      The Confirmation Order shall have become a Final Order;

      (b)      All amounts to be paid by the Plan Sponsor as the Initial Equity Contribution are indefeasibly paid in full, in Cash;

      (c)      All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of this Plan, including those actions identified in Article V of this Plan, are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors and the Plan Sponsor; and

      (d)      All authorizations, consents, and regulatory approvals, if any, required by the Debtors in connection with the consummation of this Plan are obtained and not revoked.

      9.3      *Waiver of Conditions*.

Each of the conditions precedent in Section 9.2 hereof may be waived, in whole or in part by the Debtors.  Any such waivers may be affected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action.

      9.4      *Satisfaction of Conditions*.

Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors determine that one of the conditions precedent set forth in Section 9.2 hereof cannot be satisfied and the occurrence of such condition is not waived or cannot be waived, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court and the Confirmation Order may be vacated by the Bankruptcy Court.  If the Confirmation Order is vacated pursuant to this Section, this Plan shall be null and void in all respects, and nothing contained in this Plan shall constitute a waiver or release of any Claims against the Debtors or the allowance of any Claim as an Allowed Claim.

## ARTICLE X

## EFFECT OF CONFIRMATION

      10.1      *Binding Effect*.

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and

MIAMI 2904888.4 7945135741

assigns, whether or not the Claim or Interest of such Holder is impaired under this Plan, whether or not such Holder has accepted this Plan, and whether or not such Holder is entitled to a Distribution under this Plan.

10.2    *Discharge of Debtor*.

Except to the extent otherwise provided for herein or in the Confirmation Order, the rights afforded in this Plan and the treatment of all Claims against or Interests in the Debtors hereunder shall be in exchange for and in complete satisfaction, discharge, and release of all debts of, Claims against, and Interests in, the Debtors of any nature whatsoever, known or unknown, including, without limitation, any interest accrued or expenses incurred thereon from and after the Petition Date, or against their Estates, the Reorganized Debtors, or their properties or interests in property.  Except as otherwise provided herein or in the Confirmation Order, upon the Effective Date, all Claims against and Interests in the Debtors shall be satisfied, discharged and released in full exchange for the consideration, if any, provided hereunder.  Except as otherwise provided herein or in the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors or their properties or interests in property including the Property, any other Claims based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

10.3    *Term of Injunctions or Stays*.

(a)    Except as otherwise expressly provided herein or in the Confirmation Order, all Persons who have held, hold, or may hold Claims or Interests will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on such Claim or Interest against the Debtors, the Reorganized Debtors, any of their Affiliates or Representatives, the Plan Sponsor, or any Affiliates or Representatives of the Plan Sponsor, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, any of their Affiliates or Representatives, the Plan Sponsor, or any Affiliates or Representatives of the Plan Sponsor, with respect to such Claim or Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, any of their Affiliates or Representatives, the Plan Sponsor, or any Affiliates or Representatives of the Plan Sponsor, or against the property or interests in property of the Debtors or Reorganized Debtors, including the Property, or the property or interests in property of their respective Affiliates or Representatives, with respect to such Claim or Interest, and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to the Debtors or Reorganized Debtors, or their respective Affiliates or Representatives, or the Plan Sponsor or its Affiliates or Representatives, or against the property or interests in property of the Debtors or Reorganized Debtors, or their respective Affiliates or Representatives, or the Plan Sponsor or its Affiliates or Representatives, with respect to such Claim or Interest.

MIAMI 2904888.4 7945135741

(b)      Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Cases under sections 105 and 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until and after the Effective Date.

10.4    ***Indemnification Obligations***

The Debtors' obligations under the Insider Indemnities to indemnify any Indemnified Person with respect to Claims arising prior to the Effective Date under state law will be deemed and treated as executory contracts that are assumed by the Reorganized Debtors pursuant to this Plan and sections 365 and 1123(b) of the Bankruptcy Code as of the Effective Date and the occurrence of the Effective Date shall be the only condition necessary to such assumption and all requirements for cure and/or adequate assurance of future performance under section 365 for such assumption shall be deemed satisfied (the "Assumed Insider Indemnities").

10.5    ***Exculpation***.

As of the Confirmation Date, the Debtors and their Affiliates and Representatives, and the Plan Sponsor shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.  The Debtors, the Reorganized Debtors, the Plan Sponsor, the Creditors Committee, the Disbursing Agent or Creditor Trustee, as applicable, and each of their respective Affiliates and Representatives shall have no liability to any Holder of any Claim or Interest or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Cases, the Disclosure Statement, this Plan, the solicitation of votes for and the pursuit of confirmation of this Plan, the offer and issuance of any securities under this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for willful misconduct, gross negligence, or ordinary malpractice with respect to any professionals retained, in each case determined by a Final Order, and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

10.6    ***Releases***.

**FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING, BUT NOT LIMITED TO, THE DISTRIBUTIONS TO BE MADE UNDER THE PLAN, AND THE EQUITY CONTRIBUTION, EFFECTIVE AS OF THE EFFECTIVE DATE, EACH RELEASEE IS HEREBY RELEASED BY ALL OF THE CREDITORS OF THE DEBTORS, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD ANY CLAIM OR EQUITY INTEREST, ALL OTHER PERSONS, THE DEBTORS, THE ESTATES, AND THE REORGANIZED DEBTORS FROM ANY AND ALL CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, DIRECTLY OR**

MIAMI 2904888.4 7945135741

**INDIRECTLY ARISING FROM OR RELATED TO THE DEBTORS, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, THAT ANY OF THE CREDITORS OF THE DEBTORS, ANY PERSONS WHO HAVE HELD, HOLD OR MAY HOLD ANY CLAIM OR EQUITY INTEREST, ANY OTHER PERSONS, THE DEBTORS, THE ESTATES OR THE REORGANIZED DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY CREDITORS OF THE DEBTORS, ANY PERSONS WHO HAVE HELD, HOLD OR MAY HOLD ANY CLAIM OR EQUITY INTEREST, OR ANY OTHER PERSON WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF THE DEBTORS OR THE ESTATES OR THE REORGANIZED DEBTORS, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION, CLAIMS, ACTIONS, AND CAUSES OF ACTION ARISING FROM ACTIONS TAKEN OR NOT TAKEN IN GOOD FAITH IN CONNECTION WITH THE CASES, THE PLAN, ALL AGREEMENTS, DOCUMENTS AND INSTRUMENTS RELATING TO THE OLD EQUITY INTERESTS, AND THE RESTRUCTURING OF THE DEBTORS AND OTHER TRANSACTIONS CONTEMPLATED BY THIS PLAN; PROVIDED, HOWEVER, THAT NOTHING HEREIN SHALL BE DEEMED TO RELEASE ANY RIGHTS, CLAIMS, OR INTERESTS THAT ANY SUCH PARTY MAY BE RECEIVING OR RETAINING PURSUANT TO THE PLAN ON OR AFTER THE EFFECTIVE DATE.  ALL PERSONS SHALL BE PRECLUDED AND PERMANENTLY ENJOINED FROM ASSERTING AGAINST THE RELEASEES, AND THEIR RESPECTIVE ASSETS AND PROPERTIES, ANY AND ALL CLAIMS, DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER WHICH ARE RELEASED UNDER THIS SECTION 10.6.  ANY PERSON INJURED BY ANY WILLFUL VIOLATION OF SUCH INJUNCTION SHALL RECOVER ACTUAL DAMAGES, INCLUDING COSTS AND ATTORNEYS' FEES, AND, IN APPROPRIATE CIRCUMSTANCES, MAY RECOVER PUNITIVE DAMAGES, FROM THE WILLFUL VIOLATOR.**

      10.7    ***Causes of Action.***

      Effective as of the Effective Date, the Estate Causes of Action, including all preference or other avoidance action claims and actions of the Debtors arising under chapter 5 of the Bankruptcy Code shall be retained by the Reorganized Debtors; *provided*, *however*, that any such Estate Causes of Action against current officers or directors of the Debtors, or any of their respective Representatives or Affiliates, are released and extinguished.

# ARTICLE XI

# RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction over all matters, except as expressly noted herein, arising out of, or related to, the Cases and this Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims including any Administrative Expenses resulting therefrom;

(b)    To determine any and all adversary proceedings, applications, and contested matters that are pending on the Effective Date;

(c)    To ensure that Distributions to Holders of Allowed Administrative Expenses and Allowed Claims are accomplished as provided herein;

(d)    To hear and determine any timely objections to, or requests for estimation of, Administrative Expenses or proofs of Claims, including, without limitation, any objections to the classification of any Administrative Expense, or Claim, and to allow or disallow any Disputed Administrative Expense or Disputed Claim, in whole or in part;

(e)    To resolve disputes as to the ownership of any Administrative Expense, Claim, or Equity Interest;

(f)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(g)    To issue such orders in aid of execution of this Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(h)    To consider any amendments to or modifications of this Plan, or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)    To hear and determine all applications of retained professionals under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

(j)    To hear and determine disputes or issues arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument,

34

or other document governing or relating to any of the foregoing, or any settlement approved by the Bankruptcy Court;

(k)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date, or request by the Reorganized Debtors after the Effective Date, for an expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(l)    To hear any other matter not inconsistent with the Bankruptcy Code;

(m)    To hear and determine all disputes involving the existence, scope, and nature of the discharges, releases, exculpations and injunctions granted under this Plan, the Confirmation Order, or the Bankruptcy Code;

(n)    To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any Person with the consummation or implementation of this Plan;

(o)    To enter a final decree closing the Cases; and

(p)    To hear any claim, matter or chose in action, whether or not it has been commenced prior to the Effective Date, that the Debtors or Reorganized Debtors may prosecute, including any Estate Causes of Action which have not been liquidated prior to the Effective Date, including, without limitation, any matter for which the United States District Court for the Southern District of Florida may also have concurrent jurisdiction, in which case the claim, matter, or chose in action may also be heard by such District Court.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### 12.1    *Payment of Statutory Fees*.

Notwithstanding any other provisions of the Plan to the contrary, the Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6), within ten (10) days of the entry of the order confirming the Plan, for pre-confirmation periods and simultaneously file all the Monthly Operating Reports for the relevant periods, indicating the cash disbursements for the relevant period.  The Debtor, as Reorganized Debtor, shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Reorganized Debtor, until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code, and the Reorganized Debtor shall provide to the United States Trustee upon the payment

MIAMI 2904888.4 7945135741

of each post-confirmation payment, and concurrently file with the Court, Post-Confirmation Quarterly Operating Reports indicating all the cash disbursements for the relevant period.

12.2    ***Modification of Plan***.

The Plan may be modified by the Debtors, in accordance with section 1127 of the Bankruptcy Code.

12.3    ***Revocation of Plan***.

The Debtors reserves the right at any time prior to the entry of the Confirmation Order to revoke and withdraw this Plan.

12.4    ***Severability of Plan Provisions***.

In the event that, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

12.5    ***Governing Law***.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to this Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws.

12.6    ***Compliance with Tax Requirements***.

In connection with the consummation of this Plan, any party issuing any instrument or making any Distribution under this Plan, including the Reorganized Debtors, the Disbursing Agent or Creditor Trustee, as applicable,, and the Plan Sponsor, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions under this Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under this Plan shall have the sole and exclusive responsibility for the

MIAMI 2904888.4 7945135741

satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution.  Any party issuing an instrument or making a Distribution under this Plan has the right, but not the obligation, to not make such Distribution until the Holder of the applicable Allowed Claim has made arrangements satisfactory to such disbursing party for payment of tax obligations.

     12.7    ***Computation of Time.***

     In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

     12.8    ***Notices***.

     To be effective, all notices, requests, and demands to or upon the Debtors, Reorganized Debtors and/or the Plan Sponsor relating to the Plan shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

     Town Center at Doral, LLC
     c/o Kodsi Law Firm, P.A.
     701 W. Cypress Creek Road
     Suite 303
     Fort Lauderdale, FL 33309
     Attn:  Isaac Kodsi
     Facsimile: (954) 771-4676
     Email:  ikodsi@ark-financial.com

     – and –

     Bilzin Sumberg Baena Price & Axelrod LLP
     1450 Brickell Avenue
     Suite 2300
     Miami, FL 33131
     Attn:  Mindy Mora, Esq.
         Tara V. Trevorrow, Esq.
     Facsimile:  (305) 351-2242
     Email:  mmora@bilzin.com

     – and –

     Berger Singerman
     1450 Brickell Avenue
     Suite 1900
     Miami, FL 33131

Attn: Jordi Guso, Esq.
Debi Galler, Esq.
Facsimile:  (305) 714-4340
Email:  jguso@bergersingerman.com

12.9    ***Filing or Execution of Additional Documents***.

On or before the Effective Date, and without the need for any further order or authority, the Debtors or Reorganized Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Debtors or Reorganized Debtors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

Dated: February 8, 2012                        Respectfully submitted,


TOWN CENTER AT DORAL, LLC

By:____s/_____
     Isaac Kodsi, Vice President

LANDMARK AT DORAL EAST, LLC

By:____s/_____
     Isaac Kodsi, Vice President

LANDMARK AT DORAL SOUTH, LLC

By:____s/_____
     Isaac Kodsi, Vice President


LANDMARK CLUB AT DORAL, LLC

By:____s/_____
     Isaac Kodsi, Vice President


LANDMARK AT DORAL DEVELOPERS, LLC

By:____s/_____
     Isaac Kodsi, Vice President

38

TERRA LANDMARK, LLC

By:_____s/_____
     David Martin,
     Chief Operating Officer

## Schedule 4.4A to the Joint Amended Plan
## North Section: Class A District Payment Schedule

| Period | | Beginning of Period | Interest Payment | Principal Payment | Total Semi-Annual Payment | End of Period |
|---|---|---|---|---|---|---|
| 0 | | | | | | 9,319,057 |
| 0 | May-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 1 | May-15 | 9,319,057 | -256,274 | -99,375 | -355,649 | 9,219,683 |
| 2 | Nov-15 | 9,219,683 | -253,541 | -102,107 | -355,649 | 9,117,576 |
| 3 | May-16 | 9,117,576 | -250,733 | -104,915 | -355,649 | 9,012,660 |
| 4 | Nov-16 | 9,012,660 | -247,848 | -107,800 | -355,649 | 8,904,860 |
| 5 | May-17 | 8,904,860 | -244,884 | -110,765 | -355,649 | 8,794,095 |
| 6 | Nov-17 | 8,794,095 | -241,838 | -113,811 | -355,649 | 8,680,284 |
| 7 | May-18 | 8,680,284 | -238,708 | -116,941 | -355,649 | 8,563,343 |
| 8 | Nov-18 | 8,563,343 | -235,492 | -120,157 | -355,649 | 8,443,186 |
| 9 | May-19 | 8,443,186 | -232,188 | -123,461 | -355,649 | 8,319,725 |
| 10 | Nov-19 | 8,319,725 | -228,792 | -126,856 | -355,649 | 8,192,869 |
| 11 | May-20 | 8,192,869 | -225,304 | -130,345 | -355,649 | 8,062,525 |
| 12 | Nov-20 | 8,062,525 | -221,719 | -133,929 | -355,649 | 7,928,595 |
| 13 | May-21 | 7,928,595 | -218,036 | -137,612 | -355,649 | 7,790,983 |
| 14 | Nov-21 | 7,790,983 | -214,252 | -141,397 | -355,649 | 7,649,587 |
| 15 | May-22 | 7,649,587 | -210,364 | -145,285 | -355,649 | 7,504,302 |
| 16 | Nov-22 | 7,504,302 | -206,368 | -149,280 | -355,649 | 7,355,021 |
| 17 | May-23 | 7,355,021 | -202,263 | -153,386 | -355,649 | 7,201,636 |
| 18 | Nov-23 | 7,201,636 | -198,045 | -157,604 | -355,649 | 7,044,032 |
| 19 | May-24 | 7,044,032 | -193,711 | -161,938 | -355,649 | 6,882,094 |
| 20 | Nov-24 | 6,882,094 | -189,258 | -166,391 | -355,649 | 6,715,703 |
| 21 | May-25 | 6,715,703 | -184,682 | -170,967 | -355,649 | 6,544,737 |
| 22 | Nov-25 | 6,544,737 | -179,980 | -175,668 | -355,649 | 6,369,068 |
| 23 | May-26 | 6,369,068 | -175,149 | -180,499 | -355,649 | 6,188,569 |
| 24 | Nov-26 | 6,188,569 | -170,186 | -185,463 | -355,649 | 6,003,106 |
| 25 | May-27 | 6,003,106 | -165,085 | -190,563 | -355,649 | 5,812,543 |
| 26 | Nov-27 | 5,812,543 | -159,845 | -195,804 | -355,649 | 5,616,739 |
| 27 | May-28 | 5,616,739 | -154,460 | -201,188 | -355,649 | 5,415,551 |
| 28 | Nov-28 | 5,415,551 | -148,928 | -206,721 | -355,649 | 5,208,830 |
| 29 | May-29 | 5,208,830 | -143,243 | -212,406 | -355,649 | 4,996,424 |
| 30 | Nov-29 | 4,996,424 | -137,402 | -218,247 | -355,649 | 4,778,177 |
| 31 | May-30 | 4,778,177 | -131,400 | -224,249 | -355,649 | 4,553,929 |
| 32 | Nov-30 | 4,553,929 | -125,233 | -230,416 | -355,649 | 4,323,513 |
| 33 | May-31 | 4,323,513 | -118,897 | -236,752 | -355,649 | 4,086,761 |
| 34 | Nov-31 | 4,086,761 | -112,386 | -243,263 | -355,649 | 3,843,498 |
| 35 | May-32 | 3,843,498 | -105,696 | -249,952 | -355,649 | 3,593,546 |
| 36 | Nov-32 | 3,593,546 | -98,823 | -256,826 | -355,649 | 3,336,720 |
| 37 | May-33 | 3,336,720 | -91,760 | -263,889 | -355,649 | 3,072,831 |
| 38 | Nov-33 | 3,072,831 | -84,503 | -271,146 | -355,649 | 2,801,685 |
| 39 | May-34 | 2,801,685 | -77,046 | -278,602 | -355,649 | 2,523,083 |
| 40 | Nov-34 | 2,523,083 | -69,385 | -286,264 | -355,649 | 2,236,819 |
| 41 | May-35 | 2,236,819 | -61,513 | -294,136 | -355,649 | 1,942,683 |
| 42 | Nov-35 | 1,942,683 | -53,424 | -302,225 | -355,649 | 1,640,458 |
| 43 | May-36 | 1,640,458 | -45,113 | -310,536 | -355,649 | 1,329,922 |
| 44 | Nov-36 | 1,329,922 | -36,573 | -319,076 | -355,649 | 1,010,847 |
| 45 | May-37 | 1,010,847 | -27,798 | -327,850 | -355,649 | 682,996 |
| 46 | Nov-37 | 682,996 | -18,782 | -336,866 | -355,649 | 346,130 |
| 47 | May-38 | 346,130 | -9,519 | -346,130 | -355,649 | 0 |
| | Total | | -8,934,072 | -9,319,057 | -18,253,129 | |

## Schedule 4.4B to the Joint Amended Plan
## South Section: Class A District Payment Schedule

| Period | | Beginning of Period | Interest Payment | Principal Payment | Total Semi-Annual Payment | End of Period |
|---|---|---|---|---|---|---|
| 0 | | | | | | 9,319,057 |
| 0 | May-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 1 | May-15 | 9,319,057 | -256,274 | -99,375 | -355,649 | 9,219,683 |
| 2 | Nov-15 | 9,219,683 | -253,541 | -102,107 | -355,649 | 9,117,576 |
| 3 | May-16 | 9,117,576 | -250,733 | -104,915 | -355,649 | 9,012,660 |
| 4 | Nov-16 | 9,012,660 | -247,848 | -107,800 | -355,649 | 8,904,860 |
| 5 | May-17 | 8,904,860 | -244,884 | -110,765 | -355,649 | 8,794,095 |
| 6 | Nov-17 | 8,794,095 | -241,838 | -113,811 | -355,649 | 8,680,284 |
| 7 | May-18 | 8,680,284 | -238,708 | -116,941 | -355,649 | 8,563,343 |
| 8 | Nov-18 | 8,563,343 | -235,492 | -120,157 | -355,649 | 8,443,186 |
| 9 | May-19 | 8,443,186 | -232,188 | -123,461 | -355,649 | 8,319,725 |
| 10 | Nov-19 | 8,319,725 | -228,792 | -126,856 | -355,649 | 8,192,869 |
| 11 | May-20 | 8,192,869 | -225,304 | -130,345 | -355,649 | 8,062,525 |
| 12 | Nov-20 | 8,062,525 | -221,719 | -133,929 | -355,649 | 7,928,595 |
| 13 | May-21 | 7,928,595 | -218,036 | -137,612 | -355,649 | 7,790,983 |
| 14 | Nov-21 | 7,790,983 | -214,252 | -141,397 | -355,649 | 7,649,587 |
| 15 | May-22 | 7,649,587 | -210,364 | -145,285 | -355,649 | 7,504,302 |
| 16 | Nov-22 | 7,504,302 | -206,368 | -149,280 | -355,649 | 7,355,021 |
| 17 | May-23 | 7,355,021 | -202,263 | -153,386 | -355,649 | 7,201,636 |
| 18 | Nov-23 | 7,201,636 | -198,045 | -157,604 | -355,649 | 7,044,032 |
| 19 | May-24 | 7,044,032 | -193,711 | -161,938 | -355,649 | 6,882,094 |
| 20 | Nov-24 | 6,882,094 | -189,258 | -166,391 | -355,649 | 6,715,703 |
| 21 | May-25 | 6,715,703 | -184,682 | -170,967 | -355,649 | 6,544,737 |
| 22 | Nov-25 | 6,544,737 | -179,980 | -175,668 | -355,649 | 6,369,068 |
| 23 | May-26 | 6,369,068 | -175,149 | -180,499 | -355,649 | 6,188,569 |
| 24 | Nov-26 | 6,188,569 | -170,186 | -185,463 | -355,649 | 6,003,106 |
| 25 | May-27 | 6,003,106 | -165,085 | -190,563 | -355,649 | 5,812,543 |
| 26 | Nov-27 | 5,812,543 | -159,845 | -195,804 | -355,649 | 5,616,739 |
| 27 | May-28 | 5,616,739 | -154,460 | -201,188 | -355,649 | 5,415,551 |
| 28 | Nov-28 | 5,415,551 | -148,928 | -206,721 | -355,649 | 5,208,830 |
| 29 | May-29 | 5,208,830 | -143,243 | -212,406 | -355,649 | 4,996,424 |
| 30 | Nov-29 | 4,996,424 | -137,402 | -218,247 | -355,649 | 4,778,177 |
| 31 | May-30 | 4,778,177 | -131,400 | -224,249 | -355,649 | 4,553,929 |
| 32 | Nov-30 | 4,553,929 | -125,233 | -230,416 | -355,649 | 4,323,513 |
| 33 | May-31 | 4,323,513 | -118,897 | -236,752 | -355,649 | 4,086,761 |
| 34 | Nov-31 | 4,086,761 | -112,386 | -243,263 | -355,649 | 3,843,498 |
| 35 | May-32 | 3,843,498 | -105,696 | -249,952 | -355,649 | 3,593,546 |
| 36 | Nov-32 | 3,593,546 | -98,823 | -256,826 | -355,649 | 3,336,720 |
| 37 | May-33 | 3,336,720 | -91,760 | -263,889 | -355,649 | 3,072,831 |
| 38 | Nov-33 | 3,072,831 | -84,503 | -271,146 | -355,649 | 2,801,685 |
| 39 | May-34 | 2,801,685 | -77,046 | -278,602 | -355,649 | 2,523,083 |
| 40 | Nov-34 | 2,523,083 | -69,385 | -286,264 | -355,649 | 2,236,819 |
| 41 | May-35 | 2,236,819 | -61,513 | -294,136 | -355,649 | 1,942,683 |
| 42 | Nov-35 | 1,942,683 | -53,424 | -302,225 | -355,649 | 1,640,458 |
| 43 | May-36 | 1,640,458 | -45,113 | -310,536 | -355,649 | 1,329,922 |
| 44 | Nov-36 | 1,329,922 | -36,573 | -319,076 | -355,649 | 1,010,847 |
| 45 | May-37 | 1,010,847 | -27,798 | -327,850 | -355,649 | 682,996 |
| 46 | Nov-37 | 682,996 | -18,782 | -336,866 | -355,649 | 346,130 |
| 47 | May-38 | 346,130 | -9,519 | -346,130 | -355,649 | 0 |
| | Total | | -8,934,072 | -9,319,057 | -18,253,129 | |

Exhibit A to the Joint Amended Plan

**Release Prices per Unit**
*Assuming 1111(b) is Not Elected*

|  | Class B Principal Release Price |
|---|---|
| ***North Parcel*** |  |
| Single Family | 55,046.67 |
| Rowhomes | 33,945.45 |
|  |  |
| ***South Parcel*** |  |
| Residential | 12,978.15 |
| Office | 36,055.31 |
| Retail | 20,483.85 |

**Exhibit 2**

**(Historical Financial Information)**

## Balance Sheet as of October 31, 2011

|  | Town Center at Doral LLC |
|---|---|
| **Total Assets** |  |
| Assets |  |
|    Real Property | 24,297,300.00 |
|    Personal Property | 5,000,000.00 |
| **Total Assets** | 29,297,300.00 |
|  |  |
| Liabilities & Equity |  |
|   Creditors Holding Secured Claims |  |
|     AMT CADC Venture, LLC | 103,870,058.00 |
|     BTI Bluegate FTCF LLC | 549,758.43 |
|     Hilda Pico / Ocean Bank | - |
|     Finance Southern Co. | - |
|     Sunshine State Cert III, LLLP and Bank United, Trustee | 327,691.43 |
|     Landmark at Doral Community Development Development District | 43,849,461.92 |
|   Creditors Holding Unsecured Non Priority Claims | 14,986,201.34 |
|   Creditors Holding Unsecured Non Priority Claims-Disputed | 2,550,000.00 |
|   Total Liabilities | 166,133,171.12 |
|  |  |
|   Equity |  |
|    Retained Earnings | (136,835,871.12) |
|    Net Income | - |
|   Total Equity | (136,835,871.12) |
| **Total Liabilities & Equity** | 29,297,300.00 |

## Balance Sheet as of October 31, 2011

|  | Landmark at Doral Developers, LLC |
|---|---|
| **Total Assets** |  |
| Assets |  |
|   Real Property | - |
|   Personal Property | 5,000,000.00 |
| **Total Assets** | 5,000,000.00 |
|  |  |
| Liabilities & Equity |  |
|   Creditors Holding Secured Claims |  |
|     AMT CADC Venture, LLC | 103,870,058.00 |
|     BTI Bluegate FTCF LLC | - |
|     Hilda Pico / Ocean Bank | - |
|     Finance Southern Co. | - |
|     Sunshine State Cert III, LLLP and Bank United, Trustee | - |
|     Landmark at Doral Community Development Development District | - |
|   Creditors Holding Unsecured Non Priority Claims | 14,986,201.34 |
|   Creditors Holding Unsecured Non Priority Claims-Disputed | 2,550,000.00 |
| **Total Liabilities** | 121,406,259.34 |
|  |  |
|   Equity |  |
|     Retained Earnings | (116,406,259.34) |
|     Net Income | - |
|   **Total Equity** | (116,406,259.34) |
| **Total Liabilities & Equity** | 5,000,000.00 |

## Balance Sheet as of October 31, 2011

|  | Landmark at Doral East, LLC |
| --- | --- |
| **Total Assets** | |
| Assets | |
|   Real Property | 4,745,449.00 |
|   Personal Property | 5,000,000.00 |
| **Total Assets** | **9,745,449.00** |
| | |
| Liabilities & Equity | |
|   Creditors Holding Secured Claims | |
|     AMT CADC Venture, LLC | 103,870,058.00 |
|     BTI Bluegate FTCF LLC | 139,220.00 |
|     Hilda Pico / Ocean Bank | - |
|     Finance Southern Co. | 112,686.29 |
|     Sunshine State Cert III, LLLP and Bank United, Trustee | - |
|     Landmark at Doral Community Development Development District | 12,064,711.83 |
|   Creditors Holding Unsecured Non Priority Claims | 14,986,201.34 |
|   Creditors Holding Unsecured Non Priority Claims-Disputed | 2,550,000.00 |
| **Total Liabilities** | **133,722,877.46** |
| | |
| Equity | |
|   Retained Earnings | (123,977,428.46) |
|   Net Income | - |
| **Total Equity** | **(123,977,428.46)** |
| **Total Liabilities & Equity** | **9,745,449.00** |

# Balance Sheet as of October 31, 2011

| | Landmark at Doral South, LLC |
|---|---|
| **Total Assets** | |
| Assets | |
|    Real Property | 6,621,975.00 |
|    Personal Property | 5,000,400.00 |
| Total Assets | 11,622,375.00 |
| | |
| Liabilities & Equity | |
|   Creditors Holding Secured Claims | |
|     AMT CADC Venture, LLC | 103,870,058.00 |
|     BTI Bluegate FTCF LLC | - |
|     Hilda Pico / Ocean Bank | 91,335.68 |
|     Finance Southern Co. | 116,675.61 |
|     Sunshine State Cert III, LLLP and Bank United, Trustee | - |
|     Landmark at Doral Community Development Development District | 14,530,487.70 |
|   Creditors Holding Unsecured Non Priority Claims | 14,986,201.34 |
|   Creditors Holding Unsecured Non Priority Claims-Disputed | 2,550,000.00 |
|   Total Liabilities | 136,144,758.33 |
| | |
|   Equity | |
|    Retained Earnings | (124,522,383.33) |
|    Net Income | - |
|   Total Equity | (124,522,383.33) |
| Total Liabilities & Equity | 11,622,375.00 |

## Balance Sheet as of October 31, 2011

|  | Landmark Club at Doral, LLC |
|---|---|
| **Total Assets** | |
| Assets | |
| Real Property | 724,500.00 |
| Personal Property | 5,000,000.00 |
| **Total Assets** | 5,724,500.00 |
| | |
| Liabilities & Equity | |
| Creditors Holding Secured Claims | |
| AMT CADC Venture, LLC | 103,870,058.00 |
| BTI Bluegate FTCF LLC | 41,168.98 |
| Hilda Pico / Ocean Bank | 33,325.41 |
| Finance Southern Co. | - |
| Sunshine State Cert III, LLLP and Bank United, Trustee | - |
| Landmark at Doral Community Development Development District | 1,235,642.28 |
| Creditors Holding Unsecured Non Priority Claims | 14,986,201.34 |
| Creditors Holding Unsecured Non Priority Claims-Disputed | 2,550,000.00 |
| **Total Liabilities** | 122,716,396.01 |
| | |
| Equity | |
| Retained Earnings | (116,991,896.01) |
| Net Income | - |
| **Total Equity** | (116,991,896.01) |
| **Total Liabilities & Equity** | 5,724,500.00 |

**Exhibit 3**

**(Liquidation Analysis)**

# Exhibit 3

### Liquidation Analysis

| | Based on Balance Sheet as of 10/31/2011 | Discount Percentage | Discount Amount | Estimated Liquidation Value |
|---|---|---|---|---|
| **Assets** | | | | |
| **Real Property (Assumption 1)** | | | | |
| Town Center at Doral, LLC | 24,297,300 | 30.00% | ($7,289,190) | 17,008,110 |
| Landmark at Doral South, LLC | 6,621,975 | 30.00% | ($1,986,593) | 4,635,383 |
| Landmark at Doral East, LLC | 4,745,449 | 30.00% | ($1,423,635) | 3,321,814 |
| Landmark at Doral Developers, LLC | 0 | 30.00% | $0 | - |
| Landmark Club at Doral, LLC | 724,500 | 30.00% | ($217,350) | 507,150 |
| | | | | |
| **Personal Property (Assumption 1)** | | | | |
| Town Center at Doral, LLC | 5,000,000 | 65.00% | ($3,250,000) | 1,750,000 |
| Landmark at Doral South, LLC | 5,000,400 | 65.00% | ($3,250,260) | 1,750,140 |
| Landmark at Doral East, LLC | 5,000,000 | 65.00% | ($3,250,000) | 1,750,000 |
| Landmark at Doral Developers, LLC | 5,000,000 | 65.00% | ($3,250,000) | 1,750,000 |
| Landmark Club at Doral, LLC | 5,000,000 | 65.00% | ($3,250,000) | 1,750,000 |
| | | | | |
| Impairment Value | ($21,389,624) | 100.00% | $21,389,624 | - |
| **Balance & Liquidation Proceeds** | **$40,000,000** | **14.44%** | **($5,777,403)** | **34,222,597** |

**Liquidation Costs:**

| | | |
|---|---|---|
| Administrative costs - trustee of Chapter 7 ( Assumption 1) | | ($25,000) |
| Transaction cost | | $0 |
| **Estimated liquidation costs** | | **($25,000)** |

**Summary**

| | |
|---|---|
| Liquidation value of estate assets | $34,222,597 |
| Estimated liquidation costs | ($25,000) |
| **Net value of estate assets (Assumption 2)** | **$34,197,597** |
| | |
| Net value of estate assets (Assumption 2) | $34,197,597 |
| Less value of abandoned property to secured creditor | ($34,197,597) |
| **Net available for unsecured creditors** | **$0** |

**Assumptions**

(1) Trustee abandons estates interest in the estate assets after determining validity, priority and extent of secured creditors lien

(2) Secured lender takes title to the property subject to outstanding property taxes of $539,908 for 2011 and approximately $1.3 million in delinquent real estate taxes.

# Exhibit 4
# Financial Projections

**Release Prices per Unit**
*Assuming 1111(b) Election*

| | Class B Principal Release Price | Estimated Class B True Up Payment | Total |
|---|---|---|---|
| ***North Parcel*** | | | |
| Single Family | 55,046.67 | 42,991.95 | 98,038.62 |
| Rowhomes | 33,945.45 | 26,511.70 | 60,457.15 |
| | | | |
| ***South Parcel*** | | | |
| Residential | 12,978.15 | 9,425.44 | 22,403.59 |
| Office | 36,055.31 | 26,185.34 | 62,240.64 |
| Retail | 20,483.85 | 14,876.49 | 35,360.33 |

**Exhibit 4**
**Financial Projections**
**Landmark: Assuming 1111(b) Election is Made**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total | Average Annual Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Needs from Equity/Construction Financing | $6,149,058 | $3,565,697 | $13,534,250 | $4,980,937 | $5,966,781 | $11,444,322 | $11,632,915 | $11,401,205 | $11,680,707 | $11,029,637 | $91,385,509 | $7,029,655 |
| Deposits | $0 | $10,800,000 | $15,778,800 | $7,192,800 | $11,199,597 | $14,905,923 | $9,311,523 | $7,511,781 | $6,309,896 | $3,305,184 | $86,315,505 | $6,639,654 |
| Sales Proceeds | $0 | $0 | $50,803,200 | $18,673,200 | $19,708,200 | $31,513,489 | $31,047,289 | $17,527,489 | $17,527,489 | $17,527,489 | $204,327,845 | $15,717,527 |
| **Total Sources** | **$6,149,058** | **$14,365,697** | **$80,116,250** | **$30,846,937** | **$36,874,578** | **$57,863,735** | **$51,991,727** | **$36,440,475** | **$35,518,092** | **$31,862,309** | **$382,028,859** | **$29,386,835** |
| | | | | | | | | | | | | |
| Construction & Commissions | $0 | ($7,990,080) | ($37,151,994) | ($13,220,252) | ($16,121,288) | ($26,158,337) | ($25,090,664) | ($15,802,398) | ($15,706,247) | ($14,315,932) | ($171,557,193) | ($13,196,707) |
| Land (Class B Principal Payments) | $0 | $0 | ($13,451,624) | ($4,567,874) | ($3,586,371) | ($1,985,872) | ($10,204,499) | ($2,144,942) | ($2,144,942) | ($2,144,942) | ($40,231,067) | ($3,094,697) |
| Class A Principal Payments paid by Developer | $0 | $0 | $0 | $0 | ($282,148) | ($263,686) | ($202,064) | ($142,258) | ($100,127) | ($52,855) | ($1,043,139) | ($80,241) |
| District Class A Interest | $0 | ($1,025,096) | ($964,164) | ($807,054) | ($714,332) | ($618,386) | ($438,269) | ($284,520) | ($184,392) | ($89,405) | ($5,125,620) | ($394,278) |
| District Class B Interest | $0 | ($1,184,556) | ($1,058,323) | ($753,760) | ($626,669) | ($596,025) | ($428,017) | ($193,836) | ($129,224) | ($32,306) | ($5,002,717) | ($384,824) |
| Impact fees/ A&E/Ins. /Permits / RE Taxes / Legal | ($1,216,153) | ($3,249,157) | ($1,871,128) | ($1,379,525) | ($3,676,660) | ($3,218,786) | ($1,657,413) | ($1,479,499) | ($1,460,071) | ($405,953) | ($18,614,345) | ($1,431,873) |
| Administrative and Property Maintenance Fees | ($258,863) | ($2,290,852) | ($3,817,117) | ($2,805,619) | ($3,633,072) | ($3,950,049) | ($3,834,606) | ($1,687,386) | ($1,683,685) | ($1,641,526) | ($25,602,774) | ($1,969,444) |
| Unsecured Creditors | ($3,000,000) | $0 | ($1,000,000) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($4,000,000) | ($307,692) |
| Reorganization Costs | ($300,000) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($300,000) | ($23,077) |
| **Total Uses** | **($4,775,015)** | **($15,739,740)** | **($59,314,350)** | **($23,534,085)** | **($28,640,540)** | **($35,791,144)** | **($41,855,533)** | **($21,734,840)** | **($21,408,687)** | **($18,682,920)** | **($271,476,854)** | **($20,882,835)** |
| | | | | | | | | | | | | |
| **Total Sources** | **$6,149,058** | **$14,365,697** | **$80,116,250** | **$30,846,937** | **$36,874,578** | **$57,863,735** | **$51,991,727** | **$36,440,475** | **$35,518,092** | **$31,862,309** | **$382,028,859** | **$29,386,835** |
| Total Uses | ($4,775,015) | ($15,739,740) | ($59,314,350) | ($23,534,085) | ($28,640,540) | ($35,791,144) | ($41,855,533) | ($21,734,840) | ($21,408,687) | ($18,682,920) | ($271,476,854) | ($20,882,835) |
| Return of Capital | $0 | $0 | ($20,801,900) | $0 | ($4,160,724) | ($14,759,901) | ($14,843,543) | ($14,109,097) | ($11,680,707) | ($11,029,637) | ($91,385,509) | ($7,029,655) |
| **Annual Cash Flow** | **$1,374,043** | **($1,374,043)** | **$0** | **$7,312,852** | **$4,073,314** | **$7,312,689** | **($4,707,349)** | **$596,538** | **$2,428,698** | **$2,149,753** | **$19,166,496** | **$1,474,346** |
| | | | | | | | | | | | | |
| **Cumulative Cash Flow** | **$1,374,043** | **$0** | **$0** | **$7,312,852** | **$11,386,166** | **$18,698,855** | **$13,991,506** | **$14,588,044** | **$17,016,743** | **$19,166,496** | | |
| | | | | | | | | | | | | |
| **Total Cash Flow to Equity** | **-$6,149,058** | **-$3,565,697** | **$7,267,650** | **-$4,980,937** | **-$1,806,057** | **$5,224,483** | **$14,103,280** | **$2,707,892** | **$0** | **$6,364,940** | **$19,166,496** | **$1,474,346** |

**Class A (North Parcel)**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $0 | $0 | $0 | |
| Interest Paid by Developer | | ($512,548) | ($451,616) | ($294,506) | ($204,516) | ($119,807) | ($48,892) | $0 | $0 | $0 | |
| Interest Paid by End Users | | $0 | $0 | $0 | ($305,299) | ($378,778) | ($437,829) | $0 | $0 | $0 | |
| Payment Paid by Developer | | $0 | $0 | $0 | ($88,666) | ($50,971) | ($22,403) | $0 | $0 | $0 | |
| Payment Paid by End Users | | $0 | $0 | $0 | ($120,816) | ($161,745) | ($202,173) | $0 | $0 | $0 | |
| Outstanding Principal Balance of the Class A | | $0 | $0 | $0 | $0 | $0 | ($8,680,284) | $0 | $0 | $0 | |
| EOP | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $0 | $0 | $0 | $0 | |

*The Principal and Interest Payments of the Class A is transferred to residential buyers at each closing.
Total Class A Payments:                    18,253,129
Average Annual Debt Service Per Unit       1,658
Assumes that Principal Payments begin May 2015 with a final maturity date in May 2038. Payments are semi-annually and fully amortize.

**Class A (South Parcel)**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $8,680,284 | $8,443,186 | $8,192,369 | |
| Interest Paid by Developer | | ($512,548) | ($512,548) | ($512,548) | ($509,915) | ($495,581) | ($389,377) | ($284,520) | ($184,392) | ($89,405) | |
| Interest Paid by End Users | | $0 | $0 | $0 | $0 | $0 | ($97,344) | ($189,680) | ($276,588) | ($357,619) | |
| Payment Paid by Developer | | $0 | $0 | $0 | ($201,482) | ($212,716) | ($179,661) | ($142,258) | ($100,127) | ($52,855) | |
| Payment Paid by End Users | | $0 | $0 | $0 | $0 | $0 | ($44,915) | ($94,839) | ($150,190) | ($211,419) | |
| Outstanding Principal Balance of the Class A | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($7,928,595) | |
| EOP | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $8,680,284 | $8,443,186 | $8,192,369 | $0 | |

*The Principal and Interest Payments of the Class A is transferred to residential buyers at each closing.

Total Class A Payments:                    18,253,129
Average Annual Debt Service Per Unit       1,778
Assumes that Principal Payments begin May 2015 with a final maturity date in May 2038. Payments are semi-annually and fully amortize.

**Exhibit 4**
**Financial Projections**
**Landmark: Assuming 1111(b) Election is Made**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Class B (North Parcel)** | | | | | | | | | | |
| BOP | | $16,567,213 | $16,567,213 | $8,893,707 | $6,449,635 | $4,772,106 | $6,521,878 | $0 | $0 | $0 |
| Interest Paid | | ($861,495) | ($735,262) | ($430,700) | ($303,608) | ($272,964) | ($169,569) | $0 | $0 | $0 |
| Payment | | $0 | ($7,673,506) | ($2,444,072) | ($1,677,529) | $1,749,772 | ($6,521,878) | $0 | $0 | $0 |
| EOP | $16,567,213 | $16,567,213 | $8,893,707 | $6,449,635 | $4,772,106 | $6,521,878 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | |
| **Class B True Up Payments** | | $0 | ($5,778,118) | ($2,123,802) | ($1,908,842) | ($1,590,702) | ($1,537,679) | $0 | $0 | $0 |
| | | | | | | | | | | |
| **Class B Restructured Principal Payment** | $16,567,213 | | | | | | | | | |
| **Class B Interest Payment** | $2,773,598 | | | | | | | | | |
| **Class B True-Up payments at Unit Closings** | $12,939,143 | | | | | | | | | |
| **Total Class B Payments:** | $32,279,955 | | | | | | | | | |
| | | | | | | | | | | |
| **Class B (South Parcel)** | | | | | | | | | | |
| BOP | | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $4,970,164 | $3,727,623 | $2,485,082 | $1,242,541 |
| Interest Paid | | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($258,449) | ($193,836) | ($129,224) | ($32,306) |
| Payment | | $0 | $0 | $0 | $0 | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) |
| EOP | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $4,970,164 | $3,727,623 | $2,485,082 | $1,242,541 | $0 |
| | | | | | | | | | | |
| **Class B True Up Payment** | | $0 | $0 | $0 | $0 | ($902,401) | ($902,401) | ($902,401) | ($902,401) | ($902,401) |
| | | | | | | | | | | |
| **Class B Restructured Principal Payment** | $6,212,705 | | | | | | | | | |
| **Class B Interest Payment** | $2,229,119 | | | | | | | | | |
| **Class B True-Up payments at Unit Closings** | $4,512,006 | | | | | | | | | |
| **Total Class B Payments:** | $12,953,830 | | | | | | | | | |
| | | | | | | | | | | |
| **Total District Payments** | $81,740,042 | | | | | | | | | |

**Exhibit 4**
**Financial Projections - North Parcel**

**Landmark: Assuming 1111(b) Election is Made**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total | Average Annual Amount |
|---|---|---|---|---|---|---|---|---|---|
| Cash Needs from Equity/Construction Financing | $5,898,881 | $2,570,776 | $12,523,140 | $3,969,827 | $0 | $0 | $0 | $24,962,624 | $1,920,202 |
| Deposits | $0 | $10,800,000 | $15,778,800 | $7,192,800 | $6,993,000 | $6,793,200 | $1,198,800 | $48,756,600 | $3,750,508 |
| Sales Proceeds | $0 | $0 | $50,803,200 | $18,673,200 | $19,708,200 | $13,986,000 | $13,519,800 | $116,690,400 | $8,976,185 |
| **Total Sources** | **$5,898,881** | **$13,370,776** | **$79,105,140** | **$29,835,827** | **$26,701,200** | **$20,779,200** | **$14,718,600** | **$190,409,624** | **$14,646,894** |
| | | | | | | | | | |
| Construction & Commissions | $0 | ($7,990,080) | ($37,151,994) | ($13,220,252) | ($11,864,100) | ($10,224,530) | ($8,823,524) | ($89,274,480) | ($6,867,268) |
| Land (Class B Principal Payments) | $0 | $0 | ($13,451,624) | ($4,567,874) | ($3,586,371) | $159,070 | ($8,059,557) | ($29,506,356) | ($2,269,720) |
| Class A Principal Payments paid by Developer | $0 | $0 | $0 | $0 | ($80,666) | ($50,971) | ($22,403) | ($154,040) | ($11,849) |
| District Class A Interest | $0 | ($512,548) | ($451,616) | ($294,506) | ($204,516) | ($119,807) | ($48,892) | ($1,631,885) | ($125,530) |
| District Class B Interest | $0 | ($861,495) | ($735,262) | ($430,700) | ($303,608) | ($272,964) | ($169,569) | ($2,773,598) | ($213,354) |
| Impact fees/ A&E/Ins. /Permits / RE Taxes / Legal | ($1,059,166) | ($3,108,360) | ($1,714,141) | ($1,222,538) | ($1,082,564) | ($702,051) | ($158,487) | ($9,047,308) | ($695,947) |
| Administrative and Property Maintenance Fees | ($165,672) | ($2,272,337) | ($3,798,602) | ($2,787,104) | ($2,535,287) | ($2,255,257) | ($2,143,517) | ($15,957,776) | ($1,227,521) |
| Unsecured Creditors | ($3,000,000) | $0 | ($1,000,000) | $0 | $0 | $0 | $0 | ($4,000,000) | ($307,692) |
| Reorganization Costs | ($300,000) | $0 | $0 | $0 | $0 | $0 | $0 | ($300,000) | ($23,077) |
| **Total Uses** | **($4,524,838)** | **($14,744,820)** | **($58,303,240)** | **($22,522,975)** | **($19,657,113)** | **($13,466,511)** | **($19,425,949)** | **($152,645,445)** | **($11,741,957)** |
| | | | | | | | | | |
| **Total Sources** | **$5,898,881** | **$13,370,776** | **$79,105,140** | **$29,835,827** | **$26,701,200** | **$20,779,200** | **$14,718,600** | **$190,409,624** | **$14,646,894** |
| Total Uses | ($4,524,838) | ($14,744,820) | ($58,303,240) | ($22,522,975) | ($19,657,113) | ($13,466,511) | ($19,425,949) | ($152,645,445) | ($11,741,957) |
| Return of Capital | $0 | $0 | ($20,801,900) | $0 | ($4,160,724) | $0 | $0 | ($24,962,624) | ($1,920,202) |
| **Annual Cash Flow** | **$1,374,043** | **($1,374,043)** | **$0** | **$7,312,852** | **$2,883,363** | **$7,312,689** | **($4,707,349)** | **$12,801,555** | **$984,735** |
| | | | | | | | | | |
| **Cumulative Cash Flow** | **$1,374,043** | **$0** | **$0** | **$7,312,852** | **$10,196,215** | **$17,508,904** | **$12,801,555** | | |
| | | | | | | | | | |
| **Total Cash Flow to Equity** | **-$5,898,881** | **-$2,570,776** | **$8,278,760** | **-$3,969,827** | **$4,160,724** | **$1,908,904** | **$10,892,651** | **$12,801,555** | **$984,735** |

**Class A (North Parcel)**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| BOP | | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | | |
| Interest Paid by Developer | | ($512,548) | ($451,616) | ($294,506) | ($204,516) | ($119,807) | ($48,892) | | |
| Interest Paid by End Users | | $0 | $0 | $0 | ($305,299) | ($378,775) | ($437,829) | | |
| Payment Paid by Developer | | $0 | $0 | $0 | ($80,666) | ($50,971) | ($22,403) | | |
| Payment Paid by End Users | | $0 | $0 | $0 | ($120,816) | ($161,745) | ($202,173) | | |
| Outstanding Principal Balance of the Class A | | $0 | $0 | $0 | $0 | $0 | ($8,680,284) | | |
| EOP | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $0 | | |

*The Principal and Interest Payments of the Class A is transferred to residential buyers at each closing.

Total Class A Payments: 18,253,129
Average Annual Debt Service Per Unit    1,658
Assumes that Principal Payments begin May 2015 with a final maturity date in May 2038. Payments are semi-annually and fully amortize.

**Class B (North Parcel)**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| BOP | | $16,567,213 | $16,567,213 | $8,893,707 | $6,449,635 | $4,772,106 | $6,521,878 | | |
| Interest Paid | | ($861,495) | ($735,262) | ($430,700) | ($303,608) | ($272,964) | ($169,569) | | |
| Payment | | $0 | ($7,673,506) | ($2,444,072) | ($1,677,529) | $1,749,772 | ($6,521,878) | | |
| EOP | $16,567,213 | $16,567,213 | $8,893,707 | $6,449,635 | $4,772,106 | $6,521,878 | $0 | | |
| | | | | | | | | | |
| **Class B True Up Payments** | | **$0** | **($5,778,118)** | **($2,123,802)** | **($1,908,842)** | **($1,590,702)** | **($1,537,679)** | | |

| | |
|---|---|
| Class B Restructured Principal Payment | $16,567,213 |
| Class B Interest Payment | $2,773,598 |
| Class B True-Up payments at Unit Closings | $12,939,143 |
| Total Class B Payments: | $32,279,955 |

| Total District Payments | $50,533,084 |
|---|---|

**Exhibit 4**
**Financial Projections - South Parcel**

**Landmark - Assuming 1111(b) Election is Made**
**Folio: 35-3017-001-0365**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total | Average Annual Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Needs from Equity/Construction Financing | $250,177 | $994,921 | $1,011,110 | $1,011,110 | $5,966,781 | $11,444,322 | $11,632,915 | $11,401,205 | $11,680,707 | $11,029,637 | $66,422,885 | $5,109,453 |
| Deposits | $0 | $0 | $0 | $0 | $4,206,597 | $8,112,723 | $8,112,723 | $7,511,781 | $6,309,896 | $3,305,184 | $37,558,905 | $2,889,147 |
| Sales Proceeds | $0 | $0 | $0 | $0 | $0 | $17,527,489 | $17,527,489 | $17,527,489 | $17,527,489 | $17,527,489 | $87,637,445 | $6,741,342 |
| **Total Sources** | $250,177 | $994,921 | $1,011,110 | $1,011,110 | $10,173,378 | $37,084,535 | $37,273,127 | $36,440,475 | $35,518,092 | $31,862,309 | $191,619,235 | $14,739,941 |
| | | | | | | | | | | | | |
| Construction & Commissions | $0 | $0 | $0 | $0 | ($4,257,188) | ($15,933,807) | ($16,267,140) | ($15,802,398) | ($15,706,247) | ($14,315,932) | ($82,282,713) | ($6,329,439) |
| Land (Class B Principal Payments) | $0 | $0 | $0 | $0 | $0 | ($2,144,942) | ($2,144,942) | ($2,144,942) | ($2,144,942) | ($2,144,940) | ($10,724,711) | ($824,978) |
| Class A Principal Payments paid by Developer | $0 | $0 | $0 | $0 | ($201,482) | ($212,716) | ($179,661) | ($142,258) | ($100,127) | ($52,855) | ($889,098) | ($68,392) |
| District Class A Interest | $0 | ($512,548) | ($512,548) | ($512,548) | ($509,815) | ($498,581) | ($389,377) | ($284,520) | ($184,392) | ($89,405) | ($3,493,735) | ($268,749) |
| District Class B Interest | $0 | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($258,449) | ($193,836) | ($129,224) | ($32,306) | ($2,229,119) | ($171,471) |
| Impact fees / A&E/Ins. /Permits / RE Taxes / Legal | ($156,987) | ($140,797) | ($156,987) | ($156,987) | ($2,594,096) | ($1,516,735) | ($1,498,926) | ($1,479,499) | ($1,460,071) | ($405,953) | ($9,567,037) | ($735,926) |
| Administrative and Property Maintenance Fees | ($93,191) | ($18,515) | ($18,515) | ($18,515) | ($1,097,785) | ($1,694,792) | ($1,691,089) | ($1,687,386) | ($1,683,683) | ($1,641,526) | ($9,644,997) | ($741,923) |
| Unsecured Creditors | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Reorganization Costs | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Uses** | ($250,177) | ($994,921) | ($1,011,110) | ($1,011,110) | ($8,983,427) | ($22,324,634) | ($22,429,584) | ($21,734,840) | ($21,408,687) | ($18,682,920) | ($118,831,410) | ($9,140,878) |
| | | | | | | | | | | | | |
| Total Sources | $250,177 | $994,921 | $1,011,110 | $1,011,110 | $10,173,378 | $37,084,535 | $37,273,127 | $36,440,475 | $35,518,092 | $31,862,309 | $191,619,235 | $14,739,941 |
| Total Uses | ($250,177) | ($994,921) | ($1,011,110) | ($1,011,110) | ($8,983,427) | ($22,324,634) | ($22,429,584) | ($21,734,840) | ($21,408,687) | ($18,682,920) | ($118,831,410) | ($9,140,878) |
| Return of Capital | $0 | $0 | $0 | $0 | $0 | ($14,759,901) | ($14,843,543) | ($14,109,097) | ($11,680,707) | ($11,029,637) | ($66,422,885) | ($5,109,453) |
| **Annual Cash Flow** | $0 | $0 | $0 | $0 | $1,189,951 | $0 | $0 | $596,538 | $2,428,698 | $2,149,753 | $6,364,940 | $489,611 |
| | | | | | | | | | | | | |
| **Cumulative Cash Flow** | $0 | $0 | $0 | $0 | $1,189,951 | $1,189,951 | $1,189,951 | $1,786,489 | $4,215,187 | $6,364,940 | | |
| | | | | | | | | | | | | |
| **Total Cash Flow to Equity** | -$250,177 | -$994,921 | -$1,011,110 | -$1,011,110 | -$5,966,781 | $3,315,579 | $3,210,628 | $2,707,892 | $0 | $6,364,940 | $6,364,940 | $489,611 |

**Class A (South Parcel)**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $8,680,284 | $8,443,186 | $8,192,869 |
| Interest Paid by Developer | | ($512,548) | ($512,548) | ($512,548) | ($509,815) | ($498,581) | ($389,377) | ($284,520) | ($184,392) | ($89,405) |
| Interest Paid by End Users | | $0 | $0 | $0 | $0 | $0 | ($97,344) | ($189,680) | ($276,588) | ($357,619) |
| Payment Paid by Developer | | $0 | $0 | $0 | ($201,482) | ($212,716) | ($179,661) | ($142,258) | ($100,127) | ($52,855) |
| Payment Paid by End Users | | $0 | $0 | $0 | $0 | $0 | ($44,915) | ($94,839) | ($150,190) | ($211,419) |
| Outstanding Principal Balance of the Class A | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($7,928,595) |
| EOP | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $8,680,284 | $8,443,186 | $8,192,869 | $0 |

*The Principal and Interest Payments of the Class A is transferred to residential buyers at each closing.

Total Class A Payments: 18,253,129
Average Annual Debt Service Per Unit  1,778
Assumes that Principal Payments begin May 2015 with a final maturity date in May 2038. Payments are semi-annually and fully amortize.

**Class B (South Parcel)**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $4,970,164 | $3,727,623 | $2,485,082 | $1,242,541 |
| Interest Paid | | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($258,449) | ($193,836) | ($129,224) | ($32,306) |
| Payment | | $0 | $0 | $0 | $0 | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) |
| EOP | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $4,970,164 | $3,727,623 | $2,485,082 | $1,242,541 | $0 |
| | | | | | | | | | | |
| Class B True Up Payment | | $0 | $0 | $0 | $0 | ($902,401) | ($902,401) | ($902,401) | ($902,401) | ($902,401) |

| | |
|---|---|
| Class B Restructured Principal Payment | $6,212,705 |
| Class B Interest Payment | $2,229,119 |
| Class B True-Up payments at Unit Closings | $4,512,006 |
| **Total Class B Payments:** | $12,953,830 |

| | |
|---|---|
| **Total District Payments** | $31,206,958.66 |

## Class 4(a) Payment Schedule (North Parcel)
## Landmark - 1111(b) Election

| Period | | Beginning of Period | Interest Payment | Principal Payment | Total Semi-Annual Payment | End of Period |
|---|---|---|---|---|---|---|
| 0 | | | | | | 9,319,057 |
| 0 | May-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 1 | May-15 | 9,319,057 | -256,274 | -99,375 | -355,649 | 9,219,683 |
| 2 | Nov-15 | 9,219,683 | -253,541 | -102,107 | -355,649 | 9,117,576 |
| 3 | May-16 | 9,117,576 | -250,733 | -104,915 | -355,649 | 9,012,660 |
| 4 | Nov-16 | 9,012,660 | -247,848 | -107,800 | -355,649 | 8,904,860 |
| 5 | May-17 | 8,904,860 | -244,884 | -110,765 | -355,649 | 8,794,095 |
| 6 | Nov-17 | 8,794,095 | -241,838 | -113,811 | -355,649 | 8,680,284 |
| 7 | May-18 | 8,680,284 | -238,708 | -116,941 | -355,649 | 8,563,343 |
| 8 | Nov-18 | 8,563,343 | -235,492 | -120,157 | -355,649 | 8,443,186 |
| 9 | May-19 | 8,443,186 | -232,188 | -123,461 | -355,649 | 8,319,725 |
| 10 | Nov-19 | 8,319,725 | -228,792 | -126,856 | -355,649 | 8,192,869 |
| 11 | May-20 | 8,192,869 | -225,304 | -130,345 | -355,649 | 8,062,525 |
| 12 | Nov-20 | 8,062,525 | -221,719 | -133,929 | -355,649 | 7,928,595 |
| 13 | May-21 | 7,928,595 | -218,036 | -137,612 | -355,649 | 7,790,983 |
| 14 | Nov-21 | 7,790,983 | -214,252 | -141,397 | -355,649 | 7,649,587 |
| 15 | May-22 | 7,649,587 | -210,364 | -145,285 | -355,649 | 7,504,302 |
| 16 | Nov-22 | 7,504,302 | -206,368 | -149,280 | -355,649 | 7,355,021 |
| 17 | May-23 | 7,355,021 | -202,263 | -153,386 | -355,649 | 7,201,636 |
| 18 | Nov-23 | 7,201,636 | -198,045 | -157,604 | -355,649 | 7,044,032 |
| 19 | May-24 | 7,044,032 | -193,711 | -161,938 | -355,649 | 6,882,094 |
| 20 | Nov-24 | 6,882,094 | -189,258 | -166,391 | -355,649 | 6,715,703 |
| 21 | May-25 | 6,715,703 | -184,682 | -170,967 | -355,649 | 6,544,737 |
| 22 | Nov-25 | 6,544,737 | -179,980 | -175,668 | -355,649 | 6,369,068 |
| 23 | May-26 | 6,369,068 | -175,149 | -180,499 | -355,649 | 6,188,569 |
| 24 | Nov-26 | 6,188,569 | -170,186 | -185,463 | -355,649 | 6,003,106 |
| 25 | May-27 | 6,003,106 | -165,085 | -190,563 | -355,649 | 5,812,543 |
| 26 | Nov-27 | 5,812,543 | -159,845 | -195,804 | -355,649 | 5,616,739 |
| 27 | May-28 | 5,616,739 | -154,460 | -201,188 | -355,649 | 5,415,551 |
| 28 | Nov-28 | 5,415,551 | -148,928 | -206,721 | -355,649 | 5,208,830 |
| 29 | May-29 | 5,208,830 | -143,243 | -212,406 | -355,649 | 4,996,424 |
| 30 | Nov-29 | 4,996,424 | -137,402 | -218,247 | -355,649 | 4,778,177 |
| 31 | May-30 | 4,778,177 | -131,400 | -224,249 | -355,649 | 4,553,929 |
| 32 | Nov-30 | 4,553,929 | -125,233 | -230,416 | -355,649 | 4,323,513 |
| 33 | May-31 | 4,323,513 | -118,897 | -236,752 | -355,649 | 4,086,761 |
| 34 | Nov-31 | 4,086,761 | -112,386 | -243,263 | -355,649 | 3,843,498 |
| 35 | May-32 | 3,843,498 | -105,696 | -249,952 | -355,649 | 3,593,546 |
| 36 | Nov-32 | 3,593,546 | -98,823 | -256,826 | -355,649 | 3,336,720 |
| 37 | May-33 | 3,336,720 | -91,760 | -263,889 | -355,649 | 3,072,831 |
| 38 | Nov-33 | 3,072,831 | -84,503 | -271,146 | -355,649 | 2,801,685 |
| 39 | May-34 | 2,801,685 | -77,046 | -278,602 | -355,649 | 2,523,083 |
| 40 | Nov-34 | 2,523,083 | -69,385 | -286,264 | -355,649 | 2,236,819 |
| 41 | May-35 | 2,236,819 | -61,513 | -294,136 | -355,649 | 1,942,683 |
| 42 | Nov-35 | 1,942,683 | -53,424 | -302,225 | -355,649 | 1,640,458 |
| 43 | May-36 | 1,640,458 | -45,113 | -310,536 | -355,649 | 1,329,922 |
| 44 | Nov-36 | 1,329,922 | -36,573 | -319,076 | -355,649 | 1,010,847 |
| 45 | May-37 | 1,010,847 | -27,798 | -327,850 | -355,649 | 682,996 |
| 46 | Nov-37 | 682,996 | -18,782 | -336,866 | -355,649 | 346,130 |
| 47 | May-38 | 346,130 | -9,519 | -346,130 | -355,649 | 0 |
| | Total | | -8,934,072 | -9,319,057 | -18,253,129 | |

## Class 4(b) Payment Schedule (South Parcel)
## Landmark - 1111(b) Election

| Period | | Beginning of Period | Interest Payment | Principal Payment | Total Semi-Annual Payment | End of Period |
|---|---|---|---|---|---|---|
| 0 | | | | | | 9,319,057 |
| 0 | May-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 1 | May-15 | 9,319,057 | -256,274 | -99,375 | -355,649 | 9,219,683 |
| 2 | Nov-15 | 9,219,683 | -253,541 | -102,107 | -355,649 | 9,117,576 |
| 3 | May-16 | 9,117,576 | -250,733 | -104,915 | -355,649 | 9,012,660 |
| 4 | Nov-16 | 9,012,660 | -247,848 | -107,800 | -355,649 | 8,904,860 |
| 5 | May-17 | 8,904,860 | -244,884 | -110,765 | -355,649 | 8,794,095 |
| 6 | Nov-17 | 8,794,095 | -241,838 | -113,811 | -355,649 | 8,680,284 |
| 7 | May-18 | 8,680,284 | -238,708 | -116,941 | -355,649 | 8,563,343 |
| 8 | Nov-18 | 8,563,343 | -235,492 | -120,157 | -355,649 | 8,443,186 |
| 9 | May-19 | 8,443,186 | -232,188 | -123,461 | -355,649 | 8,319,725 |
| 10 | Nov-19 | 8,319,725 | -228,792 | -126,856 | -355,649 | 8,192,869 |
| 11 | May-20 | 8,192,869 | -225,304 | -130,345 | -355,649 | 8,062,525 |
| 12 | Nov-20 | 8,062,525 | -221,719 | -133,929 | -355,649 | 7,928,595 |
| 13 | May-21 | 7,928,595 | -218,036 | -137,612 | -355,649 | 7,790,983 |
| 14 | Nov-21 | 7,790,983 | -214,252 | -141,397 | -355,649 | 7,649,587 |
| 15 | May-22 | 7,649,587 | -210,364 | -145,285 | -355,649 | 7,504,302 |
| 16 | Nov-22 | 7,504,302 | -206,368 | -149,280 | -355,649 | 7,355,021 |
| 17 | May-23 | 7,355,021 | -202,263 | -153,386 | -355,649 | 7,201,636 |
| 18 | Nov-23 | 7,201,636 | -198,045 | -157,604 | -355,649 | 7,044,032 |
| 19 | May-24 | 7,044,032 | -193,711 | -161,938 | -355,649 | 6,882,094 |
| 20 | Nov-24 | 6,882,094 | -189,258 | -166,391 | -355,649 | 6,715,703 |
| 21 | May-25 | 6,715,703 | -184,682 | -170,967 | -355,649 | 6,544,737 |
| 22 | Nov-25 | 6,544,737 | -179,980 | -175,668 | -355,649 | 6,369,068 |
| 23 | May-26 | 6,369,068 | -175,149 | -180,499 | -355,649 | 6,188,569 |
| 24 | Nov-26 | 6,188,569 | -170,186 | -185,463 | -355,649 | 6,003,106 |
| 25 | May-27 | 6,003,106 | -165,085 | -190,563 | -355,649 | 5,812,543 |
| 26 | Nov-27 | 5,812,543 | -159,845 | -195,804 | -355,649 | 5,616,739 |
| 27 | May-28 | 5,616,739 | -154,460 | -201,188 | -355,649 | 5,415,551 |
| 28 | Nov-28 | 5,415,551 | -148,928 | -206,721 | -355,649 | 5,208,830 |
| 29 | May-29 | 5,208,830 | -143,243 | -212,406 | -355,649 | 4,996,424 |
| 30 | Nov-29 | 4,996,424 | -137,402 | -218,247 | -355,649 | 4,778,177 |
| 31 | May-30 | 4,778,177 | -131,400 | -224,249 | -355,649 | 4,553,929 |
| 32 | Nov-30 | 4,553,929 | -125,233 | -230,416 | -355,649 | 4,323,513 |
| 33 | May-31 | 4,323,513 | -118,897 | -236,752 | -355,649 | 4,086,761 |
| 34 | Nov-31 | 4,086,761 | -112,386 | -243,263 | -355,649 | 3,843,498 |
| 35 | May-32 | 3,843,498 | -105,696 | -249,952 | -355,649 | 3,593,546 |
| 36 | Nov-32 | 3,593,546 | -98,823 | -256,826 | -355,649 | 3,336,720 |
| 37 | May-33 | 3,336,720 | -91,760 | -263,889 | -355,649 | 3,072,831 |
| 38 | Nov-33 | 3,072,831 | -84,503 | -271,146 | -355,649 | 2,801,685 |
| 39 | May-34 | 2,801,685 | -77,046 | -278,602 | -355,649 | 2,523,083 |
| 40 | Nov-34 | 2,523,083 | -69,385 | -286,264 | -355,649 | 2,236,819 |
| 41 | May-35 | 2,236,819 | -61,513 | -294,136 | -355,649 | 1,942,683 |
| 42 | Nov-35 | 1,942,683 | -53,424 | -302,225 | -355,649 | 1,640,458 |
| 43 | May-36 | 1,640,458 | -45,113 | -310,536 | -355,649 | 1,329,922 |
| 44 | Nov-36 | 1,329,922 | -36,573 | -319,076 | -355,649 | 1,010,847 |
| 45 | May-37 | 1,010,847 | -27,798 | -327,850 | -355,649 | 682,996 |
| 46 | Nov-37 | 682,996 | -18,782 | -336,866 | -355,649 | 346,130 |
| 47 | May-38 | 346,130 | -9,519 | -346,130 | -355,649 | 0 |
| | Total | | -8,934,072 | -9,319,057 | -18,253,129 | |

Exhibit 4 to Disclosure Statement
Financial Projections

**Release Prices per Unit**

|  | *Assuming No 1111(b) Election* |
|---|---|
| ***North Parcel*** | |
| Single Family | 55,046.67 |
| Rowhomes | 33,945.45 |
| | |
| ***South Parcel*** | |
| Residential | 12,978.15 |
| Office | 36,055.31 |
| Retail | 20,483.85 |

**Exhibit 4**
**Financial Projections**
**Landmark: 1111(b) Election is Not Made**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total | Average Annual Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Needs from Equity/Construction Financing | $6,149,058 | $3,565,697 | $19,845,980 | $1,011,110 | $5,966,781 | $11,444,322 | $11,632,915 | $11,401,205 | $8,973,504 | $6,517,631 | $86,508,203 | $6,654,477 |
| Deposits | $0 | $10,800,000 | $15,778,800 | $7,192,800 | $11,199,597 | $14,905,923 | $9,311,523 | $7,511,781 | $6,309,896 | $3,305,184 | $86,315,505 | $6,639,654 |
| Sales Proceeds | $0 | $0 | $50,803,200 | $18,673,200 | $19,708,200 | $31,513,489 | $31,047,289 | $17,527,489 | $17,527,489 | $17,527,489 | $204,327,845 | $15,717,527 |
| **Total Sources** | **$6,149,058** | **$14,365,697** | **$86,427,980** | **$26,877,110** | **$36,874,578** | **$57,863,735** | **$51,991,727** | **$36,440,475** | **$32,810,809** | **$27,350,303** | **$377,151,553** | **$29,011,658** |
| | | | | | | | | | | | | |
| Construction & Commissions | $0 | ($7,990,080) | ($37,151,994) | ($13,220,252) | ($16,121,288) | ($26,158,337) | ($25,090,664) | ($15,802,398) | ($15,706,247) | ($14,315,932) | ($171,557,197) | ($13,196,707) |
| Land (Class B Principal Payments) | $0 | $0 | ($7,673,506) | ($2,444,072) | ($2,444,072) | ($3,279,268) | ($3,211,377) | ($3,242,541) | ($3,242,541) | ($3,242,541) | ($22,779,918) | ($1,752,301) |
| Class A Principal Payments paid by Developer | $0 | $0 | $0 | $0 | ($282,148) | ($261,686) | ($202,064) | ($142,258) | ($100,127) | ($52,855) | ($1,043,139) | ($80,241) |
| District Class A Interest | $0 | ($1,025,006) | ($964,164) | ($807,054) | ($714,332) | ($618,388) | ($438,269) | ($284,520) | ($184,392) | ($89,405) | ($5,125,620) | ($394,278) |
| District Class B Interest | $0 | ($1,184,556) | ($1,058,323) | ($757,760) | ($626,609) | ($500,872) | ($309,638) | ($193,836) | ($129,224) | ($32,306) | ($4,700,185) | ($368,707) |
| Impact fees/Add'l Ins. /Permits / RE Taxes / Legal | ($1,216,153) | ($3,281,157) | ($1,871,128) | ($1,379,525) | ($3,676,660) | ($2,218,786) | ($1,657,413) | ($1,479,099) | ($1,440,071) | ($405,953) | ($18,414,595) | ($1,431,873) |
| Administrative and Property Maintenance Fees | ($258,863) | ($2,290,852) | ($3,817,117) | ($2,805,619) | ($3,633,072) | ($3,950,049) | ($3,834,606) | ($3,687,386) | ($1,683,683) | ($1,441,526) | ($25,602,774) | ($1,969,444) |
| Unsecured Creditors | ($3,000,000) | $0 | ($1,000,000) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($4,000,000) | ($307,692) |
| Reorganization Costs | ($300,000) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($300,000) | ($23,077) |
| **Total Uses** | **($4,775,015)** | **($15,739,740)** | **($53,536,232)** | **($21,410,283)** | **($27,498,241)** | **($36,993,388)** | **($34,744,031)** | **($20,832,439)** | **($20,506,286)** | **($17,780,510)** | **($253,816,174)** | **($19,524,321)** |
| | | | | | | | | | | | | |
| **Total Sources** | **$6,149,058** | **$14,365,697** | **$86,427,980** | **$26,877,110** | **$36,874,578** | **$57,863,735** | **$51,991,727** | **$36,440,475** | **$32,810,809** | **$27,350,303** | **$377,151,553** | **$29,011,658** |
| Total Uses | ($4,775,015) | ($15,739,740) | ($53,536,232) | ($21,410,283) | ($27,498,241) | ($36,993,388) | ($34,744,031) | ($20,832,439) | ($20,506,286) | ($17,780,510) | ($253,816,174) | ($19,524,321) |
| Return of Capital | $0 | $0 | ($27,304,528) | $0 | $0 | ($15,662,302) | ($15,745,944) | ($12,304,294) | ($8,973,504) | ($6,517,631) | ($86,508,203) | ($6,654,477) |
| **Annual Cash Flow** | **$1,374,043** | **($1,374,043)** | **$5,587,221** | **$5,466,827** | **$9,376,337** | **$5,208,045** | **$1,501,751** | **$3,303,742** | **$3,331,099** | **$3,052,154** | **$36,827,176** | **$2,832,860** |
| | | | | | | | | | | | | |
| **Cumulative Cash Flow** | **$1,374,043** | **$0** | **$5,587,221** | **$11,054,048** | **$20,430,385** | **$25,638,430** | **$27,140,181** | **$30,443,923** | **$33,775,022** | **$36,827,176** | | |
| | | | | | | | | | | | | |
| **Total Cash Flow to Equity** | **-$6,149,058** | **-$3,565,697** | **$7,458,547** | **-$5,011,110** | **-$2,326,347** | **$9,426,025** | **$21,214,781** | **$903,090** | **$0** | **$10,076,946** | **$36,827,176** | **$2,832,860** |

**Class A (North Parcel)**

| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $0 | $0 | $0 |
| Interest Paid by Developer | | ($512,548) | ($451,616) | ($294,506) | ($204,516) | ($119,807) | ($48,892) | $0 | $0 | $0 |
| Interest Paid by End Users | | $0 | $0 | $0 | ($305,299) | ($370,775) | ($437,829) | $0 | $0 | $0 |
| Payment Paid by Developer | | $0 | $0 | $0 | ($80,666) | ($50,971) | ($22,403) | $0 | $0 | $0 |
| Payment Paid by End Users | | $0 | $0 | $0 | ($120,816) | ($161,745) | ($202,173) | $0 | $0 | $0 |
| Outstanding Principal Balance of the Class A | | $0 | $0 | $0 | $0 | $0 | ($8,680,284) | $0 | $0 | $0 |
| EOP | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $0 | $0 | $0 | $0 |

*The Principal and Interest Payments of the Class A is transferred to residential buyers at each closing.
Total Class A Payments: 18,253,129
Average Annual Debt Service Per Unit   1,658
Assumes that Principal Payments begin May 2015 with a final maturity date in May 2038. Payments are semi-annually and fully amortize.

**Class A (South Parcel)**

| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $8,680,284 | $8,443,186 | $8,192,869 |
| Interest Paid by Developer | | ($512,548) | ($512,548) | ($512,548) | ($509,815) | ($498,581) | ($389,377) | ($284,520) | ($184,392) | ($89,405) |
| Interest Paid by End Users | | $0 | $0 | $0 | $0 | $0 | ($97,344) | ($189,680) | ($276,588) | ($357,619) |
| Payment Paid by Developer | | $0 | $0 | $0 | ($201,482) | ($212,716) | ($179,661) | ($142,258) | ($100,127) | ($52,855) |
| Payment Paid by End Users | | $0 | $0 | $0 | $0 | $0 | ($44,515) | ($94,839) | ($150,190) | ($211,419) |
| Outstanding Principal Balance of the Class A | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($7,928,595) |
| EOP | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $8,680,284 | $8,443,186 | $8,192,869 | $0 |

*The Principal and Interest Payments of the Class A is transferred to residential buyers at each closing.
Total Class A Payments: 18,253,129
Average Annual Debt Service Per Unit   1,778
Assumes that Principal Payments begin May 2015 with a final maturity date in May 2038. Payments are semi-annually and fully amortize.

**Class B (North Parcel)**

| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $16,567,213 | $16,567,213 | $8,893,707 | $6,449,635 | $4,005,563 | $1,968,836 | ($0) | ($0) | ($0) |
| Interest Paid | | ($861,495) | ($735,262) | ($430,700) | ($303,608) | ($181,812) | ($51,190) | $0 | $0 | $0 |
| Payment | | $0 | ($7,673,506) | ($2,444,072) | ($2,444,072) | ($2,036,727) | ($1,968,836) | $0 | $0 | $0 |
| EOP | $16,567,213 | $16,567,213 | $8,893,707 | $6,449,635 | $4,005,563 | $1,968,836 | ($0) | ($0) | ($0) | ($0) |
| | | | | | | | | | | |
| Class B True Up Payments | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

Class B Restructured Principal Payment   $16,567,213
Class B Interest Payment   $2,564,067
Class B True-Up payments at Unit Closings   $0
Total Class B Payments:   $19,131,280

**Class B (South Parcel)**

| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $4,970,164 | $3,727,623 | $2,485,082 | $1,242,541 |
| Interest Paid | | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($258,449) | ($193,836) | ($129,224) | ($32,306) |
| Payment | | $0 | $0 | $0 | $0 | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) |
| EOP | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $4,970,164 | $3,727,623 | $2,485,082 | $1,242,541 | $0 |
| | | | | | | | | | | |
| Class B True Up Payment | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

Class B Restructured Principal Payment   $6,212,705
Class B Interest Payment   $2,229,119
Class B True-Up payments at Unit Closings   $0
Total Class B Payments:   $8,441,824

**Total District Payments   $64,079,362**

**Exhibit A**
**Financial Projections**

**Landmark: 1111(b) Election is Not Made - North Parcel**
**Folios: 35-3017-001-0240 and 35-3017-001-0241.  Release Prices to District are allocated to Folio 35-3017-001-0240**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | | Total | Average Annual Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash Needs from Equity/Construction Financing | $5,898,881 | $2,570,776 | $18,834,870 | $0 | $0 | $0 | $0 | | $27,304,528 | $2,100,348 |
| Deposits | $0 | $10,800,000 | $15,778,800 | $7,192,800 | $6,993,000 | $6,793,200 | $1,198,800 | | $48,756,600 | $3,750,508 |
| Sales Proceeds | $0 | $0 | $50,803,200 | $18,673,200 | $19,708,200 | $13,986,000 | $13,519,800 | | $116,690,400 | $8,976,185 |
| **Total Sources** | **$5,898,881** | **$13,370,776** | **$85,416,870** | **$25,866,000** | **$26,701,200** | **$20,779,200** | **$14,718,600** | | **$192,751,528** | **$14,827,041** |
| Construction & Commissions | $0 | ($7,990,080) | ($37,151,994) | ($13,220,252) | ($11,864,100) | ($10,224,530) | ($8,823,524) | | ($89,274,480) | ($6,867,268) |
| Land (Class B Principal Payments) | $0 | $0 | ($7,673,506) | ($2,444,072) | ($2,444,072) | ($2,036,727) | ($1,968,836) | | ($16,567,213) | ($1,274,401) |
| Class A Principal Payments paid by Developer | $0 | $0 | $0 | $0 | ($80,666) | ($50,971) | ($22,403) | | ($154,040) | ($11,849) |
| District Class A Interest | $0 | ($512,548) | ($451,616) | ($294,506) | ($204,516) | ($119,807) | ($48,892) | | ($1,631,885) | ($125,530) |
| District Class B Interest | $0 | ($861,495) | ($735,262) | ($430,700) | ($303,608) | ($181,812) | ($51,190) | | ($2,564,067) | ($197,236) |
| Impact fees/ A&E/Ins. /Permits / RE Taxes / Legal | ($1,059,166) | ($3,108,360) | ($1,714,141) | ($1,222,538) | ($1,082,564) | ($702,051) | ($158,487) | | ($9,047,308) | ($695,947) |
| Administrative and Property Maintenance Fees | ($165,672) | ($2,272,337) | ($3,798,602) | ($2,787,104) | ($2,535,287) | ($2,255,257) | ($2,143,517) | | ($15,957,776) | ($1,227,521) |
| Unsecured Creditors | ($3,000,000) | $0 | $0 | $0 | $0 | $0 | $0 | | ($3,000,000) | ($307,692) |
| Reorganization Costs | ($300,000) | $0 | $0 | $0 | $0 | $0 | $0 | | ($300,000) | ($23,077) |
| **Total Uses** | **($4,524,838)** | **($14,744,820)** | **($52,525,122)** | **($20,399,173)** | **($18,514,814)** | **($15,571,155)** | **($13,216,849)** | | **($139,496,770)** | **($10,730,521)** |
| Total Sources | $5,898,881 | $13,370,776 | $85,416,870 | $25,866,000 | $26,701,200 | $20,779,200 | $14,718,600 | | $192,751,528 | $14,827,041 |
| Total Uses | ($4,524,838) | ($14,744,820) | ($52,525,122) | ($20,399,173) | ($18,514,814) | ($15,571,155) | ($13,216,849) | | ($139,496,770) | ($10,730,521) |
| Return of Capital | $0 | $0 | ($27,304,528) | $0 | $0 | $0 | $0 | | ($27,304,528) | ($2,100,348) |
| **Annual Cash Flow** | **$1,374,043** | **($1,374,043)** | **$5,587,220** | **$5,466,827** | **$8,186,386** | **$5,208,045** | **$1,501,751** | | **$25,950,230** | **$1,996,172** |
| **Cumulative Cash Flow** | **$1,374,043** | **$0** | **$5,587,221** | **$11,054,048** | **$19,240,434** | **$24,448,479** | **$25,950,230** | | | |
| **Total Cash Flow to Equity** | **-$5,898,881** | **-$2,570,776** | **$8,469,658** | **$0** | **$3,640,434** | **$5,208,045** | **$17,101,751** | | **$25,950,230** | **$1,996,172** |

**Class A (North Parcel)**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| BOP | | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | |
| Interest Paid by Developer | | ($512,548) | ($451,616) | ($294,506) | ($204,516) | ($119,807) | ($48,892) | |
| Interest Paid by End Users | | $0 | $0 | $0 | ($305,299) | ($378,775) | ($437,829) | |
| Payment Paid by Developer | | $0 | $0 | $0 | ($80,666) | ($50,971) | ($22,403) | |
| Payment Paid by End Users | | $0 | $0 | $0 | ($120,816) | ($161,745) | ($202,173) | |
| Outstanding Principal Balance of the Class A | | $0 | $0 | $0 | $0 | $0 | ($8,680,284) | |
| EOP | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $0 | |

*The Principal and Interest Payments of the Class A is transferred to residential buyers at each closing.
Total Class A Payments: 18,253,129
Average Annual Debt Service Per Unit 1,658
Assumes that Principal Payments begin May 2015 with a final maturity date in May 2038.  Payments are semi-annually and fully amortize.

**Class B (North Parcel)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BOP | | $16,567,213 | $16,567,213 | $8,893,707 | $6,449,635 | $4,005,563 | $1,968,836 |
| Interest Paid | | ($861,495) | ($735,262) | ($430,700) | ($303,608) | ($181,812) | ($51,190) |
| Payment | | $0 | ($7,673,506) | ($2,444,072) | ($2,444,072) | ($2,036,727) | ($1,968,836) |
| EOP | $16,567,213 | $16,567,213 | $8,893,707 | $6,449,635 | $4,005,563 | $1,968,836 | ($0) |
| **Class B True Up Payments** | | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** |

| | |
|---|---|
| **Class B Restructured Principal Payment** | $16,567,213 |
| **Class B Interest Payment** | $2,564,067 |
| **Class B True-Up payments at Unit Closings** | $0 |
| **Total Class B Payments:** | $19,131,280 |

| | |
|---|---|
| **Total District Payments** | **$37,384,409** |

**Exhibit 4**
**Financial Projections**

**Landmark: 1111(b) Election is Not Made - South Parcel**
**Folio: 35-3017-001-0365**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total | Average Annual Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Needs from Equity/Construction Financing | $250,177 | $994,921 | $1,011,110 | $1,011,110 | $5,966,781 | $11,444,322 | $11,632,915 | $11,401,205 | $8,973,504 | $6,517,631 | $59,203,675 | $4,554,129 |
| Deposits | $0 | $0 | $0 | $0 | $4,206,597 | $8,112,723 | $8,112,723 | $7,511,781 | $6,309,896 | $3,305,184 | $37,558,905 | $2,889,147 |
| Sales Proceeds | $0 | $0 | $0 | $0 | $0 | $17,527,489 | $17,527,489 | $17,527,489 | $17,527,489 | $17,527,489 | $87,637,445 | $6,741,342 |
| **Total Sources** | **$250,177** | **$994,921** | **$1,011,110** | **$1,011,110** | **$10,173,378** | **$37,084,535** | **$37,273,127** | **$36,440,475** | **$32,810,889** | **$27,350,303** | **$184,400,025** | **$14,184,617** |
| | | | | | | | | | | | | |
| Construction & Commissions | $0 | $0 | $0 | $0 | ($4,257,188) | ($15,933,807) | ($16,267,140) | ($15,802,398) | ($15,706,247) | ($14,315,932) | ($82,282,713) | ($6,329,439) |
| Land (Class B Principal Payments) | $0 | $0 | $0 | $0 | $0 | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($6,212,705) | ($477,900) |
| Class A Principal Payments paid by Developer | $0 | $0 | $0 | $0 | ($201,482) | ($212,716) | ($179,661) | ($142,258) | ($100,127) | ($52,855) | ($889,098) | ($68,392) |
| District Class A Interest | $0 | ($512,548) | ($512,548) | ($512,548) | ($509,815) | ($498,581) | ($389,377) | ($284,520) | ($184,392) | ($89,405) | ($3,493,735) | ($268,749) |
| District Class B Interest | $0 | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($258,449) | ($193,836) | ($129,224) | ($32,306) | ($2,229,119) | ($171,471) |
| Impact fees/ A&E/Ins. /Permits / RE Taxes / Legal | ($156,987) | ($140,797) | ($156,987) | ($156,987) | ($2,594,096) | ($1,516,735) | ($1,498,926) | ($1,479,499) | ($1,460,071) | ($405,953) | ($9,567,037) | ($735,926) |
| Administrative and Property Maintenance Fees | ($93,191) | ($18,515) | ($18,515) | ($18,515) | ($1,097,785) | ($1,694,792) | ($1,691,089) | ($1,687,386) | ($1,683,683) | ($1,661,526) | ($9,664,997) | ($741,923) |
| Unsecured Creditors | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Reorganization Costs | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Uses** | **($250,177)** | **($994,921)** | **($1,011,110)** | **($1,011,110)** | **($8,983,427)** | **($21,422,233)** | **($21,527,183)** | **($20,832,439)** | **($20,506,286)** | **($17,780,518)** | **($114,319,404)** | **($8,793,800)** |
| | | | | | | | | | | | | |
| **Total Sources** | **$250,177** | **$994,921** | **$1,011,110** | **$1,011,110** | **$10,173,378** | **$37,084,535** | **$37,273,127** | **$36,440,475** | **$32,810,889** | **$27,350,303** | **$184,400,025** | **$14,184,617** |
| Total Uses | ($250,177) | ($994,921) | ($1,011,110) | ($1,011,110) | ($8,983,427) | ($21,422,233) | ($21,527,183) | ($20,832,439) | ($20,506,286) | ($17,780,518) | ($114,319,404) | ($8,793,800) |
| Return of Capital | $0 | $0 | $0 | $0 | $0 | ($15,662,302) | ($15,745,944) | ($12,304,294) | ($8,973,504) | ($6,517,631) | ($59,203,675) | ($4,554,129) |
| **Annual Cash Flow** | **$0** | **$0** | **$0** | **$0** | **$1,189,951** | **$0** | **$0** | **$3,303,742** | **$3,331,099** | **$3,052,154** | **$10,876,946** | **$836,688** |
| | | | | | | | | | | | | |
| **Cumulative Cash Flow** | **$0** | **$0** | **$0** | **$0** | **$1,189,951** | **$1,189,951** | **$1,189,951** | **$4,493,693** | **$7,824,792** | **$10,876,946** | | |
| | | | | | | | | | | | | |
| **Total Cash Flow to Equity** | **-$250,177** | **-$994,921** | **-$1,011,110** | **-$1,011,110** | **-$5,966,781** | **$4,217,980** | **$4,113,030** | **$903,090** | **$0** | **$10,876,946** | **$10,876,946** | **$836,688** |

**Class A (South Parcel)**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $8,680,284 | $8,443,186 | $8,192,869 |
| Interest Paid by Developer | | ($512,548) | ($512,548) | ($512,548) | ($509,815) | ($498,581) | ($389,377) | ($284,520) | ($184,392) | ($89,405) |
| Interest Paid by End Users | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Payment Paid by Developer | | $0 | $0 | $0 | ($201,482) | ($212,716) | ($179,661) | ($142,258) | ($100,127) | ($52,855) |
| Payment Paid by End Users | | $0 | $0 | $0 | $0 | $0 | ($44,915) | ($94,839) | ($150,190) | ($211,419) |
| Outstanding Principal Balance of the Class A | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($7,928,595) |
| EOP | $9,319,057 | $9,319,057 | $9,319,057 | $9,319,057 | $9,117,576 | $8,904,860 | $8,680,284 | $8,443,186 | $8,192,869 | $0 |

*The Principal and Interest Payments of the Class A is transferred to residential buyers at each closing.

| | |
|---|---|
| Total Class A Payments: | 18,253,129 |
| Average Annual Debt Service Per Unit | 1,778 |

Assumes that Principal Payments begin May 2015 with a final maturity date in May 2038. Payments are semi-annually and fully amortize.

**Class B (South Parcel)**

| | Confirmation Expenses | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| BOP | | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $4,970,164 | $3,727,623 | $2,485,082 | $1,242,541 |
| Interest Paid | | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($323,061) | ($258,449) | ($193,836) | ($129,224) | ($32,306) |
| Payment | | $0 | $0 | $0 | $0 | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) | ($1,242,541) |
| EOP | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $6,212,705 | $4,970,164 | $3,727,623 | $2,485,082 | $1,242,541 | $0 |
| | | | | | | | | | | |
| Class B True Up Payment | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

| | |
|---|---|
| Class B Restructured Principal Payment | $6,212,705 |
| Class B Interest Payment | $2,229,119 |
| Class B True-Up payments at Unit Closings | $0 |
| Total Class B Payments: | $8,441,824 |

| | |
|---|---|
| **Total District Payments** | **$26,694,952.61** |

## Class 4(a) Payment Schedule (North Parcel)
## Landmark - No 1111(b) Election

| Period | | Beginning of Period | Interest Payment | Principal Payment | Total Semi-Annual Payment | End of Period |
|---|---|---|---|---|---|---|
| 0 | | | | | | 9,319,057 |
| 0 | May-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 1 | May-15 | 9,319,057 | -256,274 | -99,375 | -355,649 | 9,219,683 |
| 2 | Nov-15 | 9,219,683 | -253,541 | -102,107 | -355,649 | 9,117,576 |
| 3 | May-16 | 9,117,576 | -250,733 | -104,915 | -355,649 | 9,012,660 |
| 4 | Nov-16 | 9,012,660 | -247,848 | -107,800 | -355,649 | 8,904,860 |
| 5 | May-17 | 8,904,860 | -244,884 | -110,765 | -355,649 | 8,794,095 |
| 6 | Nov-17 | 8,794,095 | -241,838 | -113,811 | -355,649 | 8,680,284 |
| 7 | May-18 | 8,680,284 | -238,708 | -116,941 | -355,649 | 8,563,343 |
| 8 | Nov-18 | 8,563,343 | -235,492 | -120,157 | -355,649 | 8,443,186 |
| 9 | May-19 | 8,443,186 | -232,188 | -123,461 | -355,649 | 8,319,725 |
| 10 | Nov-19 | 8,319,725 | -228,792 | -126,856 | -355,649 | 8,192,869 |
| 11 | May-20 | 8,192,869 | -225,304 | -130,345 | -355,649 | 8,062,525 |
| 12 | Nov-20 | 8,062,525 | -221,719 | -133,929 | -355,649 | 7,928,595 |
| 13 | May-21 | 7,928,595 | -218,036 | -137,612 | -355,649 | 7,790,983 |
| 14 | Nov-21 | 7,790,983 | -214,252 | -141,397 | -355,649 | 7,649,587 |
| 15 | May-22 | 7,649,587 | -210,364 | -145,285 | -355,649 | 7,504,302 |
| 16 | Nov-22 | 7,504,302 | -206,368 | -149,280 | -355,649 | 7,355,021 |
| 17 | May-23 | 7,355,021 | -202,263 | -153,386 | -355,649 | 7,201,636 |
| 18 | Nov-23 | 7,201,636 | -198,045 | -157,604 | -355,649 | 7,044,032 |
| 19 | May-24 | 7,044,032 | -193,711 | -161,938 | -355,649 | 6,882,094 |
| 20 | Nov-24 | 6,882,094 | -189,258 | -166,391 | -355,649 | 6,715,703 |
| 21 | May-25 | 6,715,703 | -184,682 | -170,967 | -355,649 | 6,544,737 |
| 22 | Nov-25 | 6,544,737 | -179,980 | -175,668 | -355,649 | 6,369,068 |
| 23 | May-26 | 6,369,068 | -175,149 | -180,499 | -355,649 | 6,188,569 |
| 24 | Nov-26 | 6,188,569 | -170,186 | -185,463 | -355,649 | 6,003,106 |
| 25 | May-27 | 6,003,106 | -165,085 | -190,563 | -355,649 | 5,812,543 |
| 26 | Nov-27 | 5,812,543 | -159,845 | -195,804 | -355,649 | 5,616,739 |
| 27 | May-28 | 5,616,739 | -154,460 | -201,188 | -355,649 | 5,415,551 |
| 28 | Nov-28 | 5,415,551 | -148,928 | -206,721 | -355,649 | 5,208,830 |
| 29 | May-29 | 5,208,830 | -143,243 | -212,406 | -355,649 | 4,996,424 |
| 30 | Nov-29 | 4,996,424 | -137,402 | -218,247 | -355,649 | 4,778,177 |
| 31 | May-30 | 4,778,177 | -131,400 | -224,249 | -355,649 | 4,553,929 |
| 32 | Nov-30 | 4,553,929 | -125,233 | -230,416 | -355,649 | 4,323,513 |
| 33 | May-31 | 4,323,513 | -118,897 | -236,752 | -355,649 | 4,086,761 |
| 34 | Nov-31 | 4,086,761 | -112,386 | -243,263 | -355,649 | 3,843,498 |
| 35 | May-32 | 3,843,498 | -105,696 | -249,952 | -355,649 | 3,593,546 |
| 36 | Nov-32 | 3,593,546 | -98,823 | -256,826 | -355,649 | 3,336,720 |
| 37 | May-33 | 3,336,720 | -91,760 | -263,889 | -355,649 | 3,072,831 |
| 38 | Nov-33 | 3,072,831 | -84,503 | -271,146 | -355,649 | 2,801,685 |
| 39 | May-34 | 2,801,685 | -77,046 | -278,602 | -355,649 | 2,523,083 |
| 40 | Nov-34 | 2,523,083 | -69,385 | -286,264 | -355,649 | 2,236,819 |
| 41 | May-35 | 2,236,819 | -61,513 | -294,136 | -355,649 | 1,942,683 |
| 42 | Nov-35 | 1,942,683 | -53,424 | -302,225 | -355,649 | 1,640,458 |
| 43 | May-36 | 1,640,458 | -45,113 | -310,536 | -355,649 | 1,329,922 |
| 44 | Nov-36 | 1,329,922 | -36,573 | -319,076 | -355,649 | 1,010,847 |
| 45 | May-37 | 1,010,847 | -27,798 | -327,850 | -355,649 | 682,996 |
| 46 | Nov-37 | 682,996 | -18,782 | -336,866 | -355,649 | 346,130 |
| 47 | May-38 | 346,130 | -9,519 | -346,130 | -355,649 | 0 |
| | Total | | -8,934,072 | -9,319,057 | -18,253,129 | |

## Class 4(b) Payment Schedule (South Parcel)
## Landmark - No 1111(b) Election

| Period | | Beginning of Period | Interest Payment | Principal Payment | Total Semi-Annual Payment | End of Period |
|---|---|---|---|---|---|---|
| 0 | | | | | | 9,319,057 |
| 0 | May-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-12 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-13 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | May-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 0 | Nov-14 | 9,319,057 | -256,274 | 0 | -256,274 | 9,319,057 |
| 1 | May-15 | 9,319,057 | -256,274 | -99,375 | -355,649 | 9,219,683 |
| 2 | Nov-15 | 9,219,683 | -253,541 | -102,107 | -355,649 | 9,117,576 |
| 3 | May-16 | 9,117,576 | -250,733 | -104,915 | -355,649 | 9,012,660 |
| 4 | Nov-16 | 9,012,660 | -247,848 | -107,800 | -355,649 | 8,904,860 |
| 5 | May-17 | 8,904,860 | -244,884 | -110,765 | -355,649 | 8,794,095 |
| 6 | Nov-17 | 8,794,095 | -241,838 | -113,811 | -355,649 | 8,680,284 |
| 7 | May-18 | 8,680,284 | -238,708 | -116,941 | -355,649 | 8,563,343 |
| 8 | Nov-18 | 8,563,343 | -235,492 | -120,157 | -355,649 | 8,443,186 |
| 9 | May-19 | 8,443,186 | -232,188 | -123,461 | -355,649 | 8,319,725 |
| 10 | Nov-19 | 8,319,725 | -228,792 | -126,856 | -355,649 | 8,192,869 |
| 11 | May-20 | 8,192,869 | -225,304 | -130,345 | -355,649 | 8,062,525 |
| 12 | Nov-20 | 8,062,525 | -221,719 | -133,929 | -355,649 | 7,928,595 |
| 13 | May-21 | 7,928,595 | -218,036 | -137,612 | -355,649 | 7,790,983 |
| 14 | Nov-21 | 7,790,983 | -214,252 | -141,397 | -355,649 | 7,649,587 |
| 15 | May-22 | 7,649,587 | -210,364 | -145,285 | -355,649 | 7,504,302 |
| 16 | Nov-22 | 7,504,302 | -206,368 | -149,280 | -355,649 | 7,355,021 |
| 17 | May-23 | 7,355,021 | -202,263 | -153,386 | -355,649 | 7,201,636 |
| 18 | Nov-23 | 7,201,636 | -198,045 | -157,604 | -355,649 | 7,044,032 |
| 19 | May-24 | 7,044,032 | -193,711 | -161,938 | -355,649 | 6,882,094 |
| 20 | Nov-24 | 6,882,094 | -189,258 | -166,391 | -355,649 | 6,715,703 |
| 21 | May-25 | 6,715,703 | -184,682 | -170,967 | -355,649 | 6,544,737 |
| 22 | Nov-25 | 6,544,737 | -179,980 | -175,668 | -355,649 | 6,369,068 |
| 23 | May-26 | 6,369,068 | -175,149 | -180,499 | -355,649 | 6,188,569 |
| 24 | Nov-26 | 6,188,569 | -170,186 | -185,463 | -355,649 | 6,003,106 |
| 25 | May-27 | 6,003,106 | -165,085 | -190,563 | -355,649 | 5,812,543 |
| 26 | Nov-27 | 5,812,543 | -159,845 | -195,804 | -355,649 | 5,616,739 |
| 27 | May-28 | 5,616,739 | -154,460 | -201,188 | -355,649 | 5,415,551 |
| 28 | Nov-28 | 5,415,551 | -148,928 | -206,721 | -355,649 | 5,208,830 |
| 29 | May-29 | 5,208,830 | -143,243 | -212,406 | -355,649 | 4,996,424 |
| 30 | Nov-29 | 4,996,424 | -137,402 | -218,247 | -355,649 | 4,778,177 |
| 31 | May-30 | 4,778,177 | -131,400 | -224,249 | -355,649 | 4,553,929 |
| 32 | Nov-30 | 4,553,929 | -125,233 | -230,416 | -355,649 | 4,323,513 |
| 33 | May-31 | 4,323,513 | -118,897 | -236,752 | -355,649 | 4,086,761 |
| 34 | Nov-31 | 4,086,761 | -112,386 | -243,263 | -355,649 | 3,843,498 |
| 35 | May-32 | 3,843,498 | -105,696 | -249,952 | -355,649 | 3,593,546 |
| 36 | Nov-32 | 3,593,546 | -98,823 | -256,826 | -355,649 | 3,336,720 |
| 37 | May-33 | 3,336,720 | -91,760 | -263,889 | -355,649 | 3,072,831 |
| 38 | Nov-33 | 3,072,831 | -84,503 | -271,146 | -355,649 | 2,801,685 |
| 39 | May-34 | 2,801,685 | -77,046 | -278,602 | -355,649 | 2,523,083 |
| 40 | Nov-34 | 2,523,083 | -69,385 | -286,264 | -355,649 | 2,236,819 |
| 41 | May-35 | 2,236,819 | -61,513 | -294,136 | -355,649 | 1,942,683 |
| 42 | Nov-35 | 1,942,683 | -53,424 | -302,225 | -355,649 | 1,640,458 |
| 43 | May-36 | 1,640,458 | -45,113 | -310,536 | -355,649 | 1,329,922 |
| 44 | Nov-36 | 1,329,922 | -36,573 | -319,076 | -355,649 | 1,010,847 |
| 45 | May-37 | 1,010,847 | -27,798 | -327,850 | -355,649 | 682,996 |
| 46 | Nov-37 | 682,996 | -18,782 | -336,866 | -355,649 | 346,130 |
| 47 | May-38 | 346,130 | -9,519 | -346,130 | -355,649 | 0 |
| | Total | | -8,934,072 | -9,319,057 | -18,253,129 | |

**Exhibit 5**

**(Biographies of Managers)**

<u>Pedro Martin, Chairman and Chief Executive Officer</u>

Pedro Martin is Chairman, Chief Executive Officer and Founder of Terra Group, a Miami based leader in high-rise development and new home construction in South Florida.  Mr. Martin was awarded Developer of the Year by the American Institute of Architecture. Since founding Terra Group in 2001, Pedro Martin has led the company in its development and capital raising success.  Mr. Martin has developed more than 2.8 million commercial and residential square feet in South Florida, yielding an excess of one billion dollars in gross sales.  Through Mr. Martin's leadership, Terra Group continues to contribute to the growth of South Florida through Terra's developments such as Nautica, Metropolis, Quantum on the Bay, The Reserve, 900 Biscayne, 600 Biscayne (Freedom Tower site) and future developments such as The Grove, Doral Cay and Vintage Estates.

Mr. Martin earned a Bachelor's degree in Industrial Engineering, a Law Degree with honors from the University of Florida and a Masters in Business Administration from Rollins College.  Prior to founding the company, Pedro Martin practiced real estate law as a partner at Greenberg Traurig, representing developers and financial institutions since the 1970s.

Mr. Martin is committed to supporting charitable, civic, arts and cultural organizations, including the Performing Arts Center and the Concert Association of South Florida.  Mr. Martin is also active in business organizations as a Board of Trustees member for the University of Florida's Law School and has been the recipient of several awards and acknowledgements, including Who's Who in American Law and being selected by Super Lawyers magazine in 2008.

<u>David Martin, President and Chief Operating Officer</u>

David Martin is the President and Chief Operating Officer of Terra Group, a Miami based leader in high-rise development and new home construction in South Florida.  Mr. Martin graduated from the University of Florida with a Masters in Business Administration and a Law degree with a concentration in land use planning.

Since founding Terra Group a decade ago, David Martin has led the company's development, construction, sales and marketing initiatives.  He has also overseen all international and domestic investment and development projects for Terra Group and its sister companies.  Mr. Martin specializes in the identification and acquisition of land, as well as the assignment, construction, financing and structuring of joint ventures and investment groups to raise equity.  With his experience in creating new business initiatives, Mr. Martin has helped to found several entities that are now central to the operations of Terra Group including Terra Mortgage Bankers, Terra Real Estate Advisors, and Terra Realty.

**Exhibit 6**

**(Estimate of Anticipated True-Up Payments)**

Exhibit 6 to Disclosure Statement
Estimate of Anticipated True-Up Payments

Class 4C

| | Initial Balance | Estimated Interest | Total Payments |
|---|---|---|---|
| Class B | $16,567,213 | $2,773,598 | $19,340,812 |
| Estimated True-Up | $12,939,143 | 0 | $12,939,143 |
| Total | $29,506,356 | $2,773,598 | $32,279,955 |

Class 4D

| | Initial Balance | Estimated Interest | Total Payments |
|---|---|---|---|
| Class B | $6,212,705 | $2,229,119 | $8,441,824 |
| Estimated True-Up | $4,512,006 | 0 | $4,512,006 |
| Total | $10,724,711 | $2,229,119 | $12,953,830 |