Page 1

1              UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF FLORIDA
2

              Judge Robert A. Mark
3


4

IN RE:
5

TOWN CENTER AT DORAL, LLC,     CASE NO: 11-35884-BKC-RAM
6

        Debtor.
7
_____/

8


9  SETTING HEARING IN RE: RENEWED MOTION TO VALUE COLLATERAL
     AND FOR COURT-APPOINTED VALUATION EXPERT PURSUANT TO
10 FEDERAL RULE OF EVIDENCE 706 FILED BY DEBTOR TOWN CENTER AT
        DORAL, L.L.C. (MORA, MINDY)(185)
11

  JOINT OBJECTION TO RENEWED MOTION TO VALUE FILED BY U.S.
12     BANK NATIONAL ASSOCIATION AS TRUSTEE. (212)

13

14             FEBRUARY 13, 2012

15

16     The above-entitled cause came on for hearing before

17 the HONORABLE ROBERT A. MARK, one of the Judges in the

18 UNITED STATES BANKRUPTCY COURT, in and for the SOUTHERN

19 DISTRICT OF FLORIDA AT LARGE, at 51 SW 1st Avenue, Miami,

20 Dade County, Florida, commencing at or about 10:00 a.m. on

21 Monday, February 13, 2012, and the following proceedings

22 were had:

23

24

25           Reported by:  Amy L. Moorefield, RPR

```
 1                    APPEARANCES:
 2

 3     BILZIN SUMBERG BAENA PRICE & AXELROD, LLP, by
              MINDY A. MORA, ATTORNEY-AT-LAW
 4          TARA V. TREVORROW, ATTORNEY-AT-LAW
           on behalf of the Town Center at Doral
 5                and its affiliates, Debtors

 6           STEARNS WEAVER MILLER WEISSLER
              ALHADEFF & SITTERSON, P.A., by
 7            PATRICIA A. REDMOND, ESQUIRE
           on behalf of the Landmark at Doral
 8           Community Development District
 9

10             GREENBERG TRAURIG, LLP, by
             JOHN B. HUTTON, III, ESQUIRE
11               JOHN R. DODD, ESQUIRE
        on behalf of U.S. Bank as Indenture Trustee
12

13               BROAD AND CASSEL, by
               C. CRAIG ELLER, ESQUIRE
        on behalf of AmT CADC Joint Venture, LLC
14

15              ARNSTEIN & LEHR, LLP, by
              PHILLIP HUDSON, III, ESQUIRE
16                       and
              MR. ECKERT (phonetic), ESQUIRE
17        on behalf of Florida Prime Holdings, LLC
18

19             BERGER SINGERMAN, P.A., by
            DEBI EVANS GALLER, ATTORNEY-AT-LAW
20                  on behalf of
                 Terra Landmark, LLC
21

22        OFFICE OF THE UNITED STATES TRUSTEE, by
           STEVEN D. SCHNEIDERMAN, TRIAL ATTORNEY
           on behalf of the United States Trustee
23

24        GENOVESE, JOBLOVE & BATTISTA, P.A., by
               MARILEE A. MARK, ATTORNEY-AT-LAW
25         on behalf of the Creditors' Committee
```

1                          ALSO PRESENT:

2

                     MR. BREGSTONE (phonetic)

3

4                              — — —

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  Let's get appearances in Town Center.

 2            MS. MORA:  Judge, good morning.

 3            Mindy Mora and Tara Trevorrow on behalf of the

 4   debtors.

 5            MS. GALLER:  Good morning, Your Honor.

 6            Debi Galler from Berger Singerman on behalf of

 7   Terra Landmark, LLC.

 8            MR. HUTTON:  Good morning, Your Honor.

 9            John Hutton and John Dodd from Greenberg Traurig

10   on behalf of U.S. Bank as indenture trustee.

11            MS. REDMOND:  Good morning, Your Honor.

12            Patricia Redmond, Stearns Weaver, on behalf of

13   the Landmark at Doral Community Development District.

14            MS. MARK:  Good morning, Your Honor.

15            Marilee Mark with Genovese Joblove & Battista on

16   behalf of the Committee.

17            MR. HUDSON:  Morning, Your Honor.

18            Phillip Hudson, Arnstein & Lehr, on behalf of

19   Florida Prime Holdings, LLC holders.  Mr. Eckert, my

20   co-counsel, is with me as well.  Mr. Bregstone is in the

21   courtroom.

22            MR. ELLER:  Good morning, Your Honor.

23            Craig Eller of Broad and Cassel on behalf of

24   creditor, AmT CADC Venture, LLC.

25            THE COURT:  Okay.  And Mr. Schneiderman is here
```

Page 5

1   also.

2          The hearing on for today is the renewed motion to

3   value collateral and for court-appointed valuation expert,

4   and we will talk about it, but I want to get some status

5   updates and ask a few questions first.

6          Ms. Redmond, I think you may have disclosed at

7   the last hearing, but I didn't go back to find my notes --

8   is there a summary judgment hearing set?

9          MS. REDMOND:  Right now, Your Honor, at

10  10 o'clock this morning.

11         Your Honor, I was actually going to ask if after

12  I answer any questions the Court had -- I may be needed

13  over there.  I'm trying to get to both places at once.

14         THE COURT:  Okay.  Well, if you want to allow the

15  other two thirds of your creditor triumvirate to carry the

16  flag, then that's fine.

17         MS. REDMOND:  Well, Your Honor, if you don't have

18  any questions, I don't think it will take too long, so I

19  would come back over afterwards.

20         THE COURT:  Okay.

21         MS. REDMOND:  Thank you.

22         THE COURT:  What you might inquire is if -- well,

23  actually, never mind.  That's fine.  It's clear that the

24  stay relief is limited to judgment and not setting sale at

25  this point.

1        MS. REDMOND:  Yes, Your Honor.

2        THE COURT:  Okay.  All right.

3        So, Mr. Eller, to the extent you're willing to

4   disclose, now that the District has filed a plan and other

5   issues have arisen with respect to the Terra debtor plan,

6   are -- I see you're still sitting on the bride's side of

7   the courtroom.

8        MR. ELLER:  You're the fourth person this morning

9   to ask me that very question, Your Honor, and we are still

10  sitting on the Terra Landmark group's side.

11       We've reviewed both plans, and at this point in

12  time the Terra Landmark plan offers us considerably better

13  treatment of our unsecured claim.  In particular, the

14  amount that's provided deals specifically with the

15  unsecured class, so the amount that Terra is providing in

16  addition only deals with unsecured claims, while it appears

17  that the CDD plan provides for a maximum of 2 million to

18  deal with all claims, both administrative claims and

19  unsecured claims.  So that amount is substantially diluted.

20       So when you look at the two plans, we feel that

21  the Landmark Terra plan is superior for -- as far as our

22  treatment is concerned, Your Honor.

23       THE COURT:  Just for clarification, Mr. Hudson,

24  is the -- what happens with the tax certificates and tax

25  collector claims, either if you credit bid successfully or

Page 7

1    there's a third-party buyer?

2         MR. HUDSON:    There was a lot of discussion over

3    that, Your Honor, but at the end of day we're going to pay

4    them all in cash at closing under either scenario.

5         THE COURT:  And kick in 2 million?

6         MR. HUDSON:    And kick in 2 million.

7         THE COURT:  Not out of the 2 million?

8         MR. HUDSON:    Correct.  The taxes are separate

9    and apart.

10        THE COURT:  Okay.

11        MR. HUDSON:    So whatever that number is you can

12   add on top.

13        THE COURT:  So the 2 million would -- would be

14   administrative and then general unsecured?

15        MR. HUDSON:    That's correct, Your Honor.

16        THE COURT:  And you're seeking to subordinate --

17        MR. HUDSON:    That's correct.

18        THE COURT:  -- the DIP loan?

19        MR. HUDSON:    That's correct, Judge.

20        And I'd like to point out while I'm here, Judge,

21   we believe the extra money that's been put on the table is,

22   in essence, our money.  In other words, we think their plan

23   is illusory.  Their plan requires a valuation, which I'm

24   sure you're going to hear in a moment still.  Otherwise,

25   they can't go forward.

1        The problem is, Your Honor, they're trying to buy

2   the land so inexpensively they're trading with our dollars.

3   They're basically saying, we can put more money on the

4   table because we're buying the property so inexpensively.

5        So in our due, Judge, given that we're paying the

6   taxes and given that we're putting real money up and given

7   the fact that we think this plan is actually worse than the

8   old plan, their plan, for lots of legal reasons we simply

9   don't understand AmT's position.

10       THE COURT:  Okay.  Well, Mr. Eller, you don't

11  need to explain or negotiate on the record, but ---

12       MR. ELLER:  Not intending to, Your Honor, but

13  just another question as a matter of clarification.

14       In looking at the 2 million set aside, which we

15  believe also is going to pay administrative claims as well

16  as unsecured claims, does that also include the CDD's

17  unsecured portion of their claim as well, their deficiency

18  claim?

19       So there are a number of issues to determine

20  whether we can match apples to apples at this point in

21  time.

22       THE COURT:  Your deficiency claim stays if

23  there's a third-party buyer and is waived if you credit

24  bid, or what?

25       MR. HUDSON:  The deficiency claim has not yet

Page 9

1    been dealt with in our particular plan, Judge.

2                THE COURT:  Okay.

3                MR. ELLER:  Thank you.

4                MR. HUDSON:  It's an open issue.

5                THE COURT:  Okay.  Well, in the debtor's plan if

6    there's a stripdown, the deficiency would be in your class

7    unless I make the election; right?

8                MR. ELLER:  Unless they make the 1111(b)

9    election, I think that's correct, Your Honor.

10               THE COURT:  Okay.

11               MR. HUDSON:  And that's approximately -- again, a

12   valuation, Judge, but that's approximately a $50 million

13   claim.

14               THE COURT:  50?

15               MR. HUDSON:  Our proofs of claim filed to date

16   are about 130 million, 110 to 111 secured million, and

17   there's a $19 million unsecured completion claim as well,

18   so a $130 million gross claim.

19               THE COURT:  As of the petition date?  You're not

20   running interest?

21               MR. HUDSON:  No, not running interest, Judge.  So

22   if we assume a $70 million value, there's a $50 million

23   unsecured claim.  It's a substantial unsecured claim.

24               MS. MORA:  Judge, I'd just like to clarify, only

25   because I looked at the foreclosure judgment that was sent

1    over by state court counsel on Friday.

2              The judgment on its face, I believe, stated it

3    was about 110 million, but it included post-petition

4    interest and fees, and so when those numbers were backed

5    out, I think the actual amount of the claim is less than

6    $100 million, closer to 90.

7              THE COURT:  Okay.  Well, that's not going to

8    change anything for today, but I appreciate your comment.

9    We'll deal with that amount down the road.

10              What about the committee?  Where are you at?

11              MS. MARK:  Good morning, Your Honor.

12              The committee notes that the debtor's plan has

13    been substantially improved, and the committee would like

14    to see the debtors be able to go forward with their plan.

15    So the committee does support the debtor's renewed motion

16    to value the collateral, they think, at this point.

17              THE COURT:  Okay.  And we can do this -- just the

18    same two parties, but we'll start with Ms. Mark since

19    you're at the podium.

20              I don't believe either of you filed any response

21    to the motion to convert, and -- are you planning to take a

22    position at the hearing with respect to the Kodsi success

23    fee issue?

24              MS. MARK:  Your Honor, we -- we believe that

25    the -- the Kodsi success fee should have been disclosed,

1    but we don't know that ultimately it would have made a

2    difference.

3          The committee would suggest that, with respect to

4    the conversion and the dismissal issues, that if your

5    court -- if Your Honor would be so inclined, that it may be

6    in the best interest of the parties to go to mediation to

7    try to see if they can work through some of their issues

8    with respect to the plans and various issues.

9          THE COURT:  Has the committee, if you're willing

10   to disclose, been in any negotiations with the creditor

11   proponents, the bond holders and CDD?

12         MS. MARK:  Have they been in any negotiations?

13         THE COURT:  Yeah.  Are you talking to them about

14   their treatment of unsecureds in their plan?

15         MS. MARK:  I ---

16         THE COURT:  If you're not aware, that's fine.

17         MS. MARK:  I'm not aware, Your Honor.

18         MR. HUDSON:  I can address that, Judge.

19         There have been some -- I wouldn't say

20   discussions yet, but the doors are open, and those

21   discussions should begin.  We wanted to get our plan on

22   file as a baseline.  That's where we are.  Mr. Moses

23   reached out to Ms. Redmond in the last few days, and we

24   certainly intend on speaking with him.

25         THE COURT:  Okay.  And, Mr. Eller, any comment on

1   the success fee issue and motion to convert or dismiss

2   that's been brought?

3          MR. ELLER:  Your Honor, I have not reviewed the

4   tape from the creditors' meeting.  I seem to have a

5   recollection of the compensation of Mr. Kodsi being

6   discussed during his questioning at that point in time.

7          Again, I don't have a specific recollection as to

8   whether the success fee was addressed there.

9          THE COURT:  Have you read the debtor's response

10  in the affidavits?

11         MR. ELLER:  We have read the response,

12  Your Honor, and we feel that, you know, the success fee is

13  something that probably should not have been agreed to and

14  should not be paid at this point in time, but we also feel

15  that the sanction, if I can call it that, generated by the

16  Court in the terms of terminating exclusivity is

17  appropriate and was appropriate to deal with that

18  particular situation, and we're concerned that any further

19  sanction against the debtor or Terra based upon the success

20  fee does more to harm the unsecured creditors and the other

21  creditors of the estate than it does to deal with the

22  debtor's situation.

23         So we feel that termination of exclusivity has

24  addressed the issue, and we hope that that would be

25  sufficient under the circumstances.

1          THE COURT:  You don't think it may affect the

2    good faith of the plan, or your concern is really more

3    money than good faith?

4          MR. ELLER:  Well, Your Honor, we're always

5    concerned about the sanctity of the system as well as the

6    amounts to be obtained.  We have had very substantial

7    negotiations with the Terra group, and those negotiations

8    we believe have been in done in good faith, and they've

9    been very responsive to us.

10         That would have been through Mr. Pearl.  We've

11   not necessarily had negotiations with Mr. Kodsi, and at

12   best Mr. Kodsi is a figurehead of the debtor at this point

13   in time as Terra is in the driver's seat.

14         Again, we feel that Terra has acted in good faith

15   with us, and, thus, we support their continued efforts

16   under this plan.

17         THE COURT:  I can't remember where I read it, but

18   as long as you're up there, there was some offer that your

19   client made --

20         MR. ELLER:  This was ---

21         THE COURT:  -- pre-petition that may have

22   released the --

23         MR. ELLER:  Substantially --

24         THE COURT:  -- widow's guaranty.

25         MR. ELLER:  -- substantially pre-petition, maybe

1    a year or 18 months in advance.  I was not involved

2    directly within the negotiations.  My client's

3    representatives were.

4              THE COURT:  With Mr. Kodsi?

5              MR. ELLER:  With Mr. Kodsi.  And given the

6    progress of the CDD's case, we suspected that the -- that a

7    bankruptcy would be both in the debtor's and AmT's best

8    interest and sought to negotiate the assistance of that.

9              There was, I think, a payment of something in the

10   neighborhood of $50,000 and an offer to release various

11   guarantors at that point in time, but those negotiations

12   never reached fruition.

13             THE COURT:  Okay.  And those negotiations -- I'm

14   not sure I fully asked the question, or maybe I didn't

15   listen carefully -- were through Mr. Kodsi, not through the

16   widow?

17             MR. ELLER:  My understanding is they were through

18   Mr. Kodsi.  The widow has apparently been living in Israel

19   for some time, and we have not had any contact with her in

20   many, many months.

21             THE COURT:  Does your client have a claim against

22   the estate on the guaranty?

23             MR. ELLER:  We did file a claim against the

24   estate based upon the Elie Berdugo guaranty.  We have not

25   been paid anything on that claim.

1           THE COURT:  Okay.  All right.  Thanks.

2           MR. ELLER:  Thank you, Judge.

3           MR. SCHNEIDERMAN:  Your Honor, if I could correct

4    one thing Mr. Eller said.  I listened to the 341 tape this

5    morning.  I'm halfway through it.  At the point where we

6    discuss salary, Mr. Kodsi, in direct response to the

7    question, stated he was not receiving a salary, and I said

8    that's because there's no money to pay you, and he said

9    that was correct.  I shouldn't -- let me rephrase that.

10          I said, have you been paid anything, anything to

11   date, and he said no, and I said, is that because there's

12   no money to pay you, and he said, that's correct.

13          Your Honor, we are seriously considering filing a

14   motion for the appointment of a trustee.  I talked to

15   Ms. Mora about this on Friday.  I have looked over the

16   plans over the weekend, and Your Honor raises the issue

17   about good faith.  I'm going to listen to the rest of the

18   tape just to make sure there is no other issue that came up

19   regarding salary.

20          But when asked the question -- Mr. Kodsi's an

21   attorney -- asked the question about salary and payment,

22   the fact that the affidavit discloses that he advised

23   Ms. Mora at the 341 Meeting, upon its conclusion, about the

24   deal he had negotiated, and Ms. Mora to draft the contract

25   or an agreement, the fact that he didn't disclose that, I

1    can't find an excuse for that.

2         THE COURT:  Okay.  Well, I want to explore some

3    of the things that are part of the response in a moment.

4         All right.  Ms. Mora, turning to the motion to

5    value, to the extent it seeks reconsideration of my ruling

6    on the initial valuation hearing, I'm going to deny the

7    motion, and I believe I've stated this at other points in

8    between today and the day of the Bench ruling.

9         To restate or summarize, I do not find that there

10   was any need for rebuttal testimony and that the Court's

11   decision to not consider rebuttal testimony, even if

12   contemplated at the outset of the hearing, was not

13   prejudicial.

14        Each appraiser's testimony and report crashed on

15   its own weight based on the report, the direct and the

16   cross-examination, and under those facts rebuttal testimony

17   would not change the result.  It didn't matter what

18   Mr. Waranker (phonetic) would say about Mr. Hanson.  He had

19   said enough on his own to crush his report, and it didn't

20   matter what Mr. Hanson or anybody else later in the hearing

21   would have said about Mr. Waranker, because when we broke

22   for lunch he was done.  There was no way I was going to

23   rely on that report.

24        So to the extent, again, that your motion seeks

25   reconsideration, it's denied.

1          As to the proposal to roll forward with

2    appointing an expert or contemplating an independent expert

3    today, my issue is, I guess, the same as when we first

4    talked about scheduling and I was going to set this renewed

5    motion for March 5th, and you convinced me that that might

6    prejudice the debtors because you need a valuation hearing.

7          But we have these two threshold issues of

8    whether, number one, you can strip down the bonds and,

9    number two, the effect of the non-disclosure, and in that

10   connection I did, I think, carefully read the debtor's

11   response to the motion to convert, which is Court Paper

12   218, and the attached affidavits, and I think maybe

13   Mr. Schneiderman was hinting at some of this, but -- I know

14   we're not set for this today, but since you filed the

15   response, I assume you're obviously familiar with it.  So

16   there are some very troubling things, and maybe you can

17   clarify.

18          Unless you think it's subject to the privilege,

19   can you answer directly when you first learned of the

20   success fee?

21        MS. MORA:  Judge, it was stated in Mr. Kodsi's

22   affidavit after the 341 Meeting concluded while we were

23   still in the meeting room.  That is when I first heard

24   about Mr. Kodsi's compensation arrangement that he believed

25   he had negotiated with Terra.  That is when I learned about

1    the $10,000 per month fee and the ultimate success fee.

2          As a result of that, Mr. Kodsi had directed me to

3    prepare an agreement reflecting those terms.  I prepared

4    the agreement.

5          THE COURT:  Before you filed the financing

6    motion, you had, as Mr. Kodsi attests -- maybe he doesn't

7    talk about the timing, so let me just ask you whether you

8    prepared this so-called independent contractor agreement

9    before you filed the financing motion?  Because my

10   understanding is, unless I got the dates wrong, that the

11   341 Meeting was October -- at least originally set for

12   October 21st.  Is that the date it went forward?

13         MR. SCHNEIDERMAN:  Yes, sir.

14         THE COURT:  And so it was almost four weeks later

15   you filed the financing motion.  So it does appear that at

16   the time you filed the financing motion you knew about the

17   success fee.

18         MS. MORA:  Correct, Judge.

19         THE COURT:  And you didn't believe that was an

20   item that had to be disclosed in connection with the --

21   whatever it was called -- plan cooperation agreement or

22   compensation issue?

23         MS. MORA:  Judge, what we had put in there was --

24   because the budget only ran up to the confirmation date,

25   what we had put in there was the payments that were

1  required to be made to Mr. Kodsi in respect of the salary

2  that had been negotiated with Terra.

3          You know, looking back on it, perhaps we should

4  have put something in there -- we should have mentioned the

5  success fee that was going to be payable post-confirmation,

6  but that was an amount to be funded under the DIP line.

7  That was an amount that only would have been funded on the

8  effective date when the plan actually went effective.

9          And so because our focus with the financing

10  motion was simply on what had to be funded during the

11  bankruptcy case, no, it really didn't occur to me that it

12  was something that needed to go in the financing motion,

13  particularly because it was always the intent to get the

14  independent contractor agreement executed and file that

15  with the Court.  It ---

16          THE COURT:  Why would there be a -- why would an

17  officer of the debtor be an independent contractor of a

18  third party?

19          MS. MORA:  It -- Judge, the independent

20  contractor agreement was between Mr. Kodsi and the debtors.

21  It was not between Mr. Kodsi and Terra.  It was --

22          THE COURT:  Okay.

23          MS. MORA:  -- it was going to be those two

24  parties, the debtors and Mr. Kodsi, and it was simply the

25  fees that were guaranteed by Terra as an addendum to the

1    independent contractor agreement.

2            THE COURT:  Okay.  All right.  I misspoke.  Okay.

3            MS. MORA:  And, again, Judge, since it was the

4    intent always to disclose the arrangement as soon as

5    the ---

6            THE COURT:  Why wasn't it disclosed -- we had two

7    hearings.  We had a hearing on November 22nd, and we had

8    another hearing on December 5th, and this wasn't just the

9    financing and the budget.  There were -- there were

10   objections and arguments about the lockup agreement.  Was

11   this a sub rosa plan?  Your response was, no, this -- the

12   debtors have their fiduciary responsibilities to cooperate

13   if there's other deals brought to the committee and so

14   forth.

15           The fact that the plan proponent or that the

16   debtor's officer was beholden to the plan proponent wasn't

17   material?

18           MS. MORA:  Judge, honestly, Mr. Kodsi's

19   understanding of this -- and I wish he was here to speak to

20   the issue.  I thought he was going to be.

21           THE COURT:  I assume he'll be here on the 5th,

22   because I do want to hear his testimony on -- I want to

23   test the credibility of his magnanimous concern for the

24   unsecured creditors that is just --

25           MS. MORA:  Judge ---

1        THE COURT:  -- bursting from his affidavit that

2   the success fee was -- it was really nothing, my big

3   concern was the unsecured creditors.  I want to test that.

4        So I would appreciate if he comes in to testify

5   on that.

6        MS. MORA:  All right.  Judge, I'll absolutely

7   make sure that he will be here at that hearing, and I

8   really do want to assure you, from everything that I've

9   observed, that is the case.  This case ---

10       THE COURT:  Why?  Why would he have such an

11  undying loyalty to the unsecured creditors that this would

12  be a credible explanation?

13       MS. MORA:  Well, because, Judge, he had been

14  pre-petition counsel to the debtors and, I believe, had

15  worked with Mr. Berdugo in terms of getting the money in

16  from these creditors to support the project, and as a

17  result of that, he did feel like there was a need to try to

18  get them back some of the funds that they had invested in

19  these projects.

20       As he indicated in his affidavit, when the offer

21  was made by AmT that involved a payment to Mrs. Berdugo but

22  no money for the unsecureds, it wasn't something that he

23  thought was worth pursuing.

24       Likewise, although he could have just asked for

25  his entire compensation to be paid during the bankruptcy

1    case -- you know, everyone is viewing this as, oh, you

2    know, this success fee is the reason why he structured

3    everything the way he did, but, in fact, from Mr. Kodsi's

4    viewpoint -- my understanding is he viewed this as

5    deferring compensation unless the unsecured creditors were

6    successful in getting the distribution under the Terra

7    plan, and that's why he deferred the compensation rather

8    than taking it all as salary during the bankruptcy case.

9            But you'll hear those words yourself when

10   Mr. Kodsi appears at the hearing on March 5th.

11           And, again, Judge, frankly, the reality of the

12   lockup arrangement that Terra had asked for under our

13   initial plan support agreement was always the much more

14   definite restriction on the activities of the debtor to

15   work with Terra to get the plan confirmed using them as

16   plan sponsor.

17           Again, they were the only parties that stepped up

18   to the plate and provided the financing that allowed the

19   debtors to file this case and avert the foreclosure.

20           THE COURT:  When did you first learn of the

21   June 1st, 2011, letter of intent between Terra and Kodsi?

22           MS. MORA:  When I was drafting the response,

23   Judge, and Mr. Martin produced it with his affidavit.

24           THE COURT:  Do you find it curious that Kodsi

25   doesn't mention that in his affidavit?

1        MS. MORA:  I asked him whether he had any

2   documents reflecting the negotiations.  He said he looked

3   and wasn't able to find anything.

4        Again, Judge, it was a non-binding letter of

5   intent for discussion purposes.  Once they had moved on to

6   the definitive agreement, which was the plan support

7   agreement attached to the financing motion -- I mean, I

8   don't know that I would have kept a copy either, and

9   Mr. Kodsi has advised me he did not have it.

10        THE COURT:  But that letter of intent, he was

11   going to work for Terra, not come in as principal of the

12   debtor; correct?

13        MS. MORA:  That was a prior discussion they had

14   that, as Mr. Martin made clear in his affidavit, was

15   entirely replaced by the plan support agreement.

16        THE COURT:  Your firm didn't represent Terra at

17   all, did you --

18        MS. MORA:  No, Judge.

19        THE COURT:  -- pre-petition, other than once they

20   brought you in to do the filing?

21        MS. MORA:  Well -- when the debtors retained us

22   to do the filing, Judge.  I've not been retained to

23   represent ---

24        THE COURT:  But Terra sent Kodsi to your firm.

25        MS. MORA:  Terra suggested to Mr. Kodsi that he

1   speak to us about representing the debtors in the

2   bankruptcy case.

3          THE COURT:  Okay.  I'm not attacking your

4   independence at all.  I just wanted to clarify the timing.

5          All right.  So let's talk about the motion to

6   value a little bit.  The debtor's concept would be each

7   side would submit names and hopefully agree on one, and

8   then what?  How would this play out in connection with

9   answering, I guess, also a reply to their -- the lender's

10  request or demand under 706(d) that they be able to still

11  present independent experts?

12         MS. MORA:  Judge, the whole concept that the

13  debtors had was to streamline this process.  It didn't go

14  unnoticed that sitting in a valuation hearing for an entire

15  day was perhaps not the Court's favorite way to spend a

16  day, and the thought was that each side would essentially

17  step back and allow the Court to rely upon the testimony of

18  a court-appointed expert to enable the Court to reach its

19  own conclusion without the interference of the experts that

20  each side has already had the opportunity to retain and

21  present evidence from.

22         At this point, all we're suggesting is that there

23  be a single expert.  They'll have access to what was done

24  before, access to the Court's concern, ability to do their

25  own research and determine if there are other factors that

1   need to be brought to bear, and to provide the factual

2   evidence and analysis of their opinion of value to assist

3   the Court in allowing -- in allowing the Court to conclude

4   its own opinion of value.

5           And, again, the procedures, Judge, were just ones

6   that we suggested, that each side could provide a list of

7   three names.  If there was overlap, the Court would select

8   that.  If there was no overlap, the Court could select any

9   of those names, or, alternatively, the Court could reach

10  out and hire its own identified expert.

11          THE COURT:  But the parties under the rule would

12  have an opportunity to cross-examine --

13          MS. MORA:  Correct, Judge.

14          THE COURT:  -- and presumably depose in advance?

15          MS. MORA:  Correct.

16          THE COURT:  But are you contemplating that it

17  will be an appraiser who would do an independent appraisal

18  as if he was hired, looking at perhaps prior appraisals,

19  but not -- I guess I'm a little confused whether this would

20  be a full-blown appraisal report by an independent expert,

21  which I think is probably what it should be if we go this

22  route, and he could take in -- he or she can take into

23  account any other appraisals on the property, including the

24  two that were presented, but ---

25          MS. MORA:  Yes, Judge, that is the debtor's

Page 26

1    suggestion.

2        THE COURT:  Okay.  All right.  And who wants to

3    speak on the ---

4        MS. MORA:  Judge, if I could just make a couple

5    more points?

6        THE COURT:  Okay.  Sure.

7        MS. MORA:  In the response that the triumvirate

8    filed, they make the argument that this is really a

9    foolhardy venture because what we really need to just do is

10   determine market value.

11       But, unfortunately, the plan that the district

12   and its other creditor constituencies have filed doesn't

13   provide a mechanism to determine market value of the

14   property either.

15       The plan that they filed provides that the

16   district is making a $65 1/2 million dollar credit bid and

17   a $2 million cash bid for the property, and the district is

18   retaining the right to bid all the way up to the full

19   amount of its claim.

20       Under those circumstances where any other party

21   coming in is going to be subject to the entire credit bid

22   as a counterbid to that party's bid, it's entirely a

23   disincentive for any other party who might otherwise want

24   to come in and bid on this property to come in and bid.

25   This is -- that's not a means of obtaining a market bid for

1   the property when any creditor coming in knows that their

2   efforts are likely to be wasted because of the existence of

3   a credit bid going up to as much as $90 million.

4          Judge, we just think that it's important, from

5   the creditors' perspective, that they continue to have the

6   right to pursue their ability to maximize their return

7   here.  You've heard both the committee and AmT speak in

8   favor of the recovery that they're being offered under the

9   debtor's plan, and unless the debtors are able to proceed

10  with obtaining this valuation through -- the only mechanism

11  that we know in bankruptcy to truly obtain a value of a

12  property, absent the opportunity for a full market access

13  for the property, then I think the valuation is the only

14  way to go, through a court-appointed expert.

15         I want to just talk for a moment, Judge, about

16  the other predicate issue that the Court identified, and

17  that's the issue about the ability to strip down the bonds.

18  I know that we have been arguing at several hearings now

19  about the District's position that principles of Article 9

20  preclude this Court from considering that as an element of

21  the debtor's plan, and I want to offer to the Court three

22  reasons why we think that's incorrect.

23         First of all, under Section 106 of the

24  Bankruptcy Code, which recognizes the right of the

25  sovereign immunity of governmental entities, Section 106 is

1   expressly subject to a debtor's right to bifurcate debt

2   under 506, and so if a governmental claim was not capable

3   of being bifurcated, Section 106 wouldn't have referenced

4   that sovereign immunity claims were subject to 506 and

5   bifurcation rights.

6         Second, Judge, when Congress wanted to legislate

7   specific treatments of governmental debt under 1129, it

8   knew how to do so.  It specifically drafted those

9   provisions into the statute, for example, at Sections 1129

10  (a)(9)(c) and (d).

11        And finally, Judge, the debtors are not seeking

12  to have the federal government -- the federal court invade

13  the legislative function of this District under their plan.

14  As the Court requested, the debtors have included in their

15  amended plan a specific clarification that what we're

16  asking the Court to do is to approve the amount of the debt

17  as the Code permits the Court to do to fix the amount of

18  the debt to allow an 1111(b) election if the District

19  wishes to or not.

20        The debtor's plan only seeks the Court to

21  determine the amount of the claim and perhaps as well the

22  timing of repayment, but not the specific allocation of the

23  special assessments to the debtor's property.

24        The debtors will seek District approval of what

25  has been argued to be a legislative function, and they are

1    prepared to take that on after the confirmation hearing.

2         THE COURT:  Okay.  Is it -- just curious, 1129 is

3    not specified as one of the abrogated sections --

4         MR. HUDSON:  That's correct, Judge.

5         THE COURT:  -- under 106(a).

6         MS. MORA:  No, Judge, it isn't.  But I use it

7    merely as a means of example to show that even if sovereign

8    immunity had been asserted, which it hasn't been here, the

9    District has filed proofs of claim in this bankruptcy

10   case -- so even if it were asserted, 106 recognizes the

11   right to bifurcate, but we're not dealing with a sovereign

12   immunity claim.

13        Moreover, Judge, we had argued at the last

14   hearing that sovereign immunity, we believe, doesn't attach

15   to the rights of the District because under the case law

16   it's not deemed to be an arm of the state.

17        THE COURT:  Okay.  Turning back to the motion to

18   value -- Mr. Hutton, you look like you're ready to rise.

19   One of the issues you've raised, if we do go down this

20   road, is you want to present rebuttal experts; right?

21        MR. HUTTON:  Correct, Your Honor.  We believe,

22   and the rule actually expressly provides that -- it's not

23   so much rebuttal experts.  706(e) expressly provides that

24   the rule does not limit a party in calling its own experts.

25   So if we are going to have another valuation hearing, we'd

1   want to reserve the right to do just that, call our own

2   valuation experts, even -- either to present main testimony

3   or to present rebuttal testimony as the case may be.

4          THE COURT:  I haven't done or had any of my

5   clerks do any extensive research, but would that rule apply

6   if we've already given the parties a chance and they failed

7   to present usable expert testimony?

8          MR. HUTTON:  I think that it does, Your Honor.  I

9   don't see any reason -- if we're going to call it a

10  mulligan on the first go round on valuation and start over

11  with a new valuation hearing, you know, and the Court

12  elects to apply 706, then we have to apply it as written

13  with all the protections and safeguards that the parties

14  would have had if this was done the first time around, and

15  that would include the right on a new valuation hearing to

16  call our own experts if we so chose, and the debtor would

17  have that right as well.

18         The independent expert is just that.  It's

19  another expert.  He may pass the Daubert test.  He may not.

20  He may produce a report that's credible.  He may not.  We

21  think that the entire process is flawed.  It's failed once,

22  and it's also, we think, futile in the sense that what

23  we've proposed -- the plan that we proposed is a sale plan

24  that will allow the market to determine the value of the

25  property, and I think having that market test and having

1  real participants from the market come forward and indicate

2  what they're willing to pay, Your Honor -- and we've

3  already received indications of interest from the market

4  for the north parcel alone north of 40 million, for the

5  north parcel alone.

6          So we think that there is going to be an active

7  process.  We intend in support of our plan to file a motion

8  to establish procedures.  We will spell out the

9  solicitation process and everything else, but we think

10 there is going to be an active market just based upon what

11 we've seen and heard already.

12         THE COURT:  Are you suggesting your plan might

13 contemplate separate bids for separate parcels?  Is that

14 doable under this bond structure?

15         MR. HUTTON:  What I've stated so far is just that

16 we've received indication of interest on the north parcel.

17 Whether -- I'll defer to Mr. Hudson on that issue.

18         MR. HUDSON:  Judge, the answer is maybe.  We are

19 looking into that.  There are -- we've actually had a

20 number of expressions of interest from major home builders,

21 publicly traded home builders, on the north parcel

22 particularly, because we all know that's the most valuable

23 one, in the 40 to $45 million range.  So we contemplated a

24 lot sale breaking it up into two or three pieces.  We're

25 trying to figure out the answer to that.  I just don't know

Page 32

1   right now, Judge.

2           THE COURT:  Okay.  And it's Mr. Eckert?

3           MR. ECKERT:  Eckert.

4           THE COURT:  Eckert.  You're the go to guy, at

5   least at this point, until I learn all this stuff.

6           MR. ECKERT:  Sure.

7           THE COURT:  What's your view?  Could the District

8   sell -- through a bankruptcy, could it consent to a sale of

9   part of the collateral the way the debt is structured?

10          MR. ECKERT:  Well, right now there's accelerated

11  debt due on each parcel.  So there are provisions for

12  redemption on a parcel-by-parcel basis.  I think there's

13  five parcels within the boundaries of the District, and

14  each one of those has a set amount of debt on it at this

15  particular point in time.

16          THE COURT:  Okay.  All right.  Let's not get

17  further into that.

18          But, Mr. Hutton, regardless of whether it's

19  separate parcels or the whole property, what's your

20  response to Ms. Mora that this market test is somewhat

21  illusory given the CDD's credit bid is going to be 67.5,

22  plus more if they choose, right?

23          MR. HUTTON:  Yes, Your Honor, we have the right

24  to bid up.  Your Honor, I think that the -- part of what

25  we've tried to indicate is that it's not illusory because

1    we're already receiving expressions of interest.

2         As Your Honor noted at the last hearing, this is

3    not a unique situation, especially in today's market, where

4    there's a lender that holds debt that's potentially worth

5    more than the value of the property and you have an

6    auction, and bidders know that there's a credit bid right

7    out there.

8         That hasn't stopped market participants from

9    coming in and bidding because they know that there very

10   well may be -- very well may be a level where the lender

11   decides to take the money and start taking the property.

12        THE COURT:  Is the 67.5 million credit bid the

13   floor or -- that's the starting point?

14        MR. HUTTON:  That is the starting point.

15        MR. HUDSON:  And, Judge, we do intend on filing

16   bid procedures, and that's what we're working on now.

17   We're looking at the lot issue, and we also will put a

18   maximum in there because we do -- we don't want to scare

19   anybody away by saying 110 million.

20        So the bid procedures motion that we're

21   finalizing now will have a maximum bid in there that we

22   think -- because we have to tell a seller, if you get to

23   this number, you can walk away with a property.  So we've

24   contemplated that.

25        THE COURT:  The 67.5 is already at the high end.

1    What was your ---

2              MR. HUDSON:  That was the low end of Mr. Hanson's

3    testimony, Your Honor.  And, also, given the expressions of

4    interest that we've seen -- and, again, these are from very

5    reputable entities, and you've heard about one on the

6    witness stand a few weeks back.

7              If you put 45 million on the first, and that's

8    without twisting anybody's arm, Judge, you put 15 to

9    $20 million on the south because it's got a 10 million --

10   10 to 15 million garage, plus the dirt's probably worth

11   $10 million.  You're already 65, $68 million there, Judge,

12   and you haven't put any pressure on anybody.  You still

13   have a couple million dollar parcel on the east.  So we

14   think this number could get well into the 70s.

15             THE COURT:  Okay.  All right.  So tell me

16   procedurally where you see this going.  You're going to try

17   to have a bid procedures motion that would be considered at

18   the disclosure hearing or -- what's the -- what's the

19   sequence under your plan?

20             MR. HUDSON:  That would be our goal, Your Honor,

21   is to have that on March 5th -- have that hearing on the

22   bid procedures on March 5th.

23             THE COURT:  And then when would the sale actually

24   happen, at the confirmation hearing or prior?

25             MR. HUDSON:  We've actually left all of those

1    issues open.  It would be in conjunction with a plan to

2    take advantage of the obvious protection that a plan gives

3    us.  We've left it open.  It could be either just before,

4    just after, or simultaneously with confirmation, Judge.  We

5    wanted to keep as much flexibility as possible on that

6    issue.

7                MR. HUTTON:  And one of the points there, Judge,

8    is it's going to be a process that will take some time to

9    implement.  So at a minimum, we think there are several

10   threshold issues here that, as the Court pointed out

11   earlier in the hearing, that need to be determined on

12   March 5th before we embark on another costly and

13   time-consuming process of valuation, which we think is

14   futile in light of the fact that there will be a market

15   valuation, and that the market can better speak to what the

16   value is rather than some expert trying to get into the

17   head of a developer to see what -- to determine what the

18   developer would pay.  We have developers that are going to

19   be coming forward and expressing what they would actually

20   pay.

21               But, be that as it may, there's no prejudice to

22   the debtor, at a minimum, deferring this until March 5th

23   because there is plenty of time from that point to

24   confirmation for them to go on a parallel track.  We're

25   going to embark on our sale procedure and our sale process.

1           If the Court determines their plan is viable and

2    if they get through the threshold issue on the motion to

3    dismiss and the non-disclosure of the success fee, there

4    will be sufficient time for the debtor -- they will not be

5    prejudiced, we're not seeking that -- for them to ask the

6    Court to reconsider or conduct a new valuation hearing with

7    or without ---

8           THE COURT:  But they can't go out for vote until

9    there's a valuation, so it wouldn't exactly be parallel,

10   unless we deferred approval of your side's disclosure

11   statement.

12          MR. HUTTON:  We think it can be -- the last

13   time -- Your Honor, as a frame of reference, their

14   valuation motion was filed, I think, on December 13th.  We

15   had the valuation hearing on January 18th.  So it was about

16   a month.  And the parties had already gone through this

17   exercise before, so it could possibly be even more

18   streamlined this time around.

19          We don't think that they would be prejudiced by

20   deferring this issue to March 5th.  We just don't want to

21   spend all the time and money that it would take to go

22   through this process without having first addressed what we

23   view as the threshold issues of whether their plan is even

24   viable, an issue the Court will consider on March 5th, and

25   the impact of the non-disclosure of the Kodsi fee.

1          I think it goes even beyond potentially what has

2     been brought out so far because, in addition to the success

3     fee, we now know from looking at the term sheet that it was

4     also contemplated that Kodsi would get 25 percent of the

5     residential closings -- he's a real estate attorney -- he

6     would get 25 percent of the residential closings from the

7     development, and that's a value that's, we believe, north

8     of the ---

9          THE COURT:  Well, that was in the letter of

10    intent, right, not ---

11         MR. HUTTON:  It was in the letter of intent.

12         THE COURT:  There was a separate kicker in the

13    independent contractor agreement, too?

14         MS. MORA:  No, Judge, there wasn't.

15         THE COURT:  No?

16         MR. HUTTON:  I don't recall that being addressed

17    in the independent contractor agreement, Your Honor, but I

18    think it does evidence the intent, with Kodsi being a real

19    estate attorney and having facilitated this process for

20    Terra, that it was contemplated that he would get

21    25 percent of the residential closings, which typically

22    includes title work, that's a valuable consideration that's

23    far north of what the success fee that we believe -- and

24    probably it's worth somewhere in the neighborhood of

25    500,000 to $1 million to Mr. Kodsi.  So that's even more

Page 38

1    troubling.

2           To us, the motion to dismiss response raises more

3    questions and more concerns than it addresses, and we think

4    that's a serious threshold issue the Court can and should

5    consider on March 5th before we embark on this expensive

6    and time-consuming process of doing another valuation

7    hearing, especially in light of the fact that there's going

8    to be a market test that's going to establish value here.

9           THE COURT:  How burdensome would it be to get the

10    process rolling and at least submit names before the

11    March 5th hearing?

12           MR. HUTTON:  Your Honor, we've thought about

13    that, and if the Court wanted to take that initial step of

14    having the parties submit names, I don't think we'd be

15    adverse to that, without prejudice to our issue that, you

16    know, we don't think there should be a process.  But if the

17    Court wanted to have the parties submit names in advance of

18    the March 5th hearing -- so if the Court decided at another

19    point that it was appropriate to schedule another valuation

20    hearing and have an independent expert, that you would have

21    the names in front of you and be able to make a selection,

22    I don't think we would be adverse to that, but we don't

23    think it should go the next step until the Court addresses

24    these threshold issues.

25           THE COURT:  All right.  Does anybody else want to

Page 39

1    be heard on the valuation motion?  Okay.

2        MR. HUTTON:  Your Honor, I would also -- if the

3    Court does decide to go in that direction, we would point

4    out in Paragraph 18 of our response we laid out what our

5    ask would be -- or what our request would be consistent

6    with Rule 706 in terms of -- of the process.

7        But, again, we think that's -- those are details

8    and a process that could be worked out on March 5th if the

9    Court decides that their plan is viable and that an

10   independent valuation, aside from the market test, is

11   necessary, and that the case is not dismissed or converted

12   as a result of the non-disclosure of the Kodsi fees.

13       THE COURT:  Nothing in your request in

14   Paragraph 18 seemed inconsistent with my concept of an

15   independent expert being appointed other than Paragraph 6,

16   preparing and presenting your own experts.  But I

17   understand your legal argument there, and I'll have to go

18   back.  I think 706(e) is a fairly new addition, right, to

19   the Federal Rules of Evidence?  I'm not sure there's

20   much ---

21       MR. HUTTON:  I'm not sure.  I don't know,

22   Your Honor.

23       THE COURT:  Maybe it just was -- maybe it was

24   just relettered.  I guess I'm looking at an old version.

25   It's now 706(e)?  It's 706(d), I guess, which may be the

1    same text.  In the old version it said, nothing in this

2    rule limits the parties in calling expert witnesses of

3    their own selection.

4         MR. HUTTON:  It was only a restyling I'm told,

5    Your Honor.

6         THE COURT:  Right.  And I guess my question is

7    whether that rule requires the Court to allow independent

8    experts if we've already tried that, but we'll look at

9    that.

10         Okay.  So, Ms. Mora, I think where I'm going with

11    this is to get the process rolling, and if at the March 5th

12    hearing your plan can otherwise go forward -- may not mean

13    a definitive ruling on confirmability, but at least that --

14    if I've addressed the issues and don't find any fatal

15    defect, either bad -- lack of good faith based on the Kodsi

16    success fee issue or a definitive ruling on the stripdown,

17    then I guess I would contemplate they would be in a

18    position to get a valuation.

19         Because you need the valuation, as I suggested a

20    few minutes ago, to go out on disclosure; right?

21         MS. MORA:  Judge, that's correct.  The way that

22    the value works is either the value of the property will be

23    a cap on the amounts of the secured claim, and then the

24    district would have a deficiency claim that would go into

25    the unsecured class, or, alternatively, if the district

1   makes the 1111(b) election, then the projections that the

2   debtor provides has to show interest being paid on the

3   secured amount of the debt during the life of the plan.

4            So interest has to be paid on the secured amount

5   of the claim, and for those two reasons we do need a

6   valuation to show what the property is worth.

7            Judge, I'd also like to just comment on one of

8   the noted procedures in Paragraph 18 of the triumvirate's

9   response, and that deals with this concept of eliminating

10  ex parte communications between the appointed expert and

11  the parties.

12           I just thought that experts were allowed, as long

13  as they disclose the source of whatever information they

14  obtain, to go out and conduct their own research, and to

15  the extent that the expert wants to interview the District,

16  wants to interview the debtors, wants to speak with Terra,

17  I don't see why the experts should be precluded from

18  engaging in that type of research as long as the expert

19  fully recounts the source of all the information that the

20  experts gathered in conducting his analysis.

21           THE COURT:  Okay.  Mr. Hutton, let's talk about

22  that at least for a minute because I hadn't focused on

23  that, but is this procedure you're suggesting then limiting

24  what the -- this independent expert could do compared to a

25  retained expert?

Page 42

1          MR. HUTTON:  No, it doesn't limit, Your Honor.

2     If he deems it appropriate to -- he or she deems it

3     appropriate to speak to the District, he may.  If he or she

4     deems it appropriate to speak to any of the -- you know,

5     any of the other parties in the case, they may.

6          THE COURT:  Or Charlie or Manny from Lennar,

7     whoever your expert relied on.

8          MR. HUTTON:  The point is that -- and Lennar is

9     not a party here.

10          THE COURT:  Right.

11          MR. HUTTON:  It's an independent developer.

12          But if they're to speak to a party, you know, to

13     truly maintain the independence of the expert -- they're

14     all supposed to be independent, but to truly make sure

15     they're not being steered or coached in any way, the

16     thought was to -- not to prohibit communication, but to

17     have it be communication which both sides are present or

18     privy to the conversation.  So it doesn't ---

19          THE COURT:  Eliminate doesn't mean prohibit?

20          MR. HUTTON:  It says eliminate ex parte

21     communication, meaning communication only with, for

22     example, Terra, where there's not a representative from our

23     side that's part of the communication.  And, likewise, if

24     he wanted to talk to the District, someone on the debtor's

25     side would be privy to that communication as well.  That

1    was the thought.

2         THE COURT:  All right.  Well, maybe it's just a

3    clarified disclosure obligation of what the expert learns

4    from various sources.

5         Okay.  So I'm going to do an -- enter an order

6    that addresses the renewed motion to value collateral and

7    for court-appointed valuation expert, that's

8    Docket Entry 185 which was on for hearing today, which

9    incorporates my comments at the beginning of the hearing

10   and denies the motion to the extent it contains, in effect,

11   a request for reconsideration of the Court's order

12   rejecting the prior expert testimony.

13        Reserve ruling and set a further hearing for

14   March 5th on the request to appoint an independent expert

15   and for the procedures that will be adopted if an

16   independent expert is appointed under Rule 706, and set a

17   deadline for the parties to present names as requested in

18   the procedure set out in the motion, and of course it would

19   be without prejudging whether the Court's going to grant or

20   deny the motion.

21        So how long would the parties need?  I guess

22   there's no magic -- how many days, but it would be nice

23   maybe ten days before, a week before.

24        MR. HUTTON:  That's fine, Your Honor.

25        MS. MORA:  Judge, whenever.

Page 44

1           THE COURT:  All right.

2           Okay.  All right.  So what day of the week is our

3  hearing?  That's a Monday.  All right.  So the 27th --

4  that's two weeks from today -- to submit the names.

5           So the contemplation is that if the debtor plan

6  survives the March 5th hearing on both disclosure

7  objections, which attack confirmability, and that's among

8  the main issues, certainly the stripdown, and survives the

9  motion to convert or dismiss, then the Court, in order to

10  keep this on parallel tracks, would probably defer

11  approval, if otherwise subject to approval of the

12  District's plan until we do a valuation, and then let

13  everything go out together.

14           The one thing we haven't talked about now that

15  we've got a bunch of issues is to what extent will the

16  hearing be evidentiary.  There's obviously evidentiary

17  issues we've touched on in the motion to convert.

18  Mr. Kodsi's going to testify.

19           Are the movants planning to call witnesses?  I'm

20  just trying to scope out this hearing a little bit.

21           MR. HUDSON:  We may, Judge, and that brings up

22  discovery issues.  Obviously, if we may want to take some

23  discovery between now and then as well, we'll keep it

24  abbreviated, but we'd like the chance to do that.

25           THE COURT:  Okay.  I mean, it seems to me it

1   would be -- Mr. Kodsi and Mr. Martin would be the people

2   that would logically testify to talk about their affidavits

3   and whatever their dealings were.

4           MR. HUDSON:  That's right, Judge.  We'd probably

5   like to have an opportunity to depose both of them.  We

6   don't know what's going to come out of that.  We formulated

7   already some internal issues we'd like to delve into, so we

8   also might do some document requests on an expedited basis.

9           THE COURT:  The prior order I did that set the

10  response deadline for the motion to value, did it set any

11  other procedures?  Do you remember?

12          MR. HUDSON:  I don't believe it did, Judge.

13          THE COURT:  Do you remember?

14          MS. MORA:  I don't think it did, Judge.

15          THE COURT:  Okay.

16          MR. HUDSON:  And just to clarify, the evidentiary

17  portion would be just on the motion to dismiss or convert

18  as opposed to the disclosure; correct?

19          THE COURT:  Right, yeah.

20          MR. HUDSON:  Right.

21          THE COURT:  I mean, it would go towards

22  perhaps ---

23          MR. HUDSON:  Good faith.

24          THE COURT:  -- an argument that the plan is

25  unconfirmable as being unable to demonstrate good faith, if

1   you think that's consistent with or a part of your motion.

2          MR. HUDSON:  Right.

3          THE COURT:  All right.  Ms. Mora, do you

4   contemplate any other witnesses that would be necessary or

5   appropriate on the success fee issue?

6          MS. MORA:  I don't at this time, Judge, but -- I

7   don't want to preclude the opportunity, but I don't think

8   so at this time.

9          THE COURT:  All right.  So I'll do a supplemental

10  scheduling order that will shorten time for discovery

11  and ---

12         MR. HUDSON:  Judge ---

13         MR. SCHNEIDERMAN:  Your Honor, I mean, I

14  disclosed earlier what our office is contemplating doing.

15  I would imagine that we would have that hearing at the same

16  time for the appointment of a trustee based on the

17  allegations.

18         And, as an alternative under 1104, rather than

19  conversion or dismissal, the Code provides that if the

20  Court determines it's the best interest to leave it in

21  Chapter 11, to appoint a trustee.  So I think that's an

22  alternative that's not included in Mr. Hudson's motion, but

23  is contemplated under Section 1104 with the additional

24  information that was contained in the affidavits that were

25  attached to the response.

1      We may file a motion to appoint a trustee.  Most

2  likely will, but even if we don't, Your Honor, that's still

3  a consideration under Section 1104 in lieu of conversion or

4  dismissal.

5      THE COURT:  That leads me to a question I meant

6  to ask earlier.  Mr. Hudson, or, Mr. Hutton, or,

7  Ms. Redmond, if the Court concludes that the debtor's plan

8  is not confirmable, for whatever reasons -- the two big

9  ones are the ones that have been highlighted, but they may

10  not be the only legal objection -- but that dismissal or

11  conversion is not appropriate, then I assume your plan goes

12  forward.

13      MR. HUDSON:  Yes, sir.  Judge, back to the ---

14      THE COURT:  And your plan as presented, does that

15  have contingencies?  That is, can you -- to be blunt, can

16  you just withdraw it if the debtor's plan is deemed

17  unconfirmable and then push for stay relief?

18      MR. HUDSON:  No, Judge.  Absent ---

19      THE COURT:  You're in.

20      MR. HUDSON:  We're in.  Absent you converting it

21  or dismissing it, and that's your decision, not ours, we're

22  in.  That's our representation, it has been, and it

23  continues to be.

24      THE COURT:  Okay.

25      MR. HUDSON:  One final -- on the discovery,

1   Judge, we may -- we reserve the right to call some experts

2   as well to the extent we think they're applicable for the

3   March 5th hearing.  I know we don't want to make it long,

4   drawn out, but we think there may be an expert or two that

5   may help you make your decision on a couple of issues.

6           THE COURT:  You mean, like Tony Alfieri or

7   somebody like that on ethics, or what?  What -- an expert

8   on what?

9           MR. HUDSON:  That could be one of them, Judge,

10  that type of person.

11          THE COURT:  Okay.  I think we're done then.  I

12  will do both the scheduling order on the motion to value

13  setting out the deadline to submit names, reserving ruling,

14  and a further scheduling order on the motion to convert

15  which will shorten time for discovery and provide a

16  deadline a few days before the hearing to disclose

17  witnesses and exchange exhibits.

18          And then, I guess, we'll go forward with the

19  evidentiary hearing in the morning and disclosure in the

20  afternoon.  I guess that would be the tentative thing.

21  I've got a full day on the 6th, so I guess eat a good

22  breakfast, bring PowerBars or whatever you may need for the

23  late afternoon.  We'll go from there.

24          Okay.  Thank you.

25          MS. MORA:  Thank you, Judge.

1          MS. MARK:  Thank you, Judge.

2          MR. HUTTON:  Thank you.

3          (Thereupon, the hearing was concluded.)

4                        — — —

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 50

1                              CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY  OF  DADE:

5

6                    I, Amy L. Moorefield, Shorthand Reporter

7    and Notary Public in and for the State of Florida at Large,

8    do hereby certify that the foregoing proceedings were taken

9    before me at the date and place as stated in the caption

10   hereto on Page 1;  that the foregoing computer-aided

11   transcription is a true record of the excerpt of my

12   stenographic notes taken at said proceedings.

13                    WITNESS my hand this 14th day of February,

14   2012.

15

16

17          _____
                 Amy L. Moorefield, RPR
18             Court Reporter and Notary Public
             in and for the State of Florida at Large
19           My Commission Expires:  August 30, 2014

20

21

22

23

24

25